James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: decklund@carellabyrne.com

Robert V. Prongay
Kara M. Wolke
Leanne H. Solish
Raymond D. Sulentic
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Liaison Counsel for Plaintiffs*

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EROS INTERNATIONAL PLC SECURITIES LITIGATION | Civil Action No. 19-cv-14125 (JMV)(JAD) <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION AND OVERVIEW ...........................................1

II.    JURISDICTION AND VENUE .................................................................7

III.   PARTIES ............................................................................................7

IV.    SUBSTANTIVE ALLEGATIONS .............................................................10

       A.    Background Of The Company And Its Business ...............................10

       B.    Defendant Lulla And His Family Retain Tight Control Over Eros's
             Operations .......................................................................................11

       C.    Eros's Significant Content Expenditures Accounted For A Majority of
             Its Assets Balances .........................................................................13

       D.    Eros Now's Growth And Continued Content Acquisition Left Eros
             With A Strained Liquidity Profile ......................................................15

       E.    The Truth Begins to Emerge ............................................................18

             1.    EIML Misses Two Debt Payments, Triggering Credit
                   Downgrades And Withdrawals; Further Reports Substantiate
                   Eros's Troubled Liquidity ..........................................................18

             2.    Eros Announces A Massive Impairment To Its Intangible
                   Content Assets ..........................................................................22

             3.    Eros Turns To Toxic Financing To Source Its Cash Needs .....25

       F.    Multiple Witnesses Confirm That Eros Was Frequently Late In
             Paying Its Obligations, That The Individual Defendants Held Tight
             Control Over The Group, And That Eros Was Not Working With
             CARE To Ensure Its Rating Was Revised Upwards ..........................26

1.    Former Employees Recount Delayed Salaries And That The Individual Defendants, And Particularly Defendant Lulla, Were The Group's Decision Makers ..................................................26

2.    Other Confidential Witnesses Confirm That EIML Was Frequently Late In Paying Its Loan Obligations, Eros Was Not Cooperating With CARE To Reverse Its Credit Downgrade, And Defendant Lulla Had Tight Control Over The Group ......27

V.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........................29

A.    Defendants' False And Misleading Statements And Omissions Relating To Eros's Fourth Quarter And Fiscal Year 2017 Financial Results ............................................................................29

B.    Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter 2018 Financial Results ...................34

C.    Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter 2018 Financial Results...............35

D.    Defendants' False And Misleading Statements And Omissions Relating To Eros's Announcement Of Its 2017 Convertible Bond Offering ..........................................................................................36

E.    Defendants' False And Misleading Statements And Omissions During The January 2018 Citi Global TMT West Conference .......................37

F.    Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter 2018 Financial Results..................38

G.    Defendants' False And Misleading Statements And Omissions In The Supporting Materials For The Deutsche Bank 2018 Media, Telecom & Business Services Conference ........................................................39

H.    Defendants' False And Misleading Statements And Omissions In And Relating To Eros's Fourth Quarter And Fiscal Year 2018 Financial Results ............................................................................................40

I.      Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter of 2019 Financial Results ...............41

J.      Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter of 2019 Financial Results .........43

K.      Defendants' False And Misleading Statements And Omissions During The January 2019 Citi Global TMT West Conference ......................44

L.      Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter of 2019 Financial Results .............45

M.      Defendants' False And Misleading Statements And Omissions During Spring 2019 Conferences .......................................................46

N.      Defendants' False And Misleading Statements And Omissions Concerning Its Credit Rating Downgrades And Moody's Withdrawal Of Coverage .......................................................................47

O.      Defendants' False And Misleading Statements And Omissions In And Relating To Eros's Fourth Quarter And Fiscal Year 2019 Financial Results .......................................................................50

VI.    LOSS CAUSATION .................................................................51

VII.   ADDITIONAL SCIENTER ALLEGATIONS .............................55

VIII.  CORPORATE SCIENTER ALLEGATIONS .............................55

IX.    CLASS ACTION ALLEGATIONS............................................56

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)..................................................57

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE........................................60

XII.   CLAIMS FOR RELIEF............................................................60

XIII.  PRAYER FOR RELIEF ...........................................................65

iv

XIV.  JURY TRIAL DEMANDED...............................................................................65

iv

Lead Plaintiffs Opus Chartered Issuances, S.A., Compartment 127 and AI Undertaking IV ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Consolidated Class Action Complaint ("Complaint") against Eros International PLC ("Eros" or the "Company"), Kishore Lulla ("Lulla"), Prem Parameswaran ("Parameswaran"), and Jyoti Deshpande ("Deshpande") (together, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Eros; securities analysts' reports and advisories about the Company; press releases and other public statements issued by and disseminated by the Company; media reports about the Company; and interviews of former employees of Eros and other persons with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Eros securities between July 28, 2017 and September 25, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Eros is a global company in the Indian film entertainment industry that co-produces, acquires, and distributes Indian language films in multiple

formats worldwide. Eros was formed in 2006 to serve as the ultimate parent corporation for an international group of related companies in the Indian film and entertainment businesses (thus, Eros frequently refers to itself at the "Group"). Eros's largest and majority owned subsidiary, Eros International Media Limited ("EIML"), is Eros's core "Bollywood" film production and distribution business. EIML is Eros's most important operating subsidiary, and the content it acquires and co-develops is then distributed through the rest of the Group entities.

3. Since its founding in 1977, Eros has been run and controlled by the Lulla family, with Defendant Lulla currently serving at the helm as Group Chairman and CEO. The Lulla family retains a voting majority, and numerous members of the family serve as executives and employees within the Group of entities.

4. Under the Lulla family's tight control, Eros has engaged in numerous related party transactions with other related entities run by members of the family. These transactions smack of self-dealing and conflict of interest, as they do not appear to have been made at market rates. For example, Defendant Lulla's brother-in-law runs NextGen Films Private Limited ("NextGen"). Since Eros's initial public offering ("IPO"), NextGen has sold film rights to and received net content advances from Eros for a total of almost $95 million. Yet, according to NextGen's own website, it has only produced five films since that time, frequently with Eros, and the total budget for these films amounted to just $19.3 million.

5. Apart from Eros's questionable related party dealings, Eros's business requires significant, upfront, capital spending. In the last six years Eros has spent over $1 billion on content. These expenditures were capitalized on Eros's balance sheet as intangible content assets and constituted a majority of Eros's reported assets. During this same time, Eros was greatly expanding its digital streaming platform, Eros Now, which also necessitated significant capital. In addition, Eros

2

experienced significant delays in collecting its earned revenue due to the payment schedules in the industry.  As a result, Eros was frequently crunched for cash, and investors and analysts alike were consistently concerned by Eros's strained liquidity profile.

6.     During the Class Period, Eros continually reassured investors and analysts that the Company was succeeding in improving both its cash flows, and that Eros remained well capitalized and had a strong balance sheet.

7.     However, on June 5, 2019, EIML's credit rating was downgraded to "default" by one of India's largest credit ratings agencies, CARE Ratings.  In bringing down EIML's credit rating by 10 notches to D, CARE's lowest available rating, CARE cited concerns of "ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the company." CARE reported that:

> As a part of CARE's due diligence process, CARE had interacted with EIML's bankers and had also obtained 'Default if any' statements from the company which mentioned delays/default in debt servicing (both principal and interest) on the terms loans availed by the company, as also delays of more than 30 days in servicing interest on cash credit and packing credit, and a delay of more than 30 days in payment of bills. As per the management, the delays/ default in debt servicing is on account of slowdown in collection from debtors leading to cash flow issues in the company.

8.     In response to the dramatic, 10-notch CARE downgrade, on June 6, 2019, at approximately 9:21 a.m. ET, the Company issued a blatantly false statement claiming that "Eros International PLC and all of its subsidiaries have met and continue to meet all debt service commitments.  The Company retains the full faith and confidence of our lenders."

9.     Then, later that same day, at approximately 3:08 p.m. ET, Eros issued a "clarifying" statement admitting that, in fact, "EIML was late on two loan

interest payments for April and May 2019.  These interest payments total less than $2 million and are currently in process of remittance."

10.    On this news, the Company's share price fell $3.59 per share, nearly 50%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume.

11.    According to numerous witnesses, including former employees, and a June 10, 2019 article from Reuters, Eros's missed payments were not just a clerical error or a one-time event.  In fact, the Company was frequently late in paying its obligations, including required debt payments and payroll.

12.    The very next day, on June 7, 2019, S&P Global Ratings withdrew its credit rating on Eros for its failure to issue proposed senior unsecured notes to refinance its existing debt facilities.

13.    Also on June 7, 2019, Hindenburg Research published a report (the "Hindenburg Report") that, in commenting on EIML's CARE credit downgrade, concluded that "a liquidity event seemed to border on the inevitable."  Within its report, Hindenburg Research highlighted a number of related party entities they believe contributed to Eros's current situation, including Eros's payments to NextGen content advances and sale of film rights.  The Hindenburg Report laid out that, from the time of Eros's IPO in 2013, Eros's payments to NextGen were vastly larger than the total budget for the five films NextGen produced since that time, including the films co-produced with Eros.

14.    In response to the June 7, 2019 news, the Company's share price fell $0.41 per share, or 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume.

