**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| *In re* EROS INTERNATIONAL PLC SECURITIES LITIGATION | Civil Action No. 19-14125<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This putative class action alleges securities fraud. Lead Plaintiffs Opus Chartered Issuances, S.A.; Compartment 127; and AI Undertaking IV ("Plaintiffs") assert that Eros International PLC ("Eros") and three of its key officers and/or employees engaged in fraud under Section 10(b) and Rule 10b-5, as well as Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, as to public statements regarding Eros' financial health. D.E. 34. Currently pending before the Court is the motion to dismiss Plaintiffs' Consolidated Class Action Complaint (the "Complaint") for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u *et seq*, filed by Defendants Eros International PLC ("Eros"), Kishore Lulla, and Prem Parameswaran (collectively "Defendants") D.E. 37. In addition, Plaintiffs seek to strike certain materials that Defendants submitted in support of their motion to dismiss. D.E. 39. The Court reviewed the parties' submissions in support and in opposition,[1] and decided the

---

[1] Defendants' brief in support of their motion to dismiss will be referred to as "Defs. Br.," D.E. 37-1; Plaintiffs' opposition will be referred to as "Plfs. Opp," D.E. 38; and Defendants' reply will be referred to as "Defs. Reply," D.E. 42. Plaintiffs' brief in support of their motion to strike will be referred to as "Strike Br.," D.E. 39-1; Defendants' opposition brief will be referred to as "Strike Opp.," D.E. 40; and Plaintiffs' reply brief will be referred to as "Strike Reply," D.E. 41.

motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons stated below, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**, and Plaintiffs' motion to strike is **DENIED as moot**.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.  Factual Background[2]

Eros is an Indian media company that "co-produces, acquires, and distributes Indian language films." Compl. ¶ 2.  The company was started in 1977 by the Lulla family, who remains in control today. *Id.* ¶ 3.  Eros International PLC was formed in 2006 and is "the ultimate parent corporation for an international group of related companies in the Indian film and entertainment businesses (the "Group")." *Id.* ¶ 2.  Eros' largest subsidiary is Eros International Media Limited ("EIML").  The "core" of EIML is "Bollywood" film production and distribution; the content that EIML acquires and co-develops is distributed amongst the multiple Eros entities. *Id.*  "EIML is one of the key cash generating subsidiaries within the Group." *Id.* ¶ 43.  The Group also deals with television syndication and has a digital streaming business, Eros Now. *Id.* ¶ 42; *see also id.* ¶ 45.

"The Lulla family retains the voting majority, and numerous members of the family serve as executives and employees within the Group of entities." *Id.* ¶ 3.  The Lulla family controls 65% of the voting rights of Eros. *Id.* ¶ 47.  Defendant Kishore Lulla is currently the Chairman of Eros and Chief Executive Officer ("CEO") of the Group. *Id.* ¶ 33.  According to Plaintiffs, Lulla is the

---

[2] The facts are derived from Plaintiffs' Complaint.  D.E. 34.  When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in a complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Additionally, a district court may consider "exhibits attached to the complaint and matters of public record," as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

2

key decision-maker who "call[s] all the shots" for Eros. *See id.* ¶ 96. Defendant Prem Parameswaran is the Group's Chief Financial Officer, President for North America, and a director. *Id.* ¶ 35. Defendant Jyoti Deshpande was the Group's CEO and Managing Director from June 22, 2012 until April 1, 2018. After her departure from the Group, Deshpande continued to serve on the Eros Board of Directors through June 2019.[3] *Id.* ¶ 37. Plaintiffs, who purchased Eros securities during the proposed Class Period, allege that they relied on Defendants' materially misleading statements about Eros' financial state and suffered damages due to drops in Eros' share price. *Id.* ¶¶ 30-31.

Eros spends significant capital on its Bollywood content; all of which are considered intangible assets on Eros' balance sheet. Eros' intangible assets include film and content rights, content advances, and film production. *Id.* ¶ 53. In 2017, Eros spent $173.5 million on content and $186.8 million in 2018. *Id.* ¶¶ 52-53. In both years, Eros' intangible assets accounted for approximately 63% of its total assets. *Id.* ¶ 53.

Plaintiffs allege that through its intangible assets, Eros funneled money to Lulla family members by paying for film rights and advancements at inflated rates. Plaintiffs continue that Eros' use of these improper related party transactions was known within the Bollywood industry. *Id.* ¶¶ 102, 108-09. Specifically, Plaintiffs allege that Eros was repeatedly involved in intangible asset transactions with NextGen Films Private Limited ("NextGen") and Everest Entertainment LLP ("Everest"), which are both affiliated with Lulla's brothers-in-law. *Id.* ¶ 55. During the 2017-2019 fiscal years, Eros advanced $36.909 million to NextGen for film co-production, and Eros reported that it purchased $58 million in film rights from NextGen. *Id.* ¶ 56. The money Eros

---

[3] It appears that Plaintiffs have not served Deshpande, and she does not join in this motion to dismiss.

paid to NextGen was capitalized and included in Eros' intangible content assets balance.  *Id.*  Plaintiffs, however, allege that NextGen only released five films, with combined budgets of $19.3 million, since 2013.  Plaintiffs contend that "[t]hese facts suggest, at minimum, that Eros'[] reported content balances for NextGen films were highly bloated."  *Id.* ¶ 57.  Moreover, Plaintiffs contend that Defendants' statements about the value of Eros' intangible assets were material misrepresentations because they were inflated figures.

Plaintiffs also allege that due to Eros' large capital expenditures, which need significant upfront cash investments, "Eros'[] liquidity was consistently strained."  *Id.* ¶ 58.  "Eros has frequently tapped the capital markets" for cash infusions and "greatly relied on other forms of debt."  *Id.* ¶ 59.  Plaintiffs contend that Eros' liquidity was "a key concern for investors and analysts."  *Id.* ¶ 61.  Plaintiffs add that Defendants repeatedly assured investors that "Eros was making strides with its balance sheet and cash flows, and that the Company was well capitalized."  *Id.* ¶ 62.  Plaintiffs maintain that these statements were false and that Eros' financial profile was weaker than Defendants represented.

