James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: decklund@carellabyrne.com

*Liaison Counsel for Plaintiffs*

Kara M. Wolke
Leanne H. Solish
Raymond D. Sulentic
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EROS INTERNATIONAL PLC SECURITIES LITIGATION | Civil Action No. 19-cv-14125 (JMV)(JAD) **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION AND OVERVIEW ......................................... 1

II.   JURISDICTION AND VENUE ..................................................... 9

III.  PARTIES ......................................................................... 10

IV.   SUBSTANTIVE ALLEGATIONS .................................................. 12

    A.    Background Of The Company And Its Business ............................... 12

    B.    Defendant Lulla And His Family Retain Tight Control Over Eros's
        Operations ................................................................ 14

    C.    Eros's Significant Content Expenditures Accounted For A Majority of
        Its Assets Balances ......................................................... 16

    D.    Eros Now's Growth And Continued Content Acquisition Left Eros
        With A Strained Liquidity Profile .......................................... 19

    E.    The Truth Begins to Emerge ............................................... 22

        1.    EIML Misses Debt Payments, Triggering Credit Downgrades
            And Withdrawals; Further Reports Substantiate Eros's Troubled
            Liquidity ............................................................ 22

        2.    Eros Announces A Massive Impairment To Its Intangible
            Content Assets, But Cites Circumstances That Existed Years
            Earlier, At Least As Of The Start Of The Class Period ........... 29

        3.    Eros Turns To Toxic Financing To Source Its Cash Needs .... 33

        4.    Post-Class Period Events ......................................... 34

    F.    Multiple Witnesses Confirm That Eros Was Frequently Late In Paying
        Its Obligations, That The Individual Defendants Held Tight Control
        Over The Group, And That Eros Was Not Working With CARE To
        Ensure Its Rating Was Revised Upwards .......................................... 35

        1.    Former Employees Recount Delayed Salaries And That The
            Individual Defendants, And Particularly Defendant Lulla, Were
            The Group's Decision Makers ................................... 35

2.   Other Confidential Witnesses Confirm That EIML Was Frequently Late In Paying Its Loan Obligations, Eros Was Not Cooperating With CARE To Reverse Its Credit Downgrade, And Defendant Lulla Had Tight Control Over The Group ............ 37

G.   The Circumstances Surrounding Eros's Impairment Of Its Intangible Content Balances Strongly Infer That Defendants Were, At A Minimum, Deliberately Reckless In Reporting Bloated Content Balances And Assuring Investors That Eros's Balance Sheet Was "Strong" And "Conservative" .......................................................... 41

1.   Applicable Accounting Rules For The Impairment of Intangible Assets ...................................................................................... 41

2.   The Indications For Impairment Of Eros's Intangible Asset Content Balances Were Obvious And Existed At The Beginning Of The Class Period And Remained Throughout The Class Period ...................................................................................... 45

3.   Defendants' Misleading Explanation Of The Reasons For And Timing Of Eros's Massive Intangible Content Impairment Announced On July 15, 2019 Fail To Credibly Explain The Delay In Impairment ................................................................. 49

V.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......................... 52

A.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Fourth Quarter And Fiscal Year 2017 Financial Results .. 52

B.   Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter Of 2018 Financial Results ........................... 54

C.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter Of 2018 Financial Results ...................... 55

D.   Defendants' False And Misleading Statements And Omissions During The January 2018 Citi Global TMT West Conference ..................... 57

E.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter Of 2018 Financial Results .......................... 58

F.   Defendants' False And Misleading Statements And Omissions In The Supporting Materials For The Deutsche Bank 2018 Media, Telecom & Business Services Conference .......................................................... 59

G.   Defendants' False And Misleading Statements And Omissions In And Relating To Eros's Fourth Quarter And Fiscal Year 2018 Financial Results ........................................................................... 60

H.   Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter Of 2019 Financial Results ........................... 62

I.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter Of 2019 Financial Results ...................... 63

J.   Defendants' False And Misleading Statements And Omissions During The January 2019 Citi Global TMT West Conference ...................... 65

K.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter Of 2019 Financial Results .......................... 66

L.   Defendants' False And Misleading Statements And Omissions During Spring 2019 Conferences ................................................................... 67

M.   Defendants' False And Misleading Statements And Omissions In The Wake Of Eros's Credit Rating Downgrades And Moody's Withdrawal Of Coverage ......................................................................................... 69

VI.   LOSS CAUSATION ..................................................................... 74

VII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................. 77

VIII.   CORPORATE SCIENTER ALLEGATIONS ............................................. 78

IX.   CLASS ACTION ALLEGATIONS ....................................................... 78

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .............................................................. 80

XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ...................................................... 82

XII.   CLAIMS FOR RELIEF .................................................................. 83

XIII.   PRAYER FOR RELIEF .................................................................. 87

XIV.   JURY TRIAL DEMANDED ............................................................. 88

Lead Plaintiffs Opus Chartered Issuances, S.A., Compartment 127 and AI Undertaking IV ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Amended Consolidated Class Action Complaint ("Complaint") against Eros International PLC ("Eros" or the "Company"), Kishore Lulla ("Lulla"), Prem Parameswaran ("Parameswaran"), and Jyoti Deshpande ("Deshpande") (together, "Defendants").   The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Eros; securities analysts' reports and advisories about the Company; press releases and other public statements issued by and disseminated by the Company; media reports about the Company; and interviews of former employees of Eros and other persons with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Eros securities between July 28, 2017 and September 25, 2019, inclusive (the "Class Period"), and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Eros is a global company in the Indian film entertainment industry that co-produces, acquires, and distributes Indian language films in multiple formats

1

worldwide.  Eros was formed in 2006 to serve as the ultimate parent corporation for an international group of related companies in the Indian film and entertainment industry (thus, Eros frequently refers to itself as the "Group").  Eros's largest and majority owned subsidiary, Eros International Media Limited ("EIML"), is Eros's core "Bollywood" film production and distribution business.  EIML is Eros's most important operating subsidiary, and the content it acquires and co-develops is then distributed through the rest of the Group entities.

3.     Since its founding in 1977, Eros has been run and controlled by the Lulla family, with Defendant Lulla serving at the helm as Group Chairman since January 2010 through the end of the Class Period, and also serving as CEO and Managing Director since April 1, 2018 through the end of the Class Period.  Defendant Lulla also served as Executive Director of EIML from 2009 through the end of the Class Period.  The Lulla family retains a voting majority, and numerous members of the family serve as executives within Eros and its Group of entities.  For example, during the Class Period, Defendant Lulla's brother, Sunil Lulla, was an executive director of Eros and was the Executive Vice Chairman and Managing Director of EIML, and Defendant Lulla's daughter, Rishika Lulla Singh, was as an executive director of Eros and served as the CEO and then Chairman of Eros Digital, which houses Eros's digital streaming platform.

4.     Under the Lulla family's tight control, Eros has engaged in numerous related party transactions with entities run by members of the family.   These transactions smack of self-dealing and conflicts of interest, as they do not appear to have been made at market rates.  For example, Defendant Lulla's brother-in-law runs NextGen Films Private Limited ("NextGen").  Since Eros's November 13, 2013 U.S. initial public offering (the "IPO"), NextGen has sold film rights to and received net content advances from Eros for a total of almost $95 million.  Yet, according to NextGen's own website, it has only produced five films since that time, all which

were co-produced by Eros, and the total budget for these films amounted to just $19.3 million.

5.    Apart from Eros's questionable related party dealings, Eros's business requires significant, upfront, capital spending.  From fiscal year 2014 through fiscal year 2019,[1] Eros spent over $1 billion on intangible content acquisition, comprised of film and intangible content rights, content advances, and film productions.  Nearly half of that $1 billion (or $468 million) was expended during the financial reporting periods at issue in this action, with Eros reporting $173.5 million, $186.8 million, and $107.7 million spent on intangible content for fiscal years 2017, 2018, and 2019, respectively.   These expenditures were capitalized on Eros's balance sheet as intangible content assets, and constituted a majority of Eros's reported assets during the Class Period.  For example, Eros reported an intangible content asset balance of $998.5 million, over 70% of the Company's total assets as of the end of its fiscal year ending March 31, 2018.

6.    At the same time, Eros was greatly expanding its digital streaming platform, Eros Now, which also necessitated significant capital.  In addition, Eros experienced significant delays in collecting its earned revenue due to the payment schedules in the industry.  As a result, during the Class Period, Eros was frequently crunched for cash, and investors and analysts alike were consistently concerned by Eros's strained liquidity profile.  In response, Defendants continually reassured investors and analysts that Eros was succeeding in improving both its cash flows, and that Eros remained "well capitalized" and had a "strong" and "conservative" balance sheet.

7.    However, on June 5, 2019, EIML's credit rating was downgraded to

---

[1] Eros's fiscal year ("FY") ends on March 31.  References to a fiscal year, such as fiscal year 2019, or FY 2019, mean the fiscal year ending March 31 of that year (*e.g.*, FY 2019 runs from April 1, 2018 to March 31, 2019).

"default" by one of India's largest credit ratings agencies, CARE Ratings.   In bringing down EIML's credit rating by a whopping 10 notches from an investment grade rating to a "D" (default) rating—CARE's lowest rating—CARE cited concerns of "ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the company."   CARE reported that:

> As a part of CARE's due diligence process, CARE had interacted with EIML's bankers and had also obtained 'Default if any' statements from the company which mentioned delays/default in debt servicing (both principal and interest) on the terms loans availed by the company, as also delays of more than 30 days in servicing interest on cash credit and packing credit, and a delay of more than 30 days in payment of bills. As per the management, the delays/ default in debt servicing is on account of slowdown in collection from debtors leading to cash flow issues in the company.

8.     In response to the dramatic, 10-notch CARE downgrade, on June 6, 2019, at approximately 9:21 a.m. ET, the Company falsely claimed that "Eros International PLC and all of its subsidiaries have met and continue to meet all debt service commitments.   The Company retains the full faith and confidence of our lenders."

9.     Then, later that same day, at approximately 3:08 p.m. ET, Eros issued a "clarifying" statement admitting that, in fact, "EIML was late on two loan interest payments for April and May 2019.   These interest payments total less than $2 million and are currently in process of remittance."

10.    On this news, the Company's share price fell $3.59 per share, nearly 50%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume.

11.    According to numerous witnesses, including former employees, and a June 2019 Reuters article,[2] the missed payments cited by CARE were not just a clerical error or an isolated (as Defendants claimed) event.  In fact, the Company was frequently late in paying its obligations, including required debt payments and payroll, starting as early as 2016, and continuing throughout the Class Period.  For example, as detailed herein (*see, e.g.*, ¶¶109-116 (former employees) ¶¶117-131 (other witnesses)), former employees reported that at various times throughout the Class Period salaries were delayed by weeks.  Other witnesses explained that EIML's inability to repay its debt obligations began as early as 2017.  For example, a former auditor of EIML (CW6) explained that Eros was hit with bank penalty notifications for late payment of debt obligations during the 2017-2018 financial year, of which Defendant Lulla and his brother Sunil Lulla (the managing director of EIML), would have had knowledge.  In addition, a former credit manager at Bank of Baroda (CW7), which extended at least one loan to EIML in 2016, explained that each quarter EIML would receive an account statement of this loan, and that Defendant Lulla, his brother Sunil Lulla, and Eros's CFO and North America President, Defendant Prem Parameswaran, were notified by Bank of Baroda that the loan was not being paid.  According to CW7, EIML's failure to pay was a "non-payment fiasco" that started in 2017.

12.    On June 7, 2019, S&P Global Ratings withdrew its credit rating on Eros for its failure to issue proposed senior unsecured notes to refinance its existing debt facilities.

13.    Also on June 7, 2019, Hindenburg Research published a report (the

---

[2] Shilpa Jamkhandikar and Euan Rocha, *Eros group says it is taking action to resolve loan payment delays*, REUTERS, June 10, 2019, available at https://www.reuters.com/article/eros-debt/eros-group-says-it-is-taking-action-to-resolve-loan-payment-delays-idINKCN1TA0P2?edition-redirect=ca.

"Hindenburg Report") that, in commenting on EIML's CARE credit downgrade, concluded that "a liquidity event seemed to border on the inevitable."  Within its report, Hindenburg Research highlighted a number of related party entities they believe contributed to Eros's situation, including Eros's payments to NextGen for intangible content advances and sale of film rights.  The Hindenburg Report laid out that, since Eros's IPO in 2013, Eros's payments to NextGen were vastly larger than the total budget for the five films NextGen produced since that time, including the films co-produced with Eros.

14.   In response to the June 7, 2019 news, the Company's share price fell $0.41 per share, or 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume.

15.   Then, on June 11, 2019, Moody's downgraded Eros to B2 from B1, and lowered its outlook from stable to negative.  Moody's stated that the ratings downgrade reflected Eros's "strained liquidity profile, which led to delays in servicing the bank loans of its Indian subsidiary," EIML, and that the missed payments evidenced Eros's "poor financial management and controls across the group; factors which are inconsistent with a B1 rating."  Moody's further explained that Eros's operating subsidiaries "continue to face challenges and delays in recovering their receivables balances, which according to the company has further strained its liquidity profile[,]" and that Eros's high working capital needs means its liquidity is reliant on the refinancing of $72 million in short-term facilities.

16.   On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on unusually heavy trading volume.

17.   Then, on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros "for its own business reasons."

18.   On this news, Eros's share price fell $0.49 per share, or 22.5%, to close at $1.69 per share on June 26, 2019, on unusually heavy trading volume, and

continued to fall the following day by another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.

19.    On July 15, 2019, Eros announced its earnings results for its fiscal year ended March 31, 2019.   Within those results, Eros reported a $423.3 million impairment loss, of which $405.5 million was allocated to its balances for intangible content assets.   Of the $405.5 million in intangible content asset impairment losses,$366.7 million was allocated to impairment loss on Eros's film and content rights and $38.8 million was allocated to impairment loss on its content advances. The $38.8 million in content advance losses closely approximates the $36.9 million Eros paid to NextGen in advances during the latest three fiscal years leading up to the impairment.

