# EXHIBIT 1

Exhibits

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended March 31, 2020**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 001-36176**

# EROS INTERNATIONAL PLC

(Exact name of Registrant as specified in its charter)

**Not Applicable**

(Translation of Registrant's name into English)

**Isle of Man**

(Jurisdiction of incorporation or organization)

**550 County Avenue**
**Secaucus, New Jersey 07094**
**Tel: +1(201) 558 9001**

(Address of principal executive offices)

**Oliver Webster**
**IQ EQ (Isle of Man) Limited**
**First Names House**
**Victoria Road**
**Douglas, IM2 4DF**
**Isle of Man**
**Tel: (44) 1624 630 630**
**Email: oliver.webster@iqeq.com**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **A ordinary share, par value GBP 0.30 per share** | EROS | **The New York Stock Exchange** |

Securities registered or to be registered pursuant to Section 12(g) of the Act.

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act

**None**

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

At March 31, 2020, 127,116,702 'A' ordinary shares and 19,899,085 'B' ordinary shares, each at par value GBP 0.30 per

share, were issued and outstanding.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.☐ Yes ☑ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.☐ Yes ☑ No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.☑ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).☑ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☑          Non-accelerated filer ☐

Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐          International Financial Reporting Standards as issued          Other ☐
by the International Accounting Standards Board ☑

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow: ☐ Item 17 ☐ Item 18

If this report is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).☐ Yes ☑ No

**TABLE OF CONTENTS**
**EROS INTERNATIONAL PLC**

Page

**PART I**

| | | |
|---|---|---|
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 1 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 1 |
| ITEM 3. | KEY INFORMATION | 1 |
| ITEM 4. | INFORMATION ON THE COMPANY | 40 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS | 71 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 71 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 100 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 114 |
| ITEM 8. | FINANCIAL INFORMATION | 115 |
| ITEM 9. | THE OFFER AND LISTING | 115 |
| ITEM 10. | ADDITIONAL INFORMATION | 117 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 136 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 137 |

**PART II**

| | | |
|---|---|---|
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 138 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 138 |
| ITEM 15. | CONTROLS AND PROCEDURES | 138 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT | 140 |
| ITEM 16B. | CODE OF ETHICS | 140 |
| ITEM 16C. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 140 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 140 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 140 |
| ITEM 16F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 141 |
| ITEM 16G. | CORPORATE GOVERNANCE | 141 |
| ITEM 16H. | MINE SAFETY DISCLOSURE | 141 |

**PART III**

| | | |
|---|---|---|
| ITEM 17. | FINANCIAL STATEMENTS | 142 |
| ITEM 18. | FINANCIAL STATEMENTS | 142 |
| ITEM 19. | EXHIBITS | 143 |
| SIGNATURES | | 144 |
| INDEX TO EROS INTERNATIONAL'S CONSOLIDATED FINANCIAL STATEMENTS | | F-1 |

Unless otherwise indicated or required by the context, as used in this annual report, the terms "Eros," "we," "us,", "the Group", "our" and the "Company" refer to Eros International Plc and all its subsidiaries that are consolidated under International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Board (IASB). Our fiscal year ends on March 31 of each year. When we refer to a fiscal year, such as fiscal year 2020, fiscal 2020 or FY 2020, we are referring to the fiscal year ended on March 31 of that year. The "Founders Group" refers to Beech Investments Limited and Kishore Lulla. "$" and "dollar" refer to U.S. dollars.

"High budget" films refer to Hindi films with direct production costs in excess of $8.5 million and regional films with direct production costs in excess of $7.0 million, in each case translated at the historical average exchange rate for the applicable fiscal year. "Low budget" films refer to Hindi and regional films with less than $1.0 million in direct production costs, in each case translated at the historical average exchange rate for the applicable fiscal year. "Medium budget" films refer to Hindi, Tamil, Telugu and other regional language films within the remaining range of direct production costs. With respect to low budget films, references to "film releases" refer to theatrical releases or, for films that we did not theatrically release, to our initial DVD, digital or other non- theatrical exhibition.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This annual report contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Exchange Act, and such statements are subject to the safe harbors created thereby. Generally, these forward-looking statements can be identified by the use of forward-looking terminology such as "approximately," "anticipate," "believe," "estimate," "continue," "could," "expect," "future," "intend," "may," "plan," "potential," "predict," "project," "seek," "should," "will" and similar expressions. Those statements include, among other things, the discussions of our business strategy and expectations concerning our market position, future operations, margins, profitability, liquidity and capital resources, tax assessment orders and future capital expenditures. All of our forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that we are expecting, including, without limitation:

- our ability to successfully and cost-effectively source film content;
- our ability to achieve the desired growth rate of Eros Now, our digital over-the-top ("**OTT**") entertainment service;
- our ability to charge and collect revenues from Eros Now D2C subscribers
- our ability to refresh and update EN with new content
- our ability to continue to monetize throughout the telco infrastructure in India;
- risks that the ongoing novel coronavirus pandemic and spread of COVID-19, and related public health measures in India and elsewhere, may have material adverse effects on our business, financial position, results of operations and/or cash flows;
- our ability to maintain or raise sufficient capital;
- delays, cost overruns, cancellation or abandonment of the completion or release of our films;
- our ability to predict the popularity of our films, or changing consumer tastes;
- our ability to maintain existing rights, and to acquire new rights, to film content;
- our ability to successfully defend any future class action law suits we are a party to in the U.S.;
- anonymous letters to regulators or business associates or anonymous allegations on social media regarding our business practices, accounting practices and/or officers and directors;
- our dependence on the Indian box office success of our Hindi and high budget Tamil and Telugu films;
- our ability to recoup the full amount of box office revenues to which we are entitled due to underreporting of box office receipts by theater operators;
- our dependence on our relationships with theater operators and other industry participants to exploit our film content;
- our ability to mitigate risks relating to distribution and collection in international markets;
- fluctuation in the value of the Indian rupee against foreign currencies;
- our ability to compete in the Indian film industry;
- our ability to compete with other forms of entertainment;

· our ability to combat piracy and to protect our intellectual property;

· our ability to maintain an effective system of internal control over financial reporting;

ii

- contingent liabilities that may materialize, including our exposure to liabilities on account of unfavorable judgments/decisions in relation to legal proceedings involving us or our subsidiaries and certain of our directors and officers;
- our ability to successfully respond to technological changes;
- regulatory changes in the Indian film industry and our ability to respond to them;
- our ability to satisfy debt obligations, fund working capital and pay dividends;
- the monetary and fiscal policies of India and other countries around the world, inflation, deflation, unanticipated turbulence in interest rates, foreign exchange rates, equity prices or other rates or prices; and
- our ability to address the risks associated with acquisition opportunities.
- the possibility that the consummation of the transactions contemplated by the Merger Agreement with STX Filmworks, Inc. (described further below in "Part I — Item 10. Additional Information — C. Material Contracts") is delayed or does not occur, and the challenges, costs and potential disruptions associated with closing, integrating and achieving the anticipated benefits of such transactions, some or all of which anticipated benefits may take longer to realize than expected or may not be realized fully or at all.
- our ability to manage geo-political and global trade risks on account of content limitations, tariffs, taxes, and supply chain disruptions.

These and other factors are more fully discussed in "Part I — Item 3. Key Information — D. Risk Factors," "Part I — Item 5. Operating and Financial Review and Prospects" and elsewhere in this annual report. The forward-looking statements contained in this annual report are based on historical performance and management's current plans, estimates and expectations in light of information currently available to us and are subject to uncertainty and changes in circumstances. There can be no assurance that future developments affecting us will be those that we have anticipated. Actual results may differ materially from these expectations due to changes in global, regional or local political, economic, business, competitive, market, regulatory and other factors, many of which are beyond our control. Should one or more of these risks or uncertainties materialize or should any of our assumptions prove to be incorrect, our actual results may vary in material respects from what we may have expressed or implied by these forward-looking statements. We caution that you should not place undue reliance on any of our forward-looking statements. Any forward-looking statement made by us in this annual report speaks only as of the date on which we make it. Factors or events that could cause our actual results to differ may emerge from time to time, and it is not possible for us to predict all of them. We undertake no obligation to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise, except as may be required by applicable securities laws.

## PART I

### ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

Not applicable.

### ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE

Not applicable.

### ITEM 3. KEY INFORMATION

### A. Selected Financial Data

The table set forth below presents our selected historical consolidated financial data for the periods and at the dates indicated. The selected historical consolidated statements of income data for each of the three years ended March 31, 2020, 2019, and 2018 and the selected statements of financial position data as of March 31, 2020 and 2019 have been derived from and should be read in conjunction with "Part I — Item 5. Operating and Financial Review and Prospects" and our consolidated financial statements included elsewhere in this Annual Report on Form 20-F. The selected historical consolidated statements of income data for each of the two years ended March 31, 2017 and 2016 and the selected historical statements of financial position data as of March 31, 2018, 2017, and 2016 have been derived from audited consolidated financial statements not included in this Annual Report on Form 20-F.

| | Year ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| | (in thousands, except (Loss)/Earnings per share) | | | | |
| **Selected Statement of Income Data** | | | | | |
| Revenue | $ **155,452** | $ 270,126 | $ 261,253 | $ 252,994 | $ 274,428 |
| Cost of sales | (81,725) | (155,396) | (134,708) | (164,240) | (172,764) |
| Gross profit | **73,727** | 114,730 | 126,545 | 88,754 | 101,664 |
| Administrative costs | (144,319) | (87,134) | (68,029) | (63,309) | (64,019) |
| Operating (loss)/profit before impairment loss | **(70,592)** | 27,596 | 58,516 | 25,445 | 37,645 |
| Impairment loss | (431,200) | (423,335) | — | — | — |
| Operating (loss)/profit | **(501,792)** | (395,739) | 58,516 | 25,445 | 37,645 |
| Net finance costs | (8,779) | (7,674) | (17,813) | (17,156) | (8,010) |
| Other gains/(losses), net | (3,316) | 288 | (41,321) | 14,205 | (3,636) |
| Profit/(loss) before tax | **(513,887)** | (403,125) | (618 | 22,494 | 25,999 |
| Income tax | 22,183 | (7,328) | (9,127) | (11,039) | (12,711) |
| Profit/(loss) for the year [1] | $ **(491,704)** | $ (410,453) | $ (9,745) | $ 11,455 | $ 13,288 |
| (Loss)/Earnings per share (cents) | | | | | |
| Basic (loss)/earnings per share | (389.6) | (599.5) | (36.3) | 6.4 | 6.6 |
| Diluted (loss)/earnings per share | (389.6) | (599.5) | (36.3) | 5.1 | 5.2 |
| Weighted average number of ordinary shares | | | | | |
| Basic | 107,533 | 70,707 | 62,151 | 59,410 | 57,732 |
| Diluted | 115,770 | 72,170 | 63,482 | 60,943 | 59,036 |
| Other non-GAAP measures | | | | | |
| EBITDA [2] | $ **(501,646)** | $ (393,188) | $ 20,186 | $ 42,548 | $ 36,294 |
| Adjusted EBITDA [2] | $ **54,842** | $ 69,378 | $ 76,139 | $ 55,664 | $ 70,852 |
| Gross Adjusted EBITDA [2] | $ **119,293** | $ 199,533 | $ 191,424 | $ 190,980 | $ 199,155 |

1

| | Year ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| | | | (in thousands) | | |
| **Selected Statement of Financial Position Data:** | | | | | |
| Cash and cash equivalents | $ 2,563 | $ 89,117 | $ 87,762 | $ 112,267 | $ 182,774 |
| Goodwill | — | — | 3,800 | 4,992 | 5,097 |
| Total assets | 607,656 | 1,088,902 | 1,410,319 | 1,343,365 | 1,247,878 |
| Debt: | | | | | |
| Current portion | 116,858 | 208,908 | 151,963 | 180,029 | 210,587 |
| Long-term portion | 62,114 | 71,920 | 124,983 | 89,841 | 92,630 |
| Total liabilities | 299,170 | 431,917 | 406,902 | 459,817 | 438,784 |
| Equity attributable to Eros International Plc | 249,119 | 521,456 | 865,689 | 804,457 | 740,332 |
| Equity attributable to non-controlling interests | 59,367 | 135,529 | 137,728 | 79,091 | 68,762 |
| Total equity | $ 308,486 | $ 656,985 | $ 1,003,417 | $ 883,548 | $ 809,094 |

_____

(1) References to "net income" in this document correspond to "profit/(loss) for the period" or "profit/(loss) for the year" line items in our consolidated financial statement appearing elsewhere in this document.

(2) We use EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as supplemental financial measures. EBITDA is defined by us as net income before interest expense, income tax expense and depreciation and amortization (excluding amortization of capitalized film content and debt issuance costs). Adjusted EBITDA is defined as EBITDA adjusted for (gain)/impairment of available-for-sale financial assets, profit/loss on held for trading liabilities (including profit/loss on derivative financial instruments), transactions costs relating to equity transactions, share based payments, Loss / (Gain) on sale of property and equipment, Loss on de-recognition of financial assets measured at amortized cost, net, Credit impairment loss, net, Loss on financial liability (convertible notes) measured at fair value through profit and loss, Loss on deconsolidation of a subsidiary and exceptional items such as impairment of goodwill, trademark, film & content rights and content advances. Gross Adjusted EBITDA is defined as Adjusted EBITDA adjusted for amortization of intangible films and content rights. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as used and defined by us, may not be comparable to similarly-titled measures employed by other companies and is not a measure of performance calculated in accordance with GAAP. EBITDA Adjusted EBITDA and Gross Adjusted EBITDA should not be considered in isolation or as a substitute for operating income, net income, cash flows from operating, investing and financing activities, or other income or cash flow statement data prepared in accordance with GAAP. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA provide no information regarding a Company's capital structure, borrowings, interest costs, capital expenditures and working capital movement or tax position.

(*) The Company has discontinued disclosure of adjustment towards significant discounting component and accordingly comparatives have been changed.

The following table sets forth the reconciliation of our net income to EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA:

| | Year ended March 31 | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| **(Loss)/Profit for the year** | $ (491,704) | (410,453) | $ (9,745) | $ 11,455 | $ 13,288 |
| Income tax expense | (22,183) | 7,328 | 9,127 | 11,039 | 12,711 |
| Net finance costs | 8,779 | 7,674 | 17,813 | 17,156 | 8,010 |
| Depreciation | 2,568 | 1,049 | 1,265 | 1,082 | 1,154 |
| Amortization(a) | 894 | 1,214 | 1,726 | 1,816 | 1,131 |
| **EBITDA (Non-GAAP)** | (501,646) | (393,188) | 20,186 | 42,548 | 36,294 |
| (Gain)/Impairment of available-for-sale financial assets | 1,253 | — | — | (58) | — |
| Net (gain)/loss on derivative financial instruments | — | — | 586 | (10,297 | 3,566 |
| Share based payments(b) | 22,268 | 21,561 | 17,918 | 23,471 | 30,992 |
| Loss/(Gain) on sale of property and equipment | 70 | 97 | (2) | — | — |
| Loss on de-recognition of financial assets measured at amortized cost, net | 5,285 | 5,988 | 3,562 | — | — |
| Credit impairment loss, net | 90,808 | 10,673 | — | — | — |
| Loss on financial liability (convertible notes) measured at fair value through profit and loss | 15,987 | 21,398 | 13,840 | — | — |
| Loss on deconsolidation of a subsidiary | — | — | 14,649 | — | — |
| Impairment of goodwill | — | — | 1,205 | — | — |
| Reversal credit impairment losses/(gains) | (10,383) | (20,698) | 4,308 | — | — |
| Closure of derivative | — | 249 | — | — | — |
| Impairment loss | 431,200 | 423,335 | — | — | — |
| Others | — | (37) | (113) | — | — |
| **Adjusted EBITDA (Non-GAAP)(b)** | $ 54,842 | $ 69,378(*) | $ 76,139(*) | $ 55,664 | $ 70,852 |
| Amortization of intangible films and content rights | 64,451 | 130,155 | 115,285 | 135,316 | 128,303 |
| **Gross Adjusted EBITDA (Non-GAAP)(b)** | $ 119,293 | $ 199,533 | $ 191,424 | $ 190,980 | $ 199,155 |

_____

(a)    Includes only amortization of intangible assets other than capitalized film content.

(b)    Consists of compensation costs, recognised with respect to all outstanding share based compensation plans and all other equity settled instruments.

(*)    The Company has discontinued disclosure of adjustment towards significant discounting component and accordingly comparatives have been changed.

Our management team believes that EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA are useful to an investor in evaluating our results of operations because these measures:

- are widely used by investors to measure a company's operating performance without regard to items excluded from the calculation of such term, which can vary substantially from company to company depending upon accounting methods and book value of assets, capital structure and the method by which assets were acquired, among other factors;

- help investors to evaluate and compare the results of our operations from period to period by removing the effect of our capital structure from our operating structure; and

- are used by our management team for various other purposes in presentations to our Board of Directors as a

basis for strategic planning and forecasting.

3

However, there are significant limitations to using EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as a measure of performance, including the inability to analyze the effect of certain recurring and non-recurring items that materially affect our net income or loss, the lack of comparability of results of operations of different companies and the different methods of calculating EBITDA. Adjusted EBITDA and Gross Adjusted EBITDA reported by different companies.

**Exchange Rate Information**

Our functional and reporting currency is the U.S. dollar. Transactions in foreign currencies are translated at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities in foreign currencies are translated into U.S. dollars at the exchange rates at ruling on the date of the applicable statement of financial position. For the purposes of consolidation, all income and expenses are translated at the average rate of exchange during the period covered by the applicable statement of income and assets and liabilities are translated at the exchange rate ruling on the date of the applicable statement of financial position.

The following table sets forth, for the periods indicated, information concerning the exchange rates between Indian rupees and U.S. dollars based on the noon buying rate in the City of New York for cable transfers of Indian rupees as certified for customs purposes by the Federal Reserve Bank of New York. These rates are provided solely for your convenience and are not necessarily the exchange rates that were used in this Offering Memorandum or will be used in the preparation of periodic reports or any other information to be provided to you.

| | Period End | Average(1) | High | Low |
|---|---|---|---|---|
| **Fiscal Year** | | | | |
| 2011 | 44.54 | 45.46 | 47.49 | 43.90 |
| 2012 | 50.89 | 48.01 | 53.71 | 44.00 |
| 2013 | 54.52 | 54.36 | 57.13 | 50.64 |
| 2014 | 60.35 | 60.35 | 68.80 | 53.65 |
| 2015 | 62.58 | 61.15 | 63.70 | 58.46 |
| 2016 | 66.25 | 65.39 | 68.84 | 61.99 |
| 2017 | 64.85 | 67.01 | 68.86 | 64.85 |
| 2018 | 65.11 | 64.46 | 65.71 | 63.38 |
| 2019 | 69.16 | 69.91 | 74.33 | 64.92 |
| 2020 | 75.39 | 70.90 | 71.66 | 70.10 |
| **Months** | | | | |
| April 2019 | 69.64 | 69.41 | 70.19 | 68.58 |
| May 2019 | 69.63 | 69.77 | 70.62 | 69.08 |
| June 2019 | 68.92 | 69.39 | 69.83 | 68.92 |
| July 2019 | 68.81 | 68.74 | 69.03 | 68.40 |
| August 2019 | 71.45 | 71.19 | 72.02 | 69.00 |
| September 2019 | 70.64 | 71.32 | 72.20 | 70.49 |
| October 2019 | 71.01 | 71.00 | 71.48 | 70.71 |
| November 2019 | 71.75 | 71.48 | 72.12 | 70.76 |
| December 2019 | 71.36 | 71.16 | 71.70 | 70.62 |
| January 2020 | 71.53 | 71.27 | 71.86 | 70.69 |
| February 2020 | 72.53 | 71.53 | 72.53 | 71.11 |
| March 2020 | 75.39 | 74.55 | 76.37 | 72.88 |
| April 2020 | 75.08 | 76.17 | 76.95 | 75.08 |
| May 2020 | 75.59 | 75.67 | 76.08 | 75.03 |
| June 2020 | 75.63 | 75.73 | 76.32 | 75.03 |

(1)    Represents the average of the U.S. dollar to Indian Rupee exchange rates on the last day of each month during the period for all fiscal years presented, and the average of the noon buying rate for all days during the period for all months presented.

**B. Capitalization and Indebtedness**

Not Applicable.

---

4

**C. Reason for the Offer and the Use of Proceeds**

Not Applicable.

**D. Risk Factors**

*This annual report contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of a number of factors, including those described in the following risk factors and elsewhere in this annual report. If any of the following risks were to occur, our business affairs, prospects, assets, financial condition, results of operations and cash flows could be materially and adversely affected, and the market price of our A ordinary shares could decline. Additionally, the pandemic caused by a novel strain of coronavirus ("COVID-19") has had, and is expected to continue to have, a material adverse impact on our business, financial condition and results of operations, as well as those of many of our business partners, and local, national, and global economies. The COVID-19 pandemic has also amplified many of the other risks discussed below to which we are subject. We are unable to predict the extent to which the pandemic and its related impacts will adversely affect us. However, given the unpredictable, unprecedented, and fluid nature of the pandemic, it may also materially and adversely affect our business, financial condition, and results of operations in ways that are not currently anticipated by or known to us or that we do not currently consider to present significant risk.*

**Risks Relating to the STX Transaction and the Combined Company Upon Completion of the STX Transaction**

***We cannot assure you that the STX Transaction will occur on the timeframe that is currently contemplated or at all.***

On April 17, 2020, Eros entered into an Agreement and Plan of Merger (the "Merger Agreement") with STX Filmworks, Inc., a Delaware corporation ("STX"), England Holdings 2, Inc., a Delaware corporation and indirect wholly owned subsidiary of Eros ("England Holdings 2"), and England Merger 1 Corp. (f/k/a England Merger Corp.), a Delaware corporation and a direct wholly owned subsidiary of England Holdings 2 ("Merger Sub"), which provides for, among other things, the merger of Merger Sub with and into STX (the "Merger"), with STX surviving as the surviving corporation and a direct wholly owned subsidiary of England Holdings 2. Eros, as the combined company following the Merger, is referred to hereafter as the "combined company." The Merger and the related transactions contemplated by the Merger Agreement are collectively referred to hereafter as the "STX Transaction." The Merger Agreement and the STX Transaction are described in greater detail below under "Part I –Item 10. Additional Information – C. Material Contracts." While the parties currently expect that the STX transaction will be consummated on or shortly after the date of this Report, there is still a risk that the STX Transaction may not be consummated, including if one or more parties fails to perform under or breaches the PIPE Subscription Agreement. If the STX Transaction does not occur, our ability to conduct our business in the manner and on the timelines presently planned could be materially and negatively affected, and such failure could have a material adverse impact on our stock price, business and our results of operation and financial condition.

***Uncertainties associated with the STX Transaction may cause a loss of management personnel and other key employees, which could adversely affect the future business and operations of the combined company following completion of the STX Transaction.***

Both Eros and STX are dependent on the experience and industry knowledge of their officers and other key employees to execute their business plans and the business plan of the combined company. The combined company's success after the completion of the STX Transaction will depend in part upon the ability of the combined company to retain certain key management personnel and employees of Eros and STX. No assurance can be given that the combined company, after the completion of the STX Transaction, will be able to attract or retain key management personnel and other key employees to the same extent that Eros and STX have previously been able to attract or retain their own employees.

5

***Following the STX Transaction, the composition of the combined company board of directors will be different than the composition of the current Eros board of directors.***

The Eros board of directors currently consists of seven directors. Upon completion of the STX Transaction, the board of directors of the combined company will consist of nine directors, including four directors who were selected by the Founders Group (one of whom must be an independent director), four directors who were selected by STX (one of whom must be an independent director), and an independent director jointly selected by the Founders Group and STX. This new composition of the board of directors of the combined company may affect the future decisions of the combined company.

***The combined company may be unable to successfully integrate Eros and STX and realize the anticipated benefits of the STX Transaction.***

The success of the STX Transaction will depend, in part, on the combined company's ability to successfully combine and integrate Eros and STX, and realize the anticipated benefits, including synergies, cost savings, innovation and strategic growth opportunities and operational efficiencies from the STX Transaction in a manner that does not materially disrupt existing customer, supplier, talent, producer, distributor, employee and other industry relations and does not result in decreased revenues due to losses of, or decreases in purchase and/or viewership of its content and service offerings by, subscribers and other counterparties. If the combined company is unable to achieve these objectives within the anticipated time frame, or at all, the anticipated benefits may not be realized fully or at all, or may take longer to realize than expected, and the value of the combined company's A ordinary shares may decline. The combined company may fail to realize some or all of the anticipated benefits of the STX Transaction if the integration process takes longer than expected or is more costly than expected.

The integration of the two companies may result in material challenges, including, without limitation:

- managing a larger, more complex combined business;

- maintaining employee morale and retaining key management and other employees;

- retaining existing business and operational relationships, including customers, suppliers, distributors, employees and other counterparties, and attracting new business and operational relationships;

- consolidating corporate and administrative infrastructures and eliminating duplicative operations, including unanticipated issues in integrating information technology, communications and other systems;

- coordinating geographically separate organizations; and

- unforeseen expenses or delays associated with the STX Transaction.

Many of these factors will be outside of the combined company's control, and any one of them could result in delays, increased costs, decreases in the amount of expected revenues and other adverse impacts, which could materially affect the combined company's financial position, results of operations and cash flows.

Due to legal restrictions, Eros and STX have been and are currently permitted to conduct only limited planning for the integration of the two companies following the STX Transaction. The actual integration may result in additional and unforeseen expenses, and the anticipated benefits of the integration plan may not be realized on a timely basis, if at all.

In addition, the combined company's ability to successfully integrate and manage its expanded business and achieve the anticipated benefits of the STX Transaction may be materially and adversely effected by the ongoing COVID-19 pandemic, which is discussed in greater detail below. The ability of both Eros and STX to generate revenues from the monetization of film content in various distribution channels, including through agreements with commercial theatre

operators, has been and may continue to be adversely effected by the COVID-19 pandemic. The full extent and scope of the impact of the pandemic on national, regional and global markets and economies, and therefore the combined company's business and industry and efforts to integrate its expanded business and organization and realize anticipated benefits of the STX Transaction, is highly uncertain and cannot be predicted.

6

***The future results of the combined company may be adversely impacted if the combined company does not effectively manage its complex operations following the completion of the STX Transaction.***

Following the completion of the STX Transaction, the size of the combined company's business will be significantly larger than the current size of either Eros' business or STX's business. The combined company's ability to successfully manage this expanded business will depend, in part, upon management's ability to design and implement strategic initiatives that address not only the integration of Eros and STX, but also the increased scale and scope of the combined business with its associated increased costs and complexity. There can be no assurances that the combined company will be successful in integrating the businesses or that it will realize the expected operating efficiencies, cost savings, strategic growth opportunities and other benefits currently anticipated from the STX Transaction.

***Current Eros shareholders will generally have a reduced ownership and voting interest in the combined company after the STX Transaction.***

Immediately after the completion of the STX Transaction, each Eros shareholder will remain a shareholder of Eros, as the combined company, but with a percentage ownership that will be less than half of such shareholder's percentage of Eros as of immediately prior to the STX Transaction. As a result of this reduced ownership percentage, existing Eros shareholders will generally have less voting power in the combined company after the STX Transaction than they did prior to the STX Transaction.

***Pursuant to an Investors' Rights Agreement and the Amended Articles of Association, the Founders Group and certain significant stockholders of STX will have rights relating to governance of the combined company that are different from shareholders generally.***

As described below under "Part I –Item 10. Additional Information – C. Material Contracts," the Founders Group and certain significant stockholders of STX (the "STX Parties") will enter into an Investors' Rights Agreement at the effective time of the Merger. In addition, as required by the Merger Agreement, we convened an extraordinary general meeting of our shareholders on June 29, 2020 at which the requisite percentage of our shareholders approved the Amended Articles of Association, key provisions of which are also described in "Part I –Item 10. Additional Information – C. Material Contracts." By virtue of the Investors' Rights Agreement and the Amended Articles of Association, for a period lasting up to three years following the consummation of the STX Transaction, the Founders Group will have the right to nominate four out of nine directors on the combined company's board of directors and certain of the STX Parties affiliated with Hony Capital ("Hony") will have the right to nominate four out of nine directors on the combined company's board of directors. In addition, during this period, the board of directors of the combined company will not be permitted to take certain significant corporate actions, including adopting the combined company's annual business plan and budget, without the approval of at least one non-independent member of the board of directors that was nominated by the Founders Group. During this period, the board of directors of the combined company also will not be permitted to hire or terminate any of the chief executive officer, chief financial officer or president (or co-presidents) of the combined company without the approval of at least one non-independent member of the board of directors that was nominated by the Founders Group and at least one member of the board of directors that was nominated by Hony. In exercising their rights under the Investors' Rights Agreement and the Amended Articles of Association, the Founders Group and STX Parties may have interests that are different from or in addition to the interests of the combined company's other shareholders.

***Each of Eros and STX has incurred substantial expenses related to the completion of the STX Transaction and expects to incur substantial expenses related to the integration of Eros and STX.***

Each of Eros and STX has incurred substantial expenses in connection with the completion of the STX Transaction and expects to incur substantial expenses to integrate a large number of processes, policies, procedures, operations,

technologies and systems of Eros and STX in connection with the STX Transaction. The substantial majority of these costs will be non-recurring expenses related to the transactions and facilities and systems consolidation costs. The combined company may incur additional costs or suffer loss of business under third-party contracts that are terminated or that contain change in control or other provisions that may be triggered by the completion of the transactions, and/or losses of, or decreases in transactions by, customers and business partners of Eros and STX, and may also incur costs to retain certain key management personnel and employees. Eros and STX will also incur transaction fees and costs related to formulating integration plans for the combined business, and the execution of these plans may lead to additional unanticipated costs and time delays. These incremental transaction-related costs may exceed the savings the combined company expects to achieve from the elimination of duplicative costs and the realization of other efficiencies related to the integration of the businesses, particularly in the near term and in the event there are material unanticipated costs. Factors beyond the parties' control could affect the total amount or timing of these expenses, many of which, by their nature, are difficult to estimate accurately.

7

***The market price of the combined company's A ordinary shares after the STX Transaction is completed may be affected by factors different from those affecting the price of Eros A ordinary shares before the STX Transaction is completed.***

Upon completion of the STX Transaction, holders of Eros A ordinary shares will be holders of A ordinary shares of the combined company. As the businesses of Eros and STX are different, the results of operations as well as the price of the combined company's A ordinary shares may, in the future, be affected by factors different from, or may be affected differently by, those factors affecting Eros an independent stand-alone company. The combined company will face additional risks and uncertainties to which each of Eros and STX may currently not be exposed. As a result, the market price of the combined company's shares may fluctuate significantly following completion of the STX Transaction.

***The market price of the combined company's A ordinary shares may decline as a result of the STX Transaction.***

The market price of the combined company's A ordinary shares may decline as a result of the STX Transaction if, among other things, the operational cost savings estimates in connection with the integration of Eros's business and STX's business are not realized, there are unanticipated negative impacts on Eros's financial position, or if the transaction costs related to the STX Transaction are greater than expected. The market price also may decline if the combined company does not achieve the perceived benefits of the STX Transaction as rapidly or to the extent anticipated by financial or industry analysts or if the effect of the transactions on the combined company's financial position, results of operations or cash flows is not consistent with the expectations of financial or industry analysts.

In addition, sales of combined company's A ordinary shares after the completion of the STX Transaction may cause the market price of such shares to decrease. It is estimated that Eros will issue approximately 236,262,932 A ordinary shares, including up to 40 million share equity awards, in connection with the STX Transaction, based on the number of outstanding shares, including share equity awards, and the 10-day volume weighted average price of Eros A ordinary shares as of July 29, 2020. While STX stockholders who did not purchase shares pursuant to the PIPE Subscription Agreement described below under "Part I –Item 10. Additional Information – C. Material Contracts" will be subject to a contractual 18-month lockup period during which they may not sell the combined company's A ordinary shares they receive in the Merger, those STX stockholders who purchase shares pursuant to the PIPE Subscription Agreement are subject only to a 75-day lockup period (with respect to both the shares they receive in the Merger and the shares they purchase in the PIPE Subscription Agreement). Such STX stockholders may decide not to hold the shares of combined company common stock they will receive in STX Transaction beyond the 75-day lockup period. In addition, existing Eros shareholders may decide not to continue to hold their A ordinary shares following completion of the STX Transaction. Such sales of combined company A ordinary shares could have the effect of depressing the market price for the combined company's A ordinary shares.

Any of these events may make it more difficult for the combined company to sell equity or equity-related securities, dilute your ownership interest in the combined company and have an adverse impact on the price of the combined company's A ordinary shares.

***If certain U.S. federal income tax rules regarding ''inversion transactions'' apply to us as a result of the STX Transaction, such rules could result in adverse U.S. federal income tax consequences.***

Under section 7874 of the U.S. Internal Revenue Code of 1986, as amended (''Code''), a foreign corporation is treated as a "surrogate foreign corporation" if, pursuant to a plan (or a series of related transactions) (1) the foreign corporation completes the direct or indirect acquisition of substantially all of the properties held, directly or indirectly, by a U.S. corporation, (2) after the acquisition at least 60% of the stock (by vote or value) of the foreign corporation is held by former shareholders and certain creditors of the U.S. corporation by reason of their holding stock or debt obligations of the U.S.

corporation (such percentage held by such persons being the ''Section 7874 Percentage''), and (3) after the acquisition, the "expanded affiliated group" (within the meaning of section 7874 of the Code) that includes the foreign corporation does not have substantial business activities in the foreign country in which, or under the law of which, the foreign corporation is created or organized, relative to the total business activities of such expanded affiliated group.

8

If the Section 7874 Percentage is at least 60% but less than 80% and a foreign corporation is a surrogate foreign corporation with respect to a U.S. corporation, several limitations apply to the U.S. corporation, including, but not limited to, the prohibition, for a period of ten years, of the use of net operating losses, foreign tax credits and other tax attributes to offset the income or gain recognized by reason of transfer of any property to a foreign related person or to offset any income received or accrued during such period by reason of a license of any property to a foreign related person and an additional minimum tax under Section 59A of the Code on certain ''base eroding'' payments to members of the expanded affiliated group that are foreign corporations. In addition, under section 4985 of the Code and the rules related thereto, an excise tax at a rate of currently 20% is imposed on the value of certain share compensation held directly or indirectly by certain ''disqualified individuals'' (including certain of officers and directors). Further, shareholders of the foreign corporation that are United States persons for U.S. federal income tax purposes may not be eligible for reduced rates on dividends paid by the foreign corporation.

If the Section 7874 Percentage is at least 80% and a foreign corporation is a surrogate foreign corporation with respect to a U.S. corporation, the foreign corporation will be treated as a U.S. corporation, regardless of the fact that such corporation is also incorporated in a foreign country. If the foreign corporation were treated as a U.S. corporation, the entire net income of the foreign corporation would be subject to U.S. federal income tax on a net income basis and would be determined under U.S. federal income tax principles.

[Based on the facts as of the date hereof, we expect that, after the consummation of the STX Transaction, the Section 7874 Percentage with respect to former STX shareholders and creditors will be less than 60% and therefore we do not expect to be treated as a "surrogate foreign corporation" within the meaning of section 7874 of the Code.] Determining the Section 7874 Percentage, however, is complex and cannot be made until after the consummation of the STX Transaction, and is subject to legal uncertainties and factual uncertainties. As a result, there can be no assurance that the Section 7874 Percentage will be less than 60%. Holders are urged to consult their own tax advisors regarding the potential application of section 7874 of the Code to the STX Transaction and its potential tax consequences. A determination that we are a surrogate foreign corporation for the purposes of section 7874 of the Code may have material adverse effects on the business, financial condition, results of operations and prospects of the combined company following the STX Transaction.

**Risks Related to Our Business**

***The COVID-19 pandemic and other adverse public health developments has adversely affected our business and results of operations.***

In December 2019, COVID-19 emerged in Wuhan, Hubei Province, China. While initially the outbreak was largely concentrated in China and caused significant disruptions to its economy, it has now spread globally to many countries where we distribute films theatrically, including India, United Kingdom, United States, Dubai, Singapore and Australia. On March 11, 2020, the World Health Organization designated the outbreak a pandemic. Governments and businesses around the world have taken unprecedented actions to mitigate the spread of COVID-19, including imposing restrictions on movement and travel such as quarantines and shelter-in-place requirements, or nationwide lockdowns, as well as restricting or prohibiting outright some or all commercial and business activity, including the closure of some or all theatres and disrupting the production and availability of content, including delayed, or in some cases, shortened or cancelled theatrical releases. These measures, though currently temporary in nature, may become more severe and continue indefinitely depending on the evolution of the pandemic. To date, no fully effective vaccines or treatments have been developed and effective vaccines or treatments may not be discovered soon enough to protect against a further worsening of the pandemic.

The pandemic has materially and adversely affected our ability to generate revenues from the monetization of Indian film content in various distribution channels through agreements with commercial theatre operators, and may continue to do so unless and until the pandemic subsides or an effective treatment or vaccine is discovered. The extent of the adverse impact on our financial and operational results will be dictated by the length of time that such disruptions continue, which will, in turn, depend on the currently unknowable duration of COVID-19 and among other things, the impact of governmental actions imposed in response to the pandemic and individuals' and companies' risk tolerance regarding health matters going forward. Our business also could be significantly affected even after reopening of certain operations, should the disruptions caused by the COVID-19 lead to changes in consumer behavior (such as social distancing becoming the norm independent of any pandemic conditions) and also delayed in production schedule. For example, some areas may not re-open movie theatres or, if they do, some individuals may not feel comfortable gathering in public places such as movie theatres.

The continued spread of COVID-19 has adversely affected many industries as well as the economies and financial markets of many countries, including in many of the countries in which we distribute content, resulting in a significant deceleration of economic activity. This slowdown has reduced production, decreased the level of trade, and led to widespread corporate downsizing, causing a sharp increase in unemployment. We have also seen significant disruption of and extreme volatility in the global capital markets, which could increase the cost of, or entirely restrict access to, capital. This volatility and uncertainty have adversely affected our stock price and may continue to do so. As a result, to the extent we determine it is in our best interests to access the capital markets or refinance some or all of our indebtedness, we may not be able to do so on terms that are acceptable to us or at all. The impact of this outbreak on global, national and local economies is still uncertain and, unless the outbreak is contained, these adverse impacts could worsen, impacting all segments of the global economy, and result in a significant recession or worse.

Considerable uncertainty still surrounds COVID-19 and its potential effects, and the extent of and effectiveness of any responses taken on a local, national and global level. Infections may become more widespread and that could accelerate or magnify one or more of the risks described above. While we expect the pandemic and related events will have a negative effect on our business, the full extent and scope of the impact on national, regional and global markets and economies, and therefore our business and industry, is highly uncertain and cannot be predicted. Accordingly, our ability to conduct our business in the manner and on the timelines presently planned could be materially and negatively affected,

any of which could have a material adverse impact on our business and our results of operation and financial condition.

We are monitoring the rapidly evolving situation and its potential impacts on our financial position, results of operations, liquidity, and cash flows.

10

***We may fail to source adequate film content on favorable terms or at all through acquisitions or co-productions, which could have a material and adverse impact on our business.***

We generate revenues by monetizing Indian film content that we primarily co-produce or acquire from third parties, and then distribute through various channels. Our ability to successfully enter into co-productions and to acquire content depends on, among other things, our ability to maintain existing relationships, and form new ones, with talent and other industry participants.

The pool of quality talent in India is limited and, as a result, there is significant competition to secure the services of certain actors, directors, composers and producers, among others. Competition can increase the cost of such talent, and hence the cost of film content. These costs may continue to increase, making it more difficult for us to access content cost-effectively and reducing our ability to sustain our margins and maximize revenues from distribution and monetization. Further, we may be unable to successfully maintain our long-standing relationships with certain industry participants and continue to have access to content and/or creative talent and may be unable to establish similar relationships with new leading creative talent. This is also dependent on relationships with various writers and talent and has execution risks associated with it. If any such relationships are adversely affected, or we are unable to form new relationships, or if any party fails to perform under its agreements or arrangements with us, our business, prospects, financial condition, liquidity and results of operations could be materially adversely affected.

***Our business involves substantial capital requirements, and our inability to maintain or raise sufficient capital could materially adversely affect our business.***

Our business requires a substantial investment of capital for the production, acquisition and distribution of films and a significant amount of time may elapse between our expenditure of funds and the receipt of revenues from our films. This may require us to fund a significant portion of our capital requirements from our credit facilities or other financing sources. Any capital shortfall could have a material adverse effect on our business, prospects, financial condition, results of operations and liquidity. For additional information, please see "Part 1—Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources" and Note [2(a)] and Note [31] to our audited Consolidated Financial Statements appearing elsewhere in this annual report.

***Delays, cost overruns, cancellation or abandonment of the completion or release of films may have a material adverse effect on our business.***

There are substantial financial risks relating to film production, completion and release. Actual film costs may exceed their budgets, and factors such as labour disputes, unavailability of a star performer, equipment shortages, disputes with production teams or adverse weather conditions may cause cost overruns and delay or hamper film completion. When a film we have contracted to acquire from a third-party experiences delays or fails to be completed, we may not recover advance monies paid for the proposed acquisition. When we enter into co-productions, we are typically responsible for paying all production costs in accordance with an agreed upon budget and while we typically cap budgets in our contracts with our co-producer, given the importance of ongoing relationships in our industry, longer-term commercial considerations may in certain circumstances override strict contractual rights and we may feel obliged to fund cost over-runs where there is no contractual obligation requiring us to do so.

Production delays, failure to complete projects or cost overruns could result in us not recovering our costs and could have a material adverse effect on our business, prospects, financial condition and results of operations.

***The popularity and commercial success of our films are subject to numerous factors, over which we may have limited or no control.***

The popularity and commercial success of our films depends on many factors including, but not limited to, the key talent involved, the timing of release, the promotion and marketing of the film, the quality and acceptance of other competing programs released into the marketplace at or near the same time, the availability of alternative forms of entertainment, general economic conditions, the genre and specific subject matter of the film, its critical acclaim and the breadth, timing and format of its initial release. We cannot predict the impact of such factors on any film, and many are factors that are beyond our control. As a result of these factors and many others, our films may not be as successful as we anticipate, and as a result, our results of operations may suffer.

***The success of our business depends on our ability to consistently create and distribute filmed entertainment that meets the changing preferences of the broad consumer market both within India and internationally.***

Changing consumer tastes affect our ability to predict which films will be popular with audiences in India and internationally. As we invest in a portfolio of films across a wide variety of genres, stars and directors, it is highly likely that at least some of the films in which we invest will not appeal to Indian or international audiences. Further, where we sell rights prior to release of a film, any failure to accurately predict the likely commercial success of a film may cause us to underestimate the value of such rights. If we are unable to co-produce and acquire rights to films that appeal to Indian and international film audiences or to accurately judge audience acceptance of our film content, the costs of such films could exceed revenues generated and anticipated profits may not be realized. Our failure to realize anticipated profits could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our ability to monetize our content is limited to the rights that we acquire from third parties or otherwise own.***

We have acquired our film content through contracts with third parties, which are primarily fixed-term contracts that may be subject to expiration or early termination. Upon expiration or termination of these arrangements, content may be unavailable to us on acceptable terms or at all, including with respect to technical matters such as encryption, territorial limitation and copy protection. In addition, if any of our competitors offer better terms, we will be required to spend more money or grant better terms, or both, to acquire or extend the rights we previously held. If we are unable to renew the rights to our film library on commercially favorable terms and to continue monetizing the existing films in our library or other content, it could have a material adverse effect on our business, prospects, financial condition and results of operations.

In addition, we typically only own certain rights for the monetization of content, which limits our ability to monetize content in certain media formats. In particular, we do not own the audio music rights to the majority of the films in our library and to certain new releases. To the extent we do not own the music or other media rights in respect of a particular film, we may only monetize content through those channels to which we do own rights, which could have an adverse effect on our ability to generate revenue from a film and recover our costs from acquiring or producing content.

***We may face claims from third parties that our films may be infringing on their intellectual property.***

Third parties may claim that certain of our films misappropriate or infringe such third parties' intellectual property rights with respect to previously developed films, stories, characters, other entertainment or intellectual property. Any such assertions or claims may impact our rights to monetize the related films. Irrespective of the validity or the successful assertion of such claims, we could incur significant costs and diversion of resources in defending against them. If any claims or actions are asserted against us, we may seek to settle such claim by obtaining a license from the plaintiff covering the disputed intellectual property rights. We cannot provide any assurances, however, that under such circumstances a license, or any other form of settlement, would be available on reasonable terms or at all. Any of these occurrences could have a material adverse effect on our business, prospects, financial condition and results of operations.

***We were historically and are currently, party to class action lawsuits in the U.S. and may be subject to similar or additional claims in the future, and an adverse ruling on any such future claims could have a material adverse effect on our business, financial condition and results of operations and could negatively impact the market price of our A Ordinary Shares.***

Beginning on November 13, 2015, the Company was named a defendant in five substantially similar putative class action lawsuits filed in federal court in New Jersey and New York by purported shareholders of the Company. On May 17, 2016,

the putative class actions filed in New Jersey were transferred to the United States District Court for the Southern District of New York where they were subsequently consolidated with the other two actions. The Court-appointed lead plaintiffs filed a single consolidated complaint on July 14, 2016 and amended on October 10, 2016. The amended consolidated complaint alleged that the Company and certain individual defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), but did not assert certain claims that had been asserted in prior complaints. The remaining claims were primarily focused on whether the Company and individual defendants made material misrepresentations concerning the Company's film library and materially misstated the usage and functionality of Eros Now, our digital OTT entertainment service. On September 25, 2017, the United States District Court for the Southern District of New York entered a Memorandum and Order dismissing the putative class action with prejudice. On August 24, 2018, the United States Court of Appeals for the Second Circuit issued a summary order affirming the district court's earlier dismissal, with prejudice.

Beginning on June 21, 2019, the Company was named a defendant in three substantially similar putative class action lawsuits filed in federal court in California and New Jersey by purported shareholders of the Company. The lawsuits allege that the Company and certain individual defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by making false and/or misleading statements regarding the Company's accounting for trade receivables. On September 27, 2019, the putative class action filed in California was transferred to the United States District Court for the District of New Jersey. On April 14, 2020, the three putative class actions were consolidated, and a lead plaintiff was appointed. On July 1, 2020, the court-appointed lead plaintiff filed a consolidated complaint. The consolidated complaint expands the scope of the allegations. The company expects to file a motion to dismiss, which is due August 28, 2020.

We have incurred, and will continue to incur, significant costs to defend our position in the above-mentioned class action lawsuits. We are unable to predict whether we will be subject to similar or additional claims in the future. If we become subject to class action lawsuits or any other related lawsuits or investigations or proceedings by regulators in the future, or if the current actions are not resolved in our favor, it could result in a diversion of management resources, time and energy, significant costs, a material decline in the market price for our A Ordinary Shares, increased share price volatility and increased directors and officers liability insurance premiums and could have a material adverse effect upon our business, prospects, financial condition, results of operations and ability to access the capital markets.

***Anonymous letters to regulators or business associates or anonymous allegations on social media regarding our business practices, accounting practices and/or officers and directors could have a resultant material adverse effect on our business, financial condition and results of operations and could negatively impact the market price for our A Ordinary Shares.***

We have been, are currently and in the future may be, the target of anonymous letters sent to regulators or business associates or anonymous allegations posted on social media or circulated in short selling reports regarding our accounting practices, business practices and/or officers and directors. Every time we have received such allegations, we have undertaken what we believe to be a reasonably prudent review, including extensive due diligence to investigate the allegations, and where necessary our board of directors has engaged third-party professional firms to report directly to the Company's Audit Committee. Having conducted these investigations, in each instance we found the allegations were without merit. However, the public dissemination of these allegations has adversely affected our reputation, business and the market price of our A Ordinary Shares and required us to spend significant management time and incur substantial costs to address them.

If anonymous allegations are made in the future, or if the current allegations continue, it could result in a diversion of management resources, time and energy, significant costs, a material decline in the market price for our A Ordinary Shares, increased share price volatility and increased directors and officers liability insurance premiums and could have a material adverse effect upon our business, prospects, financial condition, results of operations and ability to access the capital markets.

***Our business involves risks of liability claims for media content.***

As a producer and distributor of media content, we may face potential liability for:

- defamation;
- invasion of privacy;
- negligence;
- copyright or trademark infringement; and
- other claims based on the nature and content of the materials distributed.

These types of claims have been brought, sometimes successfully, against producers and/or distributors of media content. Any imposition of liability that is not covered by insurance or is in excess of insurance coverage could have a material adverse effect on our business and financial condition.

13

***We depend on the Indian box office success of our Hindi and high budget Tamil and Telugu films from which we derive a significant portion of our revenues.***

In India, a relatively high percentage of a film's overall revenues are derived from theater box office sales and, in particular, from such sales in the first week of a film's release. Indian domestic box office receipts are also an indicator of a film's expected success in other Indian and international distribution channels. As such, poor box office receipts in India for our films, even for those films for which we obtain only international distribution rights, could have a significant adverse impact on our results of operations in both the year of release of the relevant films and in the future for revenues expected to be earned through other distribution channels. In particular, we depend on the Indian box office success of our Hindi films and high budget Tamil and Telugu films.

***We may not be paid the full amount of box office revenues to which we are entitled.***

We derive revenues from theatrical exhibition of our films by collecting a specified percentage of box office receipts from multiplex and single screen theater operators. The Indian film industry continues to lack full exhibitor transparency. There is limited independent monitoring of such data in India or the Middle East, unlike the monitoring services provided by comScore in the United Kingdom and the United States. We therefore rely on theater operators and our sub-distributors to report relevant information to us in an accurate and timely manner.

While multiplex and single-screen operators have now moved to a digital distribution model that provides greater clarity on the number of screenings given to our films, many still do not have computerized tracking systems for box office receipts which can be tracked independently by a third party and we are reliant on box office reports generated internally by these multiplex and single screen operators which may not be entirely accurate or transparent.

Because we do not have a reliable system to determine if our box office receipts are underreported, box office receipts and sub-distribution revenues may be inadvertently or purposefully misreported or delayed, which could prevent us from being compensated appropriately for exhibition of our films. If we are not properly compensated, our business, prospects, financial condition and results of operations could be negatively impacted.

***We depend on our relationships with theater operators and other industry participants to monetize our film content. Any disputes with multiplex operators in India could have a material adverse effect on our ability or willingness to release our films as scheduled.***

We generate revenues from the monetization of Indian film content in various distribution channels through agreements with commercial theater operators, in particular multiplex operators, and with retailers, television operators, telecommunications companies and others. Our failure to maintain these relationships, or to establish and capitalize on new relationships, could harm our business or prevent our business from growing, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

We have had disputes with multiplex operators in India that required us to delay our film releases and disrupted our marketing schedule for future films. These disputes were subsequently settled pursuant to settlement agreements that expired in June 2011. We now enter into agreements on a film-by-film and exhibitor-by-exhibitor basis instead of entering into long-term agreements. To date, our film-by-film agreements have been on commercial terms that are no less favorable than the terms of the prior settlement agreements; however, we cannot guarantee such terms can always be obtained. Accordingly, without a long-term commitment from multiplex operators, we may be at risk of losing a substantial portion of our revenues derived from our theatrical business. We may also have similar future disruptions in our relationship with multiplex operators, the operators of single-screen theaters or other industry participants, which could have a material adverse effect on our business, prospects, financial condition and results of operations. Further, the

theater industry in India is rapidly growing and evolving and we cannot assure you that we will be able to establish relationships with new commercial theater operators.

14

***Eros Now, our digital OTT entertainment service accessible via internet-enabled devices, may not achieve the desired growth rate.***

Eros Now was soft launched in 2012 and as of March 31, 2020, Eros Now caters to 29.3 Million paying subscribers and has garnered 196.8 million registered users across global digital distribution platforms. We must continue to grow and retain subscribers in India (one of our key markets) where consumers also use traditional Pay-TV and broadcast channels for content consumption, as well as grow our subscriber base in markets outside of India. Our ability to attract and retain subscribers will depend in part on our ability to consistently provide our subscribers a high-quality experience with respect to content and features and on the quality of data connectivity (either Wi-Fi, broadband, 3G or 4G mobile data) in India.

To achieve and sustain the desired growth rate from Eros Now, we must accomplish numerous objectives, including substantially increasing the number of paid subscribers to our service and retaining them, without which our revenues from digital stream will be adversely affected. We cannot assure you that we will be able to achieve these objectives due to any of the factors listed below, among other factors:

- our ability to maintain an adequate content offering;
- our ability to maintain, upgrade and develop our service offering on an ongoing basis;
- our ability to successfully distribute our service across multiple mobile, internet and cable platforms worldwide;
- our ability to secure and retain distribution across various platforms including telecom operators and original equipment manufacturers;
- our ability to convert free registered users into paid subscribers and retain them;
- our ability to compete effectively against other Indian and foreign OTT services;
- our ability to manage technical glitches or disruptions;
- our ability to attract and retain our employees;
- any changes in government regulations and policies; and
- any changes in the general economic conditions specific to the internet and the movie industry.

***Eros Now faces and will continue to face competition for subscriber time.***

We compete for the time and attention of our Eros Now subscribers with other content providers on the basis of a number of factors, including quality of experience, relevance, diversity of content, ease of use, price, accessibility, perception of advertising load, brand awareness, and reputation.

We compete with providers of on-demand Indian language entertainment, which is purchased or available for free and playable on mobile devices and in the home. We face increasing competition for subscribers from a growing variety of businesses, including other subscription services around the world, many of which offer services that deliver Indian entertainment content over the internet, through mobile phones, and through other wireless devices.

Many of our current or future competitors are already entrenched or may have significant brand recognition in a particular region or market in which we seek to penetrate.

We believe that companies with a combination of technical expertise, brand recognition, financial resources, and digital media experience also pose a significant threat of developing competing on-demand distribution technologies. In particular, if known incumbents in the digital media space such as Facebook choose to offer competing services, they may devote greater resources than we have available, have a more accelerated time frame for deployment, and leverage their existing user base and proprietary technologies to provide services that our subscribers and advertisers may view as superior. Furthermore, Amazon Prime, Netflix, Hotstar and others have competing services, which may negatively impact our business, operating results and financial condition. Our current and future competitors may have higher brand

recognition, more established relationships with talent and other content licensors and mobile device manufacturers, greater financial, technical, and other resources, more sophisticated technologies, and/or more experience in the markets in which we compete. In addition, Apple and Google also own application store platforms and are charging in-application purchase fees, which are not being levied on their own applications, thus creating a competitive advantage for themselves against us. As the market for on-demand music on the internet and mobile and connected devices increases, new competitors, business models, and solutions are likely to emerge.

15

We also compete for subscribers based on our presence and visibility as compared with other businesses and platforms that deliver entertainment content through the internet and mobile devices. We face significant competition for subscribers from companies promoting their own digital content online or through application stores, including several large, well-funded and seasoned participants in the digital media market. Mobile device application stores often offer users the ability to browse applications by various criteria, such as the number of downloads in a given time period, the length of time since a mobile application was released or updated, or the category in which the application is placed. The websites and mobile applications of our competitors may rank higher than our website and our Eros Now mobile application, and our application may be difficult to locate in mobile device application stores, which could draw potential subscribers away from our platform and towards those of our competitors. If we are unable to compete successfully for subscribers against other digital media providers by maintaining and increasing our presence and visibility online, on mobile devices and in application stores, our number of subscribers and content streamed on our platform may fail to increase or may decline, and our subscription fees and advertising sales may suffer.

***Our subscriber metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review key metrics related to the operation of our business, including, but not limited to, our subscribers, key performance indicators and monthly active users, to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data as well as other sources. At times, data may not have been validated by an independent third party. While these numbers are based on what we believe to be reasonable estimates of our subscriber base for the applicable period of measurement, there are inherent challenges in measuring how our service is used across large populations globally. For example, we believe that there are individuals who have multiple Eros Now accounts, which can result in an overstatement of key performance indicators. Errors or inaccuracies in our metrics or data could result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of monthly active users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies.

In addition, advertisers generally rely on third-party measurement services to calculate our metrics, and these third-party measurement services may not reflect our true audience. Some of our demographic data also may be incomplete or inaccurate because subscribers self-report their names and dates of birth. Consequently, the personal data we have may differ from our subscribers' actual names and ages. If advertisers, partners, or investors do not perceive our subscriber, geographic, or other demographic metrics to be accurate representations of our subscribers base, or if we discover material inaccuracies in our subscriber, geographic, or other demographic metrics, our reputation may be seriously harmed.

***Changes in how we market our service could adversely affect our marketing expenses and subscriber levels may be adversely affected.***

We utilize a broad mix of marketing and public relations programs, including social media sites, to promote our service to potential new subscribers. We may limit or discontinue use or support of certain marketing sources or activities if advertising rates increase or if we become concerned that subscribers or potential subscribers deem certain marketing practices intrusive or damaging to our brand. If the available marketing channels are curtailed, our ability to attract new subscribers may be adversely affected. Companies that promote our service may decide that we negatively impact their business or may make business decisions that in turn negatively impact us. For example, if they decide that they want to compete more directly with us, enter a similar business or exclusively support our competitors, we may no longer have

access to their marketing channels. If we are unable to maintain or replace our sources of subscribers with similarly effective sources, or if the cost of our existing sources increases, our subscriber levels and marketing expenses may be adversely affected.

16

***Privacy concerns could limit our ability to collect and leverage our subscriber data and disclosure of membership data could adversely impact our business and reputation.***

In the ordinary course of business and in particular in connection with content acquisition and delivering our service to our members, we collect and utilize data supplied by our subscribers. Other businesses have been criticized by privacy groups and governmental bodies for attempts to link personal identities and other information to data collected on the internet regarding users' browsing and other habits. Increased regulation of data utilization practices, including self-regulation or findings under existing laws that limit our ability to collect, transfer and use data, could have an adverse effect on our business. In addition, if we were to disclose data about our subscribers in a manner that was objectionable to them, our business reputation could be adversely affected, and we could face potential legal claims that could impact our operating results. Outside of India, we may become subject to additional and/or more stringent legal obligations concerning our treatment of customer and other personal information, such as laws regarding data localization and/or restrictions on data export. Failure to comply with these obligations could subject us to liability, and to the extent that we need to alter our business model or practices to adapt to these obligations, we could incur additional expenses.

***Any significant disruption in our computer systems or those of third - parties that we utilize in our operations could result in a loss or degradation of service and could adversely impact our business.***

Our reputation and ability to attract, retain and serve our subscribers is underpinned by the reliable performance and security of our computer systems and those of third parties that we work with. These systems may be subject to damage or interruption from many external factors including, *inter alia*: adverse weather conditions, natural disasters, terrorist attacks, power loss, telecommunications failures, and cybersecurity risks. Interruptions in these systems, or with the internet in general, could make our service unavailable or degraded or otherwise hinder our ability to deliver streaming content. Service interruptions, errors in our software or the unavailability of computer systems used in our operations could diminish the overall attractiveness of our membership service to existing and potential members.

***We rely upon a number of partners to make our service available on their devices.***

We currently offer subscribers the ability to receive streaming content through a host of internet-connected screens, including TVs, digital video players, television set-top boxes and mobile devices. We have agreements with various cable, satellite and mobile telecommunications operators to make our service available to subscribers. In many instances, our agreements also include provisions by which the partner bills consumers directly or otherwise offer services or products in connection with offering our service. We intend to continue to broaden our relationships with existing partners and to increase our capability to stream content to other platforms and partners over time. If we are not successful in maintaining existing and creating new relationships, or if we encounter technological, content licensing, regulatory, business or other impediments to delivering our streaming content to our subscribers via these devices, our ability to retain subscribers and grow our business could be adversely impacted. Our agreements with our partners are typically multi-year in duration and our business could be adversely affected if, upon expiration, a number of our partners do not continue to provide access to our service or are unwilling to do so on terms acceptable to us, which terms may include the degree of accessibility and prominence of our service. Furthermore, devices are manufactured and sold by entities other than Eros Now and while these entities should be responsible for the devices' performance, the connection between these devices and Eros Now may nonetheless result in consumer dissatisfaction towards Eros Now and such dissatisfaction could result in claims against us or otherwise adversely impact our business. In addition, technology changes to our streaming functionality may require that partners update their devices. If partners do not update or otherwise modify their devices, our service and our members' use and enjoyment could be negatively impacted.

***Changes in how network operators handle and charge for access to data that travel across their networks could adversely impact our business.***

We rely upon the ability of subscribers to access our service through the internet. If network operators block, restrict or otherwise impair access to our service over their networks, our service and business could be negatively affected. To the extent that network operators implement usage-based pricing, including meaningful bandwidth caps, or otherwise try to monetize access to their networks by data providers, we could incur greater operating expenses and our membership acquisition and retention could be negatively impacted. Furthermore, to the extent network operators create tiers of internet access service and either charge us for or prohibit us from being available through these tiers, our business could be negatively impacted.

17

***We rely upon third-party "cloud" computing services to operate certain aspects of our service and any disruption of or interference with our use of the third-party "cloud" computing operations would impact our operations and our business would be adversely impacted.***

The third-party "cloud" computing service operator provides a distributed computing infrastructure platform for business operations, or what is commonly referred to as a "cloud" computing service. We have architected our software and computer systems so as to utilize data processing, storage capabilities and other services provided by third-party "cloud" computing operator. Currently, we run a material amount of our computing on the third-party "cloud" computing services. Given this, along with the fact that we cannot easily switch our third-party "cloud" computing operations to another cloud provider, any disruption of or interference with our use of third-party "cloud" computing services would impact our operations and our business would be adversely impacted.

***We incur significant costs to protect electronically stored data and if our data is compromised despite this protection, we may incur additional costs, business interruption, lost opportunities and damage to our reputation.***

We collect and maintain information and data necessary for conducting our business operations, which information includes proprietary and confidential data and personal information of our customers and employees. Such information is often maintained electronically, which includes risks of intrusion, tampering, manipulation and misappropriation. We implement and maintain systems to protect our digital data and obtaining and maintaining these systems is costly and usually requires continuous monitoring and updating for technological advances and change. Additionally, we sometimes provide confidential, proprietary and personal information to third parties when required in connection with certain business and commercial transactions. For instance, we have entered into an agreement with a third-party vendor to assist in processing employee payroll, and they receive and maintain confidential personal information regarding our employees. We take precautions to try to ensure that such third parties will protect this information, but there remains a risk that the confidentiality of any data held by third parties may be compromised. If our data systems, or those of our third-party vendors and partners, are compromised, there may be negative effects on our business, including a loss of business opportunities or disclosure of trade secrets. If the personal information we maintain is tampered with or misappropriated, our reputation and relationships with our partners and customers may be adversely affected, and we may incur significant costs to remediate the problem and prevent future occurrences.

***Any significant disruption in or unauthorized access to our computer systems or those of third parties that we utilize in our operations, including those relating to cybersecurity or arising from cyber-attacks, could result in a loss or degradation of service, unauthorized disclosure of data, including member and corporate information, or theft of intellectual property, including digital content assets, which could adversely impact our business.***

Our reputation and ability to attract, retain and serve consumers is dependent upon the reliable performance and security of our computer systems and those of third parties that we utilize in our operations. These systems may be subject to damage or interruption from earthquakes, adverse weather conditions, other natural disasters, terrorist attacks, power loss, telecommunications failures, and cybersecurity risks. Interruptions or malfunctions (including those due to equipment damage, power outages, computer viruses and a range of other hardware, software and network problems) in these systems, or with the internet in general, could make our service unavailable or degraded or otherwise hinder our ability to deliver streaming content. Service interruptions, errors in our software or the unavailability of computer systems used in our operations could diminish the overall attractiveness of our service to existing and potential subscribers. Our computer systems and those of third parties we use in our operations are vulnerable to cybersecurity risks, including cyber-attacks, both from state-sponsored and individual activity, such as computer viruses, denial of service attacks, physical or electronic break-ins and similar disruptions. These systems periodically experience directed attacks intended to lead to

interruptions and delays in our service and operations as well as loss, misuse or theft of data or intellectual property. Any attempt by hackers to obtain our data (including subscriber and corporate information) or intellectual property (including digital content assets), disrupt our service, or otherwise access our systems, or those of third parties we use, if successful, could harm our business, be expensive to remedy and damage our reputation.

18

We have devoted and will continue to devote significant resources to the security of our computer systems; however, we cannot guarantee that we will not experience such malfunctions, attacks or interruptions in the future. A significant or large-scale malfunction, attack or interruption of one or more of our computer or database systems could adversely affect our ability to keep our operations running efficiently. Our insurance does not cover expenses related to such disruptions or unauthorized access. Efforts to prevent hackers from disrupting our service or otherwise accessing our systems are expensive to implement and may limit the functionality of or otherwise negatively impact our service offering and systems. Any significant disruption to our service or access to our systems could result in a loss of subscribers and adversely affect our business and results of operation. We utilize our own communications and computer hardware systems located either in our facilities or in that of a third-party web hosting provider. In addition, we utilize third-party "cloud" computing services in connection with our business operations. We also utilize our own and third-party content delivery networks to help us stream content in high volume to subscribers over the internet. Problems faced by us or our third-party web hosting, "cloud" computing, or other network providers, including technological or business-related disruptions, as well as cybersecurity threats, could adversely impact the experience of our members.

***A downturn in the Indian and international economies or instability in financial markets, including a decreased growth rate and increased Indian price inflation, could materially and adversely affect our results of operations and financial condition.***

Global economic conditions may negatively impact consumer spending. Prolonged negative trends in the global or local economies can adversely affect consumer spending and demand for our films and may shift consumer demand away from the entertainment we offer.

According to the International Monetary Fund's World Economic Outlook Database, published in April 2020, the GDP growth rate of India is projected to increase from 7.26% in 2019 to approximately 7.49% in 2020 and 7.43% in 2021. The Economic Survey 2019-20 has estimated that the growth rate in GDP for the year ended March 31, 2020 to grow at 4.2% with headwinds of Covid19.

A decline in attendance at theaters may reduce the revenues we generate from this channel, from which a significant proportion of our revenues are derived.

If a general economic downturn continues to affect the countries in which we distribute our films, discretionary consumer spending may be adversely affected, which would have an adverse impact on demand for our theater, television and digital distribution channels. Economic instability and a continuing weak economy in India may negatively impact the Indian box office success of our Hindi, Tamil and Telugu films, on which we depend for a significant portion of our revenues.

Further, a sustained decline in economic conditions could result in closure or downsizing by, or otherwise adversely impact, industry participants on whom we rely for content sourcing and distribution. Any decline in demand for our content could have a material adverse effect on our business, prospects, financial condition and results of operations. In addition, global financial uncertainty has negatively affected the Indian financial markets.

Continued financial disruptions may limit our ability to obtain financing for our films. For example, any adverse revisions to India's credit ratings for domestic and international debt by domestic or international rating agencies may adversely impact our ability to raise additional financing and the interest rates and other commercial terms at which such additional financing is available. Any such event could have a material adverse effect on our business, prospects, financial condition and results of operations. [India has recently experienced fluctuating wholesale price inflation compared to historical levels. – ***still true***] An increase in inflation in India could cause a rise in the price of wages, particularly for Indian film talent, or any other expenses that we incur. If this trend continues, we may be unable to accurately estimate or control our

costs of production. Because it is unlikely we would be able to pass all of our increased costs on to our customers, this could have a material adverse effect on our business, prospects, financial condition and results of operations.

19

***Fluctuation in the value of the Indian rupee against foreign currencies could materially and adversely affect our results of operations, financial condition and ability to service our debt.***

While a significant portion of our revenues are denominated in Indian rupees, certain contracts for our film content are or may be denominated in foreign currencies. Additionally, we report our financial results in U.S. dollars and most of our debt is denominated in U.S. dollars. We expect that the continued volatility in the value of the Indian rupee against foreign currency will continue to have an impact on our business. The Indian rupee experienced an approximately 8.3% decrease in value as compared to the U.S. dollar in Fiscal 2020. The Indian rupee experienced an approximately 5.9% decrease in value as compared to the U.S. dollar in Fiscal 2019. The Indian rupee experienced an approximately 0.4% decrease in value as compared to the U.S. dollar in fiscal year 2018. Changes in the growth of the Indian economy and the continued volatility of the Indian rupee, may adversely affect our business. As of March 31, 2020, we had an aggregate outstanding indebtedness of $179.4 million. There can be no assurance, however, that currency fluctuations will not lead to an increase in the amount of this debt.

Further, as of March 31, 2020, $49.2 million, or 27.4% of our debt, was denominated in U.S. dollars. We may not generate sufficient revenue in U.S. dollars to service all of our U.S. dollar-denominated debt. Consequently, we may be required to use revenues generated in Indian rupees to service our U.S. dollar-denominated debt. Any devaluation or depreciation in the value of the Indian rupee, compared to the U.S. dollar, could adversely affect our ability to service our debt. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Exchange Rate" for further information.

Although we have not historically done so, we may, from time to time, seek to reduce the effect of exchange rate fluctuations on our operating results by purchasing derivative instruments such as foreign exchange forward contracts to cover our intercompany indebtedness or outstanding receivables. However, we may not be able to purchase contracts to insulate ourselves adequately from foreign currency exchange risks. In addition, any such contracts may not perform effectively as a hedging mechanism. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Exchange Rate" for further information.

***We face increasing competition with other films for movie screens, and our inability to obtain sufficient distribution of our films could have a material adverse effect on our business.***

A substantial majority of the theater screens in India are typically committed at any one time to a limited number of films, and we compete directly against other producers and distributors of Indian films in each of our distribution channels. If the number of films released in the market as a whole increases it could create excess supply in the market, in particular at peak theater release times such as school and national holidays and during festivals, which would make it more difficult for our films to succeed.

Where we are unable to ensure a wide release for our films to maximize screenings in the first week of a film's release, it may have an adverse impact on our revenues. Further, failure to release during peak periods, or the inability to book sufficient screens, could cause us to miss potentially higher gross box-office receipts and/or affect subsequent revenue streams, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***We face increasing competition from other forms of entertainment, which could have a material adverse effect on our business.***

We also compete with all other sources of entertainment and information delivery, including television, mobile devices, the internet and sporting events such as the Indian Premier League for cricket. Technological advancements such as VOD,

mobile and internet streaming and downloading have increased the number of entertainment and information delivery choices available to consumers and have intensified the challenges posed by audience fragmentation. The increasing number of choices available to audiences, including crossover from our Eros Now online entertainment service, could negatively impact consumer demand for our films, and there can be no assurance that attendance rates at theaters or demand for our other distribution channels will not fall.

20

***Competition within the Indian film industry is growing rapidly, and certain of our competitors are larger, have greater financial resources and are more diversified.***

The Indian film industry's rapid growth is changing the competitive landscape, increasing competition for content, talent and release dates. Growth in the Indian film industry has attracted foreign industry participants and competitors, such as Viacom Inc., The Walt Disney Company ("Disney"), 21st Century Fox, Sony Pictures Entertainment Inc., Amazon.com, Inc. ("Amazon") and Netflix, Inc. ("Netflix"), many of which are substantially larger and have greater financial resources, including competitors that own theaters and/or television networks and/or OTT platforms. These larger competitors may have the ability to spend additional funds on production of new films, which may require us to increase our production budgets beyond what we originally anticipated in order to compete effectively. In addition, these competitors may use their financial resources to gain increased access to movie screens and enter into exclusive content arrangements with key talent in the Indian film industry. Unlike some of these major competitors that are part of larger diversified corporate groups, we derive substantially all of our revenue from our film entertainment business. If our films fail to perform to our expectations, we are likely to face a greater adverse impact than would a more diversified competitor. In addition, other larger entertainment distribution companies may have larger budgets to monetize growing technological trends. If we are unable to compete with these companies effectively, our business prospects, results of operations and financial condition could suffer. With generally increasing budgets of Hindi, Tamil and Telugu films, we may not have the resources to distribute the same level of films as competitors with greater financial strength.

***Piracy of our content, including digital and internet piracy, may adversely impact our revenues and business.***

Our business depends in part on the adequacy, enforceability and maintenance of intellectual property rights in the entertainment products and services we create. Motion picture piracy is extensive in many parts of the world and is made easier by technological advances and the conversion of motion pictures into digital formats. This trend facilitates the creation, transmission and sharing of high-quality unauthorized copies of motion pictures in theatrical release on DVDs, CDs and Blu-ray discs, from pay-per-view through set top boxes and other devices and through unlicensed broadcasts on free television and the internet.

Although DVD and CD sales represent a relatively small portion of Indian film and music industry revenues, the proliferation of unauthorized copies of these products results in lost revenue and significantly reduced pricing power, which could have a material adverse effect on our business, prospects, financial condition and results of operations. In particular, unauthorized copying and piracy are prevalent in countries outside of the United States, Canada and Western Europe, including India, whose legal systems may make it difficult for us to enforce our intellectual property rights and in which consumer awareness of the individual and industry consequences of piracy is lower. With broadband connectivity improving, 3G internet penetration increasing and with the advent of 4G in India, digital piracy of our content is an increasing risk.

In addition, the prevalence of third-party hosting sites and a large number of links to potentially pirated content make it difficult to effectively monitor and prevent digital piracy of our content. Existing copyright and trademark laws in India afford only limited practical protection and the lack of internet-specific legislation relating to trademark and copyright protection creates a further challenge for us to protect our content delivered through such media. Additionally, we may seek to implement elaborate and costly security and anti-piracy measures, which could result in significant expenses and revenue losses. Even the highest levels of security and anti-piracy measures may fail to prevent piracy.

Litigation may also be necessary in the future to enforce our intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Regardless of the legitimacy or the success of these claims, we could incur costs and diversion of resources in enforcing our intellectual property rights or in defending against such claims, which could have a material adverse effect on our

business, prospects, financial condition and results of operations.

21

***We may be unable to adequately protect or continue to use our intellectual property. Failure to protect such intellectual property may negatively impact our business.***

We rely on a combination of copyrights, trademarks, service marks and similar intellectual property rights to protect our name and branded products and to protect the entertainment products and services we create. The success of our business, in part, depends on our continued ability to use this intellectual property in order to increase awareness of the Eros name. We typically attempt to protect these intellectual property rights through available copyright and trademark laws and through a combination of employee, third-party assignments and nondisclosure agreements, other contractual restrictions*,* technological measures, and other methods. Despite these precautions, existing copyright and trademark laws afford only limited practical protection in certain countries, and the actions taken by us may be inadequate to prevent imitation by others of the Eros name and other Eros intellectual property. Despite our efforts to protect our intellectual property rights and trade secrets, unauthorized parties may attempt to copy aspects of our song recommendation technology or other technology or obtain and use our trade secrets and other confidential information. Moreover, policing our intellectual property rights is difficult and time consuming. We cannot assure you that we would have adequate resources to protect and police our intellectual property rights, and we cannot assure you that the steps we take to do so will always be effective. In addition, if the applicable laws in these countries are drafted or interpreted in ways that limit the extent or duration of our rights, or if existing laws are changed, our ability to generate revenue from our intellectual property may decrease, or the cost of obtaining and maintaining rights may increase. We could lose both the ability to assert our intellectual property rights against, or to license our technology to, others and the ability to collect royalties or other payments.

Further, many existing laws governing property ownership, copyright and other intellectual property issues were adopted before the advent of the internet and do not address the unique issues associated with the internet, personal entertainment devices and related technologies, and new interpretations of these laws in response to emerging digital platforms may increase our digital distribution costs, require us to change business practices relating to digital distribution or otherwise harm our business. We also distribute our branded products in some countries in which there is no copyright or trademark protection. As a result, it may be possible for unauthorized third parties to copy and distribute our branded products or certain portions or applications of our branded products, which could have a material adverse effect on our business, prospects, results of operations and financial condition. If we fail to register the appropriate copyrights, patents, trademarks or our other efforts to protect relevant intellectual property prove to be inadequate, the value of the Eros name could be harmed, which could adversely affect our business and results of operations.

***We may be unable to continue to use the domain names that we use in our business, or prevent third parties from acquiring and using domain names that infringe on, are similar to or otherwise decrease the value of our brand or our trademarks or service marks.***

We have several domain names for websites that we use in our business, such as *erosplc.com, erosentertainment.com*, *erosnow.com* and although our Indian subsidiaries currently own over 120 registered trademarks, we have not obtained a registered trademark for any of our domain names. If we lose the ability to use a domain name, whether due to trademark claims, failure to renew the applicable registration or any other cause, we may be forced to market our products under a new domain name, which could cause us to lose users of our websites, or to incur significant expense in order to purchase rights to such a domain name. In addition, our competitors and others could attempt to capitalize on our brand recognition by using domain names similar to ours. Domain names similar to ours have been registered in the United States of America, India and elsewhere.

We may be unable to prevent third parties from acquiring and using domain names that infringe on, are similar to or otherwise decrease the value of our brand, trademarks or service marks. Protecting and enforcing our rights in our

domain names may require litigation, which could result in substantial costs and diversion of management's attention.

22

***Litigation may be necessary to enforce our intellectual property rights or to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Regardless of the validity or the success of the assertion of any claims, we could incur significant costs and diversion of resources in enforcing our intellectual property rights or in defending against such claims, which could have a material adverse effect on our business and results of operations. Our services and products could infringe upon the intellectual property rights of third parties.***

Litigation or proceedings before governmental authorities and administrative bodies may be necessary in the future to enforce our intellectual property rights, to protect our patent rights, trademarks, trade secrets, and domain names and to determine the validity and scope of the proprietary rights of others. Our efforts to enforce or protect our proprietary rights may be ineffective and could result in substantial costs and diversion of resources and management time, each of which could substantially harm our operating results.

Other parties, including our competitors, may hold or obtain patents, trademarks, copyright protection or other proprietary rights with respect to their previously developed films, characters, stories, themes and concepts or other entertainment, technology and software or other intellectual property of which we are unaware. In addition, the creative talent that we hire or use in our productions may not own all or any of the intellectual property that they represent they do, which may instead be held by third parties. Consequently, the film content that we produce and distribute or the software and technology we use may infringe the intellectual property rights of third parties, and we frequently have infringement claims asserted against us. Any claims or litigation, justified or not, could be time-consuming and costly, harm our reputation, require us to enter into royalty or licensing arrangements that may not be available on acceptable terms or at all or require us to undertake creative changes to our film content or source alternative content, software or technology. Where it is not possible to do so, claims may prevent us from producing and/or distributing certain film content and/or using certain technology or software in our operations. Any of the foregoing could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our ability to remain competitive may be adversely affected by rapid technological changes and by our inability to access such technology.***

The Indian film entertainment industry continues to undergo significant technological developments, including the ongoing transition from film to digital media. We may be unsuccessful in adopting new digital distribution methods or may lose market share to our competitors if the methods that we adopt are not as technologically sound, user-friendly, widely accessible or appealing to consumers as those adopted by our competitors. For example, our on-demand entertainment portal accessible via internet-enabled devices, Eros Now, may not achieve the desired growth rate.

Further, advances in technologies or alternative methods of product delivery or storage, or changes in consumer behavior driven by these or other technologies, could have a negative effect on our home entertainment market in India. If we fail to successfully monetize digital and other emerging technologies, it could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our financial condition and results of operations fluctuate from period to period due to film release schedules and other factors and may not be indicative of results for future periods.***

Our financial condition and results of operations for any period fluctuate due to film release schedules in that period, none of which we can predict with reasonable certainty. Theater attendance in India has traditionally been highest during school holidays, national holidays and during festivals, and we typically aim to release big-budget films at these times. This timing of releases also takes account of competitor film releases, Indian Premier League cricket matches, and the timing dictated by the film production process. As a result, our quarterly results can vary from one year to the next, and the results of one

quarter are not necessarily indicative of results for the next or any future quarter. Additionally, the distribution window for the theatrical release of films, and the window between the theatrical release and distribution in other channels, have each been compressing in recent years and may continue to change. Further shortening of these periods could adversely impact our revenues if consumers opt to view a film on one distribution platform over another, resulting in the cannibalizing of revenues across distribution platforms. Additionally, because our revenue and operating results are seasonal in nature due to the impact of the timing of new releases, our revenue and operating results may fluctuate from period to period, and which could have a material adverse effect on our business, prospects, results of operations, financial condition and cash flows.

23

***Our accounting practices and management judgments may accentuate fluctuations in our annual and quarterly operating results and may not be comparable to other film entertainment companies.***

For first release film content, we use a stepped method of amortization and a first 12 months amortization rate based on management's judgment taking into account historic and expected performance, typically amortizing 50% of the capitalized cost for high budget films released during or after the fiscal year 2014, and 40% of the capitalized cost for all other films, in the first 12 months of their initial commercial monetization, and then the balance evenly over the lesser of the term of the rights held by us and nine years. Our management has determined to adjust the first-year amortization rate for high budget films because of the high contribution of theatrical revenue. Similar management judgment taking into account historic and expected performance is used to apply a stepped method of amortization on a quarterly basis within the first 12 months, within the overall parameters of the annual amortization.

Typically, 25% of capitalized cost for high budget films released during or after the fiscal year 2014, and 20% of capitalized cost for all other films, is amortized in the initial quarter of their commercial monetization. In the fiscal year 2009 and the fiscal years prior to 2009, the balance of capitalized film content costs were amortized evenly over a maximum of four years rather than nine. Because management judgment is involved regarding amortization amounts, our amortization practices may not be comparable to other film entertainment companies. In the case of film content that we acquire after its initial monetization, commonly referred to as library, amortization is spread evenly over the lesser of 10 years after our acquisition or our license period. At least annually, we review film and content rights for indications of impairment in accordance with International Accounting Standard (IAS) 36: Impairment of Assets issued by IASB.

***Ineffective system of internal control over financial reporting, can reduce our ability to accurately and timely report our financial results or prevent fraud may be adversely affected.***

We ceased to qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012 on March 31, 2019, and as a result, we are subject to additional requirements under the Sarbanes-Oxley Act (the "SOX Act"), including Section 404(b) of the SOX Act which requires our independent registered public accounting firm to attest to and report on management's assessment of the effectiveness of our internal control over financial reporting in our annual reports on Form 20-F, starting from annual report for Fiscal Year 2019. As discussed in Item 15. "Controls and Procedures," upon an evaluation of the effectiveness of the design and operation of our internal controls, we concluded that there were material weaknesses such that our internal controls over financial reporting need to be reviewed and updated, a process that we are currently undertaking.. Although we have instituted remedial measures to address the material weakness identified and will continually review and evaluate our internal control systems to allow management to report on the sufficiency of our internal controls, we cannot assure you that we will be able to adequately remediate all the existing material weaknesses or not discover additional weaknesses in our internal controls over financial reporting need to be reviewed and updated, a process that we are currently undertaking. Further, management continually improves, simplifies and rationalizes the Company's internal control framework where possible within the constraints of existing IT systems. However, any additional weaknesses or failure to adequately remediate the existing weakness could materially and adversely affect our financial condition or results of operations.

***Our revenue is subject to significant variation based on the timing of certain licenses and contracts we enter into that may account for a large portion of our revenue in the period in which it is completed, which could adversely affect our operating results.***

From time to time, we license film content rights to a group of films pursuant to a single license that constitutes a large portion of our revenue for the fiscal year in which the revenue from the license is recognised. The timing and size of such licenses subjects our revenue to uncertainties and variability from period to period, which could adversely affect our operating results. We expect that we will continue to enter into licenses with customers that may represent a significant

concentration of our revenues for the applicable period and we cannot guarantee that these revenues will recur.

24

***We have entered into certain related party transactions and may continue to rely on our founders for certain key development and support activities.***

We have entered, and may continue to enter, into transactions with related parties. We also rely on the Founders Group, which consists of Beech Investments Limited and Kishore Lulla and associates and enterprises controlled by certain of our directors and key management personnel for certain key development and support activities. While we believe that the Founders Group's interests are aligned with our own, such transactions may not have been entered into on an arm's-length basis, and we may have achieved more favourable terms had such transactions been entered into with unrelated parties. If future transactions with related parties are not entered into on an arm's-length basis, our business may be materially harmed.

Further, because certain members of the Founders Group are controlling shareholders of, or have significant influence on, both us and our related parties, conflicts of interest may arise in relation to dealings between us and our related parties and may not be resolved in our favor. For further information, see "Certain Relationships and Related Party Transactions."

***We may encounter operational and other problems relating to the operations of our subsidiaries, including as a result of restrictions in our current shareholder agreements.***

We operate several of our businesses through subsidiaries. Our financial condition and results of operations significantly depend on the performance of our subsidiaries and the income we receive from them. Our business may be adversely affected if our ability to exercise effective control over our non-wholly owned subsidiaries is diminished in any way. Although we control these subsidiaries through direct or indirect ownership of a majority equity interest or the ability to appoint the majority of the directors on the boards of such companies, unanimous board approval is required for major decisions relating to certain of these subsidiaries. To the extent there are disagreements between us and our various minority shareholders regarding the business and operations of our non-wholly owned subsidiaries, we may be unable to resolve them in a manner that will be satisfactory to us. Our minority shareholders may:

·    be unable or unwilling to fulfill their obligations, whether of a financial nature or otherwise;
·    have economic or business interests or goals that are inconsistent with ours;
·    take actions contrary to our instructions, policies or objectives;
·    take actions that are not acceptable to regulatory authorities;
·    have financial difficulties; or
·    have disputes with us.

Any of these actions could have a material adverse effect on our business, prospects, financial condition and results of operations.

Eros India has entered into shareholder agreements with third-party shareholders of its non-wholly owned subsidiaries, including Big Screen Entertainment Private Limited and a binding term sheet for a joint venture with Colour Yellow Productions Private Limited. These arrangements contain various restrictions on our rights in relation to these entities, including restrictions in relation to the transfer of shares, rights of first refusal, reserved board matters and non-solicitation of employees by us. We may also face operational limitations due to restrictive covenants in such shareholder agreements. In addition, under the terms of our shareholder agreement in relation to Big Screen Entertainment Private Limited, disputes between partners are required to be submitted to arbitration in Mumbai, India. These restrictions in our current shareholder agreements, and any restrictions of a similar or more onerous nature in any new or amended agreements into which we may enter, may limit our control of the relevant subsidiary or our ability to achieve our business objectives, as well as limiting our ability to realize value from our equity interests, any of which could have a material adverse effect on our business, prospects, financial condition and results of operations.

The interests of the other shareholders with respect to the operation of Big Screen Entertainment Private Limited, Colour Yellow Productions Private Limited and Mr. V. Vijayendra Prasad, may not be aligned with our interests. As a result, although we own a majority of the ownership interest in Big Screen Entertainment Private Limited, and 50% of the shareholding of Colour Yellow Productions Private Limited, taking actions that require approval of the minority shareholders (or their representative directors), such as entering into related party transactions, selling material assets and entering into material contracts, may be more difficult to accomplish.

25

***We depend on the services of senior management.***

We have, over time, built a strong team of experienced professionals on whom we depend to oversee the operations and growth of our businesses. We believe that our success substantially depends on the experience and expertise of, and the longstanding relationships with key talent and other industry participants built by, our senior management. Any loss of our senior management, any conflict of interest that may arise for such management or the inability to recruit further senior managers could impede our growth by impairing our day-to-day operations and hindering development of our business and our ability to develop, maintain and expand relationships, which would have a material adverse effect on our business, prospects, financial condition and results of operations.

In recent years, we have experienced additions to our senior management team, and our success depends in part on our ability to successfully integrate these new employees into our organization. We anticipate the need to hire additional members in senior management in connection with the expansion of our digital business. While some members of our senior management have entered into employment agreements that contain non-competition and non- solicitation provisions, these agreements may not be enforceable in the Isle of Man, India or the United Kingdom, whose laws govern these agreements or where our members of senior management reside. Even if enforceable, these non-competition and non-solicitation provisions are for limited time periods.

***To be successful, we need to attract and retain qualified personnel.***

Our success continues to depend to a significant extent on our ability to identify, attract, hire, train and retain qualified professional, creative, technical and managerial personnel. Competition for the caliber of talent required to produce and distribute our films continues to increase. We cannot assure you that we will be successful in identifying, attracting, hiring, training and retaining such personnel in the future. If we were unable to hire, assimilate and retain qualified personnel in the future, such inability would have a material adverse effect on our business and financial condition.

***We are currently completing the integration of various supporting modules to an SAP ERP operating system, which could disrupt our business, and our failure to successfully integrate our IT systems across our international operations could result in additional costs and diversion of resources and management attention.***

We have completed the accounting portion of the migration in India and significant locations outside India, and are in the process of completing the rest of the migration. For instance, we have not yet integrated supporting modules into the SAP ERP system, such as a module to manage our film library across the globe. This integration and migration may lead to unforeseen complications and expenses, and our failure to efficiently integrate and migrate our IT systems could substantially disrupt our business.

***Negative media coverage could adversely affect our business and some viewers or civil society organizations may find our film content objectionable.***

We receive a high degree of media coverage around the world. Unfavourable publicity regarding, for example, payments to talent, third-party content providers, publishers, artists, and other copyright owners, our privacy practices, terms of service, service changes, service quality, litigation or regulatory activity, government surveillance, the actions of our advertisers, the actions of our developers, the use of our OTT platform for illicit, objectionable, or illegal ends, the actions of our subscribers, the quality and integrity of content shared on our OTT platform, or the actions of other companies that provide similar services to us, could materially adversely affect our reputation. Such negative publicity also could have an adverse effect on the size, engagement, and loyalty of our subscriber base and result in decreased revenue, which could materially adversely affect our business, operating results and financial condition.

Some viewers or civil society organizations in India or other countries may object to film content produced or distributed by us based on religious, political, ideological or any other positions held by such viewers. This applies in particular to content that is graphic in nature, including violent or romantic scenes and films that are politically oriented or targeted at a segment of the film audience. Viewers or civil society organizations, including interest groups, political parties, religious or other organizations may assert legal claims, seek to ban the exhibition of our films, protest against us or our films or object in a variety of other ways. Any of the foregoing could harm our reputation and could have a material adverse effect on our business, prospects, financial condition and results of operations. The film content that we produce and distribute could result in claims being asserted, prosecuted or threatened against us based on a variety of grounds, including defamation, offending religious sentiments, invasion of privacy, negligence, obscenity or facilitating illegal activities, any of which could have a material adverse effect on our business, prospects, financial condition or results of operations.

26

***Our films are required to be certified in India by the Central Board of Film Certification.***

Pursuant to the Indian Cinematograph Act, 1952, or the Cinematograph Act, films must be certified for adult viewing or general viewing in India by the Central Board of Film Certification ("CBFC"), which looks at factors such as the interest of sovereignty, integrity and security of the relevant country, friendly relations with foreign states, public order and morality. There may be similar requirements in the United Kingdom, Canada, China and Australia, among other jurisdictions. We may be unable to obtain the desired certification for each of our films and we may have to modify the title, content, characters, storylines, themes or concepts of a given film in order to obtain any certification or a desired certification for broadcast release that will facilitate distribution and monetization of the film. Any modification could result in substantial costs and/or receipt of an undesirable certification could reduce the appeal of any affected film to our target audience and reduce our revenues from that film, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Litigation and negative claims about us or the Indian film entertainment industry generally could have a material adverse impact on our reputation, our relationship with distributors and co-producers and our business operations.***

We and certain of our directors and officers are subject to various legal civil and criminal proceedings in India. As of March 31, 2020, we were subject to certain tax proceedings in India, including service tax claims aggregating to approximately $56 million, value added tax ("VAT") and sales tax claims aggregating to approximately $3 million for the period between April 1, 2005 to March 31, 2015. As our success in the Indian film industry partially depends on our ability to maintain our brand image and corporate reputation, in particular in relation to our dealings with creative talent, co-producers, distributors and exhibitors, any such proceedings or allegations, public or private, whether or not routine or justified, could tarnish our reputation and cause creative talent, co-producers, distributors and exhibitors not to work with us. See "Business Overview— Litigation" for further details.

In addition, the nature of our business and our reliance on intellectual property and other proprietary rights subjects us to the risk of significant litigation. Litigation, or even the threat of litigation, can be expensive, lengthy and disruptive to normal business operations, and the results of litigation are inherently uncertain and may result in adverse rulings or decisions. We may enter into settlements or be subject to judgments that may, individually or in the aggregate, have a material adverse effect on our business, prospects, financial condition or results of operations.

***Our performance in India is linked to the stability of its policies, including taxation policy, and the political situation.***

The role of Indian central and state governments in the Indian economy has been and remains significant. Since 1991, India's government has pursued policies of economic liberalization, including significantly relaxing restrictions on the private sector. The rate of economic liberalization could change, and specific laws and policies affecting companies in the media and entertainment sector, foreign investment, currency exchange rates and other matters affecting investment in our securities could change as well. A significant change in India's economic liberalization and deregulation policies, and in particular, policies in relation to the film industry, could disrupt business and economic conditions in India and thereby affect our business.

Previously, taxes generally were levied on a state-by-state basis for the Indian film industry. However, with effect from July 1, 2017, goods and services tax ("GST") was implemented in India, which combines taxes and levies by the Government of India and state governments into a unified rate structure, and replaces indirect taxes on goods and services such as central excise duty, service tax, central sales tax, entertainment tax, state value added tax, cess and surcharge and excise that were being collected by the Government of India and state governments. Initially, under the

GST regime, movie exhibition fell under the highest tax bracket of 28% (for tickets above 100 rupee). However, with effect from January 1, 2019, the GST rate has been reduced to 12% for tickets under 100 rupee and 18% for tickets above 100 rupees. Further, under the state-by-state tax regime in India, the state governments were levying entertainment tax on the exhibition of films in cinemas, including multiplexes. With the implementation of GST, the entertainment tax levied by the state governments was subsumed under GST. However, certain local government bodies levy local body entertainment tax, in addition to GST, within their state. Any future increases or amendments may affect the overall tax efficiency of companies operating in India and may result in significant additional taxes becoming payable. If, as a result of a particular tax risk materializing, the tax costs associated with certain transactions are greater than anticipated, it could affect the profitability of such transactions.

27

Separately, there are certain deductions available to film producers for expenditures on production of feature films released during a given year. These tax benefits may be discontinued and impact current and deferred tax liabilities. In addition, the government of India has issued and may continue to issue tariff orders setting ceiling prices for distribution of content on cable television service charges in India.

Other changes in the Indian law and policy environment which may have an impact on our business, results of operations and prospects, to the extent that we are unable to suitably respond to and comply with any such changes in applicable law and policy include the following:

- Under the (Indian) Income-tax Act, 1961 ("IT Act"), the General Anti Avoidance Rules ("GAAR") have come into effect from April 1, 2017. The tax consequences of the GAAR provisions if applied to an arrangement could result in denial of tax benefit under the domestic tax laws and / or under a tax treaty, amongst other consequences.
  As per the Finance Act 2020, Dividend Distribution Tax ('DDT') of 20.56 percent levied on the companies declaring dividend has been abolished with effect from April 1, 2020. Consequently, dividend is taxable in the hands of recipient and there shall be withholding of taxes on such dividends.
- As per the provisions of the IT Act, income arising directly or indirectly through transfer of a capital asset, being any share or interest in a company or entity registered or incorporated outside India, will be liable to tax in India, if such share or interest derives, directly or indirectly, its value substantially from assets located in India, whether or not the seller of such share or interest has a residence, place of business, business connection, or any other presence in India. Value shall be substantially derived from assets located in India, if, on the specified date, the value of such assets located in India (i) represents at least 50% of the value of all assets owned by the company or entity, and (ii) exceeds the amount of 100 million rupees. However, the impact of the above indirect transfer provisions would need to be separately evaluated under the tax treaty scenario.
- The Organization of Economic Co-operation and Development released the final package of all Action Plans of the Base Erosion and Profit Shifting ("BEPS") project in October 2015. India is a member of G20 and active participant in the BEPS project. The BEPS project lead to a series of measures being developed across several actions such as the digital economy, treaty abuse, design of Controlled Foreign Company Rules, intangibles, country-by-country reporting, preventing artificial avoidance of PE status, improving dispute resolution etc. Several of these measures required implementation through changes in domestic law. As regards those measures which required implementation through changes to bilateral treaties, it was felt that a Multilateral Instrument ("MLI") to modify the existing bilateral treaty network would be preferable as it would ensure speed and consistency in implementation. Accordingly, MLI was introduced to inter-alia incorporate treaty related measures identified as part of the final BEPS measures in relation to:
  - Preventing the granting of treaty benefits in inappropriate circumstances;
  - Preventing the artificial avoidance of permanent establishment status ("PE"); and
  - Making dispute resolution mechanisms more effective.
  India signed the MLI to implement tax treaty related measures to prevent BEPS on June 7, 2017. On June 25, 2019, India has deposited the instrument of ratification for MLI with OECD along with a list of reservations and notifications. As a result, MLI will enter into force for India on October 1, 2019 and its provisions will have effect on India's tax treaties from financial year 2020-21 onwards where the other country has also deposited its instrument of ratification with OECD. The interplay between GAAR (under the IT Act) and the modification of the existing tax treaties by way of the MLI remains to be seen.
- An equalization levy ("EL") in respect of certain e-commerce transactions has been introduced in India with effect from June 1, 2016. EL is to be deducted in respect of payments towards "specified services" (in excess of Indian rupees 100,000). A "specified service" means online advertisement, any provision for digital advertising space or any other facility or service for the purpose of online advertisement and includes any other service as may be notified by the Indian government. Deduction of EL at the rate of six percent (on a gross basis) is the responsibility of Indian

residents or non-residents having a permanent establishment, or PE, in India on payments to non-residents (not having a PE in India). Consequently, if a non-resident (not having a PE in India) earns income towards a "specified service" which is chargeable to EL, then the same would be exempt in the hands of such non-resident.

28

- Further, the Finance Act, 2020, has expanded the scope of EL by covering e-commerce transactions. E - commerce supply or services include online sale of goods, online provision of services or both owned or provided by an E-commerce operator. However, EL shall not be charged in case sales, turnover or gross receipts of the E-commerce operator is less than INR 20 million.

  Discharge of EL at the rate of two percent (on a gross basis) is the responsibility of E – commerce operator receiving consideration on the supply or services made to Indian residents, non-residents in "specified circumstances" or any other person using IP address located in India. However, any service or supply made by the E – commerce operator which is in connection to their PE in India will not be liable for EL,. If a non-resident (not having a PE in India) earns income which is chargeable to EL, then the same would be exempt in the hands of such non-resident.

  Currently, consideration for the sale, distribution or exhibition of cinematographic films is specifically excluded from the definition of Royalty. However, as per Finance Act 2020, the definition of Royalty will be rationalized to include consideration for the sale, distribution or exhibition of cinematographic films (w.e.f. April 1, 2021).

- The concept of Place of Effective Management ("POEM") was introduced for the purpose of determining tax residence of foreign companies in India, effective April 1, 2016. The POEM is defined as the place where key management and commercial decisions that are necessary for the conduct of the business of an entity as a whole are in substance made. This could have significant impact on the foreign companies holding board meeting(s) in India, having key managerial personnel located in India, having regional headquarters located in India, etc. In the event the POEM of a foreign company is considered to be situated in India, such company becomes tax resident in India and consequently its global income would be taxable in India (even if it is not earned in India).

- Based on the report of OECD on BEPS Action Plan 1, an amendment was made vide Finance Act 2018 whereby concept of significant economic presence ("SEP") was introduced under the Indian domestic tax law to cover within the tax ambit transactions in digitized businesses. Significant economic presence shall be constituted in cases where:

  - Transaction in respect of any goods, services or property are carried out by a non-resident in India (including provision of download of data or software in India);
  - Non-residents engage in systematic and continuous soliciting of business activities or engaging in interaction with users, in India through digital means;

  if certain prescribed thresholds are breached.

  Further, if SEP is constituted, attribution shall be restricted to such aforesaid transactions and/or business activities/users in India.

  The threshold of payments received and number of users (mentioned in the aforesaid conditions) shall be prescribed by the Central Board of Direct Taxes in due course after which one will be able to gauge the impact of this expansion in the provision.

  In addition, unless corresponding modifications to PE rules are made in tax treaties, the existing treaty rules will apply. Accordingly, the above provisions would need to be separately evaluated under the tax treaty scenario.

  Further, as per Finance Act, 2020, it is pertinent to note that SEP provisions have been deferred by a year and shall be effective from April 1, 2021.

- The definition of "business connection" was expanded vide Finance Act 2018. Earlier if non-residents carried on business in India through an agent and such an agent had an authority to conclude contracts on behalf of the non-residents, business connection was constituted. After the amendment, business connection will be constituted even if the agent plays a principal role in conclusion of the contracts by the non-residents. The contracts referred herein should be –

29

- ·    in the name of the non-resident; or
- ·    for the transfer of the ownership of, or for the granting of the right to use, property owned by that non-resident or that non-resident has the right to use; or
- ·    for the provision of services by the non-resident.

Our business and financial performance could be adversely affected by unfavourable changes in or applications or interpretations of existing, or the promulgation of new, laws, rules and regulations applicable to us and our business. Such unfavourable changes could decrease demand for our products, increase costs and/or subject us to additional liabilities.

Tax increases could place pricing pressures on cable television service providers and broadcasters, which may, among other things, restrict the ability and willingness of cable television broadcasters in India to pay for content acquisition, including for our films. Any of the foregoing could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Natural disasters, epidemics, terrorist attacks and other acts of violence or war could adversely affect the financial markets, result in a loss of business confidence and adversely affect our business, prospects, financial condition and results of operations.***

Numerous countries, including India, have experienced community disturbances, strikes, terrorist attacks, riots, epidemics and natural disasters. These acts and occurrences may result in a loss of business confidence and could cause a temporary suspension of our operations, if, for example, local authorities close theaters and could have an adverse effect on the financial markets and economies of India and other countries. Such closures have previously, and could in the future, impact our ability to exhibit our films and have a material adverse effect on our business, prospects, financial condition and results of operations. In addition, travel restrictions as a result of such events may interrupt our marketing and distribution efforts and have an adverse impact on our ability to operate effectively.

***Our insurance coverage may be inadequate to satisfy future claims against us.***

While we believe that we have adequately insured our operations and property in a way that we believe is customary in the Indian film entertainment industry and in amounts that we believe to be commercially appropriate, we may become subject to liabilities against which we are not adequately insured or against which we cannot be insured, including losses suffered that are not easily quantifiable and cause severe damage to our reputation. Film bonding, which is a customary practice for U.S. film companies, is rarely used in India. Even if a claim is made under an existing insurance policy, due to exclusions and limitations on coverage, we may not be able to successfully assert our claim for any liability or loss under such insurance policy. In addition, in the future, we may not be able to maintain insurance of the types or in the amounts that we deem necessary or adequate or at premiums that we consider appropriate. The occurrence of an event for which we are not adequately or sufficiently insured including any class action litigation, the successful assertion of one or more large claims against us that exceed available insurance coverage, the successful assertion of claims against our co-producers, or changes in our insurance policies could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our Indian subsidiary, Eros India, from which we derive a substantial portion of our revenues, is publicly listed and we may lose our ability to control its activities.***

Our Indian subsidiary, Eros India, from which we derive a substantial portion of our revenues, is publicly listed on the Indian stock exchanges. As such, under Indian law, minority stockholders have certain rights and protections against oppression and mismanagement. Further shares of Eros India is pledged to secure indebtedness incurred by Eros India. To the extent that Eros India is unable to service such indebtedness, or otherwise defaults on its obligations under such

indebtedness, the lenders of such indebtedness may exercise certain remedies over such shares, including foreclosing on such shares and selling such shares. As of June 30, 2020, we owned approximately 62.31% of Eros India. Over time, we may lose control over its activities and, consequently, lose our ability to consolidate its revenues.

30

***Dividend distributions by our subsidiaries are subject to certain limitations under local laws, including Indian and UAE law (including laws of Dubai) and other contractual restrictions.***

As a holding company, we rely on funds from our subsidiaries to satisfy our obligations. Dividend payments by our subsidiaries, including Eros India, are subject to certain limitations under local laws and restrictive covenants of their borrowing arrangements. For example, under Indian law, dividends are only permitted to be paid out of the profits of the company for that year or out of the profits for any previous financial year after providing for depreciation. UAE law imposes similar limitations on dividend payments. As per the Finance Act 2020, Dividend Distribution Tax ('DDT') of 20.56 percent levied on the Indian companies declaring dividend has been abolished with effect from April 1, 2020. Consequently, dividend is taxable in the hands of recipient and there shall be withholding of taxes on such dividends.

***The Relationship Agreement with our subsidiaries may not reflect market standard terms that would have resulted from arm's-length negotiations among unaffiliated third parties and may include terms that may not be obtained from future negotiations with unaffiliated third parties.***

The 2009 Relationship Agreement was last renewed with the execution of the 2016 Relationship Agreement between Eros India, Eros Worldwide and us ("Relationship Agreement"). The Relationship Agreement, exclusively assigns to Eros Worldwide, certain intellectual property rights and all distribution rights (including global digital distribution rights) for films (other than Tamil films), held by Eros India and any of its subsidiaries (the "Eros India Group"), in all territories other than India, Nepal, and Bhutan. In return, Eros Worldwide provides a lump sum minimum guaranteed fee to the Eros India Group in a fixed payment equal to 40% of the production cost of such film (including all costs incurred in connection with the acquisition, pre-production, production or post-production of such film), plus an amount equal to 20% thereon as markup. We refer to these payments collectively as the minimum guaranteed fee. Eros Worldwide is also required to reimburse the Eros India Group pre-approved distribution expenses in connection with such film, plus an amount equal to 20% thereon as markup. In addition, 15% of the gross proceeds received by Eros International Group from monetization of such films, after certain amounts are retained by the Eros International Group, are payable over to Eros India Group.

The Relationship Agreement may not reflect terms that would have resulted from arm's-length negotiations among unaffiliated third parties, and Eros's future operating results may be negatively affected if it does not receive terms as favourable in future negotiations with unaffiliated third parties. Further, as Eros does not have complete control of Eros India, it may lose control over its activities and, consequently, its ability to ensure its continued performance under the Relationship Agreement.

The transfer pricing arrangements in the Relationship Agreement are not binding on the applicable taxing authorities, and may be subject to scrutiny by such taxing authorities. Accordingly, there may be material and adverse tax consequences if the applicable taxing authorities challenge these arrangements, and they may adjust our income and expenses for tax purposes for both present and prior tax years, and assess interest on the adjusted but unpaid taxes.

***Our indebtedness could adversely affect our operations, including our ability to perform our obligations, fund working capital and pay dividends.***

As of March 31, 2020, we had $179.4 million of borrowings outstanding of which $117.1 million is repayable within one year. We may also incur substantial additional indebtedness. Our indebtedness could have important consequences, including the following:

- we could have difficulty satisfying our interest commitments, debt obligations, and if we fail to comply with these requirements, an event of default could result;
- we may be required to dedicate a substantial portion of our cash flow from operations to required payments on indebtedness, thereby reducing the cash flow available to fund working capital, capital expenditures and other

general corporate activities or to pay dividends;

· in order to manage our debt and cash flows, we may increase our short-term indebtedness and decrease our long-term indebtedness which may not achieve the desired results;

· covenants relating to our indebtedness may restrict our ability to make distributions to our shareholders;

31

- covenants relating to our indebtedness may limit our ability to obtain additional financing for working capital, capital expenditures and other general corporate activities, which may limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- each of Eros India and Eros International Limited may be required to repay the secured loans prior to their maturity, which as of March 31, 2020, represented $71.9 million of the outstanding indebtedness of Eros India and $22.1 million of the outstanding indebtedness of Eros International Limited. Further, in the event we decide to prepay certain lenders of Eros India, we will be required to obtain their prior approval and/or prior notice of up to 30 days and this may also involve levy of prepayment charges of up to 2%;
- certain Eros India loans are subject to annual renewal, and until these renewals are obtained, the lenders under these loans may at any time require repayment of amounts outstanding. As at March 31, 2020, short-term loans amounting to $5.75 million were pending annual renewal and the Group expects the renewal to complete in due course;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be placed at a competitive disadvantage compared to our competitors with less debt; and
- we may have difficulty repaying or refinancing our obligations under our senior credit facilities on their respective maturity dates.

If any of these consequences occur, our financial condition, results of operations and ability to pay dividends could be adversely affected. This, in turn, could negatively affect the market price of our A Ordinary Shares, and we may need to undertake alternative financing plans, such as refinancing or restructuring our debt, selling assets, reducing or delaying capital investments or seeking to raise additional capital.

We cannot assure that any refinancing would be possible, that any assets could be sold, or, if sold, of the timing of the sales and the amount of proceeds that may be realized from those sales, or that additional financing could be obtained on acceptable terms, if at all. For additional information, please see [Note 2(b) and Note 31] to our audited Consolidated Financial Statements appearing elsewhere in this annual report.

***Downgrade in our credit ratings could increase our future borrowing costs and adversely affect the availability of new financing.***

There can be no assurance that any of our credit ratings will remain unchanged for any given period of time or that a rating will not be lowered if, in that rating agency's judgment, future circumstances relating to the basis of the rating so warrant. If, among other things, we are unable to maintain our outstanding debt and financial ratios at levels acceptable to the credit rating agencies, if we default on any indebtedness or if our business prospects or financial results deteriorate, our ratings could be downgraded by the rating agencies. Our credit ratings have been subject to change over time, including a downgrade in June 2019 (See Note [2(b)] of our audited consolidated financial statements). We cannot make assurances regarding how long these ratings will remain unchanged or regarding the outcome of the rating agencies future reviews of new or existing indebtedness. Such downgrade by the rating agencies could adversely affect the value of our outstanding securities, our existing debt and our ability to obtain new financing on favorable terms, if at all, and increase our borrowing costs, any of which could have a material adverse effect on business, financial condition and our results of operations.

***Our ability to incur debt and the use of our funds could be limited by the restrictive covenants in existing credit facilities as well as the notes and our GBP denominated London Stock Exchange listed bond ("UK Retail Bond").***

Our existing credit facilities as well as the notes and the UK Retail Bond contain restrictive covenants, as well as requirements to comply with certain leverage and other financial maintenance tests. These covenants and requirements could limit our ability to take various actions, including incurring additional debt, guaranteeing indebtedness and engaging

in various types of transactions, including mergers, acquisitions and sales of assets. These covenants could place us at a disadvantage compared to some of our competitors, who may have fewer restrictive covenants and may not be required to operate under these restrictions. Further, these covenants could have an adverse effect on our business by limiting our ability to take advantage of financing, mergers and acquisitions or other opportunities.

32

***We may not be able to generate sufficient cash to service all of our Indebtedness, and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful.***

Based on interest rates as of March 31, 2020, and assuming no additional borrowings or principal payments on our credit facilities, the UK Retail Bond and the Senior Convertible Notes (as defined below) until their maturities, we would need approximately $117.1 million over the next year, and $62.3 million over the next three years, to meet our principal under our debt agreements. Our ability to satisfy our debt obligations will depend upon, among other things:

- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control;
- our ability to refinance our debt as it becomes due, which will be affected by the cost and availability of credit; and
- our future ability to borrow under our revolving credit facilities, the availability of which depends on, among other things, our compliance with the covenants in our revolving credit facilities.

There can be no assurance that our business will generate sufficient cash flow from operations, or that we will be able to refinance debt as it comes due or draw under our revolving credit facilities in an amount sufficient to fund our liquidity needs. If our cash flows and capital resources are insufficient to service our indebtedness, we may be forced to reduce or delay capital expenditures, sell assets, or seek additional capital. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. In addition, the terms of existing or future debt agreements may restrict us from adopting some of these alternatives. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. If we are unable to generate sufficient cash flow, refinance our debt on favourable terms or sell additional debt or equity securities or our assets, it could have a material adverse effect on our financial condition and on our ability to make payments on our indebtedness.

Our trade accounts receivables were $101.7 million as at March 31, 2020. If the cash flow, working capital, financial condition or results of operations of our customers deteriorate, they may be unable, or they may otherwise be unwilling, to pay trade account receivables owed to us promptly or at all. In addition, from time to time, we have significant concentrations of credit risk in relation to our trade account receivables as a result of individual theatrical releases, television syndication deals or music licenses. Although we use contractual terms to stagger receipts, de-recognition of financial assets and/or the release or airing of content, as of March 31, 2020, 40.1% of our trade account receivables were represented by our top five debtors, compared to 20.4% as of March 31, 2019. Any substantial defaults or delays by our customers could materially and adversely affect our cash flows, and we could be required to terminate our relationships with customers, which could adversely affect our business, prospects, financial condition and results of operations.

***We face risks relating to the international distribution of our films and related products.***

We derive a significant percentage of our revenues from customers located outside of India. We derived 71.1% of our revenue in Fiscal Year 2020 from the monetization of our films in territories outside of India. We do not track revenues by geographical region other than based on our Company or customer domicile and not necessarily the country where the rights have been monetized or licensed. As a result, revenue by customer location may not be reflective of the potential of any given market. As a result of changes in the location of our customers, our revenues by customer location may vary year to year.

We are currently growing our presence in China through theatrical and distribution of our films. If we are unsuccessful in

the production, distribution and monetization of films not only in India but also in the international markets including China, we may suffer losses and it may materially affect our growth prospects. Several countries around the world impose restrictions on the amount and nature of content that may be distributed in that country. For instance, China has imposed an annual limit on the number of foreign films, as selected by relevant authorities in China, that may be distributed annually on a revenue share basis as determined by box office performance. In addition, in September 2018, China's film and television regulator, the National Administration of TV and Radio, published proposed regulations that would severely limit the streaming and broadcasting of foreign film and television content in China, further reducing foreign access to the Chinese market.

33

Our business is subject to risks inherent in international trade, many of which are beyond our control. These risks include:

- fluctuating foreign exchange rates;
- laws and policies affecting trade, investment and taxes, including laws and policies relating to the repatriation of funds and withholding taxes and changes in these laws;
- differing cultural tastes and attitudes, including varied censorship laws;
- differing degrees of protection for intellectual property;
- financial instability and increased market concentration of buyers in other markets;
- higher past due debtor days and difficulty of collecting trade receivables across multiple jurisdictions;
- the instability of other economies and governments; and
- war and acts of terrorism.

Events or developments related to these and other risks associated with international trade could adversely affect our revenues from non-Indian sources, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***We may pursue acquisition opportunities, which could subject us to considerable business and financial risk, divert management's attention and otherwise disrupt our operations and harm our operating results. We may fail to acquire companies whose market power or technology could be important to the future success of our business.***

We evaluate potential acquisitions of complementary businesses on an ongoing basis and may from time to time pursue acquisition opportunities. We may in the future seek to acquire or invest in other companies or technologies that we believe could complement or expand our services, enhance our technical capabilities, or otherwise offer growth opportunities. Pursuit of future potential acquisitions may divert the attention of management and cause us to incur various expenses in identifying, investigating, and pursuing suitable acquisitions, whether or not they are consummated. We may not be successful in identifying acquisition opportunities, assessing the value, strengths and weaknesses of these opportunities or consummating acquisitions on acceptable terms. In addition, we have limited experience acquiring and integrating other businesses. We may be unsuccessful in integrating our recently acquired businesses or any additional business we may acquire in the future, and we may fail to acquire companies whose market power or technology could be important to the future success of our business. Future acquisitions may result in near-term dilution of earnings, including potentially dilutive issuances of equity securities or issuances of debt. Acquisitions may expose us to particular business and financial risks that include, but are not limited to:

- diverting of financial and management resources from existing operations;
- incurring indebtedness and assuming additional liabilities, known and unknown, including liabilities relating to the use of intellectual property we acquire, including costs or liabilities arising from the acquired companies' failure to comply with intellectual property laws and licensing obligations they are subject to;
- incurring significant additional capital expenditures, transaction and operating expenses and non-recurring acquisition-related charges;
- experiencing an adverse impact on our earnings from the amortization or impairment of acquired goodwill and other intangible assets;
- failing to successfully integrate the operations and personnel of the acquired businesses;
- entering new markets or marketing new products with which we are not entirely familiar;
- failing to retain key personnel of, vendors to and clients of the acquired businesses;
- harm to our existing business relationships with business partners and advertisers as a result of the acquisition;
- harm to our brand and reputation; and
- use of resources that are needed in other parts of our business.

In addition, a significant portion of the purchase price of companies we acquire may be allocated to acquired goodwill, which must be assessed for impairment at least annually. In the future, if our acquisitions do not yield expected returns, we may be required to take charges to our operating results based on this impairment assessment process. Acquisitions also could result in dilutive issuances of equity securities or the incurrence of debt, which could adversely affect our operating results. In addition, if an acquired business fails to meet our expectations, our operating results, business and financial condition may suffer.

34

If we are unable to address the risks associated with acquisitions, or if we encounter expenses, difficulties, complications or delays frequently encountered in connection with the integration of acquired entities and the expansion of operations, we may fail to achieve acquisition synergies and may be required to focus resources on integration of operations rather than on our primary business activities. In addition, future acquisitions could result in potentially dilutive issuances of our A Ordinary Shares, the incurrence of debt, contingent liabilities or amortization expenses, or write-offs of goodwill, any of which could harm our financial condition.

***We may require additional capital to support business growth and objectives, and this capital might not be available on acceptable terms, if at all.***

We intend to continue to make investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new features or enhance our existing services, expand into additional markets around the world, improve our infrastructure, or acquire complementary businesses and technologies. Accordingly, we may need to engage, and have engaged, in equity and debt financings to secure additional funds. If we raise additional funds through future issuances of equity or convertible debt securities, our existing shareholders could suffer additional significant dilution, and any new equity securities we issue could have rights, preferences, and privileges superior to those of holders of our Ordinary Shares. Any debt financing we secure in the future, including pursuant to the unwind described above, also could contain restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and pursue business opportunities, including potential acquisitions. We may not be able to obtain additional financing on terms favourable to us, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth, acquire or retain consumers and subscribers, and to respond to business challenges could be significantly impaired, and our business may be harmed.

**Risks Related to our A Ordinary Shares**
***Our A ordinary share price has been and may be highly volatile and, as a result, shareholders could lose a significant portion or all of their investment or we could become subject to securities class action litigation.***
Prior to November 12, 2013, our ordinary shares had been admitted on the Alternative Investment Market of the London Stock Exchange ("AIM") since 2006 and our 'A' ordinary shares have been traded on the New York Stock Exchange ("NYSE") since our initial public offering in 2013. The trading price of our ordinary shares on the NYSE has been highly volatile. Since the listing of our A ordinary shares on the NYSE, the highest closing price of the A ordinary shares, in the period beginning November 12, 2013 and ended June 30, 2020, was $39.01 per share and the lowest price was $1.10 per share. The market price of the A ordinary shares on the NYSE may fluctuate as a result of several factors, including the following:

- attacks from short sellers;
- variations in our quarterly operating results;
- adverse media report about us or our directors and officers;
- changes in financial estimates or publication of research reports by analysts regarding our A ordinary shares, other comparable companies or our industry generally;
- volatility in our industry, the industries of our customers and the global securities markets;
- risks relating to our business and industry, including those discussed above;
- strategic actions by us or our competitors;
- adverse judgments or settlements obligating us to pay damages;
- actual or expected changes in our growth rates or our competitors' growth rates;
- investor perception of us, the industry in which we operate, the investment opportunity associated with the A ordinary shares and our future performance;
- additions or departures of our executive officers;

- · trading volume of our A ordinary shares;
- · sales of our ordinary shares by us or our shareholders; or
- · domestic and international economic, legal and regulatory factors unrelated to our performance.

These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions or interest rate changes may cause the market price of ordinary shares to decline.

35

In addition, some companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. A putative securities class action filed in November 2015 has now been dismissed with prejudice, but on June 21, 2019, the Company was named a defendant in two substantially similar putative class action lawsuits filed in federal court in New Jersey by purported shareholders of the Company. Securities litigation against us could result in substantial costs and divert our management's attention from other business concerns, which could adversely impact our business and affect the market price of our A ordinary shares.

***Additional equity issuances will dilute your holdings, and sales by the Founders Group could adversely affect the market price of our A ordinary shares.***

Sales of a large number of our ordinary shares by the Founders Group, as defined in "Part I — Item 4. Information on the Company — C. Organizational Structure" could adversely affect the market price of our A ordinary shares. Similarly, the perception that any such primary or secondary sale may occur; could adversely affect the market price of our A ordinary shares. Any future issuance of our A ordinary shares by us may dilute the holdings of our existing shareholders, causing the market price of our A ordinary shares to decline. In addition, any perception by potential investors that such issuances or sales might occur could also affect the trading price of our A ordinary shares.

***The Founders Group, which includes our Chairman, Kishore Lulla, holds a substantial interest in and, through the voting rights afforded to our B ordinary shares and held by the Founders Group, will continue to have the ability to exercise a controlling influence over our business, which will limit your ability to influence corporate matters.***

Our B ordinary shares have ten votes per share and our A ordinary shares, which are trading on the NYSE, have one vote per share. As of July 27, 2020, the Founders Group collectively owns 13.4% of our issued share capital in the form of 2,018,189 A ordinary shares, representing 1.3% of the voting power of our outstanding ordinary shares, and 21,700,418 B ordinary shares, representing all of our B ordinary shares and 60.0% of the voting power of our outstanding ordinary shares.

Due to the disparate voting powers attached to our two classes of ordinary shares, the Founders Group continues to have significant influence over management and affairs and over all matters requiring shareholder approval, including our management and policies and the election of our directors and senior management, the approval of lending and investment policies, revenue budgets, capital expenditure, dividend policy, significant corporate transactions, such as a merger or other sale of our company or its assets and strategic acquisitions, for the foreseeable future. In addition, because of this dual class structure, the Founders Group will continue to be able to control all matters submitted to our shareholders for approval.

This concentrated control could delay, defer or prevent a change in control of our Company, impede a merger, consolidation, takeover or other business combination involving our Company, or discourage a potential acquirer from making a tender offer, initiating a potential merger or takeover or otherwise attempting to obtain control of the Company even though other holders of A ordinary shares may view a change in control as beneficial. Many of our directors and senior management also serve as directors of, or are employed by, our affiliated companies, and we cannot guarantee that any conflicts of interest will be resolved in our favor. As a result of these factors, members of the Founders Group may influence our material policies in a manner that could conflict with the interests of our shareholders. As a result, the market price of our A ordinary shares could be adversely affected.

***We will continue to incur substantial costs as a result of being a U.S. public company.***

We became a U.S. public company in November 2013. As a U.S. public company, we incur significant legal, accounting and other expenses. Being a U.S. public company increased our legal and financial compliance costs and make some activities more time-consuming and costly. In addition it has made it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage in the future. As a result, it may be more difficult for us to attract and retain qualified individuals to serve on our board of directors or as executive officers.

36

***As a foreign private issuer, we are subject to different U.S. securities laws and NYSE governance standards than domestic U.S. issuers. This may afford less protection to holders of our A ordinary shares, and you may not receive corporate and Company information and disclosure that you are accustomed to receiving or in a manner in which you are accustomed to receiving it.***

As a foreign private issuer, the rules governing the information that we disclose differ from those governing U.S. corporations pursuant to the Securities Exchange Act of 1934, as amended, or the Exchange Act. Although we intend to report quarterly financial results and report certain material events, we are not required to file quarterly reports on Form 10-Q or provide current reports on Form 8-K disclosing significant events within four days of their occurrence and our quarterly or current reports may contain less information than required under U.S. filings. In addition, we are exempt from the Section 14 proxy rules, and proxy statements that we distribute will not be subject to review by the SEC. Our exemption from Section 16 rules regarding sales of ordinary shares by insiders means that you will have less data in this regard than shareholders of U.S. companies that are subject to the Securities Exchange Act. As a result, you may not have all the data that you are accustomed to having when making investment decisions. For example, our officers, directors and principal shareholders are exempt from the reporting and "short-swing" profit recovery provisions of Section 16 of the Exchange Act and the rules thereunder with respect to their purchases and sales of our A ordinary shares.

The periodic disclosure required of foreign private issuers is more limited than that required of domestic U.S. issuers and there may therefore be less publicly available information about us than is regularly published by or about U.S. public companies. See "Part I — Item 10. Additional Information — H. Documents on Display."

As a foreign private issuer, we are exempt from complying with certain corporate governance requirements of the NYSE applicable to a U.S. issuer, including the requirement that a majority of our board of directors consist of independent directors. Although we are in compliance with the current NYSE corporate governance requirements imposed on U.S. issuers, with the exception of our Audit Committee currently having two rather than three members, our charter does not require that we meet these requirements.

As the corporate governance standards applicable to us are different than those applicable to domestic U.S. issuers, you may not have the same protections afforded under U.S. law and the NYSE rules as shareholders of companies that do not have such exemptions. It is also possible that the significant ownership interest of the Founders Group could adversely affect investor perception of our corporate governance.

***You may be subject to Indian taxes on income arising through the sale of our A ordinary shares.***

The Indian Income Tax Act, 1961 has been amended to provide that income arising directly or indirectly through the sale of a capital asset, including shares of a company incorporated outside of India, will be subject to tax in India, if such shares derive, directly or indirectly, their value substantially from assets located in India, whether or not the seller of such shares has a residence, place of business, business connection, or any other presence in India, if, on the specified date, the value of such assets (i) represents 50% of the value of all assets owned by the company or entity, or and (ii) exceeds the amount of 100 million rupees.

If the Indian tax authorities determine that our A ordinary shares derive their value substantially from assets located in India you may be subject to Indian income taxes on the income arising, directly or indirectly, through the sale of our A ordinary shares. However, the impact of the above indirect transfer provisions would need to be separately evaluated under the tax treaty scenario of the country of which the shareholder is a tax resident. For additional information, see "Part I—Item 10. Additional Information—E. Taxation."

37

***We are an Isle of Man company and, because judicial precedent regarding the rights of shareholders is more limited under Isle of Man law than under U.S. law, you may have less protection of your shareholder rights than you would under U.S. law.***

Our constitution is set out in our memorandum and articles of association, and we are subject to the Isle of Man Companies Act 2006, as amended, — see "Part II — Item 4. Information on the Company — Government Regulations" and Isle of Man common law. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Isle of Man law are to an extent governed by the common law of the Isle of Man. The common law of the Isle of Man is derived in part from comparatively limited judicial precedent in the Isle of Man as well as from English common law, which has persuasive, but not binding, authority on a court in the Isle of Man. The rights of our shareholders and the fiduciary responsibilities of our directors under Isle of Man law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Isle of Man has a less developed body of securities laws than the United States. In addition, some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Isle of Man. Furthermore, shareholders of Isle of Man companies may not have standing to initiate a shareholder derivative action in a federal court of the United States. As a result, shareholders may have more difficulties in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as shareholders of a U.S. company.

***Our board of directors may determine that a shareholder meets the criteria of a "prohibited person" and subject such shareholder's shares to forced divestiture.***

Our articles of association permit our board of directors to determine that any person owning shares (directly or beneficially) constitutes a "prohibited person" and is not qualified to own shares if such person is in breach of any law or requirement of any country and, as determined solely by our board of directors, such ownership would cause a pecuniary or tax disadvantage to us, another shareholder or holders of our other securities. If our board of directors determines that a shareholder meets the above criteria of a "prohibited person," they may direct such shareholder to transfer all A ordinary shares such shareholder owns to another person. Under the provisions of our articles of association, such a determination by our board of directors would be conclusive and binding on such shareholder.

If our board of directors directs such shareholder to transfer all A ordinary shares such shareholder owns, such shareholder may recognize taxable gain or loss on the transfer. See "Part I — Item 10. Additional Information — E. Taxation" for a more detailed description of the tax consequences of a sale or exchange or other taxable disposition of such shareholders A ordinary shares.

***Judgments obtained against us by our shareholders may not be enforceable.***

We are an Isle of Man company and substantially all of our assets are located outside of the United States. A substantial part of our current operations are conducted in India. In addition, substantially all of our directors and executive officers are nationals and residents of countries other than the United States and we believe that a substantial portion of the assets of these persons may be located outside the United States. As a result, it may be difficult for you to effect service of process within the United States upon these persons. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors. Moreover, the courts of India would not automatically enforce judgments of U.S. courts obtained in such actions against us or our directors and officers, or entertain actions brought in India against us or such persons predicated solely upon United States federal securities laws. Further, the U.S. has not been declared by the Government of India to be a reciprocating territory for the purposes of enforcement of foreign judgments, and there are grounds upon which Indian courts may decline to enforce the judgments of United States courts. Some remedies available under the laws of United States jurisdictions, including remedies available under the United States federal securities laws, may not be allowed in Indian courts if contrary to public policy in India. Since judgments of United States courts are not automatically enforceable in India, it may be difficult for you to recover against us or our directors and officers based upon such judgments. There is uncertainty as to whether the courts of the Isle of Man would recognize or enforce judgments of

United States courts against us or such persons predicated upon the civil liability provisions of the securities laws of the United States or any state. In addition, there is uncertainty as to whether such Isle of Man courts would be competent to hear original actions brought in the Isle of Man against us or such persons predicated upon the securities laws of the United States or any state.

38

***If securities or industry analysts do not publish research or publish unfavourable or inaccurate research about our business, our share price and trading volume could decline.***

The trading market for our A ordinary shares depends, in part, on the research and reports that securities or industry analysts publish about us or our business. We may be unable to sustain coverage by well-regarded securities and industry analysts. If either none or only a limited number of securities or industry analysts maintain coverage of our company, or if these securities or industry analysts are not widely respected within the general investment community, the trading price for our A ordinary shares would be negatively impacted. In the event we obtain securities or industry analyst coverage, if one or more of the analysts who cover us downgrade our A ordinary shares or publish inaccurate or unfavourable research about our business, our share price would likely decline. We have experienced such downgrade from two of our analysts in fiscal year 2016 during the period of anonymous short seller attacks on our stock. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, or fail to maintain a favourable outlook on the company, it may cause investor sentiment to be weak, demand for our A ordinary shares could decrease, which might cause our share price and trading volume to decline.

***We do not currently intend to pay dividends on our ordinary shares. Our ability to pay dividends in the future will depend upon satisfaction of the Isle of Man 2006 Companies Act solvency test, future earnings, financial condition, cash flows, working capital requirements and capital expenditures.***

We currently intend to retain any future earnings and do not expect to pay dividends on our ordinary shares. The amount of our future dividend payments, if any, will depend upon our satisfaction of the solvency test contained in the 2006 Companies Act, our future earnings, financial condition, cash flows, working capital requirements and capital expenditures. The 2006 Companies Act provides that a company satisfies the solvency test if: (i) it is able to pay its debts as they become due in the normal course of the company's business: and (ii) the value of the company's assets exceeds the value of its liabilities. There can be no assurance that we will be able to pay dividends. Additionally, we are restricted by the terms of certain of our current debt financing facilities and may be restricted by the terms of any future debt financings in relation to the payment of dividends.

***We may be classified as a passive foreign investment company, or PFIC, under United States tax law, which could result in adverse United States federal income tax consequences to U.S. investors***

Based upon the past and projected composition of our income and valuation of our assets, we do not believe we will be a PFIC for our taxable year ending December 31, 2020, and we do not expect to become one in the future, although there can be no assurance in this regard. The determination of whether or not we are a PFIC for any taxable year is made on an annual basis and will depend on the composition of our income and assets from time to time. Specifically, we will be classified as a PFIC for United States federal income tax purposes if either:

· 75% or more of our gross income in a taxable year is passive income, or

· 50% or more of the average quarterly value of our gross assets in a taxable year is attributable to assets that produce passive income or are held for the production of passive income.

The calculation of the value of our assets will be based, in part, on the then market value of our A ordinary shares, which is subject to change. We cannot assure you that we were not a PFIC for the previous taxable years or that we will not be a PFIC for this or any future taxable year. Moreover, the determination of our PFIC status is based on an annual determination that cannot be made until the close of a taxable year and involves extensive factual investigation. This investigation includes ascertaining the fair market value of all of our assets on a quarterly basis and the character of each item of income we earn, which cannot be completed until the close of a taxable year, and, therefore, our U.S. counsel expresses no opinion with respect to our PFIC status.

If we were to be or become classified as a PFIC, a U.S. Holder (as defined in "Part I — Item 10. Additional Information — E. Taxation") may be subject to burdensome reporting requirements and may incur significantly increased United States income tax on gain recognised on the sale or other disposition of the shares and on the receipt of distributions on the shares to the extent such gain or distribution is treated as an "excess distribution" under the United States federal income tax rules. Further, if we were a PFIC for any year during which a U.S. Holder held our shares, we would continue to be

treated as a PFIC for all succeeding years during which such U.S. Holder held our shares. Each U.S. Holder is urged to consult its tax advisors concerning the United States federal income tax consequences of acquiring, holding and disposing of shares if we are or become classified as a PFIC. See "Part I — Item 10. Additional Information — E. Taxation" for a more detailed description of the PFIC rules.

39

***If the fair market value of our ordinary shares fluctuates unpredictably and significantly on a quarterly basis, the social costs we accrue for share-based compensation may fluctuate unpredictably and significantly, which could result in our failing to meet our expectations or investor expectations for quarterly financial performance. This could negatively impact investor sentiment for the Company, and as a result, adversely impact the price of our ordinary shares.***

Social costs are payroll taxes associated with employee salaries and benefits, including share-based compensation that we are subject to in various countries in which we operate.

When the fair market value of our ordinary shares increases on a quarter to quarter basis, the accrued expense for social costs will increase, and when the fair market value of ordinary shares falls, the accrued expense will become a reduction in social costs expense, all other things being equal, including the number of vested stock options and exercise price remains constant. The trading price of our A ordinary share price can be highly volatile. See "—Risks Related to our A Ordinary Shares—Our A ordinary share price may be highly volatile and, as a result, shareholders could lose a significant portion or all of their investment or we could become subject to securities class action litigation." As a result, the accrued expense for social costs may fluctuate unpredictably and significantly, from quarter to quarter, which could result in our failing to meet our expectations or investor expectations for quarterly financial performance. This could negatively impact investor sentiment for the company, and as a result, the price for our ordinary shares**.**

***Failure to comply with anti-bribery, anti-corruption and anti-money laundering laws could subject us to penalties and other adverse consequences.***

We are subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended ("FCPA"), the U.K. Bribery Act of 2010, as amended (the "U.K. Bribery Act") and other anti-bribery, anti-corruption and anti-money laundering laws in various jurisdictions around the world. The FCPA, the U.K. Bribery Act and similar applicable laws generally prohibit companies, as well as their officers, directors, employees and third-party intermediaries, business partners and agents, from making improper payments or providing other improper things of value to government officials or other persons. We and our third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state owned or affiliated entities and other third parties where we may be held liable for corrupt or other illegal activities, even if we do not explicitly authorize them. While we have policies and procedures and internal controls to address compliance with such laws, we cannot assure you that all of our employees and third-party intermediaries, business partners and agents will not take actions in violation of such policies and laws, for which we may be ultimately held responsible. To the extent that we learn that any of our employees or third-party intermediaries, business partners or agents do not adhere to our policies, procedures or internal controls, we are committed to taking appropriate remedial action. In the event that we believe or have reason to believe that our directors, officers, employees or third-party intermediaries, agents or business partners have or may have violated such laws, we may be required to investigate or to have outside counsel investigate the relevant facts and circumstances. Detecting, investigating and resolving actual or alleged violations can be extensive and require a significant diversion of time, resources and attention from senior management. Any violation of the FCPA, the U.K. Bribery Act or other applicable anti-bribery, anti-corruption and anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, loss of export privileges, and criminal or civil sanctions, penalties and fines, any of which may could adversely affect our business and financial condition.

## ITEM 4. INFORMATION ON THE COMPANY

## A. History and Development of our Company

Eros International Plc was incorporated in the Isle of Man as of March 31, 2006 under the Companies Act 1931 commonly known as the 1931 Act — see "Part II — Item 4. Information on the Company — Government Regulations," as a public company limited by shares. Effective as of September 29, 2011, the Company was de-registered under the 1931 Act and re-registered as a company limited by shares under the Isle of Man, Companies Act 2006 (as amended) commonly referred to as the 2006 Act. We maintain our registered office at First Names House, Victoria Road, Douglas, Isle of Man IM2 4DF, British Isles, our principal executive office in the U.S.A is at 550 County Avenue, Secaucus, New Jersey 07094; and our telephone number is +1(201) 558-9001. We maintain a website at *www.erosplc.com.* Information contained in our

website is not a part of, and is not incorporated by reference into, this annual report.

40

website is not a part of, and is not incorporated by reference into, this annual report.

Our capital expenditures in fiscal 2020 was $265.3 million. Our principal capital expenditures were incurred for the purposes of purchasing intangible film rights and related content. We expect our capital expenditure needs in fiscal 2021 to be in the range of $150 - $160 million, a significant amount of which we expect to be used for the acquisition of further intangible film rights and related content.

**B. Business Overview**

We are a leading global company in the Indian film entertainment industry that co-produces, acquires and distributes Indian language films in multiple formats worldwide, and operate the largest Indian-content OTT entertainment service network, Eros Now. Founded in 1977, we are one of the oldest companies in the Indian film industry to focus on international markets. Our A Ordinary Shares are listed on the NYSE; symbol "EROS". We believe we are pioneers in our business. Our success is built on the relationships we have cultivated over more than 40 years with leading talent, production companies, exhibitors and other key participants in our industry. We have aggregated multi-format rights to over 3,000 films in our library, including recent and classic titles that span different genres, budgets and languages.

**Eros Now – the Largest Indian-Content OTT Network**

We believe Eros Now has the largest Indian language movie content library worldwide with over 12,000 digital titles, out of which approximately 5,000 films are owned in perpetuity. Eros Now also has a deep library of short-form content, including music videos, trailers, original shorts exclusive interviews and marketing shorts. During fiscal year 2020 Eros Now digitally released a total of 630 films in 12 different Indian languages. Over the same period over 8,000 music audio and video files were released on Eros Now as well as over 500 units of short form and Eros Now Originals & Quickie content. Since inception, we have digitally premiered (first ever digital release) over 250 films on the Eros Now platform, and also introduced the concept of theatrical films launching on OTT prior to its satellite premiere, which is a testament to the strength of our platform and breadth and depth of our offering. As of March 31, 2020, Eros Now achieved over 196.8 million registered users across Apps, WAPs and the Eros Now website, and 29.3 million paying subscribers. Eros Now has seen a significant surge across matrices wherein engagement has risen 70%- 100% across daily viewers, time spent and repeat visits in a pre- lockdown to during lock down phase.

Having established over many partnerships and strategic collaborations globally with telecommunications operators, OEMs and streaming services providers, Eros Now is available globally through multiple distribution channels. These partnerships and strategic collaborations include our recent agreement with Apple to make Eros Now content available on all Apple devices in multiple countries outside of India, making Eros Now the first Indian OTT provider collaborating with Apple on such a scale.

**Our Distribution Channels**

In fiscal year 2020, we released a total of 30 films, including two medium budget films and twenty-eight low budget films. In the fiscal year 2019, we released a total of 72 films, including seven medium budget films and sixty-five low budget films.

We have a multi-platform business model and derive revenues from the following three distribution channels:

· **Theatrical**: The theatrical channel largely includes revenues from multiplex chains, single screen theaters, distributors and content aggregators in case of dubbed and/or subtitled versions. We are a leading player in a growing and under-penetrated cinema market with a consisent and leading box office market share. Based on gross collections reported by comScore, our market share as an average over the preceding eight calendar years to 2018 is 24% of all theatrically released Indian language films in the United Kingdom and the United States.

· **Television Syndication**: We de-risk our theatrical revenues while enhancing revenue predictability through pre-sales and television syndication which includes satellite television broadcasting, cable television and terrestrial television which are facilitated by our long-standing Eros brand, reputation and industry relationships. We license Indian film content (usually a combination of new releases and existing films in our library) over a stated period of time in exchange for a license fee, where payment terms may extend up to 2-3 years in some cases. We currently have television syndication content agreements in place with over 30 international broadcasters in the U.S., Asia, Europe and the Middle East, and includes long-term television syndication agreements with broadcast companies

such as Viacom 18 Media in India, SABC in South Africa, E Vision in the UAE and Tanzania TV, among others.

41

·   **Digital and ancillary**: In addition to our theatrical and television distribution networks, we have a global network for the digital distribution of our content, which consists of full-length films, music, music videos, clips and other video content. Through our digital distribution channel, we mainly monetize music assets and distribute films and other content primarily in IPTV, VOD (including SVOD and DTH) and online internet channels. This enables us to prolong the lifecycle of our films and film library. A significant portion of the Indian and international population are moving towards adoption of digital technology. A recent *Cisco Annual Internet Report* predicts that there will be over 907 million internet users and 966 million mobile users in India by 2023. Given these growth opportunities, we are increasing our focus on providing on-demand services via Eros Now, which leverages its extensive digital film and music libraries to stream a wide range of content.

For fiscal year 2020, our aggregate revenues were $155.5 million.

## Our Competitive Strengths

We believe the following competitive strengths position us as a leading global company in the Indian film entertainment industry.

### *Leading co-producer and acquirer of new Indian film content, with an extensive film library.*

As one of the leading participants in the Indian film entertainment industry, we believe our size, scale and market position will continue contributing to our growth in India and internationally. We have established our size and scale by aggregating a film library of over 3,000 films. We have demonstrated our market position by releasing, internationally or globally, Hindi language films which were among the top grossing films in India in calendar years 2018, 2016, 2015 and 2014. We have released 36 of the top 110 highest grossing box office films in India from 2007 to 2018. We believe that we have strong relationships with the Indian creative community and a reputation for quality productions.

We believe that these factors, along with our worldwide distribution platform, will enable us to continue to attract talent and film projects of a quality that we believe is one of the best in our industry, and build what we believe will continue to be a strong film slate in the coming years with some of the leading actors and production houses with whom we have previously delivered our biggest hits. We believe that the combined strength of our new releases and our extensive film library positions us well to build new strategic relationships.

### *Largest Indian-content OTT Service Provider Globally*

We are the largest Indian-content SVOD OTT service provider globally. Our OTT platform Eros Now has digital rights to over 12,000 films and we are collaborating with leading talents and strategic partners to create new content and expand Eros Now's digital library. To maximize the reach of Eros Now, we currently have collaborations and partnerships in India and globally with market-leading telecommunications operators, OEMs and digital distribution entities to make available our digital service Eros Now across global audiences. Our partners include, among others, major telecommunications providers such as Airtel, Reliance Jio, Etisalat, Ooredoo, Vodafone and many more as well as streaming service providers such as Amazon Channels, Apple+ Channels, Youtube, Virgin Media, Roku, Sony TV and a plethora of connected devices. We are the first and only Indian-content OTT service provider to collaborate with Apple on a large scale. Furthermore, we have a unique and strategic relationship with Microsoft to further develop and create video technology. We believe that the scale of our digital library and the number of partnerships and collaborations with market leaders make us well positioned to take advantage of the increasing demand for digital entertainment content in India and other parts of the world.

### *Established, worldwide, multi-channel distribution network with access to China.*

We distribute our films to the Indian population in India, the South Asian diaspora worldwide and to non-Indian consumers who view Indian films that are subtitled or dubbed in local languages. Internationally, our distribution network extends to over 50 countries, such as the United States, the United Kingdom and throughout the Middle East, where we distribute films to Indian expatriate populations, and to Germany, Poland, Russia, Romania, Indonesia, Malaysia, Taiwan, Japan, South Korea, China and Arabic and Spanish speaking countries, where we release Indian films that are subtitled or dubbed in local languages.

China is increasingly becoming an important market, and we expect to release selected successful films from our slate for wider release into China. We entered the China market in 2018 by releasing *Bajrangi Bhaijaan* across more than 8,000 screens, which grossed approximately $45 million at the box office in China since release. We also released *Andhadhun* in China in April 2019 which collected over $43 million in the Chinese box office in less than four weeks. Our partnership with iQiyi, one of China's leading online video sites, also gives us direct access to Chinese viewers who have an interest in Indian film content. Furthermore, we are planning the release of our Indo-Chinese co-productions in fiscal 2021 in India, China and the rest of the world.

42

During Fiscal Year 2020 Eros Now established a digital distribution partnership in China with Wasu Media, a large state-owned culture media group. The Wasu Group is one of the largest comprehensive digital content service providers across interactive TV, 3G / 4G mobile TV and Internet TV in China. Wasu's services cover approximately 100 cities in 29 provinces in China with cable network as well as covering the three major telecom operators and several million Internet users.

Through this global distribution network, we distribute Indian entertainment content over three primary distribution channels — theatrical, television syndication and digital and ancillary platforms. Our primarily internal distribution network allows us greater control, transparency and flexibility over the regions in which we distribute our films, which we believe results in the direct exploitation of our films without the payment of significant commissions to sub-distributors.

***Diversified revenue streams and pre-sale strategies mitigate risk and promote stable cash flow generation.***

Our revenue model is diversified by three major distribution channels:

· theatrical distribution;

· television syndication; and

· digital distribution and ancillary products and services, including Eros Now.

We bundle library titles with new releases to maximize cash flows, and we also utilize a pre-sale strategy to mitigate new production project risks by obtaining contractual commitments to recover a portion of our capitalized film costs through the licensing of television, music and other distribution rights prior to a film's completion.

Television pre-sales in India are an important factor in enhancing revenue predictability for our business and are part of our diversification strategy to mitigate risks of cash flow generation.

In addition, we further seek to reduce risk to our business by building a diverse film slate, with a mix of films by budget, region and genre that reduces our reliance on "hit films." This broad-based approach also enables us to bundle old and new titles for our television and digital distribution channels to generate additional revenues long after a film's theatrical release period is completed. We believe our multi-pronged approach to exploiting content through theatrical, television syndication and digital distribution channels, our pre-sale strategies and our portfolio approach to content sourcing and exploitation mitigates our dependence on any one revenue stream and promotes cash flow generation.

***Strong brand with fast-growing international reach***

We believe we are a leading brand that is a household name in India. Through our partnerships we are also able to reach the large Indian diaspora globally.

*Theatrical Distribution Outside India*: Outside India, we distribute our films theatrically through our offices in Dubai, Singapore, the United States, the United Kingdom, Australia and through sub-distributors in other markets. In our international markets, instead of focusing on wide releases, we select a smaller number of theaters that play films targeted at the expatriate South Asian population or the growing international audiences for Indian films. We generally theatrically release subtitled versions of our films internationally on the release date in India, and dubbed versions of films in countries outside India 12-24 weeks after their initial theatrical release in India, sometimes after a long gap.

*International Broadcasting Distribution*: Outside of India, we license Indian film content to content aggregator to reach cable and pay TV subscriber and for broadcasting on major channels and platforms around the world. We also license dubbed content to Europe, Arabic and Spanish speaking countries and in Southeast Asia and other parts of the world.

Often such licenses include not just new releases, but films grouped around the same star, director or genre. International pre-sales of television, music and other distribution rights are an important component of our overall pre-sale strategy. We believe that our international distribution capabilities and large library of content enable us to generate a larger portion of our revenue through international distribution.

43

*Dynamic management of our film library*

We have the ability to combine our new release strategy with our library monetization efforts to maximize our revenues. We believe our extensive film library provides us with unique opportunities for content monetization, such as our dedicated Eros content channel carried by various cable companies outside India. Our extensive film library provides us with a reliable source of recurring cash flow after the theatrical release period for a film has ended. In addition, because our film library is large and diversified, we believe that we can more effectively leverage our library in many circumstances by licensing not just single films but multiple films. The existence of high margin library monetization avenues especially in television and digital platforms reduce reliance on theatrical revenues.

*Strong and experienced management team with established relationships with key industry participants.*

Our management team has substantial industry knowledge and expertise, with a majority of our executive officers and executive directors having been involved in the film, media and entertainment industries for 20 or more years, and has served as a key driver of our strength in content sourcing. In particular, several members of our management team have established personal relationships with leading talent, production companies, exhibitors and other key participants in the Indian film industry, which have been critical to our success. Through their relationships and expertise, our management team has also built our global distribution network, which has allowed us to effectively exploit our content globally.

### Our Strategy

Our strategy is driven by the scale and variety of our content and the global exploitation of that content through diversified channels. Specifically, we intend to pursue the following strategies:

*Scaling up productions and co-productions to augment our film library and focus on creating original digital content.*

We will continue to leverage the longstanding relationships with creative talent, production houses and other key industry participants that we have built since our founding to source a wide variety of content. Our focus will be on investing in future slates comprised of a diverse portfolio mix ranging from high budget global theatrical releases to lower budget movies with targeted audiences. We intend to maintain our focus on films with various budgets and augment our library with quality content for exploitation through our distribution channels and explore new bundling strategies to monetize existing content.

We continue to focus on ramping up our own productions and co-productions through key partnerships. These include our partnership with the acclaimed producer-director, Aanand L Rai (Colour Yellow Production) and our joint venture partnership with screen writer and director V. Vijayendra Prasad. We have also entered into a distribution partnership agreement with Apple to make available Eros Now's content across Apple devices in multiple countries including India. These strategic partnerships not only help us augment our in-house content production model but also expand our geographical footprint for content monetization.

Our focus is to become a global digital content company. Eros Now has rights to 12,000 films across ten different Indian languages and is rapidly expanding its content base. Eros Now enhances its consumer appeal through exploring dynamic genres to create unseen, relatable and contemporary Originals that appeal to a wide variety of audience. The launch of our Original digital series, comprising a broad mix of genres from comedy to horror and crime thriller, has enjoyed great success to date, with its original series Side Hero, Smoke, Metro Park, Modi and others winning over ten awards across different platforms. In April 2018, Eros Now successfully premiered its first worldwide direct-to-digital original film *Meri Nimmo*, in association with acclaimed director Aanand L Rai, to positive critical reception. Over the next 12 months, Eros

Now is planning to launch an exclusive stable of feature films, made-for-digital originals films and original episodic programs, some including: *Flesh* by Siddharth Anand; *Halahal* by Zeishan Qadri*; Bhumi* by *Pavan Kripalani;* and a most awaited Season 2 of our well-known series *Metro Park.*

Eros Now Quickie, an IP that we launched to cater to high quality short form programming with stories that can be told within 80-100 mins and broken down into episodes of 8-10 mins has had fabulous pick up with Tier 2 audiences with IP's like 'The Investigation' and Date gone wrong resonating very well with the youth. We plan to further scale this initiative across regional languages and build this culture with our viewers and subscribers.

Eros Now Prime - is our soon to be launched premium English Service is scheduled to go live in Q2 FY 21. We are excited about our plans to further penetrate the English speaking, higher ARPU market in India, and further leverage and seed this premium programming to regional audiences across the country. We also announced a strategic partnership with NBC Universal earlier this year and are looking to add other studios to our platform.

The digital music industry in India has been growing exponentially over the past few years, with over 25+ million digital audio streaming users. Film music is often marketed and monetized separately from the underlying film, both before and after a film is released. To further capture this market opportunity, we plan to expand our deep music library, which is an essential component to Eros Now's offering, and to that end have recently established a partnership with YouTube Music in India to further capitalise on the digital music opportunity.

44

***To promote Eros Now, our OTT digital entertainment service platform, as the preferred choice for online entertainment by consumers across digital platforms.***

The adoption of 4G is gradually increasing and now 3G and 4G constitute over 75% of the overall wireless internet user base. Initiatives such as broadband rollout and public Wi-Fi as part of the government's Digital India campaign and the promotion of 4G data packs by leading telecoms will only help boost the quality of digital infrastructure in India.

Eros Now is increasingly focused on offering quality content including Indian films, music and original shows, opening new markets, delivering consumer friendly product features such as offline viewing and subtitles and adopting a platform agnostic distribution strategy across all operating systems and platforms across mobile, tablets, cable or internet, including through deals with OEMs. As of March 31, 2020, Eros Now caters to 29.3 million paying subscribers and has garnered 196.8 million registered users across global digital distribution platforms. While a majority of users are from South Asia, followed by North America and the United Kingdom we get paid subscribers from 150 countries. Out of the 12,000 films that Eros Now has rights to, 5,000 films are owned in perpetuity, across Hindi and regional languages. Eros Now service is integrated with some of India's major telecommunications providers such as Reliance Jio, Airtel, Vodafone, Idea and BSNL, as well as streaming service providers such as Amazon, Apple, Virgin Media and Roku, and has partnerships with connected devices such as televisions and mobile handsets with companies such as Samsung to distribute in multiple territories. We continue to believe that Eros Now will be a significant player within the OTT online Indian entertainment industry, especially given the rapidly growing internet and mobile penetration within India. We will also continue to expand Eros Now's reach beyond audiences in India through strategic collaborations such as our partnership with Apple to distribute Eros Now content on all Apple devices in multiple countries outside of India.

***Capitalize on positive industry trends driven by roll-out of high speed 4G services in the Indian market.***

Driven by the economic expansion within India and the corresponding increase in consumer discretionary spending, FICCI-EY Report 2020 projects that the dynamic Indian media and entertainment industry will grow at a 10.0% CAGR, from INR 1.674 trillion in 2018 to INR 2.416 trillion by 2022, and that the Indian digital media industry will grow at a 23% CAGR over the same period. India is one of the largest and most prolific film markets in the world as measured by output and remains underpenetrated compared to other established cinema markets such as the US and UK. Ticket prices in India remain at lower levels than other cinema markets globally and have room to increase. In fiscal year 2019 the average ticket price amongst the two leading multiplex cinema chains in India, Inox Leisure Limited and PVR Limited, was $2.70, based on information publicly disclosed by them. This compares to average ticket prices in the US of $9.16 during fiscal year 2019.

The Indian television market is the second largest in the world after China, reaching an estimated 175 million television viewers in 2019. The FICCI-EY Report 2020 projects that the Indian television industry will grow from $9.9 billion in 2018 to $11.8 billion in 2022. The growing size of the television industry has led television satellite networks to provide an increasing number of channels, resulting in competition for quality feature films for home viewing in order to attract increased advertising and subscription revenues.

Broadband and mobile platforms present growing digital avenues for content distribution in India. According to a recent Cisco report, India is forecasted to have approximately 907 million internet users by 2023, a large increase from 398 million internet users in 2018. According to a recent EY FICCI report, by 2025 there are expected to be one billion "screens" in India, of which 250 million screens would be television-sized while 750 million would be smart phones. This is expected to result in a continued growth in demand for content – both long form, episodic and short form – as well as provide significant opportunities for content creators currently there are approximately 550 million television and smart phone consumers in India, We aim to take advantage of the opportunities presented by these trends within India to monetize our library and distribute new films through existing and emerging platforms, including by exploring new content

options for expanding our digital strategy such as filming exclusive short form content for consumption through emerging channels such as mobile and internet streaming devices.

"**Disclaimer:** *The exceptional circumstances brought about by coronavirus have led to the suspension of FICCI Frames. This report and the forewords were written before this development took place. We are not yet in a position to accurately quantify the deep impact which the coronavirus will have on the media ecosystem and we will come back to the investor community when we are in a better position to articulate the impact with updated future forecasts.*"

***Further extend the distribution of our content outside of India to new audiences.***

We currently distribute our content to consumers in more than 50 countries, including in markets where there is significant demand for subtitled and dubbed Indian themed entertainment, such as Europe and South East Asia, as well as to markets where there is significant concentration of South Asian expatriates, such as the Middle East, the United States and the United Kingdom.

45

We intend to promote and distribute our films in additional countries, and further expand in countries where we already distribute, when we believe that demand for Indian filmed entertainment exists or the potential for such demand exists. To that end, we have entered into arrangements with local distributors in Taiwan, the Middle East, Japan, South Korea, and China to distribute dubbed or subtitled Eros films through theatrical release, television broadcast or DVD release. The MENA ("Middle East North Africa") market represents a compelling market opportunity given the consumer trends, attractive demographics and Eros' historic presence in the market and numerous distribution partnerships including with Etisalat and Ooredoo. Additionally, we believe that the general population growth in India experienced over recent years may eventually lead to increasing migration of Indians to other regions, resulting in increased demand for our films internationally.

***Expand our regional Indian content offerings.***

We continue to be committed to promoting regional content films and growing the regional movie industry. We will utilize our resources, international reputation and distribution network to continue expanding our non-Hindi content offerings to reach the substantial Indian population whose main language is not Hindi. While Hindi films retain a broad appeal across India, the diversity of languages within India allows us to treat regional language markets as distinct markets where particular regional language films have a strong following.

Our regional language films include Marathi, Malayalam, Punjabi, Kannada and Bengali films. Our Malayalam film *Pathemari* had won a national award for Best Malayalam Film. We intend to use our existing distribution network across India to distribute regional language films to specific territories. Where opportunities are available and where we have the rights, we also intend to exploit re-make rights to some of our popular Hindi films into non-Hindi language content targeted towards these regional audiences.

**Slate Profile**

The success of our film distribution business lies in our ability to acquire content. Each year, we focus on co-production, acquisition and distribution of a diverse portfolio of Indian language and themed films that we believe will have a wide audience appeal. Of the 30 films we released in fiscal 2020, eight were Hindi films, one was a Tamil film and twenty-one were regional films. Of the 72 films we released in fiscal year 2019, fifteen were Hindi films, seven was Tamil/Telugu films and fifty were regional films. Our typical annual slate of new releases consists of both Hindi language films as well as films produced specifically for audiences whose main language is not Hindi, primarily Tamil, and to a lesser extent other regional Indian language. Our most expensive films are generally the high and medium budget films (mainly Hindi and a few Tamil and Telugu films) that we release globally each year. The remainder of the films (mainly Hindi but also Tamil and/or Telugu) included in each annual release slate is built around films with various budgets to create a slate that will attract varying segments of the audience. The remainder of the slate consists of Hindi, Tamil, Telugu and other language films of a lower budget.

We focus on content driven films with appropriate budgets in order to generate an attractive rate of return and seek to mitigate the risks associated with film budgets through the use of our extensive pre-sale strategies. We have increased our focus on Tamil and Telugu films for similar reasons. Our Hindi films are typically high or medium budget films in the popular comedy and romance genres, supplemented by lower budget films, and our Tamil films are predominantly star-driven action or comedy films, which appeal to audiences distinct from audiences for more romance-focused Hindi films. We believe that a Tamil or Telugu film and a Hindi film can be released simultaneously on the same date without adversely affecting business for either film as each caters to a different audience.

We also believe that we can capitalize on the demand for regional films and replicate our success with Tamil and Telugu

films for other distinct regional language films, including Marathi, Malayalam, Kannada and Punjabi. In addition, the key Indian release dates for films, during school and other holidays, vary by region and therefore our ability to release films on different holidays in various regions, in addition to being able to release films in different regional languages simultaneously, expands the likely periods in which our films can be successfully released. We intend to steadily build up our portfolio of films targeting other regional language markets.

46

**Our Business**

***Content Development and Sourcing***

We currently acquire films using two principal methods — by acquiring rights for films produced by others, generally through a license agreement, and by co-producing films with a production house, typically referred to as a banner, which is usually owned by a top Indian actor, director or writer, on a project-by-project basis. We regularly co-produce and acquire film content from some of the leading banners in India, and continue to focus on ramping up our own productions and co-productions through key partnerships. These partnerships include our partnership with Aanand L Rai (Colour Yellow Productions), which has released a range of films across budgets, genres and languages; and co-production partnership with screen writer and director V. Vijayendra Prasad.

Moreover, we are continuing to focus on expanding the reach of our content by further penetrating the China market, which we believe is a significant market for Indian films, and releasing more dubbed and subtitled content to new markets beyond China. To that end, in April 2019 we released *Andhadhun*, a dark comedy crime thriller, in China in collaboration with Tang Media Partners, a leading Chinese film distributor. In addition, these strategic partnerships not only help us augment our in-house content production capacity but also expands our geographical canvas for content monetization.

Regardless of the acquisition method, over the past five years, we have typically obtained exclusive global distribution rights in all media for a minimum period of ten to 20 years from the Indian initial theatrical release date, although the term can vary for certain films for which we may only obtain international or only Indian distribution rights, and occasionally soundtrack or other rights are excluded from the rights acquired. For co-produced films, we typically have exclusive distribution rights for at least 20 years, co-own the copyright in such film in perpetuity and, after the exclusive distribution right period, share control over the further exploitation of the film.

We believe producers bring proposed films to us not only because of established relationships, but also because they want to leverage our proven distribution and marketing capabilities. Our in-house creative team also directly develops film ideas and contracts with writers and directors for development purposes. When we originate a film concept internally, we then approach appropriate banners for co-production. Our in-house creative team also participates in the selection of our slate with other members of our management in our analysis focused on the likelihood of the financial success of each project. Our management is extensively involved in the selection of our high budget films in particular.

Regardless of whether a film will be acquired or co-produced, we determine the likely value to us of the rights to be acquired for each film based on a variety of factors, including the stars cast, director, composer, script, estimated budget, genre, track record of the production house, our relationship with the talent and historical results from comparable films. We follow a disciplined green lighting process involving extensive evaluation of films involving track records, revenue potential and costs before green lighting by a committee led by senior management and business leaders. The Company also has risk sharing contracts with talent and key stakeholders to ensure risk diversification. Our primary focus is on sourcing a diversified portfolio of films expected to generate commercial success. We generally co-produce our high budget films and acquire rights to more medium and low budget films. Our model of primarily acquiring or co-producing films rather than investing in significant in-house production capability allows us to work on more than one production with key talent simultaneously. Since the producer or co-producer takes the lead on the time intensive process of production, we are able to scale our film slate more effectively. The following table summarizes the typical terms included in our acquisition and co-production contracts.

| | Acquisition | Co-production |
|---|---|---|
| Film Cost | Negotiated "market value" | Actual cost of production or capped budget and 10–15% production fee |
| Rights | 10 years–20 years | Exclusive distribution rights for at least 20 years after |

| | | which Eros shares control over the further exploitation of the film, and co-owned copyright in perpetuity, subject to applicable copyright laws |
|---|---|---|
| Payment Terms | 10–30% upon signature<br>Balance upon delivery or in instalments between signing and delivery | In accordance with film budget and production schedule |
| Recoupment Waterfall | "Gross" revenues<br>Less 10–20% Eros distribution fee (% of cost or gross revenues)<br>Less print, advertising costs (actuals)<br>Less cost of the film<br>Net revenues generally shared equally | Generally same as Acquisition except sometimes Eros also charges interest and/or a production or financing fee for the cost of capital and overhead recharges |

47

Where we acquire film rights, we pay a negotiated fee based on our assessment of the expected value to us of the completed film. Although the timing of our payment of the negotiated fee for an acquired film to its producer varies, typically we pay the producer between 10% and 30% of a film's negotiated acquisition cost upon signing the acquisition agreement, and the remainder upon delivery of the completed film or in instalments paid between signing and delivery. In addition to the negotiated fee, the producer usually receives a share of the film's revenue stream after we recoup a distribution fee on all revenues, the entire negotiated fee and distribution costs, including prints and ads. After we sign an acquisition agreement, we do not exercise any control over the production process, although we do retain complete control over the distribution rights we acquire.

For films that we co-produce, in exchange for our commitment to finance typically 100% of the agreed-upon production budget for the film and agreed budget adjustments, we typically share ownership of the intellectual property rights in perpetuity and secure exclusive global distribution rights for all media for at least 20 years. After we recoup our expenses, we and the co-producers share in the proceeds of the exploitation of the intellectual property rights. Pending determination of the actual production cost of the film, we also agree to a pre-determined production fee to compensate the co-producer for his services, which typically ranges from 10%-15% of the total budget. We typically also provide a share of net revenues to our co-producers. Net revenues generally means gross revenues less our distribution fee, distribution cost and the entire amount we have paid as committed financing for production of the film. Our distribution fee varies for each of the co-produced films, but is generally either a continuing 10% to 20% fee on all revenues, or a capped amount that is calculated as a percentage of the committed financing amount for production of the film. In some cases, net revenues also deduct an overhead charge and an amount representing an interest charge on some or all of the committed financing amount. Typically, once we agree with the co-producer on the script, cast and main crew including the director, the budget and expected cash flow through a detailed shooting schedule, the co-producer takes the lead in production and execution. We normally have our executive producer on the film to oversee the project.

We reduce financing risk for both acquired and co-produced films by capping our obligation to pay or advance funds at an agreed-upon amount or budgeted amount. We also frequently reduce financial risk on a film to which we have committed funds by pre-selling rights in that film.

Pre-sales give us advance information about likely cash flows from that particular film product, and accelerate cash flow realizable from that product. Our most common pre-sale transactions are the following:

- pre-selling theatrical rights for certain geographic areas, such as theaters outside the main theater circuits in India or certain non-Indian territories, for which we generally get nonrefundable minimum guarantees plus a share of revenues above a specified threshold;

- pre-selling television rights in India, generally by bundling releases in a package that is licensed to satellite television operators for a specified run; and

- pre-selling certain music rights, including for movie soundtracks and ringtones.

From time to time we also acquire specific rights to films that have already been released theatrically. We typically do not acquire global all-media rights to such films, but instead license limited rights to distribution channels, like digital, television, audio and home entertainment only, or rights within a certain geographic area. As additional rights to these films become available, we frequently seek to license them as well, and our package of distribution rights in a particular film may therefore vary over time. We work with producers not only to acquire or co-produce new films, but also to license from them other rights they hold that would supplement rights we hold or have previously held related to older films in our library. In certain cases, we may not hold full sequel or re-make rights or may share these rights with our co-producers.

***Our Film Library***

We currently own or license rights to over 3,000 films, including recent and classic titles that span different genres, budgets and languages. Eros Now has rights to over 12,000 films, out of which around 5,000 films are owned in perpetuity, across Hindi and regional languages from Eros's internal library as well as third party aggregated content, which we believe makes it one of the largest Indian movie offering platforms around the world. Our film library has been built up over more than 40 years and includes hits from across that time period, including, among others, Pati patni aur who, Andhadhun*, Boyz 2, Newton, Munna Michael*, *Subh Mangal Saavadhan, Ki & Ka, Housefull 3, Dishoom, Baar Baar Dekho, Bajrangi Bhaijaan, Bajirao Mastani, Tanu Weds Manu Returns, NH10, Badlapur, Devdas*, *Hum Dil De Chuke Sanam*, *Lage Raho Munna Bhai*, *Vicky Donor, English Vinglish*, and *Goliyon Ki Raasleela: Ram-Leela*. We have acquired most of our film content through fixed term contracts with third parties, which may be subject to expiration or early termination. We own the rights to the rest of our film content as co-producers or sole producer of those films. Through such acquisition and co-production arrangements, we seek to acquire rights to 40 to 50 additional films each year. While we typically hold rights to exploit our content through various distribution channels, including theatrical, television and new media formats, we may not acquire rights to all distribution channels for our films. In particular, we do not own or license the music rights to a majority of the films in our library. We expect to maintain more than half of the rights we presently own through at least December 31, 2025.

48

In an effort to reach a wide range of audiences, we maintain rights to a diverse portfolio of films spanning various genres, generations and languages. More than 55% of the films in our Hindi library are films produced in the last 15 years. We own or license rights to films produced in several regional languages, including Tamil, Telugu, Kannada, Marathi, Bengali, Malayalam, Kannada and Punjabi.

We treat our new releases as part of our film library one year from the date of their initial theatrical release. We believe our extensive film library provides us with unique opportunities for content exploitation, such as our dedicated Eros content channel carried by various cable companies outside India. Our extensive film library provides us with a reliable source of recurring cash flow after the theatrical release period for a film has ended. In addition, because our film library is large and diversified, we believe that we can more effectively leverage our library in many circumstances by licensing not just single films but multiple films.

*Award winning content/franchise*

Our film releases frequently receive awards and accolades. For instance, our Hindi release *Newton* was selected as India's official entry for the Best Foreign Film language category at the 2018 Academy Awards. It also received accolades at the Berlin Film Festival. We have won 218 awards in fiscal years 2015, 2016, 2017,2018 and 2019, including Studio of the Year. Some of our films and original digital series from fiscal year 2018 and fiscal 2019 that won awards include *Side Hero, Smoke, Mukkabaaz*, *Newton*, *Shubh Mangal Savdhaan* and *Munna Michael*. *Side Hero* won three awards including Best Web Series and Best Actor. *Smoke* received Best Launch of the Year at The ET Now - Stars of the Industry Awards. *Mukkabaaz* won three awards including Best Director and Best Actor. *Newton* won 13 awards including Best International Film. *Shubh Mangal Savdhaan* won four awards including Marketing Campaign of the Year. *Munna Michael* won two awards including Best Social Media Marketing Campaign. Our films over the years have won various awards in multiple categories such as Best Film, Best Director, Best Story, Best Actor, Best Music, Best Special Effects awards, and Innovative Launch Campaign of the Year and Best Child Actor awards, to name a few. *Bajrangi Bhaijaan* won 37 awards including National Award for Popular Film. *Bajirao Mastani* won over 79 award titles including National Award for Best Director. *Tanu Weds Manu Returns* won 19 awards including National Award for Best Female Actor in a leading role, *Hero* won seven awards and *Badlapur* won seven awards. Our Malayalam film *Pathemari* had also won a national award for Best Malayalam Film.

*Distribution Network and Channels*

We distribute film content primarily through the following distribution channels:

· **theatrical**, which includes multiplex chains and stand-alone theaters;

· **television syndication**, which includes satellite television broadcasting, cable television and terrestrial television; and

· **digital and ancillary**, which primarily includes IPTV, VOD, music, inflight entertainment, home video, internet channels and Eros Now.

We generally monetize each new film we release through an initial 12-month revenue cycle commencing after the film's theatrical release date. Thereafter, the film becomes part of our film library where we seek to continue to monetize the content through various platforms. The diagram below illustrates a typical distribution timeline through the first 12 months following theatrical release of one of our films.

**Film release first cycle timeline**



We currently acquire films both for global distribution, which includes the Indian domestic market as well as international markets and for international distribution only.

Certain information regarding our initial distribution rights to films initially released in the three fiscal years 2020, 2019 and 2018 is set forth below:

|  | Year ended March 31, | | |
|---|---|---|---|
|  | 2020 | 2019 | 2018 |
| **Global (India and International)** | | | |
| Hindi films | 2 | 7 | 10 |
| Regional films (excluding Tamil films) | 21 | 49 | 3 |
| Tamil films | — | 3 | 1 |
| **International Only** | | | |
| Hindi films | 6 | 7 | 1 |
| Regional films (excluding Tamil films) | — | — | — |
| Tamil films | — | — | - |
| **India Only** | | | |
| Hindi films | — | 1 | 3 |
| Regional films (excluding Tamil films) | 1 | 5 | 6 |
| Tamil films | — | - | 0 |
| **Total** | 30 | 72 | 24 |

We distribute content in over 50 countries through our own offices located in key strategic locations across the globe. In response to Indian cinemas' continued growth in popularity across the world, especially in non-English speaking markets, including Germany, Poland, Russia, Southeast Asia and Arabic speaking countries, we offer dubbed and/or subtitled content in over 25 different languages. In addition to our internal distribution resources, our global distribution network includes relationships with distribution partners, sub-distributors, producers, directors and prominent figures within the Indian film industry and distribution arena.

***Theatrical Distribution and Marketing***

***India Distribution.*** The Indian theatrical market is comprised of both multiplex and single screen theaters which are 100% digitally equipped. In India, the cost of distributing a digital film print is lower than the cost of distributing a digital film print in the United States. Utilisation of digital film media also provides additional protection against unauthorized copying, which enables us to capture incremental revenue that we believe are at risk of loss through content piracy.

50

India is divided into 14 geographical regions commonly known as "Film Circuits" or "Film Territories" in the Indian film business. We distribute our content in all of the circuits either through our internal distribution offices (Mumbai, Delhi, East Punjab, Mysore and Bihar) or through sub-distributors in remaining circuits. The Film Circuits where we have direct offices comprise of a market share of up to 75% of the India theatrical revenue. Our primarily internal distribution network allows us greater control, transparency and flexibility over the core regions in which we distribute our films, and allows us to retain a greater portion of revenues per picture as a result of direct exploitation instead of using sub-distributors, which requires the payment of additional fees, sub-distributor margins or revenue shares.

We entered into agreements with certain key multiplex operators to share net box office collections for our theatrical releases with the exhibitor for a predetermined base fee of 50% of net box office collections for the first week, after which the split decreases over time.

We primarily enter into agreements on a film-by-film and exhibitor-by-exhibitor basis. To date, our agreements have been on terms that are no less favourable than the terms of the prior settlement agreements; however, we cannot guarantee such terms can always be obtained.

The largest number of screens in India that we book for a particular film are booked for the first week of theatrical release, because as a substantial portion of box office revenues are collected in the first week of a film's theatrical exhibition. Our agreements with pan India multiplex operators is such that 100% of the entire first week of our share of revenues from all our films from such multiplexes is paid to us within 10 days of the release.

In single screens we either obtain non-refundable minimum guarantees/refundable advances and a revenue sharing arrangement above the minimum guarantee and with certain smaller multiplex chains we obtain refundable advances and a revenue sharing arrangement.

Pursuant to the Cinematograph Act, Indian films must be certified for adult viewing or general viewing by the CBFC, which looks at factors such as the interest of sovereignty, integrity and security of India, friendly relations with foreign states, public order and morality. Obtaining a desired certification may require us to modify the title, content, characters, storylines, themes or concepts of a given film.

***International Distribution.*** Outside India, we distribute our films theatrically through our offices in Dubai, Singapore, the United States, the United Kingdom, Australia and through sub-distributors in other markets. In our international markets, instead of focusing on wide releases, we select a smaller number of theatres that play films targeted at the expatriate South Asian population or the growing international audiences for Indian films. We generally theatrically release subtitled versions of our films internationally on the release date in India, and dubbed versions of films in countries outside India 12-24 weeks after their initial theatrical release in India sometimes after a long gap.

***Marketing.*** The marketing campaign of a film is an integral part of the overall theatrical distribution strategy. It typically starts before the film goes into production with the marketing campaign peaking closer to the release of the film. Our marketing team creates a 360 degree campaign with specific emphasis across various media platforms, including carrying out public relation campaigns and utilizing print, brand partnerships, music pre-releases, print and outdoor advertising, brand partnerships and marketing on various social media and other digital platforms. Each film campaign is unique and has a strategic, targeted approach based on the genre, talent involved, positioning of the movie, target group and overall strategy. In addition, prior to the release of a film, we introduce various film assets, including posters, teasers, trailers and songs to generate momentum for the release of a film.

Our marketing efforts are primarily managed by employees located in offices across India or in one of our international offices in Dubai, Singapore, the United States, the United Kingdom, and Australia. Occasionally, sub-distributors manage

marketing efforts in regions that do not have a dedicated Eros team, using the creative aspects developed by us for our marketing campaigns. Managing marketing locally permits us to more easily identify appropriate local advertising channels and results in more effective and efficient marketing.

### Television Distribution

**India Distribution.** We believe that the increasing television audience in India creates new opportunities for us to license our film content, and expands audience recognition of the Eros name and film products. We license Indian film content (usually a combination of new releases and existing films in our library), to satellite television broadcasters operating in India under agreements that generally allow them to telecast a film over a stated period of time in exchange for a specified license fee. We have, directly or indirectly, licensed content for major Indian television channels such as Colors, Sony, the Star Network and Zee TV.

51

*International Distribution.* Outside of India, we license Indian film content to content aggregators to reach cable and pay subscribers and for broadcasting on major channels and platforms around the world. We also license dubbed content to Europe, Arabic-speaking countries and in Southeast Asia and other parts of the world. Often such licenses include not just new releases, but films grouped around the same star, director or genre. International pre-sales of television, music and other distribution rights are an important component of our overall pre-sale strategy. We believe that our international distribution capabilities and large library of content enable us to generate a larger portion of our revenue through international distribution.

### *Digital Distribution*

In addition to our theatrical and television distribution networks, we have a global network for the digital distribution of our content, which consists of full length films, music, music videos, clips and other video content. Through our digital distribution channel, we mainly monetize music assets and distribute movies and other content primarily in IPTV, VOD (including SVOD and DTH) and online internet channels. Our film content is distributed in original language, subtitled into local languages or dubbed, in each case as driven by consumer or regional market preferences. With our large library of content and slate of new releases, we have sought to capitalize on changes in consumer demand through early adoption of new formats and services, which we believe enables us to generate a larger portion of our revenue through digital distribution than the film entertainment industry average in India.

With a significant portion of the Indian and international population moving towards the adoption of digital technology, we are increasing our focus on providing on demand services, although the platforms and strategies differ by region. Outside of India, there is a proliferation of cable, satellite and internet services that we supply. In addition, with the proliferation of internet users, we are increasing our online distribution presence as well. These platforms enable us to continue to monetize a film in our library long after its theatrical release period has ended. In addition, the speed, ease of availability and prices of digital film distribution diminish incentives for unauthorized copying and content piracy.

In North America, we have an agreement with International Networks, a subsidiary of Comcast, to provide an SVOD service fully branded as "Eros Now." The service is carried on most of the major cable network providers including Comcast, Cox Communications, Cablevision and Time Warner Cable. We provide all programming for this film and music channel and share revenues with the cable providers. We also provide content to Amazon Digital and participate in a revenue share deal. In Canada, we have signed a Program License Agreement for various movies with Rogers Broadcasting Limited. In Europe, we have partnered with My Digital Company (France), ESC Distribution (France) and MT Trading Ug (Germany). To maximize the reach of digital content, we currently have collaborations and partnerships in India and globally with market-leading telecommunications operators, OEMs and digital distribution entities to make available our digital service Eros Now across global audiences. Our partners include, among others, major telecommunications providers such as Airtel, Reliance Jio, Etisalat, Ooredoo, Vodafone and many more as well as streaming service providers such as Amazon Channels, Apple+ Channels, Youtube, Virgin Media, Roku, Sony TV and a plethora of connected devices.

### *Market opportunity*

*Domestic*: Our distribution capabilities enable us to target a majority of the 1.3 billion people in India. Recently, as demand for regional films and other media has increased in India, our brand recognition in Hindi films has helped us to grow our non-Hindi film business by targeting regional audiences in India and overseas. With our distribution network for Hindi, Tamil and Telugu films, we believe we are well positioned to expand our offering of non-Hindi content.

*Overseas:* Depending on the film, the distribution rights we acquire may be global, international or India only. Indian films have a global appeal and their popularity has been increasing in many countries that consume dubbed and subtitled

foreign content in local languages. These markets include Germany, Poland, Russia, France, Italy, Spain, Indonesia, Malaysia, Japan, South Korea, China, the Middle East and Latin America among others. In all these markets, it is the locals who are neither English nor Hindi speaking who view the content of the Indian film in a dubbed or subtitled version in their language, similar to the manner in which they view Hollywood content. Additionally, there is a large established Indian diaspora in North America which has a strong interest in the content of the Indian film industry. Other international markets that exhibit significant demand for subtitled or dubbed Indian-themed entertainment include Europe and Southeast Asia.

In addition, China is increasingly becoming an important market, and we expect to release select films from our slate for wider release into China. We recently released *Andhadhun* in China in collaboration with a leading Chinese film distributor Tang Media Partners. In March 2018, we released *Bajrangi Bhaijan* across more than 8,000 screens, including in China, and collected over $45 million at the box office in China, which we believe indicates a clear interest in Indian films by Chinese movie goers. As part of our strategy to penetrate further into the Chinese market, Eros Now has partnered with iQiyi, one of China's largest online video sites, through a content licensing arrangement in September 2018, making us the first South Asian OTT platform operator to have direct access to the Chinese market.

***Eros Now Market Opportunity***: Eros Now is uniquely positioned to benefit from the fast-growing internet and mobile penetration in India. A recent *Cisco Annual Internet Report* predicts that there will be over 907 million internet users and 966 million mobile users in India by 2023. The adoption of 4G is gradually increasing and now 3G and 4G constitute over 75% of the overall wireless internet user base. Initiatives such as broadband rollout and public Wi-Fi as part of the government's Digital India campaign and the promotion of 4G data packs by leading telecoms help boost the quality of digital infrastructure in India. We plan to take advantage of this growth and continue to grow Eros Now's paying user base in India and internationally.

***Eros Now***

With a significant portion of the Indian and international population moving towards the adoption of digital technology, we are increasing our focus on providing on-demand services via Eros Now, which leverages its extensive digital film and music libraries to stream a wide range of content. Users can access Eros Now through APPs, WAP and the internet in India and around the world. As at March 31, 2020, Eros Now had over 196.8 million registered users and 29.3 million paying users worldwide, compared to 155 million registered users and 18.8 million paying subscribers as of March 31, 2019, representing increases of 27% and 56% respectively. We define paying subscribers to mean any subscriber who has made a valid payment to subscribe to a service that includes Eros Now services as part of a bundle or on a standalone basis, either directly or indirectly through an OEM or mobile telecom provider in any given month, be it through a daily, weekly or monthly billing pack. Eros Now users have demonstrated some of the highest levels of engagement in the India OTT space. According to a published report by Counterpoint, Eros Now users are the most engaged wherein 68% access the platform daily and 59% of Tier 2 and Tier 3 users are in the age group of 24-39 in Tier 2 and Tier 3 cities of India which is the highest amongst all Indian OTT services.

We believe Eros Now has the largest Indian language movie content library worldwide with over 12,000 digital titles, out of which approximately 5,000 films are owned in perpetuity. Eros Now also has a deep library of short-form content, including music videos, trailers, original shorts exclusive interviews and marketing shorts. During fiscal year 2020 Eros Now digitally released a total of 630 films in 12 different Indian languages. Over the same period over 8,000 music audio and video files were released on Eros Now as well as over 500 units of short form and Eros Now Originals & Quickie content. Since inception, we have digitally premiered (first ever digital release) over 250 films on the Eros Now platform, and also introduced the concept of theatrical films launching on OTT prior to its satellite premiere, which is a testament to the strength of our platform and breadth and depth of our offering. As of March 31, 2020, Eros Now achieved over 196.8 million registered users across Apps, WAPs and the Eros Now website, and 29.3 million paying subscribers.

To maximize the reach of Eros Now, we currently have partnerships and strategic collaborations globally with telecommunications operators, OEMs and streaming services providers to offer Eros Now content to their users and subscribers. For instance, we recently announced our arrangement with Apple to make Eros Now available on the new Apple TV app. Eros Now is also available to customers of Reliance Jio, a major Indian mobile network operator owned by Reliance and BSNL, an Indian state-owned telecommunications company in accordance with a recent agreement that we entered into with BSNL, as well as the Malaysia-based Celcom and Maxis Berhad, Mauritius Telecom, Etisalat and Indonesia-based XL Axiata. Under these partnerships, subscribers on these networks gain access to Eros Now's extensive content including full-length movies and thematically-created playlists along with functions such as multi-language subtitles for movies, music video playlists, regional language filters, video progression and a watch list of titles. In addition, Eros Now has entered the Sri Lankan market through a partnership with Dialog Axiata, Sri Lanka's premier connectivity provider, and will be available on the Dialog ViU app.

Eros Now is also available in the Apple App Store and Google Play Store for download and can be streamed on any device including Amazon Fire TV stick, All IoS enabled devices and Roku, making the entertainment experience platform agnostic. Eros Now has over 60 distribution partners around the world including Apple TV+, Amazon Channels, Virgin

Media, Roku, Etisalat and xfinity.

Eros Now uses advanced technologies in the creation of content, giving each Eros Now original series or episode the same treatment a film receives in terms of detailing required from cinematography to production. In addition, Eros Now uses advanced technologies to allow its users easy manoeuvrability on its platform, including categorization, search ability and stacking of content under different domains.

In September 2019, we announced a ground-breaking commercial partnership with Microsoft with the goal of transforming the content streaming experience for consumers globally. This collaboration will help Eros Now develop a new intuitive online video platform to ensure seamless delivery of content across countries and languages. It will also create a host of new interactive voice offerings for customers including video search experiences, voice search for video content across multiple Indian languages, and create personalized content. This collaboration will help our Eros Now platform enhance and strengthen its reach across globe and increase engagement with consumers.

Eros Now has been increasingly focused on delivering product features to further monetize its growing registered user base. For example, we have launched Eros Now Quickie, a platform where viewers can access quality short stories to further supplement our existing vast digital content library.

53

The Eros Now platform also partners with leading companies in various industries other than entertainment in an effort to create vertical synergy and attract more users for its content. These companies cover industries including banking and lifestyle. For example, Eros Now has partnerships with three major electronic payment platforms, Paytm, CashKaro and Freecharge, so Eros Now can have access and advertise its services to the users of these payment platforms and its existing viewers can more easily purchase Eros Now content. In addition, Eros Now has partnerships with other brands like Cathay Pacific, Emirates, ICICI Bank, Grofers and a host of other brands.

At Eros Now we have focused on the core of the video technology business actively and will continue to invest in development over the coming years. At. The helm of this initiative is our relationship with Microsoft to develop the next generation video technology backend to deliver language based content to audiences over the world, Our investments in remote villages in India wherein we enable Village Level Entrepreneurs to distribute Eros Now on Internet cards across the country, our relationship with Dolby and being the first partner to introduce Dolby Atmos and Vision on our applications for OTT customers, our strategic relationship with Epic Games and the work being done on Unreal Engine to revolutionize pre-visualization technology based content production.

The Indian audience's propensity to consume content in local language has been increasing, and in recent times regional films are breaking language barriers as they cross over with dubbed versions to other markets especially the Hindi market. The regional industry also has strong releases in the next year and the market is only expected to expand further. Eros Now is well placed to capitalize on this growth given its strong regional content library and slate of compelling new regional content planned for release over the coming quarters.

### Eros Now Originals

Eros Now's various digital series, comprising a broad mix of genres from comedy to horror and crime thriller, have been well received by its viewers. Eros has a uniquely compelling slate of films and original series scheduled for release over the coming quarters, and we expect this to help drive continued growth in our Eros Now business as well as box-office revenue.

With compelling global concepts and productions in partnership with the best talent available, we believe that Eros Now's slate of original films and series will appeal to a wide range of audience. Over the next 12 months, Eros Now is planning to launch an exclusive stable of feature films, made-for-digital originals films and original episodic programs, some including: *Flesh* by Siddharth Anand; *Halahal* by Zeishan Qadri*; Bhumi* by *Pavan Kripalani;* and a most awaited Season 2 of our well-known series *Metro Park.* Over the past few months, despite the COVID-19 pandemic, we have released several pieces of original content on the Eros Now platform, *A Viral Wedding*, *Metro Park (Quarantine Edition)*, *Date Gone Wrong (Quarantine Edition).*

### Music

Music is integral to our films, and when we obtain global, all-media rights in our acquired or co-produced films, music rights typically are included. Film music rights are often marketed and monetized separately from the underlying film, both before and after the release of the related films. In addition, we act as a music publisher for third party owned music rights within India. Through our internal resources and network of licensees, we are able to provide our consumers with music content directly, through third party platforms or through licensing deals.

We also exploit the music publishing and master rights we own, which involves directly licensing songs to radio and television channels in India, synchronizing of music content to film, television and advertisers globally, as well as receiving royalties from public performance of these songs when they are played at public events. Ancillary revenues from public performances in India are collected and paid over to us through Novex, which monitors, collects and distributes royalties to its members.

During fiscal year 2020 we announced a transformational alliance between Eros Now and YouTube Music Premium. This

was the first time ever, in any geography, that Google/YouTube had partnered with a SVOD OTT player for a joint bundling and marketing opportunity. In addition, Eros Now developed the customer journey to provision access to both products and leveraged our new payment funnel. The campaign was supported by a robust digital marketing push from both sides.

54

*Impact of Covid-19*

The COVID-19 pandemic has had, and is likely to continue to have, a severe and unprecedented impact throughout the world. The COVID-19 outbreak and resulting measures taken by the Government of various countries to contain the virus have already significantly affected our business in the first quarter of fiscal year 2021. Measures to prevent its spread, including government-imposed restrictions on social gatherings, have had a significant effect on theatrical exhibition in India and around the world. The content production sector has also been disrupted, resulting in delays in many ongoing productions. These factors are expected to impact future release of content across distribution windows including theatrical, television and digital. The pandemic has had a negative overall impact on our business operations. The continued closure of cinemas in India and around the world for an indefinite period of time has created an unprecedented uncertainty and as a result it is difficult for us to accurately predict operating results and cash flows in near-term.

During the period from March 31st, 2020 to June 30th, 2020, we had several theatrical film releases scheduled in India and overseas, namely 'Haathi Mere Saathi' in three languages (Hindi, Tamil and Telugu), 'Shokuner Lobh' (Bengali), amongst others. However, under the present circumstances of the COVID-19 pandemic, we have taken the decision to defer the release of these films indefinitely until the situation changes, so that the revenue opportunities from these films can be maximized and improve our cashflows to better serve our commitments to our stakeholders.

The onslaught of the COVID - 19 pandemic has changed the social lives of people across regions and economic sections. While traditional and outdoor mediums of distribution of content, such as cinema theatres, continue to be unavailable; the home consumption mediums, such as television channels and OTT platforms (digital platforms) have gained in popularity and viewership. Going forward, along with our industry peers, we have started to consider changes to various operational and legal aspects of the business, such as project timelines, production costs, schedules, legal commitments etc, in order to adjust to the 'new normal' being presented to the world.

Our OTT platform Eros Now, for which the majority of the content library comprises our own existing content and acquired content, has also started considering innovative ways of updating its existing content libraries. Given the rise in demand for content and increasing online viewership, and the disruption in production of new content, existing content is likely to become more valuable in the future which will benefit us.

We believe, but cannot guarantee, that the cinematic exhibition industry will ultimately rebound and benefit from pent-up social demand for out-of-home entertainment, as government restrictions are lifted and home sheltering subsides. However, the ultimate significance of the pandemic, including the extent of the adverse impact on our financial and operational results, will be dictated by the currently unknowable duration and the effect on the overall economy and of responsive governmental regulations, including shelter-in-place orders of the pandemic and mandated suspension of operations.

Given the above, while the media and entertainment sector is currently grappling with various challenging issues as people strive to return to normalcy, eventually our sector may be amongst the first to recover and continue to provide premium entertainment to consumers around the world.

*Intellectual Property*

As our revenues are primarily generated from commercial exploitation of our films and other audio and/or audio-visual content, our intellectual property rights are a critical component of our business. Unauthorized use/access of intellectual property, particularly piracy of DVDs and CDs, as well as on-line piracy through unauthorized streaming/downloads, is widespread in India and other countries, and the mechanisms for protecting intellectual property rights in India and such other countries are not as effective as those of the United States and certain other countries. In order to fight against piracy, we participate directly and through industry organizations by way of actions including legal claims against persons/entities who illegally pirate our content. Furthermore, we also deal with piracy issues by promoting and marketing our films to the highest standards in order to ensure maximum viewership and revenues early in its release and shortening the period between the theatrical release of a film and its legitimate availability on DVD and VCD in the market. This is supported by the trend in the Indian market for a significant percentage of a film's box office receipts to be generated in

the first few weeks after release.

55

Recently, there has been a rapid transition of consumer preference from physical to digital modes of consumption of film and related content via on-line, mobile and digital platforms. This has enabled our OTT platform Eros Now to grow rapidly, which subjects us to competition from other such OTT platforms along with sites offering unauthorized pirated content. In order to tackle this issue of on-line piracy, we have adopted Digital Rights Management technology in order to ensure that our content is protected from unauthorized and illegal access and copying.

**Copyright protection in India**

The Copyright Act, 1957 (as amended from time to time) ("**Copyright Act**"), prescribes provisions *inter alia* relating to registration of copyrights, transfer of ownership and licensing of copyrights and infringement of copyrights and remedies available in that respect. The Copyright Act affords copyright protection to cinematographic films and sound recordings and original literary, dramatic, musical and artistic work. For cinematographic films, copyright is granted for a certain period of time, usually for a period of 60 years from the beginning of the calendar year following the year in which such film is published, subsequent to which the work falls in the public domain and any act of reproduction of such work by any person other than the author would not amount to infringement.

India is a signatory to number of international conventions and treaties that provides for universal provisions for protection and enforcement of copyrights. In addition to above, following the issuance of the International Copyright Order, 1999, subject to certain conditions and exceptions, certain provisions of the Copyright Act apply to nationals of all member states of the World Trade Organization, the Berne Convention and the Universal Copyright Convention.

The Copyright Act was amended in 2012 to allow authors of literary and musical works (which may be included as part of a cinematograph film) to retain the right to receive royalty for the utilization of such work (other than exhibition as part of the cinematograph film in a cinema hall) as mandated by the law.

Although the state governments in India serve as the enforcing authorities of the Copyright Act, the Indian government serves an advisory role in assisting with enforcement of anti-piracy measures.

It is pertinent to note that piracy continues to be one of the major issues affecting the Indian Film Industry with an annual loss of substantial revenues, to the tune of around INR 180 billion every year. In an effort to protect their Intellectual Property rights, filmmakers in India have started getting orders typically known as "John Doe" orders from court which is a pre-infringement injunction remedy provided to protect the intellectual property rights of the creator of artistic works, including movies and songs. We obtain similar protective orders from court for our films and also engage the services of a specialized anti-piracy agency to vigilantly monitor and take down on-line pirated content from our cinematograph films.

*Trademark protection in India*

We use a number of trademarks in our business, all of which are owned by our subsidiaries. Our Indian subsidiaries currently own over 120 Indian registered trademarks and domain names, which are used in their business, including the registered trademark "Eros," "Eros International," "Eros Music," and "Eros Now." However, certain of our trademarks used in India are still under the process of registration. The registration of any trademark in India is a time-consuming process, and there can be no assurance as to when any such registration will be granted.

The Trade Marks Act, 1999, (the "**Trademarks Act**"), governs the registration, acquisition, transfer and infringement of trademarks and remedies available to a registered proprietor or user of a trademark. The registration of a trademark is valid for a period of ten years but can be renewed in accordance with the specified procedure. The registration of certain types of marks is prohibited, including where the mark sought to be registered is not distinctive.

Until recently, to obtain registration of a trademark in multiple countries, an applicant was required to make separate

applications in different languages and countries and disburse different fees in the respective countries. However, the Madrid Protocol enables nationals of member countries, including India, to secure protection of trademarks by filing a single application with one fee and in one language in their country of origin.

In lieu of the above, the Trademarks Act was amended by the Trade Marks (Amendment) Act 2010, or (the "**Trademarks Amendment Act**"). The Trademarks Amendment Act empowers the Registrar of Trade Marks to deal with international applications originating from India as well as those received from the International Bureau and to maintain a record of international registrations. This amendment also removes the discretion of the Registrar of Trademarks to extend the time for filing a notice of opposition of published applications and provides for a uniform time limit of four months in all cases. Further, it simplifies the law relating to transfer of ownership of trademarks by assignment or transmission and brings the law generally in line with international practice. Pursuant to the Madrid Protocol and the Trademarks Amendment Act, we have obtained trademarks in Egypt, the European Community, United Arab Emirates, Australia and the United States.

56

In order to match the international standards of trademark protection and enforcement, and to speed up the trademark registration process the Trademark Rules, 2002 were replaced by the Trademark Rules, 2017. Some notable amendments were; reduction in the number of application forms; specific concessions in filing fees to Start Ups, Individuals and Small Enterprises; expedited processing of trademark application; registration of sound marks; etc.

### *Remedies for Infringement in Copyright Act and Trademark Act*

The remedies available in the event of infringement under the Copyright Act and the Trademarks Act include civil proceedings for damages, account of profits, injunction and the delivery of the infringing materials to the owner of the right, as well as criminal remedies including imprisonment of the accused and the imposition of fines and seizure of infringing materials.

### *Competition*

The Indian film Industry's has experienced robust growth over the last few years and the same is changing the competitive landscape. By opening up and relaxing the entry barriers for foreign investments in certain key areas of this industry, including the relaxation norms for the broadcasting sector (DTH, cable networks, internet & OTT Platforms etc.), the Government of India has provided the sector much needed impetus for growth. Several segments of the industry (such as broadcasting, films, sports and gaming) have especially undergone unprecedented advancements on multiple dimensions. The use of the latest technology in all phases of production, digitization and globalization of content, the availability of multiple revenue streams, financial transparency and corporatization have contributed towards the paradigm shift that the Media & Entertainment industry in India has witnessed over the last decade or so.

We believe we were one of the first companies in India to create an integrated business of sourcing new Indian film content through co-productions and acquisitions while building a valuable library of rights in existing content and also distributing Indian film content globally across formats.

Some of our direct competitors, such as Disney, 20th Century Fox Pictures and Viacom Studio 18, have moved towards similar models in addition to their other business lines within the Indian entertainment industry. We also face competition from the direct or indirect presence in India of significant global media companies, including the major Hollywood studios. Disney has acquired 100% of UTV and Viacom Inc. has ownership interests in Viacom Studio 18, while other Hollywood studios, such as News Corporation and Sony, have established local operations in India for film distribution, and have released a limited number of Indian films. Our primary competitors for Indian film content in the markets outside of India are UTV, Fox, Viacom and Yash Raj Films. We believe our experience and understanding of the Indian film market positions us well to compete with new and existing entrants to the Indian media and entertainment sector. Based on gross collections reported by comScore, our market share as an average over the preceding seven calendar years to 2018 is 24% of all theatrically released Indian language films in the United Kingdom and the U.S. Competition within the industry is based on relationships, distribution capabilities, reputation for quality and brand recognition.

### *Litigation*

From time to time, we and our subsidiaries are involved in various lawsuits and legal proceedings that arise in the ordinary course of business. The following discussion summarizes examples of such matters. Although the results of litigation and claims cannot be predicted with certainty, we currently believe that the final outcome of these matters will not have a material adverse effect on our business. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

Beginning on November 13, 2015, the Company was named a defendant in five substantially similar putative class action

lawsuits filed in federal court in New Jersey and New York by purported shareholders of the Company. On May 17, 2016, the putative class actions filed in New Jersey were transferred to the United States District Court for the Southern District of New York where they were subsequently consolidated with the other two actions. The Court-appointed lead plaintiffs filed a single consolidated complaint on July 14, 2016 and amended on October 10, 2016. The amended consolidated complaint alleged that the Company and certain individual defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, but did not assert certain claims that had been asserted in prior complaints. The remaining claims were primarily focused on whether the Company and individual defendants made material misrepresentations concerning the Company's film library and materially misstated the usage and functionality of Eros Now, our digital OTT entertainment service. On September 25, 2017, the United States District Court for the Southern District of New York entered a Memorandum & Order dismissing the putative class action with prejudice. On October 23, 2017, lead plaintiffs filed a Notice of Appeal. On August 24, 2018, the United States Court of Appeals for the Second Circuit issued a summary order affirming the district court's earlier dismissal, with prejudice.

On September 29, 2017, the Company filed a lawsuit against Mangrove Partners, Manuel P. Asensio, GeoInvesting, LLC, and other individuals and entities alleging the defendants and other co-conspirators disseminated material false, misleading, and defamatory information about the Company and are engaging in other misconduct that has harmed the Company. On May 31, 2018, the Company filed an amended complaint that added two new defendants and expanded the scope of the Company's initial allegations. The amended complaint alleges that Mangrove Partners and many of its co-conspirators held substantial short positions in the Company's stock and profited when its share price declined in response to their multi-year disinformation campaign. The Company seeks damages and injunctive relief for defamation, civil conspiracy, and tortious interference, including but not limited to interference with its customers, producers, distributors, investors, and lenders. On March 12, 2019, the Supreme Court of the State of New York entered a Decision and Order granting defendants' motions to dismiss. On March 13, 2019, the Company filed a Notice of Appeal. The matter is ongoing.

Beginning on June 21, 2019, the Company was named a defendant in two substantially similar putative class action lawsuits filed in federal court in New Jersey by purported shareholders of the Company. The lawsuits allege that the Company and certain individual defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by making false and/or misleading statements regarding the Company's accounting for trade receivables. On September 27, 2019, the putative class action filed in California was transferred to the United States District Court for the District of New Jersey. On April 14, 2020, the three putative class actions were consolidated, and a lead plaintiff was appointed. On July 1, 2020, the court-appointed lead plaintiff filed a consolidated complaint. The consolidated complaint expands the scope of the allegations. The Company expects to file a motion to dismiss, which is due August 28, 2020.

Eros India and its subsidiaries are involved in ordinary course government tax audits and assessments, which typically include assessment orders for previous tax years including on account of disallowance of certain claimed deductions.

Eros India and its subsidiaries received show causes notices and assessment order from Service Tax Authorities in India levying amounts to be paid on account of several grounds of non-compliance with the Service Tax Laws. An amount aggregating to $56 million (net of monies paid under protest $1.8 including interest and penalty) for the periods under dispute on account of service tax arising on temporary transfer of copyright services and certain other related matters have been considered contingent. Eros has filed an appeal against the said order before the authorities. Considering the facts and nature of levies and the ad-interim protection for service tax levy for a certain period granted by the Honorable High Court of Mumbai, the Group expects that the final outcome of this matter will be favorable. There is no further update on these matters as preliminary hearing is yet to begin. Accordingly, based on the assessment made after taking appropriate legal advice, no additional liability has been recorded in Group's consolidated financial statements.

Eros India and its subsidiaries received several assessment orders and demand notices from value added tax and sales tax authorities in India. Several revised orders have been received during the year. Eros has considered an amount equal to $3 million (net of monies paid under protest $0.1 million and including interest and penalty) for the periods under dispute as contingent. Eros has appealed against each of the orders outstanding, and such appeals are pending before relevant tax authorities. Though, uncertainties are inherent in the final outcome of these matters, the Group believes, based on assessment made after taking legal advice, that the final outcome of the matters will be favorable. Accordingly, no additional liability has been recorded in Group's consolidated financial statements.

Eros India and its subsidiaries received several assessment orders and demand notices from Income Tax Authorities in India. The orders are on account of disallowance of certain expenditures claimed by the Company. Eros has considered an amount equal to $0.1 million for the period under dispute as contingent. Eros has contested the said cases and believes that there will not be any significant liability on the group as the misstatements were bonafide and without any wrongful intentions and do not invite penalty. However, uncertainties are inherent in the final outcome of these matters and hence, after taking appropriate legal advice, group has considered the amount as contingent liability.

Eros India is also named in various lawsuits challenging its ownership of some of its intellectual property or its ability to distribute these films in India. A number of these lawsuits seek injunctive relief restraining Eros from releasing or otherwise exploiting various films, including Bhoot Returns, Goliyon Ki Rasleela-Ram-Leela, Munna Michael, Heer Ranjha (Ishak Di Misal), Sarkar 3, Bajrangi Bhaijaan, Welcome Back, and Housefull 2.

In India, private citizens are permitted to initiate criminal complaints against companies and other individuals by filing complaints or initiating proceedings with the police. Eros and certain executives have been named in certain criminal complaints from time to time.

If, as a result of such complaints, criminal proceedings are initiated by the relevant authorities in India and the Company or any of its executives are found guilty in such criminal proceedings, our executives could be subject to imprisonment as well as monetary penalties. We believe the claims brought to date are without merit and we intend to defend them vigorously.

For instance, in relation to the film *Goliyon Ki Rasleela-Ram-Leela*, certain civil proceedings had been initiated in various local courts in India in and around November 2013, alleging that this film disrespected religious sensibilities and seeking to restrain its release or seeking directions for a review of its film certification. We have contested such claims in the local courts as well as by way of petitions filed by us before the Supreme Court of India. While hearings continue in some of these proceedings are pending, we have obtained stay orders in our favor from the Supreme Court of India as well as certain of the local courts where such proceedings are being heard. This film was released in November 2013.

58

**Government Regulations**

The following description is a summary of various sector-specific laws and regulations applicable to Eros.

*Material Isle of Man Regulations*

*Companies Regime.* The Isle of Man is an internally self-governing dependent territory of the British Crown. It is politically and constitutionally separate from the United Kingdom and has its own legal system and jurisprudence based on English common law principles.

Isle of Man company law is largely based on that of England and Wales. There are two separate codes of company law, embodied in the Companies Acts of 1931-2004 (commonly referred to as the 1931 Act as the principal Act is the Companies Act 1931) and the Companies Act 2006 (commonly referred to as the 2006 Act), respectively. Our Company was incorporated on March 31, 2006 under the 1931 Act. Effective September 29, 2011, it re-registered as a company incorporated under the 2006 Act.

The 2006 Act updates and modernizes Isle of Man company law by introducing a new simplified corporate vehicle into Isle of Man law. The new corporate vehicle follows the international business company model available in a number of other jurisdictions. Companies incorporated or re-registered under the 2006 Act are governed solely by its provisions and, except in relation to liquidation and receivership, are not subject to the provisions of the 1931 Act. The following are some of the key characteristics of companies incorporated under the 2006 Act:

*Share Capital.* Under the 2006 Act, there is no longer the concept of authorized capital. Therefore, shares may be issued with or without par value.

*Dividends, Redemptions and Buy-Backs.* Subject to compliance with the memorandum and articles of association, the 2006 Act allows a company to declare and pay dividends, and to purchase, redeem or otherwise acquire its own shares subject only to meeting a solvency test set out in the 2006 Act. A company satisfies the solvency test if: (i) it is able to pay its debts as they become due in the normal course of business: and (ii) the value of the company's assets exceeds the value of its liabilities.

*Capacity and Powers.* Companies incorporated under the 2006 Act have separate legal personality and perpetual existence. In addition, such companies have unlimited capacity to carry on or undertake any business or activity; this is so regardless of corporate benefit and regardless of whether or not it is in the best interests of the company to do so.

The 2006 Act specifically states that no corporate act is beyond the capacity of a company incorporated under the 2006 Act by reason only of the fact that the relevant company has purported to restrict its capacity in any way in its memorandum or articles or otherwise. A person who deals in good faith with a company incorporated under the 2006 Act is entitled to assume that the directors of the company are acting without limitation.

*Miscellaneous.* In addition to the foregoing, the following other points should be noted in relation to companies incorporated under the 2006 Act:

·    there are no prohibitions in relation to the company providing financial assistance for the purchase of its own shares (save in relation to a public company);

·    there is no differentiation between public and private companies, but a company may adopt a name ending in the words "Public Limited Company" or "public limited company" or the abbreviation "PLC" or "plc";

·    there are simple share offering/annual report requirements;

·   there are reduced compulsory registry filings;

·   the statutory accounting requirements are simplified; and

·   the 2006 Act allows a company to indemnify and purchase indemnity insurance for its directors. Shareholders should note that the above list is not exhaustive.

59

*Exchange Controls*

No foreign exchange control regulations are in existence in the Isle of Man in relation to the exchange or remittance of sterling or any other currency from the Isle of Man and no authorizations, approvals or consents will be required from any authority in the Isle of Man in relation to the exchange and remittance of sterling and any other currency whether awarded by reason of a judgment or otherwise falling due and having been paid in the Isle of Man.

*Material Indian Regulations*

We are subject to other Indian and International regulations which may impact our business. In particular, the following regulations have a significant impact on our business.

*Notification of Industry Status.*

Prior to 1998, the lack of industry status barred legitimate financial institutions and private investors from financing films. However, on May 10, 1998, the Indian film industry was conferred industry status by a press release issued by the Minister of Information and Broadcasting (MIB).

**Foreign direct investment (FDI) in indian media and entertainment industry**

Through the liberalization of the foreign exchange regulations, the Government of India has allowed 100 percent FDI in the film sector. For the purposes of FDI, film sector broadly covers film production, exhibition, and distribution, including related services and products. FDI in the sector is permitted without any prior approval from Government of India.

However, according to the recent amendments made by the Government of India in the FDI Policy, any entity situated in or a citizen of any country sharing a land border with India, including but not limited to China, Bangladesh, Pakistan, Bhutan, Nepal, Myanmar and Afghanistan, shall be required to get a prior approval from the Government of India for making any investment(s) in any entity in India ("Government Route"). This has been done to prevent any opportunistic takeover of any domestic firms amid the ongoing COVID-19 pandemic.

*Film Certification.* The Cinematograph Act authorizes the Central Board of Film Certification (CBFC), in accordance with the Cinematograph (Certification) Rules, 1983, or the Certification Rules, for sanctioning films for public exhibition in India. Under the Certification Rules, the producer of a film/person exhibiting the film is required to apply in the specified format for certification of such film, with the prescribed fee. The film is examined by an examining committee, which determines whether the film:

·      is suitable for unrestricted public exhibition i.e. fit for "U" certificate; or

·      is suitable for unrestricted public exhibition, with a caution that the question as to whether any child below the age of 12 years may be allowed to see the film should be considered by the parents or guardian of such child i.e. fit for "UA" certificate; or

·      is suitable for public exhibition restricted to adults i.e. fit for "A" certificate; or

·      is suitable for public exhibition restricted to members of any profession or any class of persons having regard to the nature, content and theme of the film i.e. fit for "S" certificate; or

·      is suitable for grant of "U", "UA" or "A" or "S" certificate, as the case may be, if a specified portion or portions be excised or modified therefrom; or

- that the film is not suitable for unrestricted or restricted public exhibitions, or that the film be refused a certificate.

A film will not be certified for public exhibition if, in the opinion of the CBFC, the film or any part of it is against the interests of the sovereignty, integrity or security of India, friendly relations with foreign states, public order, decency or morality, or involves defamation or contempt of court or is likely to incite the commission of any offence. Any applicant, if aggrieved by any order of the CBFC either refusing to grant a certificate or granting a certificate that restricts exhibition to certain persons only, may appeal to the Film Certification Appellate Tribunal constituted by the Central Government in India under the Cinematograph Act.

A certificate granted or an order refusing to grant a certificate in respect of any film is published in the Official Gazette of India and is valid throughout India for ten years from the date of grant. Films certified for public exhibition may be re-examined by the CBFC if any complaint is received. Pursuant to grant of a certificate, film advertisements must indicate that the film has been certified for such public exhibition.

60

The Central Government in India may issue directions to licensees of cinemas generally or to any licensee in particular for the purpose of regulating the exhibition of films, so that scientific films, films intended for educational purposes, films dealing with news and current events, documentary films or indigenous films secure an adequate opportunity of being exhibited.

The Central Government in India, acting through local authorities, may order suspension of exhibition of a film, if it is of the opinion that any film being publicly exhibited is likely to cause a breach of peace. Failure to comply with the Cinematograph Act may attract imprisonment and/or monetary fines.

Separately, the Cable Television Networks Rules, 1994 require that no film or film song, promotional material, trailer or film music video, album or their promotional materials, whether produced in India or abroad, shall be carried through cable services unless it has been certified by the CBFC as suitable for unrestricted public exhibition in India.

There are several draft bills proposing to replace and/or amend the Cinematograph Act which are awaiting approval.

***Insolvency and Bankruptcy Code, 2016.*** An act to consolidate and amend the laws relating to reorganization and insolvency resolution of corporate persons, partnership firms and individuals in a time bound manner for maximization of value of assets of such persons, to promote entrepreneurship, availability of credit and balance the interests of all the stakeholders including alteration in the order of priority of payment of Government dues and to establish an Insolvency and Bankruptcy Board of India.

***Financing.*** In October 2000, the Ministry of Finance, GOI notified the film industry as an industrial concern in terms of the Industrial Development Bank of India Act, 1964, pursuant to which loans and advances to industrial concerns became available to the film industry. The Reserve Bank of India, or the RBI, by circular dated May 14, 2001, permitted commercial banks to finance up to 50.0% of total production cost of a film. Further, by an RBI circular dated June 8, 2002, bank financing is now available even where total film production cost exceeds approximately $1.6 million. Banks which finance film productions customarily require borrowers to assign the film's intellectual property or music audio/video/CDs/ DVDs/internet, satellite, channel, export/international rights as part of the security for the loan, such that the banks would have a right in negotiation of valuation of such intellectual property rights.

***Labour Laws.*** Depending on the nature of work and number of workers employed at any workplace, various labour related legislations may apply. Certain significant provisions of such labour related laws are provided herewith. The Employees' Provident Fund and Miscellaneous Provisions Act, 1952, or the EPF Act, applies to factories employing 20 or more employees and such other establishments as notified by the Government from time to time. It requires all such establishments to be registered with the relevant Provident Fund Commissioner. Also, such employers are required to contribute to the employees' provident fund the prescribed percentage of the basic wages and certain cash benefits payable to employees. Employees are also required to make equal contributions to the fund. A monthly return is required to be submitted to the relevant Provident Fund Commissioner in addition to the maintenance of registers by employers.

***Competition Act.*** The Competition Act, 2002, or the Competition Act, prohibits practices that could have an appreciable adverse effect on competition in India. Under the Competition Act, any arrangement, understanding or action, whether formal or informal, which causes or is likely to cause an appreciable adverse effect on competition in India is void. Any agreement among competitors which directly or indirectly determines purchase or sale prices, results in bid rigging or collusive bidding, limits or controls production, supply, markets, technical development, investment or the provision of services, or shares the market or source of production or provision of services in any manner, including by way of allocation of geographical area or types of goods or services or number of customers in the market, is presumed to have an appreciable adverse effect on competition. Further, the Competition Act prohibits the abuse of a dominant position by any enterprise either directly or indirectly, including by way of unfair or discriminatory pricing or conditions in the sale of goods or services, using a dominant position in one relevant market to enter into, or protect, another relevant market, and denial of market access. Further, acquisitions, mergers and amalgamations which exceed certain revenue and asset thresholds require prior approval by the Competition Commission of India.

Under the Competition Act, the Competition Commission has powers to pass directions/impose penalties in cases of anti-competitive agreements, abuse of dominant position and combinations which are not in compliance with the Competition Act. If there is a continuing non-compliance the person may be punishable with imprisonment for a term extending up to three years or with a fine or with both as the Chief Metropolitan Magistrate, Delhi may deem fit. In case of offences committed by companies, the persons responsible to the company for the conduct of the business of the company will be liable under the Competition Act, except when the offense was committed without their knowledge or when they had exercised due diligence to prevent it. Where the contravention committed by the company took place with the consent or connivance of, or is attributable to any neglect on the part of, any director, manager, secretary or other officer of the company, such person is liable to be punished.

61

The Competition Act also provides that the Competition Commission has the jurisdiction to inquire into and pass orders in relation to an anti-competitive agreement, abuse of dominant position or a combination, which even though entered into, arising or taking place outside India or signed between one or more non-Indian parties, but causes or is likely to cause an appreciable adverse effect in the relevant market in India. The Competition Act was amended in 2009, and cases which were pending before the Monopolies and Restrictive Trade Practice Commission were transferred to the Competition Commission of India.

*Indian Takeover Regulations.* The SEBI (Substantial Acquisition of Shares and Takeover) Regulations, 2011 came into effect on October 22, 2011, which was last amended on August 14, 2017, superseding the earlier takeover regulations. The Takeover Regulations provide the process, timing and disclosure requirements for a public announcement of an open offer in India and the applicable pricing norms.

Pursuant to the Takeover Regulations, a requirement to make a mandatory open offer by an "acquirer" (together with persons acting in concert with it) for at least 26% of the total shares of the Indian listed company, to all shareholders of such company (excluding the acquirer, persons acting in concert with it and the parties to any underlying agreement including persons deemed to be acting in concert) is triggered, subject to certain exemptions including transfers between promoters, if an acquirer acquires shares or voting rights in the Indian listed company, which together with its existing holdings and those of any persons acting in concert with him entitle the acquirer and persons acting in concert to exercise 25% or more of the voting rights in the Indian listed company; or an acquirer that holds between 25% and the maximum permissible non-public shareholding of an Indian listed company, acquires additional voting rights of more than 5% during a financial year; or an acquirer acquires, directly or indirectly, control over an Indian listed company, irrespective of acquisition of shares or voting rights in the Indian listed company.

An acquisition of shares or voting rights in, or control over, any company that would enable a person to exercise or direct the exercise of such percentage of voting rights in, or control over, an Indian listed company, the acquisition of which would otherwise attract the obligation to make an open offer under the Takeover Regulations will also trigger a mandatory open offer under the Takeover Regulations. Where the primary target of the acquisition is an overseas parent of an Indian listed company and the Indian listed company represents over 80% of a specified materiality parameter (including asset value, revenue or market capitalization) of the overseas parent company, such acquisition would be treated as a "direct acquisition" of the Indian listed company.

*Indian Companies Act.* A majority of the provisions of the Companies Act, 2013 read with Companies (Amendment) Act 2017, bringing into effect significant changes to the Indian company law framework, such as in the provisions related to issue of capital, disclosures, corporate governance norms, audit matters, and related party transactions. The Companies Act, 2013 has also introduced additional requirements which do not have equivalents under the Companies Act, 1956, including the introduction of a provision allowing the initiation of class action suits in India against companies by shareholders or depositors, a restriction on investment by an Indian company through more than two layers of subsidiary investment companies (subject to certain permitted exceptions), and prohibitions on advances to directors. Indian companies with net worth, turnover or net profits of INR 5,000 million or higher during any financial year are also required to spend 2% of their average net profits during the three immediately preceding financial years on activities pertaining to corporate social responsibility. Further, the Companies Act, 2013 imposes greater monetary and other liability on Indian companies, their directors and officers in default, for any non-compliance.

62

**Differences in Corporate Law**

The following chart summarizes certain material differences between the rights of holders of our A ordinary shares and the rights of holders of the common stock of a typical corporation incorporated under the laws of the State of Delaware that result from differences in governing documents and the laws of Isle of Man and Delaware.

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **General Meetings** | The 2006 Act does not require a company to hold an annual general meeting of its shareholders. Subject to anything contrary in the company's memorandum and articles of association, a meeting of shareholders can be held at such time and in such place, within or outside the Isle of Man, as the convener of the meeting considers appropriate. Under the 2006 Act, the directors of a company (or any other person permitted by the company's memorandum and articles of association) may convene a meeting of the shareholders of a company. Further, the directors of a company must call a meeting to consider a resolution requested in writing by shareholders holding at least 10% of the company's voting rights. The Isle of Man Court may order a meeting of members to be held and to be conducted in such manner as the Court orders, among other things, if it is of the opinion that it is in the interests of the shareholders of the company that a meeting of shareholders is held.<br><br>Our articles require our Board of Directors to convene annually a general meeting of the shareholders at such time and place, and to consider such business, as the Board of Directors may determine. | Shareholders of a Delaware corporation generally do not have the right to call meetings of shareholders unless that right is granted in the certificate of incorporation or bylaws. However, if a corporation fails to hold its annual meeting within a period of 30 days after the date designated for the annual meeting, or if no date has been designated for a period of 13 months after its last annual meeting, the Delaware Court of Chancery may order a meeting to be held upon the application of a shareholder. |
| **Quorum Requirements for General Meetings** | The 2006 Act provides that a quorum at a general meeting of shareholders may be fixed by the articles. Our articles provide a quorum required for any general meeting consists of shareholders holding at least 30% of the issued share capital of the Company. | A Delaware corporation's certificate of incorporation or bylaws can specify the number of shares that constitute the quorum required to conduct business at a meeting, provided that in no event will a quorum consist of less than one-third of the shares entitled to vote at a meeting. |
| **Board of Directors** | Our articles provide that unless and until otherwise determined by our Board of Directors, the number of directors will not be less than three or more than twelve, with the exact number to be set from time to time by the Board of Directors. While there is no concept of dividing a board of directors into classes under Isle of Man law, there is nothing to prohibit a company from doing so. Consequently, under our articles, our Board of Directors is divided into three classes, each as nearly equal in number as possible and at each annual general meeting, each | A typical certificate of incorporation and bylaws would provide that the number of directors on the board of directors will be fixed from time to time by a vote of the majority of the authorized directors. Under Delaware law, a board of directors can be divided into up to three classes. |

of the directors of the relevant class the term of which shall then expire shall be eligible for re-election to the Board of Directors for a period of three years.

63

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **Removal of Directors** | Under Isle of Man law, notwithstanding anything in the memorandum or articles or in any agreement between a company and its directors, a director may be removed from office by way of shareholder resolution. Such resolution may only be passed (a) at a meeting of the shareholders called for such purposes including the removal of the director or (b) by a written resolution consented to by a shareholder or shareholders holding at least 75% of the voting rights.<br><br>The 2006 Act provides that a director may be removed from office by a resolution of the directors if the directors are expressly given such authority in the memorandum or articles, but our articles do not provide this authority. | A typical certificate of incorporation and bylaws provide that, subject to the rights of holders of any preferred stock, directors may be removed at any time by the affirmative vote of the holders of at least a majority, or in some instances a supermajority, of the voting power of all of the then outstanding shares entitled to vote generally in the election of directors, voting together as a single class. A certificate of incorporation could also provide that such a right is only exercisable when a director is being removed for cause (removal of a director only for cause is the default rule in the case of a classified board). |
| **Vacancy of Directors** | Subject to any contrary provisions in a company's memorandum or articles of association, a person may be appointed as a director (either to fill a vacancy or as an additional director) by a resolution of the directors or by a resolution of the shareholders.<br><br>Our articles provide that any vacancy resulting from, among other things, removal, resignation, conviction and disqualification, may be filled by another person willing to act as a director by way of shareholder resolution or resolution of our Board of Directors. Any director appointed by the Board of Directors will hold office only until the next annual general meeting of the Company, when he will be subject to retirement or re-election. | A typical certificate of incorporation and bylaws provide that, subject to the rights of the holders of any preferred stock, any vacancy, whether arising through death, resignation, retirement, disqualification, removal, an increase in the number of directors or any other reason, may be filled by a majority vote of the remaining directors, even if such directors remaining in office constitute less than a quorum, or by the sole remaining director. Any newly elected director usually holds office for the remainder of the full term expiring at the annual meeting of shareholders at which the term of the class of directors to which the newly elected director has been elected expires. |
| **Interested Director Transactions** | Under Isle of Man law, as soon as a director becomes aware of the fact that he is interested in a transaction entered into or to be entered into by the company, he must disclose this interest to the board of directors. Our articles provide that no director may participate in approval of a transaction in which he or she is interested. | Under Delaware law, some contracts or transactions in which one or more of a Delaware corporation's directors has an interest are not void or voidable because of such interest provided that some conditions, such as obtaining the required approval and fulfilling the requirements of good faith and full disclosure, are met. For an interested director transaction not to be voided, either the shareholders or the board of directors must approve in good faith any such contract or transaction after full disclosure of the material facts or the contract or transaction must have been "fair" as to the corporation at the time it was approved. If board or committee approval is sought, the |

contract or transaction must be approved in good faith by a majority of disinterested directors after full disclosure of material facts, even though less than a majority of a quorum.

64

| | Isle of Man Law | Delaware Law |
| --- | --- | --- |
| **Cumulative Voting** | There is no concept of cumulative voting under Isle of Man law. | Delaware law does not require that a Delaware corporation provide for cumulative voting. However, the certificate of incorporation of a Delaware corporation may provide that shareholders of any class or classes or of any series may vote cumulatively either at all elections or at elections under specified circumstances. |
| **Shareholder Action Without a Meeting** | A written resolution will be passed if it is consented to in writing by shareholders holding in excess of 50% or 75% in the case of a special resolution of the rights to vote on such resolution. The consent may be in the form of counterparts, and our articles provide that, in such circumstances, the resolution takes effect on the earliest date upon which shareholders holding a sufficient number of votes to constitute a resolution of shareholders have consented to the resolution in writing. Any holder of B ordinary shares consenting to a resolution in writing is first required to certify that it is a permitted holder as defined in our articles. If any written resolution of the shareholders of the company is adopted otherwise than by unanimous written consent, a copy of such resolution must be sent to all shareholders not consenting to such resolution upon it taking effect. | Unless otherwise specified in a Delaware corporation's certificate of incorporation, any action required or permitted to be taken by shareholders at an annual or special meeting may be taken by shareholders without a meeting, without notice and without a vote, if consents, in writing, setting forth the action, are signed by shareholders with not less than the minimum number of votes that would be necessary to authorize the action at a meeting at which all shares entitled to vote were present and voted. All consents must be dated. No consent is effective unless, within 60 days of the earliest dated consent delivered to the corporation, written consents signed by a sufficient number of holders to take the action are delivered to the corporation. |
| **Business Combinations** | Under Isle of Man law, a merger or consolidation must be approved by, among other things, the directors of the company and by shareholders holding at least 75% of the voting rights. A scheme of arrangement (which includes, among other things, a sale or transfer of the assets of the company) must be approved by, among other things, the directors of the company, a 75% shareholder majority and also requires the sanction of the court. | With certain exceptions, a merger, consolidation or sale of all or substantially all the assets of a Delaware corporation must be approved by the board of directors and a majority (unless the certificate of incorporation requires a higher percentage) of the outstanding shares entitled to vote thereon. |
| **Interested Shareholders** | There are no equivalent provisions under Isle of Man law relating to interested shareholders. | Section 203 of the Delaware General Corporation Law generally prohibits a Delaware corporation from engaging in specified corporate transactions (such as mergers, stock and asset sales and loans) with an "interested shareholder" for three years following the time that the shareholder becomes an interested shareholder. Subject to specified exceptions, an "interested shareholder" is a person or group that owns 15% or more of the corporation's outstanding voting stock (including any |

rights to acquire stock pursuant to an option, warrant, agreement, arrangement or understanding, or upon the exercise of conversion or exchange rights, and stock with respect to which the person has voting rights only), or is an affiliate or associate of the corporation and was the owner of 15% or more of the voting stock at any time within the previous three years.

65

| | Isle of Man Law | Delaware Law |
|---|---|---|
| | | A Delaware corporation may elect to "opt out" of, and not be governed by, Section 203 through a provision in either its original certificate of incorporation or its bylaws, or an amendment to its original certificate or bylaws that was approved by majority shareholder vote. With a limited exception, this amendment would not become effective until 12 months following its adoption. |
| **Limitations on Personal Liability of Directors** | Under Isle of Man law, a director who vacates office remains liable under any provisions of the 2006 Act that impose liabilities on a director in respect of any acts or omissions or decisions made while that person was a director. | A Delaware corporation may include in its certificate of incorporation provisions limiting the personal liability of its directors to the corporation or its shareholders for monetary damages for many types of breach of fiduciary duty. However, these provisions may not limit liability for any breach of the duty of loyalty, acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, the authorization of unlawful dividends, shares repurchases or shares barring redemptions, or any transaction from which a director derived an improper personal benefit. A typical certificate of incorporation would also provide that if Delaware law is amended so as to allow further elimination of, or limitations on, director liability, then the liability of directors will be eliminated or limited to the fullest extent permitted by Delaware law as so amended. However, these provisions would not be likely to bar claims arising under U.S. federal securities laws. |
| **Indemnification of Directors and Officers** | A company may indemnify against all expenses, any person who is or was a party, or is threatened to be made a party to any civil, criminal, administrative or investigative proceedings (threatened, pending or completed), by reason of the fact that the person is or was a director of the company, or who is or was, at the request of the company, serving as a director or acting for another company.<br><br>Any indemnity given will be void and of no effect unless such person acted honestly and in good faith and in what such person believed to be in the best interests of the company and, in the case of criminal proceedings, had no reasonable cause to believe that the conduct of such person was | Under Delaware law, subject to specified limitations in the case of derivative suits brought by a corporation's shareholders in its name, a corporation may indemnify any person who is made a party to any third party action, suit or proceeding on account of being a director, officer, employee or agent of the corporation (or was serving at the request of the corporation in such capacity for another corporation, partnership, joint venture, trust or other enterprise) against expenses, including attorney's fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in |

unlawful.

connection with the action, suit or proceeding through, among other things, a majority vote of directors who were not parties to the suit or proceeding (even though less than a quorum), if the person:

66

| Isle of Man Law | Delaware Law |
|---|---|
| | · acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation or, in some circumstances, at least not opposed to its best interests; and<br><br>· in a criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful.<br><br>Delaware law permits indemnification by a corporation under similar circumstances for expenses (including attorneys' fees) actually and reasonably incurred by such persons in connection with the defense or settlement of a derivative action or suit, except that no indemnification may be made in respect of any claim, issue or matter as to which the person is adjudged to be liable to the corporation unless the Delaware Court of Chancery or the court in which the action or suit was brought determines upon application that the person is fairly and reasonably entitled to indemnity for the expenses which the court deems to be proper.<br><br>To the extent a director, officer, employee or agent is successful in the defense of such an action, suit or proceeding, the corporation is required by Delaware law to indemnify such person for reasonable expenses incurred thereby. Expenses (including attorneys' fees) incurred by such persons in defending any action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of that person to repay the amount if it is ultimately determined that that person is not entitled to be so indemnified. |
| **Appraisal Rights** | There is no concept of appraisal rights under Isle of Man law. | A shareholder of a Delaware corporation participating in certain major corporate transactions may, under certain circumstances, be entitled to appraisal rights pursuant to which the shareholder may receive cash in the amount of the fair value of the shares held by that shareholder (as determined by a court) in lieu of the consideration the shareholder would |

otherwise receive in the transaction.

67

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **Shareholder Suits** | The Isle of Man Court may, on application of a shareholder, permit that shareholder to bring proceedings in the name and on behalf of the company (including intervening in proceedings to which the company is a party). In determining whether or not leave is to be granted, the Isle of Man Court will take into account such things as whether the shareholder is acting in good faith and whether the Isle of Man Court itself is satisfied that it is in the interests of the company that the conduct of the proceedings should not be left to the directors or to the determination of the shareholders as a whole. Under Isle of Man law, a shareholder may bring an action against the company for a breach of a duty owed by the company to such shareholder in that capacity. | Under Delaware law, a shareholder may bring a derivative action on behalf of the corporation to enforce the rights of the corporation, including for, among other things, breach of fiduciary duty, corporate waste and actions not taken in accordance with applicable law. An individual also may commence a class action suit on behalf of himself or herself and other similarly situated shareholders where the requirements for maintaining a class action under Delaware law have been met. A person may institute and maintain such a suit only if such person was a shareholder at the time of the transaction which is the subject of the suit or his or her shares thereafter devolved upon him or her by operation of law. Additionally, under established Delaware case law, the plaintiff generally must be a shareholder not only at the time of the transaction which is the subject of the suit, but also through the duration of the derivative suit. Delaware law also requires that the derivative plaintiff make a demand on the directors of the corporation to assert the corporate claim before the suit may be prosecuted by the derivative plaintiff, unless such demand would be futile. In such derivative and class actions, the court has discretion to permit the winning party to recover attorneys' fees incurred in connection with such action. |
| **Inspection of Books and Records** | Upon giving written notice, a shareholder is entitled to inspect and to make copies of (or obtain extracts of) the memorandum and articles and any of the registers of shareholders, directors and charges. A shareholder may only inspect the accounting records (and make copies or take extracts thereof) in certain circumstances. Our articles provide that no shareholder has any right to inspect any accounting record or other document of the company unless he is authorized to do so by statute, by order of the Isle of Man Court, by our Board of Directors or by shareholder resolution. | All shareholders of a Delaware corporation have the right, upon written demand, to inspect or obtain copies of the corporation's shares ledger and its other books and records for any purpose reasonably related to such person's interest as a shareholder. |

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **Amendment of Governing Documents** | Under Isle of Man law, the shareholders of a company may, by resolution, amend the memorandum and articles of the company. The memorandum and articles of a company may authorize the directors to amend the memorandum and articles, but our memorandum and articles do not contain any such power. Our memorandum of association provides that our memorandum of association and articles of association may be amended by a special resolution of shareholders. | Under Delaware law, amendments to a corporation's certificate of incorporation require the approval of shareholders holding a majority of the outstanding shares entitled to vote on the amendment. If a class vote on the amendment is required by Delaware law, a majority of the outstanding stock of the class is required, unless a greater proportion is specified in the certificate of incorporation or by other provisions of Delaware law. Under Delaware law, the board of directors may amend bylaws if so authorized in the certificate of incorporation. The shareholders of a Delaware corporation also have the power to amend bylaws. |
| **Dividends and Repurchases** | The 2006 Act contains a statutory solvency test. A company satisfies the solvency test if it is able to pay its debts as they become due in the normal course of its business and where the value of the company's assets exceeds the value of its liabilities.<br><br>Subject to the satisfaction of the solvency test and any contrary provision contained in a company's articles, a company may, by a resolution of the directors, declare and pay dividends. Our articles provide that where the solvency test has been satisfied, our Board of Directors may declare and pay dividends (including interim dividends) out of our profits to shareholders according to their respective rights and interests in the profits of the company.<br><br>Under Isle of Man law, a company may purchase, redeem or otherwise acquire its own shares for any consideration, subject to, among other things, satisfaction of the solvency test. | Delaware law permits a corporation to declare and pay dividends out of statutory surplus or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and/or for the preceding fiscal year as long as the amount of capital of the corporation following the declaration and payment of the dividend is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets.<br><br>Under Delaware law, any corporation may purchase or redeem its own shares, except that generally it may not purchase or redeem those shares if the capital of the corporation is impaired at the time or would become impaired as a result of the redemption. A corporation may, however, purchase or redeem capital shares that are entitled upon any distribution of its assets to a preference over another class or series of its shares if the shares are to be retired and the capital reduced. |

**Changes in Capital**

The conditions in our articles of association governing changes in capital are not more stringent than as required under the 2006 Act. Our articles of association provide that our directors may, by resolution, alter our share capital. The 2006 Act subjects any reduction of share capital to the statutory solvency test. The 2006 Act provides that a company satisfies the solvency test if it is able to pay its debts as they become due in the normal course of the company's business and where the value of the company's assets exceeds the value of its liabilities.

**C. Organizational Structure**

We conduct our global operations through our Indian and international subsidiaries, including our majority-owned

subsidiary Eros International Media Limited, or Eros India, a public company incorporated in India and listed on the BSE Limited and National Stock Exchange of India Limited, or the Indian Stock Exchanges. Our agent for service of process in the United States is Prem Parameswaran, located at 550 County Avenue, Secaucus, New Jersey.

As of July 27, 2020, the Founders Group holds approximately 13.4% of our issued share capital, which comprise all of our B ordinary shares and certain A ordinary shares. Beech Investments Limited, a company incorporated in the Isle of Man, is owned by discretionary trusts that include Eros director Kishore Lulla as a potential beneficiary.

69

The following diagram summarizes the corporate structure of our consolidated group of companies as of July 27, 2020:

**Eros Organizational Chart (as of July 27, 2020)**



(a)    Eros India holds 100% of each of its Indian subsidiaries other than Big Screen Entertainment Private Limited (India) and Colour Yellow Productions Private Limited (India), and Eros International Distribution LLP.

70

**D. Property and Equipment**

Our properties consist primarily of studios, office facilities, warehouses and distribution offices, most of which are located in Mumbai, India. We own our corporate and registered offices in Mumbai and rent our remaining properties in India. Four of these leased properties are owned by members of the Lulla family. The leases with the Lulla family were entered into at what we believe were market rates. See "Part I. — Item 7. Major Shareholders and Related Party Transactions" and "Part I — Item 3. Key Information — D. Risk Factors. We have entered into certain related party transactions and may continue to rely on our founders for certain key development and support activities." We also own or lease five properties in the United Kingdom, the United States and Dubai in connection with our international operations outside of India. Property and equipment with a net carrying amount of approximately $8.2 million (2019: $6.7 million) have been pledged to secure borrowings, and we currently do not have any significant plans to construct new properties or expand or improve our existing properties.

The following table provides detail regarding our properties in India and globally.

| Location | Size | Primary Use | Leased / Owned |
|---|---|---|---|
| Mumbai, India | 13,992 sq. ft. | Corporate Office | Owned |
| Mumbai, India | 2,750 sq. ft. | Studio Premises | Leased(1) |
| Mumbai, India | 8,094 sq. ft. | Executive Accommodation | Leased(1) |
| Mumbai, India | 17,120 sq. ft. | Office | Leased(1) |
| Mumbai, India | 1,000 sq. ft. | Film Negatives Warehouse | Leased |
| Mumbai, India | 100 sq. ft. | Film Prints Warehouse | Leased |
| Mumbai, India | 2,750 sq. ft. | Corporate | Owned |
| Mumbai, India | 900 sq. ft. | Film Prints Warehouse | Leased |
| Mumbai, India | 1200 sq. ft. | Film Prints Warehouse | Leased |
| Delhi, India | 600 sq. ft. | Film Distribution Office | Leased |
| Punjab, India | 438 sq. ft. | Film Distribution Office | Leased |
| Bihar, India | 633 sq. ft | Film Distribution Office | Leased |
| Chennai, India | 841 sq. ft. | Branch Office | Leased |
| Mumbai, India | 4,610 sq. ft. | Executive Accommodation | Leased(1) |
| Delhi, India | 994 sq. ft. | Branch Office | Leased |
| Dubai, United Arab Emirates | 2,473 sq. ft. | Corporate Office | Leased |
| Dubai, United Arab Emirates | 2,473 sq. ft | Corporate Office | Leased |
| London, England | 7,549 sq. ft. | DVD Warehouse | Owned |
| Secaucus, New Jersey, U.S. | 900 sq. ft. | Corporate Office | Leased |
| San Francisco, California, U.S. | 2,315 sq. ft. | Digital Team | Leased |

(1) Leased directly or indirectly from a member of the Lulla family.

**ITEM 4A. UNRESOLVED STAFF COMMENTS**

Not applicable.

**ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

**A. Operating Results**

You should read the information contained in the table below in conjunction with our audited consolidated financial statements and the related notes included elsewhere in this annual report. The tables set forth below with our results of operations and period over period comparisons are not adjusted for the fluctuations in exchange rates described in "Part I — Item 3. Key Information — A. Selected Financial Data."

71

**OUTLOOK**

Our primary revenue streams are derived from three channels: theatrical, television syndication and digital and ancillary. For the fiscal year 2020, the aggregate revenues from theatrical, television syndication and digital and ancillary were $10.6 million, $7.1 million and $137.8 million, respectively. For the fiscal year 2019, the aggregate revenues from theatrical, television syndication and digital and ancillary were $69.5 million, $77.5 million and $123.1 million, respectively. The contribution from these three distribution channels can fluctuate year over year and period over period based on, among other things, our mix of films and budget levels, the size of our television syndication deals, the growth of the user base of our Eros Now OTT platform and other factors:

· **Theatrical**: Theatrical revenue largely includes revenues from multiplex cinema chains, single screen theaters and distributors situated in India. We anticipate that, as additional multiplex theaters are built in India, there will be increased opportunities to exploit our film content theatrically. Growth in multiplex cinema screens in India combined with an increase in average ticket prices will be the key drivers for future revenue growth. In addition, in India, we cannot predict the share of theatrical revenue we will receive, as we currently negotiate film-by-film and exhibitor-by-exhibitor. With a focus on creating intellectual property in-house along with delivering wholesome entertainment to audiences, we have entered into key co-production partnerships with writers, producers and directors. This co-production model gives us better visibility on actual cost of production ensuring capped budgets and exclusive long-term distribution rights.

  We also believe China to be a significant market opportunity and currently growing our presence in China through theatrical and distribution of our films. According to the PwC Global Entertainment & Media Outlook 2019 China was the world's second largest box-office market with revenue of $11.0 billion in 2019. In March 2018, we released *Bajrangi Bhaijan* across more than 8,000 screens, including in China, and collected over $45 million at the box office in China since its release, which we believe indicates a clear interest in Indian films by Chinese movie goers. We have also entered into film co-production arrangements with several well-established Chinese film companies and we also released Andhadhun in China in April 2019 which collected over $43 million in the Chinese box office in less than four weeks.

  In addition to our global expansion, we expect to increase the number of Tamil and Telugu global releases in our film mix, which will allow us to expand our audience within significant regional markets in India. As we expand into other regional languages such as Marathi, Bengali, Punjabi and Malayalam, we may see the composition of our film mix changing over time in order to allow us to successfully scale our business around Hindi as well as regional language content. At the same time, the distribution window for the theatrical release of films, and the window between the theatrical release and distribution in other channels, have each been compressing in recent years and may continue to evolve due to the growing importance of digital distribution.

· **Television Syndication**: A substantial portion of our revenue is also derived from licensing fees for television syndication of content to media companies such as satellite television broadcasters, direct-to-home channels and regional cable operators. Because of increased demand for Indian film content on television in India as the number of direct-to-home subscribers increases and the cable industry migrates towards digital technology, we expect demand for premium content such as movies to continue. However, as competitors with compelling products, including international content providers, expand their content offerings in India, we expect competition for television syndication revenues to increase, and license fees for such content could decrease as a result.

72

· **Digital and Ancillary**: The remainder of our revenue is derived from digital distribution and ancillary products and services, which was our fastest growing revenue channel and we anticipate it will be a principal driver of our revenue growth for the foreseeable future. With a significant portion of the Indian and international population moving towards adoption of digital technology, we are increasing our focus on Eros Now, which leverages its extensive digital film and music libraries to stream a wide range of content. Users can access Eros Now through APPs, WAP and the internet in India and around the world, and we have partnerships with the major mobile network providers in India and several other countries, as well as television and mobile handset OEMs, to offer Eros Now to their subscribers. Eros Now is also available in the Apple "App Store" and Google "Play Store" for download and can be streamed on any internet enabled device, which makes the entertainment experience platform agnostic. We also recently announced our arrangement with Apple to make Eros Now content available on its new Apple TV app. Our OEM partners also include major device manufacturers such as Sony and Samsung.

Eros Now has been increasingly focused on delivering product features to further monetize its growing registered user base. For example, we recently launched Eros Now Quickie, a platform where viewers can access quality short stories to further supplement our existing vast digital content library. During fiscal year 2020 we announced a transformational alliance between Eros Now and YouTube Music Premium. This was the first time ever, in any geography, that Google/YouTube had partnered with a SVOD OTT player for a joint bundling and marketing opportunity. In addition, Eros Now developed the customer journey to provision access to both products and leveraged our new payment funnel. The campaign was supported by a robust digital marketing push from both sides.

Ancillary revenues also include all other revenues that are not theatrical or television, including licensing to airlines and cable operators, as well as provisioning of VFX (visual special effects) support to customers.

We expect that our costs associated with the co-production and acquisition of film and digital original content are likely to increase over time as we continue to focus on making content-driven films and originals with appropriate budgets in order to generate an attractive rate of return. In addition, increased competition in the Indian film entertainment industry, including from international film entertainment providers, is likely to cause the cost of film production and acquisition to increase.

In fiscal year 2020, we invested $265.3 million (of which cash outflow is $132.2 million) in film content and fiscal year 2021, we expect to invest approximately $150 to $160 million in film content.

We anticipate our administrative costs will increase as we expand our management team, especially to support the expansion of our digital businesses. Although aggregate spending will increase, we do not anticipate that this will result in a material change in aggregate administrative costs as a percentage of revenue.

Going forward, along with our industry peers, we have started to consider changes to various operational and legal aspects of the business, such as project timelines, production costs, schedules, legal commitments etc, in order to adapt to changes and disruptions caused by the COVID-19 pandemic to our industry. Our OTT platform Eros Now, for which the majority of the content library comprises our own existing content and acquired content, has also started considering innovative ways of updating its existing content libraries. Given the rise in demand for content and increasing online viewership, and the disruption in production of new content, existing content is likely to become more valuable in the future which will benefit us.

We believe, but cannot guarantee, that the cinematic exhibition industry will ultimately rebound and benefit from pent-up social demand for out-of-home entertainment, as government restrictions are lifted and home sheltering subsides. However, the ultimate significance of the pandemic, including the extent of the adverse impact on our financial and operational results, will be dictated by the currently unknowable duration and the effect on the overall economy and of responsive governmental regulations, including shelter-in-place orders of the pandemic and mandated suspension of operations.

During the period from March 31st, 2020 to June 30th, 2020, we had several theatrical film releases scheduled in India

and overseas, namely '*Haathi Mere Saathi'* in three languages (Hindi, Tamil and Telugu), '*Roam Rome Mein'* (Hindi) and '*Shokuner Lobh'* (Bengali) amongst others. However, under the present circumstances of the COVID-19 pandemic, we have taken the decision to defer the release of these films indefinitely until the situation changes, so that the revenue opportunities from these films can be maximized and improve our cashflows to better serve our commitments to our stakeholders.

73

**SIGNIFICANT ACCOUNTING POLICIES**

***Overall considerations***

The significant accounting policies that have been used in the preparation of these consolidated financial statements are summarized below. Financial statements are subject to the application of significant accounting estimates and judgments. These are summarized in Note 37.

***Significant new accounting pronouncements***

***Adoption of IFRS 16, "Leases"***

On April 1, 2019, the Group adopted New accounting standard IFRS 16, "Leases". which specifies how to recognize, measure, present and disclose leases. The standard provides a single accounting model, requiring the recognition of assets and liabilities for all major leases previously classified as "operating leases".

The Company applied the "Modified Retrospective Approach" on the date of initial application (April 1, 2019) and made cumulative adjustments to retained earnings. Accordingly, comparatives for the year ended March 31, 2019 have not been retrospectively adjusted.

As such the Company recognizes a lease liability and a corresponding right of use asset, at the lease commencement date. The right-of-use asset is initially measured at cost, based on the initial amount of the lease liability. The assets are depreciated to the earlier of the end of the useful life of the right-of-use asset or the lease term using the straight-line method as this most closely reflects the expected pattern of consumption of the future economic benefits. The lease term includes periods covered by an option to extend if the Company is reasonably certain to exercise that option. In addition, the right-of-use asset is periodically adjusted for certain re-measurements of the lease liability. There is no impact on transition in opening balance of retained earnings as at April 1, 2019 because of the transition method applied. Further comparatives were not restated.

***Basis of consolidation***

The consolidated financial statements of the Group consolidates results of the Company and entities controlled by the Company and its subsidiary undertakings. The Group controls an entity where the group is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power to direct the activities of the entity. Subsidiaries are fully consolidated from the date on which control is transferred to the group. They are deconsolidated from the date that control ceases.

Inter-company transactions, balances and unrealized gains on transactions between Group companies are eliminated. Unrealized losses are also eliminated unless the transaction provides evidence of an impairment of the transferred asset. Amounts reported in the financial statements of subsidiaries have been adjusted where necessary to ensure consistency with the accounting policies adopted by the Group.

Business combinations are accounted for under the acquisition method. The acquisition method involves the measurement of all identifiable assets acquired and liabilities and contingent liabilities assumed, in the business combination at their fair values at the acquisition date, regardless of whether or not they were recorded in the financial statements of the acquiree prior to acquisition. On initial recognition, the assets and liabilities of the subsidiary are included in the consolidated statement of financial position at their fair values. Transaction costs that the company incurs in connection with a business combination such as finder's fees, legal fees, due diligence fees, and other professional and consulting fees are expensed as incurred. The excess of consideration transferred, amount of non-controlling interest in the acquired entity and acquisition date fair value of any previous equity interest in the acquired entity over the fair value of the net identifiable assets acquired is recorded as goodwill. If those amounts are less than the fair value of the net identifiable assets of the business acquired, the difference is recognised directly in profit or loss as a bargain purchase.

*Changes in ownership interests*

The group treats transactions with non-controlling interests that do not result in a loss of control as transactions with equity owners of the group. A change in ownership interest results in an adjustment between the carrying amounts of the controlling and non-controlling interests to reflect their relative interests in the subsidiary. Any difference between the amount of the adjustment to non-controlling interests and any consideration paid or received is recognised in a separate reserve within equity attributable to owners of the Company

When the group ceases to consolidate the subsidiary because of a loss of control, any retained interest in the entity is remeasured to its fair value, with the change in carrying amount recognised in profit or loss. This fair value becomes the initial carrying amount for the purposes of subsequently accounting for the retained interest as an associate, joint venture or financial asset. In addition, any amounts previously recognised in other comprehensive income in respect of that entity are accounted for as if the group had directly disposed of the related assets or liabilities. This may mean that amounts previously recognised in other comprehensive income are reclassified to profit or loss.

*Segment reporting*

IFRS 8 Operating Segments ("IFRS 8") requires operating segments to be identified on the same basis as is used internally for the review of performance and allocation of resources by the Group's chief operating decision maker, which is the Group's CEO and MD. The revenues of films are earned over various formats; all such formats are functional activities of filmed entertainment and these activities take place on an integrated basis. The management team reviews the financial information on an integrated basis for the Group as a whole. The management team also monitors performance separately for individual films for at least 12 months after the theatrical release. Certain resources such as publicity and advertising, and the cost of a film are also reviewed globally.

Eros has identified four geographic areas, consisting of its main geographic areas (India, North America and Europe), together with the rest of the world.

*Revenue*

Revenue from contracts are recognized only when the contract has been approved by the parties to the contract and creates enforceable rights and obligations.

Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration which the Group expects to receive in exchange for those products or services. To ensure collectability of such consideration and financial stability of the counterparty, the Group performs certain standard Know Your Client (KYC) procedures based on their geographic locations and evaluates trend of past collection from such locations.

Revenue is measured based on the transaction price, which is the consideration, adjusted for any discounts and incentives, if any, as specified in the contract with the customer. Revenue also excludes taxes collected from customers. In case of variable consideration , the Group estimates, at the contract inception, the amount to be received using the "most likely amount" approach, or the "expected value" approach, as appropriate. This amount is then included in the Group's estimate of the transaction price only if it is highly probable that a significant reversal of revenue will not occur once any uncertainty associated with the variable consideration is resolved. In making this assessment the Group considers its historical performance on similar contracts.

The Group recognises contract liabilities for consideration received in respect of unsatisfied performance obligations and reports these amounts as other liabilities in the statement of financial position (see Note 24). Similarly, if the Group satisfies a performance obligation before it receives the consideration, the Group recognises either a contract asset or a receivable in its statement of financial position, depending on whether something other than the passage of time is required before the consideration is due

The transaction price, being the amount to which the Group expects to be entitled and has rights to under the contract is allocated to the identified performance obligations. The transaction price will also include an estimate of any variable consideration where the Group's performance may result in additional revenues based on the achievement of agreed targets.

The following criteria apply in respect of various revenue streams within filmed entertainment:

·    In arrangements for theatrical distribution, contracted minimum guarantees are recognized on the theatrical release date. The Group's share of box office receipts in excess of the minimum guarantee is recognized at the point as the box office receipts gets accrued.

75

- In arrangements for television syndication, license fees received in advance which do not meet all the above criteria, including commencement of the availability for broadcast under the terms of the related licensing agreement, are included in contract liability until the criteria for recognition is met. Further in arrangements where the license fees received in advance is for a period of 12 months or more from the commencement, the company computes significant discounting component at imputed rate of interest on advances received and recognizes within net finance cost in the statement of income. Accumulated contract liability (deferred revenue) is recognized upon commencement of availability for broadcast.

- In arrangements for catalogue sales, the Group recognizes revenue if revenue recognition criteria's such as a valid sales contract exists, all content is delivered and the customer start generating economic benefits from them, the Group is reasonably certain on collectability, and the Group's contractual obligations are complete and are met. Considering the arrangement with catalogue customers provide for a contractual deferred payment terms up to a year and in many cases the payments often fall behind contractual terms, revenues from catalogue sales are recognized net of financing component calculated at imputed market rate of interest on the gross receivables. The re-measurement of such financing period at each balance sheet date and related gains or losses is recognized within administrative costs in the Statement of Income. The unwinding of the such discount is recognized using effective interest rate within net finance cost in the Statement of Income.

- Digital and ancillary media revenues are recognized at the earlier of when the content is accessed or declared. Fees received for access to the specified and unspecified future content through digital and ancillary media, including usage of over-the-top platform developed by the Group, is recognized on straight line basis over the period of the service contract. Billing in excess of the revenue recognized is shown as contract liability.

- DVD, CD and video distribution revenue is recognized on the date the product is delivered or if licensed in line with the above criteria. Visual effects, production and other fees for services rendered by the Group and overhead recharges are recognized in the period in which they are earned and in certain cases, the stage of production is used to determine the proportion recognized in the period.
- In arrangement for production services, including visual special effects (VFX), and other technical services to clients, the Group recognizes revenue if revenue recognition criteria's such as a valid sales contract exists, IP is delivered and the Group is reasonably certain on collectability. Revenue is recognized as the services are delivered based on acceptance of the services performed by the customer.

***Other income***

Dividend income is recognised when the Group's right to receive the payment is established, which is generally when shareholders approve the dividend.

Interest income is recognized on a time proportion basis taking into account the amount outstanding and the effective interest rate applicable

***Intangible assets***

Intangible assets acquired by the Group are stated at cost less accumulated amortization less impairment loss, if any, except those acquired as part of a business combination, which are shown at fair value at the date of acquisition less accumulated amortization less impairment loss, if any (Film production cost and content advances are transferred to film and content rights at the point at which content is first exploited). "Eros" (the "Trade name") is considered to have an indefinite life because of the institutional nature of the corporate brand name, its proven ability to maintain market leadership and the Group's commitment to develop, enhance and retain its value.

**Content**

Investments in films and associated rights, including acquired rights and distribution advances in respect of completed films, are stated at cost less amortization less provision for impairment. Costs include production costs, overhead and capitalized interest costs net of any amounts received from third party investors. A charge is made to write down the cost of completed rights over the estimated useful lives, writing off more in year one which recognizes initial income flows and

then the balance over a period of up to nine years, except where the asset is not yet available for exploitation. The average life of the assets is the lesser of 10 years or the remaining life of the content rights. The amortization charge is recognized in the consolidated statement of income within cost of sales. The determination of useful life is based upon management's judgment and includes assumptions on the timing and future estimated revenues to be generated by these assets, which are summarized in Note 37.3.

76

**Others**

Other intangible assets, which comprise internally generated and acquired software used within the Group's digital, home entertainment and internal accounting activities, are stated at cost less amortization less provision for impairment. A charge is made to write down the cost of completed rights over the estimated useful lives except where the asset is not yet available for exploitation. The average life of below intangible assets ranges from 3-6 years. The amortization charge is recognized in the consolidated statements of income within administrative expenses as stated below:

|  | Life of asset | Rate of amortization % straight line per annum |
|---|---|---|
| Information technology assets | 3 years | 33 |
| Other intangibles | 3 - 6 years | 17 – 33 |

**Subsequent expenditure**

Expenditure on capitalized intangible assets subsequent to the original expenditure is included only when it increases the future economic benefits embodied in the specific asset to which it relates.

**Information technology assets**

An internally generated intangible asset arising from the Group's software development activities that is expected to be completed is recognized only if all the following criteria are met:

- an asset is created that can be identified (such as software and new processes);

- it is probable that the asset created will generate future economic benefits; and

- the development cost can be measured reliably.

When these criteria are met and there are appropriate resources to complete development, the expenditure is capitalized at cost. Where these criteria are not met development expenditure is recognized as an expense in the period in which it is incurred. Internally generated intangible assets are amortized over their useful economic life from the date that they start generating future economic benefits.

***Impairment testing of goodwill, other intangible assets and property and Equipment***

For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash flows (cash-generating units). As a result, some assets are tested individually for impairment and some are tested at the cash-generating unit level. Goodwill is allocated to those cash-generating units that are expected to benefit from synergies of the related business combination and represent the lowest level within the Group at which Management monitors the related cash flows.

Goodwill and Trade names are tested for impairment at least annually. The Group has impaired Goodwill and Trade names in its entirety during the previous fiscal year. All other individual assets or cash-generating units are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.

An impairment loss is recognized for the amount by which the asset's or cash-generating unit's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of fair value, reflecting market conditions less costs to sell, and value in use based on an internal discounted cash flow evaluation. Impairment losses recognized for cash-generating units, to which goodwill has been allocated, are credited initially to the carrying amount of goodwill. Any remaining impairment loss is charged pro rata to the other assets in the cash generating unit.

Film and content rights are stated at the lower of unamortized cost and estimated recoverable amounts. In accordance with IAS 36 Impairment of Assets, film content costs are assessed for indication of impairment on a library basis as the nature of the Group's business, the contracts it has in place and the markets it operates in do not yet make an ongoing individual film evaluation feasible with reasonable certainty. Impairment losses on content advances are recognized when film production does not seem viable and refund of the advance is not probable.

With the exception of goodwill, all assets are subsequently reassessed for indications that an impairment loss previously

recognized may no longer exist.

77

***Property and equipment***

Property and equipment are stated at historical cost less accumulated depreciation and impairment. Land and freehold buildings are recognised at fair value based on periodic, but at least triennial, valuations by an external independent valuer, less subsequent depreciation for freehold buildings.

Any accumulated depreciation at the date of revaluation is eliminated against the gross carrying amount of the asset and the net amount is restated to the revalued amount. Increases in the carrying amount arising on revaluation of freehold land and buildings are credited to other reserves in shareholders' equity through other comprehensive income. Decreases that offset previous increases are charged against other reserves.

Depreciation is provided to write-off the cost of all property and equipment to their residual value as stated below:

| | Life of Asset | Rate of depreciation % WDV per annum |
|---|---|---|
| Freehold building | 60 years | 2-10 |
| Furniture and fittings and equipment | 5 years | 15-20 |
| Vehicles and machinery | 3-5 years | 20-30 |

Material residual value estimates are updated as required, but at least annually, whether or not the asset is revalued.

Advance paid towards the acquisition or improvement of property and equipment not ready for use before the reporting date are disclosed as capital work-in-progress.

***Inventories***

Inventories primarily comprise of music CDs and DVDs, are valued at the lower of cost and net realizable value. Cost in respect of goods for resale is defined as purchase price, including appropriate labor costs and other overhead costs. Costs in respect of raw materials is purchase price.

Purchase price is assigned using a weighted average basis. Net realizable value is defined as anticipated selling price or anticipated revenue less cost to completion.

***Cash and cash equivalents***

Cash and cash equivalents include cash in hand, deposits held at call with banks, other short-term highly liquid investments with original maturity of three months or less that are readily convertible into known amounts of cash and are subject to insignificant risk of changes in value. Bank overdrafts are shown within "Borrowings" in "Current liabilities" on the statement of financial position.

***Restricted deposits held with banks***

Deposits held with banks as security for overdraft facilities are included in restricted deposits held with bank.

***Financial instruments***

A financial instrument is any contract that gives rise to a financial asset of one entity and a financial liability or equity instrument of another entity.

i.   Recognition, initial measurement and derecognition

Financial assets and liabilities are recognized when the Group becomes a party to the contractual provisions of the instrument. Financial assets and liabilities are initially measured at fair value. Transaction costs that are directly attributable to the acquisition or issue of financial assets and financial liabilities (other than financial assets and financial liabilities at fair value through profit or loss) are added to or deducted from the fair value of financial assets or financial liability, as appropriate, on initial recognition.

The transaction costs directly attributable to the acquisition of financial assets and financial liabilities at fair value through profit and loss are immediately recognized in the Consolidated Statement of Income.

A financial asset is primarily derecognized (i.e. removed from the Group's statement of financial position) when:

  a)  The rights to receive cash flows from the asset have expired, or
  b)  The Group has transferred its rights to receive cash flows from the asset t or has assumed an obligation to pay the received cash flows in full without material delay to a third party under a 'pass-through' arrangement and either (a) the Group has transferred substantially all the risks and rewards of the asset, or (b) the Group has neither transferred nor retained substantially all the risks and rewards of the asset, but has transferred control of the asset. .

A financial liability is derecognized when the obligation under the liability is discharged or cancelled or expires.

ii.    Classification and subsequent measurement of financial asset

For the purpose of subsequent measurement, financial assets are classified into the following categories upon initial recognition:

  ·  Debt instruments at amortized cost
  ·  Debt instruments at fair value through other comprehensive income (FVTOCI)
  ·  Debt instruments, derivatives and equity instruments at fair value through profit or loss (FVTPL)
  ·  Equity instruments designated at fair value through other comprehensive income (FVTOCI)
  ·  Equity instruments measured at fair value profit or loss (FVTPL)

The classification depends on the entity's business model for managing the financial assets and the contractual terms of the cash flows.

**Debt instruments at amortized cost**

A 'debt instrument' is measured at the amortized cost if both the following conditions are met and is not designated as at FVTPL:

  1.  The asset is held within a business model whose objective is to hold assets for collecting contractual cash flows, and
  2.  Contractual terms of the asset give rise on specified dates to cash flows that are solely payments of principal and interest ("SPPI") on the principal amount outstanding.

After initial measurement, such financial assets are subsequently measured at amortized cost using the effective interest rate (the "EIR") method. The effective interest rate is the rate that exactly discounts future cash receipts or payments through the expected life of the financial instrument, or where appropriate, a shorter period.

Amortized cost is calculated by taking into account any discount or premium on acquisition and fees or costs that are an integral part of the EIR. The EIR amortization is included in finance income/other income in the Consolidated Statement of Income. The losses arising from impairment are recognized in the Consolidated Statement of Income.

**Debt instruments at fair value through other comprehensive income**

A 'debt instrument' is classified as at the FVTOCI if both of the following criteria are met and is not designated as at FVTPL:

  1.  The objective of the business model is achieved both by collecting contractual cash flows and selling the financial assets, and
  2.  The asset's contractual cash flows represent SPPI.

79

**Debt instruments at fair value through profit or loss**

FVTPL is a residual category for debt instruments. Any debt instrument, which does not meet the criteria for categorization as at amortized cost or as FVTOCI, is classified as at FVTPL. A gain or loss on a debt instruments that is subsequently measured at FVTPL is recognised in profit or loss and presented net within other gains/(losses) in the period in which it arises.

**Equity instruments**

All equity investments in scope of IFRS 9 are measured at fair value. Equity instruments which are held for trading are classified as at FVTPL with changes in the fair value at each reporting date recognized in the Consolidated Statement of Income.

For all other equity instruments, the Group may make an irrevocable election to present in OCI, the subsequent changes in the fair value. The Group makes such election on an instrument-by-instrument basis. If the Group decides to classify an equity instrument as at FVTOCI, then all fair value changes on the instrument, excluding dividends and impairment loss, are recognized in OCI. There is no recycling of the amounts from the OCI to the Consolidated Statement of Income, even on sale of the investment. However, the Group may transfer the cumulative gain or loss within categories of equity.

iii.    Impairment of financial assets

In accordance with IFRS 9, the Group applies the expected credit loss ("ECL") model for measurement and recognition of impairment loss on financial assets and credit risk exposures.

ECL is the difference between all contractual cash flows that are due to the Group in accordance with the contract and all the cash flows that the entity expects to receive (i.e., all cash shortfalls), discounted at the EIR of the instrument. Lifetime ECL are the expected credit losses resulting from all possible default events over the expected life of a financial instrument. The 12-month ECL is a portion of the lifetime ECL which results from default events that are possible within 12 months after the reporting date.

The Group follows 'simplified approach' for recognition of impairment loss allowance on trade receivables. Simplified approach does not require the Group to track changes in credit risk. Rather, it recognizes impairment loss allowance based on lifetime ECL at each reporting date, right from its initial recognition.

For recognition of impairment loss on other financial assets and risk exposure, the Group determines that whether there has been a significant increase in the credit risk since initial recognition. If credit risk has not increased significantly, 12-month ECL is used to provide for impairment loss. However, if credit risk has increased significantly, lifetime ECL is used. If, in a subsequent period, credit quality of the instrument improves such that there is no longer a significant increase in credit risk since initial recognition, then the entity reverts to recognizing impairment loss allowance based on 12-month ECL.

ECL impairment loss allowance (or reversal) recognized during the period is recognized as income/ expense in the Consolidated Statement of Income.

iv.    Classification and subsequent measurement of financial liabilities

The subsequent measurement of financial liabilities depends on their classification, as described below:

§      Financial liabilities at fair value through profit or loss

A financial liability is classified as at FVTPL if it is classified as held-for-trading, it is a derivative or it is designated as such on initial recognition. Financial liabilities at FVTPL are measured at fair value and net gains and losses, including any interest expense, are recognised in consolidated statement of income.. Financial liabilities are classified as held for trading if they are incurred for the purpose of repurchasing in the near term.

§      Financial liabilities measured at amortized cost

After initial recognition, interest-bearing loans and borrowings are subsequently measured at amortized cost using the EIR method. Gains and losses are recognized in the Consolidated Statement of Income when the liabilities are derecognized.

Amortized cost is calculated by taking into account any discount or premium on acquisition and fees or costs that are an integral part of the EIR. The EIR amortization is included as finance costs in the Consolidated Statement of Income.

80

**v.  Offsetting:**

Financial assets and financial liabilities are offset and the net amount presented in the statement of financial position when, and only when, the Group currently has a legally enforceable right to set off the amounts and it intends either to settle them on a net basis or to realise the asset and settle the liability simultaneously

**_Derivative financial instruments_**

The Group uses derivative financial instruments ("derivatives") to reduce its exposure to interest rate movements.

Derivatives are initially recognized at fair value at the date the derivative contracts are entered into and are subsequently re-measured to their fair value at the end of each reporting period. The resulting gain or loss is recognized in consolidated statements of income immediately.

**_Provisions_**

Provisions are recognized when the Group has a present legal or constructive obligation as a result of a past event, it is more likely than not that an outflow of resources will be required to settle the obligations and the amount can be reliably measured. Provisions are measured at management's best estimate of the expenditure required to settle the obligations at the end of each reporting period. date and are discounted to present value where the effect of the same is material.

**_Leases_**

**Measurement and recognition of leases**

The Company considers whether contract is,or contains a lease. A lease is defined as 'a contract, or part of a contract, that conveys the right to use an asset (the underlying asset) for a period of time in exchange for consideration'.

To apply this definition the Company assesses whether the contract meets three key evaluations which are whether:

a)  the contract contains an identified asset, which is either explicitly identified in the contract or implicitly specified by being identified at the time the asset is made available to the Company

b)  the Company has the right to obtain substantially all of the economic benefits from use of the identified asset throughout the period of use, considering its rights within the defined scope of the contract.

c)  the Company has the right to direct the use of the identified asset throughout the period of use. The Company assess whether it has the right to direct 'how and for what purpose' the asset is used throughout the period of use.

**Company as a lessee**

At lease commencement date, the Company recognises a right-of-use asset and a lease liability on the balance sheet. The right-of-use asset is measured at cost, which is made up of the initial measurement of the lease liability, any initial direct costs incurred by the Company and any lease payments made in advance of the lease commencement date.

The Company depreciates the right-of-use assets on a straight-line basis from the lease commencement date to the earlier of the end of the useful life of the right-of-use asset or the end of the lease term period. The Company also assesses the right-of-use asset for impairment when such indicators exist.

At the commencement date, the Company measures the lease liability at the present value of the lease payments unpaid at that date, discounted using the interest rate implicit in the lease if that rate is readily available or the Company's incremental borrowing rate.

Lease payments included in the measurement of the lease liability are made up of fixed payments (including in substance fixed), and payments arising from options reasonably certain to be exercised. Subsequent to initial measurement, the liability will be reduced for payments made and increased for interest expenses. It is remeasured to reflect any reassessment or modification.

The Company has elected to account for short-term leases and leases of low-value assets using the exemption given under IFRS 16. Instead of recognising a right-of-use asset and lease liability, the payments in relation to these are recognised as an expense in profit or loss on a straight-line basis over the lease term or on another systematic basis if that basis is more representative of the pattern of the Company's benefit.

**Company as a lessor**

Lease income from operating leases where the company is lessor is recognised in income on straight line basis over the

lease term.

### *Taxation*

Taxation on profit and loss comprises current income tax and deferred income tax. Tax is recognized in the consolidated statement of income except to the extent that it relates to items recognized directly in equity or other comprehensive income in which case it is recognized in equity or other comprehensive income.

Current income tax is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted at the reporting date along with any adjustment relating to tax payable in previous years.

Deferred income tax is provided in full, using the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the consolidated financial statements. However, deferred tax liabilities are not recognised if they arise from the initial recognition of goodwill. Deferred income tax is also not accounted for if it arises from initial recognition of an asset or liability in a transaction other than a business combination that, at the time of the transaction, affects neither accounting nor taxable profit or loss. Deferred income tax is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted or substantively enacted at the statement of financial position date and are expected to apply when the related deferred income tax asset is realized or the deferred income tax liability is settled in the appropriate territory.

Deferred income tax in respect of undistributed earnings of subsidiaries is recognized except where the Group is able to control the timing of the reversal of the temporary difference and that the temporary difference will not reverse in the foreseeable future. Deferred income tax assets are recognized to the extent that it is probable that future taxable profit will be available against which temporary differences can be utilized.

Deferred income tax assets and liabilities are offset where there is a legally enforceable right to offset current tax assets and liabilities and where the deferred tax balances relate to the same taxation authority. Current tax assets and tax liabilities are offset where the entity has a legally enforceable right to offset and intends either to settle on a net basis, or to realise the asset and settle the liability simultaneously.

### *Employee benefits*

### Defined Contribution Plan

The Group operates defined contribution pension plans and healthcare and insurance plans on behalf of its employees. The amounts due are all expensed as they fall due.

**Defined benefit plan**

Gratuity: The Group's liability towards gratuity is determined using the projected unit credit method which considers each period of service as giving rise to an additional unit of benefit entitlement and measures each unit separately to build up the final obligation. The cost for past services is recognized on a straight-line basis over the average period until the amended benefits become vested. Re-measurement gains and losses are recognized immediately in the Other Comprehensive Income as income or expense and are not reclassified to profit or loss in subsequent periods. Obligation is measured at the present value of estimated future cash flows using a discounted rate that is determined by reference to market yields at the Balance Sheet date on Government bonds where the currency and terms of the Government bonds are consistent with the currency and estimated terms of the defined benefit obligation.

**Employee stock option plan**

In accordance with IFRS 2 "Share Based Payments", the fair value of shares or options granted is recognized as personnel costs with a corresponding increase in equity. The fair value is measured at the grant date and spread over the period during which the recipient becomes unconditionally entitled to payment unless forfeited or surrendered.

The fair value of share options granted is measured using the Black Scholes model or a Monte-Carlo simulation model, each taking into account the terms and conditions upon which the grants are made. At each statement of financial position date, the Group revises its estimate of the number of equity instruments expected to vest as a result of non-market-based vesting conditions. The amount recognized as an expense is adjusted to reflect the revised estimate of the number of equity instruments that are expected to become exercisable, with a corresponding adjustment to equity reserves. None of the Group plans feature any options for cash settlements.

Upon exercise of share options, the proceeds received net of any directly attributable transaction costs up to the nominal value of the shares are allocated to share capital with any excess being recorded as share premium.

***Foreign currencies***

Transactions in foreign currencies are translated at the rates of exchange prevailing on the dates of the transactions. Monetary assets and liabilities in foreign currencies are translated at the prevailing rates of exchange at the reporting date. Non-monetary items that are measured at historical cost in a foreign currency are translated at the exchange rate at the date of the transaction when the fair value is determined.

Any exchange differences arising on the settlement of monetary items or on translating monetary items at rates different from those at which they were initially recorded are recognized in the income statement in the period in which they arise.

Non-monetary items that are measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value was determined. Translation differences on assets and liabilities carried at fair value are reported as part of the fair value gain or loss. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.

The assets and liabilities in the financial statements of foreign subsidiaries and related goodwill are translated at the closing rate at the date of that balance sheet. Income and expenses are translated at the monthly average rate. The exchange differences arising from the retranslation of the foreign operations are recognized in other comprehensive income and taken in to the "currency translation reserve" in equity. On disposal of a foreign operation the cumulative translation differences (including, if applicable, gains and losses on related hedges) are transferred to the consolidated statement of income as part of the gain or loss on disposal.

***Equity shares***

Ordinary shares are classified as equity. The Group defers costs in issuing or acquiring its own equity instruments to the extent they are incremental costs directly attributable to an equity transaction that otherwise would have been avoided. Such costs are accounted for as a deduction from equity (net of any related income tax benefit) upon completion of the equity transaction. The costs of an equity transaction which is abandoned is recognized as an expense.

*Earnings per share*

Basic earnings per share is calculated by dividing net profit after taxes attributable to the owners of the Company for the year by weighted average number of ordinary shares outstanding during the period, adjusted for bonus elements in ordinary shares issued during the year and excluding treasury shares. Diluted earnings per share adjusts the figures used in the determination of basic earnings per share to take into account the after-income tax effect of interest and other financing costs associated with dilutive potential ordinary shares, and the weighted average number of additional ordinary shares that would have been outstanding assuming the conversion of all dilutive potential ordinary shares.

*Current/Non-current classification*

The Group presents assets and liabilities in the statement of financial position based on current/non-current classification. An asset is current when it is:

· Expected to be realized or intended to be sold or consumed in the normal operating cycle (*)
· Held primarily for the purpose of trading
· Expected to be realized within twelve months after the reporting period or
· Cash or cash equivalent unless restricted from being exchanged or used to settle a liability for at least twelve months after the reporting period

All other assets are classified as non-current.

(*) The operating cycle for the business activities of the Group is considered to be twelve months except in case of catalogue sales, which have been ascertained as two years for the purpose of current / non-current classification of assets.

A liability is current when:

· It is expected to be settled in the normal operating cycle
· It is held primarily for the purpose of trading
· It is due to be settled within twelve months after the reporting period or
· There is no unconditional right to defer the settlement of the liability for at least twelve months after the reporting period

The Group classifies all other liabilities as non-current. Deferred tax assets and liabilities are classified as non-current assets and liabilities.

*Year Ended March 31, 2020 Compared to Year Ended March 31, 2019*

| | Year ended March 31, | | Change % | As a % of revenue | |
| --- | --- | --- | --- | --- | --- |
| | 2020 | 2019 | | 2020 | 2019 |
| | (in thousands) | | | | |
| Revenue | $ 155,452 | $ 270,126 | (42.5%) | 100.0 | 100.0 |
| Cost of sales | (81,725) | (155,396) | 47.4% | 52.6 | 57.5 |
| **Gross profit** | **73,727** | **114,730** | (35.7%) | 47.4 | 42.5 |
| Administrative costs | (144,319) | (87,134) | (65.6%) | 92.8 | 32.3 |
| **Operating profit/(loss) before impairment loss** | **(70,592)** | **27,596** | (355.8%) | (45.4) | 10.2 |
| Impairment loss | (431,200) | (423,335) | 1.9% | 277.4 | 156.7 |
| **Operating profit/(loss)** | **(501,792)** | **(395,739)** | (26.8%) | (322.8) | (146.5) |
| Net finance costs | (8,779) | (7,674) | (14.4%) | 5.6 | 2.8 |
| Other gains/(losses), net | (3,316) | 288 | (1251.4%) | 2.1 | (0.1) |
| **Profit/(loss) before tax** | **(513,887)** | **(403,125)** | (27.5%) | (330.6) | (149.2) |
| Income tax | 22,183 | (7,328) | (402.7%) | (14.3) | 2.7 |
| **Profit/(loss) for the year** | **$ (491,704)** | **$ (410,453)** | (19.8%) | (316.3) | (151.9) |

The following table sets forth, for the period indicated, the revenue by region of domicile of Group's operation.

| | Year ended March 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | Change (%) |
| | (in thousands) | | |
| India | $ 41,119 | $ 100,387 | (59.0%) |
| Europe | 26,927 | 63,196 | (57.4%) |
| North America | 1,309 | 1,759 | (25.6%) |
| Rest of the world | 86,097 | 104,784 | (17.8%) |
| **Total revenues** | **$ 155,452** | **$ 270,126** | (42.5%) |

### *Revenue*

In fiscal 2020, Eros film slate comprised thirty films of which two were medium budget and twenty-eight were low budget as compared to seventy-two films of which seven were medium budget and sixty-five were low budget in fiscal 2019.

In fiscal 2020, the Company's slate of thirty films comprised eight Hindi films, one Tamil/Telugu film and twenty-one regional films as compared to the same period last year where its slate of seventy-two films comprised fifteen Hindi films, seven Tamil/Telugu film and fifty regional films .

For the twelve months ended March 31, 2020, aggregate revenue decreased by 42.5% to $155.5 million compared to $270.1 million for the twelve months ended March 31, 2019, mainly due to a reduction in theatrical and television syndication revenue which was partially offset by increased revenue from our digital and ancillary business.

In the twelve months ended March 31, 2020, the aggregate theatrical revenue decreased by 84.8% to $10.6 million, compared to $69.5 million for the fiscal year 2019. The variation in theatrical revenue is primarily due to the mix of films and release of fewer number of films compared to fiscal 2019.

In the twelve months ended March 31, 2020, aggregate revenues from television syndication decreased by 90.8% to $7.1 million, compared to $77.5 million for fiscal year 2019. The decrease is mainly due to the Company's shift in business strategy to reduce the licensing of our content to third parties and increase our focus on premium digital content and drive greater value to the ErosNow platform, where the Company retains its position as the largest provider of Indian local and regional language content.

In the twelve months ended March 31, 2020, the aggregate revenues from digital and ancillary increased by 11.9% to $137.8 million, compared to $123.1 million for fiscal year 2019. The increase in revenue is primarily due to contribution from OTT (over-the-top) digital streaming revenues and ancillary business which includes revenue from providing producer support and VFX services to customers.

### Cost of sales

For the twelve months ended March 31, 2020, cost of sales decreased by 47.4% to $81.7 million, compared to $155.4 million for fiscal year 2019. The decrease was mainly due to lower amortization costs, lower marketing, advertising and distribution costs.

### Gross profit

In fiscal 2020 gross profit decreased by 35.7% to $73.7 million, compared to $114.7 million for fiscal 2019. The decrease was mainly due to decrease in revenue, which is partially offset by lower amortization cost and lower marketing, advertising and distribution costs.

**Administrative costs**

In fiscal 2020, administrative costs increased by 65.6% to $144.3 million compared to $87.1 million for fiscal year 2019, the increase in administrative cost were mainly on account of credit impairment loss amounting to $97.6 million in fiscal year 2020 compared to $ 25.7 million for fiscal 2019 due to higher expected credit loss (ECL) provision, which was partially offset by reduction in other admin cost such as reduction in legal and profession expenses, Impairment loss on advances to content vendors and other expenses.

**Net finance costs**

In fiscal 2020, net finance costs increased by 14.4% to $8.8 million, compared to $7.7 million for fiscal year 2019 mainly due to lower interest income on account of unwinding of credit impairment losses, lower bank interest income and higher interest on borrowings cost.

**Other gains/(loss), net**

In fiscal year 2020, other losses stood at $3.3 million, compared to other gains of $0.3 million in fiscal year 2019, the loss was mainly due to reduction in reversal of expected credit loss (ECL) by $10.4 million, which was partially offset by a lower loss on financial liability measured at fair value amounting to $16 million compared to $21.4 in fiscal year 2019.

**Impairment loss**

We recorded an impairment loss of $431.2 million for Fiscal Year 2020. The impairment charge was taken as per IAS 36 under IFRS accounting rules which require companies to re-assess the carrying book value of assets both on a regular annual basis and also in the case of irregular events. Examples of these "irregular events" include: a major change in market conditions or technology, expectations of future operating losses, material change in listed equity value or negative cash flows. As in our prior fiscal year, the significant reduction in the stock price and corresponding decline in market capitalisation was the main driver for the impairment charge. This was also compounded by exogenous factors such as the COVID pandemic and changes in business conditions, including delayed theatrical distribution of some films and disruptions to content production schedules. Accordingly, we recorded a non-cash impairment loss of $431.2 million, net of taxes, as an exceptional item within the statement of income/(loss). Management believes this is a conservative and prudent action, and does not believe this impairment materially impacts the near term or long-term business or operations of the company, as it is driven by compliance with accounting standards. In addition, to the extent that in future periods there is a material positive change in these business conditions, Management will be able to write-up the value of assets according to the same accounting standards.

**Income tax expense**

In fiscal 2020, income tax expenses decreased by 402.7% to $(22.2) million, compared to $7.3 million for fiscal year 2019. Effective income tax rates were 49.9% and 11.6% for March 31, 2020 and March 31, 2019, respectively, excluding non-deductible share-based payment charges, impairment loss and gain/loss on fair valuation of derivative liabilities. The change in effective rate principally reflects a change in the mix of the profits earned from taxable and non- taxable jurisdictions as well as unrecognized deductible temporary difference and carry forward losses in Indian listed subsidiary.

**Net (loss)/profit**

In fiscal year 2020, net loss was $491.7 million compared to $410.5 million for the fiscal year 2019, the increase was mainly on account of decrease in the group revenues and change in impairment loss in fiscal year 2020.

**Adjusted EBITDA (Non-GAAP)**

In fiscal 2020, adjusted EBITDA decreased by 21.0% to $54.8 million, compared to $69.4 million for fiscal year 2019. The decrease in Adjusted EBITDA is primarily due to lower syndication revenue and few theatrical releases and deferment of film releases in last quarter due to COVID-19 pandemic.

**Trade receivables**

As of March 31, 2020, Trade Receivables decreased to $101.7 million from $196.4 million as of March 31, 2019, primarily due to accounting of expected credit losses as per IFRS 9 standards, including the potential impact of COVID-19 on the credit risk of certain debtor's businesses and our ability to recover contractual revenue from them.

**Net debt**

As of March 31, 2020, net debt increased by 21.6% to $176.4 million from $145.0 million as of March 31, 2019 because of reduction in cash and cash equivalents.

85

### Year Ended March 31, 2019 Compared to Year Ended March 31, 2018

| | Year ended March 31, | | | As a % of revenue | |
|---|---|---|---|---|---|
| | 2019 | 2018 | Change % | 2019 | 2018 |
| | (in thousands) | | | | |
| Revenue | $ 270,126 | $ 261,253 | 3.4% | 100.0 | 100.0 |
| Cost of sales | (155,396) | (134,708) | 15.4% | 57.5 | 51.6 |
| **Gross profit** | **114,730** | **126,545** | (9.3%) | 42.5 | 48.4 |
| Administrative costs | (87,134) | (68,029) | 28.1% | 32.3 | 26.0 |
| **Operating profit before impairment loss** | **27,596** | **58,516** | (52.8%) | 10.2 | 22.4 |
| Impairment loss | (423,335) | — | (100%) | 156.7 | — |
| **Operating (loss)/profit** | **(395,739)** | **58,516** | (776.3%) | (146.5) | 22.4 |
| Net finance costs | (7,674) | (17,813) | (56.9%) | 2.8 | 6.8 |
| Other gains/(losses), net | 288 | (41,321) | (100.7%) | (0.1) | 15.8 |
| **Profit/(loss) before tax** | **(403,125)** | **(618)** | (65130.6%) | (149.2) | (0.2) |
| Income tax | (7,328) | (9,127) | (19.7%) | 2.7 | 3.5 |
| **Profit/(loss) for the year** | **$ (410,453)** | **$ (9,745)** | (4111.9%) | (151.9) | (3.7) |

The following table sets forth, for the period indicated, the revenue by region of domicile of Group's operation.

| | Year ended March 31, | | |
|---|---|---|---|
| | 2019 | 2018 | Change (%) |
| | (in thousands) | | |
| India | $ 100,387 | $ 98,073 | 2.4% |
| Europe | 63,196 | 27,028 | 133.8% |
| North America | 1,759 | 1,244 | 41.4% |
| Rest of the world | 104,784 | 134,908 | (22.3%) |
| **Total revenues** | **$ 270,126** | **$ 261,253** | 3.4% |

### Revenue

In fiscal 2019, Eros film slate comprised seventy-two films of which seven were medium budget and sixty five were low budget as compared to twenty four films of which one were high budget, four were medium budget and nineteen were low budget in fiscal 2018.

In fiscal 2019, the Company's slate of seventy-two films comprised fifteen Hindi films, seven Tamil/Telugu film and fifty regional films as compared to the same period last year where its slate of twenty four films comprised fourteen Hindi films, one Tamil/Telugu film and nine regional films .

For the twelve months ended March 31, 2019, revenue was adjusted by $34.5 million as significant financing component that arises on account of normal credit terms provided to licensees of our content catalogue (on account of IFRS 15 "Revenue from Contracts with Customers) and the net revenue was to $270.1 million compared to $261.3 million for the twelve months ended March 31, 2018, due to an increase in digital and ancillary revenues.

In the twelve months ended March 31, 2019, the aggregate theatrical revenue decreased by 12.1% to $69.5 million, compared to $79.1 million for the fiscal year 2018. The variation in theatrical revenue is primarily due to the mix of films and release of more low budget films.

In the twelve months ended March 31, 2019, aggregate revenues from television syndication decreased by 20.3% to $77.5 million, compared to $97.2 million for fiscal year 2018. The decrease is mainly due to mix of films and lower catalogue revenue during the year.

In the twelve months ended March 31, 2019, the aggregate revenues from digital and ancillary increased by 44.8% to $123.1 million, compared to $85.0 million for fiscal year 2018. The increase in revenue is primarily on account of contribution from catalogue revenues and digital business and an increase in revenue from OTT platform on account of an increase in subscribers by 138% when compared to the previous year.

86

In the twelve months ended March 31, 2019, revenue from India increased by 2.4% to $100.4 million, compared to $98.1 million for fiscal year 2018. The variation is due to the mix of films, partially offset by an increase in revenue from digital and ancillary business.

In the twelve months ended March 31, 2019, revenue from Europe increased by 133.8% to $63.2 million, compared to $27.0 million for fiscal year 2018. This was due to higher contribution from the monetization of catalogue films from one of our subsidiary in Europe, including digital and ancillary business.

In the twelve months ended March 31, 2019, revenue from North America increased by 41.4% to $1.7 million, compared to $1.2 million for fiscal year 2018. The increase was due to increase in revenue from digital and ancillary business.

In the twelve months ended March 31, 2019, revenue from the rest of the world decreased by 22.3% to $104.8 million, compared to $134.9 million for fiscal year 2018. This was due to lower catalogue sales during the year, partially offset by increase in revenue from digital and ancillary business.

***Cost of sales***

For the twelve months ended March 31, 2019, cost of sales increased by 15.4% to $155.4 million, compared to $134.7 million for fiscal year 2018. The increase was mainly due to higher amortization costs, higher marketing, advertising and distribution costs.

***Gross profit***

In fiscal 2019 gross profit decreased by 9.3% to $114.7 million, compared to $126.5 million for fiscal 2018. The decrease was mainly due to an increase in marketing, advertising and distribution costs and adjustment on account of adoption new accounting standard in fiscal year 2019.

***Administrative costs***

In fiscal 2019, administrative costs increased by 28.1% to $87.1 million compared to $68.0 million for fiscal year 2018, the increase in administrative cost were mainly on account of credit impairment loss amounting to $21.4 million in fiscal year 2019 and impairment of loans and advances of $7.3 million in fiscal 2019.

***Net finance costs***

In fiscal 2019, net finance costs decreased by 56.9% to $7.7 million, compared to $17.8 million for fiscal year 2018 mainly due to unwinding of credit impairment loss reserve by $13.2 million and which was partially offset by lower capitalization of interest.

***Other gains/(loss), net***

In fiscal year 2019, other gains were increased by 100.7% to $0.3 million, compared to other losses of $41.3 million in fiscal year 2018, the gain was mainly on account of reversal of expected credit loss of $20.7 million, a credit from the Government of India amounting to $2.3 million and a foreign exchange gain of $5.6 million which was partially offset by a loss on financial liability measured at fair value amounting to $21.4 million compared to $13.8 in fiscal year 2018. In addition, there were other losses in fiscal 2018 caused by a one-time loss on deconsolidation of subsidiary amounting to $14.6 million.

### Impairment loss

The Company recorded an impairment loss, totaling to $423.3 million, mainly due to high discount rate and changes in the market conditions, including decrease in projected volume primarily on account of recent credit downgrade and expected investment in film content of $150 - $160 million as more fully explained in note 2(c) to audited financial statements. The impairment loss was firstly allocated to the carrying amount of goodwill and Intangibles - trademark totaling $17.8 million and the residual amount totaling $405.5 million was allocated to Intangibles – content.

### Income tax expense

In fiscal 2019, income tax expenses decreased by 19.7% to $7.3 million, compared to $9.1 million for fiscal year 2018. Effective income tax rates were 11.6% and 20% for March 31, 2019 and March 31, 2018, respectively, excluding non-deductible share-based payment charges, impairment loss and gain/loss on fair valuation of derivative liabilities. The change in effective rate principally reflects a change in the mix of the profits earned from taxable and non- taxable jurisdictions.

### Net (loss)/profit

In fiscal year 2019, net loss was $410.5 million compared to $9.7 million for the fiscal year 2018, the increase was mainly on account of impairment loss of $423.3 million in fiscal year 2019.

### Adjusted EBITDA (Non-GAAP)

In fiscal 2019, adjusted EBITDA decrease by 8.8% to $69.4 million, compared to $76.1 million for fiscal year 2018.The decrease in Adjusted EBITDA is due to increased cost of sales, administrative cost and Profit/(loss) before impairment loss and tax.

### Trade receivables

As of March 31, 2019, Trade Receivables decreased to $196.4 million from $225.0 million as of March 31, 2018 after considering expected credit loss reserve upon adoption of new accounting standards during the year.

### Net debt

As of March 31, 2019, net debt decreased by 23.4% to $145.0 million from $189.2 million as of March 31, 2018 primarily on account of additional equity infusion during the year amounting $54.7 million. The equity infusion was primarily received from promoters' group $8 million and Reliance Industries $46.7 million at $14.7 and $15 per share, respectively.

### Exchange rates

Our functional and reporting currency is the U.S. dollar. Transactions in foreign currencies are translated at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities in foreign currencies are translated into U.S. dollars at the exchange rates ruling on the date of the applicable statement of financial position. For the purposes of consolidation, all income and expenses are translated at the average rate of exchange during the period covered by the applicable statement of income and assets and liabilities are translated at the exchange rate ruling on the date of the applicable statement of financial position.

The following table sets forth, for the periods indicated, information concerning the exchange rates between Indian rupees and U.S. dollars based on the noon buying rate in the City of New York for cable transfers of Indian rupees as certified for customs purposes by the Federal Reserve Bank of New York.

| | Period End | Average(1) | High | Low |
|---|---|---|---|---|
| **Fiscal Year** | | | | |
| 2011 | 44.54 | 45.46 | 47.49 | 43.90 |
| 2012 | 50.89 | 48.01 | 53.71 | 44.00 |
| 2013 | 54.52 | 54.36 | 57.13 | 50.64 |
| 2014 | 60.35 | 60.35 | 68.80 | 53.65 |
| 2015 | 62.58 | 61.15 | 63.70 | 58.46 |
| 2016 | 66.25 | 65.39 | 68.84 | 61.99 |
| 2017 | 64.85 | 67.01 | 68.86 | 64.85 |
| 2018 | 65.11 | 64.46 | 65.71 | 63.38 |
| 2019 | 69.16 | 69.91 | 74.33 | 64.92 |
| 2020 | 75.39 | 70.90 | 71.66 | 70.10 |
| **Months** | | | | |
| April 2019 | 69.64 | 69.41 | 70.19 | 68.58 |
| May 2019 | 69.63 | 69.77 | 70.62 | 69.08 |
| June 2019 | 68.92 | 69.39 | 69.83 | 68.92 |
| July 2019 | 68.81 | 68.74 | 69.03 | 68.40 |
| August 2019 | 71.45 | 71.19 | 72.02 | 69.00 |
| September 2019 | 70.64 | 71.32 | 72.20 | 70.49 |
| October 2019 | 71.01 | 71.00 | 71.48 | 70.71 |
| November 2019 | 71.75 | 71.48 | 72.12 | 70.76 |
| December 2019 | 71.36 | 71.16 | 71.70 | 70.62 |
| January 2020 | 71.53 | 71.27 | 71.86 | 70.69 |
| February 2020 | 72.53 | 71.53 | 72.53 | 71.11 |
| March 2020 | 75.39 | 74.55 | 76.37 | 72.88 |
| April 2020 | 75.08 | 76.17 | 76.95 | 75.08 |
| May 2020 | 75.59 | 75.67 | 76.08 | 75.03 |
| June 2020 | 75.63 | 75.73 | 76.32 | 75.03 |

(1)    Represents the average of the U.S. dollar to Indian Rupee exchange rates on the last day of each month during the period for all fiscal years presented, and the average of the noon buying rate for all days during the period for all months presented.

This volatility in the Indian Rupee as compared to the U.S. dollar and the increasing exchange rate has impacted our results of operations as shown in the table below comparing the reported results against constant currency comparable based upon the average rate of exchange for the year ended March 31, 2020, of INR 70.90 to $1.00. In addition to the impact on gross profit, the volatility during the year ended March 31, 2020 also led to a non-cash foreign exchange gain of 2.7 million principally on retail bond foreign currency in the year ended March 31, 2020 compared to non-cash foreign exchange loss of 5.6 million principally on retail bond foreign currency in the year ended March 31, 2019.

The following table sets forth our constant currency revenue (a non-GAAP financial measure) for the periods indicated. Constant currency revenue is a non- GAAP financial measure. We present constant currency revenue so that revenue may be viewed without the impact of foreign currency exchange rate fluctuations, thereby facilitating period-to-period comparisons of business performance. Constant currency revenue is presented by recalculating prior period's revenue denominated in currencies other than in US dollars using the foreign exchange rate used for the latest period. Our non-US dollar denominated revenue includes, but is not limited to, revenue denominated in Indian rupee, pound sterling and United Arab Emirates Dirham.

89

| | Year ended March 31, | | | | | |
| | 2020 | | 2019 | | 2018 | |
| | Reported | Constant Currency (Non-GAAP) | Reported | Constant Currency (Non-GAAP) | Reported | Constant Currency (Non-GAAP) |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in thousands) | | | |
| Revenue | $ 155,452 | 155,452 | $ 270,126 | 265,792 | $ 261,253 | $ 249,406 |
| Cost of sales | (81,725) | (81,725) | (155,396) | (152,364) | (134,708) | (126,836) |
| Gross Profit | $ 73,727 | 73,727 | $ 114,730 | 113,428 | $ 126,545 | $ 122,570 |

The percentage change for the data comparing the constant currency amounts against the reported results referenced in the table above:

| | Year ended March 31, | | |
| | 2020 | 2019 | 2018 |
| --- | --- | --- | --- |
| | | (in thousands) | |
| Revenue | —% | 1.6% | 4.5% |
| Cost of sales | —% | 2.0% | 5.8% |
| Gross profit | —% | 1.1% | 3.1% |

The Indian Rupee experienced an approximately 8.3% decrease in value as compared to the U.S. dollar in the fiscal year 2020. In the fiscal year 2019, it decreased by 5.9%.

## B. Liquidity and Capital Resources

Our operations and strategic objectives require continuing capital investment, and our resources include cash on hand and cash provided by operations, as well as access to capital from bank borrowings and access to capital markets. Management believes that cash generated by or available to us should be sufficient to fund our capital and liquidity needs for at least the next 12 months.

Our future financial and operating performance, ability to service or refinance debt and ability to comply with covenants and restrictions contained in our debt agreements will be subject to future economic conditions, the financial health of our customers and suppliers and to financial, business and other factors, many of which are beyond our control. Furthermore, management believes that working capital is sufficient for our present requirements.

| | Year ended March 31, | | |
| | 2020 | 2019 | 2018 |
| --- | --- | --- | --- |
| | | (in thousands) | |
| Current assets(*) | $ 118,405 | $ 351,597 | $ 339,562 |
| Current liabilities | 225,280 | 318,672 | 239,327 |
| Working capital | $ (106,875) | $ 32,925 | $ 100,235 |

(*) including trade receivables classified as current asset based on operating cycle of two years.

The decrease in working capital as at March 31, 2020 as compared to March 31, 2019 was primarily the result of reduction in trade and other receivables, Cash & Bank balance and restricted deposits by $97.9 million, $86.6 million and 51 million respectively. The short-term borrowings have also reduced by 92 million to $116.9 million as at March 31, 2020 from $208.9 million as at March 31, 2019 due to repayment of senior convertible notes and short-term borrowings secured by restricted assets.

For additional information, please see Note 2(a) and Note 31 to our audited Consolidated Financial Statements appearing elsewhere in this annual report.

### Indebtedness

As of March 31, 2020, we had aggregate outstanding indebtedness of $179.4 million, cash and cash equivalents of $2.6 million and short-term liquid investments of $3.8 million. As at March 31, 2020, the total available facilities were comprised of (i) secured credit, bill discounting and overdraft, secured term loans, and vehicle loans of $71.9 million at Eros India, (ii) secured overdraft amounting to $22.1 million at Eros International Limited. In addition, Eros International plc has debt of $62.3 million in relation to a retail bond offering for £50 million in October 2014 and Senior Convertible Notes amounting

to $23.1 million issued in December 2017. As at March 31, 2020, there were undrawn amounts under our facilities of $0.1 million.

90

| | | As of<br>March 31, 2020<br>(in thousands) |
|---|---|---|
| **Eros India** | | |
| Secured credit, bill discounting and overdraft | $ | 48,777 |
| Secured term loans | $ | 22,975 |
| Vehicle loans | $ | 127 |
| **Total** | **$** | **71,879** |
| **Eros International plc** | | |
| Retail Bond | $ | 62,274 |
| Senior Convertible Notes | $ | 23,100 |
| **Total** | **$** | **85,374** |
| **Eros International Limited** | | |
| Secured overdraft | $ | 22,118 |
| **Total** | **$** | **22,118** |
| **Total** | **$** | **179,371** |

Certain of our borrowings and loan agreements, including our new credit facility, contain customary covenants, including covenants that restrict our ability to incur additional indebtedness, create or permit liens on our assets or engage in mergers and acquisitions. Such agreements also contain various customary events of default with respect to the borrowings, including the failure to pay interest or principal when due and cross default provisions, and, under certain circumstances, lenders may be able to require repayment of loans to Eros India prior to their maturity. If an event of default occurs and is continuing, the principal amounts outstanding, together with all accrued unpaid interest and other amounts owed may be declared immediately due and payable by the lenders. If such an event were to occur, we would need to pursue new financing that may not be on as favourable terms as our current borrowings. We are currently in full compliance with all of our agreements governing indebtedness.

Borrowings under our term loan facilities and overdraft facility at Eros India matures between 2020 and 2023 and bear interest at fluctuating interest rates pursuant to the relevant sanction letter governing such loans.

We expect to renew, replace or extend our borrowings as they reach maturity. As at March 31, 2020, we had net undrawn amounts of $0.1 million available.

***The Notes***

On December 06, 2017, the Company closed a registered direct offering (the "2017 Offering") of $122,500,000 aggregate principal amount of the Company's Senior Convertible Notes (collectively, the "Notes") and a Warrant (collectively, the "Warrants") to purchase up to 2,000,000 of the Company's A ordinary shares, for an aggregate purchase price of $100,000,000. The Notes and Warrants were issued and sold pursuant to a Securities Purchase Agreement, dated as of December 04, 2017, by and among the Company and the buyers party thereto. The 2017 Offering was effected pursuant to a prospectus supplement dated December 01, 2017 under the Company's Registration Statement on Form F-3 (Registration No. 333-219708), as amended (the "Registration Statement"). The Registration Statement was declared effective on October 02, 2017. The Warrants expired on June 30, 2018 without being exercised.

In connection with the issuance of the Notes, the Company entered into an indenture, dated as of December 06, 2017, between the Company and Wilmington Savings Fund Society, FSB, as trustee (the "Base Indenture"), as supplemented by a first supplemental indenture thereto, dated as of December 06, 2017 (the "Supplemental Indenture" and, the Base Indenture as supplemented by the Supplemental Indenture, the "Indenture"). The terms of the Notes included those provided in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended.

The Notes would have matured on December 06, 2020 unless earlier converted or redeemed, subject to the right of the holders to extend the date under certain circumstances. The Notes were issued with an original issue discount and the terms of the Notes provided that they would not bear interest except upon the occurrence of an event of default, in which case the Notes would bear interest at a rate of 6.0% per annum. The Notes were senior obligations of the Company.

The Company made monthly payments consisting of an amortizing portion of the principal of each Note equal to $3,500,000 and accrued and unpaid interest and late charges on the Note. Provided equity conditions referred to in the prospectus supplement were satisfied, the Company was permitted to make a monthly payment by converting such payment amount into A ordinary shares. Alternatively the Company was permitted, at its option, to make monthly payments by redeeming such payment amount in cash, or by any combination of conversion and redemption.

All amounts due under the Notes were convertible at any time, in whole or in part, at the holder's option, into A ordinary shares at the initial conversion price of $14.6875. The conversion price was subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the conversion of a Note would also be adjusted so that the aggregate conversion price would have been the same immediately before and immediately after any such adjustment. In addition, the conversion price was also subject to an anti-dilution adjustment if the Company issued or was deemed to have issued securities at a price lower than the then applicable conversion price. Further, if the Company sold or issued any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a Note would have the right thereafter to substitute the "floating" conversion price for the conversion price upon conversion of all or part the Note.

The Notes required "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon conversion.

On or after December 06, 2019, and subject to certain conditions, the Company had the right to redeem all, but not less than all, of the remaining principal amount of the Notes and all accrued and unpaid interest and late charges in cash at a price equal to 100% of the amount being redeemed, so long as the VWAP of the A ordinary shares exceeded $18.3594 (as adjusted for stock splits, stock dividends, recapitalizations and similar events) for at least 10 consecutive trading days. At any time prior to the date of the redemption, a holder had the right to convert its Note, in whole or in part, into A ordinary shares. The Company had no right to effect an optional redemption if any event of default had occurred and was continuing.

As of June 30, 2020, all amounts due under the Notes have been converted and no principal amount of the Notes remained outstanding.

***2020 Notes Offering***

On September 30, 2019, the Company closed a registered direct offering (the "2019 Offering") of $27,500,000 aggregate principal amount of the Company's Senior Convertible Notes (collectively, the "New Notes") for aggregate net proceeds of approximately $24,500,000. The New Notes were issued and sold pursuant to a Securities Purchase Agreement, dated as of September 26, 2019, by and among the Company and the buyers party thereto. The 2019 Offering was effected pursuant to a prospectus supplement dated September 26, 2019 under the Registration Statement.

The securities purchase agreement provided, as consideration for the securities purchase agreement and pursuant to the provisions of the Notes, for the Company to waive rights to make redemptions or repayments under the Notes in cash, and for the holder of the Notes (the "2017 Holder") to waive certain specified rights and terms under the Notes, including certain rights to cash payment of any installment amounts then-due under the Notes, and provided for automatic election by the Company to pay each installment amount in the Company's A ordinary shares. Additionally, with respect to an aggregate amount of $9 million of installment amounts as to which a conversion notice was delivered by the 2017 Holder but a conversion did not occur prior to September 26, 2019 as a result of the mutual agreement of the Company and the 2017 Holder, the conversion of such installment was deemed to have been voided by the 2017 Holder as of September 3, 2019, such that the installment conversion price was automatically adjusted in accordance with clause (A) of Section 8(b) of the Notes based on the VWAP of the A ordinary shares as of August 26, 2019.

The New Notes will mature on September 30, 2020, unless earlier converted or redeemed, subject to the right of the

holders to extend the date under certain circumstances. The New Notes were issued with an original issue discount and do not bear interest except upon the occurrence of an event of default, in which case the New Notes shall bear interest at a rate of 6.0% per annum. The New Notes are senior obligations of the Company.

92

All amounts due under the New Notes are convertible at any time, in whole or in part, at the holder's option into A ordinary shares at the initial conversion price of $3.59. The conversion price is subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the conversion of a New Note will also be adjusted so that the aggregate conversion price shall be the same immediately before and immediately after any such adjustment. In addition, the conversion price is also subject to an anti-dilution adjustment if the Company issues or is deemed to have issued securities at a price lower than the then applicable conversion price. Further, if the Company sells or issues any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a New Note will have the right thereafter to substitute the "floating" conversion price for the conversion price upon conversion of all or part the New Note.

The New Notes require "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon conversion. Holders of New Notes are entitled to receive any dividends paid or distributions made to the holders of A ordinary shares on an "as if converted" basis. If the Company issues options, convertible securities, warrants, shares or similar securities to holders of A ordinary shares, each New Note holder has the right to acquire the same as if the holder had converted its New Note.

The New Notes prohibit the Company from entering into specified fundamental transactions unless the successor entity assumes all of the Company's obligations under the New Notes under a written agreement before the transaction is completed. Upon specified corporate events, a New Note holder will thereafter have the right to receive upon a conversion such shares, securities, cash, assets or any other property which the holder would have been entitled to receive upon the happening of the applicable corporate event had the New Note been converted immediately prior to the applicable corporate event. When there is a transaction involving specified changes of control, a New Note holder will have the right to force the Company to redeem all or any portion of the holder's New Note for a purchase price in cash equal to the equal to the greater of (i) 105% of the amount being redeemed, (ii) the product of (A) the amount being redeemed multiplied by (B) the quotient of (1) the highest closing sale price of the A ordinary shares during the period beginning on the date immediately before the earlier to occur of (x) the completion of the change of control and (y) the public announcement of the change of control and ending on the date the holder delivers the redemption notice divided by (2) the conversion price then in effect, or (iii) the product of (A) the amount being redeemed multiplied by (B) the quotient of (1) the aggregate cash consideration and the aggregate cash value of any non-cash consideration per A ordinary share to be paid to the holders of A ordinary shares upon the completion cash flow of the change of control divided by (2) the conversion price then in effect.

As of June 30, 2020, all amounts due under the New Notes have been converted and no principal amount of the New Notes remained outstanding.

***Sources and uses of cash***

|  | Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2020 | | 2019 | | 2018 | |
|  | (in thousands) | | | | | |
| Net cash from operating activities | $ | 18,738 | $ | 74,966 | $ | 83,243 |
| Net cash used in investing activities | $ | (80,546) | $ | (157,733) | $ | (185,420) |
| Net cash from financing activities | $ | (24,286) | $ | 84,117 | $ | 77,415 |

***Cash flow movement for the year ended March 31, 2020 compared to year ended March 31, 2019***

Net cash generated from operating activities in fiscal year 2020 was $18.7 million compared to $75.0 million in the in fiscal year 2019, a decrease of $56.3 million, or 75.1%, primarily on account of reduction in trade and other receivables.

Net cash used in investing activities in fiscal year 2020 was $80.5 million compared to $157.7 million in fiscal year 2019, a decrease of $77.2 million, or 49.0%, primarily due to increase in the investment of intangible film and content rights in fiscal year 2020 to $132.2 million, compared to $107.7 million in fiscal year 2019 and decrease in restricted deposits to $4.8 million, compared to $ 55.9 million in fiscal year 2019.

Net cash used in financing activities in fiscal year 2020 was $24.3 million compared to net cash inflow of $84.1 million in fiscal year 2019, a decrease of $108.4 million, or 128.9%, primarily on account of reduction in the proceeds from debt/

increase in repayment of debt by $64.7 million and reduction in proceeds from share capital by $49.7 million.

93

***Cash flow movement for the year ended March 31, 2019 compared to year ended March 31, 2018***

Net cash generated from operating activities in fiscal year 2019 was $75.0 million compared to $83.2 million in the in fiscal year 2018, a decrease of $8.2 million, or 9.9%, primarily due to decrease in working capital movement of $65.1 million, mainly attributable to increase in trade receivables by $88.5 million and increase in trade payables by $23.4 million and as a result of lower operating profit before exceptional item generated in fiscal year 2019 as compared to fiscal year 2018.

Net cash used in investing activities in fiscal year 2019 was $157.7 million compared to $185.4 million in fiscal year 2018, a decrease of $27.7 million, or 14.9%, primarily as a result of investment in restricted deposits amounting to $53.5 million in fiscal year 2019 and offset by the decrease in purchase of intangible film rights and content rights in fiscal year 2019 was $107.7 million, compared to $186.8 million in fiscal year 2018, decrease of $79.1 million, or 42.3%.

Net cash from financing activities in fiscal year 2019 was $84.1 million compared to $77.4 million in fiscal year 2018, an increase of $6.7 million, or 8.7%, primarily as a result of the proceeds from the issuance of share capital and an increase in short-term borrowings in fiscal year, 2019.

**Capital expenditures**

In fiscal year 2020, the company invested over $265.3 million (of which cash outflow is $132.2 million) in film content, and in fiscal 2021 the company expects to invest approximately $150 to $160 million in film content.

**C. Research and Development**

Not applicable

**D. Trend Information**

Standards, amendments and Interpretations to existing Standards that are not yet effective and have not been adopted early by the Group.

At the date of authorization of these financial statements, several new, but not yet effective, accounting standards, amendments to existing standards, and interpretations have been published by the IASB. None of these standards, amendments or interpretations have been adopted early by the Group.

Management anticipates that all relevant pronouncements will be adopted for the first period beginning on or after the effective date of the pronouncement. New Standards, amendments and Interpretations neither adopted nor listed below have not been disclosed as they are not expected to have a material impact on the Group's financial statements.

**IFRS 3 "Business Combinations"**

In October 2018, the IASB issued amendments to IFRS 3 "Business Combinations" regarding the definition of a "Business." The amendments:

- clarify that to be considered a business, an acquired set of activities and assets must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs;
- narrow the definitions of a business and of outputs by focusing on goods and services provided to customers and by removing the reference to an ability to reduce costs;
- add guidance and illustrative examples to help entities assess whether a substantive process has been acquired;
- remove the assessment of whether market participants are capable of replacing any missing inputs or processes and continuing to produce outputs; and
- add an optional concentration test that permits a simplified assessment of whether an acquired set of activities and assets is not a business.

The above amendments are effective for business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after January 1, 2020.

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

94

**IAS 1 "Presentation of Financial Statements"**

In October 2018, the IASB issued amendments to IAS 1 "Presentation of Financial Statements" ("IAS 1") and IAS 8 "Accounting Policies, Changes in Accounting Estimates and Errors" ("IAS 8") which revised the definition of "Material." Three aspects of the new definition should especially be noted, as described below:

- Obscuring: The existing definition only focused on omitting or misstating information, however, the Board concluded that obscuring material information with information that can be omitted can have a similar effect. Although the term obscuring is new in the definition, it was already part of IAS 1 (IAS 1.30A);
- Could reasonably be expected to influence: The existing definition referred to "could influence" which the Board felt might be understood as requiring too much information as almost anything "could influence" the decisions of some users even if the possibility is remote;
- Primary users: The existing definition referred only to 'users' which again the Board feared might be understood too broadly as requiring them to consider all possible users of financial statements when deciding what information to disclose.

The amendments highlight five ways in which material information can be obscured:

- if the language regarding a material item, transaction or other event is vague or unclear;
- if information regarding a material item, transaction or other event is scattered in different places in the financial statements;
- if dissimilar items, transactions or other events are inappropriately aggregated;
- if similar items, transactions or other events are inappropriately disaggregated; and
- if material information is hidden by immaterial information to the extent that it becomes unclear what information is material.

The new definition of material and the accompanying explanatory paragraphs are contained in IAS 1. The definition of material in IAS 8 has been replaced with a reference to IAS 1.

The amendments are effective for annual reporting periods beginning on or after January 1, 2020. Earlier application is permitted.

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

In January 23, 2020, the IASB issued amendments to IAS 1 "Presentation of Financial Statements" ("IAS 1") to clarify the classification criteria of liabilities in the statement of financial position. The most significant changes are listed below:

- Classification of liabilities as current or non-current should be based on rights to defer settlement that are in existence at the end of the reporting period
- Classification of a liability is unaffected by the likelihood that the entity will exercise its right to defer settlement of the liability for at least twelve months after the reporting period'. That is, management's intention to settle in the short run does not impact the classification.
- 'Settlement' is defined as the extinguishment of a liability with cash, other economic resources or an entity's own equity instruments.
- Clarifies that if the right to defer settlement is conditional on the compliance with covenants the right exists if the conditions are met at the end of the reporting period,
- Clarifies that if a liability has terms that could, at the option of the counterparty, result in its settlement by the transfer of the entity's own equity instruments, these terms do not affect its classification as current or non-current if the entity recognises

the option separately as an equity instrument applying IAS 32 Financial Instruments: Presentation.

95

The amendments are effective for annual reporting periods beginning on or after January 1, 2022. Earlier application is permitted.

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

**IAS 37 "Provisions, Contingent Liabilities and Contingent Asset"**

On May 14, 2020, the IASB issued amendment to IAS 37 by specifying that the 'cost of fulfilling' a contract comprises the 'costs that relate directly to the contract'. Costs that relate directly to a contract consist of both the incremental costs of fulfilling that contract (examples would be direct labour or materials) and an allocation of other costs that relate directly to fulfilling contracts (an example would be the allocation of the depreciation charge for an item of property, plant and equipment used in fulfilling the contract).

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

The amendments are effective for annual periods beginning on or after 1 January 2022. Early application is permitted

**Interest Rate Benchmark Reform**

In September 26, 2019, IASB introduced amendments, which modified specific hedge accounting requirements, so that entities would apply those hedge accounting requirements assuming that the interest rate benchmark is not altered as a result of the interest rate benchmark reform.

The changes will mandatorily apply to all hedging relationships that are directly affected by the interest rate benchmark reform.

The Group does not expect the amendment to have any significant impact on its consolidated financial statements.

The effective date for adoption of this amendment is annual periods beginning on or after January 1, 2020, although early adoption is permitted.

**IFRS 16 "Leases"**

On May 15, 2020, the IASB issued amendments to IFRS 16 to make it easier for lessees to account for COVID-19-related rent concessions such as rent holidays and temporary rent reductions.

The amendment exempts lessees from having to consider individual lease contracts to determine whether rent concessions occurring as a direct consequence of the covid-19 pandemic are lease modifications and allows lessees to account for such rent concessions as if they were not lease modifications. It applies to covid-19-related rent concessions that reduce lease payments due on or before 30 June 2021

These amendments are effective for periods beginning on or after June 1, 2020, with earlier application is permitted. The Company is currently evaluating the impact of amendment to IFRS 16 on its consolidated financial statements.

**Quarterly Financial Information**

The table below presents our selected unaudited quarterly results of operations for the four quarters in the fiscal year ended March 31, 2020. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. We have prepared the unaudited financial data for the quarters presented on the same basis as our audited consolidated financial statements. The historical quarterly results presented below are not necessarily indicative of the results that may be expected for any future quarters or periods.

| | Three Months Ended | | | |
| | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 |
|---|---|---|---|---|
| | (dollars in thousands) | | | |
| **Selected Quarterly Results of Operations** | | | | |
| Revenue | $ 42,252 | $ 31,371 | $ 48,736 | $ 33,093 |
| Cost of sales | (16,544) | (16,919) | (22,113) | (26,149) |
| Gross profit | 25,708 | 14,452 | 26,623 | 6,944 |
| Administrative costs | (25,970) | (29,082) | (19,784) | (69,483) |
| Operating profit/(loss) before impairment loss | (262) | (14,630) | 6,839 | (62,539) |
| Impairment Loss | — | — | — | (431,200) |
| **Operating profit/(loss)** | (262) | (14,630) | 6,839 | (493,739) |
| Net finance costs | (2,147) | (2,253) | (1,158) | (3,221) |
| Other gains/(losses), net | 8,051 | (11,326) | (19,822) | 19,781 |
| Profit/(loss) before tax | 5,642 | (28,209) | (14,141) | (477,179) |
| Income tax | (1,834) | (891) | (3,991) | 28,899 |
| **Profit/(loss) for the year** | $ 3,808 | $ (29,100) | $ (18,132) | $ (448,280) |
| **OTHER NON-GAAP MEASURES** | | | | |
| EBITDA[1] | $ 8,404 | $ (25,278) | $ (12,344) | $ (472,428) |
| Adjusted EBITDA [1] | $ 17,380 | $ 6,748 | $ 19,953 | $ 10,761 |
| Gross Adjusted EBITDA [1] | $ 29,257 | $ 19,140 | $ 39,971 | $ 30,925 |
| **OPERATING DATA** | | | | |
| High budget film releases[3] | — | — | — | — |
| Medium budget film releases[3] | — | — | 2 | — |
| Low budget film releases[3] | 12 | 11 | 4 | 1 |
| **Total new film releases[3]** | 12 | 11 | 6 | 1 |

(1)  We use EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as supplemental financial measures. EBITDA is defined by us as net income before interest expense, income tax expense and depreciation and amortization (excluding amortization of capitalized film content and debt issuance costs). Adjusted EBITDA is defined as EBITDA adjusted for (gain)/impairment of available-for-sale financial assets, profit/loss on held for trading liabilities (including profit/loss on derivative financial instruments), transactions costs relating to equity transactions, share based payments, Loss / (Gain) on sale of property and equipment, Loss on de-recognition of financial assets measured at amortized cost, net, Credit impairment loss, net, Loss on financial liability (convertible notes) measured at fair value through profit and loss, Loss on deconsolidation of a subsidiary and exceptional items such as impairment of goodwill, trade-mark, film and content rights and content advances. Gross Adjusted EBITDA is defined as Adjusted EBITDA adjusted for amortization of intangible film and content rights. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as used and defined by us, may not be comparable to similarly-titled measures employed by other companies and is not a measure of performance calculated in accordance with GAAP. EBITDA Adjusted EBITDA and Gross Adjusted EBITDA should not be considered in isolation or as a substitute for operating income, net income, cash flows from operating, investing and financing activities, or other income or cash flow statement data

prepared in accordance with GAAP. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA provide no information regarding a Company's capital structure, borrowings, interest costs, capital expenditures and working capital movement or tax position. However, our management team believes that EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA are useful to an investor in evaluating our results of operations because these measures:

· are widely used by investors to measure a company's operating performance without regard to items excluded from the calculation of such term, which can vary substantially from company to company depending upon accounting methods and book value of assets, capital structure and the method by which assets were acquired, among other factors;

97

- help investors to evaluate and compare the results of our operations from period to period by removing the effect of our capital structure from our operating structure; and
- are used by our management team for various other purposes in presentations to our board of directors as a basis for strategic planning and forecasting.

there are significant limitations to using EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as a measure of performance, including the inability to analyze the effect of certain recurring and non-recurring items that materially affect our net income or loss, the lack of comparability of results of operations of different companies and the different methods of calculating EBITDA. Adjusted EBITDA and Gross Adjusted EBITDA reported by different companies.

The following table sets forth the reconciliation of our net income to EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA:

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 |
| | (in thousands) | | | |
| **(Loss)/Profit for the year** | $ 3,808 | $ (29,100) | $ (18,132) | $ (448,280) |
| Income tax expense | 1,834 | 891 | 3,991 | (28,899) |
| Net finance costs | 2,147 | 2,253 | 1,158 | 3,221 |
| Depreciation | 391 | 454 | 415 | 1,308 |
| Amortization[a] | 224 | 224 | 224 | 222 |
| **EBITDA (Non-GAAP)** | $ 8,404 | (25,278) | $ (12,344) | $ (472,428) |
| Share based payments[b] | 3,666 | 5,717 | 4,317 | 8,568 |
| Reversal credit impairment losses/(gains) | (1,287) | (1,987) | (2,902) | (4,207) |
| Loss on de-recognition of financial assets measured at amortized cost, net | 270 | 726 | 1,625 | 2,664 |
| Credit impairment losses, net | 10,805 | 13,089 | 12,642 | 54,272 |
| Loss /(Gain) on sale of property and equipment | 4 | | 2 | 64 |
| Loss on financial liability (convertible notes) measured at fair value through profit and loss | (4,985) | 14,142 | 16,590 | (9,760) |
| Impairment Loss | — | — | — | 431,200 |
| Fair value of receivables | (306) | 306 | — | — |
| Net losses/(gains) of available- for- sale measured at FVTPL | 809 | 33 | 23 | 388 |
| **Adjusted EBITDA (Non-GAAP)** | $ 17,380 | $ 6,748 | $ 19,953 | $ 10,761 |
| Amortization of intangible film and content rights | 11,877 | 12,392 | 20,018 | 20,164 |
| **Gross Adjusted EBITDA (Non-GAAP)** | $ 29,257 | $ 19,140 | $ 39,971 | $ 30,925 |

_____

a) Includes only amortization of intangible assets other than intangible content assets.
b) Consists of compensation costs recognised with respect to all outstanding plans and all other equity settled instruments.
(2) Includes films that were released by us directly and licensed by us for release.

Our revenues and operating results are significantly affected by the timing, number and breadth of our theatrical releases and their budgets, the timing of television syndication agreements, and our amortization policy for the first 12 months of commercial exploitation for a film. The timing of releases is determined based on several factors. A significant portion of the films we distribute are delivered to Indian theaters at times when theater attendance has traditionally been highest, including school holidays, national holidays and the festivals. This timing of releases also takes into account competitor film release dates, major cricket events in India and film production schedules. Significant holidays and festivals, such as

Diwali, Eid and Christmas, occur during July to December each year, and the Indian Premier League cricket season generally occurs during April and May of each year. The Tamil New Year, called Pongal, falls in January each year making the quarter ending March an important one for Tamil releases.

Our quarterly results can vary from one period to the next, and the results of one quarter are not necessarily indicative of results for the next or any future quarter. Our revenue and operating results are therefore seasonal in nature due to the impact on income of the timing of new releases as well as timing and quantum of catalogue revenues.

98

**E. Off-Balance Sheet Arrangements**

From time to time, to satisfy our filmed content purchase contracts, we obtain guarantees or other contractual arrangements, such as letters of credit, as support for our payment obligations.

As of March 31, 2020, the Group has provided certain stand-by letters of credit amounting to $Nil (2019: $53.6 million) which are in the nature of performance guarantees issued while entering into film co-production contracts and are valid until funding obligations under these contracts are met. These guarantees, issued in connection with outstanding content commitments, have varying maturity dates.

In addition, the Group issued financial guarantees amounting to $0.03 million (2019: $0.5 million) in the ordinary course of business, having varying maturity dates up to the next 12 months. The Group is only called upon to satisfy a guarantee when the guaranteed party fails to meet its obligations.

The Group did not earn any fee to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

**F. Contractual Obligations**

We have commitments under certain firm contractual arrangements, or firm commitments, to make future payments. These firm commitments secure future rights to various assets and services to be used in the normal course of our operations. The following table summarizes our firm commitments as of March 31, 2020.

| | As of March 31, 2020 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| | | | (in thousands) | | |
| *Recorded Contractual Obligations* | | | | | |
| Debt | $ 179,371 | $ 117,097 | $ 62,274 | $ — | $ — |
| Operating leases | 1,553 | 723 | 830 | — | — |
| **Total** | **180,924** | **117,820** | **63,104** | **—** | **—** |
| *Unrecorded Contractual Obligations* | | | | | |
| Film entertainment rights purchase obligations[1] | 450,469 | 85,893 | 138,183 | 92,427 | 133,966 |
| Interest payments on Lease Liability | 163 | 99 | 64 | — | — |
| Operating leases | 623 | 229 | 394 | — | — |
| Interest payments on debt [2] | 23,741 | 17,500 | 6,241 | — | — |
| **Total** | **474,996** | **103,721** | **144,882** | **92,427** | **133,966** |

(1)  The amounts disclosed as Film entertainment rights purchase obligations are mutually agreed terms and are presently disclosed on best estimate basis.

(2)  The amounts shown in the table include future interest payments on variable and fixed rate debt at current interest rates ranging from 1.8% to 16.45%..

**G. Safe Harbor**

See "Special Note Regarding Forward-Looking Statements" at the beginning of this annual report.

**ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES**

**A. Directors and Executive Officers**

Our board of directors presently consists of seven directors.

The following table sets forth the name, age (as at June 30, 2020) and position of each of our directors and executive officers as at the date hereof.

| Name | Age | Position/s |
| --- | --- | --- |
| **Directors** | | |
| Kishore Lulla | 58 | Executive Chairman and Group Chief Executive Officer and Managing Director |
| Prem Parameswaran | 51 | Executive Director, President of North America & Group Chief Financial Officer |
| Sunil Lulla | 55 | Director, Executive Vice Chairman |
| Dilip Thakkar[1][2][3][4] | 83 | Director, Chairman of Audit Committee |
| Rishika Lulla Singh | 33 | Director |
| Shailendra Swarup[1][2][3][4] | 75 | Director, Chairman of Remuneration Committee and Nomination Committee |
| Dhirendra Swarup[1][2] | 75 | Director |
| **Senior Management** | | |
| Ridhima Lulla | 28 | Chief Content Officer |
| Kumar Ahuja | 41 | Chief Operating Officer, Eros India |
| Mark Carbeck | 48 | Chief Corporate and Strategy Officer |
| Pradeep Dwivedi | 49 | Chief Executive Officer, Eros India |
| Ali Hussein | 40 | Chief Executive Officer, Eros Now |

_____

[1]    Independent Director
[2]    Member of the Audit Committee
[3]    Member of the Remuneration Committee
[4]    Member of the Nomination Committee

Summarized below is relevant biographical information for each of our directors and executive officers.

**Directors**

*Mr. Kishore Lulla* is the Group Chief Executive Officer, Managing Director and our Executive Chairman. Mr. Lulla received a bachelor's degree in arts from the Mumbai University. He has over 36 years of experience in the media and film industry. He has served as a director since April 2006. He is a member of the British Academy of Film and Television Arts and Young Presidents' Organization and is also a board member of the School of Film at the University of California, Los Angeles. He has been honored at the Asian Business Awards 2007 and the Indian Film Academy Awards 2007 for his contribution in taking Indian cinema global. In 2010, Mr. Lulla was awarded the "Entrepreneur of the Year" at the GG2 Leadership and Diversity Awards and in 2014, Forbes Asia featured Mr. Lulla in the list of 'Best under a Billion'. He was also honored with the 2014 Global Citizenship Award by the American Jewish Committee, a leading global Jewish advocacy organization. Mr. Lulla also received the Entertainment Visionary award at the 2015 Annual Gala Dinner from the Asia Society Southern California. In 2015, he was invited to attend the "billionaires' summer camp" in Sun Valley, an annual gathering of the world's most powerful entrepreneurs and business executives. As our Chairman, he has been instrumental in expanding our presence in the United Kingdom, the United States, Dubai and Australia and other international markets. In 2018, he was featured in the Variety 500 list of "influential business leaders shaping the global $2 trillion entertainment industry". Mr. Kishore Lulla is the father of Mrs. Rishika Lulla Singh and Ms. Ridhima Lulla, the brother of Mr. Sunil Lulla and a cousin of Mr. Vijay Ahuja and Mr. Surender Sadhwani.

*Mr. Prem Parameswaran* is our Executive Director, Group Chief Financial Officer and President of Eros International Plc's North American operations. Mr. Parameswaran joined us in June 2015 and was appointed to our Board of Directors in December 2018. Mr. Parameswaran has close to 30 years of experience in the Media, Entertainment and Technology sectors. Prior to joining Eros, Mr. Parameswaran had over 23 years of experience in investment banking, advising clients in the global telecommunications, media and technology sector, including on mergers and acquisitions and public, private equity and debt financings. Mr. Parameswaran previously served as the Global Head of Media and Telecommunications Investment Banking at Jefferies LLC. Prior to Jefferies, he was the Americas Head of Media & Telecom at Deutsche Bank and also previously worked at both Goldman Sachs and Salomon Brothers. Throughout his career, he has executed over 300 transactions. Mr. Parameswaran graduated from Columbia University with a bachelor's degree in arts and received a master's degree in business administration from Columbia Business School. Mr. Parameswaran also serves on the boards of the Columbia University Alumni Trustee Nominating Committee and the Program for Financial Studies at Columbia Business School. In 2018 Mr. Parameswaran was named one of the "10 most Dynamic CFOs to watch" by Insights Success magazine. In January 2020, Mr. Parameswaran was nominated by President Donald J. Trump as a member of the Presidential Advisory Commission for Asian Americans and Pacific Islanders. He was officially sworn in as a Commissioner on January 27,2020 and is the only Indian American on the 13 member Commission.

*Mr. Sunil Lulla* is an Executive Director in our Company and is the Executive Vice Chairman and Managing Director of Eros India. He received a bachelor's degree in commerce from the Mumbai University. Mr. Lulla has over 25 years of experience in the media and entertainment industry. Mr. Lulla has valuable relationships with talent in the Indian film industry and has been instrumental in our expansion into distribution in India as well as into home entertainment and music. He has served as a director since April 2006 and led to our growth within India for many years before being appointed as the Executive Vice Chairman and Managing Director of Eros India on September 28, 2009. Mr. Sunil Lulla is the brother of Mr. Kishore Lulla, uncle of Mrs. Rishika Lulla Singh and the cousin of Mr. Ahuja and Mr. Surender Sadhwani.

*Mr. Dilip Thakkar* is an Independent Director in our Company. Mr. Thakkar received bachelor's a degree in commerce and in law from Mumbai University. A practicing-chartered accountant since 1961, Mr. Thakkar has significant financial experience. He is a senior partner of Jayantilal Thakkar & Co, Chartered Accountants and a member of the Institute of Chartered Accountants in India. In 1986, he was appointed by the Reserve Bank of India as a member of the Indian Advisory Board for HSBC Bank and for the British Bank of the Middle East for a period of eight years. He is the former president of the Bombay Chartered Accountants' Society and was then, the chairman of its International Taxation Committee. Mr. Thakkar serves as an independent director of six public limited companies and five private limited companies in India and sixteen foreign companies. He has served as a director since April 2006.

*Mrs. Rishika Lulla Singh* is an Executive Director in our Company and Chairman of Eros Digital, which covers all of the digital initiatives for Eros including Eros Now. Mrs. Lulla Singh has been instrumental in spearheading the creation and development distribution of Eros Now within India and internationally. She graduated from the School of Oriental and African Studies with a bachelor's degree in arts in South Asian Studies and Management and completed a postgraduate study at the UCLA School of Theatre, Film and Television. With over five years of experience in over-the-top platforms and content, Mrs. Lulla Singh has been a key contributor in driving the growth and penetration of Eros Now, both with technological developments and relationship management to stimulate platform penetration. She was named as "Young Entrepreneur of the Year" by the 2016 Asian Business Awards. In 2018, she won the award for "Women Leadership in Industry" at the "Times National Awards for Marketing Excellence", "40 Under 40 Business Leaders" by BW Business World and featured in "Top Women CEOs" by India Today. Mrs. Lulla Singh is the daughter of Mr. Kishore Lulla, the sister of Ms Ridhima Lulla and the niece of Mr. Sunil Lulla. She has served as director since November 2014.

*Mr. Shailendra Swarup* is an Independent Director in our Company. Mr. Swarup is a practicing lawyer in India since 1965 and has over 53 years of experience as corporate attorney in India. He is senior partner of the law firm Swarup & Company, New Delhi, India. His vast experience includes advising Indian and foreign with respect to transborder transactions, acquisitions, joint ventures, technology transfers in diverse sectors and industry. He presently serves as an

independent Director on the Board of 7 public companies and 3 private companies. He was one of the members of Confederation of Indian Industry ("CII") Task Force which formulated for the first time in India the Code for corporate governance. He was member of the Committee constituted by the Reserve Bank of India for governance of public sector banks and financial institutions in India. He advised National Council for Applied Economic Research on and reviewed the draft Bill of the new Electricity Act. He advised National Highways Authority of India and the Planning Commission of India on development of documentation for infrastructure Projects through build operate transfer model and public private partnership. Mr. Shailendra Swarup is a cousin of Mr. Dhirendra Swarup (i.e. son of the elder brother of the father of Mr. Dhirendra Swarup). He has served as a director since July 2017.

101

*Mr. Dhirendra Swarup* is an Independent Director in our Company. He is a government-certified accountant and a member of the Institute of Public Auditors of India, Mr. Swarup holds a postgraduate degree in humanities. A career bureaucrat, he retired as secretary of Ministry of Finance, Government of India in 2005. He possesses a vast experience of over 45 years in the finance sector and has also worked in UK, Turkey and Georgia. He served as the Chairman of Financial Sector Redress Agency Task Force appointed by Government of India, he is also on the Board of several listed companies besides acting as a member and the Chairman of several committees. In the past, he has held many key positions and responsibilities like being a member of the Board of the SEBI, a member of the Permanent High-level Committee on Financial Markets, chairman of the Pension Funds Regulatory Authority, Chief of the Budget Bureau of the Government of India, a member secretary of the Financial Sector Reforms Commission, chairman of Public Debt Management Authority Task Force, Vice-Chairman of the International Network on Financial Education of OECD. Mr. Dhirendra Swarup is a cousin of Mr. Shailendra Swarup Swarup (i.e. son of the younger brother of the father of Mr. Shailendra Swarup). He has served as a director since July 2019.

Mr David Maisel retired from the company's Board on March 26, 2020.

Mr Shailendra Swarup will retire from the board upon the closing of the STX transaction.

**Senior Management**

*Ms Ridhima Lulla* is our Chief Content Officer, with a core focus on the creative expression for Eros Now, the premier Indian OTT platform controlled by Eros International Plc. She has previously worked for STX Entertainment, Credit Suisse and was integral to several Eros film projects including Ra.One and Dr Cabbie representing different roles. Ridhima has been strengthening the original content strategy for Eros Now, the leading cutting edge rapidly growing OTT (Over-the-top) platform of Eros Digital. Ms Lulla has degrees in Film Production from University of California, a bachelor's degree in Business Management, Liberal Arts and Sciences from Regent's University London. She also did several Diplomas in Digital Film-Making from New York Film Academy. Ms. Lulla is the daughter of Mr. Kishore Lulla, the sister of Mrs Rishika Lulla Singh and the niece of Mr. Sunil Lulla

*Mr Kumar Ahuja* is Chief Operating Officer of Eros International Media Limited, our majority-controlled Indian operating subsidiary. Mr. Ahuja has over 22 years of experience in the media and entertainment industry. Mr Ahuja assumed the role of Chief Operating Officer in 2019 to lead the company's initiatives in Media and Entertainment and to organically build and grow businesses around the content ecosystems such as Films, Music, TV, Digital, Airborne and various other revenue departments. He has been instrumental in negotiating and securing the company's distribution partnerships which remains a key focus area, including spearheading Bollywood and opening various new markets like China, Korea, Taiwan and Hong Kong among others.

*Mr. Mark Carbeck* is our Chief Corporate & Strategy Officer, with management responsibility for Investor Relations, Group Merger and Acquisition, and Corporate Finance. Mr. Carbeck was formerly a director in Citigroup's Investment Banking division in London, where he joined its New York office in 1997. He has over 23 years of experience in the investment banking and corporate finance. Mr. Carbeck previously led the European media investment banking coverage efforts at Citigroup and has deep media industry knowledge and strong relationships with major global media companies. Mr. Carbeck graduated from the University of Chicago in 1994 with a bachelor's degree in history. Mr. Carbeck joined us in April 2014.

*Mr. Pradeep Dwivedi* is Chief Executive Officer of Eros International Media Limited, our majority-controlled Indian operating subsidiary. He is an accomplished industry leader with over two decades of experience in the advertising, media, technology and telecom sectors, with established credentials in digital infotainment business as well as print media, news television channels and experiential events. He has a demonstrated track record in revenue growth, sales and marketing, value creation, joint ventures and partnerships, corporate investments, business operations and general management. In the past, he has been CEO of Sakal Media Group, Chief Corporate Sales & Marketing Officer of Dainik Bhaskar Group, and worked in leadership positions with organisations including Tata Teleservices, American Express, GE Capital, Standard Chartered Bank & Eicher Motors in India. He is an active participant in many media industry associations, such as Director of IAA (India Chapter) and a managing committee member of The Advertising Club of

India. Mr Dwivedi holds B. Sc and MBA degrees from Panjab University.

102

*Mr. Ali Hussein* is our Chief Executive Officer of Eros Now, the premier Indian OTT platform controlled by Eros International Plc. Mr. Hussein has over 18 years of experience in the media, entertainment and digital space. Mr. Hussein has previously been a Board Advisor to Discovery Networks and other start-ups in the media and technology domain. Prior to that, He has worked with Google/YouTube where Mr. Hussein ran the charter for content and product partnerships in South Asia. Mr. Hussein was an early employee of the Joint Venture between Network 18 and Viacom (Viacom 18), where he was responsible for the digital media strategy for all consumer facing media brands like Colors, MTV and others and prior to that with Hungama Digital Media where he managed the portfolio of global content acquisition and distribution. Mr. Hussein joined us in January 2018.

## B. Compensation

Compensation of senior executive officers and directors is determined by the Remuneration Committee of our Board of Directors. The Remuneration Committee reviews the performance of our directors and each of our executive officers and sets the scale and structure of their compensation. Where required, the Remuneration Committee engages the services of external companies for the purposes of benchmarking of executive remuneration or such other remuneration related matter. As part of its role of overseeing the scale and structure of the compensation paid to our executive officers, the Remuneration Committee approves their service agreements with our subsidiaries and any bonus paid by our subsidiaries to such officers. The current members of the Remuneration Committee are two of our non-executive directors, Shailendra Swarup and Dilip Thakkar.

In determining the scale and structure of the compensation for executive directors and senior executives, the Remuneration Committee takes into account the need to offer a competitive compensation structure to attract and maintain a skilled and experienced management team. The Remuneration Committee creates competitive compensation programs by reviewing market data and setting compensation at levels comparable to those at our competitors. We believe that a compensation program with a strong performance based element is a prerequisite to obtaining our performance and growth objectives.

The main components of the compensation for our executive officers are a base salary, share awards, annual bonus and stock options.

The Remuneration Committee reviews these three compensation components in light of individual performance of the executive officers, external market data and reports provided by outside experts or advisors. For information about service contracts entered into by us, or our subsidiaries, and certain of our executives, see "Part I — Item 6. Directors, Senior Management and Employees — C. Board Practices."

The compensation of our non-executive directors is set by our board of directors as a whole, after consulting with outside experts or advisors.

The following tables and footnotes show the remuneration of each of our directors for fiscal 2020:

| | Year ended March 31, | | | | |
| | 2020 Salary | 2020 Director Fees | 2020 Benefits[1] | 2020 Total | 2019 Total |
| | | | (in thousands) | | |
|---|---|---|---|---|---|
| Kishore Lulla | $ 1,360 | $ — | $ — | $ 1,360 | $ 1,432 |
| Vijay Ahuja[3] | 73 | — | 4 | 77 | 221 |
| Sunil Lulla[2] | 804 | — | 17 | 821 | 778 |
| Dilip Thakkar | — | 76 | — | 76 | 78 |
| David Maisel | — | 93 | — | 93 | 95 |
| Rishika Lulla Singh | 480 | — | — | 480 | 445 |
| Prem Parameswaran | 450 | — | 35 | 485 | 485 |
| Shailendra Swarup | — | 51 | — | 51 | 52 |
| Dhirendra Swarup | — | 46 | — | 46 | — |
| **Total** | $ 3,167 | $ 266 | $ 56 | $ 3,489 | $ 3,586 |

(1) Health insurance, except for Sunil Lulla (see Note (2) below).

(2) Sunil Lulla's fiscal 2020 compensation consisted of the following (Indian Rupees translated to U.S. dollars at a rate of INR 70.79 per $1.00)

(3) Vijay Ahuja retired from the company's Board on December 20th, 2018.

(4) Mr. Dhirendra Swarup was appointed as a Director with effect from July 31, 2019.

103

| Particulars for Mr Sunil Lulla | INR | USD |
|---|---|---|
| Basic salary | 51,446,124 | $    726,712 |
| Reimbursements car/entertainment etc. | 39,600 | 559 |
| Company rent accommodation | 1,200,000 | 16,951 |
| **Total India** | **52,685,724** | **$    744,222** |

The total share based compensation paid to our executive officers in fiscal 2020 was $24.2 million (2019: $16.2 million). The following table and footnotes show the cost recognised in fiscal 2020 in respect to all outstanding plans and by grant of shares, which are all equity settled instruments, to our directors is as follows:

| | Option 2014 | Option 2017 | June 28, 2016 | February 2, 2017 | November 22, 2017 | November 11, 2018 | March 3, 2019 | July 11, 2019 | February 28, 2020 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Kishore Lulla | $    — | $    — | $    80 | $    — | $    249 | $  1,733 | $    — | $ 1,560 | $    268 | 3,890 |
| Jyoti Deshpande | — | — | 64 | — | 66 | — | — | $    — | $    — | 130 |
| Sunil Lulla | — | — | 64 | — | 199 | 990 | — | $    858 | $    147 | 2,258 |
| Dilip Thakkar | — | — | — | — | — | 151 | — | $    23 | $    — | 174 |
| David Maisel | 88 | — | — | — | — | — | — | $    — | $    — | 88 |
| Rishika Lulla Singh | — | 287 | 40 | — | 199 | 990 | — | $    892 | $    153 | 2,561 |
| Prem Parameswaran | — | — | — | 61 | 363 | — | 2,089 | $ 1,181 | $    — | 3,694 |
| Shailendra Swarup | — | — | — | — | — | 151 | — | $    23 | $    — | 174 |
| | | | | | | | | | | 12, |
| Total | $    88 | $    287 | $    248 | $    61 | $  1,076 | $  4,015 | $ 2,089 | $ 4,537 | $    568 | $    969 |

**Eros India Incentive Compensation**

Pursuant to the Board Resolution dated May 29, 2015 and May 26, 2017 passed by the Board of Directors of Eros India and Shareholders Resolution dated September 3, 2015 and September 28, 2017 passed by the Shareholders of Eros India, the commission upto 1% of the net profits payable to Mr. Sunil Lulla and Mr. Kishore Lulla has been approved for the services rendered by Mr. Sunil Lulla and Mr. Kishore Lulla to Eros India, in accordance to the applicable laws. Mr. Sunil Lulla is eligible for commission for the term of 5 (Five) years, until September 26, 2020 and Mr. Kishore Lulla is eligible for commission for the term of 5 (Five) years, until October 31, 2022. The Nomination and Remuneration Committee of Eros India will take into account the incentive bonus paid to both Mr. Sunil Lulla and Mr. Kishore Lulla, at the time of determination of compensation payable to each of them.

**Share Based Compensation Plans**

The compensation cost recognised with respect to all outstanding plans and by grant of shares, which are all equity settled instruments, is as follows:

| | Year ended March 31 | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| IPO India Plan | $    145 | $    1,198 | $    1,572 |
| JSOP Plan | — | — | 615 |
| Option award scheme 2012 | — | — | 197 |
| 2014 Share Plan | — | 47 | (22) |
| 2015 Share Plan(*) | 1,976 | 3,059 | 100 |
| Other share option awards(**) | 7,829 | 5,346 | 7,283 |
| Management scheme (staff share grant) (***) | 12,318 | 11,911 | 8,173 |
| | $    22,268 | $    21,561 | $    17,918 |

104

(*) includes 674,045 options granted towards Share Plan 2015 during twelve months ended March 31, 2020 at an exercise price of $ 2 per share and average grant date fair value of $ 0.82 per share. In February 2020, the exercise price of said options were modified to GBP 0.3, resulting in incremental fair value of $ 0.55 per share. In addition, includes 233,364 and 622,035 options granted in prior year/s and wherein the exercise price was modified to $ 2 per share and GBP 0.3 per share, respectively, resulting in incremental fair value of $ 0.55-0.63 per share and $ 1.18 per share, respectively.

(**) includes Restricted Share Unit (RSU) and Other share option plans. In respect of 4,899,280 units/options granted towards RSU during twelve months ended March 31, 2020, intrinsic value $ 1.94 per share approximates grant date fair value. Includes 873,000 options accelerated for immediate vesting as against original vesting period of 3 years, resulting in incremental fair value of $ $1.64 per share.

**Joint Stock Ownership Plan (JSOP)**

In April 2012, the Company established a controlled trust called the Eros International Plc Employee Benefit Trust ("JSOP Trust"). The JSOP Trust purchased 2,000,164 shares of the Company out of funds borrowed from the Company and repayable on demand. The Company's Board, Nomination and Remuneration Committee recommends to the JSOP Trust certain employees, officers and key management personnel, to whom the JSOP Trust will be required to grant shares from its holdings at nominal price. Such shares are then held by the JSOP Trust and the scheme is referred to as the "JSOP Plan." The shares held by the JSOP Trust are reported as a reduction in stockholders' equity and termed as 'JSOP reserves'.

The movement in the shares held by the JSOP Trust is given below:

|  | Year ended March 31 | | |
|---|---|---|---|
|  | **2020** | **2019** | **2018** |
| Shares held at the beginning of the year | **384,862** | 1,146,955 | 1,146,955 |
| Shares granted | — | — | — |
| Shares exercised(*) | — | — | — |
| Shares forfeiture/lapsed | (384,862) | (762,093) | — |
| Shares held at the end of the year | — | 384,862 | 1,146,955 |
| Unallocated shares held by trust | 1,253,656 | 868,794 | 106,701 |
|  | — | **1,253,656** | **1,253,656** |

(*) During the year unallocated shares held by the trust were issued to the content vendor at $3.6 per share.

**Employee Stock Option Plans**

A summary of the general terms of the grants under stock option plans and stock awards are as follows:

|  | Range of exercise prices |
|---|---|
| IPO India Plan | INR 10 – 150 |
| 2014 Share Plan | $16.25–$18.30 |
| 2015 Share Plan | $2-33.12 & GBP 0.3 |
| Other share option plans | $16.00 |
| RSU | — |
| Management Share Award | — |

Employees covered under the stock option plans are granted an option to purchase shares of the Company at the respective exercise prices, subject to fulfillment of vesting conditions (generally service conditions). These options generally vest in tranches over a period of one to five years from the date of grant. Upon vesting, the employees can acquire one share for every option. The maximum contractual term for these stock option plans ranges between two to ten years.

The activity in these employee stock option plans is summarized below:

| | | Year ended March 31 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | 2018 | | |
| | Name of Plan | Number of shares | Weighted average exercise price | Number of shares | Weighted average exercise price | Number of shares | Weighted average exercise price | |
| Outstanding at the beginning of the year | IPO India Plan | 757,886 INR | 32.17 | 1,624,035 INR | 28.85 | 2,108,063 INR | 34.96 | |
| Granted | | — | — | — | — | 863,320 | 10.00 | |
| Exercised | | (121,496) | 10.00 | (536,263) | 10.00 | (1,113, 160) | 32.19 | |
| Forfeited and lapsed | | (156,775) | 10.00 | (329,886) | 51.66 | (234,188) | 10.00 | |
| Outstanding at the end of the year | | 479,615 | 45.03 | 757,886 | 32.17 | 1,624,035 | 28.85 | |
| Exercisable at the end of the year | | 325,740 INR | 61.56 | 289,002 INR | 68.13 | 501,122 INR | 65.14 | |
| Outstanding at the beginning of the year | JSOP Plan | 384,862 $ | 11.00 | 1,146,955 $ | 16.22 | 1,146,955 $ | 16.22 | |
| Granted | | — | — | — | — | — | — | |
| Exercised | | — | — | — | — | — | — | |
| Forfeited and lapsed | | (384,862) | 11.00 | (762,093) | 18.86 | — | — | |
| Outstanding at the end of the year | | — $ | — | 384,862 $ | 11.00 | 1,146,955 $ | 16.22 | |
| Exercisable at the end of the year | | — $ | — | 384,862 $ | 11.00 | 728,736 $ | 11.00 | |
| Outstanding at the beginning of the year | Option award scheme 2012 | — $ | — | 674,045 $ | 11.00 | 674,045 $ | 11.00 | |
| Granted | | — | — | — | — | — | — | |
| Exercised | | — | — | — | — | — | — | |
| Forfeited and lapsed | | — | — | (674,045) | 11.00 | — | — | |
| Outstanding at the end of the year | | — | — | — | — | 674,045 | 11.00 | |
| Exercisable at the end of the year | | — | — | — | — | 449,363 $ | 11.00 | |
| Outstanding at the beginning of the year | 2014 Share Plan | 399,999 $ | 17.79 | 399,999 $ | 17.79 | 723,749 $ | 18.06 | |
| Granted | | — | — | — | — | — | — | |
| Exercised | | — | — | — | — | — | — | |
| Forfeited and lapsed | | — | — | — | — | (323,750) | 18.39 | |
| Outstanding at the end of the year | | 399,999 | 17.79 | 399,999 | 17.79 | 399,999 | 17.79 | |
| Exercisable at the end of the year | | 399,999 $ | 17.79 | 399,999 $ | 17.79 | 289,583 $ | 17.67 | |
| Outstanding at the beginning of the year | 2015 Share Plan | 1,290,399 $ | 14.68 | 211,250 $ | 16.21 | 233,750 $ | 16.23 | |
| Granted [i] | | 674,045 | 0.38 | 1,305,399 | 14.86 | — | — | |
| Exercised [ii] | | (132,013) | 2.00 | (10,416) | 7.92 | (10,208) | 8.71 | |
| Forfeited and lapsed | | (233,333) | 16.18 | (215,834) | 18.23 | (12,292) | 14.64 | |
| Outstanding at the end of the year | | 1,599,098 | 2.69 | 1,290,399 | 14.68 | 211,250 | 16.21 | |
| Exercisable at the end of the year | | 1,549,098 $ | 2.72 | 981,545 $ | 14.66 | 181,354 $ | 17.36 | |
| Outstanding at the beginning of the year | Other share option plans | 500,000 $ | 16.00 | 500,000 $ | 18.88 | 500,000 | 18.88 | |
| Granted | | — | — | — | — | — | — | |
| Exercised | | — | — | — | — | — | — | |
| Forfeited and lapsed | | (500,000) | 16.00 | — | — | — | — | |
| Outstanding at the end of the year | | — | — | 500,000 | 16.00 | 500,000 | 18.88 | |
| Exercisable at the end of the year | | — $ | — | 400,000 $ | 16.00 | 300,000 $ | 18.88 | |
| Outstanding at the beginning of the year | RSU | 505,945 | — | 837,590 | — | 182,725 | — | |
| Granted [iii] [iv] | | 4,899,280 | 0.06 | 211,567 | — | 1,044,290 | — | |
| Exercised | | (2,088,181) | — | (450,541) | — | (366,491) | — | |
| Forfeited and lapsed | | (37,447) | — | (92,672) | — | (22,934) | — | |
| Outstanding at the end of the year | | 3,279,597 | 0.1 | 505,944 | — | 837,590 | — | |
| Exercisable at the end of the year | | 311,740 | — | 34,416 | — | 119,150 | — | |
| Outstanding at the beginning of the year | Management | 2,593,333 | — | 1,513,333 | — | 1,130,000 | — | |

| | Scheme | | | | | |
|---|---|---|---|---|---|---|
| Granted [v] | 10,230,320 | — | 1,400,000 | — | 700,000 | — |
| Exercised [vi] | (7,448,320) | — | (320,000) | — | (316,667 | — |
| Forfeited and lapsed | (320,000) | — | — | — | — | — |
| Outstanding at the end of the year | 5,055,333 | 0.01 | 2,593,333 | — | 1,513,333 | — |
| Exercisable at the end of the year | 890,000 | 0.03 | 516,667 | — | 173,333 | — |

(i) includes 233,364 and 622,035 options granted in prior year/s and wherein the exercise price was modified to $ 2 per share and GBP 0.3 per share, respectively

(ii) the exercise price of said options were modified to GBP 0.3, resulting in incremental fair value of $ 0.55 per share

106

(iii) Out of the options granted, 619,000 RSU were converted from A ordinary shares to B ordinary shares on October 7, 2019

(iv) Out of above, 873,000 RSU were accelerated for immediate vesting as against original vesting period of 3 years.

(v) Includes 6,808,320 B Ordinary shares granted on July 12, 2019 and February 28, 2020, respectively and 1,238,000 shares converted from A Ordinary shares to B Ordinary share on October 7, 2019.

(vi) Includes treasury shares of 6,808,320 B Ordinary shares exercised during the year, wherein vesting schedule is in equal instalments over three years from date of grant. The following table summarizes information about outstanding stock options:

| | Year ended March 31 | | | | | |
| | 2020 | | 2019 | | 2018 | |
| Name of Plan | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price |
| --- | --- | --- | --- | --- | --- | --- |
| IPO India Plan | 6.30 | INR* 45.03 | 7.70 | INR* 32.17 | 8.11 | INR* 35.0 |
| JSOP Plan | — | $ — | 3.05 | $11.00 | 3.93 | $16.19 |
| Option award scheme 2012 | — | $ — | — | $ — | 3.75 | $11.00 |
| 2014 Share Plan | 1.25 | $17.79 | 2.25 | $17.79 | 5.96 | $17.79 |
| 2015 Share Plan | 5.00 | $ 2.69 | 6.01 | $14.68 | 6.06 | $16.21 |
| Other share option plans | — | $ — | 1.87 | $16.00 | 2.87 | $18.88 |
| RSU | 9.36 | $ — | 6.00 | $ — | 5.60 | $ — |
| Management Scheme | 8.94 | $ 0.1 | 6.00 | $ — | 5.56 | $ — |

*INR – Indian Rupees

**2015 Share Plan**

The following table summarizes information about inputs to the fair valuation model for options granted during the year:

| | Inputs |
| --- | --- |
| Expected volatility[1] | 108.2% |
| Option life (Years) | 2.6 |
| Dividend yield | 0% |
| Risk free rate | 0.3 |
| Range of exercise price of the granted options at the grant date[2] | $ 0.38 |

(1) The expected volatility of all other options is based on the historic share price volatility of the Company over time periods comparable to the time from the grant date to the maturity dates of the options.

(2) Fair value of options granted under all other schemes is measured using a Black Scholes model.

**Joint Stock Ownership Plan Reserve (JSOP Reserve)**

| | (in thousands) |
| --- | --- |
| **Balance at April 1, 2018** | $ (15,985) |
| Issue out of treasury shares | — |
| **Balance at April 1, 2019** | $ (15,985) |
| Issue out of treasury shares | 15,985 |
| **Balance at March 31, 2020** | $ — |

The JSOP Reserve represents the cost of shares issued by Eros International Plc and held by the JSOP Trust to satisfy the requirements of the JSOP Plan (Refer Note 27). On June 5, 2014, the Board approved discretionary vesting of 20% of the applicable JSOP shares. In the current year Nil (2019: 868,794) 'A' ordinary shares held by the JSOP Trust were eligible to be issued to employees.

The number of shares held by the JSOP Trust at March 31, 2020 was Nil 'A' Ordinary shares (2019: 1,253,656 'A' Ordinary shares).

107

**C. Board Practices**

All directors hold office until the expiration of their term of office, their resignation or removal from office for gross negligence or criminal conduct by a resolution of our shareholders or until they cease to be directors by virtue of any provision of law or they are disqualified by law from being directors or they become bankrupt or make any arrangement or composition with their creditors generally or they become of unsound mind. The term of office of the directors is divided into three classes:

- Class A, whose term will expire at the annual general meeting to be held in fiscal year 2021;
- Class B, whose term will expire at the annual general meeting to be held in fiscal year 2022; and
- Class C, whose term will expire at the annual general meeting to be held in fiscal year 2023.

Our directors for fiscal year 2020 are classified as follows:

- Class I: Dilip Thakkar and Rishika Lulla Singh;;
- Class II: Kishore Lulla, Shailendra Swarup, Dhirendra Swarup and Prem Parameswaran; and
- Class III: Sunil Lulla.

As more fully described below in "Part I — Item 10. Additional Information — C. Material Contracts," pursuant to the Merger Agreement entered into by the Company on April 17, 2020 and related agreements, upon the consummation of the transactions contemplated thereby the board of directors will have nine directors, of whom four (the "Founders Group Directors") will be selected by the Founders Group, four (the "STX Directors") will be selected by STX Filmworks, Inc. ("STX"), and the remaining one director will be jointly selected by the Founders Group and STX (the "Jointly Selected Director"). The foregoing directors will be divided into three classes, each of which will serve for staggered three-year terms. One Founders Group Director, one STX Director and the Jointly Selected Director will be allocated to the class of directors initially holding office until the Company's 2021 annual general meeting; one Founders Group Director and two STX Directors will be allocated to the class of directors initially holding office until the Company's 2022 annual general meeting; and two Founders Group Directors and one STX Director will be allocated to the class of directors initially holding office until the Company's 2023 annual general meeting.

**Indemnification Agreements**

We have entered into indemnification agreements with our directors and our officers that require us to indemnify, to the extent permitted by law, our officers and directors against liabilities that may arise by reason of their status or service as officers and directors and to pay expenses incurred by them as a result of any proceeding against them as to which they could be indemnified. We believe that these provisions are necessary to attract and retain qualified persons as directors and executive officers.

**Service Contracts and Letters of Appointment**

Kishore Lulla has entered into a service agreement with Eros Network Limited to provide services to us and our subsidiaries. The service agreements is terminable by either party with 12 months' written notice. Eros Network Limited may terminate the agreement immediately in certain circumstances, including upon certain types of misconduct or upon paying the executive an amount equivalent to his basic salary (inclusive of any bonus and benefits) for a twelve month period. The service agreements expire automatically upon the executive's 65th birthday. The service agreements provide for private medical insurance and 25 paid vacation days per year. Upon termination, compensation will be paid for any accrued but untaken holiday. The executive receive a basic gross annual salary, reviewed annually, and is entitled to participate in any current share option schemes and bonus schemes applicable to their positions maintained by the employing company. The agreement contains a confidentiality provision and non-competition and non-solicitation provisions that restrict the executive for a period of six to twelve months after termination.

Kishore Lulla also executed a letter of appointment for service as one of our directors. Under the terms of the letter of appointment, Mr. Lulla received an annual fee of $93,750. In connection with our initial public offering, this letter of appointment was terminated, and for so long as Mr. Lulla is our executive officer, he will not receive compensation as a director.

108

On November 11, 2018, with effect from November 1, 2018, Kishore Lulla's gross annual salary is amended and revised to $1,359,600. All other conditions of the employment contracts remain the same. Kishore Lulla is also director on the board of Eros India.

Sunil Lulla, our director, has entered into an employment agreement with Eros India pursuant to which he serves as Executive Vice Chairman and Managing Director of Eros India. Sunil Lulla is entitled to receive a basic gross annual salary, as well as medical insurance and certain other benefits and perquisites. Eros India may terminate the agreement upon thirty days' notice if certain events occur, including a material breach of the agreement by Sunil Lulla. The agreement contains a confidentiality provision that restricts Sunil Lulla during the term of his employment and for a period of two years following termination and a non- competition provision that restricts him during the term of his employment. Mr. Sunil Lulla is also entitled to salary of GBP 60,000 (w.e.f April 2019) and 1,191,000 A ordinary shares awards in total, which will vest annually over the next three years.

Mrs. Rishika Lulla Singh, our director, has entered into a service agreement on July 3, 2015 with Eros Digital FZ LLC, pursuant to which she serves as the Chief Executive Officer and an executive director of Eros Digital FZ LLC. On November 11, 2018 with effect from November 1, 2018, Mrs. Rishika Lulla Singh's gross annual salary is amended and revised to $480,000. Mrs. Rishika Lulla Singh is also entitled to 1,238,000 A ordinary shares awards in total, which will vest annually over the next three years.

Our non-executive Director, Mr. Dilip Thakkar, has entered into letter of appointment with us that provide him with annual fees of $76,112 per annum (equivalent to GBP 60,000, as per Board Meeting dated June 28, 2016). Mr. Shailendra Swarup has been appointed as non-executive Director with effect from July 25, 2017 and annual fees for his service has director for Eros International Plc is $50,741 (equivalent to GBP 40,000). Mr. Dhirendra Swarup has been appointed as non-executive Director with effect from July 31, 2019 and annual fees for his service as director for Eros International Plc is $34,626 (equivalent to GBP 26,667) The appointments are for an initial period of one year, and there after terminable by either the non-executive director or by us with three months' written notice, or by us immediately in the case of fraud.

Mr. David Maisel, our director, has entered into a service agreement with us, pursuant to which he serves as a non-executive director, which provides him with an annual fee of $93,000. The service agreement is terminable by either party with 30 days written notice. The service agreement is for a term of five years and three months from November 2014. Mr. Maisel was granted options to purchase up to 500,000 A ordinary shares at $16 (modified from $18.88 to $16 as of September 18,2018) as part of his service agreement, such options vest in five equal tranches commencing in November 2015. There are certain conditions under which, if the agreement is terminated before the relevant vesting date, the unvested options lapse. Mr. David Maisel resigned on March 26, 2020.

Mr. Prem Parameswaran, our Group Chief Financial Officer and President North America, has entered into an amended employment agreement with us as of June 9, 2018, which provides him with an annual salary of $450,000. The employment agreement is for a term of three years and is terminable by either party by giving 12 months written notice. Mr. Parameswaran is also entitled to 1,590,000 A ordinary shares awards in total as part of his employment agreement, which have varying vesting periods over the next three years.

Mr. Mark Carbeck, our Chief Corporate and Strategy Officer has entered into a service agreement with Eros International Limited to provide services to us and certain of our subsidiaries. The service agreement is terminable by either party with three months' written notice. Eros International Ltd may terminate the agreement immediately in certain circumstances, including upon certain types of misconduct or upon paying the executive an amount equivalent to his basic salary for a three month period. Mr. Carbeck receives a basic gross annual salary and is entitled to participate in any current bonus scheme applicable to his position. The agreement contains a confidentiality provision non-competition and non-solicitation provisions that restrict the executive for a period of twelve months following termination.

### Board Committees

We currently have an Audit Committee, Remuneration Committee and Nomination Committee, whose responsibilities are summarized below. We believe that the composition of these committees meet the criteria for independence under, and the functioning of these committees comply with the requirements of, the SOX Act, the rules of the NYSE and the SEC

rules and regulations applicable to us.

109

*Audit Committee*

Our board of directors has adopted a written charter under which our Audit Committee operates. This charter sets forth the duties and responsibilities of our Audit Committee, which, among other things, include: (i) monitoring our and our subsidiaries' accounting and financial reporting processes, including the audits of our financial statements and the integrity of the financial statements; (ii) monitoring our compliance with legal and regulatory requirements; (iii) assessing our external auditor's qualifications and independence; and (iv) monitoring the performance of our internal audit function and our external auditor. A copy of our Audit Committee charter is available on our website at www.erosplc.com. Information contained on our website is not a part of, and is not incorporated by reference into, this annual report.

The current members of our Audit Committee are Mr. Dilip Thakkar (Chair), Mr. Shailender Swarup and Mr Dhirendra Swarup. Our board of directors has determined that each of the members of our Audit Committee are independent. The Audit Committee met eight times during fiscal year 2020.

*Remuneration Committee*

Our board of directors has adopted a written charter under which our Remuneration Committee operates. This charter sets forth the duties and responsibilities of our Remuneration Committee, which, among other things, include assisting our Board of Directors in establishing remuneration policies and practices. A copy of our Remuneration Committee charter is available on our website at www.erosplc.com. Information contained in our website is not a part of, and is not incorporated by reference into, this annual report.

The current members of our Remuneration Committee are Mr. Shailendra Swarup (Chair) and Mr. Dilip Thakkar. The Remuneration Committee met five times during fiscal year 2020. Our board of directors has determined that each of the members of our Remuneration Committee is independent.

*Nomination Committee*

Our board of directors has adopted a written charter under which our Nomination Committee operates. This charter sets forth the duties and responsibilities of our Nomination Committee, which, among other things, include recommending to our Board of Directors candidates for election at the annual meeting of shareholders and performing a leadership role in shaping the Company's corporate governance policies. A copy of our Nomination Committee charter is available on our website at www.erosplc.com . Information contained in our website is not a part of, and is not incorporated by reference into, this annual report.

The current members of our Nomination Committee are Mr. Shailendra Swarup (Chair) and Mr. Thakkar. The Nomination Committee is an ad hoc committee and met three times during fiscal year 2020. Our board of directors has determined that each of the members of our Nomination Committee is independent.

The table below summarizes the composition of our committees during the year.

| | Audit Committee | Remuneration Committee | Nomination Committee |
|---|---|---|---|
| Shailendra Swarup | Member | Chairman | Chairman |
| Dilip Thakkar | Chairman | Member | Member |
| Dhirendra Swarup | Member | — | — |

As more fully described below in "Part I — Item 10. Additional Information — C. Material Contracts," upon the consummation of the transactions contemplated by the Merger Agreement, it is expected that the Audit Committee will consist of four members, two of whom will be Founders Group Directors and two of whom will be STX Directors; the Remuneration Committee will consist of three members, one of whom will be a Founders Group Director, one of whom will be an STX Director and one of whom will be the Jointly Selected Director; and the Nomination Committee will consist of four members, two of whom will be Founders Group Directors and two of whom will be STX Directors.

**D. Employees**

As of March 31, 2020, we had 340 employees, with 316 employees based in India, and the remainder employed by our international subsidiaries. All are full time employees or contractors. Our employees are not unionized. We believe that our employee relations are good.

110

**B. Related Party Transactions**

The following is a description of transactions since April 1, 2015 to which we have been a party, in which the amount involved in the transaction exceeded or will exceed $120,000, and in which any of our directors, executive officers or beneficial holders of more than 5% of our issued share capital had or will have a direct or indirect material interest.

**Family Relationships**

Mr. Kishore Lulla, our director and Chairman, is the brother of Mr. Sunil Lulla, and father of Mrs. Rishika Lulla Singh, each of whom are directors, and a cousin of Mr. Vijay Ahuja, our former director and Vice Chairman (upto December 20th, 2018)and of Mr. Surender Sadhwani, our President of Middle East Operations. Mr. Sunil Lulla is the brother of Mr. Kishore Lulla, uncle to Mrs. Rishika Lulla Singh, and a cousin of Mr. Vijay Ahuja and Mr. Surender Sadhwani. Mr. Vijay Ahuja is a cousin of Mr. Kishore Lulla and Mr. Sunil Lulla Mrs. Rishika Lulla Singh is the daughter of Mr. Kishore Lulla and niece of Mr. Sunil Lulla. Mr. Surender Sadhwani is a cousin of Mr. Kishore Lulla and Mr. Sunil Lulla. Mr. Arjan Lulla, our founder, was the father of Mr. Kishore Lulla and Mr. Sunil Lulla, grandfather of Mrs. Rishika Lulla Singh, uncle of Mr. Vijay Ahuja and Mr. Surender Sadhwani and an employee of Redbridge Group Ltd., he was the Honorary President of Eros and a director of our subsidiary Eros WorldwideMrs. Manjula Lulla, the wife of Mr. Kishore Lulla, is an employee of our subsidiary. Ms Ridhima Lulla, is the daughter of Mr. Kishore Lulla and an employee of our subsidiary. Mrs. Krishika Lulla is the wife of Mr. Sunil Lulla and an employee of Eros India. Mr. Swaneet Singh is the husband of Mrs. Rishika Lulla Singh and son in law of Mr. Kishore Lulla.

**Leases**

Pursuant to a lease agreement that expired on March 31, 2020, the lease requires Eros International Media Limited to pay $4,000 each month under this lease. Eros International Media Limited leases apartments for studio use at Kailash Plaza, 3rd Floor, Opp. Laxmi Industrial Estate, Andheri (W), Mumbai, from Manjula K. Lulla, the wife of Kishore Lulla. The lease was renewed on April 1, 2020 for a further period of one year on the same terms.

Pursuant to a lease agreement that expires on September 30, 2021, the lease requires Eros International Media Limited to pay $4,000 each month under this lease. Eros International Media Limited leases for use as executive accommodations the property Aumkar Bungalow, Gandhi Gram Road, Juhu, Mumbai, from Sunil Lulla.

Pursuant to a lease agreement that expired on January 4, 2020, Eros International Media Limited leases office premise for studio use at Supreme Chambers, 5th Floor, Andheri (W), Mumbai from Kishore and Sunil Lulla. Beginning January 2015, the lease requires Eros International Media Limited to pay $82,000 each month under this lease. The lease was renewed with effect from January 5, 2020 for a further period of five years on the same terms.

**Honorary Appointment of Mr. Arjan Lulla**

Pursuant to an agreement the Group entered into with Red Bridge Group Limited on June 27, 2006, the Group agreed to pay an annual fee set each year for the services of late Arjan Lulla, the father of Kishore Lulla and Sunil Lulla, grandfather of Mrs. Rishika Lulla Singh, uncle of Vijay Ahuja and Surender Sadhwani and an employee of Redbridge Group Limited. In the fiscal years 2020, 2019 and 2018, the Group paid Arjan Lulla $ Nil, $186,000 and $270,000, respectively. The agreement made Arjan Lulla honorary life president and provided for services including attendance at Board meetings, entrepreneurial leadership and assistance in setting the Group's strategy. Arjan Lulla passed away in December 2018. Red Bridge Group Limited is an entity owned indirectly by a discretionary trust of which Kishore Lulla is a potential beneficiary.

**Lulla Family Transactions**

The Lulla family refers to Mr. Arjan Lulla, Mr. Kishore Lulla, Mr. Sunil Lulla, Mrs. Manjula Lulla, Mrs. Krishika Lulla, Mrs. Rishika Lulla Singh, and Ms. Riddhima Lulla and Mr. Swaneet Singh.

111

The Group has engaged in transactions with NextGen Films Private Limited[(*)], an entity owned by the husband of Puja Rajani, sister of Kishore Lulla and Sunil Lulla, which with effect from September 19, 2019 ceased to be a related party, each of which involved the purchase and sale of film rights. In the period ended September 19, 2019, NextGen Films Private Limited sold film rights $ 393,000 (2019: $1,109,000 2018: $7,760,000) to the Group, and purchased film rights, including production services, of Nil (2019: Nil and 2018: $Nil). The Group the period ended September 19, 2019 advanced $2,113,000 (2019: $6,192,000 2018: $19,025,000) to NextGen Films Private Limited for film co-production and received refund of $Nil (2019: $Nil, 2018: $6,114,000) on abandonment of certain film projects.

The Group also engaged in transactions with Everest Entertainment LLP entity owned by the brother of Manjula K. Lulla, wife of Kishore Lulla, which is involved in the purchase and sale of film rights. In March 31, 2020, Everest Entertainment LLP sold film rights of $18,000 (2019: 1,260,000, 2018: 166,000) to the Group and purchased film rights of $ Nil (2019: $ 314,000).

Mrs. Manjula Lulla, the wife of Kishore Lulla, is an employee of Eros International Plc. and is entitled to a salary of $147,000 per annum (2019: $144,000 and 2018: $139,000). Mrs. Krishika Lulla, the wife of Sunil Lulla, is an employee of EIML and is entitled to a salary of $121,000 per annum (2019: $123,000 2018: $133,000). Ms. Riddhima Lulla, the daughter of Kishore Lulla, is an employee of Eros Digital FZ LLC and is entitled to a salary of $300,000 per annum (2019: $213,000 2018: $90,000) which is borne by Eros Worldwide LLC.

All of the amounts outstanding are unsecured and will be settled in cash.

As at March 31, 2020, the Group has provided performance guarantee to a bank amounting to $Nil (2019: $8,000,000 2018: $8,000,000) in connection with funding commitments. under film co-production agreements with NextGen Films Private Limited and having varying maturity dates up to the next 12 months. The Group did not earn any fee to provide such guarantees.

The Group has engaged in transactions with Xfinite Global Plc, a subsidiary of Eros Investment Limited on which it has significant influence. The Group has accounted $12,776 (2019: $1,413, 2018: $ Nil) as revenue during the year ended March 31, 2020.

[(*)] With effect from September 19, 2019, NextGen Films Private Limited ceased to be a related party.

**Relationship Agreement**

Both we and our subsidiaries, including Eros India, acquire rights in movies. The 2009 Relationship Agreement was renewed with the execution of the 2016 Relationship Agreement between Eros India, Eros Worldwide and us ("Relationship Agreement"). The Relationship Agreement, exclusively assigns to Eros Worldwide, certain intellectual property rights and all distribution rights (including global digital distribution rights) for films (other than Tamil films), held by Eros India or any of its subsidiary or the "Eros India" group, in all territories other than India, Nepal, and Bhutan. In return, Eros Worldwide provides a lump sum minimum guaranteed fee to the Eros India Group in a fixed payment equal to 40% of the production cost of such film (including all costs incurred in connection with the acquisition, pre-production, production or post-production of such film), plus an amount equal to 20% thereon as markup. We refer to these payments collectively as the Minimum Guaranteed Fee. Eros Worldwide is also required to reimburse the Eros India Group pre-approved distribution expenses in connection with such film, plus an amount equal to 20% thereon as markup ("distribution expenses"). In addition, 15% of the gross proceeds received by the Eros International Group from monetization of such films, after certain amounts are retained by the Eros International Group, are payable over to the Eros India Group.

No share of gross proceeds from a film is payable by the Eros International Group to the Eros India Group until the Eros International Group has received and retained an amount equal to the Minimum Guaranteed Fee, a 20% fee on all gross proceeds and 100% of the distribution expenses incurred by the Eros International Group and the distribution expenses for which Eros Worldwide has provided reimbursement to the Eros India Group.

The initial term of the 2016 Relationship Agreement expires in April 2021. Upon expiration, the agreement provides that it

will be automatically renewed for successive two year terms unless terminated by any party by 180 days written notice on or before commencement of any renewal term.

112

**Lulla Foundation**

Prior to our listing on the NYSE in November 2013, we issued the equivalent of 282,949 A ordinary shares to the Lulla Foundation (formerly the Eros Foundation), a U.K. registered charity, for no consideration. Such shares were granted by our Remuneration Committee to Mr. Kishore Lulla as compensation, each of whom directed the issuance of such shares to the Lulla Foundation. Mr. Kishore Lulla and his wife, Mrs. Manjula K. Lulla, are trustees, but not beneficiaries, of the foundation. The Lulla Foundation sold 76,000 A ordinary shares between May 20, 2014 and June 8, 2018 and now currently has 221,949 A ordinary shares as of June 30, 2020.

**C. Interests of Experts and Counsel**

Not applicable.

**E. Share Ownership**

The following table sets forth information with respect to the beneficial ownership of our ordinary shares as at July 27, 2020 by each of our directors and all our directors and executive officers as a group. As used in this table, beneficial ownership means the sole or shared power to vote or direct the voting or to dispose of or direct the sale of any security. A person is deemed to be the beneficial owner of securities that can be acquired within 60 days upon the exercise of any option, warrant or right. Ordinary shares subject to options, warrants or rights that are currently exercisable or exercisable within 60 days are deemed outstanding for computing the ownership percentage of the person holding the options, warrants or rights, but are not deemed outstanding for computing the ownership percentage of any other person. The amounts and percentages as at July 27, 2020 are based on an aggregate of 177,277,956 ordinary shares issued and outstanding as at that date.

| | Number of A Ordinary Shares Beneficially Owned | | Number of B Ordinary Shares Beneficially Owned | |
|---|---|---|---|---|
| **Directors** | **Number of A Shares** | **Percent of Class** | **Number of B Shares** | **Percent of Class** |
| Kishore Lulla [1] | * | * | 17,723,085 | 81.7% |
| Rishika Lulla Singh | * | * | 2,662,666 | 12.2% |
| Sunil Lulla | * | * | * | * |
| Prem Parameswaran | * | * | * | * |
| Shailendra Swarup | * | * | * | * |
| Dhirendra Swarup | * | * | * | * |
| Dilip Thakkar | * | * | * | * |
| **Senior Management** | | | | |
| Kumar Ahuja | * | * | * | * |
| Mark Carbeck | * | * | * | * |
| Pradeep Dwivedi | * | * | * | * |
| Ali Hussein | * | * | * | * |
| Ridhima Lulla | * | * | 1,314,667 | 6.1% |
| All Directors and Senior Management | 5,542,655 | 3.56% | 21,700,418 | 100.0% |

\*      Represents less than 1%.

(1)      Kishore Lulla's interest in certain of his shares is by virtue of (i) his holding ownership interests in, and being a potential beneficiary of, discretionary trusts that hold our shares and (ii) serving as trustee of the Lulla Foundation, a U.K. registered charity that holds our shares.

113

The Founder Group, including Kishore Lulla and his direct descendants, by virtue of the B ordinary shares they own, have different voting rights from holders of A ordinary shares. Each A ordinary share is entitled to one vote on all matters upon which the ordinary shares are entitled to vote, and each B ordinary share is entitled to ten votes. In order to vote at any meeting of shareholders, a holder of B ordinary shares will first be required to certify that it is a permitted holder as defined in our articles of association. Following the adoption of the new Amended Articles of Association, Mr. Sunil Lulla, the brother of Kishore Lulla and the current Chairman and Managing Director of Eros International Media Limited and a member of the board of directors of Eros, and his descendants, will be within the scope of permitted holders.

Options to purchase A ordinary from the Company are granted from time to time to directors, officers and employees of the Company on terms and conditions acceptable to the Board of Directors.

The following table provides option details with respect to the directors and officers as at June 30, 2020.

| Name | Number of 'A' ordinary Shares Options | Date of Grant | Exercise Price | Expiration Date |
|---|---|---|---|---|
| Prem Parameswaran | 300,000 | Sep-15 | $18.30 | Jun-21 |
| Mark Carbeck | 70,000 | Feb-15 | $14.97 | Mar-25 |
| Ridhima Lulla | 250,000 | Sep-18 | GBP 0.30 | Mar-25 |
| Rishika Lulla | 242,035 | Sep-18 | GBP 0.30 | Mar-25 |

## ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### A. Major Shareholders

The following table and accompanying footnotes provide information regarding the beneficial ownership of our ordinary shares as of July 27, 2020 with respect to each person or group who beneficially owned 5% or more of our issued ordinary shares.

Beneficial ownership, which is determined in accordance with the rules and regulations of the SEC, means the sole or shared power to vote or direct the voting or dispose or direct the disposition of our ordinary shares. The number of our ordinary shares beneficially owned by a person includes ordinary shares issuable with respect to options or similar convertible securities held by that person that are exercisable or convertible within 60 days of July 27, 2020.

The number of shares and percentage beneficial ownership of ordinary shares below is based on 155,577,538 issued A ordinary shares and 21,700,418 issued B ordinary shares as of July 27, 2020.

Except as otherwise indicated in the footnotes to the table, shares are owned directly or indirectly with sole voting and investment power, subject to applicable marital property laws.

| Major shareholders | Number of A Ordinary Shares Beneficially Owned | | Number of B Ordinary Shares Beneficially Owned | |
|---|---|---|---|---|
| | Number of A Shares | Percent of Class | Number of B Shares | Percent of Class |
| Kishore Lulla | 1,041,404 | 0.7% | 17,723,085 | 81.7% |
| Beech Investments Limited | 318,818 | 0.2% | 8,046,048 | 37.1% |

(1)   Kishore Lulla's interest in certain of his shares is by virtue of (i) his holding ownership interests in, and being a potential beneficiary of, discretionary trusts that hold our shares and (ii) serving as trustee of the Lulla Foundation, a U.K. registered charity that holds our shares.

(2)   Beech Investments Limited, c/o SG Kleinwort Hambros Trust Company (Channel Islands) Limited, PO Box 197, SG Hambros House, 18 Esplanade, St Helier, Jersey, JE4 8RT. Beech Investments, a company incorporated in the Isle of Man, is owned by discretionary trusts that include Eros director Kishore Lulla as a beneficiary. The shares currently held by Beech Investments Limited are being held as both A ordinary and B ordinary shares. The B ordinary shares would convert into A ordinary shares (pursuant to Section 22.1 of the Articles of Association) upon being transferred to a person who is not a Permitted Holder (as defined in Section 22.1 of the Articles of Association).

114

The following summarizes the significant changes in the percentage ownership held by our major shareholders during the past three years:

·   Kishore Lulla's interest in certain of his shares is by virtue of (i) his holding ownership interests in, and being a potential beneficiary of, discretionary trusts that hold our shares and (ii) serving as trustee of the Lulla Foundation, a U.K. registered charity that holds our shares. Since July 30, 2019, Mr. Lulla's aggregate ownership of our A and B ordinary shares, through both direct and indirect ownership, has increased by 1,149,493 shares. The change in Mr. Lulla's ownership was driven by several factors including, but not limited to: share grants received through executive compensation schemes, a decrease in holdings of Eros Ventures limited and the conversion of certain amounts of B ordinary shares into A ordinary shares.

The Founder Group, including Kishore Lulla and his direct descendants, by virtue of the B ordinary shares they own, have different voting rights from holders of A ordinary shares. Each A ordinary share is entitled to one vote on all matters upon which the ordinary shares are entitled to vote, and each B ordinary share is entitled to ten votes. In order to vote at any meeting of shareholders, a holder of B ordinary shares will first be required to certify that it is a permitted holder as defined in our articles of association. Following the adoption of the new Amended Articles of Association, Mr. Sunil Lulla, the brother of Kishore Lulla and the current Chairman and Managing Director of Eros International Media Limited and a member of the board of directors of Eros, and his descendants, will be within the scope of permitted holders.

As of June 30, 2020, approximately 140,631,271 of our A ordinary shares, representing 95.0% of our outstanding A ordinary shares as of June 30, 2020, were held by a total of 2 record holders with addresses in the United States. The number of beneficial owners of our A ordinary shares in the United States is likely to be much larger than the number of record holders of our A ordinary shares in the United States. No B ordinary shares are held by individuals with addresses in the United States.

## ITEM 8. FINANCIAL INFORMATION

### A. Consolidated Statements and Other Financial Information

Please see "Part III — Item 18. Financial Statements" for a list of the financial statements filed as part of this Annual Report on Form 20-F.

## ITEM 9. THE OFFER AND LISTING

### A. Offer and Listing Details

The high and low last reported sale prices for our shares for the periods indicated are as shown below. We note that the periods are split between when Eros International was listed on the Alternative Investment Market ("AIM") and when it was listed on the New York Stock Exchange ("NYSE") on November 13, 2013. With respect to the trading prices on AIM, the prices are adjusted to reflect the one-for-three reverse stock split, which occurred on November 18, 2013, and a translation from British Pound Sterling to U.S. dollars based on the prevailing exchange rate between the British Pound Sterling and the U.S. dollar at the time of the applicable trade. Amounts on the NYSE share price table below are for the period November 18, 2013 to June 30, 2020; and on the AIM share price table, for the period April 1, 2010 to November 18, 2013, only.

| | Price per share on NYSE | | | |
| --- | --- | --- | --- | --- |
| | | High | | Low |
| **Fiscal year:** | | | | |
| 2014 | $ | 16.07 | $ | 8.94 |
| 2015 | $ | 22.44 | $ | 13.65 |
| 2016 | $ | 37.60 | $ | 6.81 |
| 2017 | $ | 19.23 | $ | 9.65 |
| 2018 | $ | 16.10 | $ | 6.85 |
| 2019 | $ | 14.50 | $ | 7.04 |
| 2020 | $ | 8.97 | $ | 1.24 |
| Fiscal Quarter: | | | | |
| First quarter 2020 | $ | 8.97 | $ | 1.35 |
| Second quarter 2020 | $ | 4.44 | $ | |
| Third quarter 2020 | $ | 3.39 | $ | 1.30 |
| Fourth quarter 2020 | $ | 4.44 | $ | 1.37 |
| **Month:** | | | | |
| April 2019 | $ | 8.97 | $ | 8.00 |
| May 2019 | $ | 8.59 | $ | 7.44 |
| June 2019 | $ | 7.66 | $ | 1.35 |
| July 2019 | $ | 1.82 | $ | 1.48 |
| August 2019 | $ | 1.69 | $ | 1.24 |
| September 2019 | $ | 3.51 | $ | 1.72 |
| October 2019 | $ | 2.32 | $ | 1.30 |
| November 2019 | $ | 2.67 | $ | 1.91 |
| December 2019 | $ | 3.39 | $ | 2.45 |
| January 2020 | $ | 4.44 | $ | 2.41 |
| February 2020 | $ | 3.14 | $ | 2.29 |
| March 2020 | $ | 2.52 | $ | 1.37 |
| April 2020 | $ | 3.05 | $ | 1.43 |
| May 2020 | $ | 3.32 | $ | 2.45 |
| June 2020 | $ | 3.84 | $ | 2.90 |

| | Price per share on AIM | | | |
| --- | --- | --- | --- | --- |
| | | High | | Low |
| **Fiscal year:** | | | | |
| 2011 | $ | 13.37 | $ | 7.51 |
| 2012 | $ | 13.11 | $ | 9.54 |
| 2013 | $ | 15.02 | $ | 8.05 |
| **Fiscal Quarter:** | | | | |
| First quarter 2013 | $ | 15.02 | $ | 8.50 |
| Second quarter 2013 | $ | 11.53 | $ | 8.05 |
| Third quarter 2013 | $ | 11.81 | $ | 8.90 |
| Fourth quarter 2013 | $ | 12.16 | $ | 10.44 |
| First quarter 2014 | $ | 11.36 | $ | 8.79 |
| Second quarter 2014 | $ | 13.45 | $ | 9.06 |
| **Month:** | | | | |
| October 2013 | $ | 11.05 | $ | 10.27 |
| November 2013 | $ | 11.05 | $ | 10.27 |

Our closing price on AIM on November 13, 2013 was $11.18.

**B. Plan of Distribution**

Not applicable.

**C. Markets**

Our shares are listed on the NYSE under the symbol "EROS."

116

**D. Selling Shareholders**

Not applicable.

**E. Dilution**

Not applicable.

**F. Expenses of the Issue**

Not applicable.

**ITEM 10. ADDITIONAL INFORMATION**

**A. Share Capital**

Not applicable.

**B. Memorandum and Articles of Association**

Eros International Plc was incorporated in the Isle of Man on March 31, 2006 under the 1931 Act, as a public company limited by shares and effective as of September 29, 2011, was de-registered under the 1931 Act and re-registered as a company limited by shares under the 2006 Act. We maintain our registered office at First Names House, Victoria Road Douglas, Isle of Man IM2 4DF, British Isles; our principal executive office in the U.S. is at 550 County Avenue, Secaucus, New Jersey 07094.

At March 31, 2020, Eros International plc has authorized share capital of 180,100,915 A ordinary shares at a par value of GBP 0.30 per share, of which 127,116,702 is issued share capital, and authorized share capital of 19,899,085B ordinary shares at a par value of GBP 0.30 per share, of which 19,899,085is entirely issued and outstanding.

Our activities are regulated by our Memorandum and Articles of Association. We adopted revised Articles of Association by special resolution of our shareholders passed on December 20, 2018. The material provisions of our revised Articles of Association are described below. In addition to our Memorandum and Articles of Association, our activities are regulated by (among other relevant legislation) the 2006 Act. Our Memorandum of Association states our company name, that we are a company limited by shares, that our registered office is at First Names House, Victoria Road Douglas, Isle of Man IM2 4DF, British Isles , that our registered agent is IQ EQ (Isle of Man) Limited and that neither the memorandum of association nor the articles of association may be amended except pursuant to a resolution approved by a majority of not less than three-fourths of such members as, being entitled so to do, vote in person or by proxy at the general meeting at which such resolution is proposed. Below is a summary of some of the provisions of our Articles of Association. It is not, nor does it purport to be, complete or to identify all of the rights and obligations of our shareholders.

On 29 June 2020, at an extraordinary general meeting, a resolution of our shareholders was passed that, conditional upon the completion of the Merger described in the accompanying Circular, the Articles of Association be amended as set out in the marked-up version of the Articles of Association provided to shareholders as part of the proxy materials for that meeting. As at the date hereof, completion of the Merger has not taken place and the amendments are not yet effective.

The summary is qualified in its entirety by reference to our Articles of Association. See "Part III — Item 19. Exhibits — Exhibit 1.1" and "Part III — Item 19. Exhibits — Exhibit 1.2."

The following is a description of the material provisions of our articles of association, ordinary shares and certain provisions of Isle of Man law. This summary does not purport to be complete and is qualified in its entirety by reference to our Articles of Association, See "Part III - Item 19.

117

**Board of Directors**

Under our Articles of Association, the 2006 Act and the committee charters and governance policies adopted by our board of directors, our board of directors controls our business and actions. Our board of directors consists of between three and twelve directors and is divided into three staggered classes of directors of the same or nearly the same number. At each annual general meeting, a class of directors is elected for a three-year term to succeed the directors of the same class whose terms are then expiring. No director may participate in any approval of a transaction in which he or she is interested. The directors receive a fee determined by our board of directors for their services as directors and such fees are distinct from any salary, remuneration or other amounts that may be payable to the directors under our articles.

However, any director who is also one of our subsidiaries' officers is not entitled to any such director fees but may be paid a salary and/or remuneration for holding any employment or executive office, in accordance with the articles. Our directors are entitled to be repaid all reasonable expenses incurred in the performance of their duties as directors. There is no mandatory retirement age for our directors.

Our articles provide that the quorum necessary for the transaction of business may be determined by our board of directors and, in the absence of such determination, is the majority of the members of our board of directors. Subject to the provisions of the 2006 Act, the directors may exercise all the powers of the Company to borrow money, guarantee, indemnify and to mortgage or charge our assets.

**Ordinary Shares**

***Dividends***

Holders of our A ordinary shares and B ordinary shares whose names appear on the register on the date on which a dividend is declared by our board of directors are entitled to such dividends according to the shareholders' respective rights and interests in our profits and subject to the satisfaction of the solvency test contained in the 2006 Act. Any such dividend is payable on the date declared by our board of directors, or on any other date specified by our board of directors. Under the 2006 Act, a company satisfies the solvency test if (a) it is able to pay its debts as they become due in the normal course of its business and (b) the value of its assets exceeds the value of its liabilities. Under certain circumstances, if dividend payments are returned to us undelivered or left uncashed, we will not be obligated to send further dividends or other payments with respect to such ordinary shares until that shareholder notifies us of an address to be used for the purpose. In the discretion of our board of directors, all dividends unclaimed for a period of twelve months may be invested or otherwise used by our board of directors for our benefit until claimed (and we are not a trustee of such unclaimed funds) and all dividends unclaimed for a period of twelve years after having become due for payment may be forfeited and revert to us.

***Voting Rights***

Each A ordinary share is entitled to one vote on all matters upon which the ordinary shares are entitled to vote, and each B ordinary share is entitled to ten votes. In order to vote at any meeting of shareholders, a holder of B ordinary shares will first be required to certify that it is a permitted holder as defined in our articles.

***General Meetings***

Unless unanimously approved by all shareholders entitled to attend and vote at the meeting, all general meetings for the approval of a resolution appointing a director may be convened by our board of directors with at least 21 days' notice (excluding the date of notice and the date of the general meeting), and any other general meeting may be convened by our Board of Directors with at least 14 days' notice (excluding the date of notice and the date of the general meeting). A quorum required for any general meeting consists of shareholders holding at least 30% of our issued share capital. The concept of "ordinary," "special" and "extraordinary" resolutions is not recognised under the 2006 Act, and resolutions passed at a meeting of shareholders only require the approval of shareholders present in person or by proxy, holding in excess of 50% of the voting rights exercised in relation thereto. However, as permitted under the 2006 Act, our articles of association incorporate the concept of a "special resolution" (requiring the approval of shareholders holding 75% or more of the voting rights exercised in relation thereto) in relation to certain matters, such as directing the management of our business (subject to the provisions of the 2006 Act and our articles), sanctioning a transfer or sale of the whole or part of

our business or property to another company (pursuant to the relevant section of the 1931 Act) and allocating any shares or other consideration among the shareholders in the event of a winding up.

118

***Rights to Share in Dividends***

Our shareholders have the right to a proportionate share of any dividends we declare.

***Limitations on Right to Hold Shares***

Our board of directors may determine that any person owning shares (directly or beneficially) constitutes a "prohibited person" and is not qualified to own shares if such person is in breach of any law or requirement of any country and, as determined solely by our board of directors, such ownership would cause a pecuniary or tax disadvantage to us, another shareholder or any of our other securities. Our board of directors may direct the prohibited person to transfer the shares to another person who is not a prohibited person. Any such determination made or action taken by our board of directors is conclusive and binding on all persons concerned, although in the event of such a transfer, the net proceeds of the sale of the relevant shares, after payment of our costs of the sale, shall be paid by us to the previous registered holders of such shares or, if reasonable inquiries failed to disclose the location of such registered holders, into a trust account at a bank designated by us, the associated costs of which shall be borne by such trust account. A prohibited person would have the right to apply to the Isle of Man court if he or she felt that our board of directors had not complied with the relevant provisions of our articles of association.

Our articles also identify certain "permitted holders" of B ordinary shares. Any B ordinary shares transferred to a person other than a permitted holder will, immediately upon registration of such transfer, convert automatically into A ordinary shares.

***Untraceable Shareholders***

Under certain circumstances, if any payment with respect to any ordinary shares has not been cashed and we have not received any communications from the holder of such ordinary shares, we may sell such ordinary shares after giving notice in accordance with procedures set out by our articles to the holder of the ordinary shares and any relevant regulatory authority.

***Action Required to Change Shareholder Rights or Amend Our Memorandum or Articles of Association***

All or any of the rights attached to any class of our ordinary shares may, subject to the provisions of the 2006 Act, be amended either with the written consent of the holders of 75% of the issued shares of that class or by a special resolution passed at a general meeting of the holders of shares of that class. Furthermore, our memorandum and articles of association may be amended by a special resolution of the holders of 75% of the issued shares.

***Liquidation Rights***

On a return of capital on winding up, assets available for distribution among the holders of ordinary shares will be distributed among holders of our ordinary shares on a pro rata basis. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately.

***Minority Shareholder Protections***

Under the 2006 Act, if a shareholder believes that the affairs of the company have been or are being conducted in a manner that is unfair to such shareholder or unfairly prejudicial or oppressive, the shareholder can seek a range of court remedies including winding up the company or setting aside decisions in breach of the 2006 Act or the company's memorandum and articles of association. Further, if a company or a director of a company breaches or proposes to breach the 2006 Act or its memorandum or articles of association, then, in response to a shareholder's application, the Isle of Man Court may issue an order requiring compliance with the 2006 Act or the memorandum or articles of association; alternatively, the Isle of Man Court may issue an order restraining certain action to prevent such a breach from occurring.

The 2006 Act also contains provisions that enable a shareholder to apply to the Isle of Man court for an order directing that an investigation be made of a company and any of its associated companies.

**Anti-takeover Effects of Our Dual Class Structure**

As a result of our dual class structure, the Founders Group and our executives and employees will have significant influence over all matters requiring shareholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets. This concentrated control could discourage others from initiating any potential merger, takeover or other change of control transaction that other shareholders may view as beneficial.

**C. Material Contracts**

***Agreement and Plan of Merger***

On April 17, 2020, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with STX Filmworks Inc., a Delaware corporation ("STX"), England Holdings 2 Inc., a Delaware corporation and indirect wholly owned subsidiary of the Company ("England Holdings 2"), and England Merger 1 Corp. (f/k/a England Merger Corp.), a Delaware corporation and a direct wholly owned subsidiary of England Holdings 2 ("Merger Sub"), which provides for, among other things, the merger of Merger Sub with and into STX (the "Merger"), with STX surviving as the surviving corporation and a direct wholly owned subsidiary of England Holdings 2. Eros, as the combined company following the Merger, is referred to hereafter as the "combined company."

On the terms and subject to the conditions of the Merger Agreement, each share of STX preferred stock issued and outstanding immediately prior to the effective time of the Merger (the "Effective Time") will be converted into the right to receive a number of contractual contingent value rights ("CVRs"), without interest, based on the liquidation value and, if applicable, the exit payment, of the respective share of STX preferred stock (the "Merger Consideration"), and such CVRs will in turn entitle the holder thereof to receive, on the settlement date of the CVRs, a number of A ordinary shares to be calculated in accordance with certain agreements governing the CVRs (the "CVR Agreements"). Each share of STX common stock and each STX stock option and restricted stock unit award issued and outstanding as of immediately prior to the Effective Time will be cancelled at the Effective Time without consideration. The aggregate number of A ordinary shares to be issued to the former STX stockholders upon settlement of the CVRs (the "Aggregate Merger Consideration CVR Shares") will be equal to, and will in no event exceed, the total number of ordinary shares of the Company outstanding as of immediately prior to the Effective Time on a fully diluted basis. The calculation of the fully diluted number of outstanding ordinary shares for this purpose will include (1) the aggregate number of ordinary shares subject to issuance pursuant to then outstanding in-the-money (based on the volume weighted average trading price of A ordinary shares for the 20 days prior to the Effective Time) Company stock options and (2) the aggregate number of ordinary shares subject to issuance pursuant to then outstanding Company restricted stock unit awards.

Pursuant to the CVR Agreements, the applicable CVRs issued as Merger Consideration shall be settled in A ordinary shares on the date (the "Settlement Date") that is the earlier to occur of (1) the later to occur of (a) the first time that the A ordinary shares issuable pursuant to the CVRs have been registered for resale pursuant to an effective registration statement under the Securities Act of 1933, as amended, and (b) the 75th day after the Effective Time and (2) the date that is six months after the Effective Time. Each CVR will entitle the holder thereof to receive, on the Settlement Date, a number of A ordinary shares allocated from the Aggregate Merger Consideration CVR Shares based on the respective classes of STX preferred stock in respect of which the applicable CVRs were issued. However, the total number of A ordinary shares issuable pursuant to all CVRs will not exceed, in the aggregate, the Aggregate Merger Consideration CVR Shares.

Each holder of a CVR (other than any such holder that is also a purchaser under the PIPE Subscription Agreement (as defined below) and delivered a PIPE Lock-Up Agreement (as defined below) in connection with the PIPE Subscription Agreement) will, as a condition to receiving any A ordinary shares issuable in respect of such CVRs on the Settlement Date, be required to execute and deliver a lock-up agreement to the combined company (the "CVR Lock-Up Agreements"). Pursuant to the CVR Lock-Up Agreements, each holder of a CVR will agree not to, without the prior written consent of the combined company, directly or indirectly transfer the A ordinary shares issued to such holder on the Settlement Date for a period of 18 months from the Settlement Date.

120

The Merger Agreement, among other things, addresses certain post-closing governance matters, including, (1) that Kishore Lulla, currently the Executive Chairman and Chief Executive Officer of the Company, will be appointed as Executive Co-Chairman of the combined company; and (2) Robert B. Simonds, Jr., currently the Chairman and Chief Executive Officer of STX, will be appointed as Co-Chairman and Chief Executive Officer of the combined company. In addition, effective as of the Effective Time, the board of directors of the combined company (the "Board") will have nine directors, of whom four (the "Founders Group Directors") will be selected by the Founders Group, four (the "STX Directors") will be selected by STX, and the remaining one director will be jointly selected by the Founders Group and STX (the "Jointly Designated Director"). The foregoing directors will be divided into three classes, each of which will serve for staggered three-years term. One Founders Group Director, one STX Director and the Jointly Designated Directorwill be allocated to the class of directors initially holding office until the Company's 2021 annual general meeting; one Founders Group Director and two STX Directors will be allocated to the class of directors initially holding office until the Company's 2022 annual general meeting; and two Founders Group Directors and one STX Director will be allocated to the class of directors initially holding office until the Company's 2023 annual general meeting. At least one Founders Group Director and at least one STX Director will each be required to satisfy the independence standards of the New York Stock Exchange with respect to the combined company as of the Effective Time.

Effective as of the Effective Time, the Audit Committee of the Board will consist of four members, two of whom will be Founders Group Directors and two of whom will be STX Directors; the Nomination and Governance Committee of the Board will consist of four members, two of whom will be Founders Group Directors and two of whom will be STX Directors; and the Remuneration Committee of the Board will consist of three members, one of whom will be a Founders Group Director, one of whom will be an STX Director and one of whom will be the Jointly Designated Director.

The requisite majority of STX stockholders have adopted the Merger Agreement and approved the transactions contemplated by the Merger Agreement and related documents. Although not required under the Company's organizational documents or Isle of Man law, a majority in voting power of the Company shareholders have approved the transactions contemplated by the Merger Agreement, PIPE Subscription Agreement and related documents, including the issuance of A ordinary shares pursuant to the Merger Agreement and the Equity Financing (as defined below). Pursuant to a Voting and Support Agreement entered into concurrently with the Merger Agreement, the Founders Group further agreed, among other things, to vote their respective ordinary shares in favor of the transactions contemplated by the Merger Agreement and the Equity Financing, the adoption of the Amended Articles of Association (as defined below) and against any alternative proposals.

The completion of the Merger is subject to customary conditions, including: (1) the expiration or termination of the applicable waiting period (or any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which condition was fulfilled on May 11, 2020; (2) the receipt of any authorization or consent from a governmental authority required to be obtained with respect to the Merger under certain non-U.S. antitrust laws, which condition was fulfilled on July 8, 2020; (3) the absence of any order or law that has the effect of enjoining or otherwise prohibiting the consummation of the Merger; (4) the substantially concurrent consummation of an aggregate of at least $110 million out of a total of $125 million of equity financing for the combined company (the "Equity Financing"), consisting of (a) the transactions contemplated by the PIPE Subscription Agreement, together with the related subscription for a new class of preferred stock of STX by the purchasers under the PIPE Subscription Agreement, and (b) the arrangement by the Company of at least $50 million of additional equity financing (the "Additional Equity Financing") from new investors and/or through drawdowns pursuant to the 2020 Equity Offering (as defined below), of which Additional Equity Financing of at least $35 million of gross proceeds must be funded at or prior to the Effective Time (with at least $20 million of such $35 million of gross proceeds at closing required to be drawn pursuant to the 2020 Equity Offering), with any remaining balance of the Equity Financing required to be consummated within 90 days after the Effective Time; (5) the approval for listing on the New York Stock Exchange of the Aggregate Merger Consideration CVR Shares; (6) the continued effectiveness of certain consents and waivers by STX's existing senior lenders under STX's existing senior credit facilities and by STX's existing mezzanine lenders under STX's existing mezzanine credit facility with respect to the Merger and

related transactions, which was delivered concurrently with the Merger Agreement; (7) the execution and delivery by the parties thereto of the CVR Agreements, the Investors' Rights Agreement (as defined below) and the Registration Rights Agreement (as defined below); (8) subject to certain exceptions, the accuracy of the representations and warranties of Eros and STX, respectively; and (9) performance by the Company and STX in all material respects of their respective obligations under the Merger Agreement.

121

The Merger Agreement includes customary representations and warranties of the Company and STX and each party has agreed to customary covenants, including, among others, covenants relating to (1) the conduct of its business during the interim period between execution of the Merger Agreement and the Effective Time and (2) its non-solicitation obligations in connection with alternative acquisition proposals. In addition, the Company agreed to call and hold, as soon as practicable after the date of the Merger Agreement, an extraordinary general meeting of shareholders for the purpose of approving the Amended Articles of Association to reflect certain governance arrangements set forth in the Investors' Rights Agreement and certain related matters. At such extraordinary general meeting, held on June 29, 2020, the Amended Articles of Association were duly approved by the requisite vote of the Company shareholders.

The Merger Agreement provides for certain customary termination rights for both the Company and STX, including in the event the conditions to their respective obligations have not been satisfied by August 17, 2020 (which would be automatically extended to November 13, 2020 if the only remaining unsatisfied conditions relate to obtaining antitrust approval).

### *PIPE Subscription Agreement*

On April 17, 2020, concurrently and in connection with the Merger Agreement, the Company entered into a Subscription Agreement (the "PIPE Subscription Agreement") with certain purchasers, pursuant to which such purchasers will purchase newly issued A ordinary shares from the Company for an aggregate purchase price of $75 million in a private placement transaction (the "PIPE Financing"). Each purchaser under the PIPE Subscription Agreement is an existing stockholder of STX.

The purchase price for each A ordinary share to be purchased under the PIPE Subscription Agreement is equal to the lowest of (1) $2.60 (the "Base Price"), (2) the weighted average of the purchase price of all purchases made by the purchasers pursuant to the 2020 Equity Offering prior to the Effective Time and (3) the volume weighted average trading price of Eros A Ordinary Shares for the 10 trading days immediately prior to the Effective Time (the "Pre-Closing VWAP"); provided, however, that if the Pre-Closing VWAP is greater than $3.25, then the purchase price per Eros A Ordinary Share under the PIPE Subscription Agreement will be equal to the average of the Base Price and the Pre-Closing VWAP.

The consummation of the PIPE Financing is subject, among other customary closing conditions, to (1) the substantially concurrent consummation of the Merger pursuant to the Merger Agreement (without any amendment, modification or supplementation of the terms of the Merger Agreement in a manner that would reasonably be expected to materially and adversely affect the rights or economic benefits that the purchasers under the PIPE Subscription Agreement would reasonably expect to receive thereunder, without, in each case, the consent of each such purchaser), (2) the prior or substantially concurrent consummation of the Additional Equity Financing, with aggregate funded proceeds at or prior to the Effective Time of at least $35 million, and (3) the accuracy of the representations and warranties made by the Company to STX in the Merger Agreement to the same extent so required to be true and correct under the terms and conditions of the Merger Agreement.

Concurrently with the execution of the PIPE Subscription Agreement, each purchaser thereunder executed a lock-up agreement (the "PIPE Lock-Up Agreements") pursuant to which such purchaser agreed not to, without the prior written consent of the Company, directly or indirectly transfer the A ordinary shares issued to such purchaser in the PIPE Financing and the Merger for a period of 75 days from the Effective Time.

### *Form of Investors' Rights Agreement*

Pursuant to the Merger Agreement, at the Effective Time, the Company, certain former stockholders of STX who are purchasing A ordinary shares in the PIPE Financing and the Founders Group will enter into an Investors' Rights Agreement (the "Investors' Rights Agreement"), in substantially the form attached to the Merger Agreement.

The Investors' Rights Agreement provides that, until the third anniversary of the Effective Time, (1) the Hony Investor (as defined therein) will have the right, for so long as the Hony Investor beneficially owns at least 50% of the number of A ordinary shares beneficially owned by it as of the Effective Time (giving effect, prior to the Settlement Date, to the A ordinary shares underlying the CVRs issued to the Hony Investor pursuant to the Merger Agreement), to nominate for election or appointment to the Board each successor to or replacement for an STX Director, and (2) the Founders Group will have the right, for so long as the Founders Group continues to beneficially own at least 50% of the number of ordinary shares beneficially owned by the Founders Group as of the Effective Time (excluding for this purpose shares issued in respect of new equity awards granted at or immediately after the Effective Time), to nominate for election or appointment to the Board each successor to or replacement for a Founders Group Director. In addition, for so long as the Founders Group has the foregoing Board nomination right, with respect to all other directorships to be elected in an election of directors to the Board, the Founders Group shall vote its shares proportionately to the vote of all holders of shares who are not members of the Founders Group; provided that, for purposes of determining any such proportional vote prior to the settlement of the CVRs, CVRs shall be deemed to be outstanding A ordinary shares and to have been voted in such election.

In addition, for so long as the Hony Investor has the foregoing Board nomination right, the hiring or termination of the chief executive officer, chief financial officer or president (including any co-president) of the combined company will require the approval of a majority of the Board, including at least one director nominated by the Hony Investor.

In addition, until the earlier of the third anniversary of the Effective Time or the date that the Founders Group ceases to beneficially own at least 50% of the number of ordinary shares beneficially owned by the Founders Group as of the Effective Time (excluding for this purpose shares issued in respect of new equity awards granted at or immediately after the Effective Time), the following actions by the combined company or any of its subsidiaries will require the approval of a majority of the Board, including at least one Founders Group Director that is not an independent director (the "Founders Group Protections"): (1) entering into a change of control transaction; (2) initiating a voluntary liquidation, dissolution, bankruptcy or other insolvency proceeding; (3) making a material change in the nature of the business conducted by the combined company and its subsidiaries; (4) hiring or terminating the chief executive officer, chief financial officer or president (including any co-president) of the combined company; or (5) adopting the annual business plan (including operating budget) of the combined company and its subsidiaries.

The Investors' Rights Agreement also provides that, until the third anniversary of the Effective Time, the Founders Group will not, without the prior approval of an independent committee of the Board, acquire beneficial ownership of ordinary shares, or convert A ordinary shares owned by the Founders Group from time to time into B ordinary shares, to the extent doing so would result in the Founders Group beneficially owning more than 50% of the total voting power of the outstanding ordinary shares (the "Founders Group 50% Limit"). Following the third anniversary of the Effective Time, the Founders Group may acquire ordinary shares, and/or convert between A ordinary shares and B ordinary shares, without limitation.

The Investors' Rights Agreement provides for the following minority protections (the "Minority Protections"):

- From the Effective Time until the third anniversary of the Effective Time, the prior approval of holders of a majority of the outstanding A ordinary shares will be required before the combined company or any of its subsidiaries takes (or agrees or commits to take) any of the following actions: (1) amending, supplementing or otherwise modifying the combined company's Memorandum or Articles of Association in a manner that would affect the relative rights of the holders of B ordinary shares vis-à-vis the holders of A ordinary shares; (2) effecting any transaction or series of transactions providing for consideration to the holders of B ordinary shares that is in a different amount or form per share than the consideration provided to the holders of A ordinary shares in such transaction; (3) any action that would have the effect of increasing the relative voting power of the then outstanding B ordinary shares vis-à-vis the then outstanding A ordinary shares; (4) issuing additional B ordinary shares (other than upon conversion of A ordinary shares held by the Founders Group subject to the limitations in the immediately preceding paragraph); or (5) entering into non arms' length related party transactions between

the combined company and the Founders Group.

123

- From the Effective Time until the third anniversary of the Effective Time, the prior approval of an independent committee of the Board will also be required before the combined company or any of its subsidiaries takes (or agrees or commits to take) any of the actions described in items (1), (2) and (5) of the immediately preceding bullet.

- From the Effective Time until the Settlement Date, all of the actions described in the preceding two bullets, as well as any election or removal of directors by the holders of ordinary shares or any other action generally requiring the approval of holders of ordinary shares, will in addition require the consent of the holders of CVRs corresponding to a number of shares that, together with outstanding shares actually voted with respect to the action in question and assuming the conversion of all CVRs into the respective number of A ordinary shares issuable thereunder as of such date, would be required to approve such action pursuant to the organizational documents or otherwise pursuant to the Minority Protections described in the two preceding bullets.

Except for certain fundamental reserved matters that will be subject to approval by a majority of the whole Board, all matters relating to the management of the combined company's Indian subsidiary, Eros International Media Limited, will be delegated exclusively to a committee of the Board consisting only of Founders Group Directors.

Pursuant to the Merger Agreement and the Investors' Rights Agreement, the Company convened an extraordinary general meeting of shareholders on June 29, 2020 at which the requisite majority in voting power of Company shareholders duly approved an amendment and restatement of the Company's Articles of Association in substantially the form attached to the Merger Agreement (the "Amended Articles of Association"), in order to reflect the Founders Group Protections, the Founders Group 50% Limit and the Minority Protections. In addition to the foregoing changes, the Amended Articles of Association also expand the definition of "Permitted Holders" therein to include any descendants of the late Mr. Arjan Lulla, who founded Eros and was the father of Kishore Lulla, the Company's current Executive Chairman and Chief Executive Officer. "Permitted Holders" defines the specific categories of shareholders who are permitted to hold B ordinary shares of the combined company, which will continue after the Effective Time to carry 10:1 voting rights as compared to the A ordinary shares of the combined company. The change to this definition will bring Mr. Sunil Lulla, the brother of Kishore Lulla and the current Chairman and Managing Director of Eros India and currently a member of the board of directors of the Company, and his descendants, within the scope of "Permitted Holders." As provided in the resolution pursuant to which the Amended Articles of Association were approved, the Amended Articles of Association are conditioned, and will take effect only upon, the Effective Time.

***Form of Registration Rights Agreement***

Pursuant to the Merger Agreement, at the Effective Time, the Company, the former stockholders of STX who are entitled to receive CVRs in the Merger and/or who are purchasers in the PIPE Financing and the Founders Group will enter into a Registration Rights Agreement (the "Registration Rights Agreement"), in substantially the form attached to the Merger Agreement.

Pursuant to the Registration Rights Agreement, the combined company is required as soon as reasonably practicable after the Effective Time, but in no event later than the 60th day following the Effective Time, to prepare and file with the SEC a registration statement on Form F-1 or Form F-3 (the "Shelf Registration Statement") providing for the resale from time to time of all A ordinary shares issued (1) at the Effective Time to the former STX stockholders who are purchasing A ordinary shares in the PIPE Financing and (2) on the Settlement Date upon settlement of the CVRs issued to the former STX stockholders pursuant to the Merger Agreement. The combined company must use commercially reasonable efforts to keep the Shelf Registration Statement continuously effective until the earliest of the date as of which all A ordinary shares covered by the Shelf Registration Statement have been sold, such shorter period as may be agreed by all of the former STX stockholders holding A ordinary shares then covered by the Shelf Registration Statement or the four-year anniversary of the date of effectiveness of the Shelf Registration Statement.

The former STX stockholders will have the right, from time to time, to cause the combined company to undertake underwritten offerings or sales of A ordinary shares covered by the Shelf Registration Statement having an aggregate value of at least $20 million (each, a "Shelf Take-Down"), in each case at the expense of the combined company. The

combined company will not be obligated in any calendar year to effect more than four block trade Shelf Take-Downs or one Shelf Take-Down that is not a block trade.

124

In addition to the rights of the STX stockholders under the Registration Rights Agreement, the Founders Group will have the right, from time to time after the three-month anniversary of the Effective Time, to demand registration, at the combined company's expense, of ordinary shares having an aggregate value of at least $20 million. The combined company will not be obligated to effect more than five such demand registrations, and such demand registrations are subject to customary "piggyback" registration rights in favor of the former STX stockholders.

**Important Note Regarding the Merger Agreement and Related Agreements**

The representations, warranties and covenants contained in the Merger Agreement and other agreements and documents described above were made only for purposes of those agreements and documents and as of the specified dates set forth therein, were solely for the benefit of the parties to those agreements and documents, may be subject to limitations agreed upon by those parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between those parties instead of establishing particular matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors should not rely on these representations, warranties or covenants or any descriptions thereof as characterizations of the actual state of facts or conditions of the parties or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of the representations, warranties and covenants may change after the date of the agreement containing them, which subsequent information may or may not be fully reflected in the Company's and the combined company's public disclosures. Accordingly, the agreements described above are described in this filing only to provide investors with information regarding the terms of such agreements and not to provide investors with any other factual information regarding the parties or their respective businesses.

***2017 Notes Offering***

On December 06, 2017, the Company closed a registered direct offering (the "2017 Offering") of $122,500,000 aggregate principal amount of the Company's Senior Convertible Notes (collectively, the "Notes") and a Warrant (collectively, the "Warrants") to purchase up to 2,000,000 of the Company's A ordinary shares, for an aggregate purchase price of $100,000,000. The Notes and Warrants were issued and sold pursuant to a Securities Purchase Agreement, dated as of December 04, 2017, by and among the Company and the buyers party thereto. The 2017 Offering was effected pursuant to a prospectus supplement dated December 01, 2017 under the Company's Registration Statement on Form F-3 (Registration No. 333-219708), as amended (the "Registration Statement"). The Registration Statement was declared effective on October 02, 2017. The Warrants expired on June 30, 2018 without being exercised.

In connection with the issuance of the Notes, the Company entered into an indenture, dated as of December 06, 2017, between the Company and Wilmington Savings Fund Society, FSB, as trustee (the "Base Indenture"), as supplemented by a first supplemental indenture thereto, dated as of December 06, 2017 (the "Supplemental Indenture" and, the Base Indenture as supplemented by the Supplemental Indenture, the "Indenture"). The terms of the Notes included those provided in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended.

The Notes would have matured on December 06, 2020 unless earlier converted or redeemed, subject to the right of the holders to extend the date under certain circumstances. The Notes were issued with an original issue discount and the terms of the Notes provided that they would not bear interest except upon the occurrence of an event of default, in which case the Notes would bear interest at a rate of 6.0% per annum. The Notes were senior obligations of the Company.

The Company made monthly payments consisting of an amortizing portion of the principal of each Note equal to $3,500,000 and accrued and unpaid interest and late charges on the Note. Provided equity conditions referred to in the prospectus supplement were satisfied, the Company was permitted to make a monthly payment by converting such payment amount into A ordinary shares. Alternatively the Company was permitted, at its option, to make monthly payments by redeeming such payment amount in cash, or by any combination of conversion and redemption.

125

All amounts due under the Notes were convertible at any time, in whole or in part, at the holder's option, into A ordinary shares at the initial conversion price of $14.6875. The conversion price was subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the conversion of a Note would also be adjusted so that the aggregate conversion price would have been the same immediately before and immediately after any such adjustment. In addition, the conversion price was also subject to an anti-dilution adjustment if the Company issued or was deemed to have issued securities at a price lower than the then applicable conversion price. Further, if the Company sold or issued any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a Note would have the right thereafter to substitute the "floating" conversion price for the conversion price upon conversion of all or part the Note.

The Notes required "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon conversion.

On or after December 06, 2019, and subject to certain conditions, the Company had the right to redeem all, but not less than all, of the remaining principal amount of the Notes and all accrued and unpaid interest and late charges in cash at a price equal to 100% of the amount being redeemed, so long as the VWAP of the A ordinary shares exceeded $18.3594 (as adjusted for stock splits, stock dividends, recapitalizations and similar events) for at least 10 consecutive trading days. At any time prior to the date of the redemption, a holder had the right to convert its Note, in whole or in part, into A ordinary shares. The Company had no right to effect an optional redemption if any event of default had occurred and was continuing.

As of June 30, 2020, all amounts due under the Notes have been converted and no principal amount of the Notes remained outstanding.

### *2020 Notes Offering*

On September 30, 2019, the Company closed a registered direct offering (the "2019 Offering") of $27,500,000 aggregate principal amount of the Company's Senior Convertible Notes (collectively, the "New Notes") for aggregate net proceeds of approximately $24,500,000. The New Notes were issued and sold pursuant to a Securities Purchase Agreement, dated as of September 26, 2019, by and among the Company and the buyers party thereto. The 2019 Offering was effected pursuant to a prospectus supplement dated September 26, 2019 under the Registration Statement.

The securities purchase agreement provided, as consideration for the securities purchase agreement and pursuant to the provisions of the Notes, for the Company to waive rights to make redemptions or repayments under the Notes in cash, and for the holder of the Notes (the "2017 Holder") to waive certain specified rights and terms under the Notes, including certain rights to cash payment of any installment amounts then-due under the Notes, and provided for automatic election by the Company to pay each installment amount in the Company's A ordinary shares. Additionally, with respect to an aggregate amount of $9 million of installment amounts as to which a conversion notice was delivered by the 2017 Holder but a conversion did not occur prior to September 26, 2019 as a result of the mutual agreement of the Company and the 2017 Holder, the conversion of such installment was deemed to have been voided by the 2017 Holder as of September 3, 2019, such that the installment conversion price was automatically adjusted in accordance with clause (A) of Section 8(b) of the Notes based on the VWAP of the A ordinary shares as of August 26, 2019.

The New Notes will mature on September 30, 2020, unless earlier converted or redeemed, subject to the right of the holders to extend the date under certain circumstances. The New Notes were issued with an original issue discount and do not bear interest except upon the occurrence of an event of default, in which case the New Notes shall bear interest at a rate of 6.0% per annum. The New Notes are senior obligations of the Company.

All amounts due under the New Notes are convertible at any time, in whole or in part, at the holder's option into A ordinary shares at the initial conversion price of $3.59. The conversion price is subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the conversion of a New Note will also be adjusted so that the aggregate conversion price shall be the same immediately before and immediately after any such adjustment. In addition, the conversion price is also subject to an anti-dilution adjustment if the Company issues or is deemed to have issued securities at a price lower than the then applicable conversion price. Further, if the Company

sells or issues any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a New Note will have the right thereafter to substitute the "floating" conversion price for the conversion price upon conversion of all or part the New Note.

126

The New Notes require "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon conversion. Holders of New Notes are entitled to receive any dividends paid or distributions made to the holders of A ordinary shares on an "as if converted" basis. If the Company issues options, convertible securities, warrants, shares or similar securities to holders of A ordinary shares, each New Note holder has the right to acquire the same as if the holder had converted its New Note.

The New Notes prohibit the Company from entering into specified fundamental transactions unless the successor entity assumes all of the Company's obligations under the New Notes under a written agreement before the transaction is completed. Upon specified corporate events, a New Note holder will thereafter have the right to receive upon a conversion such shares, securities, cash, assets or any other property which the holder would have been entitled to receive upon the happening of the applicable corporate event had the New Note been converted immediately prior to the applicable corporate event. When there is a transaction involving specified changes of control, a New Note holder will have the right to force the Company to redeem all or any portion of the holder's New Note for a purchase price in cash equal to the equal to the greater of (i) 105% of the amount being redeemed, (ii) the product of (A) the amount being redeemed multiplied by (B) the quotient of (1) the highest closing sale price of the A ordinary shares during the period beginning on the date immediately before the earlier to occur of (x) the completion of the change of control and (y) the public announcement of the change of control and ending on the date the holder delivers the redemption notice divided by (2) the conversion price then in effect, or (iii) the product of (A) the amount being redeemed multiplied by (B) the quotient of (1) the aggregate cash consideration and the aggregate cash value of any non-cash consideration per A ordinary share to be paid to the holders of A ordinary shares upon the completion of the change of control divided by (2) the conversion price then in effect.

As of June 30, 2020, all amounts due under the New Notes have been converted and no principal amount of the New Notes remained outstanding.

***2020 Equity Offering***

On January 27, 2020, the Company announced a registered direct offering (the "2020 Equity Offering") of up to 13,888,889 of the Company's A ordinary shares to be effected pursuant to a prospectus supplement under the Registration Statement. The A ordinary shares will be issued and sold from time to time pursuant to one or more subscription agreements entered into with the purchasers.

Subject to certain limitations set forth in the subscription agreement, each time the Company wishes to sell A ordinary shares under the agreement, it will notify an investor of the number of shares to be sold and the minimum price below which the sale will not be made. The per share purchase price for sales will be an amount equal to 95% of the lowest daily VWAP of the A ordinary shares on the New York Stock Exchange for each of the five successive trading days beginning on the first trading day following the date of the Company's notice to the investor. However, if the VWAP on any trading day during this five-day period is lower than any minimum price specified in the notice to the investor, then for each such trading day, the number of A ordinary shares to be sold under such notice will automatically be reduced by an amount equal to 20% and that trading day will not be included in the final determination of the per share purchase price.

The Company makes certain customary representations and warranties in the agreement, including with respect to certain capitalization and securities law matters. The agreement also obligates the parties to indemnify each other for certain losses suffered or incurred by reason of the other party's breach of the agreement.

As of June 30, 2020, the Company had sold an aggregate of 9,472,522 A ordinary shares for aggregate net proceeds of $ 31,087,500, before deducting estimated expenses, which the Company intends to use to fund investment in new content, with a focus on digital, and for general corporate purposes. Such proceeds of the 2020 Equity Offering constitute the Additional Equity Financing and satisfy the related closing condition under the Merger Agreement, as described above under the heading "Merger Agreement."

***Reliance Registration Rights Agreement***

The Company entered into a registration rights agreement with Reliance Industrial Investments and Holdings Limited, dated August 8, 2018 in connection with the purchase by Reliance Industries Limited, or Reliance, of A ordinary shares.

The terms of the registration rights agreement required that the Company register the resale of the A ordinary shares held by Reliance as of the date of the registration rights agreement and also requires that the Company register the resale of any A ordinary shares subsequently acquired by Reliance. The Company filed a Registration Statement on Form F-3 (File No. 333-227380) on September 17, 2018 as required by the registration rights agreement. The SEC declared the registration statement effective on October 9, 2018.

127

**D. Exchange Controls**

No foreign exchange control regulations are in existence in the Isle of Man in relation to the exchange or remittance of sterling or any other currency from the Isle of Man and no authorizations, approvals or consents will be required from any authority in the Isle of Man in relation to the exchange and remittance of sterling and any other currency whether awarded by reason of a judgment or otherwise falling due and having been paid in the Isle of Man.

**E. Taxation**

**Summary of Material Indian Tax Considerations**

The discussion contained herein is based on the applicable tax laws of India as in effect on the date hereof and is subject to possible changes that may come into effect after such date. The information set forth below is intended to be a general discussion only. Prospective investors should consult their own tax advisers as to the consequences of purchasing the A ordinary shares, including, without limitation, the consequences of the receipt of dividend and the sale, transfer or disposition of the ordinary shares.

**i) Direct Tax:**

**Indirect Transfer:**

Based on the fact that we are considered for tax purposes as a company domiciled abroad, any dividend distributed in respect of ordinary shares will not be subject to any withholding or deduction under the Indian income tax laws. As per the provisions of the Indian Income Tax Act, 1961, income arising directly or indirectly through the transfer of a capital asset, including any share or interest in a company or entity registered or incorporated outside India, will be liable to tax in India, if such share or interest derives, directly or indirectly, its value substantially from assets located in India, whether or not the seller of such share or interest has a residence, place of business, business connection, or any other presence in India, if, on the specified date, the value of such assets located in India (i) represents at least 50% of the value of all assets owned by the company or entity, and (ii) exceeds the amount of 100 million rupees. However, the impact of the above indirect transfer provisions would need to be separately evaluated under the tax treaty scenario.

**Dividend Distribution Tax:**

As per the Finance Act 2020, Dividend Distribution Tax ('DDT') of 20.56% levied on the companies declaring dividend has been abolished with effect from April 1, 2020. Consequently, dividend is taxable in the hands of recipient and there shall be withholding of taxes on such dividends. The withholding tax rate under local laws is 10% (excluding surcharge and cess) for Indian residents and 20% (excluding surcharge and cess) for non-residents / foreign companies. Benefits are available under the relevant tax treaties.

**Equalization Levy:**

An equalization levy or EL in respect of certain e-commerce transactions has been introduced in India with effect from June 1, 2016. EL is to be deducted in respect of payment towards "specified services" (in excess of INR 100,000). A "Specified service" means online advertisement, any provision for digital advertising space or any other facility or service for the purpose of online advertisement and includes any other service as may be notified. Deduction of EL at the rate of six per cent (on a gross basis) is the responsibility of Indian residents / non-residents having a permanent establishment (PE) in India on payments to non-residents (not having a PE in India). Consequently, if a non-resident (not having a PE in India) earns income towards a "specified service" which is chargeable to EL, then the same would be exempt in the hands of such non-resident.

Further, the Finance Act, 2020 has expanded the scope of EL by covering e-commerce transactions. E - commerce supply or services include online sale of goods, online provision of services or both owned or provided by an E-commerce operator. However, EL shall not be charged in case sales, turnover or gross receipts of the E-commerce operator is less than INR 20 million.

Discharge of EL at the rate of two percent (on a gross basis) is the responsibility of E – commerce operator receiving consideration on the supply or services made to Indian residents, non-residents in "specified circumstances" or any other person using IP address located in India. However, any service or supply made by the E – commerce operator which is in connection to their PE in India will not be liable for EL. If a non-resident (not having a PE in India) earns income which is

chargeable to EL, then the same would be exempt in the hands of such non-resident.

128

**Tax on sale of films as 'Royalty'**

Currently, consideration for the sale, distribution or exhibition of cinematographic films is specifically excluded from the definition of Royalty. However, as per Finance Act 2020, the definition of Royalty will be rationalized to include consideration for the sale, distribution or exhibition of cinematographic films (w.e.f. April 1, 2021).

**Place of Effective Management:**

The concept of Place of Effective Management or POEM is introduced for the purpose of determining the tax residence of overseas companies in India. The POEM is defined to mean a place where key management and commercial decisions that are necessary for the conduct of the business of an entity as a whole are in substance made. This could have significant impact on the foreign companies holding board meeting(s) in India, having key managerial personnel located in India, having regional headquarters located in India, etc. In the event the POEM of a foreign company is considered to be situated in India, it becomes tax resident in India, and consequently, its global income would be taxable in India (even if it is not earned in India).

**General Anti Avoidance Rules:**

The General Anti Avoidance Rules ("GAAR") have come into effect from financial year 2017-18. The tax consequences of the GAAR provisions if applied to an arrangement could result in denial of tax benefit under the domestic tax laws and / or under a tax treaty, amongst other consequences.

**Multilateral Instrument:**

The Organization of Economic Co-operation and Development (OECD) released the final package of all Action Plans of the Base Erosion and Profit Shifting (BEPS) project in October 2015. India is a member of G20 and active participant in the BEPS project. The BEPS project lead to a series of measures being developed across several actions such as the digital economy, treaty abuse, design of Controlled Foreign Company Rules, intangibles, country-by-country reporting, preventing artificial avoidance of PE status, improving dispute resolution, etc. Several of these measures required implementation through changes in domestic law. In order to implement the measures which entailed changes to bilateral tax treaties, Instrument (MLI) was introduced to modify the existing bilateral tax treaty network and ensure speed and consistency in implementation. MLI inter-alia addresses following treaty related measures:

- Preventing the granting of treaty benefits in inappropriate circumstances;
- Preventing the artificial avoidance of Permanent Establishment status;
- Making dispute resolution mechanisms more effective.

On June 07, 2017, India signed the MLI to implement tax treaty related measures to prevent BEPS. On June 25, 2019, India deposited the instrument of ratification for MLI with OECD along with a list of reservations and notifications. As a result, MLI will enter into force for India on October 1, 2019 and its provisions will have effect on India's tax treaties from FY 2020-21 onwards where the other country has also deposited its instrument of ratification with OECD.

**Significant Economic Presence:**

Given the digital age, the need for physical presence in conducting business is steeply reducing giving way to interaction by way of technology. Having regard to the report of OECD on BEPS Action Plan 1, an amendment was been made vide Finance Act 2018 whereby concept of 'significant economic presence' was introduced under the domestic tax laws to cover within the tax ambit transactions in digitized business. Significant economic presence shall be constituted in cases where:

- Transactions in respect of any goods, services or property are carried out by a non-resident in India (including downloading of data or software);
- Non-residents engage in systematic and continuous soliciting of business activities or engaging with users in India, through digital means;

if the prescribed thresholds are breached.

Further, if SEP is constituted, attribution of profits for taxation in India shall be restricted to transactions and / or business activities / users in India.

The threshold of payments received and number of users (mentioned in the aforesaid conditions) shall be prescribed by

the Central Board of Direct Taxes (CBDT) in due course, after which, one will be able to gauge the impact of this expansion in the provision.

129

Further, unless corresponding modifications to PE rules are made in tax treaties, the existing treaty rules will apply. Accordingly, the above provisions would need to be separately evaluated under the tax treaty scenario.

However, as per Finance Act, 2020, it is pertinent to note that SEP provisions have been deferred by a year and shall be effective from April 1, 2021.

**ii) Indirect Tax**

**Goods and Services Tax**

As far as introduction of Goods and Services Tax ("GST") is concerned, it has been a little more than three years since its enactment. Most of the indirect taxes under earlier regime have been subsumed and only one tax i.e. GST is being levied at national level. In India, there is a dual GST model which grants power to central as well as state governments to levy GST on interstate and intrastate transactions, respectively. To a large extent GST has curtailed various exemptions and concessions which were prevalent in the earlier tax regime. The benefits of GST such as, elimination of multiple taxes and levy of one tax has reduced the cascading effect and has consequently reduced the overall incidence of taxes.

Under GST regime, the entertainment tax which under earlier regime was levied by state governments in most of the states has been subsumed under GST. However, in certain states the local authorities have been given powers to levy and collect taxes on entertainment. This may be said to be a back door entry by state governments to levy taxes on entertainment.

On the other hand, the government through its GST Council meetings are also trying to resolve various issues that had surfaced under GST, thereby resolving ambiguity for the Media and Entertainment industry and avoiding the possibility of probable tax litigation. However, the impact of GST on the media and entertainment industry are both positive and negative. The industry stands to benefit considerably with the introduction of GST, due to single tax levy on licensing of copyright, fungibility of credit of goods and overall reduction of cascading effect of taxes having a positive effect on the cost of production and profitability. However, certain concern areas still remain open, for which the industry seek certain amendments in the law and clarifications from the government. The industry awaits a positive response from the government in reference to such concern areas.

**Summary of Material Isle of Man Tax Considerations**

*Tax residence in the Isle of Man*

We are resident for taxation purposes in the Isle of Man by virtue of being incorporated in the Isle of Man.

*Capital taxes in the Isle of Man*

The Isle of Man has a regime for the taxation of income, but there are no taxes on capital gains, stamp taxes or inheritance taxes in the Isle of Man. No Isle of Man stamp duty or stamp duty reserve tax will be payable on the issue or transfer of, or any other dealing in, the A ordinary shares.

*Zero rate of corporate income tax in the Isle of Man*

The Isle of Man operates a zero rate of tax for most corporate taxpayers, including the Company. Under the regime, the Company will technically be subject to Isle of Man taxation on its income, but the rate of tax will be zero; there will be no required withholding by the Company on account of Isle of Man tax in respect of dividends paid by the Company.

The Company will be required to pay an annual return fee of £380 (US $495) per year.

*Isle of Man probate*

In the event of death of a sole, individual holder of the A ordinary shares, an Isle of Man probate fee or administration may be required, in respect of which certain fees will be payable to the Isle of Man government, subject to the fee. Currently the maximum fee, where the value of an estate exceeds £1,000,000 (US $1,300,000) is approximately £8,000 (US $10, 400).

**Summary of Material United States Federal Income Tax Considerations**

The following summary describes the material United States federal income tax consequences associated with the acquisition, ownership and disposition of our A ordinary shares as of the date hereof. The discussion set forth below is applicable only to U.S. Holders (as defined below) and does not purport to be a comprehensive description of all tax considerations that may be relevant to a particular person's decision to acquire the A ordinary shares.

Except where noted, this summary applies only to a U.S. Holder that holds A ordinary shares as capital assets for United States federal income tax purposes. As used herein, the term "U.S. Holder" means a beneficial owner of a share that is for United States federal income tax purposes:

- an individual citizen or resident of the United States;
- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to United States federal income taxation regardless of its source; or
- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This summary does not describe all of the United States federal income tax consequences applicable to you if you are subject to special treatment under the United States federal income tax laws, including if you are a broker, a dealer or trader in securities or currencies, a financial institution, a regulated investment company, a real estate investment trust, a cooperative, an insurance company, a pension plan, a tax-exempt entity, a person holding our A ordinary shares as part of a hedging, integrated or conversion transaction, a constructive sale, a wash sale or a straddle, a person liable for alternative minimum tax, a person who owns directly, indirectly or constructively, 5% or more, by voting power or value, of our stock, a person holding our A ordinary shares in connection with a trade or business conducted outside of the United States, a partnership or other pass-through entity for United States federal income tax purposes (and any investors in such partnership or other pass-through entity), a U.S. expatriate or a person whose "functional currency" for United States federal income tax purposes is not the United States dollar. The discussion below assumes that we will not be treated as a "surrogate foreign corporation" under section 7874 of the Code as a result of the STX Transaction. The discussion below is based upon the provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), and regulations (including proposed regulations), rulings and judicial decisions thereunder as of the date hereof, and such authorities may be subject to differing interpretations or may be replaced, revoked or modified, possibly with retroactive effect, so as to result in United States federal income tax consequences different from those discussed below.

If a partnership (or other entity or arrangement treated as a partnership for United States federal income tax purposes) holds our A ordinary shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership holding our A ordinary shares or a partner of a partnership holding our A ordinary shares, you should consult your tax advisors as to the particular United States federal income tax consequences of acquiring, holding and disposing of the A ordinary shares.

This discussion does not contain a detailed description of all the United States federal income tax consequences to you in light of your particular circumstances and does not address estate and gift taxes or the effects of any state, local or non-United States tax laws. If you are considering the purchase, ownership or disposition of our A ordinary shares, you should consult your own tax advisors concerning the United States federal income tax consequences to you in light of your particular situation as well as any other consequences to you arising under U.S. federal, state and local laws and the laws of any other applicable taxing jurisdiction in light of your particular circumstances.

131

***Taxation of Distributions***

Subject to the discussion under "—Passive Foreign Investment Company" below, the gross amount of distributions on the A ordinary shares will be taxable as dividends to the extent paid out of our current or accumulated earnings and profits, as determined under United States federal income tax principles. To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits (as determined under U.S. federal income tax principles) such excess will be treated first as a tax-free return of capital to the extent of the U.S. Holder's tax basis in the A ordinary shares and thereafter as capital gain recognized on a sale or exchange. Because we do not expect to keep track of earnings and profits in accordance with United States federal income tax principles, you should expect that a distribution in respect of the A ordinary shares will generally be treated and reported as a dividend to you. Such dividend income will be includable in your gross income as ordinary income on the day actually received by you or on the day received by your nominee or agent that holds the A ordinary shares on your behalf. Such dividends will not be eligible for the dividends received deduction allowed to corporations in respect of dividends received from other U.S. corporations under the Code.

With respect to non-corporate U.S. Holders, certain dividends received from a qualified foreign corporation may be subject to reduced rates of taxation. A foreign corporation is treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares that are readily tradable on an established securities market in the United States. Our A ordinary shares are listed on the NYSE and we expect such shares to be considered readily tradable on an established securities market, although there can be no assurance in this regard nor can there be assurance, if our shares are considered to be readily tradable on an established securities market, that our A ordinary shares will continue to be readily tradable on an established securities market in later years. However, even if the A ordinary shares are readily tradable on an established securities market in the United States, we will not be treated as a qualified foreign corporation if we are a passive foreign investment company, or PFIC, for the taxable year in which we pay a dividend or were a passive foreign investment company, or PFIC, for the preceding taxable year or if we are treated as a "surrogate foreign corporation" within the meaning of Section 7874 of the Code. Non-corporate holders that do not meet a minimum holding period requirement during which they are not protected from a risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) (B) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. For this purpose, the minimum holding period requirement will not be met if a share has been held by a holder for 60 days or less during the 121-day period beginning on the date which is 60 days before the date on which such share becomes ex-dividend with respect to such dividend, appropriately reduced by any period in which such holder is protected from risk of loss. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. You should consult your own tax advisors regarding the availability of the reduced tax rate on dividends in light of your particular circumstances.

Subject to certain conditions and limitations imposed by United States federal income tax rules relating to the availability of the foreign tax credit, some of which vary depending upon the U.S. Holder's circumstances, any foreign withholding taxes on dividends will be treated as foreign taxes eligible for credit against your United States federal income tax liability. The application of the rules governing foreign tax credits depends on the particular circumstances of each U.S. Holder. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For purposes of calculating the foreign tax credit, dividends paid on the A ordinary shares will be treated as income from sources outside the United States and will generally constitute "passive category income." Further, in certain circumstances, you will not be allowed a foreign tax credit for foreign taxes imposed on certain dividends paid on the A ordinary shares if you:

- have held A ordinary shares for less than a specified minimum period during which you are not protected from risk of loss, or
- are obligated to make certain payments related to the dividends.

The rules governing the foreign tax credit are complex and involve the application of rules that depend on your particular circumstances. You are urged to consult your tax advisors regarding the availability of the foreign tax credit under your

particular circumstances.

132

***Passive Foreign Investment Company***

Based on the composition of our income and valuation of our assets, we do not believe we will be a PFIC for United States federal income tax purposes for the 2020 taxable year, and we do not expect to become one in the future. However, because PFIC status is an annual factual determination that cannot be made until after the close of each taxable year and depends on the composition of a company's income and assets and the market value of its assets from time to time, there can be no assurance that we will not be a PFIC for any taxable year.

In general, a non-United States corporation will be treated as a PFIC for U.S. federal income tax purposes for any taxable year in which:

- at least 75% of its gross income is passive income, or
- at least 50% of the value (determined based on a quarterly average) of its gross assets is attributable to assets that produce, or are held for the production of, passive income.

For this purpose, passive income generally includes dividends, interest, royalties and rents (except for certain royalties and rents derived from the active conduct of a trade or business), certain gains from commodities and securities transactions and the excess of gains over losses from the disposition of assets which produce passive income.

If we own, directly or indirectly, at least 25% (by value) of the stock of another corporation, we will be treated, for purposes of the PFIC tests described above, as directly owning our proportionate share of the other corporation's assets and receiving our proportionate share of the other corporation's income.

If we are a PFIC for any taxable year during which you hold our A ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" received and any gain realised from a sale or other disposition, including a pledge, of A ordinary shares, unless you make a "mark-to-market" election as discussed below.

Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the A ordinary shares (before the current taxable year) and gain realised on disposition of the A ordinary shares will be treated as excess distributions. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for your A ordinary shares,
- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and
- the amount allocated to each other year will be subject to tax at the highest applicable tax rate in effect for corporations or individuals, as appropriate, for that taxable year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

The tax liability for amounts allocated to years prior to the year of an "excess distribution" (including a disposition) cannot be offset by any net operating losses for such years, and gains (but not losses) realised on the sale of the A ordinary shares cannot be treated as capital and will be subject to the "excess distribution" regime described above, even if you hold the A ordinary shares as capital assets.

In addition, as explained above under "—Taxation of Distributions," non-corporate U.S. Holders will not be eligible for reduced rates of taxation on any dividends received from us if we are a PFIC in our taxable year in which such dividends are paid or in the preceding taxable year.

If we are a PFIC for any taxable year during which you own our A ordinary shares, we will generally continue to be treated as a PFIC with respect to you for all succeeding years during which you own our A ordinary shares, even if we cease to meet the threshold requirements for PFIC status.

You will generally be required to file Internal Revenue Service Form 8621(a) annually if the aggregate value of all your directly owned PFIC shares on the last day of the taxable year is more than $25,000 ($50,000 on a joint return) or if you are deemed to own indirectly more than $5,000 in value of any PFIC shares owned by us; (b) you receive distributions on the A ordinary shares or realize any gain on the disposition of the A ordinary shares or (c) if you have made a mark-to-market election (as described below). Other reporting requirements may apply. You are urged to consult your tax advisors regarding Form 8621 and other information reporting requirements if we are considered a PFIC in any taxable year.

133

If we are a PFIC for any taxable year during which a U.S. Holder holds our A ordinary shares and any of our non-United States subsidiaries is also a PFIC, a U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules.

Under these circumstances, a U.S. Holder would be subject to United States federal income tax on (i) a distribution on the shares of a lower-tier PFIC and (ii) a disposition of shares of a lower-tier PFIC, both as if such U.S. Holder directly held the shares of such lower-tier PFIC. You are urged to consult your tax advisors about the application of the PFIC rules to any of our subsidiaries.

In certain circumstances, in lieu of being subject to the excess distribution rules discussed above, you may make an election to include gain on the stock of a PFIC as ordinary income under a mark-to-market method, provided that such stock is regularly traded in other than de minimis quantities for at least 15 days during each calendar quarter on a qualified exchange, as defined in applicable U.S. Treasury Regulations. Our A ordinary shares are listed on the NYSE and we expect such shares to be "regularly traded" for purposes of the mark-to-market election, though no assurances can be made in this regard, nor can there be assurance, if our shares are considered to be "readily tradable" for this purpose, that our A ordinary shares will continue to be "readily tradable".

If you make an effective mark-to-market election, you will include in each year that we are a PFIC, as ordinary income the excess of the fair market value of your A ordinary shares at the end of the year over your adjusted tax basis in the A ordinary shares. You will be entitled to deduct as an ordinary loss in each such year the excess of your adjusted tax basis in the A ordinary shares over their fair market value at the end of the year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election, although no assurance can be given that a mark-to-market election will be available to U.S. Holders.

If you make an effective mark-to-market election, any gain you recognize upon the sale or other disposition of your A ordinary shares in a year in which we are a PFIC will be treated as ordinary income. Any loss will be treated as ordinary loss, but only to the extent of the net amount of previously included income as a result of the mark-to-market election.

Your adjusted tax basis in the A ordinary shares will be increased by the amount of any income inclusion and decreased by the amount of any deductions under the mark-to-market rules. If you make a mark-to-market election, it will be effective for the taxable year for which the election is made and all subsequent taxable years unless the A ordinary shares are no longer regularly traded on a qualified exchange or the Internal Revenue Service consents to the revocation of the election. A mark-to-market election should be made by filing IRS Form 8621 in the first taxable year during which the U.S. Holder held the A ordinary shares and in which we are a PFIC. A mark-to-market election would not be available with respect to a subsidiary PFIC of ours that a U.S. Holder is deemed to own for the purposes of the PFIC rules; accordingly, a U.S. Holder would not be able to mitigate certain of the adverse U.S. "excess distribution" federal income tax consequences of its deemed ownership of stock in our subsidiary PFICs by making a mark-to-market election. You are urged to consult your tax advisor about the availability of the mark-to-market election and whether making the election would be advisable in your particular circumstances.

Alternatively, holders of PFIC shares can sometimes avoid the rules described above by electing to treat such PFIC as a "qualified electing fund" under Section 1295 of the Code. However, this option is not available to you because we do not intend to comply with the requirements, or furnish you with the information, necessary to permit you to make this election. You are urged to consult your tax advisors concerning the United States federal income tax consequences of holding A ordinary shares if we are considered a PFIC in any taxable year.

134

***Sale or Other Disposition of A Ordinary Shares***

For United States federal income tax purposes, you will recognize taxable gain or loss on any sale or exchange or other taxable disposition of an A ordinary share in an amount equal to the difference between the amount realised for the share and your tax basis in the A ordinary share, in each case as determined in United States dollars. Subject to the discussion above under "Passive Foreign Investment Company," such gain or loss will be capital gain or loss. Capital gains of non-corporate U.S. Holders derived with respect to capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

Any gain or loss recognised by you will generally be treated as United States source gain or loss for U.S. foreign tax credit purposes. You are encouraged to consult your tax advisor regarding the availability of the U.S. foreign tax credit in your particular circumstances.

***Information Reporting and Backup Withholding***

In general, information reporting will apply to distributions in respect of our A ordinary shares and the proceeds from the sale, exchange or redemption of our A ordinary shares that are paid to you within the United States or through certain U.S.-related financial intermediaries, unless you are an exempt recipient. Backup withholding may apply to such payments if you fail to (i) provide a correct taxpayer identification number or (ii) certify that you are not subject to backup withholding or (iii) otherwise comply with the backup withholding rules. U.S. Holders who are required to establish their exemption from backup withholding must timely provide the applicable withholding agent such certification on a properly completed Internal Revenue Service Form W-9. U.S. Holders should consult their tax advisors regarding the application of the United States information reporting and backup withholding rules.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the Internal Revenue Service.

Certain U.S. Holders who hold "specified foreign financial assets," including shares of a non-U.S. corporation that are not held in an account maintained by a U.S. "financial institution," the aggregate value of which exceeds $50,000 (or other applicable amount) during the tax year, may be required to attach to their tax returns for the year IRS Form 8938 containing certain specified information. Significant penalties can apply if you are required to file this form and you fail to do so. You are urged to consult your tax advisors regarding this and other information reporting requirements relating to your ownership of the A ordinary shares.

***Medicare Tax***

Certain U.S. Holders that are individuals, estates or trusts will be subject to an additional 3.8% tax on all or a portion of their "net investment income," which may include all or a portion of their dividends and net gains from the disposition of A ordinary shares. Special rules apply to stock in a PFIC. If you are a U.S. Holder that is an individual, estate or trust, you should consult your tax advisors regarding the applicability of this tax to your income and gains in respect of your investment in the A ordinary shares.

**F. Dividends and Paying Agents**

Not applicable.

**G. Statement by Experts**

Not applicable.

**H. Documents on Display**

Publicly filed documents concerning our company which are referred to in this annual report may be inspected and copied at the public reference facilities maintained by the Commission at 100 F Street, N.E., Washington, D.C. 20549. Copies of these materials can also be obtained from the Public Reference Room at the Commission's principal office, 100 F Street, N.E., Washington D.C. 20549, after payment of fees at prescribed rates.

135

The Commission maintains a website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that make electronic filings through its Electronic Data Gathering, Analysis, and Retrieval, or EDGAR, system. We have made all our filings with the Commission using the EDGAR system.

### I. Subsidiary Information

For more information on our subsidiaries, please see "Part I — Item 4. Information on the Company — C. Organizational Structure."

### ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to financial risks, including credit risk, interest rate risk, foreign currency risk and equity risk:

#### *Credit Risk*

Trading credit risk is managed on a country by country basis by the use of credit checks on new clients and individual credit limits, where appropriate, together with regular updates on any changes in the trading partner's situation. In a number of cases trading partners will be required to make advance payments or minimum guarantee payments before delivery of any goods. The Group reviews reports received from third parties and in certain cases as a matter of course reserve the right within the contracts it enters into to request an independent third - party audit of the revenue reporting. Further, in many of the catalogue sales, the trading partners have extended payment terms of up to a year and often fall behind contractual payment terms, thus payment cycle extends to 18 to 24 months. With respect to catalogue and other customers with a long trading history with the Group and who have contracted and paid significant amounts in the past without any prior history of bad debt, the Group closely monitors the same revised payment plans to assure collections. In case of new customer onboarding, the Group follows certain standard Know Your Client (KYC) procedures to ascertain financial stability of the counterparty and follows internal policies to not make ongoing sales to such new customers who are not reasonably current with their payments.

The Group from time to time will have significant concentration of credit risk in relation to individual theatrical releases, television syndication deals, music licenses, or producer/ VFX services. This risk is mitigated by contractual terms which seek to stagger receipts, de-recognition of financial assets and/or the release or airing of content. As at March 31, 2020, 40.1% (2019: 20.4%) of trade account receivables were represented by the top five debtors and for the year ended March 31, 2020, a loss on de-recognition of financial assets amounting to $5,285 (2019: $5,988 and 2018: $3,562) arising on assignment and novation of trade receivable and trade payables with no recourse have been recognized in the statement of Income within other gains/(losses), net. The maximum exposure to credit risk is that shown within the statements of financial position, net of credit impairment loss $112,323 (2019: $ 41,335, 2018: $ 10,193). The maximum credit exposure on financial guarantees given by the Group for various financial facilities is described in Note 31.

As at March 31, 2020, the Group did not hold any material collateral or other credit enhancements to cover its credit risks associated with its financial assets.

#### *Interest Rate Risk*

The Group is exposed to interest rate risk because entities in the Group borrow funds at both fixed and floating interest rates. The risk is managed by maintaining an appropriate mix between fixed, capped and floating rate borrowings, and by the use of interest rate swap contracts and forward interest rate contracts. Hedging activities are evaluated to align with interest rate views to ensure the most cost effective hedging strategies are applied.

#### *Foreign Currency Risk*

The Group operates throughout the world with significant operations in India, the British Isles, the United States of America and the United Arab Emirates. As a result it faces both translation and transaction currency risks which are principally mitigated by matching foreign currency revenues and costs wherever possible.

The Group's major revenues are denominated in U.S. Dollars, Indian Rupees and British pounds sterling which are matched where possible to its costs so that these act as an automatic hedge against foreign currency exchange movements.

We have to date not entered into any currency hedging transactions, and we have managed foreign currency exposure to date by seeking to match foreign currency inflows and outflows to the extent possible.

A uniform decrease of 10% in exchange rates against all foreign currencies in position as of March 31, 2020 would have increased the Company's net loss before tax by approximately $6,952 (2019: gain of $7,036 and 2018: gain of $5,935). An equal and opposite impact would be experienced in the event of an increase by a similar percentage.

Our sensitivity to foreign currency has increased during the year ended March 31, 2020 as a result of an increase in liabilities compared to assets denominated in foreign currency over the comparative period. In Management's opinion, the sensitivity analysis is unrepresentative of the inherent foreign exchange risk because the exposure at the end of the reporting period does not reflect the exposure during the year.

### *Equity Risk*

We are exposed to market risk relating to changes in the market value of our investments, which we hold for purposes other than trading. We invest in equity instruments of private companies for operational and strategic business reasons. These securities may be subject to significant fluctuations in fair market value due to volatility in the industries in which they operate. As at March 31, 2020, the aggregate value of all such equity investments was $0.1 million. For further discussion of our investments see Note 17 to our audited Consolidated Financial Statements appearing elsewhere in this Annual Report.

### ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

### A. Debt Securities

Not applicable.

### B. Warrants and Rights

Not applicable.

### C. Other Securities

Not applicable.

### D. American Depository Shares

Not applicable.

**PART II**

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES**

None.

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS**

Not applicable.

**ITEM 15. CONTROLS AND PROCEDURES**

**ITEM 15A. DISCLOSURE CONTROLS AND PROCEDURES**

Our management is responsible for the disclosure of controls and procedures that are designed to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and such information is accumulated and communicated to our management, as appropriate, to allow for timely decisions regarding required disclosure.

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgement in evaluating the cost-benefit relationship of possible controls and procedures.

During the evaluation of disclosure controls and procedures and our internal control over financial reporting as of March 31, 2019, conducted during the preparation of our financial statements, which were included in our Annual Report on Form 20-F for the year ended March 31, 2019, our management had concluded that our disclosure controls and procedures were not effective as of March 31, 2019 because of material weaknesses in our internal control over financial reporting relating to our Internal Control Environment.

As required by SEC Rule 13a-15(d), we carried out an evaluation, under the supervision and with the participation of our management, of the effectiveness of our disclosure controls and procedures as of March 31, 2020. As of March 31, 2020, and as described under the Status of Remediation of Material Weakness in Internal Controls Over Financial Reporting below, the material weaknesses were not fully remediated. As a result, our management concluded that our disclosure controls and procedures were not effective as of March 31, 2020. In light of the material weakness described below, the Company performed additional analysis and other post-closing procedures to determine if its consolidated financial statements are prepared in accordance with IFRS as issued by IASB. Accordingly, management concluded that the financial statements included in this Annual Report on Form 20-F fairly present in all material respects the Company's financial condition, results of operations and cash flow for the periods presented.

**ITEM 15B. MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a- 15(d) of the Exchange Act. Our management has assessed the effectiveness of our internal control over financial reporting as of March 31, 2020 using the criteria established in "Internal Control – Integrated Framework" (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Our management concluded that our internal control over financial reporting were not effective as of March 31, 2020 because of material weaknesses in our internal control over financial reporting. A material weakness is deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the preparation of our consolidated financial statements as of and for the year ended March 31, 2020, we identified the following material weaknesses in our internal control over financial reporting:

    a)   The Company's process of performing customer and/ or vendor due diligence assessment prior to sale or purchase is not satisfactory, which could amongst other things result in assigning of inappropriate credit limits to customer and/ or vendor. Customer and vendor business particulars are among the key data which the Company should have documented in a Customer/Vendor's master file.

138

   b)   The management review controls designed by the Company, including review of spreadsheets/excel utility control assessment, did not provide sufficient and appropriate evidence to substantiate a level of aggregation and consistency of performance required to prevent or detect misstatements. To be specific, there was lack of documentation at the level of precision required to demonstrate effective management review, including review of the version changes on the excel utility.

Notwithstanding the material weakness our internal control over financial reporting, the Group performed additional procedures in connection with the preparation of the consolidated financial statements for the year ended March 31, 2020 which have allowed management to conclude that, the consolidated financial statements included in the annual report fairly present, in all material respects, the Group's financial position, results of operations and cash flows for the periods presented in conformity with IFRS as issued by the IASB.

**ITEM 15C. REGISTERED PUBLIC ACCOUNTANTS' REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Grant Thornton India LLP , has issued an attestation report on the Company's internal control over financial reporting as of March 31, 2020, as stated in their report included in "Part III — Item 17 — Report of Independent Registered Public Accounting Firm Grant Thornton India LLP" in this Annual Report on Form 20-F.

**ITEM 15D. CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**

During the period covered by this report, no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act), have occurred that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Status of Remediation of Material Weakness in Internal Control Over Financial Reporting**

The Group actively engaged a third-party independent expert to assist in implementation of the remediation efforts to address the abovementioned material weakness identified in our Annual Report on Form 20-F for the year ended March 31, 2019 and any other subsequently identified significant deficiencies or material weaknesses. Our management has taken and completed few initial action steps, with other remaining planned actions to be taken during fiscal 2021, to ensure that the material weakness is remediated in the coming year, which include as follows:

   a)   The Group has made continuing efforts to improve the design and effectiveness of customer and/or vendor due diligence assessment process by seeking additional details of customer and/or vendor business particulars, which amongst other things will also require timely documentation of the credit assessment of the customer and the vendor made prior to execution of the transactions. In addition, the Group has identified a plan to request for such additional information in respect of ongoing customer/s and vendor/s with transaction greater than a specified threshold in the rolling 12 months, once in a year, and re-validate the customer/s and vendor/s KYC information and/ or set-up amounts up to which credit sales/purchases can be made to such customer/s and vendor/s.

   b)   The Group has increased the depth and experience of the finance department in the fiscal 2020 and maintained adherence to password protection in respect of excel utility controls, In addition, the trail of management review of the excel utility and the journal entries posted on the ERP system was maintained, The Group will continue to focus on implementing an appropriate and formal training programs for staff, manager and executive levels to ensure policy in respect detailed documentation substantiating the level of precision at which the management review was being performed is maintained and of version change controls in respect of excel utility controls are adhered to. While Company will aim to further enhance the level of documentation trail of the level of precision of the management review performed, on long-term perspective, the Group also plan to automate the controls on the ERP system, including trail of review and approval on the ERP system, both comprehensively and consistent applied across all our subsidiaries.

As discussed in the aforesaid paragraphs, while management has initiated the remediation plan during fiscal 2020 and is focused to enhance them further through fiscal 2021, due to the nature of the remediation process, which amongst other things include obtaining additional information from external parties and conducting of the formal training of the staff, manager and executive, and the need to allow adequate time after implementation to evaluate and test the effectiveness

of the controls, no assurance can be given as to the timing of achievement of remediation. Rather, the material weaknesses will be fully remediated when, in the opinion of our management, the revised control processes have been operating for a sufficient period of time and independent validation has been completed to provide reasonable assurance as to their operating effectiveness also. The remediation and ultimate resolution of the material weakness will be reviewed and approved by the Audit Committee.

139

**ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT**

Our Audit Committee members are Mr. Dilip Thakkar (Chairman), Mr. Shailendra Swarup and Mr. Dhirendra Swarup. All the members are independent director pursuant to the applicable rules of the Commission and the NYSE. See "Part I — Item 6. Directors, Senior Management and Employees — A. Directors and Executive Officers" for the experience and qualifications of the members of the Audit Committee. Our Board of Directors has determined that Mr. Thakkar qualifies as an "audit committee financial expert" as defined in Item 16A of Form 20-F.

**ITEM 16B. CODE OF ETHICS**

We have adopted a written Code of Business Conduct and Ethics that is applicable to all of our directors, senior management and employees. We have posted the code on our website at *www.erosplc.com*. Information contained on our website does not constitute a part of this annual report. We will also make available a copy of the Code of Business Conduct and Ethics to any person, without charge, if a written request is made to Investor Relations at our offices at Unit 23, Sovereign Park, Coronation Road, Park Royal, London, NW10 7QP.

**ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

**Principal Accountant Fees and Services**

Grant Thornton India LLP has served as our independent registered public accountant for the fiscal years ended March 31, 2020 and 2019. The following table shows the fees we paid or accrued for the audit and other services provided by Grant Thornton India LLP and associated entities for the years ended March 31, 2020 and 2019.

|  | Fiscal | |
|---|---|---|
|  | **2020** | **2019** |
| Audit fees | $ 751,000 | $ 1,133,000 |
| Tax fees | 12,000 | 14,000 |

**Notes:**

*Audit fees.* This category consists of fees billed for the audit of financial statements, quarterly review of financial statements and other audit services, which are normally provided by the independent auditors in connection with statutory and accounting matters that arose during, or as a result of, the audit or the review of interim financial statements and include the group audit; comfort letters and consents; attest services; and assistance with and review of documents filed with the Commission.

*Tax fees.* This category includes fees billed for transfer pricing study/certification.

**Audit Committee Pre-approval Process**

Our Audit Committee reviews and pre-approves the scope and the cost of all audit and permissible non-audit services performed by our independent auditor. All of the services provided by Grant Thornton India LLP and associated entities during the last fiscal year have been pre-approved by our Audit Committee.

**ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

As permitted by the rules of the U.S. Securities and Exchange Commission, our audit committee is currently comprised of three non-executives. We believe that our reliance on this exemption from the listing standards for audit committees does not materially adversely affect the ability of our audit committee to act independently.

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Neither we, nor any affiliated purchaser, made any purchase of our equity securities in fiscal year 2020.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

Not applicable.

**ITEM 16G. CORPORATE GOVERNANCE**

We have posted our Corporate Governance Guidelines on our website at *www.erosplc.com*. Information contained on our website does not constitute a part of this annual report.

As our shares are listed on the NYSE, we are subject to the NYSE listing standards. However, as a foreign private issuer, we are exempt from complying with certain corporate governance requirements of the NYSE applicable to a U.S. issuer. Under NYSE rules applicable to us, we only need to:

- establish an independent audit committee that has responsibilities set out in the NYSE rules;
- provide prompt certification by our chief executive officer of any material non-compliance with any corporate governance rules of the NYSE;
- provide periodic (annual and interim) written affirmations to the NYSE with respect to our corporate governance practices; and
- include in our annual reports a brief description of significant differences between our corporate governance practices and those followed by U.S. companies.

We are currently in compliance with the current applicable NYSE corporate governance requirements for foreign private issuers.

We believe that our corporate governance practices do not differ in any significant way from those required to be followed by issuers incorporated in the United States under the NYSE listing standards, except that the Dodd-Frank Wall Street Reform and Consumer Protection Act generally provides shareholders of United States public companies with the right to cast three types of votes: (i) an advisory vote to approve the compensation of the named executive officers, (ii) an advisory vote on the frequency with which shareholders should be entitled to cast votes on the company's executive compensation, and (iii) an advisory vote to approve certain payments made in connection with an acquisition, merger or other specified corporate transaction. We, as a foreign private issuer, are not subject to these requirements and we do not adopt any such voting practices.

As a foreign private issuer, we are exempt from the rules under the Exchange Act governing the furnishing and content of proxy statements, and our directors, senior management and principal shareholders are exempt from the reporting and "short-swing profit" recovery provisions contained in Section 16 of the Exchange Act.

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

141

**PART III**

**ITEM 17. FINANCIAL STATEMENTS**

See "Part III — Item 18. Financial Statements" for a list of our consolidated financial statements included elsewhere in this annual report.

**ITEM 18. FINANCIAL STATEMENTS**

The following statements are filed as part of this annual report, together with the report of the independent registered public accounting firm:

- Report of Independent Registered Public Accounting Firm Grant Thornton India LLP
- Consolidated Statements of Financial Position as at March 31, 2020 and 2019
- Consolidated Statements of Income for the years ended March 31, 2020, 2019, and 2018
- Consolidated Statements of Comprehensive Income for the years ended March 31, 2020, 2019, and 2018
- Consolidated Statements of Changes in Equity for the years ended March 31, 2020, 2019, and 2018
- Consolidated Statements of Cash Flows for the years ended March 31, 2020, 2019, and 2018
- Notes to Consolidated Financial Statements

142

**ITEM 19. EXHIBITS**

The following exhibits are filed as part of this annual report:

| Exhibit Number | Title | |
|---|---|---|
| 1.1 | Memorandum of Association | (c) |
| 1.2 | Articles of Association (as currently in effect) | (m) |
| 1.3 | Articles of Association (to become effective upon completion of STX Transaction) | (a) |
| 2.1 | Form of A Share Certificate | (d) |
| 4.1 | Relationship Agreement, dated as of December 16, 2009, between Eros International Media Limited, the Company and Eros Worldwide FZ-LLC | (b) |
| 4.2 | Shareholders' Agreement, dated as of January 13, 2007, between Eros Multimedia Private Limited and The Group and Big Screen Entertainment Private Limited | (b) |
| 4.3 | Shareholders' Agreement for Ayngaran International Limited, dated as of July 11, 2007 | (b) |
| 4.4 | Employment Agreement of Sunil Lulla as Executive Vice Chairman of Eros International Medial Limited, dated September 29, 2009 | (b) |
| 4.5 | Service Agreement of Prem Parameswaran as Chief Financial Officer and President of North America and Group Chief Financial Officer, dated May 26, 2015 | (f) |
| 4.6 | Service Agreement of Kishore Lulla, dated February 17, 2016 | (g) |
| 4.7 | Rules of the Eros International Plc Bonus Share Plan Unapproved Option Scheme 2006, dated May 17, 2006 | (b) |
| 4.8 | IPO Plan Form of Option Agreement | (d) |
| 4.9 | Eros International Media Pvt. Ltd. ESOP 2009 | (c) |
| 4.10 | Form of Joint Share Ownership Deed Measured By Total Share Return | (c) |
| 4.11 | Form of Joint Share Ownership Deed Measured By Earnings Per Share | (c) |
| 4.12 | Employee Benefit Trust Deed | (c) |
| 4.13 | Form of Option Agreement for Option Awards Approved April 17, 2012 | (d) |
| 4.14 | Service Agreement of Pranab Kapadia as President – Europe & Africa of Eros International Ltd., dated December 1, 2007 | (d) |
| 4.15 | Amended and Restated Service Agreement of Rishika Lulla Singh as Chief Executive Officer – Eros Digital FZ LLC, dated February 17, 2016 | (g) |
| 4.16 | Service Agreement of Mark Carbeck as Chief Corporate and Strategy Officer, dated April 3, 2014 | (g) |
| 4.17 | Service Agreement of David Maisel as Non-Executive Director, dated February 13, 2015 | (f) |
| 4.18 | Form of 2014 Option Agreement for Option Awards | (f) |
| 4.19 | Form of 2015 Option Agreement for Option Awards | (f) |
| 4.20 | Trust Deed constituting the £50 million 6.50% Bonds due 2021, dated October 15, 2014 | (f) |
| 4.21 | Relationship Agreement dated as of September 20, 2016 between Eros International Media Limited and Eros Worldwide FZ LLC | (i) |
| 4.22 | Form of Indenture between the Company and Wilmington Savings Fund Society, FSB, as trustee | (j) |
| 4.23 | Form of Supplementary Indenture between the Company and Wilmington Savings Fund Society, FSB, as trustee | (j) |

| | | |
|---|---|---|
| 4.24 | Form of Senior Convertible Note (included as Exhibit A to Exhibit 4.34 hereto) | (j) |
| 4.25 | Form of Securities Purchase Agreement | (j) |
| 4.26 | Registration Rights Agreement between Eros International Plc and Reliance Industrial Investments and Holdings Limited, dated August 8, 2018 | (l) |
| 4.27 | Form of Securities Purchase Agreement | (m) |
| 4.28 | Form of Senior Convertible Note | (m) |
| 4.29 | Form of Subscription Agreement | (n) |
| 4.30 | Agreement and Plan of Merger, dated as of April 17, 2020, among Eros International Plc, STX Filmworks, Inc., England Holdings 2, Inc. and England Merger 1 Corp. (f/k/a/ England Merger Corp.) | (a) |
| 4.31 | Voting and Support Agreement, dated as of April 17, 2020, by and among STX Filmworks, Inc., Kishore Lulla, Rishika Lulla Singh, Beech Investments Limited and Eros Ventures Limited | (a) |
| 4.32 | Subscription Agreement, dated as of April 17, 2020, by and among Eros International Plc and the purchasers thereto | (a) |
| 4.33 | Amendment No. 1 to Subscription Agreement, dated as of July 21, 2020, by Eros International Plc | |
| 4.34 | Form of Class E CVR Agreement | (a) |
| 4.35 | Form of Class D CVR Agreement | (a) |
| 4.36 | Form of Class C CVR Agreement | (a) |
| 4.37 | Form of Class B CVR Agreement | (a) |
| 4.38 | Form of Class A CVR Agreement | (a) |
| 4.39 | Form of Investors' Rights Agreement | (a) |
| 4.40 | Form of Registration Rights Agreement | (a) |
| 8.1 | Subsidiaries of Eros International Plc | (a) |
| 12.1 | Certification of Principal Executive Officer Pursuant to Rule 13a-14(a)/15d-14(a) | (a) |
| 12.2 | Certification of Principal Financial Officer Pursuant to Rule 13a-14(a)/15d-14(a) | (a) |
| 13.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350 | (a) |
| 13.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350 | (a) |
| 101.INS | XBRL Instance Document | (a) |
| 101.SCH | XBRL Taxonomy Extension Schema Document | (a) |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | (a) |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | (a) |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | (a) |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | (a) |

_____

(a)    Filed herewith

(b)    Previously filed on March 30, 2012 as an exhibit to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(c)    Previously filed on April 24, 2012 as an exhibit to Amendment No. 1 to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(d)    Previously filed on October 29, 2013 as an exhibit to Amendment No. 5 to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(e)    Previously filed on November 5, 2013 as an exhibit to Amendment No. 6 to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(f)    Previously filed on July 8, 2015 as an exhibit to the Company's Annual Report on Form 20-F and incorporated herein by reference.

(g)    Previously filed on July 27, 2016 as an exhibit to the Company's Annual Report on Form 20-F and incorporated herein by reference.

(h)    Previously filed on July 31, 2017 as an exhibit to the Company's Annual Report on Form 20-F and incorporated herein by reference.

(i)    Previously filed on August 4, 2017 as an exhibit to the Company's Registration Statement on Form F-3 (File No. 333-219708) and incorporated herein by reference.

(j)    Previously filed on December 4, 2017 as an exhibit to the Company's Current report on Form 6-K and incorporated herein by reference.

(k)    Previously filed on March 14, 2018 as an exhibit to the Company's Registration Statement on Form S-8 (File No. 333-223643) and incorporated herein by reference.

(l)    Previously filed on September 17, 2018 as an exhibit to the Company's Registration Statement on Form F-3 (File No. 333-227380) and incorporated herein by reference.

(m)    Previously filed on September 26, 2019 as an exhibit to the Company's Current report on Form 6-K and incorporated herein by reference.

(n)    Previously filed on January 27, 2020 as an exhibit to the Company's Current report on Form 6-K and incorporated herein by reference.

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: July 30, 2020                  EROS INTERNATIONAL PLC

By:     */s/ Prem Parameswaran*
_____

Name: Prem Parameswaran

Title:   Executive Director, President of North America & Group Chief
         Financial Officer

By:     */s/ Kishore Lulla*
_____

Name: Kishore Lulla

144

**EROS INTERNATIONAL PLC**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Financial Position as of March 31, 2020 and 2019 | F-5 |
| Consolidated Statements of Income/(Loss) for the years ended March 31, 2020, 2019 and 2018 | F-6 |
| Consolidated Statements of Comprehensive Income/(Loss) for the years ended March 31, 2020, 2019 and 2018 | F-7 |
| Consolidated Statements of Cash Flows for the years ended March 31, 2020, 2019 and 2018 | F-8 |
| Consolidated Statements of Changes in Equity for the years ended March 31, 2020, 2019 and 2018 | F-10 |
| Notes to the Consolidated Financial Statements | F-13 |

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders

Eros International Plc

**Opinion on the consolidated financial statements**

We have audited the accompanying consolidated statements of financial position of Eros International Plc and subsidiaries (the "Company") as of March 31, 2020 and 2019, the related consolidated statements of income/(loss), comprehensive income/(loss), changes in shareholders' equity, and cash flows for each of the three years in the period ended March 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended March 31, 2020, in conformity with the International Financial Reporting Standards, as issued by the International Accounting Standards Board.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of March 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated July 30, 2020 expressed an adverse opinion.

**Substantial doubt about the Company's ability to continue as a going concern**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 (b) to the financial statements, the Company has incurred a net loss of $ 491,704 thousand in current year ended 31 March 2020, including loss from impairment of non-current assets of $431,200 thousand. Further, the Company has a negative net current asset position as of balance sheet date of $ 106,875 thousand and the credit rating of the Company's Indian listed subsidiary had been significantly downgraded in June 2019 on account of delay in payment of certain banking facilities during the year ended 31 March 2020. Further, Note 2(a) describes the uncertainties relating to the impact of ongoing disruption due to the COVID-19 pandemic on the operations of the Company and the related financial impact. These events and factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2 (b). The consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

We have served as the Company's auditor since 2013.

/s/ Grant Thornton India LLP

Mumbai, India

July 30, 2020

F-2

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**Board of Directors and Shareholders**

**Eros International Plc**

**Opinion on internal control over financial reporting**

We have audited the internal control over financial reporting of Eros International Plc and subsidiaries (the "Company") as of March 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, because of the effect of the material weaknesses described in the following paragraphs on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of March 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

The Management has identified material weaknesses related to (a) lack of sufficiency in the level of precision applied in management review controls, including review of completeness and accuracy of the source data maintained on an excel utility and inadequacy of documentation that provides evidence of review, and (b) the process of performing customer and vendor due diligence assessment prior to execution of sale and purchase transactions is not satisfactory.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended March 31, 2020. The material weaknesses identified above were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2020 consolidated financial statements, and this report does not affect our report dated July 30, 2020, which expressed an unqualified opinion on those financial statements.

F-3

**Basis for opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Grant Thornton India LLP

Mumbai, India

July 30, 2020

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF FINANCIAL POSITION**
**AS AT MARCH 31, 2020 AND 2019**

| | Note | As at March 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2019 |
| | | (in thousands) | |
| **ASSETS** | | | |
| **Current assets** | | | |
| Inventories | 18 | $ — | $ 435 |
| Trade and other receivables — fair value | 19 | 94,749 | 125,229 |
| Trade and other receivables — amortised cost | 19 | 12,504 | 79,916 |
| Investments | 17 | 3,802 | 1,042 |
| Cash and cash equivalents | 21 | 2,563 | 89,117 |
| Restricted deposits | | 4,787 | 55,858 |
| **Total current assets** | | 118,405 | 351,597 |
| **Non-current assets** | | | |
| Property and equipment | 13 | $ 9,234 | $ 10,921 |
| Right-of-use-assets | 38 | 1,512 | — |
| Intangible assets — content | 15 | 461,889 | 706,572 |
| Intangible assets — others | 16 | 2,935 | 3,794 |
| Investments | 17 | 140 | 2,650 |
| Trade and other receivables — amortised cost | 19 | 10,761 | 10,065 |
| Income tax receivable | | 1,975 | 1,284 |
| Restricted deposits | | 63 | 756 |
| Deferred income tax assets | 11 | 742 | 1,263 |
| **Total non-current assets** | | $ 489,251 | $ 737,305 |
| **Total assets** | | $ 607,656 | $ 1,088,902 |
| **LIABILITIES** | | | |
| **Current liabilities** | | | |
| Trade and other payables | 20 | $ 90,941 | $ 83,487 |
| Acceptances | 23 | 1,858 | 8,366 |
| Short-term borrowings — fair value | 22 | 23,100 | 68,349 |
| Short-term borrowings — amortised cost | 22 | 93,758 | 140,559 |
| Derivative financial instruments | 25 | — | 620 |
| Lease liabilities | 38 | 723 | — |
| Current income tax payable | | 14,900 | 17,291 |
| **Total current liabilities** | | $ 225,280 | $ 318,672 |
| **Non-current liabilities** | | | |
| Long-term borrowings — amortised cost | 22 | 62,114 | 71,920 |
| Lease liabilities | 38 | 830 | — |
| Other long - term liabilities | 24 | 8,258 | 13,898 |
| Deferred income tax liabilities | 11 | 2,688 | 27,427 |
| **Total non-current liabilities** | | $ 73,890 | $ 113,245 |
| **Total liabilities** | | $ 299,170 | $ 431,917 |
| **EQUITY** | | | |
| Share capital | 26 | $ 66,727 | $ 39,326 |
| Share premium | | 673,717 | 580,013 |
| Reserves | | (405,665) | (2,202) |
| Other components of equity | 29 | (85,660) | (79,696) |

| | | | | | |
|---|---|---|---|---|---|
| JSOP reserve | 28 | | — | | (15,985) |
| **Equity attributable to equity holders of Eros International Plc** | | $ | **249,119** | $ | **521,456** |
| Non-controlling interest | 36 | | 59,367 | | 135,529 |
| **Total equity** | | $ | **308,486** | $ | **656,985** |
| **Total liabilities and shareholder's equity** | | $ | **607,656** | $ | **1,088,902** |

The accompanying notes form an integral part of these consolidated financial statements.

F-5

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF INCOME (LOSS)**
**FOR THE YEARS ENDED MARCH 31, 2020, 2019 AND 2018**

| | Note | Year ended March 31 | | |
| --- | :---: | :---: | :---: | :---: |
| | | 2020 | 2019 | 2018 |
| | | (in thousands, except per share amounts) | | |
| **Revenue** | 5 | $ 155,452 | $ 270,126 | $ 261,253 |
| Cost of sales | 6 | (81,725) | (155,396) | (134,708) |
| **Gross profit** | | 73,727 | 114,730 | 126,545 |
| Administrative costs | 6 | (144,319) | (87,134) | (68,029) |
| **Operating (loss)/profit before impairment loss** | | (70,592) | 27,596 | 58,516 |
| Impairment loss | 2(c) | (431,200) | (423,335) | — |
| **Operating profit/(loss)** | | (501,792) | (395,739) | 58,516 |
| Finance costs | 8 | (20,771) | (24,093) | (19,668) |
| Finance income | 8 | 11,992 | 16,419 | 1,855 |
| Net finance costs | 8 | (8,779) | (7,674) | (17,813) |
| Other gains/(losses) | 9 | (3,316) | 288 | (41,321) |
| **(Loss) before tax** | | (513,887) | (403,125) | (618) |
| Income tax | 10 | 22,183 | (7,328) | (9,127) |
| **(Loss) for the year** | | $ (491,704) | $ (410,453) | $ (9,745) |
| **Attributable to:** | | | | |
| Equity holders of Eros International Plc | | $ (418,992) | $ (423,867) | $ (22,575) |
| Non-controlling interest | | (72,712) | 13,414 | 12,830 |
| | | $ (491,704) | $ (410,453) | $ (9,745) |
| **(Loss) per share (cents)** | | | | |
| Basic/(loss) per share | 12 | (389.6) | (599.5) | (36.3) |
| Diluted/(loss) per share | 12 | (389.6) | (599.5) | (36.3) |

The accompanying notes form an integral part of these consolidated financial statements.

F-6

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME/(LOSS)**
**FOR THE YEARS ENDED MARCH 31, 2020, 2019 AND 2018**

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | 2018 |
| | | (in thousands, except per share amounts) | | | | |
| (Loss) for the year | $ | (491,704) | $ | (410,453) | $ | (9,745) |
| Other comprehensive income: | | | | | | |
| Items that will not be subsequently reclassified to profit or loss | | | | | | |
| Changes in fair value of investments | | (1,860) | | (24,687) | | — |
| Revaluation of property and equipment | | — | | 1,745 | | — |
| Items that will be subsequently reclassified to profit or loss | | | | | | |
| Exchange differences on translating foreign operations | | (8,031) | | (13,934) | | (1,153) |
| Exchange differences on revaluation of property and equipment | | (156) | | 78 | | 6 |
| Reclassification of cash flow hedge to consolidated statements of income | | — | | — | | 375 |
| Fair value gain/(loss) on trade account receivable (FVTOCI) | | 2,014 | | (4,664) | | — |
| **Total other comprehensive (loss)/income for the year** | $ | (8,033) | $ | (41,462) | $ | (772) |
| **Total comprehensive loss for the year, net of tax** | $ | (499,737) | $ | (451,915) | $ | (10,517) |
| **Attributable to** | | | | | | |
| Equity holders of Eros International Plc | | (423,130) | | (459,321) | | (23,106) |
| Non-controlling interest | | (76,607) | | 7,406 | | 12,589 |

The accompanying notes form an integral part of these consolidated financial statements.

F-7

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED MARCH 31, 2020, 2019 AND 2018**

| | Note | 2020 | 2019 | 2018 |
|---|---|---|---|---|
| | | **Year ended March 31** | | |
| | | (in thousands) | | |
| **Cash flow from operating activities** | | | | |
| (Loss) before tax | | $ (513,887) | $ (403,125) | $ (618) |
| Adjustments for: | | | | |
| Depreciation | 13 | 891 | 1,049 | 1,265 |
| Depreciation on ROU | 38 | 1,677 | | |
| Share based payments | 27 | 22,268 | 21,561 | 17,918 |
| Amortization of intangible film and content rights | 15 | 64,451 | 130,155 | 115,285 |
| Amortization of other intangible assets | 16 | 894 | 1,214 | 1,726 |
| Other non-cash items | 30 | 100,118 | 58,438 | 50,119 |
| Impairment Loss | | 431,200 | 423,335 | — |
| Net finance costs | 9 | 17,085 | 20,901 | 18,745 |
| (Gain) on sale of available-for-sale financial assets | | — | (37) | — |
| Loss/(gain) on sale of property and equipment | | 70 | 97 | (2) |
| Movement in trade and other receivables | | (87,885) | (179,784) | (91,317) |
| Movement in inventories | | — | (99) | (219) |
| Movement in trade and other payables | | 1,995 | 22,166 | (1,215) |
| Cash generated from operations | | 38,877 | 95,871 | 111,687 |
| Interest paid | | (14,890) | (13,347) | (20,761) |
| Income taxes paid | | (5,249) | (7,558) | (7,683) |
| **Net cash generated from operating activities** | | **$ 18,738** | **$ 74,966** | **$ 83,243** |
| **Cash flows from investing activities** | | | | |
| Purchase of current investment | | $ (4,013) | $ (1,005) | $ — |
| Proceeds from sale of non- current Investment | | 650 | | |
| Purchase of property and equipment | | (60) | (380) | (913) |
| Proceeds from disposal of property and equipment | | 82 | 6 | 70 |
| Investment in restricted deposits held with banks | | (8,530) | (53,507) | (27) |
| Restricted deposits matured | | 59,780 | 3,952 | — |
| Deconsolidation/acquisition of cash and cash equivalent in subsidiary | | — | — | (9) |
| Purchase of intangible film rights and content rights | | (132,249) | (107,722) | (186,757) |
| Purchase of other intangible assets | | (338) | (907) | (321) |
| Interest received | | 4,132 | 1,830 | 2,537 |
| **Net cash (used in) investing activities** | | **$ (80,546)** | **$ (157,733)** | **$ (185,420)** |
| **Cash flows from financing activities** | | | | |
| Proceeds from issue of share capital, net of transaction costs | | $ 5,164 | $ 54,820 | $ 16,645 |
| Proceeds from issue of shares by subsidiary | | 17 | 77 | 556 |
| Investment in shares of subsidiary | | — | (2,892) | 40,221 |
| Share application money received pending allotment | | — | — | 18,000 |
| (Repayment of)/ proceeds from/ short term debt with maturity less than three months (net) | | — | — | 211 |
| Proceeds from short-term debt | | 56,337 | 103,365 | 48,249 |
| Repayment of short-term debt | | (76,672) | (59,014) | (43,785) |
| Proceeds from long-term debt, net of transaction costs of Nil (2018: Nil and 2017: $384) | | | — | 111,278 |

| | | | | | |
|---|---|---|---|---|---|
| Repayment of long-term debt | | (7,553) | | (12,239) | (113,960) |
| Payment of lease liability | | (1,579) | | — | — |
| **Net cash (used in)/ generated from financing activities** | $ | **(24,286)** | $ | **84,117** | $ **77,415** |
| Net increase/(decrease) in cash and cash equivalents | | (86,094) | | 1,350 | (24,762) |
| Effects of exchange rate changes on cash and cash equivalent | | (460) | | 5 | 257 |
| Cash and cash equivalents at beginning of year | | **89,117** | | 87,762 | 112,267 |
| **Cash and cash equivalents at the end of year** | $ | **2,563** | $ | **89,117** | $ **87,762** |

The cash outflow towards intangible film rights and content right includes, interest paid and capitalized $6,378 (2019: $9,607 and 2018: $11,722).

The accompanying notes form an integral part of these consolidated financial statements.

F-8

**Reconciliation of Liabilities arising from Financing activities:**

| | Long term debt [*] | Short term debt [#] | Total |
|---|---|---|---|
| As at March 31, 2019 | $ 147,254 | $ 142,560 | $ 289,814 |
| Impact on adoption of IFRS 16 | (251) | — | (251) |
| Considered in cash flow (net) | (7,553) | (20,335) | (27,888) |
| Finance cost in relation to convertible notes and lease liabilities | 4,245 | 1,272 | 5,517 |
| Shares issued in lieu of convertible note | (82,967) | (8,786) | (91,753) |
| Change in fair value of convertible notes measured at fair value through profit and loss | 10,374 | 5,613 | 15,987 |
| Amortization of debt issuance cost | 249 | 43 | 292 |
| Exchange adjustment | (1,998) | (8,890) | (10,888) |
| **As at March 31, 2020** | **$ 69,353** | **$ 111,477** | **$ 180,830** |

| | Long term debt [*] | Short term debt [#] | Total |
|---|---|---|---|
| As at March 31, 2018 | $ 188,909 | $ 96,653 | $ 285,562 |
| Considered in cash flow (net) | (12,239) | 44,351 | 32,112 |
| Net finance cost in relation to convertible notes | 10,682 | — | 10,682 |
| Shares issued in lieu of convertible note | (49,741) | — | (49,741) |
| Movement in derivative financial instruments | — | 902 | 902 |
| Borrowing for purchase of property and equipment, net | 424 | — | 424 |
| Amortization of debt issuance cost | 415 | — | 415 |
| Transfer of long-term loan to short- term loan | (5,555) | 5,555 | — |
| Changes in fair value of convertible notes measured at fair value through profit and loss | 21,398 | — | 21,398 |
| Exchange adjustment | (7,039) | (4,901) | (11,940)) |
| **As at March 31, 2019** | **$ 147,254** | **$ 142,560** | **$ 289,814** |

[*] including current portion of long- term debt.

[#] Including acceptances and derivative financial instruments.

The accompanying notes form an integral part of these consolidated financial statements.

F-9

**EROS INTERNATIONAL PLC**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEAR ENDED MARCH 31, 2020**

| | Share capital | Share premium account | Currency translation reserve | Available for sale fair value reserves | Revaluation reserve | Reserves | JSOP reserve | Equity Attributable to Shareholders of EROS International PLC | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in thousands) | | | | |
| Balance as at March 31, 2019 | $ 39,326 | $ 580,013 | $ (64,179) | $ (18,449) | $ 2,932 | $ (2,202) | $ (15,985) | $ 521,456 | $ 135,529 | $ 656,985 |
| Loss for the period | — | — | — | — | — | (418,992) | — | (418,992) | (72,712) | (491,704) |
| Other comprehensive income/(loss) for the period | — | — | (3,948) | (1,860) | (156) | 1,826 | — | (4,138) | (3,895) | (8,033) |
| Total comprehensive loss for the period | — | — | (3,948) | (1,860) | (156) | (417,166) | — | (423,130) | (76,607) | (499,737) |
| Shares issued on exercise of employee stock options and awards* (Refer Note 26) | 3,505 | 4,896 | — | — | — | (8,137) | — | 264 | — | 264 |
| Share based compensation (Refer Note 27) | — | — | — | — | — | 22,207 | — | 22,207 | 61 | 22,268 |
| Shares issued in lieu of cash (Refer Note 26) | 2,079 | 8,971 | — | — | — | — | — | 11,050 | — | 11,050 |
| Payables settled by issuance of shares (Refer Note 26) | 3,296 | 22,590 | — | — | — | — | — | 25,886 | — | 25,886 |
| Changes in ownership interests in subsidiaries that do not result in a loss of control | — | — | — | — | — | (367) | — | (367) | 384 | 17 |
| Closure of JSOP Trust | — | (15,985) | — | — | — | — | 15,985 | — | — | — |
| Shares issued in lieu of convertible notes (Refer Note 26) | 18,521 | 73,232 | — | — | — | — | — | 91,753 | — | 91,753 |
| Balance as at March 31, 2020 | $ 66,727 | $ 673,717 | $ (68,127) | $ (20,309) | $ 2,776 | $ (405,665) | $ — | $ 249,119 | $ 59,367 | $ 308,486 |

*Includes issuance of 6,808,320 treasury shares

The accompanying notes form an integral part of these consolidated financial statements.

F-10

## EROS INTERNATIONAL PLC

### CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEAR ENDED MARCH 31, 2019

| | Share capital | Share premium account | Currency translation reserve | Other components of equity — Available for sale fair value reserves | Revaluation reserve | Reserves | JSOP reserve | Share Application Reserve | Equity Attributable to Shareholders of EROS International PLC | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in thousands) | | | | | |
| Balance as at March 31, 2018 | $ 35,334 | $ 453,997 | $ (56,722) | $ 6,238 | $ 1,835 | $ 422,992 | $ (15,985) | $ 18,000 | $ 865,689 | $ 137,728 | $ 1,003,417 |
| Adoption of IFRS 15/9 | — | — | (34) | — | — | (14,270) | — | — | (14,304) | (3,520) | (17,824) |
| Balance as at April 1, 2018 | $ 35,334 | $ 453,997 | $ (56,756) | $ 6,238 | $ 1,835 | $ 408,722 | $ (15,985) | $ 18,000 | $ 851,385 | $ 134,208 | $ 985,593 |
| Profit for the period | — | — | — | — | — | (423,867) | — | — | (423,867) | 13,414 | (410,453) |
| Other comprehensive income/(loss) for the period | — | — | (7,423) | (24,687) | 1,097 | (4,441) | — | — | (35,454) | (6,008) | (41,462) |
| Total comprehensive income/(loss) for the period | — | — | (7,423) | (24,687) | 1,097 | (428,308) | — | — | (459,321) | 7,406 | (451,915) |
| Issue of shares (Refer Note 26) | 1,948 | 70,718 | — | — | — | — | — | (18,000) | 54,666 | — | 54,666 |
| Shares issued on exercise of employee stock options and awards | 302 | 7,299 | — | — | — | (7,447) | — | — | 154 | — | 154 |
| Share based Compensation (Refer Note 26) | — | — | — | — | — | 21,118 | — | — | 21,118 | 443 | 21,561 |
| Changes in ownership interests in subsidiaries that do not result in a loss of control | — | — | — | — | — | 3,713 | — | — | 3,713 | (6,528) | (2,815) |
| Shares issued in lieu of convertible notes (Refer Note 26) | 1,742 | 47,999 | — | — | — | — | — | — | 49,741 | — | 49,741 |
| Balance as at March 31, 2019 | $ 39,326 | $ 580,013 | $ (64,179) | $ (18,449) | $ 2,932 | $ (2,202) | $ (15,985) | $ — | $ 521,456 | $ 135,529 | $ 656,985 |

The accompanying notes form an integral part of these consolidated financial statements.

## EROS INTERNATIONAL PLC

### CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEAR ENDED MARCH 31, 2018

| | Share capital | Share premium account | Other components of equity — Currency translation reserve | Available for sale fair value reserves | Revaluation reserve | Hedging reserve | Reserves | JSOP reserve | Share Application Reserve | Equity Attributable to Shareholders of EROS International PLC | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in thousands) | | | | | | |
| Balance as at April 1, 2017 | $ 31,877 | $ 399,686 | $ (55,810) | $ 6,238 | $ 1,829 | $ (375) | $ 436,997 | $ (15,985) | $ — | $ 804,457 | $ 79,091 | $ 883,548 |
| (Loss)/Profit for the year | — | — | — | — | — | — | (22,575) | — | — | (22,575) | 12,830 | (9,745) |
| Other comprehensive income/(loss) for the year | — | — | (912) | — | 6 | 375 | — | — | — | (531) | (241) | (772) |
| Total comprehensive income/(loss) for the year | — | — | (912) | — | 6 | 375 | (22,575) | — | — | (23,106) | 12,589 | (10,517) |
| Share based compensation (Refer Note 27) | — | — | — | — | — | — | 17,316 | — | — | 17,316 | 602 | 17,918 |
| Shares issued on exercise of employee stock options and awards (Refer Note 27) | 277 | 8,894 | — | — | — | — | (8,955) | — | — | 216 | — | 216 |
| Changes in ownership interests in subsidiaries that do not result in a loss of control (Refer Note 4) | — | — | — | — | — | — | 209 | — | — | 209 | 40,568 | 40,777 |
| Issue of shares, net of transaction costs of Nil (Refer Note 26) | 555 | 15,874 | — | — | — | — | — | — | — | 16,429 | — | 16,429 |
| Loss of control in a subsidiary (Refer Note 4) | — | — | — | — | — | — | — | — | — | — | 4,878 | 4,878 |
| Shares pending for allotment (Refer Note 26) | — | — | — | — | — | — | — | — | 18,000 | 18,000 | — | 18,000 |
| Shares issued in lieu of convertible notes (Refer Note 26) | 2,625 | 29,543 | — | — | — | — | — | — | — | 32,168 | — | 32,168 |
| Balance as at March 31, 2018 | $ 35,334 | $ 453,997 | $ (56,722) | $ 6,238 | $ 1,835 | $ — | $ 422,992 | $ (15,985) | $ 18,000 | $ 865,689 | $ 137,728 | $ 1,003,417 |

The accompanying notes form an integral part of these consolidated financial statements.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**1     NATURE OF OPERATIONS, GENERAL INFORMATION AND BASIS OF PREPARATION**

Eros International Plc ("Eros" or the "Company") and its subsidiaries' (together with Eros, the "Group") principal activities include the acquisition, co-production, distribution of Indian films and provision of related production services, including visual special effects, for filmed entertainment sector . Eros International Plc is the Group's ultimate parent company. It is incorporated and domiciled in the Isle of Man. The address of Eros International Plc's registered office is First Names House, Victoria Road, Douglas, Isle of Man IM2 4DF.

The consolidated financial statements of the Group have been prepared in accordance with International Financial Reporting Standards ("IFRSs"), as issued by the International Accounting Standards Board (IASB). The financial statements have been prepared on accrual basis and under the historical cost convention on a going concern basis, with the exception of:

- A)   revaluation of certain properties and equipment
- B)   certain financial instruments and assets acquired and liabilities assumed in a business combination that have been measured at fair value as required by relevant IFRSs
- C)   Employee stock option plans which have been recognized at fair value
- D)   Certain employee benefit plans, which are measured based on actuarial assumptions
- E)   Trade receivables and Investments recorded at Fair Value Through Profit and Loss (FVTPL) and Fair Value Through Other Comprehensive Income (FVOCI)

The Group's accounting policies as set out below have been applied consistently throughout the Group to all the periods presented, unless otherwise stated. The financial statements of Eros and each of its subsidiaries are measured using the currency of the primary economic environment in which these entities operate (i.e. the functional currency). The consolidated financial statements are presented in US Dollars (USD) which is the presentation currency of the Company and has been rounded off to the nearest thousands.

The consolidated financial statements for the year ended March 31, 2020 were approved by the Eros Board of Directors and authorized for issue on July 30, 2020.

**2     GLOBAL PANDEMIC, GOING CONCERN AND IMPAIRMENT OF NON- CURRENT ASSETS**

**2(a)     GLOBAL PANDEMIC**

In December 2019, a novel strain of coronavirus ('Global Pandemic'or 'COVID-19') emerged in Wuhan, Hubei Province, China. While initially the outbreak was largely concentrated in China and caused significant disruptions to its economy, it has now spread to several other countries, and infections have been reported globally including India, United Kingdom, United States, Dubai, Singapore and Australia where the group through its offices distributes the films theatrically. In response to the public health risks associated with the COVID-19, the Government of the aforesaid countries has announced nation-wide lockdown which resulted in the closure of all the theatres in the respective geographies and caused disruptions in the production and availability of content, including delayed, or in some cases, shortened or cancelled theatrical releases. The lockdown has affected the Group's ability to generate revenues from the monetization of Indian film content in various distribution channels through agreements with commercial theatre operators. Also refer to note 2 (c), wherein the Group has recorded an impairment charge of $ 431,200 for the year ended March 31, 2020. In addition, refer to note 19, wherein the Group has recorded credit impairment loss of $ 103,109 for the year ended March 31, 2020.

The extent of the adverse impact on the Group's financial and operational results will be dictated by the length of time that such disruptions continue, which will, in turn, depend on the currently unknowable duration of COVID-19 and among other things, the impact of governmental actions imposed in response to the pandemic and individuals' and companies' risk tolerance regarding health matters going forward. The Group's business also could be significantly affected even after reopening of certain operations, should the disruptions caused by the COVID-19 lead to changes in consumer behaviour (such as social distancing), which the Group currently believes will be temporary.

The Group is continuously monitoring the rapidly evolving situation and its potential impacts on the Group's financial position, results of operations, liquidity, and cash flows.

F-13

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**2(b)    GOING CONCERN ASSUMPTION**

The Group meets its day to day working capital requirements and funds its investment in content and film rights primarily through a variety of cash generated from operations, banking arrangements, de-recognition of financial assets and strategic alternatives.

The Group is dependent upon external borrowings for its working capital needs and investment in content and film rights. Under the terms of such banking arrangements, the Group is able to draw down in the local currencies of its operating businesses.

The borrowings (as set out in Note 22) are subject to individual covenants and a negative pledge that restricts the Group's ability to incur liens, security interests or similar encumbrances or arrangements on its assets. During the current year, there had been a credit rating downgrade of our Indian listed subsidiary due to delay in repayment of loan instalments.

As at March 31, 2020, Group's borrowings were $ 178,972, of which $ 117,097 is repayable in fiscal 2021. In addition, the Group has opted for moratorium as per Reserve Bank of India guidelines 2019-2020/2392 on account of global pandemic wherein all the instalments due from 1 March 2020 to 31 August 2020 will be converted to short-term borrowing post moratorium period.

Further, the Group has reported a negative net current assets position on the balance sheet date.

The Group continue to experience significant net loss for fiscal 2020. The Group has incurred loss amounting $491,704 for the year ended March 31, 2020 [after considering the impact of an impairment loss amounting $431,200 as described in Note 2 (c)] when compared to net loss of $ $410,453 [after considering the impact of an impairment loss amounting $423,355 as described in Note 2 (c)] and $9,745 respectively for the year ended March 31, 2019 and 2018.

Despite these uncertainties, and uncertainties arising from the global pandemic, which have been explained in detail in Note 2 (a), the management continues to adopt the going concern basis in preparing the consolidated financial statements as of March 31, 2020 in accordance with IFRS as issued by the IASB, which assumes that the Group will be able to discharge all its liabilities, including mandatory repayment of the banking facilities, as disclosed in Note 31, as they fall due on account of:

a)  On September 26, 2019, the Group entered into a definitive agreement with an institutional investor to procure additional funding of $25,000 through the issuance of senior convertible notes, resulting enhanced liquidity to the Group. Subsequent to the reporting period, the Company fully paid the outstanding balance of senior convertible notes by conversion into A ordinary shares.

b)  On April 17, 2020, the Group entered into an Agreement and plan of merger with STX Filmworks, Inc, a Delaware corporation ("STX") – a Company that specializes in producing, financing, distributing and marketing film, television and digital content. This merger will help create a pre-eminent global media company, which can develop local and international premium content at scale and across many platforms.

As the result of this merger, (i) new investors and existing STX equity investors are expected to contribute incremental equity financing of $125,000 (of which $35,000 is received as on the date of issuance of the financial statements] and (ii) a line of undrawn credit facility totaling to ~$ 100,000 from a large financial institution/s with a moratorium of 5 years will be available to the combined company.

In addition, the Group expects the combined company to be uniquely positioned to benefit from the accelerating consumption of premium digital content in the world's most important growth markets with robust capital structure and experienced management team. The combined company is also expected to generate operating synergies within 24 months of closing of the merger transaction, stemming from integration and scale benefits, optimization of global content distribution and enhanced monetization of the Eros Now platform.

c)  The Group have continued to generate a positive operating cash flow before incurring capital expenditures for the year ended March 31, 2020, 2019 and 2018, respectively.

**2(c)    IMPAIRMENT OF NON- CURRENT ASSETS**

Impairment reviews in respect of goodwill and indefinite-lived intangible assets are performed annually. More regular reviews, and impairment reviews in respect of other non-current assets, are performed if events indicate that an impairment review is necessary. Examples of such triggering events would include a significant planned restructuring, a major change in market conditions or technology, reduction in market capitalization, expectations of future operating losses, or negative cash flows. The asset or Cash Generating Unit (CGU) is impaired if carrying amount of the CGU exceeds its recoverable amount.

The group performed impairment assessment as of March 31, 2020. The recoverable amount of the cash generating unit was determined based on value in use.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Value in use was determined based on future cash flows after considering current economic conditions and trends, estimated future operating results, growth rates (which is lower than those considered in previous years) and anticipated future economic conditions. The approach and key (unobservable) assumptions used to determine the cash generating unit's value in use were as follows:

| Assumptions | As at March 31, 2020 | As at March 31, 2019 |
|---|---|---|
| Growth rate applied beyond approved forecast period | 4% | 4% |
| Pre-tax discount rate | 20% | 21% |

The Company considered it appropriate to undertake an impairment assessment with reference to the estimated cash flows for the period of four years developed using internal forecast and extrapolated for the fifth year. The growth rates used in the value in use calculation reflect those inherent within the Company's internal forecast, which is primarily a function of the future assumptions, past performance and management's expectation of future developments through fiscal 2024.

Accordingly, the Group recorded an impairment loss, totaling to $431,200 and $423,335 as an exceptional item, being significant and non-recurring in nature, within the Statement of Income for the year ended March 31, 2020 and March 31, 2019 respectively. Impairment loss is mainly due to changes in the market conditions, including lower projected volume when compared to prior year/s on account of ongoing global pandemic. The aforesaid impairment loss was allocated to Intangible assets - content. [Refer Note 15]

**Sensitivity to key assumptions**

The change in the key following assumptions used in the impairment review would, in isolation, lead to an increase in impairment loss recognized by followings amounts as at March 31, 2020 (Although it should be noted that these sensitivities do not take account of potential mitigating actions)

| | (in millions) | |
|---|---|---|
| | As at March 31, 2020 | As at March 31, 2019 |
| Increase in discount rate by 1% | 52 | 54 |
| Decrease in long term growth rate applied beyond approved forecast period by 1% | 67 | 30 |
| Decrease in projected volume by 1% | 44 | 63 |

**3    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**3.1.    Overall considerations**

The significant accounting policies that have been used in the preparation of these consolidated financial statements are summarized below. Financial statements are subject to the application of significant accounting estimates and judgments. These are summarized in Note 37.

**Significant new accounting pronouncement**

F-15

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

New accounting standard IFRS 16, "Leases"

Effective April 1, 2019, IFRS 16, Leases, was adopted by the Group on April 1, 2019. The impact of adopting this new standards on the financial statements at April 1, 2019 are disclosed in note 38.

The Company adopted IFRS 16, Leases, which specifies how to recognize, measure, present and disclose leases. The standard provides a single accounting model, requiring the recognition of assets and liabilities for all major leases previously classified as "operating leases".

The Company applied the "Modified Retrospective Approach" on the date of initial application (April 1, 2019) and the comparatives for the year ended March 31, 2019 have not been retrospectively adjusted. As of April 1, 2019, no cumulative adjustments have been recorded to the retained earnings.

As such the Company recognizes a lease liability and a corresponding right of use asset, at the lease commencement date. The right-of-use asset is initially measured at cost, based on the initial amount of the lease liability. The assets are depreciated to the earlier of the end of the useful life of the right-of-use asset or the lease term using the straight-line method as this most closely reflects the expected pattern of consumption of the future economic benefits. The lease term includes periods covered by an option to extend if the Company is reasonably certain to exercise that option. In addition, the right-of-use asset is periodically adjusted for certain re-measurements of the lease liability. There is no impact on transition in opening balance of retained earnings as at April 1, 2019 because of the transition method applied. Further comparatives were not restated.

### 3.2.    *Basis of consolidation*

The financial statements of the Group consolidates results of the Company and entities controlled by the Company and its subsidiary undertakings. Control exists when the Company, directly or indirectly, has existing rights that give the Company the current ability to direct the activities which affect the entity's returns; the Company is exposed to or has rights to a return which may vary depending on the entity's performance; and the Company has the ability to use its powers to affect its own returns from its involvement with the entity.

F-16

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Unrealized gains on transactions within the Group are eliminated. Unrealized losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Amounts reported in the financial statements of subsidiaries have been adjusted where necessary to ensure consistency with the accounting policies adopted by the Group.

Business combinations are accounted for under the acquisition method. The purchase method involves the recognition at fair value of all identifiable assets and liabilities, including contingent liabilities of the subsidiary, at the acquisition date, regardless of whether or not they were recorded in the financial statements of the subsidiary prior to acquisition. On initial recognition, the assets and liabilities of the subsidiary are included in the consolidated statement of financial position at their fair values. Transaction costs that the company incurs in connection with a business combination such as finder's fees, legal fees, due diligence fees, and other professional and consulting fees are expensed as incurred. Goodwill is stated after separating out identifiable intangible assets. Goodwill represents the excess of acquisition cost over the fair value of the Group's share of the identifiable net assets of the acquired subsidiary at the date of acquisition. Gain on bargain purchase is recognized immediately after acquisition in the consolidated statement of income.

Changes in controlling interest in a subsidiary that do not result in gaining or losing control are not business combinations as defined by IFRS 3. The Group adopts the "equity transaction method" which regards the transaction as a realignment of the interests of the different equity holders in the Group. Under the equity transaction method an increase or decrease in the Group's ownership interest is accounted for as follows:

- the non-controlling component of equity is adjusted to reflect the non-controlling interest revised share of the net carrying value of the subsidiaries net assets;

- the difference between the consideration received or paid and the adjustment to non-controlling interests is debited or credited to a different component of equity — merger reserves;

- no adjustment is made to the carrying amount of goodwill or the subsidiaries' net assets as reported in the consolidated financial statements; and

- no gain or loss is reported in the consolidated statements of income.

**Loss of control policy**

When a change in the Group's ownership interest in a subsidiary results in a loss of control over the subsidiary, the assets and liabilities of the subsidiary including any goodwill are derecognized and a gain or loss arising thereto is accounted within Statement of Income. Amounts previously recognized in other comprehensive income in respect of that entity are also reclassified to Statement of Income.

**3.3.    Segment reporting**

IFRS 8 Operating Segments ("IFRS 8") requires operating segments to be identified on the same basis as is used internally for the review of performance and allocation of resources by the Group's chief operating decision maker, which is the Group's CEO and MD. The revenues of films are earned over various formats; all such formats are functional activities of filmed entertainment and these activities take place on an integrated basis. The management team reviews the financial information on an integrated basis for the Group as a whole. The management team also monitors performance separately for individual films for at least 12 months after the theatrical release. Certain resources such as publicity and advertising, and the cost of a film are also reviewed globally.

Eros has identified four geographic areas, consisting of its main geographic areas (India, North America and Europe), together with the rest of the world.

**3.4.    Revenue**

Effective April 1, 2018, the Group has applied IFRS 15 'Revenue from Contracts with Customers' which establishes a comprehensive framework for determining whether, how much and when revenue is to be recognized. IFRS 15 replaces IAS 18 'Revenue', IAS 11 'Construction Contracts' and certain revenue related interpretations and the cumulative effect of

initial application is recognised as an adjustment to the opening balance of retained earnings at April 1, 2018. The comparative information for the year ended March 31, 2018 continues to be reported under IAS 18 and IAS 11. Refer note 3.4 – Summary of Significant accounting policies – Revenue recognition in the Annual report of the Group for the year ended March 31, 2019, for revenue recognition policy as per IAS 18 and IAS 11.

F-17

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

To determine whether to recognise revenue, the Group follows a 5-step process:

a) Identifying the contract with a customer
b) Identifying the performance obligations
c) Determining the transaction price
d) Allocating the transaction price to the performance obligations
e) Recognising revenue when/as performance obligation(s) are satisfied

Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration which the Group expects to receive in exchange for those products or services. To ensure collectability of such consideration and financial stability of the counterparty, the Group performs certain standard Know Your Client (KYC) procedures based on their geographic locations and evaluates trend of past collection from such locations.

Revenue is measured based on the transaction price, which is the consideration, adjusted for any discounts and incentives, if any, as specified in the contract with the customer. Revenue also excludes taxes collected from customers. In case of revenues which are subject to change, the Group estimates the amount to be received using the "most likely amount" approach, or the "expected value" approach, as appropriate. This amount is then included in the Group's estimate of the transaction price only if it is highly probable that a significant reversal of revenue will not occur once any uncertainty surrounding the bonus is resolved. In making this assessment the Group considers its historical performance on similar contracts.

The Group recognises contract liabilities for consideration received in respect of unsatisfied performance obligations and reports these amounts as other liabilities in the statement of financial position (see Note 24). Similarly, if the Group satisfies a performance obligation before it receives the consideration, the Group recognises either a contract asset or a receivable in its statement of financial position, depending on whether something other than the passage of time is required before the consideration is due

The following criteria apply in respect of various revenue streams within filmed entertainment:

• In arrangements for theatrical distribution, contracted minimum guarantees are recognized on the theatrical release date. The Group's share of box office receipts in excess of the minimum guarantee is recognized at the point as the box office receipts gets accrued.

• In arrangements for television syndication, license fees received in advance which do not meet all the above criteria, including commencement of the availability for broadcast under the terms of the related licensing agreement, are included in contract liability until the criteria for recognition is met. Further in arrangements where the license fees received in advance is for a period of 12 months or more from the commencement, the company computes significant discounting component at imputed rate of interest on advances received and recognizes within net finance cost in the statement of income. . Accumulated contract liability (deferred revenue) is recognized upon commencement of availability for broadcast.

• In arrangements for catalogue sales, the Group recognizes revenue if revenue recognition criteria's such as a valid sales contract exists, all content is delivered and the customer start generating economic benefits from them, the Group is reasonably certain on collectability, and the Group's contractual obligations are complete and are met. Considering the arrangement with catalogue customers provide for a contractual deferred payment terms up to a year and in many cases the payments often fall behind contractual terms, revenues from catalogue sales are recognized net of financing component calculated at imputed market rate of interest on the gross receivables. The re-measurement of such financing period at each balance sheet date and related gains or losses is recognized within administrative costs in the Statement of Income. Unwinding of the such discount is recognized using effective interest rate within net finance cost in the Statement of Income.

• Digital and ancillary media revenues are recognized at the earlier of when the content is accessed or declared.

Fees received for access to the specified and unspecified future content through digital and ancillary media, including usage of over-the-top platform developed by the Group, is recognized on straight line basis over the period of the service contract. Billing in excess of the revenue recognized is shown as contract liability .

- DVD, CD and video distribution revenue is recognized on the date the product is delivered or if licensed in line with the above criteria. Visual effects, production and other fees for services rendered by the Group and overhead recharges are recognized in the period in which they are earned and in certain cases, the stage of production is used to determine the proportion recognized in the period.

- In arrangement for production services, including visual special effects (VFX), and other technical services to clients, the Group recognizes revenue if revenue recognition criteria's such as a valid sales contract exists, IP is delivered and the Group is reasonably certain on collectability. Revenue is recognized as the services are delivered based on acceptance of the services performed by the customer.

F-18

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### 3.5.    Goodwill

Goodwill represents the excess of the consideration transferred in a business combination over the fair value of the Group's share of the identifiable net assets acquired. Goodwill is carried at cost less accumulated impairment losses. Gain on bargain purchase is recognized immediately after acquisition in the consolidated statement of income.

### 3.6.    Intangible assets

Identifiable intangible assets are recognised when the Group controls the asset, it is probable that future economic benefits attributed to the asset will flow to the Group and the cost of the asset can be reliably measured. Intangible assets acquired by the Group are stated at cost less accumulated amortization less impairment loss, if any, except those acquired as part of a business combination, which are shown at fair value at the date of acquisition less accumulated amortization less impairment loss, if any (Film production cost and content advances are transferred to film and content rights at the point at which content is first exploited). "Eros" (the "Trade name") is considered to have an indefinite life because of the institutional nature of the corporate brand name, its proven ability to maintain market leadership and the Group's commitment to develop, enhance and retain its value. The carrying value is reviewed at least annually for impairment and adjusted to recoverable amount if required.

**Content**

Investments in films and associated rights, including acquired rights and distribution advances in respect of completed films, are stated at cost less amortization less provision for impairment. Costs include production costs, overhead and capitalized interest costs net of any amounts received from third party investors. A charge is made to write down the cost of completed rights over the estimated useful lives, writing off more in year one which recognizes initial income flows and then the balance over a period of up to nine years, except where the asset is not yet available for exploitation. The average life of the assets is the lesser of 10 years or the remaining life of the content rights. The amortization charge is recognized in the consolidated statement of income within cost of sales. The determination of useful life is based upon management's judgment and includes assumptions on the timing and future estimated revenues to be generated by these assets, which are summarized in Note 37.3.

**Others**

Other intangible assets, which comprise internally generated and acquired software used within the Group's digital, home entertainment and internal accounting activities, are stated at cost less amortization less provision for impairment. A charge is made to write down the cost of completed rights over the estimated useful lives except where the asset is not yet available for exploitation. The average life of below intangible assets ranges from 3-6 years. The amortization charge is recognized in the consolidated statements of income within administrative expenses as stated below:

|  | Life of asset | Rate of amortization % straight line per annum |
|---|---|---|
| Information technology assets | 3 years | 33 |
| Other intangibles | 3 - 6 years | 17 – 33 |

**Subsequent expenditure**

Expenditure on capitalized intangible assets subsequent to the original expenditure is included only when it increases the future economic benefits embodied in the specific asset to which it relates.

**Information technology assets**

An internally generated intangible asset arising from the Group's software development activities that is expected to be completed is recognized only if all the following criteria are met:

- an asset is created that can be identified (such as software and new processes);

- it is probable that the asset created will generate future economic benefits; and

- the development cost can be measured reliably.

F-19

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

When these criteria are met and there are appropriate resources to complete development, the expenditure is capitalized at cost. Where these criteria are not met development expenditure is recognized as an expense in the period in which it is incurred. Internally generated intangible assets are amortized over their useful economic life from the date that they start generating future economic benefits.

### 3.7.    *Impairment testing of goodwill, other intangible assets and property and Equipment*

For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash flows (cash-generating units). As a result, some assets are tested individually for impairment and some are tested at the cash-generating unit level. Goodwill is allocated to those cash-generating units that are expected to benefit from synergies of the related business combination and represent the lowest level within the Group at which Management monitors the related cash flows.

Goodwill and Trade names are tested for impairment at least annually. All other individual assets or cash-generating units are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Management believes that due to change in the key assumptions with respect to volume growth and discount rate has resulted in impairment of Goodwill and Trade name.

An impairment loss is recognized for the amount by which the asset's or cash-generating unit's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of fair value, reflecting market conditions less costs to sell, and value in use based on an internal discounted cash flow evaluation. Impairment losses recognized for cash-generating units, to which goodwill has been allocated, are credited initially to the carrying amount of goodwill. Any remaining impairment loss is charged pro rata to the other assets in the cash generating unit.

Film and content rights are stated at the lower of unamortized cost and estimated recoverable amounts. In accordance with IAS 36 Impairment of Assets, film content costs are assessed for indication of impairment on a library basis as the nature of the Group's business, the contracts it has in place and the markets it operates in do not yet make an ongoing individual film evaluation feasible with reasonable certainty. Impairment losses on content advances are recognized when film production does not seem viable and refund of the advance is not probable.

With the exception of goodwill, all assets are subsequently reassessed for indications that an impairment loss previously recognized may no longer exist.

### 3.8.    *Property and equipment*

Property and equipment are stated at historical cost less accumulated depreciation and impairment. Land and freehold buildings are shown at what Management believes to be their fair value, based on, among other things, periodic but at least triennial valuations by an external independent valuer, less subsequent depreciation for freehold buildings.

Any accumulated depreciation at the date of revaluation is eliminated against the gross carrying amount of the asset and the net amount is restated to the revalued amount. Increases in the carrying amount arising on revaluation of freehold land and buildings are credited to other reserves in shareholders' equity through other comprehensive income. Decreases that offset previous increases are charged against other reserves.

Depreciation is provided to write-off the cost of all property and equipment to their residual value as stated below:

| | Life of Asset | Rate of depreciation % WDV per annum |
|---|---|---|
| Freehold building | 60 years | 2-10 |
| Furniture and fittings and equipment | 5 years | 15-20 |
| Vehicles and machinery | 3-5 years | 20-30 |

Material residual value estimates are updated as required, but at least annually, whether or not the asset is revalued.

Advance paid towards the acquisition or improvement of property and equipment not ready for use before the reporting date are disclosed as capital work-in-progress.

F-20

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### 3.9. Inventories

Inventories primarily comprise of music CDs and DVDs, and are valued at the lower of cost and net realizable value. Cost in respect of goods for resale is defined as purchase price, including appropriate labor costs and other overhead costs. Costs in respect of raw materials is purchase price.

Purchase price is assigned using a weighted average basis. Net realizable value is defined as anticipated selling price or anticipated revenue less cost to completion.

### 3.10. Cash and cash equivalents

Cash and cash equivalents include cash in hand, deposits held at call with banks, other short-term highly liquid investments which are readily convertible into known amounts of cash and are subject to insignificant risk of changes in value. Bank overdrafts are shown within "Borrowings" in "Current liabilities" on the statement of financial position.

### 3.11. Restricted deposits held with banks

Deposits held with banks as security for overdraft facilities are included in restricted deposits held with bank.

### 3.12. Financial instruments

A financial instrument is any contract that gives rise to a financial asset of one entity and a financial liability or equity instrument of another entity.

i.      Recognition, initial measurement and derecognition

Financial assets and liabilities are recognised when the Group becomes a party to the contractual provisions of the instrument. Financial assets and liabilities are initially measured at fair value. Transaction costs that are directly attributable to the acquisition or issue of financial assets and financial liabilities (other than financial assets and financial liabilities at fair value through profit or loss) are added to or deducted from the fair value measured on initial recognition of financial assets or financial liability.

The transaction costs directly attributable to the acquisition of financial assets and financial liabilities at fair value through profit and loss are immediately recognised in the Consolidated Statement of Income.

A financial asset is primarily derecognised (i.e. removed from the Group's statement of financial position) when:

  a)   The rights to receive cash flows from the asset have expired, or
  b)   The Group has transferred its rights to receive cash flows under an eligible transaction.

A financial liability is derecognised when the obligation under the liability is discharged or cancelled or expires.

ii.      Classification

For the purpose of subsequent measurement, financial assets are classified into the following categories upon initial recognition:

  •   Debt instruments at amortised cost
  •   Debt instruments at fair value through other comprehensive income (FVTOCI)
  •   Debt instruments, derivatives and equity instruments at fair value through profit or loss (FVTPL)
  •   Equity instruments measured at fair value through other comprehensive income (FVTOCI)
  •   Equity instruments measured at fair value profit or loss (FVTPL)

The classification depends on the entity's business model for managing the financial assets and the contractual terms of the cash flows.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Debt instruments at amortised cost**

A 'debt instrument' is measured at the amortised cost if both the following conditions are met:

1. The asset is held within a business model whose objective is to hold assets for collecting contractual cash flows, and

2. Contractual terms of the asset give rise on specified dates to cash flows that are solely payments of principal and interest ("SPPI") on the principal amount outstanding.

After initial measurement, such financial assets are subsequently measured at amortised cost using the effective interest rate (the "EIR") method. The effective interest rate is the rate that exactly discounts future cash receipts or payments through the expected life of the financial instrument, or where appropriate, a shorter period.

Amortised cost is calculated by taking into account any discount or premium on acquisition and fees or costs that are an integral part of the EIR. The EIR amortisation is included in finance income/other income in the Consolidated Statement of Income . The losses arising from impairment are recognised in the Consolidated Statement of Income .

**Debt instruments at fair value through other comprehensive income**

A 'debt instrument' is classified as at the FVTOCI if both of the following criteria are met:

1. The objective of the business model is achieved both by collecting contractual cash flows and selling the financial assets, and

2. The asset's contractual cash flows represent SPPI.

**Debt instruments at fair value through profit or loss**

FVTPL is a residual category for debt instruments. Any debt instrument, which does not meet the criteria for categorization as at amortized cost or as FVTOCI, is classified as at FVTPL.

**Equity instruments**

All equity investments in scope of IFRS 9 are measured at fair value. Equity instruments which are held for trading are classified as at FVTPL with all changes recognised in the Consolidated Statement of Income .

For all other equity instruments, the Group may make an irrevocable election to present in OCI, the subsequent changes in the fair value. The Group makes such election on an instrument-by-instrument basis. If the Group decides to classify an equity instrument as at FVTOCI, then all fair value changes on the instrument, excluding dividends and impairment loss, are recognised in OCI. There is no recycling of the amounts from the OCI to the Consolidated Statement of Income , even on sale of the investment. However, the Group may transfer the cumulative gain or loss within categories of equity.

iii.      Impairment of financial assets

In accordance with IFRS 9, the Group applies the expected credit loss ("ECL") model for measurement and recognition of impairment loss on financial assets and credit risk exposures.

ECL is the difference between all contractual cash flows that are due to the Group in accordance with the contract and all the cash flows that the entity expects to receive (i.e., all cash shortfalls), discounted at the EIR of the instrument. Lifetime ECL are the expected credit losses resulting from all possible default events over the expected life of a financial instrument. The 12-month ECL is a portion of the lifetime ECL which results from default events that are possible within 12 months after the reporting date.

The Group follows 'simplified approach' for recognition of impairment loss allowance on trade receivables, which do not have a significant financing component as per IFRS 15. Simplified approach does not require the Group to track changes in credit risk. Rather, it recognises impairment loss allowance based on lifetime ECL at each reporting date, right from its initial recognition.

F-22

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

For recognition of impairment loss on other financial assets and risk exposure, the Group determines that whether there has been a significant increase in the credit risk since initial recognition. If credit risk has not increased significantly, 12-month ECL is used to provide for impairment loss. However, if credit risk has increased significantly, lifetime ECL is used. If, in a subsequent period, credit quality of the instrument improves such that there is no longer a significant increase in credit risk since initial recognition, then the entity reverts to recognising impairment loss allowance based on 12-month ECL.

ECL impairment loss allowance (or reversal) recognised during the period is recognised as income/ expense in the Consolidated Statement of Income .

iv.    Classification and subsequent measurement of financial liabilities

All financial liabilities are recognised initially at fair value, adjusted by directly attributable transaction costs.
The measurement of financial liabilities depends on their classification, as described below:

■   Financial liabilities at fair value through profit or loss

Financial liabilities at fair value through profit or loss include financial liabilities held for trading and financial liabilities designated upon initial recognition as at fair value through profit or loss. Financial liabilities are classified as held for trading if they are incurred for the purpose of repurchasing in the near term. The Group does not have any financial liabilities classified at fair value through profit or loss.

■   Financial liabilities measured at amortised cost

After initial recognition, interest-bearing loans and borrowings are subsequently measured at amortised cost using the EIR method. Gains and losses are recognised in the Consolidated Statement of Income when the liabilities are derecognised.
Amortised cost is calculated by taking into account any discount or premium on acquisition and fees or costs that are an integral part of the EIR. The EIR amortisation is included as finance costs in the Consolidated Statement of Income .

**3.13.    Derivative financial instruments**

The Group uses derivative financial instruments ("derivatives") to reduce its exposure to interest rate movements.
Derivatives are initially recognized at fair value at the date the derivative contracts are entered into and are subsequently re-measured to their fair value at the end of each reporting period. The resulting gain or loss is recognized in consolidated statements of income immediately.

**3.14.    Provisions**

Provisions are recognized when the Group has a present legal or constructive obligation as a result of a past event, it is more likely than not that an outflow of resources will be required to settle the obligations and can be reliably measured. Provisions are measured at management's best estimate of the expenditure required to settle the obligations at the statement of financial position date and are discounted to present value where the effect is material.

**3.15.    Leases**

**Measurement and recognition of leases**

The Company considers whether contract is,or contains a lease. A lease is defined as 'a contract, or part of a contract, that conveys the right to use an asset (the underlying asset) for a period of time in exchange for consideration'.
To apply this definition the Company assesses whether the contract meets three key evaluations which are whether:

    a)   the contract contains an identified asset, which is either explicitly identified in the contract or implicitly specified by being identified at the time the asset is made available to the Company

    b)   the Company has the right to obtain substantially all of the economic benefits from use of the identified asset throughout the period of use, considering its rights within the defined scope of the contract.

F-23

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

c) the Company has the right to direct the use of the identified asset throughout the period of use. The Company assess whether it has the right to direct 'how and for what purpose' the asset is used throughout the period of use.

**Company as a lessee**

At lease commencement date, the Company recognises a right-of-use asset and a lease liability on the balance sheet. The right-of-use asset is measured at cost, which is made up of the initial measurement of the lease liability, any initial direct costs incurred by the Company and any lease payments made in advance of the lease commencement date.

The Company depreciates the right-of-use assets on a straight-line basis from the lease commencement date to the earlier of the end of the useful life of the right-of-use asset or the end of the lease term period. The Company also assesses the right-of-use asset for impairment when such indicators exist.

At the commencement date, the Company measures the lease liability at the present value of the lease payments unpaid at that date, discounted using the interest rate implicit in the lease if that rate is readily available or the Company's incremental borrowing rate.

Lease payments included in the measurement of the lease liability are made up of fixed payments (including in substance fixed), and payments arising from options reasonably certain to be exercised. Subsequent to initial measurement, the liability will be reduced for payments made and increased for interest expenses. It is remeasured to reflect any reassessment or modification.

The Company has elected to account for short-term leases and leases of low-value assets using the exemption given under IFRS 16. Instead of recognising a right-of-use asset and lease liability, the payments in relation to these are recognised as an expense in profit or loss on a straight-line basis over the lease term or on another systematic basis if that basis is more representative of the pattern of the Company's benefit.

**Company as a lessor**

Lease income from operating leases where the company is lessor is recognised in income on straight line basis over the lease term.

### 3.16.    Taxation

Taxation on profit and loss comprises current income tax and deferred income tax. Tax is recognized in the consolidated statement of income except to the extent that it relates to items recognized directly in equity or other comprehensive income in which case it is recognized in equity or other comprehensive income.

Current income tax is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted at the reporting date along with any adjustment relating to tax payable in previous years.

Deferred income tax is provided in full, using the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the consolidated financial statements. Deferred income tax is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted or substantively enacted at the statement of financial position date and are expected to apply when the related deferred income tax asset is realized or the deferred income tax liability is settled in the appropriate territory.

Deferred income tax in respect of undistributed earnings of subsidiaries is recognized except where the Group is able to control the timing of the reversal of the temporary difference and that the temporary difference will not reverse in the foreseeable future. Deferred income tax assets are recognized to the extent that it is probable that future taxable profit will be available against which temporary differences can be utilized.

Deferred income tax assets and deferred income tax liabilities are offset if, and only if the Group has a legally enforceable right to set off current tax assets against current tax liabilities and the deferred tax assets and the deferred tax liabilities relate to income taxes levied by the same taxation authority on either the same taxable entity or different taxable entities which intend either to settle current tax liabilities and assets on a net basis, or to realize the assets and settle the liabilities simultaneously, in each future period in which significant amounts of deferred tax liabilities or assets are expected to be

settled or recovered.

F-24

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### 3.17.    Employee benefits

The Group operates defined contribution pension plans and healthcare and insurance plans on behalf of its employees. The amounts due are all expensed as they fall due.

In accordance with IFRS 2 "Share Based Payments", the fair value of shares or options granted is recognized as personnel costs with a corresponding increase in equity. The fair value is measured at the grant date and spread over the period during which the recipient becomes unconditionally entitled to payment unless forfeited or surrendered.

The fair value of share options granted is measured using the Black Scholes model or a Monte-Carlo simulation model, each taking into account the terms and conditions upon which the grants are made. At each statement of financial position date, the Group revises its estimate of the number of equity instruments expected to vest as a result of non-market-based vesting conditions. The amount recognized as an expense is adjusted to reflect the revised estimate of the number of equity instruments that are expected to become exercisable, with a corresponding adjustment to equity reserves. None of the Group plans feature any options for cash settlements.

Upon exercise of share options, the proceeds received net of any directly attributable transaction costs up to the nominal value of the shares are allocated to share capital with any excess being recorded as share premium.

### 3.18.    Foreign currencies

Transactions in foreign currencies are translated at the rates of exchange prevailing on the dates of the transactions. Monetary assets and liabilities in foreign currencies are translated at the prevailing rates of exchange at the reporting date. Non-monetary items that are measured at historical cost in a foreign currency are translated at the exchange rate at the date of the transaction. Non-monetary items that are measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value was determined.

Any exchange differences arising on the settlement of monetary items or on translating monetary items at rates different from those at which they were initially recorded are recognized in the income statement in the period in which they arise. Non-monetary items carried at fair value that are denominated in foreign currencies are translated at rates prevailing at the date when the fair value was determined. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.

The assets and liabilities in the financial statements of foreign subsidiaries and related goodwill are translated at the prevailing rate of exchange at the statement of financial position date. Income and expenses are translated at the monthly average rate. The exchange differences arising from the retranslation of the foreign operations are recognized in other comprehensive income and taken in to the "currency translation reserve" in equity. On disposal of a foreign operation the cumulative translation differences (including, if applicable, gains and losses on related hedges) are transferred to the consolidated statement of income as part of the gain or loss on disposal.

### 3.19.    Equity shares

Equity shares are classified as equity. The Group defers costs in issuing or acquiring its own equity instruments to the extent they are incremental costs directly attributable to an equity transaction that otherwise would have been avoided. Such costs are accounted for as a deduction from equity (net of any related income tax benefit) upon completion of the equity transaction. The costs of an equity transaction which is abandoned is recognized as an expense.

### 3.20.    Earnings per share

Basic earnings per share is computed using the weighted average number of ordinary shares outstanding during the period. Diluted earnings per share is computed by considering the impact of the potential issuance of ordinary shares, using the treasury stock method, on the weighted average number of shares outstanding during the period except where the results would be anti-dilutive.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### 3.21.    Current/Non-current classification

The Group presents assets and liabilities in the statement of financial position based on current/non-current classification. An asset is current when it is:

- Expected to be realised or intended to sold or consumed in the normal operating cycle (*)
- Held primarily for the purpose of trading
- Expected to be realised within twelve months after the reporting period or
- Cash or cash equivalent unless restricted from being exchanged or used to settle a liability for at least twelve months after the reporting period

All other assets are classified as non-current.

(*) The operating cycle for the business activities of the Group is considered to be twelve months except in case of catalogue sales, which have been ascertained as two years for the purpose of current / non-current classification of assets.

A liability is current when:

- It is expected to be settled in the normal operating cycle
- It is held primarily for the purpose of trading
- It is due to be settled within twelve months after the reporting period or
- There is no unconditional right to defer the settlement of the liability for at least twelve months after the reporting period

The Group classifies all other liabilities as non-current. Deferred tax assets and liabilities are classified as non-current assets and liabilities.

## 4    ACQUISITION, CHANGES IN OWNERSHIP INTEREST IN SUBSIDIARY AND DECONSOLIDATION

**Changes in ownership interest in a subsidiary**

As of March 31, 2020, EIML has 479,614 (2019: 757,886), stock option outstanding under the India IPO Plan. In the year ended March 31, 2020, 121,496 (2019: 536,263) options were exercised at a weighted average exercise price of INR 10 (2019: INR 10) per share.

**Deconsolidation**

During fiscal 2018, the Group had divested its 51 percent equity interest in Ayngaran Group to the non-controlling investee. The sale of the 51 percent equity interest in the majority-owned subsidiary resulted in a loss of control of the subsidiary, and therefore it was deconsolidated from the Company's financial statements during fiscal 2018.

The Company recognised loss of $14,649 on the deconsolidation, measured as the fair value of the consideration received for the 51 percent equity interest in the former subsidiary and the fair value of the financial asset retained in the former subsidiary on deconsolidation. Of the above, loss of $457 resulted on account of recording the retained financial assets at fair value. The aforesaid loss was recorded within other gains/(losses), net in Statement of Income.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**5      BUSINESS SEGMENTAL DATA**

The Group acquires, co-produces, distributes and provides production services, including visual special effects (VFX) in respect of Indian films in multiple formats worldwide. Film advances is monitored and strategic decisions around the business operations are made based on the filmed entertainment sector, whether it is new release, library or services. Hence, the Management identifies only one operating segment in the business, filmed entertainment. We distribute our film content to the Indian population in India, the South Asian diaspora worldwide and to non-Indian consumers who view Indian films that are subtitled or dubbed in local languages. As a result of these distribution activities, Eros has identified four geographic markets: India, North America, Europe and the Rest of the world.

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | 2018 |
| | | (in thousands) | | | | |
| **Revenue by region of domicile of Group's operation** | | | | | | |
| India | $ | 41,119 | $ | 100,387 | $ | 98,073 |
| Europe | | 26,927 | | 63,196 | | 27,028 |
| North America | | 1,309 | | 1,759 | | 1,244 |
| Rest of the world | | 86,097 | | 104,784 | | 134,908 |
| **Total Revenue (*)** | $ | **155,452** | $ | **270,126** | $ | **261,253** |

Revenue of $85,793 (2019: $81,409 and 2018: $103,263) from the United Arab Emirates and is included within Rest of the world and revenue of $26,927 (2019: $63,196 and 2018: $27,028) from the United Kingdom and Isle of Man are included under Europe in the above table.

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | 2018 |
| | | (in thousands) | | | | |
| **Revenue by region of domicile of customer's location** | | | | | | |
| India | $ | 44,887 | $ | 116,078 | $ | 109,986 |
| Europe | | 94,887 | | 2,345 | | 7,739 |
| North America | | 6,078 | | 5,682 | | 5,147 |
| Rest of the world | | 9,600 | | 146,021 | | 138,381 |
| **Total Revenue (*)** | $ | **155,452** | $ | **270,126** | $ | **261,253** |

Revenue of $1,329 (2019: $62,527 and 2018: $67,993) from the United Arab Emirates and $5,240 from China are included within Rest of the world and revenue of $81,465 (2019: $1,180 and 2018: $5,200) from United Kingdom is included under Europe in the above table.

For the year ended March 31, 2020, March 31, 2019 and March 31, 2018, two customers accounted for more than 10% of the Group's total revenues

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | 2018 |
| | | (in thousands) | | | | |
| **Revenue by source** | | | | | | |
| Theatrical | $ | 10,586 | $ | 69,542 | $ | 79,069 |
| Satellite Content licensing | | 7,112 | | 77,453 | | 97,168 |
| Digital and other ancillary(*) | | 137,754 | | 123,131 | | 85,016 |
| **Total Revenue(**)** | $ | **155,452** | $ | **270,126** | $ | **261,253** |

(*) the ancillary includes revenue from providing producer support and VFX services to customers
(**) Net of significant discounting component $5,558 (2019: $34,467 and 2018: $6,816 ). [Refer Note 19].

F-27

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Segment assets by region of domicile of Group's operation:

| | Total | India | North America | Europe | Rest of the World |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Non-current assets (*)** | | | | | |
| As of March 31, 2020 | $ 475,633 | $ 152,340 | $ 1 | $ 25,860 | $ 297,432 |
| As of March 31, 2019 | $ 722,043 | $ 336,431 | $ 4 | $ 34,217 | $ 351,391 |

Segment assets of $292,109 (2019: $295,685) in the United Arab Emirates is included under Rest of the world and segment assets of $25,601 (2019: $32,287) and $259 (2019: $1,903) in the United Kingdom and IOM respectively is included under Europe in the above table.

(*) Non-current assets include property and equipment, right of use assets, intangibles assets (content and others) and restricted deposit by geographic area.

**6      NATURE OF EXPENSES**

(Loss)/Profit for the year is arrived at after the following are charged to the consolidate statements of income:

| | Year ended March 31 | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| Publicity and advertisement costs | $ 11,452 | $ 19,779 | $ 12,684 |
| Film distribution costs | 1,320 | 5,462 | 6,739 |
| Amortization expenses [Refer note 15] | 64,451 | 130,155 | 115,285 |
| Personnel costs [Refer note 7] | 36,697 | 37,015 | 35,661 |
| Rent expenses | 391 | 1,916 | 1,359 |
| Legal and professional expenses | 4,615 | 6,980 | 8,204 |
| Provision for trade and other receivables | — | — | 1,968 |
| Bad debt | — | — | 2,772 |
| Credit impairment loss, net [Refer note 19] | 97,551 | 25,741 | 4,308 |
| Depreciation and amortization of other intangibles | 3,462 | 2,263 | 2,991 |
| Impairment charge on goodwill | — | — | 1,205 |
| Impairment loss on content advances | — | — | 353 |
| Impairment loss on advances to content vendors | — | 7,284 | — |
| Others | 6,105 | 5,935 | 9,208 |
| | $ 226,044 | $ 242,530 | $ 202,737 |
| Cost of services | $ 81,725 | $ 155,396 | $ 134,708 |
| Administrative costs | $ 144,319 | $ 87,134 | $ 68,029 |

**7      PERSONNEL COSTS**

| | Year ended March 31 | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| Salaries | $ 13,781 | $ 14,591 | $ 16,790 |
| Social security and other employment charges | 617 | 831 | 916 |
| Salaries and other charges | 14,398 | 15,422 | 17,706 |
| Share based compensation (Refer note 27) | 22,268 | 21,561 | 17,918 |
| Pension charges | 31 | 32 | 37 |
| | $ 36,697 | $ 37,015 | $ 35,661 |
| | Year ended March 31 | | |

| **Key management compensation** | | 2020 | | 2019 | | 2018 |
|---|---|---|---|---|---|---|
| | | | | (in thousands) | | |
| Salaries | $ | 4,395 | $ | 4,010 | $ | 4,919 |
| Share based compensation | | 19,829 | | 13,859 | | 11,519 |
| Pension charges | | 23 | | 21 | | 16 |
| | $ | 24,247 | $ | 17,890 | $ | 16,454 |

F-28

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**8      NET FINANCE COSTS**

| | Year ended March 31 | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| Interest on borrowings [*] | $ 29,474 | $ 33,530 | $ 32,556 |
| Reclassification of cash flow hedge to consolidated statements of income | — | — | 375 |
| Total interest expense [*] | 29,474 | 33,530 | 32,931 |
| Capitalized interest on eligible film rights and content advances | (8,703) | (9,437) | (13,263) |
| **Total finance costs** | **20,771** | **24,093** | **19,668** |
| Less: Interest income | | | |
| Unwinding of interest | (9,807) | (13,227) | (932) |
| Bank deposits | (2,185) | (3,192) | (923) |
| **Total finance income** | **(11,992)** | **(16,419)** | **(1,855)** |
| | $ 8,779 | $ 7,674 | $ 17,813 |

For the year ended March 31, 2020, the capitalization rate of interest was 11.00% (2019: 10.21% and 2018:11.56%).
[*] includes interest expense in respect of financial liabilities classified at fair value through profit or loss $5,517 (2019: $10,682 and 2018: $4,338), significant discounting on long-term advance from customers $1,501 (2019: $458) and leases $ 184

**9      OTHER GAINS/(LOSSES)**

| | Year ended March 31 | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| Foreign exchange (loss)/gain, net | $ 5,650 | $ 5,610 | $ (6,250) |
| Gain/(loss) on sale of property and equipment and other Intangibles | (70) | (97) | 2 |
| Gain/(Loss) on available-for-sale financial assets (Refer note 17) | (1,253) | 37 | — |
| Impairment charge on available -for- sale financial assets (Refer note 17) | — | — | (2,436) |
| (Loss) on de-recognition of financial assets measured at amortized cost net [*] | (5,285) | (5,988) | (3,562) |
| Mark to market gain/(loss) on derivative financial instrument measured at fair value through profit and loss account (Refer note 25) | — | (902) | — |
| (Loss) on settlement of derivative financial instruments | — | — | (586) |
| (Loss) on financial liability (convertible notes) measured at fair value through profit and loss account (Refer note 22) | (15,987) | (21,398) | (13,840) |
| (Loss) on deconsolidation of a subsidiary (Refer note 4) | — | — | (14,649) |
| Reversal of expected credit loss (Refer note 19) | 10,382 | 20,698 | — |
| Liabilities no longer required, written-back | 2,487 | — | |
| Credit from Government of India | 760 | 2,328 | — |
| | $ (3,316) | $ 288 | $ (41,321) |

[*] Arising on assignment and novation of trade receivables and trade payables with no-recourse. Derecognition of aforesaid financial assets/liabilities measured at amortized cost is to mitigate both credit risk and liquidity risk (Refer Note 31).

**10      INCOME TAX EXPENSE**

| | Year ended March 31 | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| **Current income tax expense** | $ 1,800 | $ 17,372 | $ 5,556 |
| Deferred income tax (benefit) / charge | (23,983) | (10,044) | 3,571 |
| **Income tax expenses** | $ (22,183) | $ 7,328 | $ 9,127 |

F-29

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Reconciliation of tax charge

| | Year ended March 31 | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| (Loss) before tax | $ (513,887) | $ (403,125) | $ (618) |
| Income tax (benefit)/expense at tax rates applicable to individual entities[#] | (44,763) | 6,814 | 7,358 |
| Tax effect of: | | | |
| Effect of unrecognised tax asset (*) | 29,898 | — | 657 |
| Changes in tax rates on temporary differences brought forward | (7,476) | 232 | (168) |
| Items not deductible for income tax | 5 | 688 | 486 |
| Adjustment in respect of current income tax of previous years | — | (762) | — |
| Others | 153 | 356 | 794 |
| Income tax expense | $ (22,183) | $ 7,328 | $ 9,127 |

[#] Domestic tax is Nil as the Company is subject to income tax in Isle of Man at a rate of zero percent. Foreign taxes are based on applicable tax rates in each subsidiary jurisdiction.

(*) In view of tax losses on Company's Indian Listed subsidiary, deferred tax assets on deductible temporary differences have been recognised to the extent of deferred tax liability on taxable temporary difference on account of lack of sufficient certainty of future earnings against which such deferred tax asset can be realised. Unrecognised tax asset, in respect of tax losses and deductible temporary differences of $ 118,793, is $ 29,898.

**11      DEFERRED INCOME TAX ASSETS AND LIABILITIES**

Changes in deferred income tax assets and liabilities

| | As At March 31, 2020 | | | |
|---|---|---|---|---|
| | Opening Balance | Recognized in statements of income | Exchange Difference | Closing Balance |
| **Deferred tax assets:** | | | | |
| Minimum alternate tax carry-forward | $ 88 | $ 2 | $ (6) | $ 84 |
| Property and equipment | 76 | 120 | (9) | 187 |
| Credit impairment loss | 5,044 | (3,740) | (918) | 386 |
| Content advances and film production | — | 11,791 | (2,916) | 8,875 |
| Others | 3,281 | (4,328) | 2,167 | 1,120 |
| **Total income deferred tax asset** | $ 8,489 | $ 3,845 | $ (1,682) | $ 10,652 |
| **Deferred income tax liabilities:** | | | | |
| Property and equipment | (624) | 38 | 520 | (66) |
| Content advances and film production | (34,029 | 20,100 | 1,397 | (12,532) |
| **Total deferred income tax liability** | $ (34,653) | $ 20,138 | $ 1,917 | $ (12,598) |
| **Net deferred tax (liability)** | $ (26,164) | $ 23,983 | $ 235 | $ (1,946) |
| **As at March 31, 2020** | | | | |
| **Deferred income tax asset** | | | | $ 742 |
| **Deferred income tax liability** | | | | $ (2,688) |

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

As At March 31, 2019

| | Opening Balance | Impact of adoption of IFRS 9 | Recognized in statements of income | Exchange Difference | Closing Balance |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Deferred tax assets:** | | | | | |
| Minimum alternate tax carry-forward | $ 927 | — | $ (778) | $ (61) | $ 88 |
| Property and equipment | 83 | — | (2) | (5) | 76 |
| Credit impairment loss | — | 673 | 4,385 | (14) | 5,044 |
| Others | 2,442 | — | 984 | (116) | 3,310 |
| **Total income deferred tax asset** | $ 3,452 | 673 | $ 4,589 | $ (196) | $ 8,518 |
| **Deferred income tax liabilities:** | | | | | |
| Property and equipment | (776) | — | 142 | 10 | (624) |
| Intangible assets | (41,815) | — | 5,313 | 2,473 | (34,029) |
| Others | (29) | — | — | — | (29) |
| **Total deferred income tax liability** | (42,620) | — | $ 5,455 | $ 2,483 | $ (34,682) |
| **Net deferred tax (liability)** | (39,168) | 673 | $ 10,044 | $ 2,287 | $ (26,164) |
| **As at March 31, 2019** | | | | | |
| **Deferred income tax asset** | | | | | $ 1,263 |
| **Deferred income tax liability** | | | | | $ (27,427) |

Deferred tax is calculated in full on all temporary differences under the liability method using the local tax rate of the country in which the timing difference occurs.

Deferred tax assets have been recognised on the basis that there is reasonable certainty of profitability to utilize the available losses and tax credits. However, in view of tax losses on Group's Indian listed subsidiary, deferred tax assets on deductible temporary differences have been recognised to the extent of deferred tax liability on taxable temporary difference on account of lack of sufficient certainty of future earnings against which such deferred tax asset can be realised.

Deferred tax liabilities to the extent of $21,390 (2019: $49,163 and 2018: $43,962) have not been provided on the undistributed earnings of subsidiaries as Eros is able to control the timing of the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future.

The excess tax paid under MAT provisions over and above normal tax liability can be carried forward and setoff against future tax liabilities computed under normal tax provisions. The Indian subsidiaries were required to pay MAT in the past years and accordingly, a deferred tax asset of $84 (2019: $88 and 2018: $927) has been recognised in the consolidated financial position, which can be carried forward for a period of fifteen assessment years immediately succeeding the assessment year in which it becomes allowable.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 12    EARNINGS PER SHARE (EPS)

|  | 2020 Basic | 2020 Diluted | 2019 Basic | 2019 Diluted | 2018 Basic | 2018 Diluted |
|---|---|---|---|---|---|---|
|  | (in thousands, except number of shares and earnings per share) | | | | | |
| **(Loss)/earnings** | | | | | | |
| (Loss)attributable to the equity holders of the parent | $(418,992) | (418,992) | $ (423,867) | (423,867) | $ (22,575) | $ (22,575) |
| Potential dilutive effect related to share based compensation scheme in subsidiary undertaking | — | — | — | (197) | — | (475) |
| **Adjusted earnings attributable to equity holders of the parent** | $(418,992) | **(418,992)** | $ (423,867) | **(424,064)** | $ (22,575) | $ (23,050) |
| Number of shares | | | | | | |
| Weighted average number of shares | 107,532, 584 | 107,532, 584 | 70,706, 579 | 70,706, 579 | 62,151, 155 | 62,151, 155 |
| Potential dilutive effect related to share based compensation scheme | | 8,237, 299 | — | 1,463, 640 | — | 1,331, 211 |
| Adjusted weighted average number of shares | **107,532, 584** | **115,769, 883** | 70,706, 579 | 72,170, 219 | 62,151, 155 | 63,482, 366 |
| **(Loss) per share** | | | | | | |
| (Loss) attributable to the equity holders of the parent per share (cents) | (389.6) | (389.6) | (599.5) | (599.5) | (36.3) | (36.3) |

The above table does not split the earnings per share separately for the 'A' ordinary 30p shares and the 'B' ordinary 30p shares as there is no variation in their entitlement to participate in undistributed earnings.

The Company excludes options with exercise prices that are greater than the average market price from the calculation of diluted EPS because their effect would be anti-dilutive. In the year ended March 31, 2020, 601,667 shares were not included in diluted earnings per share (2019: 1,957,035). Since there is loss for the fiscal year 2019, the potential equity shares resulting from dilutive options are not considered as dilutive and hence, the Diluted EPS is same as Basic EPS. Further, the Company have excluded convertible notes 13,888,889 shares because of their effect was anti-dilutive (2019 : 7,567,962).

## 13    PROPERTY AND EQUIPMENT

|  |  | Land and Building |  | Furniture, fittings and equipment |  | Vehicles |  | Machinery |  | Total |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | | | | As At March 31, 2020 | | | | | |
|  |  | | | | (in thousands) | | | | | |
| Opening net carrying amount | $ | 9,562 | $ | 199 | $ | 549 | $ | 601 | $ | 10,911 |
| Exchange difference |  | (480) |  | (8) |  | (29) |  | (7) |  | (524) |
| Additions |  | 30 |  | — |  | — |  | 31 |  | 61 |
| Adjustment on Adoption of IFRS 16 |  | — |  | — |  | — |  | (243) |  | (243) |
| Disposals |  | — |  | (2) |  | (116) |  | (2) |  | (120) |
| Adjustment of depreciation on disposal |  | — |  | 1 |  | 28 |  | 2 |  | 31 |
| Depreciation charge |  | (579) |  | (49) |  | (132) |  | (131) |  | (891) |
| **Balance as at March 31, 2020** | $ | 8,533 | $ | 141 | $ | 300 | $ | 251 | $ | 9,225 |
| Capital work-in-progress |  | | | | | | | | $ | 9 |
| **Net carrying value as at March 31,** |  | | | | | | | | $ | 9,234 |

**2020**

F-32

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**As At March 31, 2020**
**(in thousands)**

|  | | | | | |
|---|--:|--:|--:|--:|--:|
| Cost or valuation | $ 13,408 | $ 1,749 | $ 1,244 | $ 4,032 | $ 20,433 |
| Accumulated depreciation | (4,875) | (1,608) | (944) | (3,781) | (11,208) |
| **Net carrying amount** | $ 8,533 | $ 141 | $ 300 | $ 251 | $ 9,225 |
| Capital work-in-progress | | | | | $ 9 |
| **Net carrying value as at March 31, 2020** | | | | | $ 9,234 |

**As At March 31, 2019**

| | Land and Building | Furniture, fittings and equipment | Vehicles | Machinery | Total |
|---|--:|--:|--:|--:|--:|
| | | | **(in thousands)** | | |
| Opening net carrying amount | $ 8,481 | $ 348 | $ 698 | $ 476 | $ 10,003 |
| Exchange difference | (292) | (12) | (43) | (12) | (359) |
| Revaluation | 1,745 | — | — | — | 1,745 |
| Additions | 207 | 16 | 116 | 394 | 733 |
| Reclassification and other adjustment | | (61) | 2 | — | (59) |
| Disposals | (449) | (56) | — | (65) | (570) |
| Adjustment of depreciation on disposal | 367 | 39 | — | 61 | 467 |
| Depreciation charge | (497) | (75) | (224) | (253) | (1,049) |
| **Balance as at March 31, 2019** | $ 9,562 | $ 199 | $ 549 | $ 601 | $ 10,911 |
| Capital work-in-progress | | | | | $ 10 |
| **Net carrying value as at March 31, 2019** | | | | | $ 10,921 |

**As At March 31, 2019**
**(in thousands)**

|  | | | | | |
|---|--:|--:|--:|--:|--:|
| Cost or valuation | $ 13,858 | $ 1,759 | $ 1,389 | $ 4,318 | $ 21,324 |
| Accumulated depreciation | (4,296) | (1,560) | (840) | (3,717) | (10,413) |
| **Net carrying amount** | $ 9,562 | $ 199 | $ 549 | $ 601 | $ 10,911 |
| Capital work-in-progress | | | | | $ 10 |
| **Net carrying value as at March 31, 2019** | | | | | $ 10,921 |

Property and equipment with a net carrying amount of $8,189 (2019: $6,685) have been pledged to secure borrowings (Refer Note 22).

Land and buildings were revalued as at March 31, 2019 by independent valuers on the basis of market value. Fair values were estimated based on recent market transactions, which were then adjusted for specific conditions relating to the land and buildings. As at March 31, 2020, had land and buildings of the Group been carried at historical cost less accumulated depreciation, their carrying amount would have been $4,337 (2019: $4,983).

Capital work-in-progress of $9 (2019: $10) primarily related to Machinery cost in Company's leased premises.

**14    GOODWILL AND TRADEMARK**

| Goodwill and Trademark | Amount in US$ |
|---|--:|
| Balance as at March 31, 2019 | $ — |
| Balance as at March 31, 2020 | $ — |

F-33

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 15    INTANGIBLE CONTENT ASSETS

| | Gross Content Assets | Accumulated Amortization | Impairment Loss | Content Assets |
|---|---|---|---|---|
| **As at March 31, 2020** | | | | |
| Film and content rights | $ 1,835,263 | $ (975,774) | $ (557,510) | $ 301,979 |
| Content advances | 427,046 | — | (274,325) | 152,721 |
| Film productions | 12,089 | — | (4,900) | 7,189 |
| **Non-current content assets** | **$ 2,274,398** | **$ (975,774)** | **$ (836,735)** | **$ 461,889** |
| **As at March 31, 2019** | | | | |
| Film and content rights | $ 1,675,406 | (954,628) | (366,703) | $ 354,075 |
| Content advances | 378,268 | — | (38,832) | 339,436 |
| Film productions | 13,061 | — | — | 13,061 |
| **Non-current content assets** | **$ 2,066,735** | **(954,628)** | **(405,535)** | **$ 706,572** |

| | As At ended March 31 | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| **Film productions** | | |
| **Opening balance** | $ 13,061 | $ 10,867 |
| Additions | 9,314 | 3,413 |
| Exchange difference | (751) | (775) |
| Impairment loss (Refer to Note 2 (c)) | (4,900) | — |
| Transfer to film and content rights | (9,535) | (444) |
| **Closing balance** | **$ 7,189** | **$ 13,061** |
| **Content advances** | | |
| **Opening balance** | $ 339,436 | $ 349,568 |
| Additions (*) (**) | 255,940 | 261,002 |
| Reclassifications | — | (65) |
| Exchange difference | (9,484) | (12,314) |
| Impairment loss (Refer to Note 2 (c)) | (235,493) | (38,832) |
| Transfer to film and content rights | (197,678) | (219,923) |
| **Closing balance** | **$ 152,721** | **$ 339,436** |
| **Film and content rights** | | |
| **Opening balance** | $ 354,075 | $ 638,108 |
| Amortization | (64,451) | (130,155) |
| Exchange difference | (4,486) | (7,542) |
| Impairment loss (Refer to Note 2 (c)) | (190,807) | (366,703) |
| Transfer from inventory | 435 | — |
| Transfer from film productions and content advances | 207,213 | 220,367 |
| **Closing balance** | **$ 301,979** | **$ 354,075** |

Film and content rights with a carrying amount of $123,180 (2019: $310,996) have been pledged against secured borrowings (Refer Note 22).

(*)represents non-cash movement on account of de-recognition of financial liabilities amounting to $90,118 (2019: $160,615) [Refer Note 31].

(**) capital creditors amounting $24,513 were settled by issuance of A Ordinary Shares, [Refer note 26].

**16      INTANGIBLE ASSETS-OTHER**

Other intangibles comprise of software and other intangibles used within the Group's digital and home entertainment activities and internal accounting activities.

F-34

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The changes in other intangible assets are as follows:

|  | As At March 31, 2020 (in thousands) | | |
| --- | --- | --- | --- |
|  | Information technology assets | Other intangibles | Total |
| Opening net carrying amount as on March 31, 2019 | $ 1,204 | $ 2,590 | $ 3,794 |
| Exchange difference | — | (137) | (137) |
| Additions | — | — | — |
| Disposal and reclassification | (59) | (4) | (63) |
| Amortization charge | (39) | (855) | (894) |
| Sub- total | 1,106 | 1,594 | 2,700 |
| Intangibles under development | — | — | 235 |
| Closing net carrying amount as on March 31, 2020 | $ 1,106 | $ 1,594 | $ 2,935 |

|  | As At March 31, 2020 (in thousands) | | |
| --- | --- | --- | --- |
| Cost or valuation as on March 31, 2019 | $ 5,055 | $ 6,466 | $ 11,521 |
| Accumulated amortization | (3,949) | (4,872) | (8,821) |
| Net carrying amount as on March 31, 2020 | $ 1,106 | $ 1,594 | $ 2,700 |
| **Intangibles Under Development** |  |  | $ 235 |
| **Net carrying value as at March 31, 2020** |  |  | $ 2,935 |

|  | As At March 31, 2019 (in thousands) | | |
| --- | --- | --- | --- |
|  | Information technology assets | Other intangibles | Total |
| Opening net carrying amount as on March 31, 2018 | $ 1,449 | $ 3,831 | $ 5,280 |
| Exchange difference | — | (148) | (148) |
| Additions | — | 907 | 907 |
| Disposal and reclassification | 59 | (1,090) | (1,031) |
| Amortization charge | (304) | (910) | (1,214) |
| Closing net carrying amount as on March 31, 2019 | $ 1,204 | $ 2,590 | $ 3,794 |

|  | As At March 31, 2019 (in thousands) | | |
| --- | --- | --- | --- |
| Cost or valuation as on March 31, 2019 | $ 5,114 | $ 6,607 | $ 11,721 |
| Accumulated amortization | (3,910) | (4,017) | (7,927) |
| Net carrying amount as on March 31, 2019 | $ 1,204 | $ 2,590 | $ 3,794 |

Other intangible assets with a carrying amount of $57 (2019: $92) have been pledged against secured borrowings (Refer Note 22).

**17    AVAILABLE-FOR-SALE FINANCIAL ASSETS**

|  | As At March 31 | |
| --- | --- | --- |
|  | 2020 | 2019 |
|  | (in thousands) | |
| **Non-Current investments** |  |  |

| | | | | |
|---|---|---:|---|---:|
| Valuable Technologies Limited | $ | 140 | $ | 2,000 |
| LMB Holdings Limited | | — | | 650 |
| | $ | 140 | $ | 2,650 |
| **Current investments** | | | | |
| Polyxo Global Limited | $ | 225 | $ | 1,042 |
| Plutus Opportunities Fund Limited | | 3,577 | | — |
| | $ | 3,942 | $ | 3,692 |

F-35

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The movement in the financial assets is as follows:

|  | Financial Assets at FVTPL | Financial Assets at FVTOCI |
|---|---|---|
| **As at March 31, 2018** | $ 27,257 | $ — |
| Reclassification (refer note 29) | (27,257) | 27,257 |
| Additions | 1,005 | 80 |
| Fair valuation gain / (loss) | 37 | (24,687) |
| **As at March 31, 2019** | 1,042 | $ 2,650 |
| Additions/(Disposal) | 4,013 | (650) |
| Fair valuation gain / (loss) | (1,253) | (1,860) |
| **As at March 31, 2020** | $ 3,802 | $ 140 |

Eros acquired an interest in Valuable Technologies Limited ("Valuable") in the year ended March 31, 2009. Valuable manages and operates a number of companies within media and entertainment, technology and infrastructure. These companies include "UFO Moviez", the leading provider of Digital projection solutions for cinemas in India and "Impact" whose business is theatrical ticketing and sales data. As at March 31, 2020 and March 31, 2019, Eros owns 7.2% of Valuable's equity. For the year ended March 31, 2020 and March 31, 2019, management has used the latest available financial statements, which shows decrease in revenue and increase in losses compared to prior years. Accordingly, the fair value has been computed using the Net Asset Value method. Management has used an estimate of 30% for the discount for lack of liquidity (DLOL). DLOL reflects the ease of investor's ability to liquidate its business interest. As per Eros's stake of 7.2%, the estimated fair value (Non- Marketable and Non-Control Basis) is arrived at $140.

Acacia Investments Holdings Limited ("Acacia") is a dormant holding company and owns 12.97% of L.M.B Holdings Limited ("LMB") which through its subsidiaries operates satellite television channels, such as "B4U Music", "B4U Movies" and "The Movie House Channel". As of March 31, 2020, and prior, the Group had no Board representation, no involvement in policy decision making, did not provide input in respect of technical know-how and had no material contract with LMB or its subsidiaries nor did they have the power to exert significant influence. Until the year ended March 31, 2018, due to the range of potential outcomes for the investment was estimated using level 3 inputs, using guideline public companies method with revenue multiple. The Management has concluded the sale of their stake in "LMB Holdings Limited" at $650 in the month of July 2019.

Investments in these unquoted equity investments are not held for trading. Instead, they are medium or long-term strategic purpose fair value of the investment has been derived based on the information and closing statement received from funds.

**18    INVENTORIES**

|  | As At March 31 | |
|---|---|---|
|  | 2020 | 2019 |
|  | (in thousands) | |
| Goods for resale | $ — | $ 435 |
|  | $ — | $ 435 |

During the year ended March 31, 2020, inventory of Nil (2019: $93 and 2018: $290) was recognised in the consolidated statements of income as an expense. In addition to the year the company has charged Nil (2019: $69) as expense in statement of income as a result of the write down of inventories. Inventories with a carrying amount of $NIL (2019: $435) have been pledged as security for certain of the Group's borrowings (Refer note 22).

**EROS INTERNATIONAL PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**19      TRADE AND OTHER RECEIVABLES**

| | | As at | | |
|---|---|---|---|---|
| | | March 31, 2020 | | March 31, 2019 |
| **Trade accounts receivables at fair value** [*] | | | | |
| Trade accounts receivables | $ | 138,869 | | 156,026 |
| Credit impairment (loss) | | (41,470) | | (26,133) |
| Fair Value gain/(loss) | | (2,650) | | (4,664) |
| **Trade accounts receivables net** | | **94,749** | | **125,229** |
| **Trade accounts receivables at amortised cost** | | | | |
| Trade accounts receivables | $ | 77,772 | $ | 86,331 |
| Credit impairment (loss) | | (70,853) | | (15,202) |
| **Trade accounts receivables net** | | **6,919** | | **71,129** |
| **Total Trade accounts receivables** | $ | **101,668** | $ | **196,358** |
| Balance with statutory authorities | | 6,568 | | 7,672 |
| Accrued interest | | 92 | | 2,188 |
| Advance to content vendor | | 1,373 | | 3,462 |
| Prepaid charges | | 2,578 | | 1,790 |
| Unbilled revenues | | 553 | | 1,717 |
| Other receivables | | 5,182 | | 2,023 |
| **Trade and other receivables** | $ | **118,014** | $ | **215,210** |
| **Current** | | 107,253 | | 205,145 |
| **Non-current** | | 10,761 | | 10,065 |
| | $ | **118,014** | $ | **215,210** |

[*] Business model is achieved both by collecting contractual cash flows and de-recognition of financial assets arising on assignment and novation transaction. (Refer Note 31)

The age of account receivables net of credit of credit impairment loss are past due but not impaired were as follows:

| | | As at | | |
|---|---|---|---|---|
| | | March 31, 2020 | | March 31, 2019 |
| Not more than three months | $ | 15,097 | $ | 44,687 |
| More than three months but not more than six months | | 11,764 | | 15,948 |
| More than six months but not more than one year | | 14,896 | | 15,310 |
| More than one year | | 4,899 | | 8,796 |
| | $ | 46,656 | $ | 84,741 |

Trade and other receivables with a net carrying amount of $29,969 (2019: $83,991) have been pledged against secured borrowings (Refer Note 22).

F-37

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The movement in the allowances for expected credit losses is as follows:

| | Year ended March 31, 2020 | | |
|---|---|---|---|
| | Trade Receivables | Other Receivables | Total Receivables |
| Balance as on April 1, 2019 | $ 41,335 | $ 447 | $ 41,782 |
| Charged to operations | 103,109 | — | 103,109 |
| Unwinding of expected credit loss (included in finance income) | (9,807) | — | (9,807) |
| Reversal of expected credit loss (included in other gains/(losses)) | (10,382) | — | (10,382) |
| Bad debts | (6,743) | — | (6,743) |
| Translation Adjustment | (5,189) | | (5,189) |
| **Balance at the end of the year** | $ 112,323 | $ 447 | $ 112,770 |

The movement in the allowances for expected credit losses is as follows:

| | Year ended March 31, 2019 | | |
|---|---|---|---|
| | Trade Receivables | Other Receivables | Total Receivables |
| Balance at the beginning of the period | $ 10,193 | $ — | $ 10,193 |
| Impact of adoption of IFRS 9 | 18,050 | 447 | 18,497 |
| Balance as on April 1, 2018 | 28,243 | 447 | 28,690 |
| Charged to operations | 60,208 | 7,284 | 67,492 |
| Unwinding of expected credit loss (included in finance income) | (13,227) | — | (13,227) |
| Reversal of expected credit loss (included in other gains/(losses)) | (20,698) | — | (20,698) |
| Bad debts | (13,031) | (7,284) | (20,315) |
| Translation adjustment | (160) | — | (160) |
| **Balance at the end of the year** | $ 41,335 | $ 447 | $ 41,782 |

**20    TRADE AND OTHER PAYABLES**

| | As At March 31 | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| Trade accounts payable[(*)] | $ 21,030 | $ 25,299 |
| Accruals and other payables (includes creditors for content assets of $29,937 (2019: $16,139)) | 43,809 | 32,888 |
| Contract liability (deferred revenue) | 9,827 | 12,260 |
| Accrued interest | 3,106 | 2,395 |
| Value added taxes and other taxes payable | 13,169 | 10,645 |
| | $ 90,941 | $ 83,487 |

[(*)] Includes settlement of payables through issuance of shares (Refer note 27). and de-recognition of financial liabilities arising on assignment and novation transaction [Refer note 31]

The carrying amount of trade and other payables are considered a reasonable approximation of fair value.

**21    CASH AND CASH EQUIVALENTS**

Cash and cash equivalents consist of cash on hand and balance with banks (including balances in current account and demand deposits). Cash and cash equivalents included in the statements of cash flows comprise the following amounts in the statement of financial position.

| | As At March 31 |
|---|---|

|  | 2020 | | 2019 | |
|---|---|---|---|---|
|  | (in thousands) | | | |
| Cash at bank and in hand | $ | 2,563 | $ | 89,117 |
|  | $ | 2,563 | $ | 89,117 |

F-38

# EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

**22    BORROWINGS**

An analysis of long-term borrowings is shown in the table below.

| | Nominal Interest Rate | Maturity | As at March 31, 2020 | As at March 31, 2019 |
|---|---|---|---|---|
| | | | (in thousands) | |
| **Asset backed borrowings** | | | | |
| Vehicle loan | 2.5 - 9.5% | 2017-22 | $ 127 | $ 382 |
| Term loan | MCLR +3.2% - 4.50% | 2019-22 | 6,843 | 12,947 |
| Term loan | BR + 2.75% | 2020-21 | 509 | 1,083 |
| Term loan | 10.39% - 13.75% | 2020-23 | — | 251 |
| | | | $ 7,479 | $ 14,663 |
| **Unsecured borrowings** | | | | |
| Retail bond | 6.50% | 2021-22 | 62,274 | 65,215 |
| Convertible notes[1] | 14.23% | 2020-21 | — | 68,349 |
| | | | $ 62,274 | $ 133,564 |
| Cumulative effect of unamortised costs | | | (399) | (691) |
| **Instalments due within one year:** | | | | |
| Convertible notes[2] | | | — | (68,349) |
| Others | | | (7,240) | (7,267) |
| | | | $ 62,114 | $ 71,920 |
| **Long-term borrowings at amortised cost** | | | $ 62,114 | $ 71,920 |

Bank prime lending rate and marginal cost lending rate ("BPLR" & "MCLR") is the Indian equivalent to LIBOR. Asset backed borrowings are secured by fixed and floating charges over certain Group assets.

**Analysis of short-term borrowings**

| | Nominal interest rate (%) | As at March 31, 2020 | As at March 31, 2019 |
|---|---|---|---|
| | | (in thousands) | |
| **Asset backed borrowings** | | | |
| Export credit, bill discounting and overdraft | MCLR +.40% to 6% | $ 37,755 | $ 32,078 |
| Export credit, bill discounting and overdraft | Base Rate + 0.5% to 1% | 3,442 | 3,533 |
| Export credit, bill discounting and overdraft | 6.01% - 15.25% | 28,773 | 26,719 |
| Convertible notes[1] | 9.96% | 23,100 | — |
| Short- term loan[3] | 3.25% - 16.45% | 16,548 | 70,962 |
| | | $ 109,618 | $ 133,292 |
| **Unsecured borrowings** | | | |
| Instalments due within one year on long-term borrowing | | 7,240 | 75,616 |
| | | $ 116,858 | $ 208,908 |
| **Short-term borrowings at fair value** | | 23,100 | 68,349 |
| **Short-term borrowings at amortised cost** | | $ 93,758 | $ 140,559 |

1   Eros International Plc. ("issuer") issued Senior Convertible Notes (SCN or convertible notes) on December 06, 2017 amounting to $122,500 principal amount and option to purchase warrants up to 2,000 of A ordinary share for a term of

6 months at an offer price of $100,000 by private placement. The notes are payable in equal installments of $3,500 per month for 35 months starting December 31, 2017. The installments can be paid either in cash or can be converted into A ordinary equity shares of the issuer at the option of the issuer as per the terms of the arrangement. The notes are fully paid as at the date of reporting. Further, Eros International Plc. ("issuer") issued Senior Convertible Notes (SCN or convertible notes) on September 25, 2019 amounting to $27,500 principal amount. The maturity date of convertible is September 26, 2020. . The installments will be converted into A ordinary equity shares of the issuer at the option of the issuer as per the terms of the arrangement.

F-39

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The holder of the notes can defer the payment of the amount due on any instalment dates to another instalment date as well as has the right to accelerate the payment on the notes as per the terms of the agreement

The Company has classified the instrument as a financial liability at fair value through profit or loss. The Company the Monte-Carlo simulation model to obtain the fair value of the convertible notes. Fair value of the financial liability outstanding as at the date of reporting is $23,100 (2019: $68,349)

The mark-to-market loss and interest expense for the year ended March 31, 2020 was $15,987 (2019: $21,398) and $5,517 (2019: $10,682) have been recognized within other gain/(losses) and net finance cost, respectively, net in the Statement of Income.

2.    Secured by pledge of shares held in the Group's majority owned subsidiary, Eros International Media Limited, India.

3.    For the twelve months ended March 31, 2020 capitalization rate of interest was 11.00% (2019: 10.21%)

4.    Borrowing agreements are subjected to covenant clause, whereby the Company is required to meet certain key financial ratios and those remaining unfulfilled resulted in disclosure of the outstanding balance with the aforesaid banking institution as a current liability as of March 31, 2020. Management is in the process of renewal of the aforesaid borrowing arrangement with the bank/s and is expecting that a revised loan sanction letter will be in place in the coming quarter/s.

Fair value of the long-term borrowings as at March 31, 2020 is $43,964 (2019: $140,968). Fair values of long-term financial liabilities except retail bonds and convertibles notes have been determined by calculating their present values at the reporting date, using fixed effective market interest rates available to the Companies within the Group. As at March 31, 2020, the fair value of retail bond amounting to $36,897 (2019: $59,313) has been determined using quoted prices from the London Stock Exchange and the fair value of senior convertible notes has been determined at $23,100 (2019: $68,349) by an independent valuation expert using Monte-Carlo simulation model. Carrying amount of short-term borrowings are considered a reasonable approximation of fair value.

Reconciliation of fair value measurement of convertible notes:

| Particulars | March 3, 2020 (in thousands) |
|---|---:|
| As at March 31,2019 | $    68,349 |
| Interest | 5,517 |
| 'A' ordinary shares issued in lieu of convertible notes | (91,753) |
| Receipt from convertible notes | 25,000 |
| Loss on fair value of convertible notes | 15,987 |
| As at March 31, 2020 | $    23,100 |

23    ACCEPTANCES

| | As At March 31 | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| Payable under the film financing arrangements | $    1,858 | $    8,366 |
| | $    1,858 | $    8,366 |

Acceptances comprise of short-term credit availed from financial institutions for payment to film producers for film co-production arrangement entered by the group. The carrying value of acceptances are considered a reasonable approximation of fair value.

24    OTHER LONG -TERM LIABILITIES

| | As At March 31 | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| Contract liability (deferred revenue)(*) | $    7,793 | $    13,271 |

| | | |
|---|---:|---:|
| Employee benefit obligation | 465 | 627 |
| | $ 8,258 | $ 13,898 |

[*] includes significant discounting on long-term advances from customers $1,925 (2019: 458)

**25      DERIVATIVE FINANCIAL INSTRUMENTS**

| | As At March 31 | |
|---|---:|---:|
| | **2020** | **2019** |
| | (in thousands) | |
| **Current** | | |
| Derivative liabilities – Held for trading | | |
| Interest rate cap | $ — | $ (620) |
| | $ — | $ 620 |

F-40

## EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

The above interest rate derivative instruments are not designated in a hedging relationship. They are carried at fair value through profit or loss. (Refer Note 9).

**26    ISSUED SHARE CAPITAL**

| | Number of Shares | GBP |
|---|---|---|
| | | (in thousands) |
| **Authorized** | | |
| Ordinary shares of 30p each at March 31, 2019 | 150,000,000 | 45,000 |
| Ordinary shares of 30p each at March 31, 2020 (*) | 200,000,000 | 60,000 |

(*) The Company increased authorized number of shares to 200,000,000 on September 25, 2019.

| | Number of Shares | | USD |
|---|---|---|---|
| | A Ordinary | B Ordinary | |
| **Allotted, called up and fully paid** | 30p Shares(*) | 30p Shares(*) | (in thousands) |
| **As at March 31, 2018** | **55,718,423** | **9,712,715** | **$    35,334** |
| Issue of shares in the quarter ended June 30, 2018 | 2,747,645 | — | 1,138 |
| Issue of shares in the quarter ended September 30, 2018 | 3,773,385 | — | 1,471 |
| Issue of shares in the quarter ended December 31, 2018 | 1,659,767 | — | 641 |
| Transfer of B Ordinary to A Ordinary share | 1,500,000 | (1,500,000) | — |
| Issue of shares in the quarter ended March 31, 2019 | 1,892,518 | — | 742 |
| **As at March 31, 2019** | **67,291,738** | **8,212,715** | **$    39,326** |
| Issue of shares in the quarter ended June 30, 2019 | 4,192,459 | — | 1,598 |
| Issue of shares in the quarter ended September 30, 2019 | 25,956,283 | 7,044,210 | 12,276 |
| Issue of shares in the quarter ended December 31, 2019 | 16,250,661 | — | 6,747 |
| Issue of shares in the quarter ended March 31, 2020 | 13,425,561 | 4,642,160 | 6,780 |
| **As at March 31, 2020** | **127,116,702** | **19,899,085** | **66,727** |

(*) Each A ordinary shares is entitled to one vote on all matters and each B shares is entitled to ten votes.

The Company issued A and B Ordinary shares as follows:

| | A Ordinary | | B Ordinary | |
|---|---|---|---|---|
| | For the year ended | | For the year ended | |
| | March 31, 2020 | March 31, 2019 | March 31, 2020 | March 31, 2019 |
| Issuance to Founders Group (1) (7) | — | 1,769,911 | 4,878,050 | — |
| Issuance towards settlement of Convertible notes (2) | 49,185,958 | 4,411,359 | — | — |
| Exercise against Restricted Share Unit/ Management scheme (3) | 2,728,181 | 770,541 | 6,808,320 | — |
| Issuance towards Reliance Industries Limited (4) | — | 3,111,088 | — | — |
| 2015 Share Plan (5) | 132,013 | 10,416 | — | — |
| Issuance to vendors (8) | 6,475,600 | — | — | — |
| Issuance towards equity infusion from funds (6) | 1,303,212 | — | — | — |
| **Total** | **59,824,964** | **10,073,315** | **11,686,370** | **—** |

(1) Average price of A Ordinary Shares at NIL price (March 2019: $14.69)and B Ordinary Shares at $1.64 (March 2019:Nil)

(2) Average exercise price of A Ordinary Shares $1.87 (March 2019: $11.28)

(3) 2,728,181 A Ordinary shares (March 2019: 183,000) at NIL(March 2019: $0.39) and 6,808,320 B Ordinary shares (March 2019: Nil) exercised at NIL price March 2019: Nil)

(4) Average exercise price of A Ordinary Shares NIL (March 2019: $15)

(5) Average exercise price A Ordinary Shares $2 (March 2019: $7.92)

(6) Average exercise price A Ordinary Shares $3.22 (March 2019: Nil)

(7) Includes 4,176,830 B Ordinary shares issued against advance received ($6,150) as of March 31, 2019 and $700 received during the

year and $1,150 payables settled by issuance of 701,220 B Ordinary shares

[8] Includes payables settled by issuance 100,000 A Ordinary shares issued to a consultant at an average exercised price at $2.23 (March 2019: NIL) and 6,375,600 A Ordinary Shares towards payables settlement at an average exercised price at $3.14 (March 2019: Nil)

F-42

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**27      SHARE BASED COMPENSATION PLANS**

The compensation cost recognised with respect to all outstanding plans and by grant of shares, which are all equity settled instruments, is as follows:

| | Year ended March 31 | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| | (in thousands) | | |
| IPO India Plan | $      145 | $      1,198 | $      1,572 |
| JSOP Plan | — | — | 615 |
| Option award scheme 2012 | — | — | 197 |
| 2014 Share Plan | — | 47 | (22) |
| 2015 Share Plan[(*)] | 1,976 | 3,059 | 100 |
| Other share option awards[(**)] | 7,829 | 5,346 | 7,283 |
| Management scheme (staff share grant) [(***)] | 12,318 | 11,911 | 8,173 |
| | $      22,268 | $      21,561 | $      17,918 |

[(*)] includes 674,045 options granted towards Share Plan 2015 during twelve months ended March 31, 2020 at an exercise price of $2 per share and average grant date fair value of $0.82 per share. In February 2020, the exercise price of said options were modified to GBP 0.3, resulting in incremental fair value of $0.55 per share. In addition, includes 233,364 and 622,035 options granted in prior year/s and wherein the exercise price was modified to $2 per share and GBP 0.3 per share, respectively, resulting in incremental fair value of $0.55-0.63 per share and $1.18 per share, respectively.

[(**)] includes Restricted Share Unit (RSU) and Other share option plans. In respect of 4,899,280 units/options granted towards RSU during twelve months ended March 31, 2020, intrinsic value $ 1.94 per share approximates grant date fair value.Includes 873,000 options accelerated for immediate vesting as against original vesting period of 3 years, resulting in incremental at grant date fair value of $1.64 per share.

[(***)] includes 10,230,320 shares granted twelve months ended March 31, 2020 to management personnel at intrinsic value $1.94 per share approximates grant date fair value.

**Joint Stock Ownership Plan (JSOP)**

In April 2012, the Company established a controlled trust called the Eros International Plc Employee Benefit Trust ("JSOP Trust"). The JSOP Trust purchased 2,000,164 shares of the Company out of funds borrowed from the Company and repayable on demand. The Company's Board, Nomination and Remuneration Committee recommends to the JSOP Trust certain employees, officers and key management personnel, to whom the JSOP Trust will be required to grant shares from its holdings at nominal price. Such shares are then held by the JSOP Trust and the scheme is referred to as the "JSOP Plan." The shares held by the JSOP Trust are reported as a reduction in stockholders' equity and termed as 'JSOP reserves'.

F-43

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The movement in the shares held by the JSOP Trust is given below:

| | Year ended March 31 | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| Shares held at the beginning of the year | 384,862 | 1,146,955 | 1,146,955 |
| Shares granted | — | — | — |
| Shares exercised | | — | — |
| Shares forfeiture/lapsed | (384,862) | (762,093) | — |
| Shares held at the end of the year | — | 384,862 | 1,146,955 |
| Unallocated shares held by trust[*] | **1,253,656** | 868,794 | 106,701 |
| | **—** | **1,253,656** | **1,253,656** |

[*] During the year unallocated shares held by the trust were issued to the content vendor at $3.6 per share.

**Employee Stock Option Plans**

A summary of the general terms of the grants under stock option plans and stock awards are as follows:

| | Range of exercise prices |
| --- | --- |
| IPO India Plan | INR 10 – 150 |
| 2014 Share Plan | $16.25–$18.30 |
| 2015 Share Plan | $2-33.12 & GBP 0.3 |
| Other share option plans | $16.00 |
| RSU | Nil-0.3 GBP |
| Management Share Award | — |

Employees covered under the stock option plans are granted an option to purchase shares of the Company at the respective exercise prices, subject to fulfillment of vesting conditions (generally service conditions). These options generally vest in tranches over a period of one to five years from the date of grant. Upon vesting, the employees can acquire one share for every option. The maximum contractual term for these stock option plans ranges between two to ten years.

F-44

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The activity in these employee stock option plans is summarized below:

| | | Year ended March 31 | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** | |
| | **Name of Plan** | **Number of shares** | **Weighted average exercise price** | **Number of shares** | **Weighted average exercise price** | **Number of shares** | **Weighted average exercise price** |
| Outstanding at the beginning of the year | IPO India Plan | 757,886 INR | 32.17 | 1,624,035 INR | 28.85 | 2,108,063 INR | 34.96 |
| Granted | | — | — | — | — | 863,320 | 10.00 |
| Exercised | | (121,496) | 10.00 | (536,263) | 10.00 | (1,113,160) | 32.19 |
| Forfeited and lapsed | | (156,775) | 10.00 | (329,886) | 51.66 | (234,188) | 10.00 |
| Outstanding at the end of the year | | 479,615 | 45.03 | 757,886 | 32.17 | 1,624,035 | 28.85 |
| Exercisable at the end of the year | | 325,740 INR | 61.56 | 289,002 INR | 68.13 | 501,122 INR | 65.14 |
| Outstanding at the beginning of the year | JSOP Plan | 384,862 $ | 11.00 | 1,146,955 $ | 16.22 | 1,146,955 $ | 16.22 |
| Granted | | — | — | — | — | — | — |
| Exercised | | — | — | — | — | — | — |
| Forfeited and lapsed | | (384,862) | 11.00 | (762,093) | 18.86 | — | — |
| Outstanding at the end of the year | | — $ | — | 384,862 $ | 11.00 | 1,146,955 $ | 16.22 |
| Exercisable at the end of the year | | — $ | — | 384,862 $ | 11.00 | 728,736 $ | 11.00 |
| Outstanding at the beginning of the year | Option award scheme 2012 | — $ | — | 674,045 $ | 11.00 | 674,045 $ | 11.00 |
| Granted | | — | — | — | — | — | — |
| Exercised | | — | — | — | — | — | — |
| Forfeited and lapsed | | — | — | (674,045) | 11.00 | — | — |
| Outstanding at the end of the year | | — | — | — | — | 674,045 | 11.00 |
| Exercisable at the end of the year | | — | — | — | — | 449,363 $ | 11.00 |
| Outstanding at the beginning of the year | 2014 Share Plan | 399,999 $ | 17.79 | 399,999 $ | 17.79 | 723,749 $ | 18.06 |
| Granted | | — | — | — | — | — | — |
| Exercised | | — | — | — | — | — | — |
| Forfeited and lapsed | | — | — | — | — | (323,750) | 18.39 |
| Outstanding at the end of the year | | 399,999 | 17.79 | 399,999 | 17.79 | 399,999 | 17.79 |
| Exercisable at the end of the year | | 399,999 $ | 17.79 | 399,999 $ | 17.79 | 289,583 $ | 17.67 |
| Outstanding at the beginning of the year [i] | 2015 Share Plan | 1,290,399 $ | 14.68 | 211,250 $ | 16.21 | 233,750 $ | 16.23 |
| Granted [ii] | | 674,045 | 0.38 | 1,305,399 | 14.86 | — | — |
| Exercised | | (132,013) | 2.00 | (10,416) | 7.92 | (10,208) | 8.71 |
| Forfeited and lapsed | | (233,333) | 16.18 | (215,834) | 18.23 | (12,292) | 14.64 |
| Outstanding at the end of the year | | 1,599,098 | 2.69 | 1,290,399 | 14.68 | 211,250 | 16.21 |
| Exercisable at the end of the year | | 1,549,098 $ | 2.72 | 981,545 $ | 14.66 | 181,354 $ | 17.36 |
| Outstanding at the beginning of the year | Other share option | 500,000 $ | 16.00 | 500,000 $ | 18.88 | 500,000 | 18.88 |

|  | plans |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Granted |  | — |  | — |  | — |  | — |
| Exercised |  | — |  | — |  | — |  | — |
| Forfeited and lapsed |  | (500,000) | 16.00 | — |  | — |  | — |
| Outstanding at the end of the year |  | — | — | 500,000 | 16.00 | 500,000 | 18.88 |
| Exercisable at the end of the year |  | — $ | — | 400,000 $ | 16.00 | 300,000 $ | 18.88 |
| Outstanding at the beginning of the year | RSU | 505,945 | — | 837,590 | — | 182,725 | — |
| Granted (iii) |  | 4,899,280 | 0.06 | 211,567 | — | 1,044,290 | — |
| Exercised |  | (2,088,181) | — | (450,541) | — | (366,491) | — |
| Forfeited and lapsed |  | (37,447) | — | (92,672) | — | (22,934) | — |
| Outstanding at the end of the year |  | 3,279,597 | 0.1 | 505,944 | — | 837,590 | — |
| Exercisable at the end of the year |  | 311,740 | — | 34,416 | — | 119,150 | — |
| Outstanding at the beginning of the year | Management Scheme | 2,593,333 | — | 1,513,333 | — | 1,130,000 | — |
| Granted (iv) |  | 10,230,320 | — | 1,400,000 | — | 700,000 | — |
| Exercised (v) |  | (7,448,320) | — | (320,000) | — | (316,667 | — |
| Forfeited and lapsed |  | (320,000) | — | — | — | — | — |
| Outstanding at the end of the year |  | 5,055,333 | 0.01 | 2,593,333 | — | 1,513,333 | — |
| Exercisable at the end of the year |  | 890,000 | 0.03 | 516,667 | — | 173,333 | — |

(i) includes 233,364 and 622,035 options granted in prior year/s and wherein the exercise price was modified to $ 2 per share and GBP 0.3 per share, respectively

(ii) Options granted in during the year, wherein the exercise price was modified to GBP 0.3 per share

(iii) Out of above, 873,000 RSU were accelerated for immediate vesting as against original vesting period of 3 years.

(iv) Includes 6,808,320 B Ordinary shares granted on July 12, 2019 and February 28, 2020, respectively

(v) Includes issuance of 6,808,320 B Ordinary treasury shares

F-45

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes information about outstanding stock options:

| | Year ended March 31 | | | | | |
| | 2020 | | 2019 | | 2018 | |
| Name of Plan | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price |
|---|---|---|---|---|---|---|
| IPO India Plan | 6.30 | INR* 45.03 | 7.70 | INR* 32.17 | 8.11 | INR* 35.0 |
| JSOP Plan | — | $ — | 3.05 | $ 11.00 | 3.93 | $ 16.19 |
| Option award scheme 2012 | — | $ — | — | $ — | 3.75 | $ 11.00 |
| 2014 Share Plan | 1.25 | $ 17.79 | 2.25 | $ 17.79 | 5.96 | $ 17.79 |
| 2015 Share Plan | 5.00 | $ 2.69 | 6.01 | $ 14.68 | 6.06 | $ 16.21 |
| Other share option plans | — | $ — | 1.87 | $ 16.00 | 2.87 | $ 18.88 |
| RSU | 9.36 | $ — | 6.00 | $ — | 5.60 | $ — |
| Management Scheme | 8.94 | $ 0.1 | 6.00 | $ — | 5.56 | $ — |

*INR – Indian Rupees

**2015 Share Plan**

The following table summarizes information about inputs to the fair valuation model for options granted during the year:

| | Inputs |
|---|---|
| Expected volatility[1] | 108.2% |
| Option life (Years) | 2.6 |
| Dividend yield | 0% |
| Risk free rate | 0.3 |
| Range of exercise price of the granted options at the grant date[2] | $ 0.38 |

(1)  The expected volatility of all other options is based on the historic share price volatility of the Company over time periods comparable to the time from the grant date to the maturity dates of the options.

(2)  Fair value of options granted under all other schemes is measured using a Black Scholes model.

**28    JOINT STOCK OWNERSHIP PLAN RESERVE (JSOP Reserve)**

| | (in thousands) |
|---|---|
| **Balance at April 1, 2018** | $ (15,985) |
| Issue out of treasury shares | — |
| **Balance at April 1, 2019** | $ (15,985) |
| Issue out of treasury shares | 15,985 |
| **Balance at March 31, 2020** | $ — |

The JSOP Reserve represents the cost of shares issued by Eros International Plc and held by the JSOP Trust to satisfy the requirements of the JSOP Plan (Refer Note 27). On June 5, 2014, the Board approved discretionary vesting of 20% of the applicable JSOP shares. In the current year Nil (2019: 868,794) 'A' ordinary shares held by the JSOP Trust were eligible to be issued to employees.

The number of shares held by the JSOP Trust at March 31, 2020 was Nil 'A' Ordinary shares (2019: 1,253,656 'A' Ordinary shares).

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**29    OTHER COMPONENTS OF EQUITY**

| | | As at March 31 (in thousands) | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| **Movement in hedging reserve:** | | | | | | |
| Opening balance | $ | — | $ | — | $ | (375) |
| Reclassified to consolidated statements of income | | — | | — | | 375 |
| Closing balance | $ | — | $ | — | $ | — |
| **Movement in revaluation reserve:** | | | | | | |
| Opening balance | $ | 2,932 | $ | 1,835 | $ | 1,829 |
| Net gain recognised on revaluation of property and equipment | | — | | 1,019 | | — |
| Impact of translation difference | | (156) | | 78 | | 6 |
| Closing balance | $ | 2,776 | $ | 2,932 | $ | 1,835 |
| **Movement in available for sale fair value reserve:** | | | | | | |
| Opening balance | $ | (18,449) | $ | 6,238 | $ | 6,238 |
| Impairment loss on available-for-sale financial assets | | (1,860) | | (24,687) | | — |
| Closing balance | $ | (20,309) | $ | (18,449) | $ | 6,238 |
| **Movement in Foreign currency translation reserves** | | | | | | |
| Opening balance | $ | (64,179) | $ | (56,722) | $ | (55,810) |
| Adoption of IFRS 9 (net of tax) | | — | | (34) | | — |
| Other comprehensive loss due to translation of foreign operations (*) | | (3,948) | | (7,423) | | (912) |
| Closing balance | $ | (68,127) | $ | (64,179) | $ | (56,722) |
| Total other components of equity | $ | (85,660) | $ | (79,696) | $ | (48,649) |

(*) includes movement in foreign currency translation reserves arising on account of deconsolidation $Nil (2019: Nil, 2018: $502) of financial asset.

**30    SIGNIFICANT NON-CASH EXPENSES**

Significant non-cash expenses, except loss on sale of assets, share based compensation, depreciation and amortization were as follows:

| | | As at March 31 | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| | | (in thousands) | | | | |
| Unrealised foreign exchange loss / (gain) | $ | (4,458) | $ | (3,329) | $ | 5,466 |
| Credit impairment loss, net | | 82,920 | | 26,283 | | 3,376 |
| Impairment charge on available-for-sale financial assets | | 1,253 | | — | | 2,436 |
| Net losses on de-recognition of financial assets measured at amortized cost, net | | 5,285 | | 5,988 | | 3,562 |
| Mark to market gain on derivative financial instrument measured at fair value through profit and loss | | — | | 902 | | — |
| Loss on settlement of derivative financial instruments | | — | | — | | 586 |
| Loss on financial liability (convertible notes) measures at fair value through profit and loss | | 15,987 | | 21,398 | | 13,840 |
| Loss on deconsolidation of a subsidiary | | — | | — | | 14,649 |
| Provisions for trade and other receivables | | — | | — | | 4,740 |
| Provision no longer required, written-back | | (2,636) | | (120) | | (124) |

| | | | |
|---|---:|---:|---:|
| Impairment loss on advances content vendors | — | 7,284 | 353 |
| Impairment loss | — | — | 1,205 |
| Significant discounting on deferred revenue | 1,501 | — | — |
| Others | 266 | 32 | 30 |
| | $ 100,118 | $ 58,438 | $ 50,119 |

F-47

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**31    FINANCIAL INSTRUMENTS AND RISK MANAGEMENT**

The Group has established objectives concerning the holding and use of financial instruments. The underlying basis of these objectives is to manage the financial risks faced by the Group.

Formal policies and guidelines have been set to achieve these objectives. The Group does not enter into speculative arrangements or trade in financial instruments and it is the Group's policy not to enter into complex financial instruments unless there are specific identified risks for which such instruments help mitigate uncertainties.

**Management of Capital Risk and Financial Risk**

The Group manages its capital to ensure that entities in the Group will be able to continue as a going concern while maximizing the return to shareholders through the optimization of the debt and equity balance. The capital structure of the Group consists of debt, which includes the cash and cash equivalents, borrowings and equity attributable to equity holders of Eros, comprising issued capital, reserves and retained earnings as disclosed in Notes 21, 22 and 26 and the consolidated statement of changes in equity.

The gearing ratio at the end of the reporting period was as follows:

|  | As at March 31 | |
| --- | --- | --- |
|  | 2020 | 2019 |
|  | (in thousands) | |
| Debt (net of debt issuance cost of $399 (2019: $691)) | $        178,972 | $        280,828 |
| Cash and cash equivalents (*) | 2,563 | 135,783 |
| Net debt | 176,409 | 145,045 |
| Equity | 308,486 | 656,985 |
| Net debt to equity ratio | 57.2% | 22.1% |

(*) includes $Nil (2019: $46,666) of restricted deposits.

Debt is defined as long and short-term borrowings (excluding derivatives). Equity includes all capital and reserves of the Group that are managed as capital.

**Categories of financial instruments**

|  | 2020 | 2019 |
| --- | --- | --- |
|  | (in thousands) | |
| **Financial assets** | | |
| Available-for-sale investments | $        3,942 | $        3,692 |
| Other financial assets [1] | 116,281 | 351,477 |
|  | $        120,223 | $        355,169 |
| **Financial liabilities at amortized cost** | | |
| Trade payables and acceptances excluding value added tax and other tax payables | $        79,630 | $        81,208 |
| Borrowings excluding Senior Convertible Notes | 155,872 | 212,479 |
| **Financial Liabilities at fair value through profit or loss** | | |
| Derivatives at fair value through profit or loss - held for trading | — | 620 |
| Senior convertible Notes at fair value through profit or loss | 23,100 | 68,349 |
|  | $        258,602 | $        362,656 |

(1) Other financial assets include loans and receivables, excluding prepaid charges and statutory receivables, and includes cash and cash equivalents and restricted deposits held with banks.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Financial risk management objectives**

Based on the operations of the Group throughout the world, the management considers that the key financial risks that it faces are credit risk, currency risk, liquidity risk and interest rate risk. The objectives under each of these risks are as follows:

- credit risk: minimize the risk of default and concentration.

- currency risk: reduce exposure to foreign exchange movements principally between U.S. dollar, Indian Rupee and GBP.

- liquidity risk: ensure adequate funding to support working capital and future capital expenditure requirements.

- interest rate risk: mitigate risk of significant change in market rates on the cash flow of issued variable rate debt.

**Credit risk**

Trading credit risk is managed on a country by country basis by the use of credit checks on new clients and individual credit limits, where appropriate, together with regular updates on any changes in the trading partner's situation. In a number of cases trading partners will be required to make advance payments or minimum guarantee payments before delivery of any goods. The Group reviews reports received from third parties and in certain cases as a matter of course reserve the right within the contracts it enters into to request an independent third - party audit of the revenue reporting. Further, in many of the catalogue sales, the trading partners have extended payment terms of up to a year and often fall behind contractual payment terms, thus payment cycle extends to 18 to 24 months. With respect to catalogue and other customers with a long trading history with the Group and who have contracted and paid significant amounts in the past without any prior history of bad debt, the Group closely monitors the same revised payment plans to assure collections. In case of new customer onboarding, the Group follows certain standard Know Your Client (KYC) procedures to ascertain financial stability of the counterparty and follows internal policies to not make ongoing sales to such new customers who are not reasonably current with their payments.

The Group from time to time will have significant concentration of credit risk in relation to individual theatrical releases, television syndication deals, music licenses, or producer/ VFX services. This risk is mitigated by contractual terms which seek to stagger receipts, de-recognition of financial assets and/or the release or airing of content. As at March 31, 2020, 40.1% (2019: 20.4%) of trade account receivables were represented by the top five debtors and for the year ended March 31, 2020, a loss on de-recognition of financial assets amounting to $5,285 (2019: 5,988 and 2018: 3,562) arising on assignment and novation of trade receivable and trade payables with no recourse have been recognized in the statement of Income within other gains/(losses), net. The maximum exposure to credit risk is that shown within the statements of financial position, net of credit impairment loss $112,323 (2019: $ 41,335, 2018: $ 10,193). The maximum credit exposure on financial guarantees given by the Group for various financial facilities is described in Note 32.

As at March 31, 2020, the Group did not hold any material collateral or other credit enhancements to cover its credit risks associated with its financial assets.

**Currency risk**

The Group operates throughout the world with significant operations in India, the British Isles, the United States of America and the United Arab Emirates. As a result it faces both translation and transaction currency risks which are principally mitigated by matching foreign currency revenues and costs wherever possible.

The Group's major revenues are denominated in U.S. Dollars, Indian Rupees and British pounds sterling which are matched where possible to its costs so that these act as an automatic hedge against foreign currency exchange movements.

The Group has identified that it will need to utilize hedge transactions to mitigate any risks in movements between the U.S. Dollar and the Indian Rupee and has adopted an agreed set of principles that will be used when entering into any such transactions. No such transactions have been entered into to date and the Group has managed foreign currency

exposure to date by seeking to match foreign currency inflows and outflows as much as possible. Details of the foreign currency borrowings that the Group uses to mitigate risk are shown within Interest Risk disclosures.

As at the reporting date there were no outstanding forward foreign exchange contracts. Further, in fiscal 2020, the Company did not hedge foreign exchange exposure towards foreign currency borrowings. The Group adopts a policy of borrowing where appropriate in the local currency as a hedge against translation risk. The table below shows the Group's net foreign currency monetary assets and liabilities position in the main foreign currencies, translated to USD equivalents, as at the year-end:

F-49

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

|  | | Net Balance | |
|---|---|---|---|
|  | USD | GBP | Other |
|  | (in thousands) | | |
| As at March 31, 2020 | (3,895) | (65,446) | (182) |
| As at March 31, 2019 | (6,117) | (61,927) | (2,317) |

The above exposure to foreign currency arises where a consolidated entity holds monetary assets and liabilities denominated in a currency different to the functional currency of that entity.

A uniform decrease of 10% in exchange rates against all foreign currencies in position as of March 31, 2020 would have increased the Company's net loss before tax by approximately $6,952 (2019: gain of $7,036 and 2018: gain of $5,935). An equal and opposite impact would be experienced in the event of an increase by a similar percentage.

Our sensitivity to foreign currency has increased during the year ended March 31, 2020 as a result of an increase in liabilities compared to assets denominated in foreign currency over the comparative period. In Management's opinion, the sensitivity analysis is unrepresentative of the inherent foreign exchange risk because the exposure at the end of the reporting period does not reflect the exposure during the year.

**Liquidity risk**

The Group manages liquidity risk by maintaining adequate reserves and agreed committed banking facilities. Management of working capital takes account of film release dates and payment terms agreed with customers.

An analysis of short-term and long-term borrowings is set out in Note 22. Set out below is a maturity analysis for non-derivative and derivative financial liabilities. The amounts disclosed are based on contractual undiscounted cash flows. The table includes both interest and principal cash flows. To the extent that interest flows are floating rate, the undiscounted amount is derived from interest rates as at March 31, in each year.

|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
|  | | | (in thousands) | | |
| **As at March 31, 2020** | | | | | |
| Borrowing principal payments[1] | $ 179,371 | $ 117,097 | $ 62,274 | $ — | $ — |
| Borrowing interest payments | 23,741 | 17,500 | 6,241 | — | — |
| Acceptances | 1,858 | 1,858 | — | — | — |
| Trade and other payables | 90,941 | 90,941 | — | — | — |
| Minimum lease payments | 1,716 | 822 | 894 | — | — |

|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
|  | | | (in thousands) | | |
| **As at March 31, 2019** | | | | | |
| Borrowing principal payments[1] | $ 281,519 | $ 209,180 | $ 72,339 | $ — | $ — |
| Borrowing interest payments | 29,016 | 21,820 | 7,196 | — | — |
| Derivative financial instruments | 620 | 620 | — | — | — |
| Acceptances | 8,366 | 8,366 | — | — | — |
| Trade and other payables | 83,487 | 83,487 | — | — | — |
| Minimum lease payments | 2,956 | 1,480 | 1,360 | 116 | — |

(1) Excludes cumulative effect of unamortized costs.

At March 31, 2020, the Group had facilities available of $181,340 (2019: $290,353) and had net undrawn amounts of $111 (2019: $468) available.

In addition, the Group has issued financial guarantees amounting to $33 (2019: $51) in the ordinary course of business,

having maturity dates up to the next 12 months. The Group did not earn any fees to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

F-50

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Interest rate risk**

The Group is exposed to interest rate risk because entities in the Group borrow funds at both fixed and floating interest rates. The risk is managed by maintaining an appropriate mix between fixed, capped and floating rate borrowings, and by the use of interest rate swap contracts and forward interest rate contracts. Hedging activities are evaluated to align with interest rate views to ensure the most cost effective hedging strategies are applied.

**Currency, Maturity and Nature of Interest Rate of the Nominal Value of Borrowings**

|  | As at March 31 | | | |
|  | 2020 | % | 2019 | % |
|---|---|---|---|---|
|  | (in thousands, except percentages) | | | |
| **Currency** | | | | |
| U.S. Dollar | $ 49,182 | 27.4% | $ 148,201 | 52.6% |
| Great British Pounds Sterling | 62,274 | 34.7% | 65,215 | 23.2% |
| Indian Rupees | 67,915 | 37.9% | 68,103 | 24.2% |
| Total | $ 179,371 | 100.0% | $ 281,519 | 100.0% |
| **Maturity** | | | | |
| Due before one year | $ 117,097 | 64.3% | $ 209,180 | 74.3% |
| Due between one and three years | 62,274 | 34.7% | 72,339 | 25.7% |
| Due between four and five years | — | — | — | — |
| Due after five years | — | — | — | — |
|  | $ 179,371 | 100.0% | $ 281,519 | 100.0% |
| **Nature of rates** | | | | |
| Fixed interest rate | $ 96,904 | 54.0% | $ 205,156 | 72.9% |
| Floating rate | 82,467 | 46.0% | 76,363 | 27.1% |
| Total | $ 179,371 | 100.0% | $ 281,519 | 100.0% |

At 1% increase in underlying bank rates would lead to increase in the Company's net loss before tax by $ 895 for the year ended March 31, 2020 (2019: $1,029) on net income. An equal and opposite impact would be felt if rates fell by 1%.

This analysis assumes that all other variables, in particular foreign currency and credit ratings, remain constant.

Under the interest swap contracts, we have agreed to exchange the difference between fixed and floating rate interest amounts calculated on an agreed notional principal amount. Such contracts enable us to mitigate the risk of changing interest rates on the cash flow of issued variable rate debt.

The fair value of interest rate derivatives which comprise derivatives at fair value through profit and loss is determined as the present value of future cash flows estimated and discounted based on the applicable yield curves derived from quoted interest rates.

**Financial instruments — disclosure of fair value measurement level**

Disclosures of fair value measurements are grouped into the following levels:

- Level 1 fair value measurements derived from unadjusted quoted prices in active markets for identical assets or liabilities;

- Level 2 fair value measurements derived from inputs, other than quoted prices included within Level 1, that are observable for the asset or liability, either directly (as prices) or indirectly (derived from prices); and

- Level 3 fair value measurements derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data.

F-51

Case 2:19-cv-14125-ES-JSA   Document 66-3   Filed 03/04/22   Page 332 of 351
PageID: 1906

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The table below presents assets and liabilities measured at fair value on a recurring basis, which are all category level 2:

**As at March 31, 2020**
**(in thousands)**

| Description of type of financial assets | Gross amount of recognized financial assets | Gross amount of recognized financial liabilities offset in the statement of financial position | Net amounts financial assets presented in the statement of financial position |
|---|---|---|---|
| Derivative assets | — | — | — |
| Trade and other receivables | 94,749 | — | 94,749 |
| Investments at FVTPL | 3,802 | — | 3,802 |
| Investments at FVTOCI | 140 | — | 140 |
| **Total** | **98,691** | **—** | **98,691** |

| Description of type of financial liabilities | Gross amount of recognized financial liabilities | Gross amount of recognized financial assets offset in the statement of financial position | Net amounts financial liabilities presented in the statement of financial position |
|---|---|---|---|
| Derivative liabilities | — | — | — |
| Long-term borrowings at fair value | 23,100 | — | 23,100 |
| **Total** | **23,100** | **—** | **23,100** |

**As at March 31, 2019**
**(in thousands)**

| Description of type of financial assets | Gross amount of recognized financial assets | Gross amount of recognized financial liabilities offset in the statement of financial position | Net amounts financial assets presented in the statement of financial position |
|---|---|---|---|
| Derivative assets | — | — | — |
| Trade and other receivables | 125,229 | — | 125,229 |
| Investments at FVTPL | 1,042 | — | 1,042 |
| Investments at FVTOCI | 2,650 | — | 2,650 |
| **Total** | **128,921** | **—** | **128,921** |

| Description of type of financial liabilities | Gross amount of recognized financial liabilities | Gross amount of recognized financial assets offset in the statement of financial position | Net amounts financial liabilities presented in the statement of financial position |
|---|---|---|---|
| Derivative liabilities | 620 | — | 620 |
| Long-term borrowings at fair value | 68,349 | — | 68,349 |
| **Total** | **68,969** | **—** | **68,969** |

None of the above derivative instruments is designated in a hedging relationship. A net loss of Nil (loss in 2019: $902) in respect of the above derivative instruments has been recognized in the consolidated statements of income within other gain/(loss), net. Fair value of interest rate derivative involving interest rate options and cross currency swap is estimated as the present value of the estimated future cash flows based on observable yield curves using an option pricing model.

Management uses valuation techniques in measuring the fair value of financial instruments, where active market quotes are not available. In applying the valuation techniques, management makes maximum use of market inputs, and uses estimates and assumptions that are, as far as possible, consistent with observable data that market participants would use in pricing the instrument. Where applicable data is not observable, management uses its best estimate about the assumptions that market participants would make. These estimates may vary from the actual prices that would be achieved in an arm's length transaction at the reporting date.

There were no transfers between any Levels in any of the years.

F-52

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 32    CONTRACTUAL OBLIGATIONS AND COMMITMENTS

Eros' material contractual obligations are comprised of contracts related to content commitments.

|  | Total |
| --- | --- |
|  | (in thousands) |
| **As at March 31, 2020** | $       450,469 |
| **As at March 31, 2019** | $       301,660 |

The Group has provided certain stand-by letters of credit amounting to $Nil (2019: $53,565) which are in the nature of performance guarantees issued while entering into film co-production contracts and are valid until funding obligations under these contracts are met. These guarantees, issued in connection with the aforementioned content commitments, and included in the table above have varying maturity dates and are expected to fall due within a period of one to three years.

In addition, the Group has issued financial guarantees amounting to $33 (2019: $51) in the ordinary course of business, and included in the table above, having varying maturity dates up to the next 12 months. The Group is only called upon to satisfy a guarantee when the guaranteed party fails to meet its obligations. The Group did not earn any fee to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

## 33    CONTINGENT LIABILITIES

1.   Eros has received several show causes notices and assessment order from Service Tax Authorities in India levying amounts to be paid on account of several grounds of non-compliance with the Service Tax Laws. An amount aggregating to $56,064 (net of monies paid under protest $1,790 and including interest and penalty) for the periods under dispute on account of service tax arising on temporary transfer of copyright services and certain other related matters have been considered contingent. Eros has filed an appeal against the said order before the authorities. Considering the facts and nature of levies and the ad-interim protection for service tax levy for a certain period granted by the Honorable High Court of Mumbai, the Group expects that the final outcome of this matter will be favorable. There is no further update on this matters as preliminary hearing is yet to begin. Accordingly, based on the assessment made after taking appropriate legal advice, no additional liability has been recorded in Group's consolidated financial statements.

2.   Eros has received several assessment orders and demand notices from value added tax and sales tax authorities in India. Several revised orders have been received during the year. Eros has considered an amount equal to $2,631 (net of monies paid under protest $137 and including interest and penalty) for the periods under dispute as contingent. Eros has appealed against each of the orders outstanding, and such appeals are pending before relevant tax authorities. Though, uncertainties are inherent in the final outcome of these matters, the Group believes, based on assessment made after taking legal advice, that the final outcome of the matters will be favorable. Accordingly, no additional liability has been recorded in Group's consolidated financial statements.

3.   Eros has received several assessment orders and demand notices from Income Tax Authorities in India. The orders are on account of disallowance of certain expenditures claimed by the Company. Eros has considered an amount equal to $ 139 for the period under dispute as contingent. Eros has contested the said cases and believes that there will not be any significant liability on the Group as the misstatements were bonafide and without any wrongful intentions and do not invite penalty. However, uncertainties are inherent in the final outcome of these matters and hence, after taking appropriate legal advice, Group has considered the amount as contingent liability.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

4. On September 29, 2017, the Company filed a lawsuit against Mangrove Partners, Manuel P. Asensio, GeoInvesting, LLC, and other individuals and entities alleging the defendants and other co-conspirators disseminated material false, misleading, and defamatory information about the Company and are engaging in other misconduct that has harmed the Company. On May 31, 2018, the Company filed an amended complaint that added two new defendants and expanded the scope of the Company's initial allegations. The amended complaint alleges that Mangrove Partners and many of its co-conspirators held substantial short positions in the Company's stock and profited when its share price declined in response to their multi-year disinformation campaign. The Company seeks damages and injunctive relief for defamation, civil conspiracy, and tortious interference, including but not limited to interference with its customers, producers, distributors, investors, and lenders. On March 12, 2019, the Supreme Court of the State of New York entered a Decision and Order granting defendants' motions to dismiss. On March 13, 2019, the Company filed a Notice of Appeal against the said order.

5. Beginning on June 21, 2019, the Company was named a defendant in three substantially similar putative class action lawsuits filed in federal court in California and New Jersey by purported shareholders of the Company. The lawsuits allege that the Company and certain individual defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by making false and/or misleading statements regarding the Company's accounting for trade receivables. On September 27, 2019, the putative class action filed in California was transferred to the United States District Court for the District of New Jersey. On April 14, 2020, the three putative class actions were consolidated and a lead plaintiff was appointed. On July 1, 2020, the court-appointed lead plaintiff filed a consolidated complaint. The Company expects to file a motion to dismiss, which is due August 28, 2020.

From time to time, Eros is involved in legal proceedings arising in the ordinary course of its business, typically intellectual property litigation and infringement claims related to the Group's feature films and other commercial activities, which could cause it to incur expenses or prevent it from releasing a film. While the resolution of these matters cannot be predicted with certainty, the Group does not believe, based on current knowledge or information available, that any existing legal proceedings or claims are likely to have a material and adverse effect on its financial position, results of operations or cash flows.

There were no other material ongoing litigations at March 31, 2020 and March 31, 2019.

**34    RELATED PARTY TRANSACTIONS**

| | Details of Transaction | As at March 31, 2020 | | As at March 31, 2019 | |
|---|---|---|---|---|---|
| | | Liability | Asset | Liability | Asset |
| | | (in thousands) | | | |
| Red Bridge Group Limited | President fees | $ 648 | $ — | $ 648 | $ — |
| 550 County Avenue | Rent/Deposit | 156 | — | 499 | 135 |
| NextGen Films Private Limited (*) | Purchase/Sale | — | — | — | 41,470 |
| Everest Entertainment LLP | Purchase/Sale | 557 | — | 574 | — |
| Beech Investments Limited | Advance | 592 | — | 500 | — |
| Lulla Family | Rent/Deposit | 487 | 356 | 243 | 841 |
| Lulla Family | Salary | 4,155 | — | 3,279 | — |
| Lulla Family | Advance | — | — | 6,150 | — |
| Lulla Family | Advance | 500 | — | 500 | — |
| Xfinite Global Plc | Sale | 3,812 | — | 6,500 | — |

The Lulla family refers to late Mr. Arjan Lulla, Mr. Kishore Lulla, Mr. Sunil Lulla, Mrs. Manjula Lulla, Mrs. Krishika Lulla, Mrs. Rishika Lulla Singh, and Ms. Riddhima Lulla and Mr. Swaneet Singh.

Pursuant to a lease agreement that expired on March 31, 2020, the lease requires Eros International Media Limited to pay $4 each month under this lease. Eros International Media Limited leases apartments for studio use at Kailash Plaza, 3rd Floor, Opp. Laxmi Industrial Estate, Andheri (W), Mumbai, from Manjula K. Lulla, the wife of Kishore Lulla. The lease was renewed on April 1, 2020 for a further period of one year on the same terms.

Pursuant to a lease agreement that expires on September 30, 2021, the lease requires Eros International Media Limited to pay $4 each month under this lease. Eros International Media Limited leases for use as executive accommodations the property Aumkar Bungalow, Gandhi Gram Road, Juhu, Mumbai, from Sunil Lulla.

F-54

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Pursuant to a lease agreement that expired on January 4, 2020, Eros International Media Limited leases office premise for studio use at Supreme Chambers, 5th Floor, Andheri (W), Mumbai from Kishore and Sunil Lulla. Beginning January 2015, the lease requires Eros International Media Limited to pay $82 each month under this lease. The lease was renewed on January 5, 2020 for a further period of five years on the same terms.

Pursuant to an agreement the Group entered into with Redbridge Group Limited on June 27, 2006, the Group agreed to pay an annual fee set each year of $Nil, $186 and $270 in the respective years ended March 31, 2020, 2019 and 2018, for the services of Arjan Lulla, the father of Kishore Lulla and Sunil Lulla, grandfather of Mrs. Rishika Lulla Singh, uncle of Vijay Ahuja and Surender Sadhwani and an employee of Redbridge Group Limited. The agreement makes Arjan Lulla honorary life president and provides for services including attendance at Board meetings, entrepreneurial leadership and assistance in setting the Group's strategy. Arjan Lulla passed away in December 2018 Redbridge Group Limited is an entity owned indirectly by a discretionary trust of which Kishore Lulla is a potential beneficiary.

The Group has engaged in transactions with NextGen Films Private Limited, an entity owned by the husband of Puja Rajani, sister of Kishore Lulla and Sunil Lulla, which with effect from September 19, 2019 ceased to be a related party, each of which involved the purchase and sale of film rights. In the period ended September 19, 2019, NextGen Films Private Limited sold film rights $ 393 (2019: $1,109, 2018: $$7,760) to the Group, and purchased film rights, including production services, of Nil (2019: Nil and 2018: $Nil). The Group advanced $2,113 (2019: $6,192, 2018: $19,025) to NextGen Films Private Limited for film co-production and received refund of $Nil (2019: $Nil, 2018: $6,114) on abandonment of certain film projects. With effect from September 19, 2019, NextGen Films Private Limited ceased to be a related party having a balance of $47,742 towards film content advances.

The Group also engaged in transactions with Everest Entertainment LLP entity owned by the brother of Manjula K. Lulla, wife of Kishore Lulla, which is involved in the purchase and sale of film rights. In March 31, 2020, Everest Entertainment LLP sold film rights of $18 (2019: 1,260, 2018: 166) to the Group and purchased film rights of $ Nil (2019: $ 314).

Mrs. Manjula Lulla, the wife of Kishore Lulla, is an employee of Eros International Plc. and is entitled to a salary of $147 per annum (2019: $144 and 2018: $139). Mrs. Krishika Lulla, the wife of Sunil Lulla, is an employee of EIML and is entitled to a salary of $121 per annum (2019: $123, 2018: $133). Ms. Riddhima Lulla, the daughter of Kishore Lulla, is an employee of Eros Digital FZ LLC and is entitled to a salary of $300 per annum (2019: $213, 2018: $90) which is borne by Eros Worldwide LLC.

All of the amounts outstanding are unsecured and will be settled in cash.

As at March 31, 2020, the Group has provided performance guarantee to a bank amounting to $Nil (2019: $8,000, 2018: $8,000) in connection with funding commitments. under film co-production agreements with NextGen Films Private Limited and having varying maturity dates up to the next 12 months. The Group did not earn any fee to provide such guarantees.

$(^{*})$ With effect from September 19, 2019, NextGen Films Private Limited ceased to be a related party.

**License Arrangement with Xfinite Global Plc**

The Group has engaged in transactions with Xfinite Global Plc, a subsidiary of Eros Investment Limited on which it has significant influence. The Group has accounted $12,776 (2019: $1,413, 2018: $ Nil) as revenue during the year ended March 31, 2020.

F-55

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**35                                          MAJOR CONSOLIDATED ENTITIES**

| | Date | Country of Incorporation | % of voting rights held |
|---|---|---|---|
| Copsale Limited | June 2006 | BVI | 100.00 |
| Eros Australia Pty Limited | June 2006 | Australia | 100.00 |
| Eros International Films Private Limited | June 2006 | India | 100.00 |
| Eros International Limited | June 2006 | U.K. | 100.00 |
| Eros International Media Limited | June 2006 | India | 62.31 |
| Eros International USA Inc | June 2006 | U.S. | 100.00 |
| Eros Network Limited | June 2006 | U.K. | 100.00 |
| Eros Worldwide FZ-LLC | June 2006 | UAE | 100.00 |
| Big Screen Entertainment Private Limited | January 2007 | India | 64.00 |
| EyeQube Studios Private Limited | January 2008 | India | 99.99 |
| Acacia Investments Holdings Limited | April 2008 | IOM | 100.00 |
| Eros International Pte Limited | August 2010 | Singapore | 100.00 |
| Digicine Pte. Limited | March 2012 | Singapore | 100.00 |
| Colour Yellow Productions Private Limited | May 2014 | India | 50.00 |
| Eros Digital FZ LLC | September 2015 | UAE | 100.00 |
| Eros Digital Limited | July 2016 | IOM | 100.00 |
| Eros Films Limited | November 2016 | IOM | 100.00 |
| Universal Power Systems Private Limited | August 2015 | India | 100.00 |
| England Merger 1, Corp | March 2020 | U.S. | 100.00 |
| England Holdings 2,Inc | March 2020 | U.S. | 100.00 |
| England Holdings 3,Inc | March 2020 | U.S. | 100.00 |

All of the companies were involved with the distribution of film content and associated media. All the companies are indirectly owned with the exception of Eros Network Limited, Eros Worldwide FZ-LLC and Eros International Pte Ltd.

In fiscal year 2020, Group shareholding of Eros International Media Ltd decreased to 62.31% (2019: 62.39%) The change in shareholding was due to exercise of 0.08% ESOP by the employees.

In fiscal year 2020, the Group has pledged 38.40% of its holding in Eros International Media Limited as security for certain of the Group's borrowings (See Note 22).

**36      NON-CONTROLLING INTERESTS**

*Details of subsidiary that have material non-controlling interests*

The Group has a number of subsidiaries held directly and indirectly which operate and are incorporated around the world. Note 35 to the financial statements lists details of the major consolidated entities and the interests in these subsidiaries. The non-controlling interests that are material to the Group relate to Eros International Media Limited and its subsidiaries whose principal place of business is in India.

The table below shows the summarized financial information of Eros International Media Limited and its subsidiaries (EIML) as at March 31, 2020, non-controlling interests held an economic interest by virtue of shareholding of 37.69% (March 2019: 37.61%). The change in shareholding was due to exercise of 0.08% (March 2019: 0.11%) ESOP by employees. The summarized financial information represents amounts before inter-company eliminations.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

| EIML | | Year ended March 31 | | |
| --- | --- | --- | --- | --- |
| | | (in thousands) | | |
| | | 2020 | | 2019 |
| Current assets | $ | 170,724 | $ | 183,944 |
| Non-current assets | | 152,059 | | 385,463 |
| Current liabilities | | (147,004) | | (158,182) |
| Non-current liabilities | | (21,285) | | (53,210) |
| **Total net assets attributable** | $ | **154,494** | $ | **358,015** |
| Equity attributable to owners of the Group | $ | 95,127 | $ | 222,486 |
| Equity attributable to non-controlling interests | $ | 59,367 | $ | 135,529 |
| Revenue | $ | 119,821 | $ | 149,969 |
| Expenses (including impairment of $ 208,931) | | (313,660) | | (114,709) |
| **Profit for the year** | $ | **(193,839)** | $ | **35,260** |
| Profit attributable to the owners of the Group | $ | (121,127) | $ | 21,846 |
| Profit attributable to non-controlling interests | $ | (72,712) | $ | 13,414 |
| **Other comprehensive (loss)/income during the year** | $ | **(9,861)** | $ | **(12,500)** |
| **Total comprehensive income during the year** | $ | **(203,700)** | $ | **22,760** |
| Total comprehensive income attributable to the owners of the Group | | (127,093) | | 15,354 |
| Total comprehensive income attributable to non-controlling interests | | (76,607) | | 7,406 |
| Net cash inflow from operating activities | $ | 7,654 | $ | 50,470 |
| Net cash outflow from investing activities | | (13,635) | | (37,729 |
| Net cash inflow from financing activities | | (12,901) | | (14,462) |
| **Net cash (outflow)/inflow** | $ | **(18,882)** | $ | **36,008** |

No dividends were paid to non-controlling interests during the year ended March 31, 2020. (2019: Nil).

## 37    SIGNIFICANT ACCOUNTING ESTIMATES AND JUDGMENTS

Estimates and judgments are evaluated on a regular basis and are based on historical experience and other factors, such as expectations of future events that are believed to be reasonable under the present circumstances.

The Group makes estimates and assumptions concerning the future. These estimates, by definition, will rarely equal the related actual results. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the financial year are highlighted below:

### 37.1.    Basis of consolidation

The Group evaluates arrangements with special purpose vehicles in accordance with of IFRS 10 – Consolidated Financial Statements to establish how transactions with such entities should be accounted for. This requires a judgment over control such that it is exposed, or has rights, to variable returns and can influence the returns attached to the arrangements.

### 37.2.    Impairment of non- current assets

The Group tests annually whether its non- current assets have suffered impairment, in accordance with its accounting policy. The recoverable amount of cash-generating units has been determined based on value in use calculations. We use market related information and estimates (generally risk adjusted discounted cash flows) to determine value in use. Cash flow projections take into account past experience and represent management's best estimate about future developments. Key assumptions on which management has based its determination of fair value less costs to sell and value in use includes estimated volume growth, long-term growth rates, weighted average cost of capital and tax rates. These estimates, includes the methodology used, can have a material impact on the respective values and ultimately the amount of any impairment, if any. The Group also compared the value in use determined above to the stock price on the

balance sheet date plus a control premium for broadcasting sector based on 5 years historical period to validate the amount of impairment recorded in the consolidated financial statements.

F-57

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**37.3.    Intangible assets**

The Group is required to identify and assess the useful life of intangible assets and determine their income generating life. Judgment is required in determining this and then providing an amortization rate to match this life as well as considering the recoverability or conversion of advances made in respect of securing film content or the services of talent associated with film production.

Accounting for the film content requires Management's judgment as it relates to total revenues to be received and costs to be incurred throughout the life of each film or its license period, whichever is the shorter. These judgments are used to determine the amortization of capitalized film content costs. The Group uses a stepped method of amortization on first release film content writing off more in year one which recognizes initial income flows and then the balance over a period of up to nine years. In the case of film content that is acquired by the Group after its initial exploitation, commonly referred to as Library, amortization is spread evenly over the lesser of 10 years or the license period. Management's policy is based upon factors such as historical performance of similar films, the star power of the lead actors and actresses and others. Management regularly reviews, and revises when necessary, its estimates, which may result in a change in the rate of amortization and/or a write down of the asset to the recoverable amount.

The Group tests annually whether intangible assets have suffered any impairment, in accordance with the accounting policy. These calculations require judgments and estimates to be made, and, in the event of an unforeseen event these judgments and assumptions would need to be revised and the value of the intangible assets could be affected. There may be instances where the useful life of an asset is shortened to reflect the uncertainty of its estimated income generating life. This is particularly the case when acquiring assets in markets that the Group has not previously exploited.

**37.4.    Credit impairment losses**

In case of catalogue and producer/ VFX services , the Group provides contractual deferred payment terms up to a year to the partners. Further, in several instances the catalogue customers fall behind contractual payment terms. The Group estimates credit impairment losses based on historical experience of collection from catalogue customers multiplied by the incremental borrowing rate applicable to the group of similar class of customer by geography. Incremental borrowing rate has been calculated considering applicable class of corporate bond in the United States specific to such customers and further adjusted the same for the relevant Country Risk Premium as such amount is invested in US dollar in those countries.

**37.5.    Investment in equity shares (Financial Assets) at FVOCI**

The Group follows the guidance of IFRS 9 – Financial Instruments: to determine the fair value of its investment in equity instruments, which have been measured using net assets value method based on financial information of the investee company. The aforesaid financial information is available with the lag of 2 years. Further a discount for lack of liquidity of 30% is applied which reflects ease of investors ability to liquidate.

**37.6.    Income taxes and deferred taxation**

The Group is subject to income taxes in various jurisdictions. Judgment is required in determining the worldwide provision for income taxes. We are subject to tax assessment in certain jurisdictions. Significant judgment is involved in determining the provision for income taxes including judgment on whether the tax positions are probable of being sustained in tax assessments.

Judgment is also required when determining whether the Group should recognize a deferred tax asset, based on whether the Management considers there is sufficient certainty in future earnings to justify the carry forward of assets created by tax losses and tax credits. Judgment is also required when determining whether the Group should recognize a deferred tax liability on undistributed earnings of subsidiaries. Where the ultimate outcome is different than that which was initially recorded there will be an impact on the income tax and deferred tax provisions.

F-58

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**37.7.    Share-based payments**

The Group is required to evaluate the terms to determine whether share-based payment is equity settled or cash settled. Judgment is required to do this evaluation. Further, the Group is required to measure the fair value of equity settled transactions with employees at the grant date of the equity instruments. The fair value is determined principally by using the Black Scholes model and/or Monte Carlo Simulation Models which require assumptions regarding risk free interest rates, share price volatility, the expected term and other variables. The basis and assumptions used in these calculations are disclosed within Note 27. The aforementioned inputs entered in to the option valuation model that we use to determine the fair value of our share awards are subjective estimates and changes to these estimates will cause the fair value of our share-based awards and related share- based compensations expense we record to vary.

**37.8.    Business combinations and deconsolidation**

Business combinations are accounted for using the acquisition method under the provisions of IFRS 3 (Revised), "Business Combinations".

The cost of an acquisition is measured at the fair value of the assets transferred, equity instruments issued and liabilities incurred at the date of acquisition. The cost of the acquisition also includes the fair value of any contingent consideration. Identifiable tangible and intangible assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair value on the date of acquisition. Significant estimates are required to be made in determining the value of contingent consideration and intangible assets.

During fiscal 2018, the Group divested its 51 percent equity interest in Ayngaran Group to the non-controlling investee. The Group recorded the financial asset retained in the former subsidiary on deconsolidation at its fair value and recorded a loss of $500. The discounting of the financial asset was determined using associated credit risk for similar instrument.

**37.9 .    Financial liabilities at fair value through profit and loss**

The Group has classified the convertible note as a financial liability at fair value through profit or loss and used the valuation models i.e. Black and Scholes and Monte-Carlo simulations to obtain the fair value of share warrant and convertible notes. Key assumptions on which external valuation experts has based their determination of fair value includes risk free rate, weighted average cost of capital, future volatility, proportion of debt to be converted into equity shares. These estimates, includes the methodology used, can have a material impact on the respective values and ultimately the amount of financial liability.

**37.10 .    Leases**

IFRS 16 requires Company to make certain judgements and estimations, and those that are significant are disclosed below:

- · establishing whether or not it is reasonably certain that an extension option/termination option will be exercised - In determining the lease term, management considers all facts and circumstances that create an economic incentive to exercise an extension option,or not exercise a termination option. Extension options (or periods after termination options) are only included in the lease term if the lease is reasonably certain to be extended (or not terminated). The following factors are normally the most relevant

    o   If there are significant penalties to terminate (or not extend), the Company is typically reasonably certain to extend (or not terminate).

    o   If any leasehold improvements are expected to have a significant remaining value, the Company is typically reasonably certain to extend (or not terminate).

    o   Otherwise, the Company considers other factors including historical lease durations and the costs and business disruption required to replace the leased asset.

- · calculating the appropriate discount rate – Incremental borrowing rate is considered for discounting the future lease payments, in cases where a rate is not implicit in the lease. For such assessment, the Company considers the market risk free interest rates, currency and credit risk premium.

F-59

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 38      NEW STANDARDS ADOPTED AS AT APRIL 1, 2019

*Adoption of IFRS 16, "Leases"*

On April 1, 2019, the Group adopted New accounting standard IFRS 16, "Leases". which specifies how to recognize, measure, present and disclose leases. The standard provides a single accounting model, requiring the recognition of assets and liabilities for all major leases previously classified as "operating leases".

The Group applied the "Modified Retrospective Approach" on the date of initial application (April 1, 2019) and has decided to use the approach that allows the right-of-use asset to be recognized at an amount equal to the liability as at the date of initial application and hence, no adjustments to retained earnings were required. Accordingly, comparatives for the year ended March 31, 2019 have not been retrospectively adjusted.

As such the Company recognizes a lease liability and a corresponding right of use asset, at the lease commencement date. The right-of-use asset is initially measured at cost, based on the initial amount of the lease liability and adjusted for prepaid expense or accrued liability outstanding at the end of previous year. The assets are depreciated to the earlier of the end of the useful life of the right-of-use asset or the lease term using the straight-line method as this most closely reflects the expected pattern of consumption of the future economic benefits. The lease term includes periods covered by an option to extend if the Company is reasonably certain to exercise that option. In addition, the right-of-use asset is periodically adjusted for certain re-measurements of the lease liability. There is no impact on transition in opening balance of retained earnings as at April 1, 2019 because of the transition method applied.

### Right of Use Assets

| Gross Carrying Value | | Premises | Equipment | Total |
|---|---|---|---|---|
| On adoption of IFRS 16* | $ | 2,531 | 307 | 2,838 |
| Additions | | 398 | 71 | 469 |
| Termination/retirements | | — | — | — |
| **Balance as at March 31, 2020** | $ | **2,929** | **378** | **3,307** |
| **Accumulated depreciation** | | | | |
| Balance as at April 1, 2019 | | — | 62 | 62 |
| Depreciation | | 1,557 | 120 | 1,677 |
| Disposals/retirements | | — | — | — |
| Net Translation adjustments | | 36 | 20 | 56 |
| Balance as at March 31, 2020 | | 1,593 | 202 | 1,795 |
| **Net Carrying value as at March 31, 2020** | $ | **1,336** | **176** | **1,512** |

Premises are under operating lease arrangement and Equipment are acquired under finance lease arrangement.

### Lease Liabilities

| Particulars | | Total |
|---|---|---|
| On adoption of IFRS 16* | $ | 2,618 |
| Additions | | 469 |
| Finance Expense | | 184 |
| Payment of lease liabilities | $ | (1,579) |
| Premature Retirements | | — |
| Translation adjustments | | (139) |
| **Balance as at March 31, 2020** | $ | 1,553 |

*The difference in the number accounted on adoption of IFRS 16 is due to Prepaid expenses outstanding last year reduced from Other Receivables amounting to $ 164.

The Weighted average incremental borrowing rate applied to lease liabilities as at April 1, 2019 is 12% for India location and 7.45% for UAE location.

F-60

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Future minimum lease payments**

Future minimum lease payments due as of March 31, 2020 is as below:

| | Lease payments | | Interest | | Net Present Value | |
|---|---|---|---|---|---|---|
| Within than one year | $ | 822 | $ | 99 | $ | 723 |
| 1 - 3 years | | 894 | | 64 | | 830 |
| 3 - 5 years | | — | | — | | — |
| | $ | 1,716 | $ | 163 | | 1,553 |

Future minimum lease payments due as of March 31, 2019 is as below:

| | **Lease payments** | | **Interest** | | **Net Present Value** | |
|---|---|---|---|---|---|---|
| Within than one year | $ | 1,480 | $ | 161 | $ | 1,319 |
| 1 - 3 years | | 1,360 | | 154 | | 1,206 |
| 3 - 5 years | | 116 | | 23 | | 93 |
| | $ | 2,956 | $ | 338 | $ | 2,618 |

**39    STANDARDS NOT YET ADOPTED**

**Standards, amendments and Interpretations to existing Standards that are not yet effective and have not been adopted early by the Group**

At the date of authorization of these financial statements, several new, but not yet effective, accounting standards, amendments to existing standards, and interpretations have been published by the IASB. None of these standards, amendments or interpretations have been adopted early by the Group.

Management anticipates that all relevant pronouncements will be adopted for the first period beginning on or after the effective date of the pronouncement. New Standards, amendments and Interpretations neither adopted nor listed below have not been disclosed as they are not expected to have a material impact on the Group's financial statements.

Those which are considered to be relevant to the Company's operations are set out below.

i.    In October 2018, the IASB issued amendments to IFRS 3 "*Business Combinations*" regarding the definition of a "Business." The amendments:

- clarify that to be considered a business, an acquired set of activities and assets must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs;
- narrow the definitions of a business and of outputs by focusing on goods and services provided to customers and by removing the reference to an ability to reduce costs;
- add guidance and illustrative examples to help entities assess whether a substantive process has been acquired;
- remove the assessment of whether market participants are capable of replacing any missing inputs or processes and continuing to produce outputs; and
- add an optional concentration test that permits a simplified assessment of whether an acquired set of activities and assets is not a business.

The above amendments are effective for business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after January 1, 2020.

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

ii.   In October 2018, the IASB issued amendments to IAS 1 "*Presentation of Financial Statements*" ("IAS 1") and IAS 8 " *Accounting Policies, Changes in Accounting Estimates and Errors* " ("IAS 8") which revised the definition of "Material." Three aspects of the new definition should especially be noted, as described below:

- **Obscuring**. The existing definition only focused on omitting or misstating information, however, the Board concluded that obscuring material information with information that can be omitted can have a similar effect. Although the term obscuring is new in the definition, it was already part of IAS 1 (IAS 1.30A);
- **Could reasonably be expected to influence**. The existing definition referred to "could influence" which the Board felt might be understood as requiring too much information as almost anything "could influence" the decisions of some users even if the possibility is remote;
- **Primary users**. The existing definition referred only to 'users' which again the Board feared might be understood too broadly as requiring them to consider all possible users of financial statements when deciding what information to disclose.

The amendments highlight five ways in which material information can be obscured:

- if the language regarding a material item, transaction or other event is vague or unclear;
- if information regarding a material item, transaction or other event is scattered in different places in the financial statements;
- if dissimilar items, transactions or other events are inappropriately aggregated;
- if similar items, transactions or other events are inappropriately disaggregated; and

F-61

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

- if material information is hidden by immaterial information to the extent that it becomes unclear what information is material.

The new definition of material and the accompanying explanatory paragraphs are contained in IAS 1. The definition of material in IAS 8 has been replaced with a reference to IAS 1. The amendments are effective for annual reporting periods beginning on or after January 1, 2020. Earlier application is permitted.

The amendments are effective for annual reporting periods beginning on or after January 1, 2020. Earlier application is permitted.

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

iii. On May 14, 2020, the IASB issued amendment to IAS 37 by specifying that the 'cost of fulfilling' a contract comprises the 'costs that relate directly to the contract'. Costs that relate directly to a contract consist of both the incremental costs of fulfilling that contract (examples would be direct labour or materials) and an allocation of other costs that relate directly to fulfilling contracts (an example would be the allocation of the depreciation charge for an item of property, plant and equipment used in fulfilling the contract).

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

The amendments are effective for annual periods beginning on or after 1 January 2022. Early application is permitted

iv. In January 23, 2020, the IASB issued amendments to IAS 1 "Presentation of Financial Statements" ("IAS 1") to clarify the classification criteria of liabilities in the statement of financial position. The most significant changes are listed below:

- Classification of liabilities as current or non-current should be based on rights to defer settlement that are in existence at the end of the reporting period
- Classification of a liability is unaffected by the likelihood that the entity will exercise its right to defer settlement of the liability for at least twelve months after the reporting period'. That is, management's intention to settle in the short run does not impact the classification.
- 'Settlement' is defined as the extinguishment of a liability with cash, other economic resources or an entity's own equity instruments.
- Clarifies that if the right to defer settlement is conditional on the compliance with covenants the right exists if the conditions are met at the end of the reporting period,
- Clarifies that if a liability has terms that could, at the option of the counterparty, result in its settlement by the transfer of the entity's own equity instruments, these terms do not affect its classification as current or non-current if the entity recognises the option separately as an equity instrument applying IAS 32 Financial Instruments: Presentation.

The amendments are effective for annual reporting periods beginning on or after January 1, 2022. Earlier application is permitted.

The Company is currently evaluating the impact of these amendments on its consolidated financial statements.

F-62

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**40      SUBSEQUENT EVENTS**

**MERGER**

On April 17, 2020, Eros International Plc ("Eros") entered into the Merger Agreement with STX Filmworks, Inc., a Delaware corporation ("STX"). Pursuant to closing of the merger, STX will merge with a newly formed subsidiary of Eros and will survive as a wholly owned subsidiary of Eros. As merger consideration, Eros will issue to the former stockholders of STX a number of A ordinary shares equal in the aggregate to the total number of Eros ordinary shares outstanding on a fully diluted basis as of immediately prior to the effective time of the merger.

STX Entertainment is a fully integrated global media company specializing in the production, marketing, and distribution of talent-driven motion picture, television and multimedia content. It is the first major entertainment and media company to be launched at this scale in Hollywood in more than twenty years.

The group expects that the combined company will be uniquely positioned to benefit from the accelerating consumption of premium digital content in the world's most important growth markets with robust capital structure and experienced management team. The combined company is also expected to generate an operating synergies within 24 months of closing of the merger transaction, stemming from integration and scale benefits, optimization of global content distribution and enhanced monetization of the Eros Now platform. In connection with the merger, $125,000 of incremental equity will also be contributed to the combined company by new equity investors and existing STX equity investors.

The Merger Agreement was approved unanimously by the Boards of Directors of both companies and the closing of the merger is subject to regulatory approvals and other customary closing conditions.

The Company is in the process of evaluating accounting implication in respect of the aforesaid merger transaction.

F-63