15.    A few days later, on June 11, 2019, Moody's downgraded Eros to B2 from B1, and lowered its outlook to negative from stable.  Moody's stated that the ratings downgrade reflected Eros's "strained liquidity profile, which led to delays

4

in servicing the bank loans of its Indian subsidiary," EIML, and that the missed payments evidenced Eros's "poor financial management and controls across the group; factors which are inconsistent with a B1 rating." Moody's further explained that Eros's operating subsidiaries "continue to face challenges and delays in recovering their receivables balances, which according to the company has further strained its liquidity profile[,]" and that Eros's high working capital needs means its liquidity is reliant on the refinancing of $72 million in short-term facilities.

16.    On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on unusually heavy trading volume.

17.    Then, on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros "for its own business reasons."

18.    On this news, Eros's share price fell $0.49 per share, or 22.5%, to close at $1.69 per share on June 26, 2019, on unusually heavy trading volume, and continued to fall the following day by another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.

19.    On July 15, 2019, Eros announced its earnings results for its fiscal year ended March 31, 2019.  Within those results, Eros reported a $423.3 million impairment loss, of which $405.5 million was allocated to its balances for intangible content assets.  Eros explained that the impairment resulted from the Company's analysis that their collective film content library carrying amount exceeded its recoverable amount.  Later that same day, during an earnings call, Defendant Parameswaran further explained that the impairment analysis was triggered by the Company's significant market value decline.

20.    The $405.5 million in intangible content asset impairment losses was further allocated between a $366.7 million impairment loss for film and content rights and a $38.8 million impairment loss to content advances.  The $38.8 million in content advance losses closely approximates the $36.9 million Eros paid to

NextGen in the latest three fiscal years leading up to the impairment.

21.    Finally, on September 26, 2019, before the market opened, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principle amount of senior convertible notes due 2020. Eros said it planned to use the net proceeds of $25 million for general corporate purposes.

22.    On this news, the Company's share price fell $0.85, nearly 30%, to close at $1.99 on September 26, 2019, on extremely heavy trading volume.

23.    As detailed in a Seeking Alpha analysis of this September 2109 convertible note transaction, the offering surprised investors, was regarded as a toxic, and provided further evidence of Eros's liquidity issues.

24.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that the Company's internal controls and procedures and compliance policies were inadequate; (5) that, as a result, Eros turned to toxic financing; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

25.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Accordingly,

Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.   JURISDICTION AND VENUE

26.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

29.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

30.   Plaintiff Opus Chartered Issuances, S.A., Compartment 127, as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 8-4), purchased Eros securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

31.   Plaintiff AI Undertaking IV, as set forth in the certification previously

filed with the Court, incorporated by reference herein (Dkt. No. 8-4), purchased Eros securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

32.     Defendant Eros International PLC ("Eros" or the "Company") is incorporated under the laws of Isle of Man, United Kingdom with its principal executive offices located at 550 County Avenue, Secaucus, New Jersey 07094. Eros's shares trades on the New York Stock Exchange ("NYSE") under the symbol "EROS."

33.     Defendant Kishore Lulla ("Lulla") has served as the Company's Group Chief Executive Officer ("CEO") and Managing Director of the Company since April 1, 2018.  During all relevant times, Lulla has served as a director and Chairman of the Board of Directors of Eros.  Lulla has also served as Executive Director of EIML since 2009.  Lulla has worked at Eros since the age of 16, expanding Eros's presence in the international markets and spearheading the Company's growth.  Lulla has over 30 years in the film and media entertainment industry.

34.     Throughout the Class Period, Lulla spoke to investors and analysts on conference calls.  Lulla possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Lulla signed and certified the accuracy Eros's yearly report on SEC Form 20-F for the fiscal year ended March 31, 2019 and certified the accuracy of Eros's yearly report on SEC Form 20-F for the year ended March 31, 2018.

35.     Defendant Prem Parameswaran ("Parameswaran") has served as Eros's Group Chief Financial Officer ("CFO") of the Company and President for North America since May 28, 2015, and has served as a director of the Company since December 20, 2018.  Before joining Eros, Parameswaran had over 23 years

8

of investment banking experience, having worked at Goldman Sachs, Deutsche Bank, and most recently, as Global Head of Media and Telecommunications Investment Banking at Jefferies LLC.

36.    Throughout the Class Period, Parameswaran spoke to investors and analysts on conference calls.  Parameswaran possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Parameswaran signed and certified the accuracy of Eros's yearly reports on SEC Form 20-F for the fiscal years ended March 31, 2018 and March 31, 2019, certified the accuracy of Eros's yearly report on SEC Form 20-F for the year ended March 31, 2017, and signed Eros's quarterly report on SEC Form 6-K for the quarterly periods ended June 30, 2017 through December 31, 2018.

37.    Defendant Jyoti Deshpande ("Deshpande") served as Group CEO and Managing Director of the Company from June 22, 2012 to April 1, 2018. Deshpande has over 25 years of experience in media and entertainment, and has been part of Eros's leadership team since 2001.  In April 2018, Deshpande joined Reliance Industries to head the Media and Entertainment business as President of the Chairman's Office, while continuing to serve on the Board of Directors of Eros through June 2019.

38.    Throughout the Class Period, Deshpande spoke to investors and analysts on conference calls.  Deshpande possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Deshpande signed and certified the accuracy of Eros's yearly report on SEC Form 20-F for the fiscal year ended March 31, 2017, and signed Eros's quarterly report on SEC Form 6-K for the quarterly period ended June 30, 2017.

39.    Defendants Lulla, Parameswaran, and Deshpande (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the

9

SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background Of The Company And Its Business

40.   Eros is a global company in the Indian film entertainment industry that co-produces, acquires, and distributes Indian language films in multiple formats worldwide, and operates the purportedly largest Indian-content digital streaming service, Eros Now. Eros was formed in 2006 to serve as the ultimate parent corporation for an international group of related companies in the Indian film and entertainment businesses (the "Group").

41.   Eros originated with what is now Eros's largest subsidiary, Eros International Media Ltd. ("EIML"), an Indian corporation founded in 1977 by Defendant Lulla's father, Arjan Lulla.[1]   Eros began as a distributor of films throughout India, and claims to be one of the oldest companies in the Indian film industry to focus on the international market for "Bollywood" entertainment.

---

[1] EIML is publicly traded on the Bombay Stock Exchange ("BSE") Limited and the National Stock Exchange ("NSE") in India, but remains majority-owned by Eros.

42.   Since its founding, Eros has diversified its operations and expanded its business lines.  Today, Eros operates several different operating segments, including distribution of theatrical film, television syndication, and the Company's digital streaming business, Eros Now.

43.   EIML still operates as Eros's core Bollywood film production and distribution business, and is the key operating subsidiary which acquires and co-produces content that the Group then distributes internationally.  For example, two of Eros's international business operating subsidiaries buy EIML's intellectual property rights and distribute them internationally, with Indian distribution of those rights retained by EIML.  Thus, EIML is one of the key cash generating subsidiaries within the Group.

44.   Eros has aggregated multi-format rights to over 3,000 films in its library, including both recent and classic titles spanning genres, budgets, and languages.  Eros Now has digital rights to over 12,000 films, through Eros's internal library and through third-party aggregated content.

45.   Since its November 2013 U.S. IPO, a significant part of Eros's business has been focused on developing and expanding the content and users of Eros Now.  This is reflected in Eros's revenues for its most recent fiscal results: for the year ended March 31, 2019, Eros reported that 25.7% of its revenue came from theatrical distribution, 28.7% from television syndication, and 45.6% from Eros Now and other ancillary businesses.  Before Eros Now was developed in 2012, the Company primarily made money through its other two operating segments.

**B.   Defendant Lulla And His Family Retain Tight Control Over Eros's Operations**

46.   Since its founding in 1977, EIML and the Eros Group of businesses has been tightly run and controlled by Arjan Lulla, and later by Defendant Lulla after Arjan Lulla transferred control to him in 2006.

11

47.     Eros admits that the Founder's Group,[2] which includes Defendant Lulla, has a substantial interest in and has the "ability to exercise a controlling influence over our business" through the voting rights afforded by the Founder's Group's ownership of 100% of Eros's class B shares.  Eros's dual class structure affords "B" shares ten votes per share, compared to one vote per share afforded to class "A" shares, which are owned by the investing public.  This gives the Lulla family control of 65% of the voting rights in the Company.

48.     Furthermore, other members of the Lulla family run Eros and its subsidiaries.  For example, Defendant Lulla's brother, Sunil Lulla, has been an executive director of Eros since 2006, and is the Executive Vice Chairman and Managing Director of EIML, being appointed in 2009.  Defendant Lulla's daughter, Rishika Lulla Singh, also serves as an executive director of Eros, and served as the CEO of Eros Digital, which includes Eros Now, until recently, when she was appointed Chairman of Eros Digital.  Defendant Lulla's cousin, Surender Sadhwani, has been Eros's President of Middle East operations since 2006, and another of Defendant Lulla's cousins, Vijay Ahuja, served as Eros's director and Vice Chairman until December 20, 2018.  And Defendant Lulla's wife, another daughter, a son-in-law, and a sister-in-law are all employees of Eros or one of its subsidiaries.