Plaintiffs indicate that during the summer of 2019, Defendants' misrepresentations about Eros' financial strength were revealed, resulting in Eros' share prices falling after each revelation.  *Id.* ¶¶ 192-206.  First, after the markets closed on June 5, 2019, EIML's credit rating was downgraded "10 notches to 'default' by India's largest credit ratings agency, CARE Ratings ("CARE")."  *Id.* ¶ 66.  CARE cited "concerns of ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the company."  *Id.*  The following day, June 6, 2019, Eros issued a press release stating that the Company and its subsidiaries "have met and continue to meet all debt service commitments."  *Id.* ¶ 68.  Less than six hours later, Eros issued a second press release, explaining that EIML was late on loan interest

payments for April and May 2019.  The press release continued that the missed payments totaled less than $2 million and were currently in the process of remittance.  *Id.* ¶ 69.  EIML also issued a company update on the NSE and BSE stock exchanges, two exchanges in India, explaining that the missed loan payments "will be cleared within the next seven working days."  *Id.*  After EIML's credit rating downgrade, analysts began to question Eros' financial viability.  *Id.* ¶¶ 71-77.  Plaintiffs allege that Defendants also made misrepresentations about the CARE's rating downgrade and EIML's missed loan payments.

Next, on June 11, 2019, Moody's downgraded Eros' rating, and changed its outlook for Eros from stable to negative.  *Id.* ¶ 78.  "Moody's stated that the ratings downgrade reflected Eros'[] strained liquidity profile, which led to delays in servicing the bank loans of its Indian subsidiary, EIML."  *Id.* ¶ 78.  Then on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros for Moody's "own business reasons."  *Id.* ¶ 83.  Plaintiffs also allege that Defendants made material misrepresentations about the Moody's withdrawal.

Finally, on July 15, 2019, Eros issued a press release about its fourth quarter and fiscal year 2019 financial results.  Eros reported an impairment loss of $405.5 million to its intangible content asset balance.  Eros explained that in March 2019, it performed an impairment assessment pursuant to accounting standards and determined that an impairment was necessary.  *Id.* ¶¶ 86, 89.  Eros attributed the impairment to "a high discount rate" and "changes in the market conditions."  *Id.* ¶ 86.  Plaintiffs alleges that the changed discount rate only explains a small portion of the impairment loss, noting that the $38.8 million impairment that Eros allocated to content advances "closely approximates the net content advances of $36.9 million to NextGen."  *Id.* ¶¶ 85, 87.  With Eros' intangible assets balance substantially lower, Plaintiffs allege that Eros was forced to turn to toxic financing to obtain needed cash.  *Id.* ¶¶ 92-94.

### B.  Procedural History

On June 21, 2019, Paul Montesano filed a putative class action complaint in this matter. D.E.1.  On June 28, 2019, John Schraufnagel also filed a class action complaint that alleged claims of securities fraud against all Defendants.  D.E. 1, No. 19-14445 (D.N.J. June 28, 2019).  Finally, on August 20, 2019, Plaintiffs filed their class action complaint in the Central District of California, D.E. 1, No. 19-18547 (C.D. Cal. Sept. 27, 2019), which was subsequently transferred to the District of New Jersey.  D.E. 19, No. 19-18547 (D.N.J. Sept. 20, 2019).  On August 20 and 21, 2019, four movants, including Plaintiffs, filed motions to serve as lead plaintiff, appoint class counsel, and to consolidate the matters.  D.E. 5-8.  On April 14, 2020, this Court consolidated the three matters; appointed Plaintiffs as the Lead Plaintiffs; and appointed class counsel.  D.E. 20, 21.

Plaintiffs subsequently filed their Consolidated Class Action Complaint on July 1, 2020. Plaintiffs assert the following counts: (i) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (ii) violations of Section 20(a) of the Exchange Act against Defendants Kishore Lulla, Prem Parameswaran and Jyoti Deshpande (the "Individual Defendants").  D.E. 34.  The current motion to dismiss and motion to strike followed.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes additional pleading requirements. "Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at

issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### C. PSLRA

The PSLRA imposes further pleading requirements. "The PSLRA established heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). The PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Id.* at 241-42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (internal quotations omitted).

Both provisions of the PSLRA pleading standard require that facts be pled "with particularity," echoing the requirement set forth in Rule 9(b). *Id.* at 241 n.3. Although the "PSLRA replaced Fed. R. Civ. P. 9(b) as the applicable pleading standard in private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA. *Id.* This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Section 78u-4(b)(1) also adds the requirement that where

"an allegation regarding [a defendant's] statement or omission is made on information or belief," plaintiffs must "state with particularity all facts on which that belief is formed"; that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1).

As to the second element, the PSLRA's approach for pleading scienter sharply deviates from Rule 9(b), which allows plaintiffs to plead the scienter element generally. *Avaya*, 564 F.3d at 253. Under the PSLRA, the court must evaluate whether all the facts in the complaint as alleged, taken collectively, give rise to a "strong inference of scienter" – not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of scienter, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates how likely one conclusion is as compared to others, in light of the pleaded facts. *Id.* Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324. Although the inference that the defendant acted with scienter need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## III.   ANALYSIS

### A.  Section 10(b) and Rule 10b-5

In Count One, Plaintiffs allege that Defendants violated Section 10(b) and Rule 10b-5, which provide as follows:

> Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).  The Supreme Court has implied a private cause of action from the text and purpose of [S]ection 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36-37 (2011).

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).  Accordingly, to state a securities fraud claim pursuant to Section 10(b) and Rule 10b-5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Id.* at 167.

### 1. Material Misrepresentations

As to the first element, a plaintiff must "identify a false representation of material fact or omission that makes a disclosed statement materially misleading." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419 (3d Cir. 1997)).  "[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to the investor." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988)).  In other words, courts must "examine statements in the full context of the documents which they are a part" and not engage in a "selective reading" of the statements. *Pfizer, Inc.*, 754 F.3d at 168-69 (citing *Burlington Coat Factory*, 114 F.3d at 1426; *Tellabs*, 551 U.S. at 322).

As discussed, Plaintiffs' allegations of securities fraud revolve around Eros' financial well-being.  The alleged misrepresentations can be grouped into four categories: (1) statements regarding the Eros' general financial profile; (2) statements concerning Eros' intangible assets; (3) statements concerning Eros' internal controls and related certifications under the Sarbanes-Oxley Act of 2002 ("SOX Certifications"); and (4) statements pertaining to the ratings agencies, CARE and Moody's.  The Court addresses each category in turn.

### a.  Statements Concerning Eros' Financial Profile

Defendants' statements regarding Eros' financial profile involve representations that Eros had a "solid capital structure," *see, e.g.*, Compl. ¶ 157, was "well-capitalized," *see, e.g.*, *id.* ¶ 110-11, and had a "conservative" balance sheet, *see, e.g.*, *id.* ¶ 184.  Plaintiffs contend that when Defendants made these statements, Defendants had a duty to speak truthfully about Eros' financial profile.  Accordingly, Plaintiffs continue, Defendants were required to disclose that Eros' liquidity was significantly strained and that its balance sheet was not as strong as professed.  Plaintiffs conclude that because Defendants failed to do so, their statements constitute material misrepresentations.  Plfs. Opp. at 12-13.