20.    Eros explained that the intangible content asset impairment—*i.e.*, the bulk of the massive impairment loss announced on July 15, 2019—resulted from the Company's analysis that its collective film content library carrying amount[3] exceeded its recoverable amount.   Later that same day, during an earnings call, Defendant Parameswaran further explained that "[d]uring fiscal year-end 2019, due to the significant decline in the market value, we tested impairment for carrying the value of net assets of the group exceeding our market capitalization and expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations."   However, both of these indicators had consistently existed since at least the beginning of the Class Period—and Defendants' further discussion of the impairment charge provided no credible explanation as to what changes (if any) accounted for the bulk of this massive impairment of over one-third of Eros's greatest asset, its intangible content.   The existence of the impairment indicators as

---

[3] An asset's carrying, or book, value is the original cost of the asset, less accumulated depreciation or amortization.

of the start of the Class Period with the announcement of FY 2017 results (*see* ¶¶144-147), combined with the lack of credible explanation for Defendants' decision to record the massive impairment as of March 31, 2019 in the Company's FY 2019 results (*see* ¶¶148-160), strongly suggests that Eros's intangible content assets were impaired as of the start of the Class Period and the impairment expense should have been recorded long before Defendants eventually did so.

21.    Finally, on September 26, 2019, before the market opened, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principal amount of senior convertible notes due 2020.  Eros said it planned to use the net proceeds of $25 million for general corporate purposes.

22.    On this news, the Company's share price fell $0.85, nearly 30%, to close at $1.99 on September 26, 2019, on extremely heavy trading volume.

23.    As detailed in a Seeking Alpha analysis of this September 2019 convertible note transaction, the offering surprised investors, was regarded as toxic financing, and provided further evidence of Eros's liquidity crisis.

24.    In sum, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors during the Class Period that: (1) the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the start of the Class Period, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such) as of the start of the Class Period; (3) as a result, the Company's liquidity and financial position

was materially weaker than Defendants had represented during the Class Period; (4) as a result, the Company and its subsidiaries frequently had trouble timely paying its debt obligations, including EIML missing loan payments; and (5) as a result, Eros was at heightened risk of needing to rely on toxic financing to fund its operations.

25.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

29.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

30.   Plaintiff Opus Chartered Issuances, S.A., Compartment 127, as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 8-4), purchased Eros securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

31.   Plaintiff AI Undertaking IV, as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 8-4), purchased Eros securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

32.   Defendant Eros International PLC ("Eros" or the "Company") is incorporated under the laws of Isle of Man, United Kingdom.  At all relevant times, Eros's principal executive offices were located at 550 County Avenue, Secaucus, New Jersey 07094.  Eros's shares trades on the New York Stock Exchange ("NYSE") under the symbol "EROS."[4]

33.   Defendant Kishore Lulla ("Lulla") has served as the Company's Group Chief Executive Officer ("CEO") and Managing Director of the Company since April 1, 2018 through the end of the Class Period.  During all relevant times, Lulla served as a director and Chairman of the Board of Directors of Eros.  Lulla has also served as Executive Director and served on the Board of Directors of EIML since 2009.  Lulla has worked at Eros since the age of 16, expanding Eros's presence in

---

[4] On July 30, 2020, Eros announced the completion of its merger with STX Filmworks, Inc. ("STX"), and changed its name to Eros STX Global Corporation and its ticker symbol to ESGC.  As part of the merger announcement, the Company announced that Lulla would be the Executive Co-Chairman of the Board of Directors, and Parameswaran would serve as Head of Corporate Strategy.

the international markets and spearheading the Company's growth.  Lulla has over 30 years in the film and media entertainment industry.

34.    Throughout the Class Period, Lulla spoke to investors and analysts on conference calls.  Lulla possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Lulla signed and certified the accuracy Eros's yearly report on SEC Form 20-F for the fiscal year ended March 31, 2019 and certified the accuracy of Eros's yearly report on SEC Form 20-F for the year ended March 31, 2018.

35.    Defendant Prem Parameswaran ("Parameswaran") has served as Eros's Group Chief Financial Officer ("CFO") of the Company and President for North America since May 28, 2015 through the end of the Class Period, and has served as a director of the Company since December 20, 2018 through the end of the Class Period.  Before joining Eros, Parameswaran had over 23 years of investment banking experience, having worked at Goldman Sachs, Deutsche Bank, and most recently, as Global Head of Media and Telecommunications Investment Banking at Jefferies LLC.

36.    Throughout the Class Period, Parameswaran spoke to investors and analysts on conference calls.  Parameswaran possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Parameswaran signed and certified the accuracy of Eros's yearly reports on SEC Form 20-F for the fiscal years ended March 31, 2018 and March 31, 2019, certified the accuracy of Eros's yearly report on SEC Form 20-F for the year ended March 31, 2017, and signed Eros's quarterly report on SEC Form 6-K for the quarterly periods ended June 30, 2017 through December 31, 2018.

37.    Defendant Jyoti Deshpande ("Deshpande") served as Group CEO and Managing Director of the Company from June 22, 2012 to April 1, 2018.  Deshpande has over 25 years of experience in media and entertainment, and has been part of

Eros's leadership team since 2001.  In April 2018, Deshpande joined Reliance Industries to head the Media and Entertainment business as President of the Chairman's Office, while continuing to serve on the Board of Directors of Eros and of EIML (appointed in July 2012) through June 28, 2019 when she resigned due to "other commitments."

38.    During the Class Period, Deshpande spoke to investors and analysts on conference calls.  Deshpande possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Deshpande signed and certified the accuracy of Eros's yearly report on SEC Form 20-F for the fiscal year ended March 31, 2017, and signed Eros's quarterly report on SEC Form 6-K for the quarterly period ended June 30, 2017.

39.    Defendants Lulla, Parameswaran, and Deshpande (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background Of The Company And Its Business

40.    Eros is a global company in the Indian film entertainment industry that

co-produces, acquires, and distributes Indian language films in multiple formats worldwide, and operates the purportedly largest Indian-content digital streaming service, Eros Now.  Eros was formed in 2006 to serve as the ultimate parent corporation for an international group of related companies in the Indian film and entertainment businesses (the "Group").

41.   Eros originated with what is now Eros's largest subsidiary, Eros International Media Ltd. ("EIML"), an Indian corporation founded in 1977 by Defendant Lulla's father, Arjan Lulla.[5]   Eros began as a distributor of films throughout India, and claims to be one of the oldest companies in the Indian film industry to focus on the international market for "Bollywood" entertainment.

42.   Since its founding, Eros has diversified its operations and expanded its business lines.  Today, Eros operates several different operating segments, including distribution of theatrical film, television syndication, and the Company's digital streaming business, Eros Now.

43.   EIML still operates as Eros's core Bollywood film production and distribution business, and is the key operating subsidiary which acquires and co-produces content that the Group then distributes internationally.  For example, two of Eros's international business operating subsidiaries buy EIML's intellectual property rights and distribute them internationally, with Indian distribution of those rights retained by EIML.  Thus, EIML is one of the key cash generating subsidiaries within the Group.

44.   Eros has aggregated multi-format rights to over 3,000 films in its library, including both recent and classic titles spanning genres, budgets, and languages.  Eros Now has digital rights to over 12,000 films, through Eros's internal library and

---

[5] EIML is publicly traded on the Bombay Stock Exchange ("BSE") Limited and the National Stock Exchange ("NSE") in India, but remains majority-owned by Eros.

through third-party aggregated content.

45.     Since its November 2013 U.S. IPO, a significant part of Eros's business has been focused on developing and expanding the content and users of Eros Now. This focus is reflected in Eros's revenues for its most recent fiscal results: for the year ended March 31, 2019, Eros reported that 25.7% of its revenue came from theatrical distribution, 28.7% from television syndication, and 45.6% from Eros Now and other ancillary businesses.  Before Eros Now was developed in 2012, the Company primarily made money through its other two operating segments.

**B.     Defendant Lulla And His Family Retain Tight Control Over Eros's Operations**

46.     Since its founding in 1977, EIML and the Eros Group of businesses has been tightly run and controlled by Arjan Lulla, and later by Defendant Lulla after Arjan Lulla transferred control to him in 2006.

47.     Eros admits that the Founder's Group,[6] which includes Defendant Lulla, has a substantial interest in and has the "ability to exercise a controlling influence over our business" through the voting rights afforded by the Founder's Group's ownership of 100% of Eros's class B shares.  Eros's dual class structure affords "B" shares ten votes per share, compared to one vote per share afforded to class "A" shares, which are owned by the investing public.  This gives the Lulla family control of 65% of the voting rights in the Company.

48.     Furthermore, other members of the Lulla family run Eros and its subsidiaries.  For example, from 2006 through at least the end of the Class Period, Defendant Lulla's brother, Sunil Lulla, was an executive director of Eros, and was the Executive Vice Chairman and Managing Director of EIML since being

---

[6] The "Founders Group" refers to Beech Investments Limited and Kishore Lulla. Beech Investments Limited is owned by discretionary trusts that include Defendant Lulla as a potential beneficiary.

appointed in 2009. Defendant Lulla's daughter, Rishika Lulla Singh, also served as an executive director of Eros from November 2014 until Eros merged with STX and has continues to serve on the Board of Directors of Eros STX Global Corporation, and also served as the CEO and later also as Chairman of Eros Digital, which includes Eros Now, until the merger with STX, where she now serves as Co-President of the combined company.[7]  Rishika Lulla Singh was just 27 years old when she joined Eros's Board and had already been serving as the CEO of Eros Digital when appointed.

49.    Defendant Lulla's cousin, Surender Sadhwani, was Eros's President of Middle East operations from 2006 through the end of the Class Period. Another of Defendant Lulla's cousins, Vijay Ahuja, served as Eros's director and Vice Chairman from April 2006 until December 20, 2018. Finally, Defendant Lulla's wife Manjulla Lulla, another daughter, Riddhima Lulla, a son-in-law, and a sister-in-law, Krishika Lulla, were all employees of Eros or one of its subsidiaries.

50.    In a detailed report on June 14, 2019, Moody's noted high governance and "key person" risks due to the Lulla family's control. Moody's further explained that the family was involved in the day-to-day operations of Eros, and the family's "long-standing relationships with talent, production houses and cinema operators are critical to the success of the company and its strategy." Moody's further noted that the Lulla family has no significant business interests outside of Eros, "which further supports their vested interest in [Eros's] performance."

51.    Defendant Parameswaran highlighted Defendant Lulla's control and involvement in the Company during a June 4, 2019, Credit Suisse conference:

---

[7] In addition to Defendant Lulla, both his brother, Sunil Lulla, and his daughter, Rishika Lulla Singh, retained senior executive positions after Eros's merger with STX, and Defendant Lulla and his daughter, Rishika Lulla Singh, remained on the Board of Directors of the newly merged company.

And then obviously, Kishore Lulla, the CEO, he owns the majority of our company, he's the Founder.  And again, when I say he's the Founder, in India you have [individuals] who own like different industries. His company, this Eros International is his bread-and-butter. He doesn't have an oil company. He doesn't have a textile company. He has only Eros. And so I think, we're proud to say that we're very focused on it.

52.     Defendant Lulla himself has displayed his tight control and management over the Group through press interviews and during earnings calls.  For example, following the devastating CARE credit downgrade, Lulla repeatedly and emphatically assured investors that the missed payments had been rectified in interviews with numerous media outlets, including The Economic Times, Bloomberg *Quint*, CNBC TV 18, and Reuters (*see* ¶¶78-80, *infra*).

### C.     Eros's Significant Content Expenditures Accounted For A Majority of Its Assets Balances

53.     As a Bollywood entertainment company, Eros generates revenues by monetizing Indian film content, primarily by co-producing or acquiring this content from third parties, and then distributing its content through various channels, including through EIML.  Its principal—and significant—capital expenditures are therefore spent on this content.  For example, in fiscal years 2017, 2018, and 2019, Eros spent $173.5 million, $186.8 million, and $107.7 million, respectively on content.  And for the three fiscal years preceding those covered by the Class Period, Eros spent over $650 million on content.

54.     These content expenditures greatly increased Eros's intangible content assets balance on its balance sheet.[8]  The "intangible assets – content" line item is comprised of film and content rights, content advances, and film productions.

---

[8] At times Eros uses the terms "content" and "intangible content" interchangeably as they both generally refer to the same thing.  After Eros purchases its content, it then records the purchase as an "Intangible Assets – Content" asset on its balance sheet.

Together, Eros's intangible content assets constitute a majority of the Company's total assets, as reflected in the following chart:

| Fiscal Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Intangible Assets – Content (in thousands)** | $719,214 | $795,139 | $904,628 | $998,543 | $706,572 |
| **Total Assets (in thousands)** | $1,149,533 | $1,247,878 | $1,343,365 | $1,410,319 | $1,088,902 |
| **%** | 62.6% | 63.7% | 67.3% | 70.8% | 64.9% |

55.    As explained in Eros's Form 20-F filings with the SEC, its "[i]nvestments in films and associated rights, including acquired rights and distribution advances in respect of completed films, are stated at cost" on Eros's balance sheet.  Eros further explains in its 20-Fs that "[c]osts include production costs, overhead and capitalized interest costs net of any amounts received from third party investors."[9]

56.    Over the years, Eros has been accused of funneling funds to/from other Lulla family members through related party transactions for considerable sums of money at non-market rates.  Not only did Eros's overpayments to related parties compound the Company's issues with achieving positive cash flow (*see* Sec. IV.D, *infra*), it also inflated Eros's balances for its intangible content assets.

57.    Two examples of Eros's dealings with Lulla family members involved Eros's repeated engagement in transactions involving the purchase and sale of film rights and advancements for film co-production with two of Defendant Lulla's

---

[9] These capitalized intangible film content costs are then amortized over their estimated useful lives, which usually is the lesser of 10 years or the remaining useful life of the content rights.

brothers-in-law, through their businesses, NextGen Films Private Limited ("NextGen") and Everest Entertainment LLP ("Everest").

58.    During the Class Period, Eros reported purchases of $9.485 million in film rights during the 2017-2019 fiscal years and also that Eros advanced $36.909 million (net of refunds) to NextGen for film co-production during this same time. Eros likewise reported purchasing $1.426 million in film rights from Everest during the 2017-2019 fiscal years.   And since the IPO, Eros has reported that it has purchased almost $58 million in film rights from NextGen and $1.85 million from Everest.   Thus, since Eros's IPO, a total of $96.7 million paid to related entities NextGen and Everest was capitalized by Eros and included in its intangible content assets balance on Eros's balance sheet in its financial results issued during the Class Period.