49.     In a detailed report on June 14, 2019, Moody's noted high governance and "key person" risks due to the Lulla family's control.  Moody's further explained that the family remains involved in the day to day operations of Eros, and the family's "long-standing relationships with talent, production houses and cinema operators are critical to the success of the company and its strategy."

---

[2] The "Founders Group" refers to Beech Investments Limited and Kishore Lulla. Beech Investments Limited is owned by discretionary trusts that include Defendant Lulla as a potential beneficiary.

Moody's further noted that the Lulla family has no significant business interests outside of Eros, "which further supports their vested interest in [Eros's] performance."

50.     Defendant Parameswaran highlighted Defendant Lulla's control and involvement in the Company during a June 4, 2019 Credit Suisse conference:

> And then obviously, Kishore Lulla, the CEO, he owns the majority of our company, he's the Founder.  And again, when I say he's the Founder, in India you have [individuals] who own like different industries. His company, this Eros International is his bread-and-butter. He doesn't have an oil company. He doesn't have a textile company. He has only Eros. And so I think, we're proud to say that we're very focused on it.

51.     Defendant Lulla himself has displayed his tight control and management over the Group through press interviews and during earnings calls. For example, Lulla discussed the CARE credit downgrade and assured investors that the missed payments had been rectified in interviews with numerous media outlets, including The Economic Times, Bloomberg Quint, CNBC TV 18, and Reuters.

**C.     Eros's Significant Content Expenditures Accounted For A Majority of Its Assets Balances**

52.     As a Bollywood entertainment company, Eros spent significant capital on its content.  For example, in fiscal years 2017, 2018, and 2019, Eros spent $173.5 million, $186.8 million, and $107.7 million, respectively on content.  And, for the three years preceding the Class Period, Eros spent over $650 million on content.

53.     These content expenditures greatly increased Eros's intangible content asset on its balance sheet.  The "intangible assets – content" line item is comprised of film and content rights, content advances, and film productions.  Together,

13

Eros's intangible content assets constitute a majority of the Company's total assets, as reflected in the following chart:

| Fiscal Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Intangible Assets – Content (in thousands) | $719,214 | $795,139 | $904,628 | $998,543 | $706,572 |
| Total Assets (in thousands) | $1,149,533 | $1,247,878 | $1,343,365 | $1,410,319 | $1,088,902 |
| % | 62.6% | 63.7% | 67.3% | 70.8% | 64.9% |

54.    Over the years, Eros has been accused of funneling funds to/from other Lulla family members through related party transactions for considerable sums of money at non-market rates. Not only did Eros's overpayments to related parties compound the Company's issues with achieving positive cash flow (*see* Sec. IV.D, *infra*), it also inflated Eros's balances for its intangible content assets.

55.    Two examples of Eros's dealings with Lulla family members involved Eros's repeated engagement in transactions involving the purchase and sale of film rights and advancements for film co-production with two of Defendant Lulla's brothers-in-law, through their businesses, NextGen Films Private Limited ("NextGen") and Everest Entertainment LLP ("Everest").

56.    During the Class Period, Eros reported purchases of $9.485 million in film rights during the 2017-2019 fiscal years and also that Eros advanced $36.909 million (net of refunds) to NextGen for film co-production during this same time. Eros likewise reported purchasing $1.426 million in film rights from Everest during the 2017-2019 fiscal years. And since the IPO, Eros has reported that it has purchased almost $58 million in film rights from NextGen and $1.85 million from Everest. Thus, since Eros's IPO, the $96.7 million paid to NextGen and Everest were capitalized by Eros and included in its intangible content assets balance.

14

57.     As the Hindenburg Report details, NextGen has reportedly released just five films since Eros's IPO—for a combined budget of $19.3 million. NextGen does not make its catalog of film rights publicly available on its website—but Eros's $36.9 million in Class Period content advances to NextGen is *almost double* the entire reported budget for NextGen's films since the IPO— without including the fact that these films were largely co-produced by Eros. These facts suggest, at minimum, that Eros's reported content balances for NextGen films were highly bloated.

**D.     Eros Now's Growth And Continued Content Acquisition Left Eros With A Strained Liquidity Profile**

58.     Eros had large capital expenditures for the production, acquisition and distribution of content, which required significant upfront cash investments. That cash need, combined with Eros's focus on expanding Eros Now, meant that Eros's business continually needed lots of capital.  In addition, due to the significant time delays in collecting Eros's earned revenues, Eros's liquidity was consistently strained, and as a result caused the Company to experience negative free cash flows in recent years.

59.     To ease that liquidity strain, Eros has frequently tapped the capital markets for hundreds of millions of dollars through numerous transactions since its IPO.  Despite numerous cash infusions through equity and bond offerings, Eros also greatly relied on other forms of debt.  As of March 31, 2017, Eros had $271.5 million of borrowings outstanding, more than half of which was repayable within a year.

60.     At the beginning of the Class Period, Eros was focused on repaying its outstanding balances under its revolving credit facility and returning the Company to a positive cash flow position.  For example, in its July 28, 2017 press release announcing financial results for the fourth quarter and fiscal year 2017, ended

15

March 31, 2017, Eros highlighted that it had "[r]educed its Revolving Credit Facility from $123 million to $85 million in fiscal 2017 and since then have set aside approximately $40 million to pay it down further and bring it to around $45 million." Defendant Deshpande commented that:

> [I]t reflects our financial strength and stability where in without raising any significant external debt or equity, we not only paid down the RCF significantly but also funded our ongoing future slate as well as Eros Now catalogue purchases and originals and still have around $115 million of cash balance after all that. Over $200 million is already invested in the ongoing slate. While we are in advanced stages of negotiations for a debt refinancing deal as well as expect to file a shelf for a potential capital raise soon after this earnings, even if any of these are delayed we are already well capitalized and have enough cash to continue to grow the business in the short to medium turn.

Defendant Parameswaran confirmed that Eros had further reduced its net debt by $40 million post balance sheet filing, and further stated that "We continue to pursue refinancing and capital market transaction and are confident we will go back to being free cash flow positive in fiscal 2018[.]" On an earnings call later that day, Defendant Parameswaran explained that the additional $40 million in cash was raised by selling 11% of its stake in EIML. He assured the market that Eros "remains well-capitalized and able to invest in future growth."

61.    Eros's liquidity and negative free cash flows was also a key concern for investors and analysts. For example, Wells Fargo noted Eros's "limited liquidity" in an August 7, 2017 report. Maybank Kim Eng listed free cash flow as a "key financial metric," noting that it remained a challenge due to Eros's high capital expenditures. And analysts from Jeffries noted in a July 28, 2017 report that one of the key takeaways for Eros was lingering questions regarding its liquidity.

62.    As the Class Period continued, Defendants continued to reassure

16

investors and analysts that Eros was making strides with its balance sheet and cash flows, and that the Company was well capitalized. For example, on Eros's February 21, 2018 earnings call, Defendant Parameswaran assured investors and analysts that Eros "remain[ed] focused on improving our working capital position[.]"

63. Eros's assurances were backed up by two infusions of cash through direct offerings with individual institutional investors. First, on December 4, 2017, Eros announced that it had entered into definitive agreements with an institutional investor in connection with a registered direct offering of $122.5 million aggregate principal amount of senior convertible notes due 2020 and warrants to purchase 2,000,000 of the Company's A ordinary shares, for proceeds of $100 million. Eros further announced that it would use the net proceeds of this offering to repay amounts outstanding under its revolving credit facility and for general corporate purposes. Investors and analysts generally saw this equity-linked financing as positive news.

64. Second, on February 20, 2018, Eros announced that: (i) Reliance Industries Limited[3] would be acquiring a 5% stake in Eros at $15 per share; (ii) that Reliance and EIML would enter into a partnership to jointly produce and acquire content in India, with both companies equally investing up to $150 million; and (iii) that Defendant Deshpande would leave Eros to become the head of Media and Entertainment at Reliance. On August 6, 2018, Eros announced that the sale of the 5% stake to Reliance had been completed for a cash consideration of $46.6 million. Analysts noted that Reliance's investment provided a vote of confidence in the Company, and that this equity infusion along with the $100 million equity-

---

[3] Reliance is an Indian multinational conglomerate, is a Fortune 500 company, and is the largest private sector corporation in India.

17

linked financing would help improve Eros's cash flow and balance sheet.

65.     When Eros did not return to a positive free cash flow by its 2018 fiscal year, Defendants continued to regularly reassure investors and analysts that this was a high priority for the Company.  For instance, Defendant Parameswaran stated in multiple earnings calls throughout Eros's 2019 fiscal year that "[w]e remain committed to improving our working capital position" and in a January 8, 2019 conference, that "we intend to be free cash flow positive within the next three years…. So I think the good news is we're not only going to be free cash flow generative and there's a return on your equity investment on that, which is good."