Defendants first contend that Plaintiffs fail to allege that the statements were false when made because most of these statements pre-date the CARE downgrade and missed loan payments.  Accordingly, Defendants maintain that they must be dismissed.  Defs. Br. at 14-15.  The Court disagrees.  Importantly, in making this argument, Defendants implicitly concede that some of the alleged misrepresentations were made after EIML missed its loan payments in April and May 2019.  As for the statements that occurred before this event, Plaintiffs' allegations sufficiently allege that Eros was having financial difficulty.  Plaintiffs allege that between 2016 and 2019, Eros had occasional delays in paying employee salaries, Compl. ¶¶ 77, 95-99; that during the 2017-

2018 financial year Eros "fac[ed] some issues in repaying the banks' dues, and as a result it was being charged with late installment penalties and its credit rating was decreasing," *id.* ¶ 104; and that Eros had inconsistencies in its loan repayment to a bank since 2016, *id.* ¶ 106. Viewed together, Plaintiffs sufficiently plead that leading up to the downgrade, Eros' finances were not as strong as Defendants represented. The Court now turns to the substance of the alleged misrepresentations.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (quoting *Basic Inc.*, 485 U.S. at 239 n.17). "The duty to disclose arises 'when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Id.* (quoting *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000)). In this instance, Plaintiffs rely on the last category, arguing that Defendants had a duty to fully disclose information to ensure that their statements were not inaccurate or misleading, and that Defendants failed to do so.

Defendants counter that the statements are immaterial because they were vague and accompanied by facts and language that substantiated Defendants' statements about Eros' strong financial picture. Defs. Br. at 14-15. Many of the alleged misrepresentations were made in conjunction with quarterly financial reports. Defendants also point to Eros' annual SEC Form 20-Fs, which included a financial report for the year. *See* Declaration of Christos Papapetrou ("Papapetrou Decl."), Exs. 1, 7, 15, D.E. 37-3, -9, -17. Through these reports, Eros regularly provided information as to whether Eros was in fact well-capitalized. Accordingly, according to Defendants, Eros' financial disclosures provided investors with concrete information and render Defendants' allegedly false statements describing Eros as "well-capitalized" immaterial. *Fan v. Stonemor Partners LP*, 927 F.3d 710, 716-17 (3d Cir. 2019) (explaining that a company's Form

10-Ks and annual reports rendered the alleged fraudulent statements immaterial because they contained information that directly pertained to and negated the plaintiffs' allegations).

To the extent that the alleged misrepresentations are not rendered immaterial by Eros' financial disclosures, Defendants maintain that the statements regarding Eros' strong and solid financials are non-actionable puffery.  Defs. Br. at 24-26.  Puffery amounts to "vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied." *In re Aetna*, 617 F.3d at 284; *see also Pfizer, Inc.*, 754 F.3d at 172 ("Moreover, the adjective 'spectacular' is the kind of 'vague and general statement of optimism' that 'constitutes no more than puffery and is understood by reasonable investors as such.'" (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999))).  Such statements "are non-actionable precisely because they are not material—a reasonable investor would not base decisions on such statements."  *Fan*, 927 F.3d at 716.

Defendants contend that "[n]umerous cases in this Circuit have dismissed securities actions based on similar vague and generalized statements."  Defs. Br. at 25.  In *Aetna*, for example, the Third Circuit determined that the defendants' statements about "'disciplined' pricing statements" were "oblique references to Aetna's pricing policy" that were "too vague to ascertain anything on which a reasonable investor might rely."  *In re Aetna*, 617 F.3d at 284; *see also Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) ("[S]tatements concerning the Company's 'dramatic deposit growth,' 'strong performance,' and 'unique business model,' constitute nothing more than mere 'puffery,' insufficient to sustain a Rule 10b-5 claims."); *In re Hertz Global Holdings, Inc.*, No. 13-7050, 2017 WL 1536223, at *10 (D.N.J. Apr. 27, 2017) ("The Court agrees that statements about 'strong' and 'record' financial results, as well as the generally optimistic statements, constitute puffery.").  Plaintiffs respond that courts have also concluded that statements

similar to "Defendants' evaluations of Eros' financial well-being . . . to be actionable and not immaterial puffery." Plfs. Opp. at 14. In *Shapiro v. UJB Financial Corp.*, for example, the Third Circuit determined that "such general labels as 'conversative' and 'cautious' can be the basis for liability under Rule 10b-5." 964 F.2d 272, 282 (3d Cir. 1992).

The parties each identify precedent to support their arguments. "[Q]uestions of materiality have traditionally been viewed as particularly appropriate for the trier of fact." *In re Aetna*, 617 F.3d at 283. Accordingly, the Court cannot conclude at the motion to dismiss stage that Defendants' statements regarding Eros' "strong," "healthy," "solid," and "conservative" balance sheet and cash flow are non-material statements of puffery. Defendants' motion, therefore, is denied on these grounds.

Defendants also argue that to the extent their statements about Eros' financial well-being are forward looking, in that they discuss Eros' future growth, *see, e.g.*, Compl. ¶¶ 116, 122, 124, they are protected by the PLSRA's "Safe Harbor." Defs. Br. at 26-27. Plaintiffs explain that they are not basing their claims on any forward-looking statements, rather their allegations are focused on the non-forward-looking aspects of certain statements. Plfs. Opp. at 15-16.

The PSLRA Safe Harbor "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)). A statement is "forward-looking" if it contains a "projection of revenues, income [], earnings [] per share, capital expenditures, dividends, capital structure, or other financial items," or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." *Id.* at 255 (citing 15 U.S.C. § 78u–5(i)(1)(A)–(C)). With

14

respect to mixed present and future statements, the component of the statement that refers to the present is not protected by the Safe Harbor.  But when the present-tense statement cannot "meaningfully be distinguished from the future projection of which they are a part," the statement, as a whole, can be considered forward looking.  *Id.* at 255.

Many of the allegedly false or misleading statements at issue here can meaningfully be separated into present and forward-looking statements.  One statement, for example, indicates that "[o]ur balance sheet *remains* strong . . . . And we are *on track to be free* cash flow positive by the fiscal year-end."  *See, e.g.*, Comp. ¶ 130 (emphases added).  "[R]emains" clearly refers to a current, not future, state.  "[O]n track to be free" is not as clear.  "On track" is arguably a reflection of a current position, while "to be free" clearly indicates a future event.  However, even if the "on track to be free" language is considered forward looking in its entirety, the "remains" could be actionable.  As discussed, Plaintiffs clearly state that they do not contend that the forward-looking components are actionable.  Plfs. Opp. at 15-16.  Moreover, the other statements identified by Defendants are not actually forward looking.  *See, e.g.*, Compl. ¶ 124 ("We *have maintained* a strong balance sheet *and built-in* working capital efficiencies as we paid down our RCF significantly and continue to fund Eros Now growth as well as our future slate." (emphases added)); *see also* Compl. ¶¶ 153, 158.  Consequently, the Safe Harbor is not applicable to Defendants' alleged misrepresentations regarding Eros' financial well-being.