59.    As the Hindenburg Report details, NextGen has reportedly released just five films since Eros's IPO—for a combined budget of $19.3 million.[10]   NextGen does not make its catalog of film rights publicly available on its website—but Eros's $36.9 million in Class Period content advances to NextGen is **_almost double_** the entire reported budget[11] for NextGen's films since the IPO—without including the

---

[10] A film's budget "includes all costs relating to the development, production, and post-production of a film[,]" and "does include self-charged 'producer fees' paid to the producer[,]" overhead, financing costs (including interest and legal fees), and extra contingencies. Schuyler Moore, _Why Film Budgets Are Important, Beyond The Cost of Production_, FORBES, Apr. 13, 2019, available at https://www.forbes.com/sites/schuylermoore/2019/04/13/the-importance-of-film-budgets/?sh=3399728827f5.

[11] And, according to at least two Bollywood executives, these film budgets are most likely themselves inflated by as much as 25-50%.  Pramod Thomas, _Are 'Baahubali' and '2.0' really expensive films or is it just marketing strategy?_, THE NEW INDIAN EXPRESS, Nov. 7, 2016, available at https://www.newindianexpress.com/business/2016/nov/07/are-baahubali-and-20-really-expensive-films-or-is-it-just-marketing-strategy-1535769.html.

fact that these films were largely co-produced by Eros. These facts suggest, at minimum, that Eros's reported content balances for NextGen films were highly bloated.

### D.   Eros Now's Growth And Continued Content Acquisition Left Eros With A Strained Liquidity Profile

60.   Eros had large capital expenditures for the production, acquisition and distribution of content, which required significant upfront cash investments. That cash need, combined with Eros's focus on expanding Eros Now, meant that Eros's business continually needed lots of capital. In addition, due to the significant time delays in collecting Eros's earned revenues, Eros's liquidity was consistently strained, and as a result caused the Company to experience negative free cash flows in recent years.

61.   To ease that liquidity strain, Eros has frequently tapped the capital markets for hundreds of millions of dollars through numerous transactions since its IPO. Despite numerous cash infusions through equity and bond offerings, Eros also greatly relied on other forms of debt. As of March 31, 2017, Eros had $271.5 million of borrowings outstanding, more than half of which was repayable within a year.

62.   At the beginning of the Class Period, Eros was focused on repaying its outstanding balances under its revolving credit facility and returning the Company to a positive cash flow position. For example, in its July 28, 2017 press release announcing financial results for the fourth quarter and fiscal year 2017, ended March 31, 2017, Eros highlighted that it had "[r]educed its Revolving Credit Facility from $123 million to $85 million in fiscal 2017 and since then have set aside approximately $40 million to pay it down further and bring it to around $45 million." Defendant Deshpande commented that:

> [I]t reflects our financial strength and stability where in without raising any significant external debt or equity, we not only paid down the RCF significantly but also funded our ongoing future slate as well as Eros

Now catalogue purchases and originals and still have around $115 million of cash balance after all that.  Over $200 million is already invested in the ongoing slate.  While we are in advanced stages of negotiations for a debt refinancing deal as well as expect to file a shelf for a potential capital raise soon after this earnings, even if any of these are delayed we are already well capitalized and have enough cash to continue to grow the business in the short to medium turn.

63.    Defendant Parameswaran confirmed that Eros had further reduced its net debt by $40 million post balance sheet filing, and further stated that "We continue to pursue refinancing and capital market transaction and are confident we will go back to being free cash flow positive in fiscal 2018[.]"  On an earnings call later that day, Defendant Parameswaran explained that the additional $40 million in cash was raised by selling 11% of its stake in EIML.  He assured the market that Eros "remains well-capitalized and able to invest in future growth."

64.    Eros's liquidity and negative free cash flows was also a key concern for investors and analysts.  For example, Wells Fargo noted Eros's "limited liquidity" in an August 7, 2017 report.  Maybank Kim Eng listed free cash flow as a "key financial metric," noting that it remained a challenge due to Eros's high capital expenditures.  And analysts from Jeffries noted in a July 28, 2017 report that one of the key takeaways for Eros was lingering questions regarding its liquidity.

65.    As the Class Period continued, Defendants continued to reassure investors and analysts that Eros was making strides with its balance sheet and cash flows, and that the Company was well capitalized.  For example, on Eros's February 21, 2018 earnings call, Defendant Parameswaran assured investors and analysts that Eros "remain[ed] focused on improving our working capital position[.]"

66.    Eros's assurances were backed up by two infusions of cash through direct offerings with individual institutional investors.  First, on December 4, 2017, Eros announced that it had entered into definitive agreements with an institutional investor in connection with a registered direct offering of $122.5 million aggregate

principal amount of senior convertible notes due 2020 and warrants to purchase 2,000,000 of the Company's A ordinary shares, for proceeds of $100 million.  Eros further announced that it would use the net proceeds of this offering to repay amounts outstanding under its revolving credit facility and for general corporate purposes.  Investors and analysts generally saw this equity-linked financing as positive news.

67.    Second, on February 20, 2018, Eros announced that: (i) Reliance Industries Limited[12] would be acquiring a 5% stake in Eros at $15 per share; (ii) that Reliance and EIML would enter into a partnership to jointly produce and acquire content in India, with both companies equally investing up to $150 million; and (iii) that Defendant Deshpande would leave Eros to become the head of Media and Entertainment at Reliance.  On August 6, 2018, Eros announced that the sale of the 5% stake to Reliance had been completed for a cash consideration of $46.6 million.  Analysts noted that Reliance's investment provided a vote of confidence in the Company, and that this equity infusion along with the $100 million equity-linked financing would help improve Eros's cash flow and balance sheet.

68.    When Eros did not return to a positive free cash flow by its 2018 fiscal year, Defendants continued to regularly reassure investors and analysts that this was a high priority for the Company.  For instance, Defendant Parameswaran stated in multiple earnings calls throughout Eros's 2019 fiscal year that "[w]e remain committed to improving our working capital position" and in a January 8, 2019 conference, that "we intend to be free cash flow positive within the next three years…. So I think the good news is we're not only going to be free cash flow generative and there's a return on your equity investment on that, which is good."

---

[12] Reliance is an Indian multinational conglomerate, is a Fortune 500 company, and is the largest private sector corporation in India.

E.     **The Truth Begins to Emerge**

1.     **EIML Misses Debt Payments, Triggering Credit Downgrades And Withdrawals; Further Reports Substantiate Eros's Troubled Liquidity**

69.    On June 5, 2019, after the close of market, EIML's credit rating was downgraded 10 notches to "default" (CARE D) by India's largest credit ratings agency, CARE Ratings, over concerns of "ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the company." CARE had previously rated EIML's long-term bank facilities CARE BBB-, outlook stable and its short-term bank facilities CARE A3 in October 2018.[13]

70.    As part of its downgrade CARE explained that:

As a part of CARE's due diligence process, CARE had interacted with EIML's bankers and had also obtained 'Default if any' statements from the company which mentioned delays/default in debt servicing (both principal and interest) on the terms loans availed by the company, as also delays of more than 30 days in servicing interest on cash credit and packing credit, and a delay of more than 30 days in payment of bills. As per the management, the delays/ default in debt servicing is on account of slowdown in collection from debtors leading to cash flow issues in the company.

71.    Responding to CARE's downgrade, on June 6, 2019, at approximately 9:21 a.m. ET, the Company issued a blatantly false press release claiming that "Eros International PLC and all of its subsidiaries have met and continue to meet all debt service commitments. The Company retains the full faith and confidence of our lenders."

_____

[13] CARE Ratings has a 21 notch system for long-term debt instruments when accounting for its positive (+)/negative (-) modifiers, and a 9 notch system for short-term debt instruments when accounting for its positive (+) modifier. *See* https://www.careratings.com/resources/rating-resources.aspx#:~:text=CARE%20would%20adopt%20an%20eight,State%20level (last accessed July 1, 2020).

72.     Then, at approximately 3:08 p.m. ET, Eros issued a second, "clarifying" statement admitting that, in fact, "as previously communicated through our Indian subsidiary, EIML was late on two loan interest payments for April and May 2019. These interest payments total less than $2 million and are currently in process of remittance."  Indeed, EIML had issued a company update on both the NSE and BSE stock exchanges at 13:24 IST and 15:54 IST (or approximately 1:24 am ET and 3:24 am ET), respectively, clarifying "the intimation made by [EIML] to the Stock Exchanges on June 5, 2019 regarding CARE D Ratings assigned to the Company, we would like to clarify that this is on account of a delay in servicing of Bank loans for the month of April 2019 and May 2019 and will be cleared within the next seven working days."

73.     Following all of this news, the Company's share price fell $3.59 per share, over 49%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume.

74.     Some analysts seem to have accepted at face value Defendants' claims that EIML's missed payments were mere processing errors.  For example, Macquarie Research issued a report on June 6, 2019 entitled "Hard to explain," stating that its "understanding is that the missed payments from EIML are due to clerical error, not to lack of cash, and for small amounts." Macquarie concluded: "This is inexcusable if true[.]"

75.     The following day, on June 7, 2019 before the market opened, S&P Global Ratings withdrew its preliminary B+ credit rating on Eros.  In its press release, S&P Global Ratings explained that the preliminary rating was based on Eros's proposed issuance of senior unsecured notes to refinance its existing debt facilities.  However, Eros had not issued the notes within the expected time frame, and as a result S&P Global Ratings decided to withdraw its rating.

76.     Also before the market opened on June 7, 2019, Hindenburg Research

published a report explaining why it believed EIML had been downgraded by CARE, concluding that "a liquidity event seemed to border on the inevitable."  In explaining why it was "inevitable" that Eros would face a liquidity event, the Hindenburg Report highlighted Eros's relationship with a number of entities they "believe are contributing to its current situation."  The Hindenburg Report went on to explain that although Eros has made $153 million in net payments and advances to NextGen from 2012 through 2018, there were only five films produced during that same time by NextGen for a total budget of $19.35 million.  Hindenburg Research further pointed out that these films were largely co-produced by Eros, and then posed the logical question: if Eros distributed $153 million in payments to NextGen, but only $19.35 million was actually used, where did the rest of the money go?

77.    On all this news, the Company's share price fell $0.41 per share, or over 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume.

78.    Defendant Lulla responded in multiple interviews with Indian press outlets on June 9 and June 10, 2019.  For example, in a June 9, 2019 Reuters article twice quotes Defendant Lulla: "'All the steps have been taken to rectify the issues (around delayed loan payments),' said Lulla, in a phone interview. 'And we have no loans, or debt due in the short-term.'"  Later in the article Lulla is quoted: "I don't understand what shorts are trying to achieve here.  It is just trying to create a smoke-screen.  There is nothing in the report that we should be worried about[.]"[14]

---

[14] Shilpa Jamkhandikar and Euan Rocha, *Eros CEO says loan payment delays being rectified as pressure mount*, REUTERS, June 9, 2019, available at https://www.reuters.com/article/us-eros-debt/eros-ceo-says-loan-payment-delays-being-rectified-as-pressure-mounts-idUSKCN1TA0P6.

79.   On June 10, 2019, Defendant Lulla was quoted in at least three more Indian news outlets.  CNBC-TV18 reported:[15]

> "We have not defaulted on any loans and the banks have not served us any notice on any loans.  We have already rectified whatever has to be rectified and we will take up the matter with CARE for revision of our ratings soon in the coming weeks," said Lulla.

> "There is no near maturity of debt and we have not defaulted on any debt. The net debt of the company is only Rs 450 crore," he added.

> Talking about delay in repayment, Lulla said, "The cash is being deployed for expansion of the business.  We are in the growth area now and when the company is in the growth area, we are not a dividend paying company."

In a phone interview during a Bloomberg *Quint* television broadcast on June 10, 2019, of which parts were republished online,[16] in discussing the CARE downgrade, Lulla explained: "'We will take it up with CARE now so that we can get our ratings reinstated in the coming weeks,' Kishore Lulla, chairman of its parent Eros International Plc, told Bloomberg *Quint* in an interview.  'Eros International has honoured its due payments.'"  Defendant Lulla also explained, among others, that to support EIML, "[w]e [Eros] have bought shares for Eros India if you see in the last filing, up to 2 percent of the company."

---

[15] Latha Venkatesh, Sonia Shenoy and Anuj Singhal, *Have not defaulted on any loans, clarifies Eros International after CARE Ratings downgrade*, CNBC-TV18, June 10, 2019, available at https://www.cnbctv18.com/market/have-not-defaulted-on-any-loans-clarifies-eros-international-after-care-ratings-downgrade-3634751.htm.

[16] Mahima Kapoor, *Eros Says Temporary Cash-Flow Issue Led To Default, Dues Paid*, BLOOMBERG QUINT, June 10, 2019, available at https://www.bloombergquint.com/business/eros-says-temporary-cash-flow-issue-led-to-default-dues-paid.

80.    The Economic Times also published edited excerpts from an interview with "ETNOW" on June 10, 2019:[17]

> *The instructions went on Friday only itself and the payments should have been cleared. All the banks should receive the payments today, said Kishore Lulla, Group EC,  Eros International, talking to ETNOW on downgrading by CARE.*

*Edited excerpts:*

**The CARE downgrade cannot be without a reason. What has changed in the operations of the company?**
The operations of the company, in fact, has increased. We have increased our EBITDA, PAT margins. In the last one year, we have reduced the debt by even Rs 100 crore. The downgrade came as a shock to the management. For whatever reason, we had missed April and May payments, which amount to Rs 13 crore and that has been rectified now. We will take up the matter with CARE but it was not expected at all. We do not have any debt maturities nearby which are of concern, which the company cannot meet.  We have reduced our debt by Rs 100 crore in the last one year and we will keep on doing so in the coming years.

**What is the current position of the company's cash and liquidity? Is it currently adequate?**
The EIML Group has Rs 100 crore on the balance sheet which is in the subsidiaries and we have the cash flow from the operations which are quite strong and which the company is generating today.

**You also said that the debt payment has been taken care of. Have the April and May debt payments been made?**
Yes, it has already been affected.

---

[17] *We have made April and May debt payments: Kishore Lulla, Eros*, THE ECONOMIC TIMES, June 10, 2019, available at https://economictimes.indiatimes.com/markets/expert-view/we-have-made-april-and-may-debt-payments-kishore-lulla-eros/articleshow/69723408.cms?utm_source=contentofinterest&utm_medium=text&utm_campaign=cppst.

81.   Even so, on June 10, 2019, Maybank Kim Eng dropped its analyst coverage of Eros.  In its accompanying report, Maybank Kim Eng explained that EIML's missed interest payment was surprising, and further explained that "[t]he drop in share price on the CARE D/G is negative for EROS US because it likely impedes the company's ability to raise both debt and equity."  This impediment to raising funds made it no longer possible to fundamentally value the Company, and thus Maybank Kim Eng was ceasing coverage of Eros.