E.     **The Truth Begins to Emerge**

1.     **EIML Misses Two Debt Payments, Triggering Credit Downgrades And Withdrawals; Further Reports Substantiate Eros's Troubled Liquidity**

66.     On June 5, 2019, after the close of market, EIML's credit rating was downgraded 10 notches to "default" (CARE D) by India's largest credit ratings agency, CARE Ratings, over concerns of "ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the company."  CARE had previously rated EIML's long-term bank facilities CARE BBB-, outlook stable and its short-term bank facilities CARE A3 in October 2018.[4]

67.     As part of its downgrade CARE explained that:

As a part of CARE's due diligence process, CARE had interacted with EIML's bankers and had also obtained 'Default if any' statements from the company which mentioned delays/default in

---

[4] CARE Ratings has a 21 notch system for long-term debt instruments when accounting for its positive (+)/negative (-) modifiers, and a 9 notch system for short-term debt instruments when accounting for its positive (+) modifier.  *See* https://www.careratings.com/resources/rating-resources.aspx#:~:text=CARE%20would%20adopt%20an%20eight,State%20level (last accessed July 1, 2020).

debt servicing (both principal and interest) on the terms loans availed by the company, as also delays of more than 30 days in servicing interest on cash credit and packing credit, and a delay of more than 30 days in payment of bills. As per the management, the delays/ default in debt servicing is on account of slowdown in collection from debtors leading to cash flow issues in the company.

68. Responding to CARE's downgrade, on June 6, 2019, at approximately 9:21 a.m. ET, the Company issued a blatantly false press release claiming that "Eros International PLC and all of its subsidiaries have met and continue to meet all debt service commitments. The Company retains the full faith and confidence of our lenders."

69. Then, at approximately 3:08 p.m. ET, Eros issued a second, "clarifying" statement admitting that, in fact, "as previously communicated through our Indian subsidiary, EIML was late on two loan interest payments for April and May 2019. These interest payments total less than $2 million and are currently in process of remittance." Indeed, EIML had issued a company update on both the NSE and BSE stock exchanges at 13:24 IST and 15:54 IST (or approximately 1:24 am ET and 3:24 am ET), respectively, clarifying "the intimation made by [EIML] to the Stock Exchanges on June 5, 2019 regarding CARE D Ratings assigned to the Company, we would like to clarify that this is on account of a delay in servicing of Bank loans for the month of April 2019 and May 2019 and will be cleared within the next seven working days."

70. Following all of this news, the Company's share price fell $3.59 per share, over 49%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume.

71. Macquarie Research issued a report on June 6, 2019 entitled "Hard to explain," stating that its understanding is that the missed payments are due to clerical error, which "is inexcusable if true," but that based on public filings and

19

management's explanation of the reason for the missed payments, Eros "does not face balance sheet or cash flow constraints."

72.    The following day, on June 7, 2019 before the market opened, S&P Global Ratings withdrew its preliminary B+ credit rating on Eros.  In its press release, S&P Global Ratings explained that the preliminary rating was based on Eros's proposed issuance of senior unsecured notes to refinance its existing debt facilities.  However, Eros had not issued the notes within the expected time frame, and as a result S&P Global Ratings decided to withdraw its rating.

73.    Also before the market opened on June 7, 2019, Hindenburg Research published a report explaining why it believed EIML had been downgraded by CARE, concluding that "a liquidity event seemed to border on the inevitable."  In explaining why it was "inevitable" that Eros would face a liquidity event, the Hindenburg Report highlighted Eros's relationship with a number of entities they "believe are contributing to its current situation."  The Hindenburg Report went on to explain that although Eros has made $153 million in net payments and advances to NextGen from 2012 through 2018, there were only five films produced during that same time by NextGen for a total budget of $19.35 million.  Hindenburg Research further pointed out that these films were largely co-produced by Eros, and then posed the logical question: if Eros distributed $153 million in payments to NextGen, but only $19.35 million was actually used, where did the rest of the money go?

74.    On all this news, the Company's share price fell $0.41 per share, or over 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume.

75.    On June 10, 2019, Maybank Kim Eng dropped its analyst coverage of Eros.  In its accompanying report, Maybank Kim Eng explained that EIML's missed interest payment was surprising, and further explained that "[t]he drop in

20

share price on the CARE D/G is negative for EROS US because it likely impedes the company's ability to raise both debt and equity." This impediment to raising funds made it no longer possible to fundamentally value the Company, and thus Maybank Kim Eng was ceasing coverage of Eros.

76.    Analysts at Citi reacted to the CARE credit downgrade by slashing its price target for Eros in half to $6.50 on June 10, 2019, noting the possibility that a cash crunch at EIML poses a risk to its parent's shares, *i.e.*, to Eros's shares.

77.    An article published on June 10, 2019 in Reuters highlighted that Eros's shares were under pressure after the ratings cut due to payment delays, and further, that payment of some employee salaries and other dues had also been delayed. Therein, the article provided more detail:

> Despite Eros's assurances, several Eros employees and industry insiders, who asked not to be named, told Reuters they were concerned about the situation.
>
> Two Eros employees told Reuters that the company has been a few days late in paying some employee salaries over the last two months. Those two sources and three other industry sources, also said Eros had not made payments due to makers of some movies and shows.
>
> In an emailed response to questions from Reuters, Eros said, "The company has paid all salary dues up to May 2019."
>
> Eros also said its various shows "are at different stages of production and the company pays for these as per the production and delivery milestones."

78.    On June 11, 2019, Moody's downgraded Eros to B2 from B1, and changed its outlook to negative from stable. Moody's stated that the ratings downgrade reflected Eros's "strained liquidity profile, which led to delays in servicing the bank loans of its Indian subsidiary," EIML. Although Moody's noted that EIML stated its intention to pay the late debt payments, that "[n]onetheless, the delays in timely debt servicing exacerbates our concerns over the complex and

21

multijurisdictional group structure, which has inhibited the timely movement of cash within the group entities."

79.    Moody's pointed out "that the delays in scheduled debt servicing evidence [Eros's] poor financial management and controls across the group; factors which are inconsistent with a B1 rating."

80.    Moody's further explained that Eros's operating subsidiaries "continue to face challenges and delays in recovering their receivables balances, which according to the company has further strained its liquidity profile[,]" and that Eros's high working capital needs means its liquidity is reliant on the refinancing of $72 million in short-term facilities.

81.    Thus, Moody's rating considered Eros's "small scale (revenues of around $300 million) compared to global peers, weak cash flow metrics because of the ongoing need to invest in content, weak liquidity profile, and complex group structure."

82.    On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on unusually heavy trading volume.

83.    Then, on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros "for its own business reasons."

84.    On this news, Eros's share price fell $0.49 per share, or 22.5%, to close at $1.69 per share on June 26, 2019, on unusually heavy trading volume, and continued to fall on the following day another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.

> **2.    Eros Announces A Massive Impairment To Its Intangible Content Assets**

85.    On July 15, 2019, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2019, ended March 31, 2019.  As part of the release, Eros reported an impairment loss of $405.5 million to its intangible

content asset balances, allocating an impairment loss of $366.7 million to film and content rights and $38.8 million to content advances. The $38.8 million in impairment losses allocated to content advances closely approximates the net content advances of $36.9 million to NextGen in fiscal years 2017-2019.

86. The press release explained Eros's impairment process:

The asset or Cash Generating Unit (CGU) is impaired if its carrying amount exceeds its recoverable amount. The recoverable amount is defined as the higher of the 'fair value less costs of disposal' ("FVLCD") and the 'value in use' ("VIU").

The Group identified one reporting segment and CGU, i.e. film content. The group performed impairment assessment as of March 31, 2019. The recoverable amount of the cash generating unit was determined based on value in use, which was higher than the FVLCD.

Value in use was determined based on future cash flows after considering current economic conditions and trends, estimated future operating results, growth rates and anticipated future economic conditions. The approach and key (unobservable) assumptions used to determine the cash generating unit's value in use were as follows:

| Assumptions | As at March 31, 2019 | As at March 31, 2018 |
|---|---|---|
| Growth rate applied beyond approved forecast period | 4.00% | 4.00% |
| Pre-tax discount rate | 20.9% | 18.9% |

The Company considered it appropriate to undertake an impairment assessment with reference to the estimated cash flows for the period of four years developed using internal forecast and extrapolated for the fifth year. The growth rates used in the value in use calculation reflect those inherent within the Company's internal forecast, which is primarily a function of the future assumptions, past performance and management's expectation of future developments through fiscal 2024.

23

Accordingly, the Group recorded an impairment loss, totaling to $423,335 thousand, as an exceptional item, within the Statement of Income for the year ended March 31, 2019 *mainly due to high discount rate as explained in the table above and changes in the market conditions*. The aforesaid impairment loss was firstly, allocated from the carrying amount of goodwill and Intangible assets-trademark totaling $17,800 thousand and the residual amount totaling $405,535 thousand was allocated to Intangible assets-content.

87. The discount rate that Eros claims was "mainly" responsible for its $405.5 million impairment increased by just two percentage points, from 18.9% to 20.9%. Later, in its Form 20-F filed on August 14, 2019, Eros explained that a 1% change in its discount rate would increase Eros's impairment charge by just $54 million. In other words, according to Eros's Form 20-F, at most only $108 million of the $405.5 million impairment could have resulted from the change in discount rate.

88. The other factor in Eros's impairment loss was "changes in market conditions." Eros did not fully explain what these changing market conditions were other than lower projected volume, and that a 1% decrease in projected volume would account for a $63 million impairment loss. This $63 million combined with the 2% change in the discount rate accounted for just $171 million in impairment losses to content assets—far short of the total $405.5 million impairment loss for this intangible asset.