In sum, the Court denies Defendants' motion on these grounds.

### b.  Eros' Intangible Assets

The next category involves statements about Eros' intangible assets.  *See, e.g.*, Compl. ¶¶ 113, 117, 123, 129, 139.  Plaintiffs allege that Defendants' statements were false because Eros overpaid related parties for film rights and advances, which inflated Eros' intangible content asset

balances. *Id.* ¶¶ 52-57. Defendants maintain that these statements are opinions, and Eros' public disclosures "make clear the subjectivity involved in calculating intangible assets balances." Defs. Br. at 15. Defendants rely on *In re Hertz Global Holdings, Inc. Securities Litigation*, No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017). In *Hertz*, the defendants argued that statements about GAAP compliance in Hertz's public filing were opinions. The Court determined that the GAAP standards at issue were subjective and "involve a range of possible treatments instead of a single objective set of calculations." *In re Hertz*, 2017 WL 1536223, at \*11. In addition, Hertz's public filings "explain[ed] this inherent subjectivity." *Id.* The *Hertz* court, therefore, determined that "[t]hese are not matters of objective fact." *Id.*

Plaintiffs argue that the allegations here are materially different than differences of opinion involved in making complex accounting decisions, asserting that the misstatements at issue should be treated as facts. The cases Plaintiffs cite in support, however, are distinguishable. In *Oregon Laborers Employers Pension Trust Fund v. Maxar Technologies Inc.*, No. 19-124, 2020 WL 5500458 (D. Colo. Sept. 11, 2020), the plaintiffs alleged that the defendants inappropriately followed certain accounting standards. The plaintiffs further alleged that this failure led to an overstatement of the value of the defendants' intangible assets. 2020 WL 5500458, at \*12-13. *Fresno County Employees' Retirement Association v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017) also involved allegations that the defendants utilized improper accounting standards. In fact, the court in *comScore* explicitly distinguished *Hertz*. 268 F. Supp. 3d at 546. Here, Plaintiffs do not allege that Defendants failed to follow or misapplied accountings standards to value the intangible assets. Moreover, on a more fundamental level, neither case cited by Plaintiffs stands for the proposition that a defendant's valuation of intangible assets should be

treated as a statement of fact.  As a result, the Court will construe the alleged misrepresentations as opinions.

Both parties rely on *Omnicare v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) as to whether Defendants' statements are actionable opinions.  Defs. Br. at 16-17; Plfs. Opp. at 17.  In *Omnicare*, the Supreme Court determined that an opinion can be actionable if the speaker "omits material facts about the issuer's inquiry or knowledge concerning a statement of opinion," and "those facts conflict with what a reasonable investor would take from the statement itself."  *Omnicare*, 575 U.S. at 189.  *Omnicare*, however, addressed liability under § 11 of the Securities Act of 1933.  *Id.*  The Third Circuit has "not considered whether *Omnicare* applies to claims brought under the Exchange Act."  *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 n.16 (3d Cir. 2020).  Accordingly, it is not clear whether *Omnicare* even applies.  Neither party, moreover, provides any explanation as to why the Court should apply *Omnicare* rather than the standard that is expressly recognized by the Circuit, as set forth in *Pfizer, Inc.*, 754 F.3d at 170. But the issue is largely academic because Plaintiffs plead actionable opinions under either standard.

In *Pfizer*, the Third Circuit stated that "[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis."  *Pfizer, Inc.*, 754 F.3d at 170. In light of Plaintiffs' allegations that Eros' advances to NextGen were almost double the reported budget, Compl. ¶¶ 56-57, and that Defendants engaged in self-dealing to funnel money to family members, *id.* ¶ 54-55, the Court concludes that Plaintiffs sufficiently allege that Eros' intangible asset valuation lacked a reasonable basis and it is reasonable to infer that it was not honestly believed.  Therefore, Plaintiffs plead actionable opinions under *Pfizer*.  Turning to the *Omnicare* standard, the omitted information conflicts with what a reasonable investor would understand the

opinions to mean.  Accordingly, the alleged misrepresentations can also be considered opinions under *Omnicare*.

Defendants next assert that Eros' public disclosures insulate their opinions from being actionable.  Defs. Br. at 15-16.  Eros' Form 20-F states, among other things, that "[j]udgment is required in determining" the "useful life of intangible assets and determine[ing] their income generating life," and that "[t]hese calculations require judgments and estimates to be made."  *See* Papapetrou Decl., Ex. 7 at 67.  Eros' Form 20-Fs also explain that the value of films encompasses several factors, such as the budget, cast, and intellectual property rights.  *Id.* at 39-40.  Finally, Eros disclosed that it engaged in related-party transactions, including with NextGen and Everest, *id.* at 98, and that Eros "may have achieved more favorable terms had such transactions been entered into with unrelated parties," *id.* at 15.  Defendants contend that these disclosures "fully informed investors of all material information concerning the intangible asset balances."  Defs. Br. at 17-18.  But none of these statements warned investors that Defendants intentionally inflated the value of the Eros film rights, as alleged, to funnel money between family members.  Accordingly, Eros Form 20-F disclosures do not insulate the opinions.

Defendants also argue that Plaintiffs used  an unreliable source, a report from a short-seller, to establish that Eros improperly inflated the value of its intangible assets.  Defs. Br. at 19.  A June 7, 2019 report from Hindenburg Research noted that since the IPO, "Eros'[] payments to NextGen were vastly larger than the total budget for the five films NextGen produced since that time."  Compl. ¶ 13; *see also id.* ¶¶ 57, 73.  Defendants first argue that Eros' Form 20-F fully disclosed the company's related transactions and explained that a film's value encompasses more than its budget.  Defs. Br. at 19.  But, as discussed, the general statements in the Form 20-F do not render Defendants' statements about the intangible assets not misleading in light of Plaintiffs' allegations.

18

Defendants also argue that the Hindenburg article is unreliable because Hindenburg is a short-seller who would profit from Eros declining share price. Defs. Br. at 19. But none of the cases that Defendants cite to support their argument stand for the proposition that a report from a short-seller is unreliable as a matter of law. Instead, many courts "have held that a short-seller report . . . 'does not implicate the same skepticism as a "traditional" anonymous source.'" *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (quoting *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012)). As a result, the Court credits Plaintiffs' allegations that emanate from the Hindenburg article as true.

Finally, Defendants provide a counter explanation for Eros' 2019 announcement of its intangible assets impairment. Defs. Br. at 18-19. But Plaintiffs' allegations do not depend on the 2019 impairment announcement. Thus, Defendants' argument is denied on these grounds.