82.   Analysts at Citi reacted to the CARE credit downgrade by slashing its price target for Eros in half to $6.50 on June 10, 2019, noting the possibility that a cash crunch at EIML poses a risk to its parent's shares, *i.e.*, to Eros's shares.

83.   Another article published on June 10, 2019 in Reuters[18] highlighted that Eros's shares were under pressure after the ratings cut due to payment delays, and further, that payment of some employee salaries and other dues had also been delayed.  Therein, the article provided more detail:

> Despite Eros's assurances, several Eros employees and industry insiders, who asked not to be named, told Reuters they were concerned about the situation.
>
> Two Eros employees told Reuters that the company has been a few days late in paying some employee salaries over the last two months.  Those two sources and three other industry sources, also said Eros had not made payments due to makers of some movies and shows.
>
> In an emailed response to questions from Reuters, Eros said, "The company has paid all salary dues up to May 2019."
>
> Eros also said its various shows "are at different stages of production and the company pays for these as per the production and delivery

---

[18] Shilpa Jamkhandikar and Euan Rocha, *Eros group says it is taking action to resolve loan payment delays*, REUTERS, June 10, 2019, available at https://www.reuters.com/article/eros-debt/eros-group-says-it-is-taking-action-to-resolve-loan-payment-delays-idINKCN1TA0P2?edition-redirect=ca.

milestones."

84.    This second Reuters article further referenced its interview with Defendant Lulla, stating: "Lulla told Reuters that Eros was also working to boost revenue and explore different forms of capital raising.… He said Eros had retained Barclays and Citibank to explore a debt offering secured against its library of thousands of films. 'We have completed that exercise and at the appropriate time we will complete the transaction,' Lulla said, adding that Eros could use these funds to refinance debt that comes due in the next two years."

85.    On June 11, 2019, Moody's downgraded Eros to B2 from B1, and changed its outlook to negative from stable.  Moody's stated that the ratings downgrade reflected Eros's "strained liquidity profile, which led to delays in servicing the bank loans of its Indian subsidiary," EIML.  Although Moody's noted that EIML stated its intention to pay the late debt payments, that "[n]onetheless, the delays in timely debt servicing exacerbates our concerns over the complex and multijurisdictional group structure, which has inhibited the timely movement of cash within the group entities."

86.    Moody's pointed out "that the delays in scheduled debt servicing evidence [Eros's] poor financial management and controls across the group; factors which are inconsistent with a B1 rating."

87.    Moody's further explained that Eros's operating subsidiaries "continue to face challenges and delays in recovering their receivables balances, which according to the company has further strained its liquidity profile[,]" and that Eros's high working capital needs means its liquidity is reliant on the refinancing of $72 million in short-term facilities.

88.    Thus, Moody's rating considered Eros's "small scale (revenues of around $300 million) compared to global peers, weak cash flow metrics because of the ongoing need to invest in content, weak liquidity profile, and complex group

structure."

89.   On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on unusually heavy trading volume.

90.   Then, on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros "for its own business reasons."

91.   On this news, Eros's share price fell $0.49 per share, or 22.5%, to close at $1.69 per share on June 26, 2019, on unusually heavy trading volume, and continued to fall on the following day another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.

### 2.   Eros Announces A Massive Impairment To Its Intangible Content Assets, But Cites Circumstances That Existed Years Earlier, At Least As Of The Start Of The Class Period

92.   On July 15, 2019, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2019, ended March 31, 2019.  As part of the release, Eros reported an impairment loss of $405.5 million to its intangible content asset balances—wiping out more than a third of the Company's reported content balances and 40% of the Company's equity attributable to equity holders of the Company (*i.e.*, its shareholders).[19]

93.   Of this $405.5 million impairment, Eros allocated $366.7 million to film and content rights and $38.8 million to content advances.  The $38.8 million in impairment losses allocated to content advances closely approximates the net content advances of $36.9 million to NextGen in fiscal years 2017-2019.

---

[19] Eros reported a balance of $865.69 million as of March 31, 2018 for the "Equity attributable to equity holders of Eros International Plc," and a balance of $521.46 million as of March 31, 2019, a $344.23 million decrease.

94.   The press release purported to explain Eros's impairment process, *i.e.*, how Defendants determined the recoverable amount of Eros's intangible content, and thus recognized an impairment loss:

> The asset or Cash Generating Unit (CGU) is impaired if its carrying amount exceeds its recoverable amount. The recoverable amount is defined as the higher of the 'fair value less costs of disposal' ("FVLCD") and the 'value in use' ("VIU").
>
> The Group identified one reporting segment and CGU, i.e. film content. The group performed impairment assessment as of March 31, 2019. The recoverable amount of the cash generating unit was determined based on value in use, which was higher than the FVLCD.
>
> Value in use was determined based on future cash flows after considering current economic conditions and trends, estimated future operating results, growth rates and anticipated future economic conditions. The approach and key (unobservable) assumptions used to determine the cash generating unit's value in use were as follows:

| Assumptions | As at March 31, 2019 | As at March 31, 2018 |
|---|---|---|
| Growth rate applied beyond approved forecast period | 4.00% | 4.00% |
| Pre-tax discount rate | 20.9% | 18.9% |

> The Company considered it appropriate to undertake an impairment assessment with reference to the estimated cash flows for the period of four years developed using internal forecast and extrapolated for the fifth year. The growth rates used in the value in use calculation reflect those inherent within the Company's internal forecast, which is primarily a function of the future assumptions, past performance and management's expectation of future developments through fiscal 2024.
>
> Accordingly, the Group recorded an impairment loss, totaling to $423,335 thousand, as an exceptional item, within the Statement of Income for the year ended March 31, 2019 ***mainly due to high discount rate as explained in the table above and changes in the market conditions***. The aforesaid impairment loss was firstly, allocated from

the carrying amount of goodwill and Intangible assets-trademark totaling $17,800 thousand and the residual amount totaling $405,535 thousand was allocated to Intangible assets-content.

95.    Later on July 15, 2019, Eros held an earnings conference call to discuss these financial results.[20]   During the question and answer portion of the call, an analyst asked: "You mentioned an impairment charge, which is quite a large number I thought, a little surprised to see that given the monetization potential [of] your film content on Eros Now.   So if you could please address that?"   Defendant Parameswaran further explained that a number of indications during the 2019 fiscal year indicated that an impairment may be necessary:

> PREM PARAMESWARAN: Tim, it's Prem. And let me answer the impairment charge. So the impairment charge was part of IAS 36 under the IFRS accounting rules, which require a company basically to reassess the carrying book value of assets, both on a regular and annual basis and also in case of the irregular events. Example of these irregular events include major change in market conditions or technology, expectation of future losses or a material change in the listed equity value or negative cash flows. In this propose, the equity value of our company, our market cap has gone down. ***During fiscal year-end 2019, due to the significant decline in the market value, we tested impairment for carrying the value of net assets of the group exceeding our market capitalization and expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations.*** Accordingly, we recorded a noncash impairment loss of $423 million net of taxes as an exceptional item within the P&L. This impairment loss recorded has been reduced from the carrying amount of goodwill, trademark, content/film rights and long-term advances to content vendors. This is a one-time exceptional item, which has no cash impact on the business.

---

[20] All quotes and references from the July 15, 2019 earnings call transcript from Fair Disclosure Wire.

96.   Defendant Lulla and Parameswaran further explained:

KISHORE ARJAN LULLA: And also this is reversible. As soon as the market capitalization of the company goes up, this could be reversed back to the same value also.

PREM PARAMESWARAN : That's right.

[Analyst]: So can I jump in on that? So there's no change in your assessment of the actual real value of the film content, as it seems to me, it's -- the value is still there.  I mean your Eros Now platform is growing, you should be able to monetize that more effectively. So it's the other items that are creating the …?

PREM PARAMESWARAN : That's right.

97.   Also during the call, Defendant Lulla answered a question about whether there is anything with Eros's corporate structure or payment systems that were brought up in the Hindenburg Report that they could do differently going forward.  Defendant Lulla stated that "we are just observing our internal controls also so that it doesn't ever happen again."

98.   On this news, Eros's share price fell $0.21 per share, or 11.5%, to close at $1.61 per share on July 15, 2019, on unusually heavy trading volume.

99.   The problem with Defendants' explanations regarding the decision to record the impairment, however, is that the circumstances they cited, *i.e.*, (1) the carrying value of net assets exceeded the Company's market capitalization, and (2) the expenditure for film and content rights exceeded positive cash flows, in fact existed at the beginning of the Class Period and remained throughout.  *See* Sec. IV.G.2, *infra*.

100.  On August 14, 2019, Eros issued its annual report of financial results for the fiscal year ended March 31, 2019 on SEC Form 20-F (the "2019 20-F").  In Note 2(b) to the consolidated financial statements, Defendants similarly provided an explanation of how they recognized and measured Eros's impairment loss, and

further quantified Eros's key assumptions used to determine the "value in use" of Eros's film content:

**Sensitivity to key assumptions**

The change in the key following assumptions used in the impairment review would, in isolation, lead to an increase in impairment loss recognized by followings amounts as at March 31, 2019 (Although it should be noted that these sensitivities do not take account of potential mitigating actions)

| | (in millions) As at March 31, 2019 |
|---|---|
| Increase in discount rate by 1% | $    54 |
| Decrease in long term growth rate applied beyond approved forecast period by 1% | $    30 |
| Decrease in projected volume by 1% | $    63 |

### 3.     Eros Turns To Toxic Financing To Source Its Cash Needs

101.  Finally, on September 26, 2019, before the market opened, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principal amount of senior convertible notes due 2020.  Eros said it planned to use the net proceeds of $25 million for general corporate purposes.

102.  On this news, the Company's share price fell $0.85, nearly 30%, to close at $1.99 on September 26, 2019, on extremely heavy trading volume.

103.  A September 27, 2019 Seeking Alpha article highlighted that the offering was surprising, constituted a toxic financing transaction, and provided further evidence of Eros's "perceived liquidity issues."

### 4. Post-Class Period Events

#### a) Eros Again Impairs Its Intangible Content Assets

104. On July 30, 2020, Eros issued its financial results for the fourth quarter and fiscal year 2020, ended March 31, 2020, reporting that it had recorded another impairment loss of $431.2 million to its intangible content asset balances. Combined with the 2019 impairment, Eros recorded a total impairment loss of $836.7 million to its intangible content balances—wiping out 84% of Eros's largest asset, which Defendants had reported at close to $1 billion during the Class Period.

105. This second impairment also had the effect of erasing another 52% of the equity attributable to equity holders of the Company,[21] bringing that balance to below $300 million from over $865 million as reported in the 2018 fiscal year end results, prior to the impairment losses.

#### b) CARE Ratings Announces That EIML Is Not Cooperating With The Ratings Agency

106. On September 25, 2020, one year after the close of the Class Period, CARE Ratings issued a press release announcing that it has categorized EIML as "Not Cooperating" and reaffirmed its CARE D rating of the company. As part of its ratings update, CARE explained:

> CARE has requested information from Eros International Media Limited (EIML) to review the rating(s). The company has not provided requisite information for monitoring the ratings. In line with the extant SEBI guidelines, CARE has reviewed the rating on the basis of best available information about the company which however, in CARE's opinion, is not sufficient to arrive at a fair rating. Hence, CARE has assigned CARE D; ISSUER NOT CO-OPERATING

---

[21] Eros reported a balance of just $249.12 million as of March 31, 2020 for the "Equity attributable to equity holders of Eros International Plc" line item, a decrease of $272.34 million from the reported balance of $521.46 million as of March 31, 2019.

(Single D; ISSUER NOT CO-OPERATING) rating.

107.  CARE explained further in its Credit Rating Process in effect at the time:

Assigning and monitoring of a rating requires adequate and timely information and cooperation from clients. In the absence of the same, it is not possible, in a reasonable manner, to arrive at the credit quality of an instrument/facility being rated. In case the issuer does not provide the information sought by CARE for monitoring the rating in a timely manner, despite adequate efforts by CARE, CARE shall categorize the issuer as 'non-cooperating'.

108.  Then, on October 7, 2020, CARE withdrew its ratings of EIML's bank facilities altogether at EIML's request.

**F.     Multiple Witnesses Confirm That Eros Was Frequently Late In Paying Its Obligations, That The Individual Defendants Held Tight Control Over The Group, And That Eros Was Not Working With CARE To Ensure Its Rating Was Revised Upwards**

**1.     Former Employees Recount Delayed Salaries And That The Individual Defendants, And Particularly Defendant Lulla, Were The Group's Decision Makers**

109.  Confidential Witness ("CW") 1 was associated with EIML from 2015 through 2019, during which time CW1 served as a Vice President, Company Secretary & Compliance Officer.   During CW1's tenure, CW1 observed that Defendants Lulla, Parameswaran, and Deshpande worked together closely.   CW1 also reported that the Individual Defendants as well as Sunil Lulla were the key decision makers at Eros.   CW1 stated that during 2016 through 2019, there were at times delays in payment of employee salaries.

110.  CW2 was associated with EIML from 2016 through 2019, during which time CW2 served as a Vice President, Company Secretary.   CW2 explained that Defendant Lulla is the key decision maker at EIML, and that Defendant Lulla was the executive to call all the "shots."   CW2 stated that after employee salaries were at times paid late and such delays often occurred following periods when Eros's share

price dropped on the NYSE.  CW2 further stated that around this same time, senior management began to seek financing alternatives to maintain cash flow.

111.  CW3 was associated with EIML from 2015 through 2017, serving as a manager in the administrative department.  CW3 stated that mid-level management had to wait for their salaries frequently during the 2016-2018 timeframe, further explaining that in 2017 salaries were inconsistent, Eros provided no fixed date for the salary credit, and recalled that twice the salaries were delayed by almost 15-20 days, though CW3 never personally experienced a pay cut.  CW3 added that it was possible that Eros was taking out loans to manage its cash flow issues, but that mid-management employees were not made aware of any financial crisis.  CW3 stated that CW3 was still in contact with former EIML colleagues after CW3 left EIML, and that those colleagues told CW3 that the inconsistent salary trend "lasted till 2019[,]" and that in 2018, EIML employees had to "chase" the human resources managers for salary updates, who provided a standard answer: "it is processed and will soon be credited."

112.  CW4 was associated with EIML as a senior sales manager until 2018. CW4 stated that CW4 left the company because employees were not getting their salaries on time.