89. Later on July 15, 2019, Eros held an earnings conference call to discuss these financial results. During the question and answer portion of the call, an analyst asked: "You mentioned an impairment charge, which is quite a large number I thought, a little surprised to see that given the monetization potential [of] your film content on Eros Now. So if you could please address that?" Defendant Parameswaran and Lulla responded:

PREM PARAMESWARAN: Tim, it's Prem. And let me answer the impairment charge. So the impairment charge was part of IAS 36 under the IFRS accounting rules, which require a company basically to reassess the carrying book value of assets, both on a regular and annual basis and also in case of the irregular events. Example of these irregular events include major change in market conditions or technology, expectation of future losses or a material change in the listed equity value or negative cash flows. In this propose, the equity value of our company, our market cap has gone down. During fiscal year-end 2019, due to the significant decline in the market value, *we tested impairment for carrying the value of net assets of the group exceeding our market capitalization and expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations.* Accordingly, we recorded a noncash impairment loss of $423 million net of taxes as an exceptional item within the P&L. This impairment loss recorded has been reduced from the carrying amount of goodwill, trademark, content/film rights and long-term advances to content vendors. This is a one-time exceptional item, which has no cash impact on the business.

90.     Also during the call, Defendant Lulla answered a question about whether there is anything with Eros's corporate structure or payment systems that were brought up in the Hindenburg Report that they could do differently going forward.  Defendant Lulla stated that "we are just observing our internal controls also so that it doesn't ever happen again."

91.     On this news, Eros's share price fell $0.21 per share, or 11.5%, to close at $1.61 per share on July 15, 2019, on unusually heavy trading volume.

### 3.     Eros Turns To Toxic Financing To Source Its Cash Needs

92.     Finally, on September 26, 2019, before the market opened, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principle amount of senior convertible notes due 2020.  Eros said it planned to use the net proceeds of $25 million for general corporate purposes.

25

93. On this news, the Company's share price fell $0.85, nearly 30%, to close at $1.99 on September 26, 2019, on extremely heavy trading volume.

94. A September 27, 2019 Seeking Alpha article highlighted that the offering was surprising, constituted a toxic financing transaction, and provided further evidence of Eros's "perceived liquidity issues."

**F.  Multiple Witnesses Confirm That Eros Was Frequently Late In Paying Its Obligations, That The Individual Defendants Held Tight Control Over The Group, And That Eros Was Not Working With CARE To Ensure Its Rating Was Revised Upwards**

**1.  Former Employees Recount Delayed Salaries And That The Individual Defendants, And Particularly Defendant Lulla, Were The Group's Decision Makers**

95. Confidential Witness ("CW") 1 was associated with EIML from 2015 through 2019, and served as a Vice President, Company Secretary & Compliance Officer.  During their tenure, CW 1 observed that Defendants Lulla, Parameswaran, and Deshpande worked together closely.  CW 1 also mentioned that the Individual Defendants as well as Sunil Lulla were the key decision makers at Eros.  CW 1 stated that during the period of 2016 through 2019, although employees were paid their salaries, there had been delays on occasion.

96. CW 2 was associated with EIML from 2016 through 2019, and served as a Vice President, Company Secretary.  CW 2 explained that Defendant Lulla is the key decision maker at EIML, and that Defendant Lulla has been calling all the shots.  CW 2 stated that after Eros's share price took a hit on the NYSE, there were delays in employees' salaries.  CW 2 further stated that around this same time, senior management began to seek financing alternatives to maintain cash flow.

97. CW 3 was associated with EIML from 2015 through 2017 and was a manager in the administrative department.  CW 3 stated that mid-level management had to wait for their salaries during the period of 2016-2018.  CW 3

further explained that it was possible that Eros was taking out loans to manage its cash flow issues, but that mid-management employees were not made aware of any financial crisis.

98.   CW 4 was associated with EIML as a senior sales manager when they left the company in 2018.   CW 4 stated that they left the company because employees were not getting their salaries on time.

**2.   Other Confidential Witnesses Confirm That EIML Was Frequently Late In Paying Its Loan Obligations, Eros Was Not Cooperating With CARE To Reverse Its Credit Downgrade, And Defendant Lulla Had Tight Control Over The Group**

99.   CW 5 is a ratings analyst/manager at CARE.   CW 5 explained that Eros has been rated by CARE for more than seven years, and that there have been three different analysts/managers who have managed the Eros account.   CW 5 explained that typically the CEO/CFO of EIML were the ones to interact with the CARE team, but that the EIML executives did not have any authority, and that after discussions with the CARE team, they would go back to consult and act upon directions from the Lulla family.

100.   CW 5 explained some of the circumstances concerning CARE's June 2019 ratings downgrade and the default of EIML's loan obligations cited by CARE as the source for the downgrade.   CW 5 stated that CARE was not initially informed of this default by anyone from the Company or EIML, and learnt about it after the default happened.

101.   After the default and CARE's subsequent downgrade of EIML, CW 5 explained that Eros entered into discussions with CARE in an attempt to convince the ratings agency to revise its downgrade, but that when CARE asked for additional details, Eros refused to provide them.

27

102.   CW 5 added that over the last three years it was evident that Eros was inflating its revenues, and that the modus operandi was to book a sale of a movie, rights to overseas distribution or some part of the movie to one of their close associates for a large sum.

103.   CW 6 is a certified chartered accountant and was associated with Chaturvedi & Shah, EIML's auditors.   CW 6 assisted the senior manager conducting the statutory audit of EIML for the financial year 2017-2018.   CW 6 stated that during the audit, Defendant Lulla and Sunil Lulla were present and that they were closely monitoring the balance sheets of EIML's subsidiaries.

104.   CW 6 stated that it was evident EIML would be downgraded due to their borrowings and inconsistent repayments to the banks.   CW 6 explained that Eros was facing some issues in repaying the banks' dues, and as a result it was being charged with late installment penalties and its credit rating was decreasing. CW 6 said that except for Defendant Lulla, Sunil Lulla, and Farokh Gandhi (EIML's CFO), no one else would have been aware about all the transactions.

105.   CW 6 further commented that the Group Chairman, Defendant Lulla, is the key decision maker and all the critical decisions are taken under his supervision.

106.   CW 7 is associated with the Bank of Baroda, and worked as the credit manager with the bank during the loan sanction to EIML in 2016.   According to CW 7, since the loan was sanctioned to EIML in 2016, it has been repaying the loan in installments to the bank.   CW 7 added that there have been inconsistencies during the repayment on the loan on EIML's end, and that a penalty was levied on the non-payment of the installments.

107.   CW 8 is a business head and CEO of an entertainment channel, and has been in the Indian media industry for almost 20 years, and as a result, is familiar with Eros and its business practices.   CW 8 said that the credit downgrades

28

by CARE Ratings and Moody's was a surprise for the industry, but that the management and most of the core team at Eros were aware that the downgrades were coming. CW 8 said that the employees were told to stay away from trading in the listed shares of the company.

108. CW 8 said that EIML has discussed delays and defaults in collections from its debtors, and that a large part of the debtors are not actual companies, but rather shell companies whose entire turnover is derived purely from buying Eros content at inflated prices. CW 8 further stated that no one other than the core team at Eros would know the details of these debtors/shell companies. CW 8 said that, over the years, Eros has been accused of improperly "pumping-up" its revenue through related party transactions, essentially loaning a related party money and then reporting revenue from that related party, and the most discussed of these is with NextGen. CW8 said that these related party transactions are not rumors, but are facts known to all in the industry, but which no one talks about openly.

109. CW 8 also said that Eros has a history and track record of buying films at a premium to the prevailing market price.

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Defendants' False And Misleading Statements And Omissions Relating To Eros's Fourth Quarter And Fiscal Year 2017 Financial Results

110. The Class Period begins on July 28, 2017. On that day, the Company issued a press release containing its financial results for the fourth quarter and fiscal year 2017, ended March 31, 2017, highlighting that "the company remains well-capitalized[.]"

111. Within the press release, both Defendant Deshpande and Defendant Parameswaran provided management comments, wherein Defendant Deshpande

29

again stated that "we are already well capitalized."

112.   Defendant Parameswaran further stated that "[we] are confident that we will go back to being free cash flow positive in fiscal 2018 as we were in fiscal 2016."

113.   The July 28, 2017 press release further reported a balance of $904,628,000 for Eros's intangible content assets, comprised of a balance of $634,465,000 for film and content rights, $266,232,000 for content advances, and $3,931,000 for film productions.

114.   Also on July 28, 2017, Eros held an earnings call to discuss the Company's financial results for the fourth quarter of 2017 and the 2017 fiscal year. As part of his opening comments, Defendant Lulla stated that: "Our ***strong cash flows and balance sheet*** has enabled us to pay down the approximately $80 million of the … revolving credit facility as well as invest into a strong contents rate for the FY '18, '19."

115.   In her prepared comments, Defendant Deshpande again repeated "we are already well-capitalized."

116.   Defendant Parameswaran likewise assured investors in his prepared comments that "the company remains well-capitalized and able to invest in future growth."

117.   On July 31, 2017, Eros issued its annual report of financial results for the fiscal year ended March 31, 2017 on SEC Form 20-F ("2017 20-F"), and which was signed by Defendant Deshpande.   Therein, Eros reported a balance of $904,628,000 for Eros's intangible content assets, comprised of a balance of $634,465,000 for film and content rights, $266,232,000 for content advances, and $3,931,000 for film productions.