In sum, Plaintiffs sufficiently plead that Defendants made actionable opinions about the value of Eros intangible assets. Defendants' motion is denied on these grounds.

### c. Statements Concerning Eros' Internal Controls & SOX Certifications

For the third category, Plaintiffs identify allegedly fraudulent statements in Eros' 2017 and 2018 Form 20-Fs. In both forms, Eros states, among other things, that

> our internal control over financial reporting was effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Compl. ¶¶ 118, 149. Deshpande and Parameswaran also signed SOX Certifications attesting that the Form 20-Fs had no material misstatements and/or omissions and also fairly presented the financial condition of Eros. *Id.* ¶¶ 119-20; 150-51.

Defendants maintain that Plaintiffs' allegations as to Eros' internal controls and SOX Certifications are not pled with requisite specificity. Defs. Br. at 20-21. The Court agrees. In bringing a § 10(b) and Rule 10b-5 claim, a plaintiff may plead facts demonstrating that when making a SOX certification, "defendants knew or consciously avoided any meaningful exposure to the information that was rendering their Sarbanes-Oxley certification erroneous." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417-18 (D. Del. 2009). However, "Plaintiffs making such a claim must still satisfy the heightened pleading requirements of the PSLRA." *Id.* As discussed, a claim involving an allegedly false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Rahman*, 736 F.3d at 242 (internal quotation omitted). Here, Plaintiffs simply allege "that the Company's internal controls and procedures and compliance policies were inadequate." *See* Compl. ¶¶ 121, 152. This conclusory allegation falls short of the PSLRA's pleading requirements because Plaintiffs fail to provide supporting allegations regarding the alleged inadequate internal controls.

In their opposition brief, Plaintiffs identify two paragraphs of the Complaint that purportedly substantiate their allegations about Eros lack of internal controls. *See* Compl. ¶¶ 79, 90. Both paragraphs address events in 2019. *Id.* But Plaintiffs' allegations about Eros' internal controls stem from Eros' 2017 and 2018 Form 20-Fs. Thus, statements and events that occurred a year later fail to demonstrate that earlier statements were false when made. *Cf. Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007) ("The District Court found the proposed amendments futile because Winer did not plead that any defendant knew any statement was false or misleading when made."). Consequently, Defendants' motion is granted on these grounds and

Plaintiffs' claim, to the extent that it relies on alleged misrepresentations concerning Eros' Internal Controls & SOX Certifications, is dismissed.

### d.  Interactions with Ratings Agencies

The final category of alleged misrepresentations involves Defendants' interactions with CARE and Moody's.  Plaintiffs allege that Defendants' statements that they were working with CARES to restore Eros' credit rating after the downgrade were false, Compl. ¶¶ 177, 181, as well as statements that the withdrawal of Moody's rating was at Eros' request, *id.* ¶¶ 181, 185.  Plaintiffs also assert that the first press release issued on June 6, 2019 was false.  In the release, Eros stated that it and its subsidiaries "continue to meet all debt service commitments."  *Id.* ¶ 175.  Later that day, however, Eros issued a second statement indicating that EIML missed two interest payments. *Id.* ¶ 176.

Defendants seek to dismiss the allegations about Eros working with CARE because they are based solely on information from a confidential witness, that Defendants contend is unreliable. Defs. Br. at 22.  The Third Circuit has provided the following guidance when considering allegations from confidential witness under the PSLRA:

> The PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or of a defendant's scienter. 15 U.S.C. § 78u–4(b)(1), (b)(2).  In the case of confidential witness allegations, we apply that requirement by evaluating the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  [*Cal. Pub. Emps.' Ret. Sys. v.*] *Chubb,* 394 F.3d [126,] 147 [(3d Cir. 2004)].  If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply.  This is consistent with *Tellabs*'s teaching that "omissions and ambiguities count against inferring scienter" under the PSLRA's particularity requirements. *Tellabs,* 551 U.S. at 325. If, on the other hand, a complaint's confidential witness allegations

> are adequately particularized, we will not dismiss them simply on account of their anonymity.  In short, *Chubb* remains good law.

*Avaya*, 564 F.3d at 263 (footnote omitted).

In this instance, Plaintiffs rely on information from CW5, "a ratings analyst/manager at CARE," in alleging that Defendants were not actually working with CARE after the credit downgrade.  Compl. ¶ 99.  CW5, however, never worked on the Eros account.  *Id.*  Further, Plaintiffs fail to provide any information as to how CW5 obtained the information which forms of basis of his statements.  As a result, the Court questions CW5's reliability and basis of knowledge, and discounts CW5's allegations due to these shortcomings.  Moreover, Plaintiffs provide no other allegations regarding Eros' failure to cooperate with CARE after the credit downgrade.[4]  As a result, the Court concludes that Plaintiffs' allegations about misrepresentations regarding Eros' cooperation with CARE are not plead with particularity.

Turning to Plaintiffs' allegations about the Moody's withdrawal, Defendants argue that the alleged misrepresentations are not material because they were made after Moody's issued its report.  Defendants further argue that "Plaintiffs could not have been misled by a statement made *after* the purportedly correct statement was public."  Defs. Br. at 23 (emphasis in original).  After Moody's withdrew its rating of Eros, Eros issued a press release on July 2, 2019 stating that "the Company reiterates that the recent withdrawal of its Moody's rating was at the Company's

---

[4] In their opposition brief, Plaintiffs cite to a September 25, 2020 press release from CARE stating that Eros is not cooperating with CARE because it has "has not provided requisite information for monitoring the ratings."  Declaration of Donald A. Ecklund, Ex. A, D.E. 38-2.  This press release, or information about the press release is not asserted in the Complaint.  In fact, the release was issued months after the Complaint was filed.  Plaintiffs cannot amend their Complaint through a brief.  *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)).  Accordingly, the Court does not consider these new factual allegations or the exhibit in deciding the current motion.

request[.]"  Compl. ¶ 181; *see also id.* ¶ 185.  Even though this statement was issued after the withdrawal, it appears (or at least can be reasonably inferred) to be Eros' attempt at damage control.  It is entirely plausible that investors would rely on this statement as the Complaint references.  *See* Compl. ¶ 185 (indicating that analyst on the earnings call stated, in response to Lulla's explanation that Eros asked Moody's to withdraw its rating, that it was "an important point, I think").