113.  CW9 joined Eros in March 2019 as a design and development engineer and quit after less than one year.  When CW9 joined, CW9's salary was delayed every month, and these delays continued for four-to-five months until roughly the summer of 2019.  During the time between CW9's start date through the summer of 2019, salary delays were as late as the 24th of the month when payment for employees was expected on the first of the month.

114.  CW9 also explained that when salaries were finally paid, it was the full amount, but often paid very late.  CW9 recounted that Eros lost good teams because of this salary delay issue, offering that during this time, most of the 6-8 members of

the software team left.  CW9 further stated that highly talented senior professionals and leadership were leaving due to not timely receiving their salaries, and also not receiving salary increments (*i.e.*, raises) for 2018-19.

115.  CW10 was an Assistant Vice President with EIML in Bangalore from 2017 to 2020.  CW10 stated that the salaries were delayed in early 2019 for four-to-five months, but that junior employees were not affected because management ensured that those whose salaries were less than INR 200,000 [approximately $2,750] would receive their salaries on time.  CW10 explained that for mid-management and above, there were salary delays multiple times, and that for most of these delays, the salaries were received by mid-month but that at times salary payments were delayed by months.  CW10 further stated that there were two-to-three months during the middle of 2019 when salaries were paid on time, but delays resumed in September or October 2019 and continued on-and-off thereafter until CW10 left EIML in 2020.

116.  CW10 further stated that CW10 heard that the salary delays continue even today, and that payments from Eros owed to some vendors CW10 introduced to Eros were also "stuck."  CW10 stated that these vendors "were chasing" CW10 for these payments, and CW10 in turn "had to chase" Eros for the payments, which were finally cleared in January 2021 after six months of delay.

> **2.    Other Confidential Witnesses Confirm That EIML Was Frequently Late In Paying Its Loan Obligations, Eros Was Not Cooperating With CARE To Reverse Its Credit Downgrade, And Defendant Lulla Had Tight Control Over The Group**

117.  CW5 is a ratings analyst/manager at CARE.  Although CW5 was not the Eros analyst, CW5 was part of the same analyst pool as the Eros analyst and explained that there are general discussions among junior employees and that Eros had been discussed a couple of times during these general discussions.  CW5

explained that Eros has been rated by CARE for more than seven years, and that there have been three different analysts/managers who have managed the Eros account.  CW5 explained that typically the CEO/CFO of EIML were the ones to interact with the CARE team, but that the EIML executives did not have any authority, and that after discussions with the CARE team, the EIML executives would go back to consult and act on directions from the Lulla family.

118. CW5 explained some circumstances concerning CARE's June 2019 ratings downgrade and the default of EIML's loan obligations cited by CARE as the source for the downgrade.  CW5 stated that CARE was not initially informed of this default by anyone from the Company or EIML, and learnt about it after the default happened.

119.  After the default and CARE's subsequent downgrade of EIML, CW5 explained that Eros entered into discussions with CARE in an attempt to convince the ratings agency to revise its downgrade, but that when CARE asked for additional details, Eros refused to provide them.  CW5 further explained that CW5 was aware that CW5's colleague working on the Eros account had requested these details on the Company's financials from the Eros finance team.  Although CW5 does not know why EIML did not provide the additional requested details, CW5 explained that with other assignments in the past, when there is financial stress, companies try to limit data shared with the CARE ratings team in hopes that the rating will not be downgraded.

120. CW5 added that over the last three years it was evident that Eros was inflating its revenues, and that the modus operandi was to book a sale of a movie, rights to overseas distribution or some part of the movie to one of their close associates for a large sum.

121. CW6 is a certified chartered accountant and was associated with Chaturvedi & Shah, EIML's auditors in 2017.  CW6 assisted the senior managers,

Rajendra Koria and Amit Chaturvedi,[22] conducting the statutory audit of EIML for the financial year 2017-2018.  CW6 stated that during the audit, Defendant Lulla and Sunil Lulla were present and that they were closely monitoring the balance sheets of EIML's subsidiaries.  CW6 further explained that Mr. Koria was in touch with Defendant Lulla and Sunil Lulla for audit related issues.

122.  CW6 stated that it was evident EIML would be downgraded due to its borrowings and inconsistent repayments to the banks.  CW6 explained that Eros was facing some issues in repaying the banks' dues and as a result was being charged with late installment penalties, that these delayed payments were increasing Eros's liabilities, and therefore it was evident the downgrade was about to happen.  CW6 stated that EIML was receiving late and non-payment notes, and although CW6 was not privy to the details of the bank notes, CW6 stated based on CW6's experience as an auditor for EIML's 2017-18 statutory audit that Defendant Lulla and Sunil Lulla would have had knowledge of the bank penalty notifications as chair and vice chair of EIML.  CW6 said that except for Defendant Lulla, Sunil Lulla, and Farokh Gandhi (EIML's CFO), no one else would have been aware about all the transactions.

123.  CW6 stated that CW6 informed Mr. Koria that based on this borrowing and lending, EIML would soon face cash flow problems as per the 2017-2018 audit report.  CW6 also stated that Defendant Lulla and Sunil Lulla were informed about these financial concerns from the EIML team and that discussions regarding the downgrade started in 2017 among the employees due to salary delays.

124.  CW6 further commented that the Group Chairman, Defendant Lulla, is the key decision maker and all the critical decisions are taken under his supervision.

---

[22] Messrs. Koria and Chaturvedi are both listed as partners and part of the management team at Chaturvedi & Shah: http://www.cas.ind.in/partners-2/ (last accessed May 27, 2021).

125. CW7 is associated with the Bank of Baroda and worked as the credit manager with the bank at the time that the bank extended a loan to EIML in 2016. According to CW7, since the loan was extended to EIML in 2016, it has been repaying the loan in installments to the bank.  CW7 added that there have been inconsistencies during the repayment on the loan on EIML's end, and that a penalty was levied on the non-payment of certain installments.  CW7 stated that CW7 could not share the loan amount or whether EIML took multiple loans from the Bank of Baroda because it is highly confidential information banks are not allowed to share. CW7 did state that that 2% of the total amount due was levied as a penalty on non-payment of installments.  CW7 also said that in 2017, after EIML began incurring penalties for inconsistent payments, that Parameswaran and the Lullas were notified at EIML.

126. CW7 also stated that Eros's "non-payment fiasco" started in 2017 and Eros's senior management was immediately notified.  Each quarter an account statement was generated and sent to the EIML office, and Parameswaran and the Lullas were notified at EIML, said CW7.

127. CW7 further commented that due to EIML's cash flow problems, salaries were also delayed and several employees left.  CW7 stated that EIML was under scrutiny for inconsistent salary payments from 2017-2019 and that 4-5 times a year, salaries were either delayed or not credited at all and adjusted in the next month's salary.

128. CW8 is a business head and CEO of an entertainment channel, and has been in the Indian media industry for more than 25 years, and as a result, is familiar with Eros and its business practices.  CW8 explained that due to CW8's years in the industry CW8 has a good network and connections in the industry, and that CW8 has a few close friends and colleagues at EIML.  CW8 explained that being well-connected in the industry, one gets to know insider information.

129. CW8 said that the credit downgrades by CARE Ratings and Moody's was a surprise for the industry, but that, as CW8 knew from CW8's network at Eros, the management and most of the core team at Eros were aware that the downgrades were coming. CW8 explained that anyone working in the strategy or finance department for a long time and who has a good rapport with seniors were aware of the problems. CW8 said that the employees were told to stay away from trading in the listed shares of the company.

130. CW8 said that EIML has discussed delays and defaults in collections from its debtors, and that a large part of the debtors are not actual companies, but shell companies whose entire turnover is derived purely from buying Eros content at inflated prices. CW8 further stated that no one other than the core team at Eros would know the details of these debtors/shell companies. CW8 said that, over the years, Eros has been accused of improperly "pumping-up" its revenue through related party transactions, essentially loaning a related party money and then reporting revenue from that related party, and the most discussed of these is with NextGen. CW8 said that these related party transactions are not rumors but are facts known to all in the industry, but which no one talks about openly.

131. CW8 also said that Eros has a history and track record of buying films at a premium to the prevailing market price.

**G.    The Circumstances Surrounding Eros's Impairment Of Its Intangible Content Balances Strongly Infer That Defendants Were, At A Minimum, Deliberately Reckless In Reporting Bloated Content Balances And Assuring Investors That Eros's Balance Sheet Was "Strong" And "Conservative"**

**1.    Applicable Accounting Rules For The Impairment of Intangible Assets**

132. During the Class Period, Eros prepared its consolidated financial statements in accordance with International Financial Reporting Standards

("IFRS"), as issued by the International Accounting Standards Board (IASB).  IFRS, comprised of principles, conventions, rules, and procedures, are globally accepted accounting standards specifying how accounts must be maintained and reported. IFRS has been adopted by more than 144 countries, and is equivalent in nature to U.S. Generally Accepted Accounting Principles ("GAAP") in the United States. "International Accounting Standards" ("IAS"), issued by IASB's predecessor, were adopted by IASB and remain part of IFRS.

133.  IAS 36, *Impairment of Assets*, "prescribe[s] the procedures that an entity applies to ensure that its assets are carried at no more than their recoverable amount. An asset is carried at more than its recoverable amount if its carrying amount exceeds the [highest of the] amount to be recovered through use or [the amount to be recovered through the] sale of the asset.  If this is the case, the asset is described as impaired and the Standard requires the entity to recognise an impairment loss."  IAS 36.1.

134.  At the end of each reporting period, an entity must assess whether there "is any indication that an asset may be impaired."  IAS 36.9.  IAS 36.12 contains a non-exhaustive (*see* IAS 36.13-14) list of indications from both external and internal sources of information, that at minimum an entity must consider, including if "the carrying amount of the net assets of the entity is more than its market capitalisation" (IAS 36.12(d)) and evidence of obsolescence (IAS 36.12(e)) or evidence from internal reporting (such as cash flows) indicating "that the economic performance of an asset is, or will be, worse than expected" (IAS 36.12(g); IAS 36.14).

135.  If any such indication exists, the entity shall estimate the recoverable amount of the asset or cash-generating unit.[23]  IAS 36.9.

---

[23] A cash-generating unit "is the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets or

136.  An asset or cash-generating unit's recoverable amount is defined as the higher of (a) an asset's or cash-generating unit's fair value less costs of disposal; and (b) its value in use.  IAS 36.18.

137.  An asset or cash-generating unit's fair value is "the price that would be received to sell an asset … in an orderly transaction between market participants at the measurement date."  IAS 36.6.  The fair value method is what the market says the asset or cash-generating unit could sell for less costs of disposal.

138.  Value in use "is the present value of the future cash flows expected to be derived from an asset or cash-generating unit."  IAS 36.6.  The discount rate applied to these future cash flows "shall be a pre-tax rate … that reflect(s) current market assessments of: (a) the time value of money; and (b) the risk specific to the asset for which the future cash flow estimates have not been adjusted."  IAS 36.55.

139.  If the "recoverable amount of an asset is less than its carrying amount, the carrying amount of the asset shall be reduced to its recoverable amount.  That reduction is an impairment loss."  IAS 36.59.  This impairment loss "shall be recognised immediately" in the entity's income statement.  IAS 36.60.

140.  Along with disclosing the amount of impairment losses recognized in an entity's income statement (IAS 36.126(a)), an entity is also required to disclose the recoverable amount of the asset or cash-generating unit and which method was used to determine the recoverable amount (IAS 36.130(e)).

---

groups of assets."  IAS 36.6 (emphasis in original).  An entity should determine the recoverable amount "for the cash-generating unit to which the asset belongs" if it is not possible to estimate the recoverable amount of an individual asset.  IAS 36.22. Eros identified its film content as a cash-generating unit, explaining that Defendants "assessed for indication of impairment on a library basis as the nature of [Eros's] business, the contracts it has in place and the markets it operates in do not yet make an ongoing individual film evaluation feasible with reasonable certainty."

141.  An entity is also required to disclose for each cash-generating unit, if the recoverable amount is based on value in use:

(i)      each key assumption on which management has based its cash flow projections for the period covered by the most recent budgets/forecasts. Key assumptions are those to which the unit's (group of units') recoverable amount is most sensitive.

(ii)     a description of management's approach to determining the value(s) assigned to each key assumption, whether those value(s) reflect past experience or, if appropriate, are consistent with external sources of information, and, if not, how and why they differ from past experience or external sources of information.

(iii)    the period over which management has projected cash flows based on financial budgets/forecasts approved by management and, when a period greater than five years is used for a cash-generating unit (group of units), an explanation of why that longer period is justified.

(iv)     the growth rate used to extrapolate cash flow projections beyond the period covered by the most recent budgets/forecasts, and the justification for using any growth rate that exceeds the long-term average growth rate for the products, industries, or country or countries in which the entity operates, or for the market to which the unit (group of units) is dedicated.

(v)      the discount rate(s) applied to the cash flow projections.

IAS 36.134(d).

142.  An entity may reverse an impairment loss if, at the end of a reporting period, "there is any indication that an impairment loss recognised in prior periods for an asset other than goodwill may no longer exist or may have decreased.  If any such indication exists, the entity shall estimate the recoverable amount of that asset." IAS 36.110.  Such indications include observable indications that an asset or cash-generating unit's value has increased significantly during the period and "significant changes with a favourable effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal

environment in which the entity operates or in the market to which the asset is dedicated."  IAS 36.111.

143.  "An impairment loss … shall be reversed, ***if and only if, there has been a change in the estimates used to determine the asset's recoverable amount*** since the last impairment loss was recognised."  IAS 36.114 (emphasis added).  IAS 36 specifically notes that an asset or cash-generating unit's "value in use may become greater than the asset's carrying amount simply because the present value of future cash inflows increases as they become closer.  However, the service potential of the asset has not increased.  Therefore, an impairment loss is not reversed just because of the passage of time (sometimes called the 'unwinding' of the discount), even if the recoverable amount of the asset becomes higher than its carrying amount."  IAS 36.116.