118.   The 2017 20-F also attested to the effectiveness of the Company's internal controls over financial reporting:

Management assessed the effectiveness of internal control over financial reporting as at March 31, 2017, based on the criteria established in 2013 *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the above criteria, and as a result of this assessment, management concluded that, as at March 31, 2017, our internal control over financial reporting was effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

119.  Eros's 2017 20-F also contained certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002[5] (the "SOX 302 Certifications"), signed by Defendants Deshpande and Parameswaran, certifying that:

1.  I have reviewed this annual report on Form 20-F of Eros International Plc (the "Company");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as

---

[5] SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

31

defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.   The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's Board of Directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect

32

the Company's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting

120.   Eros's 2017 20-F also contained certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "SOX 906 Certifications"), signed by Defendants Deshpande and Parameswaran, which further certified that:

(1)     I am the Group Chief Executive Officer[6] of the Company;

(2)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(3)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

121.   The statements made in ¶¶110-120 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that the Company's internal controls and procedures and compliance policies were inadequate; (5) that, as a result, Eros turned to toxic financing; and (6) as a result, Defendants' public statements

---

[6] Defendant Parameswaran's SOX 906 Certification was substantially identical other than stating that he is the Group Chief Financial Officer of the Company.

attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**B.    Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter 2018 Financial Results**

122.    On October 6, 2017, the Company issued a press release containing its financial results for the first quarter of its 2018 fiscal year, ending June 30, 2017. Within the press release, Defendant Parameswaran commented: "We remain ***well-capitalized*** and able to deliver on our future film slate plans as well as fund growth of Eros Now. ***We have a strong balance sheet***[.]"

123.    The October 6, 2017 press release further reported a balance of $891,819,000 for Eros's intangible content assets, comprised of a balance of $617,517,000 for film and content rights, $268,987,000 for content advances, and $5,315,000 for film productions.

124.    Later that same day, Eros held an earnings call to discuss these financial results. During her opening comments, Defendant Deshpande stated: "***We have maintained a strong balance sheet*** and built-in working capital efficiencies as we paid down our RCF significantly and continue to fund Eros Now growth as well as our future slate."

125.    In his prepared remarks, Defendant Parameswaran reiterated that "the company remains well capitalized and well funded to execute our business plan."

126.    On November 3, 2017, Eros also issued its report of financial results for the quarterly period ended June 30, 2017, on SEC Form 6-K, and which was signed by Defendant Parameswaran.    Therein, Eros reported a balance of $891,819,000 for Eros's intangible content assets, comprised of a balance of $617,517,000 for film and content rights, $268,987,000 for content advances, and $5,315,000 for film productions.

127.    The statements made in ¶¶122-126 were materially false and/or

34

misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**C.  Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter 2018 Financial Results**

128.  On November 22, 2017, the Company issued a press release containing its financial results for the second quarter of its 2018 fiscal year, ending September 30, 2017, which was later filed with the SEC on November 30, 2017 as an attachment to Form 6-K.  Within the press release, Defendant Parameswaran commented that "our balance sheet remains strong and we are well capitalized for future growth."

129.  The November 22, 2017 press release further reported a balance of $889,361,000 for Eros's intangible content assets, comprised of a balance of $598,993,000 for film and content rights, $286,526,000 for content advances, and $3,842,000 for film productions.

130.  On November 26, 2017, Eros held an earnings conference call to discuss its second quarter of 2018 financial results.   Therein, Defendant Parameswaran stated: "Our balance sheet remains strong…. And we are on track to be free cash flow positive by the fiscal year-end."

131. On July 31, 2018 Eros issued its report of financial results for the quarterly period ended September 30, 2017 on SEC Form 6-K, and which was signed by Defendant Parameswaran. Therein, Eros reported a balance of $889,361,000 for Eros's intangible content assets, comprised of a balance of $598,993,000 for film and content rights, $286,526,000 for content advances, and $3,842,000 for film productions.

132. The statements made in ¶¶128-131 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**D.    Defendants' False And Misleading Statements And Omissions Relating To Eros's Announcement Of Its 2017 Convertible Bond Offering**

133. On December 6, 2017, Eros issued a press release announcing the closing of its registered direct offering of $122.5 million aggregate principal amount of its senior convertible notes and warrants. The press release included commentary from Defendant Parameswaran, stating: "The $100 million of gross proceeds will help to *significantly improve our balance sheet*, support the continued growth of our Eros Now platform and *leave us well capitalized* for the

future."

134.   This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**E.     Defendants' False And Misleading Statements And Omissions During The January 2018 Citi Global TMT West Conference**

135.   On January 9, 2018, Defendant Parameswaran presented at the Citi Global TMT West Conference to discuss Eros, its business, and its business prospects.  During the presentation, Defendant Parameswaran stated "we have a very conservative balance sheet."

136.   Supporting materials to this presentation included slides posted on Eros's website.  Page 14 of these slides highlighted Eros's "Conservative Balance Sheet."

137.   The statements made in ¶¶135-136 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and

financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

### F.     Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter 2018 Financial Results

138.   On February 21, 2018, the Company issued a press release containing its financial results for the third quarter of its 2018 fiscal year, ending December 31, 2017.  The press release included commentary from Defendant Parameswaran, stating: "The $100 million convertible notes offering in December 2017 has *further strengthened our balance sheet and increased our liquidity position*."

139.   The February 21, 2018 press release also reported a balance of $908,330,000 for Eros's intangible content assets, comprised of a balance of $616,070,000 for film and content rights, $286,933,000 for content advances, and $5,327,000 for film productions.

140.   Later that same day, Eros held an earnings call to discuss these financial results.  During his prepared remarks, Defendant Parameswaran stated: "With $135 million of cash on our balance sheet, just under $50 million in capital raised from Reliance, and investment in the $100 million convertible bond offering in December, *our balance sheet has never been stronger*."

141.   On July 31, 2018 Eros also issued its report of financial results for the quarterly period ended December 31, 2017 on SEC Form 6-K, and which was signed by Defendant Parameswaran.   Therein, Eros reported a balance of $908,330,000 for Eros's intangible content assets, comprised of a balance of $616,070,000 for film and content rights, $286,933,000 for content advances, and

38

$5,327,000 for film productions.

142. The statements made in ¶¶138-141 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**G.     Defendants' False And Misleading Statements And Omissions In The Supporting Materials For The Deutsche Bank 2018 Media, Telecom & Business Services Conference**

143. On March 6, 2018, Eros presented at the Deutsche Bank 2018 Media, Telecom & Business Services Conference.   Supporting materials to this presentation included slides that were posted on Eros's website.  Page twenty of these slides highlighted Eros's "Conservative Balance Sheet."

144. This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its

39

subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**H.    Defendants' False And Misleading Statements And Omissions In And Relating To Eros's Fourth Quarter And Fiscal Year 2018 Financial Results**

145.   On June 27, 2018, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2018, ended March 31, 2018.  The press release included commentary from Defendant Lulla, stating: "I believe that our *strong balance sheet*, market leadership and differentiated business strategy gives us a powerful and sustainable competitive advantage[.]"

146.   This press release also included comments from Defendant Parameswaran, stating "I am pleased with our fiscal year 2018 performance, highlighted by strong top-line growth, margin expansion, continued *balance sheet strength* and solid subscriber additions out of our Eros Now business."

147.   The June 27, 2018 press release further reported a balance of $998,543,000 for Eros's intangible content assets, comprised of a balance of $638,108,000 for film and content rights, $349,568,000 for content advances, and $10,867,000 for film productions.

148.   On July 31, 2018, Eros also issued its annual report of financial results for the fiscal year ended March 31, 2018 on SEC Form 20-F ("2018 20-F"), and which was signed by Defendant Parameswaran.  Therein, Eros reported a balance of $998,543,000 for Eros's intangible content assets, comprised of a balance of $638,108,000 for film and content rights, $349,568,000 for content advances, and $10,867,000 for film productions.

149.   The 2018 20-F contained an attestation as to the effectiveness of the

40

Company's internal controls over financial reporting that was substantively similar to the attestation in Eros's 2017 10-K quoted in ¶118.

150. Attached as Exhibits 12-1 and 12-2 to the 2018 20-F were the SOX 302 Certifications of Defendants Lulla and Parameswaran, which were substantially identical to the SOX 302 Certifications in Eros's 2017 20-F quoted in ¶119.

151. Attached as Exhibits13-1 and 13-2 to the 2018 20-F were the SOX 906 Certifications of Defendants Lulla and Parameswaran, which were substantially identical to the SOX 906 Certifications in Eros's 2017 20-F quoted in ¶120.

152. The statements made in ¶¶145-151 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that the Company's internal controls and procedures and compliance policies were inadequate; (5) that, as a result, Eros turned to toxic financing; and (6) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

## I.    Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter of 2019 Financial Results

153. On August 23, 2018, Eros issued a press release announcing its financial results for the first quarter of 2019, ended June 30, 2018. The press

release included commentary from Defendant Parameswaran, who stated that Eros's Adjusted EBITDA growth and margin expansion "combined with our **conservative balance sheet** with net debt leverage ratio of 2.28x has us poised for growth in the coming fiscal year."