Defendants also argue that Moody's policy about a withdrawal of credit ratings establishes that the withdrawal could not have been made per Eros' request.  Defs. Br. at 23.  Defendants, however, appear to rely on a policy that was not in effect at the time.  *See* Plf. Opp. at 24 n.20.  But regardless of what the Moody's policy actually says, Moody's announced that it "has decided to withdraw the rating" of Eros "for [Moody's] *own* business reasons."  Papapetrou Decl., Ex. 18, D.E. 37-20 (emphasis added); *see also* Compl. ¶ 83 (pleading that Moody's withdrew its rating of Eros "for its own business reasons").  In addition, Defendants appear to be arguing that Eros' statement (that Moody's withdrawal was at Eros' request) was not believable due to Moody's internal policy.  Putting aside the unusual aspects of this argument, Defendants have not shown that investors knew of Moody's policy.  Defendants also argue that Moody's statement was an opinion.  Defs. Br. at 23.  The Court disagrees.  Although Moody's credit ratings themselves are opinions, the reason why Moody's withdrew its rating of Eros is not.  Plaintiffs plausibly plead that Defendants' statements about the reasons for Moody's withdrawal were not correct.

Plaintiffs also allege a misrepresentation as to the initial June 6, 2019 press release in response to the CARE credit rating downgrade.  In the release, Eros stated that it and its subsidiaries "continue to meet all debt service commitments."  Compl. ¶ 175.  Later that day, Eros clarified that EIML missed two loan interest payments in April and May 2019.  *Id.* ¶ 176.  Plaintiffs

allege that the first June 6 press release was a material misrepresentation because Eros admitted a few hours later that EIML missed two payments, and because Eros missed other obligations, including loan payments and payroll.   *Id.*   Defendants do not contest that the alleged misrepresentations about EIML's missed loan payments are actionable.   Therefore, Plaintiffs state a claim with respect to the June 6 press release.

### 2.   Scienter

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind."[5]   *Avaya*, 564 F.3d at 252 (internal citations and quotations omitted) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976) and citing *Advanta*, 180 F.3d at 534-35).   The PSLRA scienter standard "requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"   *Id.* at 267 (quoting *Advanta*, 180 F.3d at 534-35).   A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."   *Id.* at 267 n.42 (citing *Advanta*, 180 F.3d at 535).   "'[C]laims essentially grounded on corporate mismanagement' do not adequately plead recklessness."   *Id.* (citing *Advanta*, 180 F.3d at 540).

A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."   *Id.* at 267 (quoting *Tellabs*, 551 U.S. at 324).   It is more than "merely 'reasonable' or 'permissible.'"   *Tellabs*, 551 U.S. at 324.   To make this determination, a court must "weigh the plausible nonculpable explanations for the defendant's

---

[5] This standard is distinguishable from the mental state for forward-looking statements, which requires actual knowledge, under the PSLRA Safe Harbor provision.   *See* 15 U.S.C. § 78u-5(c).

conduct against the inferences favoring the plaintiff." *Avaya*, 564 F.3d at 267 (quoting *Tellabs*, 551 U.S. at 324) (internal quotations omitted).  However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."  *Id.* (quoting *Tellabs*, 551 U.S. at 324).  "The pertinent question is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 267-68 (quoting *Tellabs*, 551 U.S. at 323).  "Omissions and ambiguities 'count against inferring scienter.'" *Id.* at 268 (quoting *Tellabs*, 551 U.S. at 326).  "Motive and an opportunity to commit fraud" are just a factor in this analysis.  *Advanta*, 180 F.3d at 534-35.  In sum, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

The Court will address the parties' arguments as to scienter in the same groupings as it did when determining whether Plaintiffs alleged actionable misrepresentations.

### a.  Statements Concerning Eros' Financial Profile

Plaintiffs argue that the Court can infer that Defendants were knowledgeable about topics on which they regularly spoke to investors, including Eros' "strong" financial profile.  Plaintiffs continue that the Complaint includes allegations that contradict these public representations and that these allegations are sufficient to infer recklessness as to the Individual Defendants.  Plfs. Opp. at 28.  Recklessness may be inferred at the motion to dismiss stage when plaintiffs "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

Prior to the CARE credit downgrade, Plaintiffs' allegations about the Individual Defendants' knowledge come from confidential witnesses and pertain to missed loan payments and salaries.  As discussed, when considering allegations from confidential witnesses, a court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (footnote omitted) (quoting *Chubb*, 394 F.3d at 147).  "If allegations are found wanting with respect to these criteria," a court can discount information from a confidential witness steeply. *Id.*

Plaintiffs' first four confidential witnesses are former Eros employees (CW 1, CW 2, CW 3, and CW 4) who all state that between 2016 and 2019, there were some delays in paying salaries at Eros.  Compl. ¶¶ 95-98.  CW 1 also alleges that the Individual Defendants were "the key decision makers at Eros," *id.* ¶ 95, and CW 2 adds that Lulla "call[ed] the shots," *id.* ¶ 96.  None of the witnesses, however, provide sufficient details to support their allegations.  For example, the CWs do not explain how long the delays were, how frequently delays occurred, or how many employees were affected.  In fact, these CWs do not even specifically allege that they were personally affected by these delays.  Critically, these confidential witnesses fail to allege that any Defendant was aware of these occasional delays.  Given the lack of specificity, the Court will steeply discount allegations from the former employee CWs.

CW 6 also provides allegations about Eros' actual financial profile.  CW 6 was an accountant who worked on the 2017-18 EIML audit.  CW 6 believes that "it was evident that EIML would be downgraded due to their borrowings and inconsistent repayment to the banks" and that Eros "was facing some issues in repaying the banks' dues." *Id.* ¶ 104.  Although the Complaint provides more information as to CW 6, his allegations still lack a substantial amount of detail.  For

example, CW 6 does not indicate to whom (or when or what) he communicated his concerns (about the imminent downgrade) with at Eros or how Eros otherwise had knowledge of the coming downgrade other than it was "evident" to CW 6.  Therefore, the Court also discounts the allegations from CW 6.

Plaintiffs' allegations from CW 7 suffer the same fate.  CW 7 is a credit manager at the bank that issued EIML its loan in 2016.  *Id.* ¶ 106.  CW 7, however, provides no information about Defendants' involvement in, or knowledge of, the "inconsistencies" in the loan repayment.  The same is true as to CW 8's allegations.  CW 8 is a "business head and CEO of an entertainment channel," who has worked in the media industry for "almost twenty years, and as a result, is familiar with Eros and its business practices."  *Id.* ¶ 107.  Although Plaintiffs plead that CW 8 is familiar with Eros, Plaintiffs again fail to explain where or how CW 8 obtained his information.  Thus, CW 8's allegations are discounted.

In sum, none of confidential witnesses' allegations (standing alone or in combination) are sufficient to establish that any of the Individual Defendants had knowledge that contradicted the statements that Eros' financial profile was strong before the CARE credit rating downgrade.  Plaintiffs, therefore, fail to allege sufficiently that any of the Individual Defendants acted recklessly during this time.