> **2.** **The Indications For Impairment Of Eros's Intangible Asset Content Balances Were Obvious And Existed At The Beginning Of The Class Period And Remained Throughout The Class Period**

144.  In the July 15, 2019 earnings conference call, Parameswaran cited two indications as necessitating Eros's impairment review as of the 2019 fiscal year-end: (1) the "carrying … value of net assets of [Eros] exceeding our market capitalization[;] and [(2)] expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations."  However, both of these indicators had existed since at least the beginning of the Class Period, when Eros reported its financial results for the 2017 fiscal year (FY 2017), as reflected in the following charts:

| Indicator 1: Carrying Value of Net Assets Exceeded Market Capitalization | | | | |
|---|---|---|---|---|
| Fiscal Period | Market Capitalization (In Thousands) (Retrieved from Blomberg L.P.) | Column A[24] Simple Calculation of Carrying Value of Net Assets (In Thousands) | Column B Alternative Calculation of Carrying Value of Net Assets (In Thousands) | Column C Carrying Value of Eros's Intangible Asset Content Balance (In Thousands) |
| FY 2016 | $662,259 | $809,094 | $740,332 | $795,139 |
| Q1 2017 | $936,139 | $815,565[25] | $745,723 | $779,891 |
| Q2 2017 | $887,181 | $857,839 | $784,780 | $786,987 |
| Q3 2017 | $788,574 | $871,034 | $795,119 | $848,427 |
| FY 2017 | $624,779 | $883,548 | $804,457 | $904,628 |
| Q1 2018 | $694,536 | $913,791 | $814,744 | $891,819 |
| Q2 2018 | $867,890 | $934,196 | $818,745 | $889,361 |
| Q3 2018 | $590,957 | $968,849 | $842,320 | $908,330 |
| FY 2018 | $667,506 | $1,003,417 | $865,689 | $998,543 |
| Q1 2019 | $796,108 | $988,830 | $854,555 | $1,004,763 |
| Q2 2019 | $866,973 | $1,055,858 | $925,620 | $1,038,040 |
| Q3 2019 | $596,484 | $1,088,972 | $953,769 | $1,072,686 |
| FY 2019 (Post-Impairment) | $672,813 | $656,985 | $521,456 | $706,572 |

[24] Defendants did not define net assets for purposes of determining Eros's carrying value. Typically, net assets is determined by a simple equation of total assets minus total liabilities (as reflected in Column A above). However, because Eros consolidates a number of entities' financial results with its own, but does not own 100% of all these entities, "Equity attributable to equity holders of Eros International Plc" as reported on Eros's balance sheet (Column B) is an appropriate figure to approximate the carrying value of net assets when comparing to the Company's market capitalization. Column C in the above table reflects that when comparing market capitalization to the carrying value of Eros's intangible asset content balances (i.e., the primary asset impaired), Eros still failed, and in greater magnitude, this impairment indicator test.

[25] The green highlighted cells indicate the few times when Eros's market capitalization actually exceeded the Company's carrying value of net assets or intangible content, i.e., when this impairment indicator was **not** present. The red highlighted cells are when Eros's carrying value of its net assets exceed its market capitalization, i.e., when this impairment indicator was present.

| Fiscal Period | *Indicator 2: Content And Film Rights Expenditures Exceeded The Positive Cash Flow From Operations* | |
| --- | --- | --- |
| | Cash Generated From Operations[26] (In Thousands) | Expenditure Towards The Purchase Of Content And Film Rights (In Thousands) |
| Q1 2017 | $23,802[27] | $17,089 |
| Q2 2017 | $63,647[28] | $58,478 |
| Q3 2017 | $113,535 | $168,585 |
| FY 2017 | $122,196 | $173,481 |
| Q1 2018 | $34,000 | $35,037 |
| Q2 2018 | $34,221 | $43,004 |
| Q3 2018 | $68,901 | $89,107 |
| FY 2018 | $111,687 | $186,757 |
| Q1 2019 | $19,797 | $15,429 |
| Q2 2019 | $24,204 | $54,060 |
| Q3 2019 | $55,057 | $79,328 |
| FY 2019 (Post-Impairment) | $86,446 | $98,115 |

---

[26] This figure excludes interest and income taxes paid (*i.e.*, pre-tax and pre-interest cash flow) and is per Eros's Consolidated Statement of Cash Flows.

Cash flow and expenditures are also cumulative for the year; for example, the second quarter figures also include the first quarter figures, and so on.

[27] The green highlighted cells indicate the few times when Eros's cash generated from its operating activities actually exceeded the Company's expenditures towards the purchase of film and intangible content rights, *i.e.*, when this impairment indicator was **not** present. The red highlighted cells are when Eros's expenditures towards the purchase of film and intangible content rights exceeded its cash generated from its operating activities, *i.e.*, when this impairment indicator was present.

[28] If Q2 2017 is isolated, however, the cash generated from operations for the quarter of $34.8 million ($63.6 million less $28.8 million) is less than the isolated expenditures toward content for the quarter of $41.4 million ($58.5 million less $17.1 million), meaning that this impairment indicator was actually present during Q2 2017.

145. As the above charts illustrate, both of these indicators of impairment were consistently present throughout the Class Period.[29]   Moreover, Eros's expenditures towards content and film rights exceeded its cash generated from operations by 41.9% and 67.2% for FY 2017 and FY 2018, respectively.[30]   These facts demonstrate not only that the impairment should have been recorded in FY 2017, but that the need to record the impairment was obvious *long* before Defendants finally recorded it.

146. Grant Thornton, Eros's independent public accountant, explains in its guide to assist management in understanding the requirements of IAS 36, that "[i]n practice, an adverse trend might develop over a series of reporting periods …. While an entity may not be able to pinpoint a specific event or moment when an adverse trend becomes an impairment indicator, adverse trends such as this clearly cannot be ignored."[31]

147. Despite these obvious adverse trends existing for multiple financial periods and Defendants affirmation in Eros's annual reports on Form 20-F that "[a]t least annually, we review film and content rights for indications of impairment in

---

[29] Q1 2017 and Q2 2017 (quarters wherein the indicators arguably were not present) cover the calendar year from April 1, 2016 to June 30, 2016 and July 1, 2016 to September 30, 2016, respectively—long before the start of the Class Period herein. By the start of the Class Period on July 28, 2017, the indicators had been present for approximately ten months (since Q3 2017, which began on October 1, 2016).

[30] For FY 2017, Eros reported $122.2 million in cash generated from operations and $173.5 million in expenditure towards the purchase of content and film rights. $173.5 million divided by $122.2 million equals 41.9%.  Applying the same calculation to Eros's $111.7 million and $186.8 million of cash generated from operations and expenditure towards the purchase of content, respectively, equals 67.2%.

[31] This guide can be found on Grant Thornton's website: https://www.grantthornton.tw/en/insights/articles/Applying-IAS-36-in-practice/ (last accessed May 25, 2021).

accordance with [IAS] 36[,]" according to Parameswaran, it was not these adverse trends that prompted Defendants' impairment review but the "the significant decline in the market value" "[d]uring fiscal year-end 2019[.]"

> ### 3. Defendants' Misleading Explanation Of The Reasons For And Timing Of Eros's Massive Intangible Content Impairment Announced On July 15, 2019 Fail To Credibly Explain The Delay In Impairment

148. Defendants purported to provide some explanation of how they determined the recoverable amount of Eros's intangible content and corresponding impairment in Eros's July 15, 2019 press release and earnings conference call and again in the 2019 20-F filed on August 14, 2019. For example, Defendants explained that the impairment was "mainly due to high discount rate … and changes in the market conditions."

149. The discount rate that Eros claims was "mainly" responsible for its $405.5 million impairment increased by just two percentage points, from 18.9% to 20.9%. The 2019 20-F explained that a 1% change in its discount rate would increase Eros's impairment loss by just $54 million, but that this sensitivity "did not take account of potential mitigating actions"—*i.e.*, at most only $108 million of the $405.5 million impairment, just over 25%, could have resulted from the change in discount rate.

150. The other factor Defendants cited as "mainly" responsible for Eros's impairment loss was "changes in market conditions." In Eros's July 15, 2019 press release, Defendants did not explain what or how market conditions changed toward the end of the 2019 fiscal year. Moreover, on the July 15, 2019 earnings call, in response to an analyst question, Defendant Parameswaran affirmed that "***the actual real value of the film content … is still there***[,]" because the "Eros Now platform is growing, [and Eros] should be able to monetize that more effectively." This affirmation indicated to investors that Defendants actually anticipated the "changes

in market conditions" for Eros's intangible content were trending in a positive direction as of the end of the 2019 fiscal year.

151.   In the 2019 20-F, Eros explained that changes in market condition "include[ed] lower projected volume when compared to prior year/s."  However, Defendants did not quantify how much lower the projected volume was as they had for the change in discount rate (from 18.9% to 20.9%).  The 2019 20-F did explain that, in isolation, a 1% decrease in projected volume would account for a $63 million impairment loss, but further noted that this did not account for "potential mitigating actions."

152.   Because Eros did not actually quantify "lower projected volume," it is impossible to determine how lower projected volume assumptions actually affected the reported impairment loss, and thus, what, if any, other changes market conditions affected the reported impairment loss.

153.   Eros's impairment explanation also did not comply with the disclosure requirements under IAS 36.  First, Defendants failed to disclose the recoverable amount of Eros's cash-generating unit (*i.e.*, film content) as required by IAS 36.130(e).  Rather, Defendants chose to keep their explanation vague and provided no means for investors to determine what purported change in market conditions accounted for an almost $300 million impairment loss to Eros's most important asset.

154.   Second, Eros's explanation did not explain how management's determination of the value's assigned to the key assumptions differed from past experience or external sources of information as required under IAS 36.134(d).  The failure to provide this explanation combined with quantifying only 26% of the impairment loss makes it both impossible to determine and impossible to understand why Defendants waited to impair its intangible content balances, when each of the impairment indicators had already existed for years.

155.   Defendants' vague discussion as to management's considerations in determining the future cash flows of its film content cash-generating unit, combined with Defendants not fully following IAS 36's disclosure requirements, amount to a glaring failure to explain why Eros only impaired its intangible content balances as of the end of the 2019 fiscal year, when, as explained above, the impairment indicators were obvious and had existed since before the start of the Class Period.

156.   Moreover, Defendants purposely muddied their explanations to the market, insinuating that the impairment was solely due to an unprecedented drop in market capitalization.

157.   For example, Defendants Lulla and Parameswaran both stated on the July 15, 2019 earnings call that the impairment could simply be reversed as soon as the "market capitalization of the [C]ompany goes up."  Not only did this explanation seem to blame the drop in market capitalization for the loss, it also greatly simplifies IAS's guidance on when an impairment loss may be reversed.  While significant favorable changes in the market may indicate that Eros should again determine the recoverable amount of an intangible asset or cash-generating unit (IAS 36.111), ***an impairment loss cannot be reversed unless the estimates used to determine Eros's intangible content have changed***, *i.e.*, if Eros changes the actual estimates and assumptions used to determine the intangible content balance's recoverable amount. IAS 36.114, IAS 36.116.

158.   Then, in Eros's report of annual financial results for the year ended March 31, 2020, filed with the SEC on Form 20-F (the "2020 20-F") on July 30, 2020, in noting that Eros recorded an impairment loss of $431.2 million for the year, Defendants explained that "[a]s in our prior fiscal year, the significant reduction in the stock price and ***corresponding decline in market capitalisation was the main driver*** for the impairment charge."

159.   As explained above, a steep decline in market capitalization cannot be the "main driver of the impairment charge."   Rather, it is only an indicator of impairment; and, moreover, an indicator that had been present throughout the Class Period.

160.   The combination of the above facts suggests that Eros only took its impairment to its March 31, 2019, financials because of the June 7, 2019 Hindenburg Research report that spotlighted the facts underlying the intangible content issue.

## V.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Fourth Quarter And Fiscal Year 2017 Financial Results

161.   The Class Period begins on July 28, 2017.   On that day, the Company issued a press release containing its financial results for the fourth quarter and fiscal year 2017, ended March 31, 2017, highlighting that "***the company remains well-capitalized***[.]"

162.   Within the press release, both Defendant Deshpande and Defendant Parameswaran provided management comments, wherein Defendant Deshpande again stated that "***we are already well capitalized***."

163.   Defendant Parameswaran further stated that "***[we] are confident that we will go back to being free cash flow positive in fiscal 2018*** as we were in fiscal 2016."

164.   The July 28, 2017 press release further reported a balance of $904,628,000 for Eros's intangible content assets, comprised of a balance of $634,465,000 for film and content rights, $266,232,000 for content advances, and $3,931,000 for film productions.

165.   Also on July 28, 2017, Eros held an earnings call to discuss the

Company's financial results for the fourth quarter of 2017 and the 2017 fiscal year. As part of his opening comments, Defendant Lulla stated that: "Our **strong cash flows and balance sheet** has enabled us to pay down the approximately $80 million of the … revolving credit facility as well as invest into a strong contents rate for the FY '18, '19."

166.   In her prepared comments, Defendant Deshpande again repeated "**we are already well-capitalized**."

167.   Defendant Parameswaran likewise assured investors in his prepared comments that "**the company remains well-capitalized** and able to invest in future growth."

168.   On July 31, 2017, Eros issued its annual report of financial results for the fiscal year ended March 31, 2017 on SEC Form 20-F ("2017 20-F"), and which was signed by Defendant Deshpande.   Therein, Eros reported a balance of $904,628,000 for Eros's intangible content assets, comprised of a balance of $634,465,000 for film and content rights, $266,232,000 for content advances, and $3,931,000 for film productions.

169.   The emphasized statements attesting that Eros was well-capitalized, had strong cash flows, and a strong balance sheet, as well as the statements reporting Eros's intangible content balances made in ¶¶161-168 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of fiscal year 2017, thus strongly indicating that Eros's intangible content asset balances were

impaired (and should have been recorded as such in Eros's FY 2017 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### B.   Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter Of 2018 Financial Results

170.   On October 6, 2017, the Company issued a press release containing its financial results for the first quarter of its 2018 fiscal year, ending June 30, 2017. Within the press release, Defendant Parameswaran commented: "We remain ***well-capitalized*** and able to deliver on our future film slate plans as well as fund growth of Eros Now. ***We have a strong balance sheet***[.]"

171.   The October 6, 2017 press release further reported a balance of $891,819,000 for Eros's intangible content assets, comprised of a balance of $617,517,000 for film and content rights, $268,987,000 for content advances, and $5,315,000 for film productions.

172.   Later that same day, Eros held an earnings call to discuss these financial results.   During her opening comments, Defendant Deshpande stated: "***We have maintained a strong balance sheet*** and built-in working capital efficiencies as we paid down our RCF significantly and continue to fund Eros Now growth as well as our future slate."

173.   In his prepared remarks, Defendant Parameswaran reiterated that "***the company remains well capitalized and well funded to execute our business plan***."