154. The August 23, 2018 press release further reported a balance of $1,004,763,000 for Eros's intangible content assets, comprised of a balance of $646,218,000 for film and content rights, $342,550,000 for content advances, and $15,995,000 for film productions.

155. Also on August 23, 2018, Eros issued its report of financial results for the quarterly period ended June 30, 2018 on SEC Form 6-K, and which was signed by Defendant Parameswaran. Therein, Eros reported a balance of $1,004,763,000 for Eros's intangible content assets, comprised of a balance of $646,218,000 for film and content rights, $342,550,000 for content advances, and $15,995,000 for film productions.

156. The statements made in ¶¶153-155 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**J.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter of 2019 Financial Results**

157.   On November 15, 2018, Eros issued a press release announcing its financial results for the second quarter of 2019, ended September 30, 2018.  The press release contained commentary from Defendant Lulla, who stated: "We are pleased to announce another strong performance this quarter, highlighted by sequential revenue growth, improving margins and a ***solid capital structure***."

158.   In the press release, Defendant Parameswaran also commented: "I am pleased with our second quarter performance as the business delivered strong EBITDA growth and margin expansion, ***continued balance sheet strength*** and exceptional Eros Now paying subscriber additions, outperforming market expectations.…  Our strong operating performance coupled with our ***conservative balance sheet*** has us poised for growth in the coming fiscal years."

159.   The November 15, 2018 press release further reported a balance of $1,038,040,000 for Eros's intangible content assets, comprised of a balance of $670,576,000 for film and content rights, $357,164,000 for content advances, and $10,300,000 for film productions.

160.   Also on November 15, 2018, Eros held an earnings conference call to discuss these financial results.  As part of his prepared remarks, Defendant Lulla again stated: "We are pleased to announce another strong set of results this quarter, including sequential revenue growth, improving margins and a solid capital structure."

161.   During the question and answer portion of the call, Defendant Lulla provided the following answer to an analyst's question about Eros's cash flow:

> [Analyst]: Okay. The question for Prem is about the -- I think Kishore mentioned about the investments. I mean how do you manage the investments in terms of the CapEx and yet generate a free cash flow or not very major negative free cash flow?

43

\*    \*    \*    \*

KISHORE ARJAN LULLA: …. And to answer your question about the major negative cash flow, it'll not be major negative cash flow upfronted. So if there is a worry that it could be $100 million negative cash flow or something like that. ***No, not at all. Not to worry, we're not going to leverage the company with lot of debt.***

162. The following day, on November 16, 2018, Eros issued its report of financial results for the quarterly period ended September 30, 2018 on SEC Form 6-K, and which was signed by Defendant Parameswaran. Therein, Eros reported a balance of $1,038,040,00 for its intangible content assets, comprised of a balance of $670,576,000 for film and content rights, $357,164,000 for content advances, and $10,300,000 for film productions.

163. The statements made in ¶¶157-162 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**K.    Defendants' False And Misleading Statements And Omissions During The January 2019 Citi Global TMT West Conference**

164. On January 8, 2019, Defendant Parameswaran presented at the Citi Global TMT West Conference to discuss Eros, its business, and its business

44

prospects.  During the presentation, Defendant Parameswaran stated "I think again, we have a very conservative balance sheet."

165.  This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

## L. Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter of 2019 Financial Results

166.  On February 21, 2019, Eros issued a press release announcing its financial results for the third quarter of 2019, ended December 31, 2018.  The press release contained commentary from Defendant Lulla, who stated: "Our balance sheet remains conservative and we are well-capitalised[.]"

167.  The press release further reported a balance of $1,072,686,000 for Eros's intangible content assets, comprised of a balance of $699,906,000 for film and content rights, $361,548,000 for content advances, and $11,232,000 for film productions.

168.  Also on February 21, 2019, Eros held an earnings conference call to discuss these financial results.  As part of his prepared remarks, Defendant Parameswaran stated: "I wanted to take this opportunity to highlight a few of *our key strengths* that often come in conversations with our shareholders and partners,

45

which I thought would be worth going over for the benefit of the new and existing shareholders alike…. Two, our financial policies are prudent and we have a ***very conservative balance sheet*** with net leverage at 1.5x."

169. On February 26, 2019, Eros issued its report of financial results for the quarterly period ended December 31, 2018 on SEC Form 6-K, and which was signed by Defendant Parameswaran. Therein, Eros reported a balance of $1,072,686 for its intangible content assets, comprised of a balance of $699,906,000 for film and content rights, $361,548,000 for content advances, and $11,232,000 for film productions.

170. The statements made in ¶¶166-169 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**M.   Defendants' False And Misleading Statements And Omissions During Spring 2019 Conferences**

171. On March 11, 2019, Defendant Parameswaran presented at the Deutsche Bank Media and Telecom Conference. During the conference, Defendant Parameswaran stated: "We've a ***very conservative balance sheet***. We're less than 2x net leverage. We have LTM adjusted EBITDA of roughly $100

million.  And we think, from that perspective, we have a ***very conservative balance sheet*** with very little debt, when you look at it.  So it's pretty good."

172.  Supporting materials to this presentation included eight slides posted on Eros's website.  Page six of these slides highlighted Eros's "Conservative Balance Sheet."

173.  On May 21, 2019, Eros presented at the SunTrust Robinson Humphrey 2019 Internet & Digital Media Conference in San Francisco. Supporting materials to this presentation included eight slides posted on Eros's website.  Page 6 of these slides highlighted Eros's "Conservative Balance Sheet."

174.  The statements made in ¶¶171-173 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

**N.    Defendants' False And Misleading Statements And Omissions Concerning Its Credit Rating Downgrades And Moody's Withdrawal Of Coverage**

175.  On June 6, 2019, Eros issued a press release in response to the CARE credit rating downgrade.  Within the press release, the Company provided the following statement: "Eros International PLC and all of its subsidiaries have met

47

and continue to meet all debt service commitments. The Company retains the full faith and confidence of our lenders."

176. This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because: (1) later that same day, Eros "clarifi[ed]" that, in fact, it had not met its debt services commitments, admitting: "As previously communicated through our Indian subsidiary, EIML was late on two loan interest payments for April and May 2019. These interest payments total less than $2 million and are currently in process of remittance[;]" and (2) Eros was late in making other of its obligations, including loan payments and payroll.

177. On June 9, 2019, Eros issued a press release announces a share repurchase program and reiterating its positive business fundamentals. The press release included commentary from Defendant Lulla, who stated: "Additionally, I am pleased to inform shareholders that we now have a strong financial and operating position and ***our management team are making it a priority to work with CARE Ratings, the regulatory agency, to have our credit rating revised upwards in due course.***"

178. This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose, among other things, that management was not in fact working with CARE Ratings, and rather, refused to provide CARE with the additional details CARE requested.

179. The press release also included commentary from Defendant Parameswaran, who stated: "Eros has a strong liquidity profile and healthy balance sheet."

180. This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not

48

misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the Company's liquidity and financial position was weaker than it had disclosed; (3) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; (4) that, as a result, Eros turned to toxic financing; and (5) as a result, Defendants' public statements attesting to the Company's financial condition and internal controls were materially false and misleading at all times.

181. On July 2, 2019, Eros issued a press release providing a business update, which stated:

> The Company reports that outstanding interest payments of the Company's Indian operating subsidiary (EIML) that caused a recent ratings downgrade by CARE have been paid by EIML. *The Company is working with CARE in an attempt to restore its previous investment grade rating*, with the full support of its existing banking consortium. In addition, *the Company reiterates that the recent withdrawal of its Moody's rating was at the Company's request given that it does not have any outstanding public institutional bonds*.

182. The emphasized statement concerning Eros working with CARE to restore its rating was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose, among other things, that management was not in fact working with CARE Ratings, and rather, refused to provide CARE with the additional details CARE requested.

183. The emphasized portion of the statement relating to the withdrawal of the Moody's rating was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading

49

because they failed to disclose, among other things, that Moody's had withdrawn its credit rating of Eros on June 26, 2019, "for its own business reasons." According to Moody's policy for withdrawal of credit ratings, when Moody's indicates that a credit rating is withdrawn for "'business reasons,' this refers to [Moody's] business reasons, not the business reasons of the Rated Entity or obligor." In fact, Moody's has a separate reason to withdraw a credit rating if a rated entity does not have any outstanding public bonds: "Maturity of Obligation or Termination of Program: the Credit Rating on an obligation will be withdrawn when the obligation is not outstanding or the program has been terminated. This includes when … a Credit Rating on a debt or program is issued and published but the debt is ultimately not issued or the program is not closed[.]"

**O.    Defendants' False And Misleading Statements And Omissions In And Relating To Eros's Fourth Quarter And Fiscal Year 2019 Financial Results**

184.   On July 15, 2019, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2019, ended March 31, 2019. The press release stated: "Eros' ***balance sheet remains conservative*** and the Company is ***well-capitalized***…."

185.   Also on July 15, 2019, Eros held an earnings call to discuss the Company's financial results for the fourth quarter of 2019 and the 2019 fiscal year. During the question and answer portion of the call, after responding to a question about what really happened with respect to the CARE downgrade of EIML, Lulla added further commentary:

> KISHORE ARJAN LULLA: "….[T]here were reports or there was kind of fake news or false reports about Moody's in their withdrawal of their rating. Just to clarify for the record that we as a company had asked Moody's to withdraw their credit ratings -- withdraw their services, quite frankly, just because we do not have any institutional public bonds outstanding. We did the same thing with S&P as well.