Plaintiffs, however, allege that Lulla and Parameswaran each made a material misstatement about Eros' financial profile after the credit rating downgrade.  Compl. ¶¶ 177, 179.  This timing is sufficient for the Court to infer recklessness for Lulla and Parameswaran, given their position in the Company and because of the public nature of the downgrade.  Thus, Plaintiffs sufficiently allege scienter for Lulla and Parameswaran for these statements.

### b.  Intangible Assets

Plaintiffs rely on the core operations doctrine to establish scienter for their allegations as to Eros' intangible assets.  Plfs. Opp. at 32.  The core operations doctrine provides that when misrepresentations and omissions involve "'core matters' of central importance" to the corporate defendant, "a 'core operations inference' supports scienter."  *Avaya*, 564 F.3d at 268.  But "a corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter."  *Rahman*, 736 F.3d at 247.  Rather, there must be "some additional allegations of specific information conveyed to management and related to fraud."  *Id.*  Here, Plaintiffs allege that Eros' core operation was to acquire content and monetize it.  *See, e.g.*, Compl. ¶¶ 40-45.  Plaintiffs, however, fail to include allegations demonstrating specific information conveyed to the Individual Defendants.  As discussed, the Court discounts the allegations from confidential witnesses due to a lack of specificity.  In addition, allegations from the Hindenburg report, which Plaintiffs also rely on to establish misrepresentations regarding Eros' intangible assets do not address the Individual Defendants' knowledge.  Without such allegations, Plaintiffs' reliance on the core operations doctrine comes up short.

Next, Plaintiffs contend that the circumstances surrounding Eros' impairment of its intangible assets on July 15, 2019 contribute to a strong inference of scienter.  Plfs. Opp. at 31.  Plaintiffs argue that it is plausible "that the events in the month before the impairment shown a spotlight on Eros'[] balance sheet, and the Company could no longer keep reporting inflated content asset balances."  *Id.*  Plaintiffs add that an inference of scienter is warranted based on Defendants' vague explanation for the impairment (*i.e.*, market conditions) and the size of the impairment.  *Id.*  Plaintiffs cite two cases that purportedly support making such an inference, but each case is inapposite.

First, in *In re Leapfrog Enterprises, Inc. Securities Litigation*, 237 F. Supp. 3d 943 (N.D. Cal. 2017) the Court determined that it could infer scienter due to the timing and size of the defendant company's impairment and because of the specific allegations in the complaint demonstrating that the need for an impairment was obvious. The defendant company's impairment occurred in the fourth quarter because of a stock decline that was obvious as of the third quarter. *Id.* at 954. In addition, the impairment "represented 96% of [the company's] long-lived assets." *Id.* In *Oregon Laborers Employers Pension Trust Fund v. Maxar Technologies, Inc.*, the court found that the plaintiffs' allegations gave rise to a strong inference of scienter where, despite many red flags, the defendant company only conducted an impairment analysis "after its financial health and accounting practices were questioned by Spruce Point," a third-party report that looked into the company's financial health and accounting practices. *See* No. 19-124, 2020 WL 5500458, at *7, 14-15 (D. Colo. Sept. 11, 2020). Thus, in both cases, the court concluded that there was a strong inference of scienter due to the impairment, coupled with additional allegations of an obvious need for the impairment. Here, Plaintiffs do not adequately allege that the Eros' impairment should have been taken earlier,[6] that the need for the impairment was obvious, or that Eros only took the impairment due to outside pressure. In other words, Plaintiffs lack the additional allegations that were necessary for the courts to infer scienter in *Leapfrog* and *Maxar*. Without these additional allegations, the Court will not infer scienter.

Finally, Plaintiffs argue that the Court should infer scienter as to Lulla because of Lulla's involvement with Eros and because his relatives received the inflated payments for film rights and content advances. Plfs. Opp. at 29. In support, Plaintiffs rely on *Zhengyu He v. China Zenix Auto*

---

[6] In their opposition brief, Plaintiffs argue that the triggering events that led to the impairment also occurred in 2017 and 2018. Plfs. Opp. at 19. These allegations do not appear in the Complaint. Again, Plaintiffs cannot amend their pleading through a brief.

*International Limited*, No. 18-15530, 2020 WL 3169506 (D.N.J. June 12, 2020).  In *Zhengyu*, the court determined that an inference of scienter was plausible as to the CEO defendant based on a number of factors, including that the company's stock was delisted by the New York Stock Exchange after an investigation that questioned improper trading by company employees and because the CEO ran "the Company like a family business" and owned approximately 70% of the company.  2020 WL 3169506, at *9.  Here, Plaintiffs' allegations about Lulla's alleged scheme involving family members and his management style come predominately from confidential witnesses that the Court has already discounted.  Therefore, as pled, the Court cannot conclude that there is a strong inference of scienter as to Lulla based on his position at the Company.  As a result, Plaintiffs fail to sufficiently allege scienter with respect to their allegations about Eros' intangible assets.  These claims are therefore dismissed.

### c.   Interactions with Ratings Agencies

The last category of alleged misstatements involves Defendants' statements regarding Moody's and CARE.  Plaintiffs contend that "[a]ffirmative steps taken by Defendants to discredit specific public criticisms point to a finding of scienter."  Plfs. Opp. at 29.  Namely, after the CARE downgrade, Eros initially issued a press release stating that Eros and its subsidiaries had met all debt service commitments.  Compl. ¶ 68.  This statement was not true and was corrected through a second press release the same day.  *Id.* ¶ 69.  Lulla also stated that Eros' management team was "making it a priority to work with CARE Ratings . . . to have our credit rating revised upwards in due course."  *Id.* ¶ 177.  After Moody's withdrew its rating, Eros issued a press release stating that the withdrawal was at Eros' request and Lulla later stated that it was "fake news or false reports" that it was Moody's decision to withdraw the rating.  *Id.* ¶ 185.  Plaintiffs allege that Lulla was

attempting recklessly to obscure the severity of CARE and Moody's decisions.  Defendants fail to provide a plausible counter-explanation.  Therefore, the Court will infer scienter as to Lulla.

Finally, the June 6 press release was issued by Eros and is not attributed to a specific Individual Defendant.  Compl. ¶ 175.  The parties only address scienter with respect to the Individual Defendants, and do not consider whether the Court can impute scienter to Eros alone.  Because Defendants do not appear to argue that any claims should be dismissed on these grounds, the Court permits the claims to stand.[7]

In sum, Plaintiffs establish scienter only as to Lulla and Parameswaran for their statements about Eros' financial profile after the CARE downgrade, and as to Lulla for his statements regarding Moody's, which may be imputed to Eros.  Scienter also exists as to Eros for the June 6 press release.