174.   On November 3, 2017, Eros also issued its report of financial results for the quarterly period ended June 30, 2017, on SEC Form 6-K, and which was signed by Defendant Parameswaran.   Therein, Eros reported a balance of $891,819,000 for

Eros's intangible content assets, comprised of a balance of $617,517,000 for film and content rights, $268,987,000 for content advances, and $5,315,000 for film productions.

175.  The emphasized statements attesting that Eros was well-capitalized and had strong a strong balance sheet, as well as the statements reporting Eros's intangible content balances made in ¶¶170-174 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the first quarter of Eros's 2018 fiscal year, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such in Eros's 1Q 2018 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

## C.   Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter Of 2018 Financial Results

176.  On November 22, 2017, the Company issued a press release containing its financial results for the second quarter of its 2018 fiscal year, ending September 30, 2017, which was later filed with the SEC on November 30, 2017 as an attachment to Form 6-K.  Within the press release, Defendant Parameswaran commented that

"*our balance sheet remains strong and we are well capitalized* for future growth."

177.  The November 22, 2017 press release further reported a balance of $889,361,000 for Eros's intangible content assets, comprised of a balance of $598,993,000 for film and content rights, $286,526,000 for content advances, and $3,842,000 for film productions.

178.  On November 26, 2017, Eros held an earnings conference call to discuss its second quarter of 2018 financial results.  Therein, Defendant Parameswaran stated: "*Our balance sheet remains strong…. And we are on track to be free cash flow positive by the fiscal year-end*."

179.  On July 31, 2018 Eros issued its report of financial results for the quarterly period ended September 30, 2017 on SEC Form 6-K, and which was signed by Defendant Parameswaran.  Therein, Eros reported a balance of $889,361,000 for Eros's intangible content assets, comprised of a balance of $598,993,000 for film and content rights, $286,526,000 for content advances, and $3,842,000 for film productions.

180.  The emphasized statements attesting that Eros was well-capitalized, had strong cash flows, and a strong balance sheet, as well as the statements reporting Eros's intangible content balances made in ¶¶176-179 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that expenditures towards the purchase of content and film rights exceeded the positive cash flow from operations, an indicator of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019, actually existed as of end of the second quarter of Eros's 2018 fiscal year, thus strongly

indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such, in Eros's 2Q 2018 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### D. Defendants' False And Misleading Statements And Omissions During The January 2018 Citi Global TMT West Conference

181. On January 9, 2018, Defendant Parameswaran presented at the Citi Global TMT West Conference to discuss Eros, its business, and its business prospects.  During the presentation, Defendant Parameswaran stated "*we have a very conservative balance sheet*."

182. Supporting materials to this presentation included slides posted on Eros's website.  Page 14 of these slides highlighted Eros's "*Conservative Balance Sheet*."

183. The emphasized statements attesting to Eros's conservative balance sheet made in ¶¶181-182 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the third quarter of Eros's 2018 fiscal year (ending December 31, 2017) and continued to exist during the fourth quarter of Eros's 2018 fiscal (when this statement was made), thus strongly

indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### E. Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter Of 2018 Financial Results

184. On February 21, 2018, the Company issued a press release containing its financial results for the third quarter of its 2018 fiscal year, ending December 31, 2017. The press release included commentary from Defendant Parameswaran, stating: "The $100 million convertible notes offering in December 2017 has *further strengthened our balance sheet and increased our liquidity position*."

185. The February 21, 2018 press release also reported a balance of $908,330,000 for Eros's intangible content assets, comprised of a balance of $616,070,000 for film and content rights, $286,933,000 for content advances, and $5,327,000 for film productions.

186. Later that same day, Eros held an earnings call to discuss these financial results. During his prepared remarks, Defendant Parameswaran stated: "With $135 million of cash on our balance sheet, just under $50 million in capital raised from Reliance, and investment in the $100 million convertible bond offering in December, *our balance sheet has never been stronger*."

187. On July 31, 2018 Eros also issued its report of financial results for the quarterly period ended December 31, 2017 on SEC Form 6-K, and which was signed by Defendant Parameswaran. Therein, Eros reported a balance of $908,330,000 for Eros's intangible content assets, comprised of a balance of $616,070,000 for film

and content rights, $286,933,000 for content advances, and $5,327,000 for film productions.

188. The emphasized statements attesting to Eros's liquidity and strong balance sheet, as well as the statements reporting Eros's intangible content balances made in ¶¶184-187 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the third quarter of Eros's 2018 fiscal year, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such in Eros's 3Q 2018 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### F. Defendants' False And Misleading Statements And Omissions In The Supporting Materials For The Deutsche Bank 2018 Media, Telecom & Business Services Conference

189. On March 6, 2018, Eros presented at the Deutsche Bank 2018 Media, Telecom & Business Services Conference. Supporting materials to this presentation included slides that were posted on Eros's website. Page twenty of these slides highlighted Eros's "*Conservative Balance Sheet*."

190. This statement attesting to Eros's conservative balance sheet was

materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because it failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 had actually existed as of the third quarter of Eros's 2018 fiscal year (ending December 31, 2017) and continued to exist during the fourth quarter of its fiscal year 2018 (when this statement was made), thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### G. Defendants' False And Misleading Statements And Omissions In And Relating To Eros's Fourth Quarter And Fiscal Year 2018 Financial Results

191. On June 27, 2018, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2018, ended March 31, 2018. The press release included commentary from Defendant Lulla, stating: "I believe that our ***strong balance sheet***, market leadership and differentiated business strategy gives us a powerful and sustainable competitive advantage[.]"

192. This press release also included comments from Defendant Parameswaran, stating "I am pleased with our fiscal year 2018 performance, highlighted by strong top-line growth, margin expansion, continued ***balance sheet***

***strength*** and solid subscriber additions out of our Eros Now business."

193. The June 27, 2018 press release further reported a balance of $998,543,000 for Eros's intangible content assets, comprised of a balance of $638,108,000 for film and content rights, $349,568,000 for content advances, and $10,867,000 for film productions.

194. On July 31, 2018, Eros also issued its annual report of financial results for the fiscal year ended March 31, 2018 on SEC Form 20-F ("2018 20-F"), and which was signed by Defendant Parameswaran. Therein, Eros reported a balance of $998,543,000 for Eros's intangible content assets, comprised of a balance of $638,108,000 for film and content rights, $349,568,000 for content advances, and $10,867,000 for film productions.

195. The emphasized statements attesting that Eros had a strong balance sheet, as well as the statements reporting Eros's intangible content balances made in in ¶¶191-194 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the fiscal year 2018, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such in Eros's FY 2018 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of

needing to rely on toxic financing to fund its operations.

### H.   Defendants' False And Misleading Statements And Omissions Relating To Eros's First Quarter Of 2019 Financial Results

196.  On August 23, 2018, Eros issued a press release announcing its financial results for the first quarter of 2019, ended June 30, 2018.  The press release included commentary from Defendant Parameswaran, who stated that Eros's Adjusted EBITDA growth and margin expansion "combined with our ***conservative balance sheet*** with net debt leverage ratio of 2.28x has us poised for growth in the coming fiscal year."

197.  The August 23, 2018 press release further reported a balance of $1,004,763,000 for Eros's intangible content assets, comprised of a balance of $646,218,000 for film and content rights, $342,550,000 for content advances, and $15,995,000 for film productions.

198.  Also on August 23, 2018, Eros issued its report of financial results for the quarterly period ended June 30, 2018 on SEC Form 6-K, and which was signed by Defendant Parameswaran.  Therein, Eros reported a balance of $1,004,763,000 for Eros's intangible content assets, comprised of a balance of $646,218,000 for film and content rights, $342,550,000 for content advances, and $15,995,000 for film productions.

199.  This statement attesting to Eros's conservative balance sheet, as well as the statements reporting Eros's intangible content balances made in ¶¶196-198 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the carrying value of net assets exceeded market capitalization, a "main" indicator of

impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the first quarter of Eros's 2019 fiscal year, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such in Eros's Q1 2019 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on to toxic financing to fund its operations.

## I.     Defendants' False And Misleading Statements And Omissions Relating To Eros's Second Quarter Of 2019 Financial Results

200.  On November 15, 2018, Eros issued a press release announcing its financial results for the second quarter of 2019, ended September 30, 2018.  The press release contained commentary from Defendant Lulla, who stated: "We are pleased to announce another strong performance this quarter, highlighted by sequential revenue growth, improving margins and a ***solid capital structure***."

201.  In the press release, Defendant Parameswaran also commented: "I am pleased with our second quarter performance as the business delivered strong EBITDA growth and margin expansion, ***continued balance sheet strength*** and exceptional Eros Now paying subscriber additions, outperforming market expectations.…  Our strong operating performance coupled with our ***conservative balance sheet*** has us poised for growth in the coming fiscal years."

202.  The November 15, 2018 press release further reported a balance of $1,038,040,000 for Eros's intangible content assets, comprised of a balance of $670,576,000 for film and content rights, $357,164,000 for content advances, and $10,300,000 for film productions.

203.  Also on November 15, 2018, Eros held an earnings conference call to discuss these financial results.  As part of his prepared remarks, Defendant Lulla again stated: "We are pleased to announce **another strong set of results this quarter**, including sequential revenue growth, improving margins and a **solid capital structure**."

204.  During the question and answer portion of the call, Defendant Lulla provided the following answer to an analyst's question about Eros's cash flow:

> [Analyst]: Okay. The question for Prem is about the -- I think Kishore mentioned about the investments. I mean how do you manage the investments in terms of the CapEx and yet generate a free cash flow or not very major negative free cash flow?
>
> *          *          *          *
>
> KISHORE ARJAN LULLA: …. And to answer your question about the major negative cash flow, it'll not be major negative cash flow upfronted. So if there is a worry that it could be $100 million negative cash flow or something like that. ***No, not at all. Not to worry, we're not going to leverage the company with lot of debt.***

205.  The following day, on November 16, 2018, Eros issued its report of financial results for the quarterly period ended September 30, 2018 on SEC Form 6-K, and which was signed by Defendant Parameswaran.  Therein, Eros reported a balance of $1,038,040,00 for its intangible content assets, comprised of a balance of $670,576,000 for film and content rights, $357,164,000 for content advances, and $10,300,000 for film productions.

206.  The emphasized statements attesting to Eros's solid capital structure, strong and conservative balance sheet, and that Eros would not be leveraged with a lot of debt, as well as the statements reporting Eros's intangible content balances made in ¶¶200-205 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1)

that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the second quarter of Eros's 2019 fiscal year, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such in Eros's 2Q 2019 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### J.    Defendants' False And Misleading Statements And Omissions During The January 2019 Citi Global TMT West Conference

207. On January 8, 2019, Defendant Parameswaran presented at the Citi Global TMT West Conference to discuss Eros, its business, and its business prospects.  During the presentation, Defendant Parameswaran stated "I think again, we have a ***very conservative balance sheet***."

208. This statement attesting to Eros's conservative balance sheet was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because it failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the third quarter of Eros's 2019 fiscal year (ending December 31, 2018)

and continued to exist during the fourth quarter of its fiscal year 2019 (when this statement was made), thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

### K.  Defendants' False And Misleading Statements And Omissions Relating To Eros's Third Quarter Of 2019 Financial Results

209.  On February 21, 2019, Eros issued a press release announcing its financial results for the third quarter of 2019, ended December 31, 2018.  The press release contained commentary from Defendant Lulla, who stated: "***Our balance sheet remains conservative and we are well-capitalised***[.]"

210.  The press release further reported a balance of $1,072,686,000 for Eros's intangible content assets, comprised of a balance of $699,906,000 for film and content rights, $361,548,000 for content advances, and $11,232,000 for film productions.

211.  Also on February 21, 2019, Eros held an earnings conference call to discuss these financial results.   As part of his prepared remarks, Defendant Parameswaran stated: "I wanted to take this opportunity to highlight a few of ***our key strengths*** that often come in conversations with our shareholders and partners, which I thought would be worth going over for the benefit of the new and existing shareholders alike….   Two, our financial policies are prudent and we have a ***very conservative balance sheet*** with net leverage at 1.5x."

212.  On February 26, 2019, Eros issued its report of financial results for the quarterly period ended December 31, 2018 on SEC Form 6-K, and which was signed

by Defendant Parameswaran.  Therein, Eros reported a balance of $1,072,686 for its intangible content assets, comprised of a balance of $699,906,000 for film and content rights, $361,548,000 for content advances, and $11,232,000 for film productions.

213.  The emphasized statements attesting that Eros was well-capitalized had a conservative balance sheet, as well as the statements reporting Eros's intangible content balances made in ¶¶209-212 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the third quarter of Eros's 2019 fiscal year, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such in Eros's 3Q 2019 results); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

## L.    Defendants' False And Misleading Statements And Omissions During Spring 2019 Conferences

214.  On March 11, 2019, Defendant Parameswaran presented at the Deutsche Bank Media and Telecom Conference.   During the conference, Defendant Parameswaran stated: "***We've a very conservative balance sheet***.  We're less than 2x net leverage.  We have LTM adjusted EBITDA of roughly $100 million.  And

we think, from that perspective, we have a ***very conservative balance sheet*** with very little debt, when you look at it.  So it's pretty good."

215.  Supporting materials to this presentation included eight slides posted on Eros's website.  Page six of these slides highlighted Eros's "***Conservative Balance Sheet.***"

216.  On May 21, 2019, Eros presented at the SunTrust Robinson Humphrey 2019 Internet & Digital Media Conference in San Francisco.  Supporting materials to this presentation included eight slides posted on Eros's website.  Page 6 of these slides highlighted Eros's "***Conservative Balance Sheet.***"

217.  The statements attesting to Eros's conservative balance sheet in ¶¶214-216 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the end of the third quarter of Eros's 2019 fiscal year (ending December 31, 2018) and during the fourth quarter of its fiscal year 2019 (when these statement were made), thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

**M.**     **Defendants' False And Misleading Statements And Omissions In The Wake Of Eros's Credit Rating Downgrades And Moody's Withdrawal Of Coverage**

218.  On June 6, 2019, Eros issued a press release in response to the CARE credit rating downgrade.  Within the press release, the Company provided the following statement: "Eros International PLC and all of its subsidiaries have met and continue to meet all debt service commitments.  The Company retains the full faith and confidence of our lenders."

219.  This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because: (1) later that same day, Eros "clarifi[ed]" that, in fact, it had not met its debt services commitments, admitting: "As previously communicated through our Indian subsidiary, EIML was late on two loan interest payments for April and May 2019.  These interest payments total less than $2 million and are currently in process of remittance[;]" and (2) Eros was late in making other of its obligations, including loan payments and payroll.