[Analyst]: So you asked Moody's to withdraw coverage of Eros, essentially?

KISHORE ARJAN LULLA: That is correct.  That is correct.

[Analyst]: Okay.  That's an important point, I think.

186.   This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose, among other things, that Moody's had withdrawn its credit rating of Eros on June 26, 2019, "for its own business reasons."   According to Moody's policy for withdrawal of credit ratings, when Moody's indicates that a credit rating is withdrawn for "'business reasons,' this refers to [Moody's] business reasons, not the business reasons of the Rated Entity or obligor."   In fact, Moody's has a separate reason to withdraw a credit rating for the situation Lulla described: "Maturity of Obligation or Termination of Program: the Credit Rating on an obligation will be withdrawn when the obligation is not outstanding or the program has been terminated.  This includes when … a Credit Rating on a debt or program is issued and published but the debt is ultimately not issued or the program is not closed[.]"

## VI.   LOSS CAUSATION

187.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

188.   During the Class Period, Plaintiffs and the Class purchased Eros securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

189.   Artificial inflation in EROS's stock price was removed when concealed risks partially materialized  and/or  the  truth  about  the  material

misrepresentations and omissions was partially revealed to the public on June 5, 2019, June 6, 2019, June 7, 2019, June 11, 2019, June 26, 2019, July 15, 2019, and September 26, 2019. As a direct result of these partial disclosures, the price of Eros's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

190. On June 5, 2019, after the close of market, EIML's credit rating was downgraded 10 notches to "default" (CARE D) by India's largest credit ratings agency, CARE Ratings, over concerns of "ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the company."

191. Responding to CARE's downgrade, on June 6, 2019, Eros issued two press releases, first stating that the Company and its subsidiaries "have met and continue to meet all debt service commitments. The Company retains the full faith and confidence of our lenders." Later that day, but before the close of market, Eros issued a second, "clarifying" statement admitting that, in fact, "as previously communicated through our Indian subsidiary, EIML was late on two loan interest payments for April and May 2019. These interest payments total less than $2 million and are currently in process of remittance."

192. Following all of this news, the Company's share price fell $3.59 per share, over 49%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume.

193. On June 7, 2019 S&P Global Ratings withdrew its preliminary B+ credit rating on Eros. In its press release announcing the withdrawal, S&P Global Ratings explained that its withdrawal was on account of Eros not issuing proposed senior unsecured notes to refinance its existing debt facilities.

194. Also on June 7, 2019, Hindenburg Research published a report explaining why it believed EIML had been downgraded by CARE concluding that

"a liquidity event seemed to border on the inevitable." The Hindenburg Report highlighted Eros's relationship with a number of entities they "believe are contributing to its current situation." The Hindenburg Report highlighted the net payments and advances to NextGen, owned by Defendant Lulla's brother-in-law, from Eros, which dwarfed the combined total budget of $19.35 million for the five films produced by NextGen (and largely co-produced by Eros) since the IPO, and had the effect of padding Eros's intangible content balances.

195. On all this news, the Company's share price fell $0.41 per share, or 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume.

196. On June 10, 2019, Maybank Kim Eng decided to drop its analyst coverage of Eros. In its accompanying report, Maybank Kim Eng explained that EIML's missed interest payment was surprising, and further explained that "[t]he drop in share price on the CARE D/G is negative for EROS US because it likely impedes the company's ability to raise both debt and equity."

197. Analysts at Citi reacted to this news by slashing its price target for Eros in half to $6.50 from $13 on June 10, 2019, noting the possibility of a cash crunch at EIML poses a risk to Eros's shares.

198. On June 11, 2019, Moody's downgraded Eros to B2 from B1, and changed the outlook to negative from stable. Moody's stated that the ratings downgrade reflected Eros's "strained liquidity profile, which led to delays in servicing the bank loans of its Indian subsidiary." Moody's rating took into consideration, among others, considered Eros's "weak cash flow metrics because of the ongoing need to invest in content[ and] weak liquidity profile[.]"

199. On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on unusually heavy trading volume.

200. Then, on June 26, 2019, Moody's announced that it had decided to

withdraw its rating of Eros "for its own business reasons."

201.  On this news, Eros's share price fell $0.49 per share, or 22.5%, to close at $1.69 per share on June 26, 2019, on unusually heavy trading volume, and continued to fall on the following day another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.

202.  On July 15, 2019, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2019, ended March 31, 2019.  As part of the release, Eros reported a total impairment loss of $423.3 million.  Of this impairment loss, $405.5 million was allocated to Eros's intangible content asset balances, which was further allocated between an impairment loss of $366.7 million to film and content rights and $38.8 million to content advances.  Eros further explained that the impairment was the result of the Company's assessment that their collective film content asset's carrying amount exceeded its recoverable amount.

203.  Later that day, Eros held an earnings conference call to discuss these financial results.  During the question and answer portion of the call, Defendant Parameswaran explained that Eros's impairment analysis was triggered by Eros's "significant decline in the market value."

204.  On this news, Eros's share price fell $0.21 per share, or 11.5%, to close at $1.61 per share on July 15, 2019, on unusually heavy trading volume.

205.  Finally, on September 26, 2019, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principle amount of senior convertible notes due 2020.  Eros said it planned to use the $25 million in net proceeds from this toxic financing transaction for general corporate purposes.

206.  On this news, the Company's share price fell $0.85, nearly 30%, to close at $1.99 on September 26, 2019, on extremely heavy trading volume.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

207.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

208.   As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Eros, their control over, and/or receipt and/or modification of Eros's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Eros, participated in the fraudulent scheme alleged herein.

## VIII.   CORPORATE SCIENTER ALLEGATIONS

209.   The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

210.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

211.   Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Eros as an entity. Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading.   Here, the

55

statements alleged were made to the investing public regarding the Company's operations, internal controls, finances and business practices—all important topics that would necessarily require approval by appropriate corporate officers.

## IX.    CLASS ACTION ALLEGATIONS

212.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Eros securities between July 28, 2017 and September 25, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

213.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Eros's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of Eros common stock were traded publicly during the Class Period on the NYSE.  As of July 30, 2019, Eros had 84,430,802 'A' ordinary shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Eros or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

215.    Plaintiffs will   fairly   and   adequately   protect   the   interests   of   the

members of the Class and has retained counsel competent and experienced in class and securities litigation.

216. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eros;

c. whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d. whether Defendants engaged in a scheme to defraud investors;

e. whether the price of Eros securities were artificially inflated because of Defendants' conduct complained of herein; and

f. to what extent the members of the Class have sustained damages and the proper measure of damages.

217. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

218. The market for Eros's securities was open, well-developed and

efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Eros's securities traded at artificially inflated prices during the Class Period.  On September 19, 2017, the Company's share price closed at a Class Period high of $16.10 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Eros's securities and market information relating to Eros, and have been damaged thereby.

219.  During the Class Period, the artificial inflation of Eros's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eros's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Eros and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

220.  At all relevant times, the market for Eros's securities was an efficient market for the following reasons, among others:

   a.  Eros shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

   b.  As a regulated issuer, Eros filed periodic public reports with the SEC and/or the NYSE;

   c.  Eros regularly communicated with public investors via

58

established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    Eros was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and/or

e.    The average daily trading volume for Eros securities during the Class Period was approximately 966,314 shares with more than 84.43 million 'A' ordinary shares of stock outstanding as of July 30, 2019, and a market capitalization reaching $977.13 million during the Class Period.

221.   As a result of the foregoing, the market for Eros's securities promptly digested current information regarding Eros from all publicly available sources and reflected such information in Eros's share price. Under these circumstances, all purchasers of Eros's securities during the Class Period suffered similar injury through their purchase of Eros's securities at artificially inflated prices and a presumption of reliance applies.

222.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material

59

in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

223. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

224. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

225. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eros who knew that the statement was false when made.

## XII. CLAIMS FOR RELIEF

### FIRST CLAIM
#### Violation of Section 10(b)
#### Of The Exchange Act And Rule 10b-5 Promulgated Thereunder
#### Against Defendant Eros International Plc And The Individual Defendants

226. Plaintiffs repeat and re-allege each and every allegation contained

60

above as if fully set forth herein.

227.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Eros's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

228.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Eros's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

229.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Eros's financial well-being and prospects, as specified herein.

230.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eros's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the

statements made about Eros and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

231. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

232. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Eros's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business,

62

operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

233. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Eros's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Eros's securities during the Class Period at artificially high prices and were damaged thereby.

234. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Eros was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Eros securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

235. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236. As a direct and proximate result of Defendants' wrongful conduct,

63

Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

237. Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

238. Individual Defendants acted as controlling persons of Eros within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

239. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

240. As set forth above, Eros and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

64

Complaint.    By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)    awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: July 1, 2020                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

By:  *s/ Donald A. Ecklund*
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: decklund@carellabyrne.com

*Liaison Counsel for Plaintiffs*


**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Kara M. Wolke
Leanne H. Solish
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs*

66

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 1, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the District of New Jersey, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 1, 2020.


*s/ Donald A. Ecklund*
Donald A. Ecklund