### 3.  Reliance

Plaintiffs rely on a fraud-on-the-market theory of reliance.  Compl. ¶¶ 218-22.  With the fraud-on-the-market presumption, "if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 462 (2013).  Defendants do not challenge Plaintiffs' allegations regarding the fraud-on-the-market presumption.  Accordingly, the Court concludes that Plaintiffs adequately plead reliance.

---

[7] While not raised by any party, the scienter of the individual Defendants who made actionable statements, who are all corporate officers, is imputed to Defendant Eros.  *See Avaya*, 564 F.3d at 251-52 ("Although Shareholders' Complaint focuses on the statements of McGuire and Peterson, liability for these statements, if they were fraudulent, can also be imputed to Avaya because a corporation is liable for statements by employees who have apparent authority to make them.").

### 4.  Loss Causation & Economic Loss

Defendants argue that Plaintiffs fail to establish loss causation.  Defs. Br. at 39.  Loss causation requires "a causal connection between the material misrepresentation and the loss." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 424 (3d Cir. 2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  Specifically, the "loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *Id.* at 426 (citing *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185-87 (3d Cir. 2000)).  To establish loss causation in a typical § 10(b) case in which a plaintiff alleges that public misstatements or omissions affected the price of publicly traded stock, "a plaintiff must show that its 'losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation.'"  *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *39 (D.N.J. Dec. 31, 2018) (quoting *Pure Earth, Inc. v. Call*, 531 F. App'x 256, (3d Cir. 2013)).

Plaintiffs utilize the "materialization of the risk" approach to demonstrate proximate cause.  Under this approach, Plaintiffs must prove that "the materialization of the undisclosed risk caused the alleged loss." *McCabe*, 494 F.3d at 429 (quoting Dane A. Holbrook, *Measuring & Limiting Recovery Under Rule 10b–5: Optimizing Loss Causation and Damages in Securities Fraud Litigation*, 39 Tex. J. Bus. L. 215, 260-62 (2003)).  Plaintiffs also use a corrective disclosure approach, meaning that "[a]fter a misrepresentation has been made, a corrective disclosure reveals 'the falsity of the alleged misrepresentation, and introduces new information on the market.'"  *De Vito*, 2018 WL 6891832, at *39 (D.N.J. Dec. 31, 2018) (quoting *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2020), *aff'd* 639 F.3d 623 (3d Cir. 2011)).

Plaintiffs' first surviving misrepresentation occurred on June 6, 2019 and was corrected the same day.  Compl. ¶ 175-76.  Plaintiffs allege that on June 6, 2019, Eros share price fell over 49%.

32

*Id.* ¶ 192.  Defendants counter that this drop in the share price cannot be attributed to the disclosure about the missed loan payments (the second release on June 6), rather it is actually associated with the CARE ratings downgrade.  The CARE ratings downgrade occurred after the market closed on June 5, 2019.  Defs. Br. at 41.  Defendants also allege that the corrective press release did not actually reveal any wrongdoing.  *Id.*  The Court disagrees.  "[A p]laintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)."  *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).  Further, "[a] corrective disclosure only needs to relate to the same subject as the misrepresentation and there is no requirement that the disclosure mirror the earlier misrepresentation."  *Vanderhoef v. China Auto Logistics Inc.*, No. 18-10174, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020).  Plaintiffs allege that CARE's downgrade and Eros' press release the following day together caused the Company's share price to fall.  Compl. ¶ 191.  At the motion to dismiss stage, Plaintiffs do not need to explain why other market forces did not affect the share price.  Accordingly, Plaintiffs plausibly plead loss causation for the alleged June 6 misrepresentation.

The next misrepresentations, as to Eros' financial profile, occurred and on June 9, 2019.  *Id.* ¶¶ 177, 79.  After this occurred, Plaintiffs allege a series of corrective disclosures regarding the truth of Eros' liquidity problems.  Moreover, after each these disclosures, Eros' share price fell.  *See id.* ¶¶ 196-206.  Plaintiffs sufficiently allege loss causation for the alleged misrepresentations about Eros' financial profile.

The final alleged misrepresentations are Lulla's statements that the Moody's withdrawal occurred due to Eros' request.  *Id.* ¶¶ 181, 185.  Plaintiffs, however, fail to plead allegations

demonstrating that there was any corrective statement on the market after Lulla's statements. Plaintiffs, therefore, fail to allege loss causation for these alleged misrepresentations. Plaintiffs' claims, as they pertain to the alleged Moody's misrepresentations are dismissed.

In sum, only the allegations pertaining to the June 6 press release and the two post-CARE ratings downgrade statements about Eros' strong financial profile survive the motion to dismiss.

### B.   Section 20(a)

In Count Two, Plaintiffs assert claims for control person liability against Lulla, Parameswaran, and Deshpande under Section 20(a) of the Exchange Act. Compl. ¶¶ 237-240. "Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a 'controlled person' who violates Section 10(b)." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (citing 15 U.S.C. § 78t(a); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005)). The three elements to this claim are "(1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *Id.* (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 (3d Cir. 2006)). Thus, "liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.*

Defendants only seek to dismiss the § 20(b) claims because they contend that Plaintiffs fail to state any § 10(b) claims. But the Court has concluded that Plaintiffs sufficiently pled an underlying Section 10(b) violation with respect to Lulla, Parameswaran, and Eros. Thus, Defendants' motion is denied on these grounds and the § 20(b) claim will not be dismissed.[8]

---

[8] In a single sentence footnote, Defendants argue that the Complaint should be dismissed as to Lulla because Plaintiffs fail to establish that the Court has personal jurisdiction over Lulla. *See* Defs. Br. at 44 n.18. The Court will not address this argument because it is not properly before

### C.  Motion to Strike

In their motion to strike, Plaintiffs seek to strike Exhibits 4, 5, 6, and 17 from the Papapetrou Declaration, which Defendants filed in support of their motion to dismiss.  Plaintiffs argue that these documents were not explicitly referred to or relied upon in the Complaint.  Strike Br. at 1.  The Court did not rely on any of these Exhibits when deciding the motion to dismiss. Accordingly, Plaintiffs' motion to strike is denied as moot.

## IV.    CONCLUSION

In sum, the Court **GRANTS in part** and **DENIES in part** Defendants' motion to dismiss Lead Plaintiffs' Complaint.  D.E. 37.  With respect to the portions of the Complaint that are dismissed, the dismissal is without prejudice.  Plaintiffs shall have thirty (30) days to file an amended complaint, which cures the deficiencies noted herein.  If Plaintiffs do not file an amended pleading, the dismissed claims will be dismissed with prejudice.  In addition, Plaintiffs' motion to strike is **DENIED** as moot.  D.E. 39.  An appropriate Order accompanies this Opinion.

Dated: April 20, 2021

John Michael Vazquez, U.S.D.J.

---

the Court.  *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (internal citation omitted).