220.  On June 9, 2019, Eros issued a press release announces a share repurchase program and reiterating its positive business fundamentals.  The press release included commentary from Defendant Lulla, who stated: "Additionally, I am pleased to inform shareholders that we now have a strong financial and operating position and *our management team are making it a priority to work with CARE Ratings, the regulatory agency, to have our credit rating revised upwards in due course.*"

221.  This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because it failed to disclose, among other things, that management was not in fact working with CARE Ratings, and rather, refused to provide CARE with

the additional details CARE requested.

222. The press release also included commentary from Defendant Parameswaran, who stated: "Eros has a ***strong liquidity profile and healthy balance sheet.***"

223. This statement attesting to Eros's strong liquidity profile and healthy balance sheet was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because it failed to disclose, among other things, the following adverse facts: (1) that the Company and its executives overpaid related parties for film rights and advancements for film co-production which inflated Eros's intangible content asset balances; (2) that the indicators of impairment that Defendants cited as the explanation of the impairment charge announced on July 15, 2019 and recorded as of March 31, 2019 actually existed as of the 2019 fiscal year-end, thus strongly indicating that Eros's intangible content asset balances were impaired (and should have been recorded as such); (3) that, as a result, the Company's liquidity and financial position was materially weaker than Defendants had represented during the Class Period; (4) that, as a result, the Company and its subsidiaries frequently had trouble timely paying its obligations, including EIML missing loan payments; and (5) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

224. On June 10, 2019, in an article entitled "Have not defaulted on any loans, clarifies Eros International after CARE Ratings downgrade" with CNBC-TV18, Defendant Lulla is quoted as stating: "the banks have not served us any notice on any loans."

225. This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because it failed to disclose, among other things, that EIML had received

late and/or nonpayment notes and other notice of late payments.

226.  On July 2, 2019, Eros issued a press release providing a business update, which stated:

> The Company reports that outstanding interest payments of the Company's Indian operating subsidiary (EIML) that caused a recent ratings downgrade by CARE have been paid by EIML. ***The Company is working with CARE in an attempt to restore its previous investment grade rating***, with the full support of its existing banking consortium. In addition, ***the Company reiterates that the recent withdrawal of its Moody's rating was at the Company's request given that it does not have any outstanding public institutional bonds***.

227.  The emphasized statement concerning Eros working with CARE to restore its rating was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because it failed to disclose, among other things, that management was not in fact working with CARE Ratings, and rather, refused to provide CARE with the additional details CARE requested.

228.  The emphasized portion of the statement relating to the withdrawal of the Moody's rating was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because it failed to disclose, among other things, that Moody's had withdrawn its credit rating of Eros on June 26, 2019, "for its own business reasons."  According to Moody's policy for withdrawal of credit ratings,[32] when Moody's indicates that a credit rating is withdrawn for "'business reasons,' this refers to [Moody's] business

---

[32] Moody's Policy for Withdrawal of Credit Ratings in effect at that time can be found in Moody's Annual Certification Application as a Nationally Recognized Statistical Rating Organization, filed on Form NRSRO with the SEC on March 29, 2019, available from the SEC on its website at https://www.sec.gov/Archives/edgar/data/1698547/000119312519091962/0001193 125-19-091962-index.htm.

reasons, not the business reasons of the Rated Entity or obligor."  In fact, Moody's has a separate reason to withdraw a credit rating if a rated entity does not have any outstanding public bonds: "Maturity of Obligation or Termination of Program: the Credit Rating on an obligation will be withdrawn when the obligation is not outstanding or the program has been terminated.  This includes when … a Credit Rating on a debt or program is issued and published but the debt is ultimately not issued or the program is not closed[.]"

229.  On July 15, 2019, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2019, ended March 31, 2019.  The press release stated: "Eros' ***balance sheet remains conservative*** and the Company is ***well-capitalized***…."

230.  The emphasized statements above in ¶229 attesting that Eros was well-capitalized and had a conservative balance sheet were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because it failed to disclose, among other things, the following adverse facts: (1) that the indicators of impairment and muddied explanation of the impairment charge as of March 31, 2019 objectively and overwhelmingly indicated that Eros's intangible content asset balances were more than likely impaired as of the start of the Class Period; (2) that the Company's liquidity and financial position was weaker than Defendants had disclosed and that Eros's balance sheet was not conservative; and (3) that, as a result, Eros was at a heightened risk of needing to rely on toxic financing to fund its operations.

231. Also on July 15, 2019, Eros held an earnings call to discuss the Company's financial results for the fourth quarter of 2019 and the 2019 fiscal year. During the question and answer portion of the call, after responding to a question about what really happened with respect to the CARE downgrade of EIML, Lulla added further commentary:

KISHORE ARJAN LULLA: "….[T]here were reports or there was kind of fake news or false reports about Moody's in their withdrawal of their rating.  Just to clarify for the record that we as a company had asked Moody's to withdraw their credit ratings -- withdraw their services, quite frankly, just because we do not have any institutional public bonds outstanding.  We did the same thing with S&P as well.

[Analyst]: So you asked Moody's to withdraw coverage of Eros, essentially?

KISHORE ARJAN LULLA: That is correct.  That is correct.

[Analyst]: Okay.  That's an important point, I think.

232. This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because it failed to disclose, among other things, that Moody's had withdrawn its credit rating of Eros on June 26, 2019, "for its own business reasons." According to Moody's policy for withdrawal of credit ratings, when Moody's indicates that a credit rating is withdrawn for "'business reasons,' this refers to [Moody's] business reasons, not the business reasons of the Rated Entity or obligor." In fact, Moody's has a separate reason to withdraw a credit rating for the situation Lulla described: "Maturity of Obligation or Termination of Program: the Credit Rating on an obligation will be withdrawn when the obligation is not outstanding or the program has been terminated.  This includes when … a Credit Rating on a debt or program is issued and published but the debt is ultimately not issued or the program is not closed[.]"

233.  The statements made in made in ¶¶218, 220, 222, 224, and 231 also gave the materially misleading impression that Eros's financial position and liquidity were in a better shape than they were and that the credit rating issues were simply clerical/mechanical issues that would be swiftly resolved.  For example, in response to this statement, Macquarie Research's July 15, 2019 report stated:

> Management addressed several of the questions that have hit the stock in the past 2 months, pointing out that Eros has made the missed interest payments that led to its CARE rating agency downgrade, and is working to restore its investment grade status. … And notably, Eros clarified that it asked Moody's to withdraw coverage as it does not have institutional bonds outstanding.

In truth, as was later disclosed just two months later, the traditional financing sources were closed to Eros and it had to turn to toxic financing for its liquidity and cash flow needs.

## VI.   LOSS CAUSATION

234. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

235. During the Class Period, Plaintiffs and the Class purchased Eros securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

236.  Artificial inflation in EROS's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on June 5, 2019, June 6, 2019, June 7, 2019, June 11, 2019, June 26, 2019, July 15, 2019, and September 26, 2019. As a direct result of these partial disclosures, the price of Eros's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

237. On June 5, 2019, after the close of market, EIML's credit rating was downgraded 10 notches to "default" (CARE D) by India's largest credit ratings agency, CARE Ratings, over concerns of "ongoing delays/default in debt servicing due to slowdown in collection from debtors, leading to cash flow issues in the

company."

238.  Responding to CARE's downgrade, on June 6, 2019, Eros issued two press releases, first stating that the Company and its subsidiaries "have met and continue to meet all debt service commitments.  The Company retains the full faith and confidence of our lenders."  Later that day, but before the close of market, Eros issued a second, "clarifying" statement admitting that, in fact, "as previously communicated through our Indian subsidiary, EIML was late on two loan interest payments for April and May 2019.  These interest payments total less than $2 million and are currently in process of remittance."

239.  Following all of this news, the Company's share price fell $3.59 per share, over 49%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume.

240.  On June 7, 2019 S&P Global Ratings withdrew its preliminary B+ credit rating on Eros.  In its press release announcing the withdrawal, S&P Global Ratings explained that its withdrawal was on account of Eros not issuing proposed senior unsecured notes to refinance its existing debt facilities.

241. Also on June 7, 2019, Hindenburg Research published a report explaining why it believed EIML had been downgraded by CARE concluding that "a liquidity event seemed to border on the inevitable."  The Hindenburg Report highlighted Eros's relationship with a number of entities they "believe are contributing to its current situation."  The Hindenburg Report highlighted the net payments and advances to NextGen, owned by Defendant Lulla's brother-in-law, from Eros, which dwarfed the combined total budget of $19.35 million for the five films produced by NextGen (and largely co-produced by Eros) since the IPO, and had the effect of padding Eros's intangible content balances.

242.  On all this news, the Company's share price fell $0.41 per share, or 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume.

243. On June 10, 2019, Maybank Kim Eng decided to drop its analyst coverage of Eros.  In its accompanying report, Maybank Kim Eng explained that EIML's missed interest payment was surprising, and further explained that "[t]he drop in share price on the CARE D/G is negative for EROS US because it likely impedes the company's ability to raise both debt and equity."

244.  Analysts at Citi reacted to this news by slashing its price target for Eros in half to $6.50 from $13 on June 10, 2019, noting the possibility of a cash crunch at EIML poses a risk to Eros's shares.

245.  On June 11, 2019, Moody's downgraded Eros to B2 from B1, and changed the outlook to negative from stable.  Moody's stated that the ratings downgrade reflected Eros's "strained liquidity profile, which led to delays in servicing the bank loans of its Indian subsidiary."  Moody's rating took into consideration, among others, considered Eros's "weak cash flow metrics because of the ongoing need to invest in content[ and] weak liquidity profile[.]"

246.  On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on unusually heavy trading volume.

247.  Then, on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros "for its own business reasons."

248.  On this news, Eros's share price fell $0.49 per share, or 22.5%, to close at $1.69 per share on June 26, 2019, on unusually heavy trading volume, and continued to fall on the following day another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.

249.  On July 15, 2019, Eros issued a press release announcing its financial results for the fourth quarter and fiscal year 2019, ended March 31, 2019.  As part of the release, Eros reported a total impairment loss of $423.3 million.  Of this impairment loss, $405.5 million was allocated to Eros's intangible content asset balances, which was further allocated between an impairment loss of $366.7 million

to film and content rights and $38.8 million to content advances.  Eros further explained that the impairment was the result of the Company's assessment that their collective film intangible content asset's carrying amount exceeded its recoverable amount.

250.  Later that day, Eros held an earnings conference call to discuss these financial results.  During the question and answer portion of the call, Defendant Parameswaran explained that Eros's impairment analysis was triggered by Eros's "significant decline in the market value."

251.  On this news, Eros's share price fell $0.21 per share, or 11.5%, to close at $1.61 per share on July 15, 2019, on unusually heavy trading volume.

252.  Finally, on September 26, 2019, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principal amount of senior convertible notes due 2020.  Eros said it planned to use the $25 million in net proceeds from this toxic financing transaction for general corporate purposes.

253.  On this news, the Company's share price fell $0.85, nearly 30%, to close at $1.99 on September 26, 2019, on extremely heavy trading volume.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

254.  As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

255.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Eros, their

control over, and/or receipt and/or modification of Eros's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Eros, participated in the fraudulent scheme alleged herein.

## VIII.   CORPORATE SCIENTER ALLEGATIONS

256.  The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

257. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

258.  Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Eros as an entity.  Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading.  Here, the statements alleged were made to the investing public regarding the Company's operations, internal controls, finances and business practices—all important topics that would necessarily require approval by appropriate corporate officers.

## IX.   CLASS ACTION ALLEGATIONS

259.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Eros securities between July 28, 2017 and September 25, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

260.  The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Eros's common shares actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.   Millions of shares of Eros common stock were traded publicly during the Class Period on the NYSE.  As of July 30, 2019, Eros had 84,430,802 'A' ordinary shares of common stock outstanding.   Record owners and other members of the Class may be identified from records maintained by Eros or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

261.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

262.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

263.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eros;

       c.      whether Defendants knew or deliberately disregarded that their statements were false and misleading;

       d.      whether Defendants engaged in a scheme to defraud investors;

       e.      whether the price of Eros securities were artificially inflated because of Defendants' conduct complained of herein; and

       f.      to what extent the members of the Class have sustained damages and the proper measure of damages.

264. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

265. The market for Eros's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Eros's securities traded at artificially inflated prices during the Class Period. On September 19, 2017, the Company's share price closed at a Class Period high of $16.10 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Eros's securities and market information relating to Eros, and have been damaged thereby.

266. During the Class Period, the artificial inflation of Eros's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to

be made a series of materially false and/or misleading statements about Eros's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Eros and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

267. At all relevant times, the market for Eros's securities was an efficient market for the following reasons, among others:

      a.     Eros shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b.     As a regulated issuer, Eros filed periodic public reports with the SEC and/or the NYSE;

      c.     Eros regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

      d.     Eros was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

      e.     The average daily trading volume for Eros securities during the Class Period was approximately 966,314 shares with more than 84.43 million 'A' ordinary shares of stock outstanding as of July 30, 2019, and a market capitalization

81

reaching $977.13 million during the Class Period.

268.  As a result of the foregoing, the market for Eros's securities promptly digested current information regarding Eros from all publicly available sources and reflected such information in Eros's share price. Under these circumstances, all purchasers of Eros's securities during the Class Period suffered similar injury through their purchase of Eros's securities at artificially inflated prices and a presumption of reliance applies.

269.  A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

270.  The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

271.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

272. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eros who knew that the statement was false when made.

## XII.   CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of Section 10(b)
### Of The Exchange Act And Rule 10b-5 Promulgated Thereunder
### Against Defendant Eros International Plc And The Individual Defendants

273.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

274. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Eros's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

275. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices

for Eros's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

276. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Eros's financial well-being and prospects, as specified herein.

277. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eros's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Eros and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

278. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other

members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

279. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Eros's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

280.  As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Eros's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class

acquired Eros's securities during the Class Period at artificially high prices and were damaged thereby.

281.  At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Eros was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Eros securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

282.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

283.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**<u>Against the Individual Defendants</u>**

284.  Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

285.  Individual Defendants acted as controlling persons of Eros within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and

did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

286. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

287. As set forth above, Eros and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)     declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)     awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)     awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: June 4, 2021                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

By:  *s/ Donald A. Ecklund*
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: decklund@carellabyrne.com

*Liaison Counsel for Plaintiffs*


**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke
Leanne H. Solish
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs*