# EXHIBIT 3

Exhibits

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended March 31, 2018**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 001-32945**

# EROS INTERNATIONAL PLC

(Exact name of Registrant as specified in its charter)

**Not Applicable**

(Translation of Registrant's name into English)

**Isle of Man**

(Jurisdiction of incorporation or organization)

**550 County Avenue**
**Secaucus, New Jersey 07094**
**Tel: (201) 558 9001**

(Address of principal executive offices)

**Oliver Webster**
**First Names (Isle of Man) Limited**
**First Names House**
**Victoria Road**
**Douglas, IM2 4DF**
**Isle of Man**
**Tel: (44) 1624 630 630**
**Email: iom@firstnames.com**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| **A ordinary share, par value GBP 0.30 per share** | **The New York Stock Exchange** |

Securities registered or to be registered pursuant to Section 12(g) of the Act.

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act

**None**

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

At March 31, 2018, 55,718,423 'A' ordinary shares and 9,712,715 'B' ordinary shares, each at par value GBP 0.30 per share, were issued and outstanding.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.☐ Yes ☑ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.☐ Yes ☑ No

Note — Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.☑ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).☑ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☑          Non-accelerated filer ☐

Emerging growth company ☑

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐          International Financial Reporting Standards as issued          Other ☐
by the International Accounting Standards Board ☑

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow:☐ Item 17 ☐ Item 18

If this report is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).☐ Yes ☑ No

 (APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☐ No ☐

**TABLE OF CONTENTS**
**EROS INTERNATIONAL PLC**

Page

**PART I**

| | | |
|---|---|---|
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 1 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 1 |
| ITEM 3. | KEY INFORMATION | 1 |
| ITEM 4. | INFORMATION ON THE COMPANY | 28 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS | 64 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 64 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 84 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 96 |
| ITEM 8. | FINANCIAL INFORMATION | 99 |
| ITEM 9. | THE OFFER AND LISTING | 100 |
| ITEM 10. | ADDITIONAL INFORMATION | 101 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 112 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 113 |

**PART II**

| | | |
|---|---|---|
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 114 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 114 |
| ITEM 15. | CONTROLS AND PROCEDURES | 114 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT | 115 |
| ITEM 16B. | CODE OF ETHICS | 115 |
| ITEM 16C. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 115 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 115 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 115 |
| ITEM 16F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 115 |
| ITEM 16G. | CORPORATE GOVERNANCE | 116 |
| ITEM 16H. | MINE SAFETY DISCLOSURE | 116 |

**PART III**

| | | |
|---|---|---|
| ITEM 17. | FINANCIAL STATEMENTS | 117 |
| ITEM 18. | FINANCIAL STATEMENTS | 117 |
| ITEM 19. | EXHIBITS | 118 |
| SIGNATURES | | |
| INDEX TO EROS INTERNATIONAL'S CONSOLIDATED FINANCIAL STATEMENTS | | F-1 |

i

Unless otherwise indicated or required by the context, as used in this annual report, the terms "Eros," "we," "us,", "the Group", "our" and the "Company" refer to Eros International Plc and all its subsidiaries that are consolidated under International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Board (IASB). Our fiscal year ends on March 31 of each year. When we refer to a fiscal year, such as fiscal year 2018, fiscal 2018 or FY 2018, we are referring to the fiscal year ended on March 31 of that year. The "Founders Group" refers to Beech Investments Limited, Kishore Lulla and Vijay Ahuja. "$" and "dollar" refer to U.S. dollars.

"High budget" films refer to Hindi films with direct production costs in excess of $8.5 million and regional films with direct production costs in excess of $7.0 million, in each case translated at the historical average exchange rate for the applicable fiscal year. "Low budget" films refer to Hindi and regional films with less than $1.0 million in direct production costs, in each case translated at the historical average exchange rate for the applicable fiscal year. "Medium budget" films refer to Hindi, Tamil, Telugu and other regional language films within the remaining range of direct production costs. With respect to low budget films, references to "film releases" refer to theatrical releases or, for films that we did not theatrically release, to our initial DVD, digital or other non- theatrical exhibition.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This annual report contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Exchange Act, and such statements are subject to the safe harbors created thereby. Generally, these forward-looking statements can be identified by the use of forward-looking terminology such as "approximately," "anticipate," "believe," "estimate," "continue," "could," "expect," "future," "intend," "may," "plan," "potential," "predict," "project," "seek," "should," "will" and similar expressions. Those statements include, among other things, the discussions of our business strategy and expectations concerning our market position, future operations, margins, profitability, liquidity and capital resources, tax assessment orders and future capital expenditures. All of our forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that we are expecting, including, without limitation:

- anonymous letters, to regulators or business associates or anonymous allegations on social media regarding our business practices, accounting practices and/or officers and directors;
- our ability to successfully defend class action law suits we are party to in the U.S.;
- our ability to successfully and cost-effectively source film content;
- our ability to maintain or raise sufficient capital;
- delays, cost overruns, cancellation or abandonment of the completion or release of our films;
- our ability to predict the popularity of our films, or changing consumer tastes;
- our dependence on our relationships with theater operators and other industry participants to exploit our film content;
- our ability to maintain existing rights, and to acquire new rights, to film content;
- our dependence on the Indian box office success of our Hindi and high budget Tamil and Telugu films;
- our ability to achieve the desired growth rate of Eros Now, our digital OTT entertainment service;
- our ability to recoup the full amount of box office revenues to which we are entitled due to underreporting of box office receipts by theater operators;
- our ability to mitigate risks relating to distribution and collection in international markets;
- fluctuation in the value of the Indian Rupee against foreign currencies;
- our ability to compete in the Indian film industry;
- our ability to compete with other forms of entertainment;
- the impact of a new amendment to accounting standards for the recognition of revenue from contracts with customers;
- our ability to combat piracy and to protect our intellectual property;
- our ability to achieve or maintain an effective system of internal control over financial reporting;
- contingent liabilities that may materialize, including our exposure to liabilities on account of unfavorable

judgments/decisions in relation to legal proceedings involving us or our subsidiaries and certain of our directors and officers;

· our ability to successfully respond to technological changes;

· regulatory changes in the Indian film industry and our ability to respond to them;

· our ability to satisfy debt obligations, fund working capital and pay dividends;

· the monetary and fiscal policies of India and other countries around the world, inflation, deflation, unanticipated turbulence in interest rates, foreign exchange rates, equity prices or other rates or prices; and

· our ability to address the risks associated with acquisition opportunities.

ii

These and other factors are more fully discussed in "Part I — Item 3. Key Information — D. Risk Factors," "Part I — Item 5. Operating and Financial Review and Prospects" and elsewhere in this annual report. The forward-looking statements contained in this annual report are based on historical performance and management's current plans, estimates and expectations in light of information currently available to us and are subject to uncertainty and changes in circumstances. There can be no assurance that future developments affecting us will be those that we have anticipated. Actual results may differ materially from these expectations due to changes in global, regional or local political, economic, business, competitive, market, regulatory and other factors, many of which are beyond our control. Should one or more of these risks or uncertainties materialize or should any of our assumptions prove to be incorrect, our actual results may vary in material respects from what we may have expressed or implied by these forward-looking statements. We caution that you should not place undue reliance on any of our forward-looking statements. Any forward-looking statement made by us in this annual report speaks only as of the date on which we make it. Factors or events that could cause our actual results to differ may emerge from time to time, and it is not possible for us to predict all of them. We undertake no obligation to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise, except as may be required by applicable securities laws.

**PART I**

**ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3. KEY INFORMATION**

**A. Selected Financial Data**

The table set forth below presents our selected historical consolidated financial data for the periods and at the dates indicated. The selected historical consolidated statements of income data for each of the three years ended March 31, 2018, 2017, and 2016 and the selected statements of financial position data as of March 31, 2018 and 2017 have been derived from and should be read in conjunction with "Part I — Item 5. Operating and Financial Review and Prospects" and our consolidated financial statements included elsewhere in this Annual Report on Form 20-F. The selected historical consolidated statements of income data for each of the two years ended March 31, 2015 and 2014 and the selected historical statements of financial position data as of March 31, 2016, 2015, and 2014 have been derived from audited consolidated financial statements not included in this Annual Report on Form 20-F.

| | Year ended March 31, | | | | |
|---|---|---|---|---|---|
| | **2018** | **2017** | **2016** | **2015** | **2014** |
| | (in thousands, except (Loss)/Earnings per share) | | | | |
| **Selected Statement of Income Data** | | | | | |
| Revenue | $ 261,253 | $ 252,994 | $ 274,428 | $ 284,175 | $ 235,470 |
| Cost of sales | (134,708) | (164,240) | (172,764) | (155,777) | (132,933) |
| Gross profit | 126,545 | 88,754 | 101,664 | 128,398 | 102,537 |
| Administrative costs | (68,029) | (63,309) | (64,019) | (49,546) | (42,680) |
| Operating profit | 58,516 | 25,445 | 37,645 | 78,852 | 59,857 |
| Net finance costs | (17,813) | (17,156) | (8,010) | (5,861) | (7,517) |
| Other gains/(losses), net | (41,321) | 14,205 | (3,636) | (10,483) | (2,353) |
| (Loss)/Profit before tax | (618) | 22,494 | 25,999 | 62,508 | 49,987 |
| Income tax expense | (9,127) | (11,039) | (12,711) | (13,178) | (12,843) |
| (Loss)/Profit for the year[1] | $ (9,745) | $ 11,455 | $ 13,288 | $ 49,330 | $ 37,144 |
| (Loss)/Earnings per share (cents) | | | | | |
| Basic (loss)/earnings per share | (36.3) | 6.4 | 6.6 | 74.3 | 65.5 |
| Diluted (loss)/earnings per share | (36.3) | 5.1 | 5.2 | 72.4 | 65.2 |
| Weighted average number of ordinary shares | | | | | |
| Basic | 62,151 | 59,410 | 57,732 | 54,278 | 45,590 |
| Diluted | 63,482 | 60,943 | 59,036 | 54,969 | 45,607 |
| Other non-GAAP measures | | | | | |
| EBITDA [2] | $ 20,186 | $ 42,548 | $ 36,294 | $ 70,066 | $ 58,871 |
| Adjusted EBITDA [2] | $ 78,575 | $ 55,664 | $ 70,852 | $ 101,150 | $ 80,284 |
| Gross Adjusted EBITDA [2] | $ 193,860 | $ 190,980 | $ 199,155 | $ 218,404 | $ 179,904 |

1

| | | Year ended March 31, | | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| | | | (in thousands) | | |
| **Selected Statement of Financial Position Data:** | | | | | |
| Cash and cash equivalents | $ 87,762 | $ 112,267 | $ 182,774 | $ 153,664 | $ 145,449 |
| Goodwill | 3,800 | 4,992 | 5,097 | 1,878 | 1,878 |
| Total assets | 1,410,319 | 1,343,365 | 1,247,878 | 1,149,533 | 906,011 |
| Debt: | | | | | |
| Current portion | 151,963 | 180,029 | 210,587 | 96,397 | 92,879 |
| Long-term portion | 124,983 | 89,841 | 92,630 | 218,273 | 165,254 |
| Total liabilities | 406,902 | 459,817 | 438,784 | 393,478 | 327,970 |
| Equity attributable to Eros International Plc | 865,689 | 804,457 | 740,332 | 697,334 | 527,691 |
| Equity attributable to non-controlling interests | 137,728 | 79,091 | 68,762 | 58,721 | 50,350 |
| Total equity | $ 1,003,417 | $ 883,548 | $ 809,094 | $ 756,055 | $ 578,041 |

_____

(1)    References to "net income" in this document correspond to "profit/(loss) for the period" or "profit/(loss) for the year" line items in our consolidated financial statement appearing elsewhere in this document.

(2)    We use EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as supplemental financial measures. EBITDA is defined by us as net income before interest expense, income tax expense and depreciation and amortization (excluding amortization of capitalized film content and debt issuance costs). Adjusted EBITDA is defined as EBITDA adjusted for (gain)/impairment of available-for-sale financial assets, profit/loss on held for trading liabilities (including profit/loss on derivative financial instruments), transactions costs relating to equity transactions, share based payments, Loss / (Gain) on sale of property and equipment, Loss on de-recognition of financial assets measured at amortized cost, net, Credit impairment loss, net, Loss on financial liability (convertible notes) measured at fair value through profit and loss, Loss on deconsolidation of a subsidiary and Impairment of goodwill. Gross Adjusted EBITDA is defined as Adjusted EBITDA adjusted for amortization amortization of intangible films and content rights. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as used and defined by us, may not be comparable to similarly-titled measures employed by other companies and is not a measure of performance calculated in accordance with GAAP. EBITDA Adjusted EBITDA and Gross Adjusted EBITDA should not be considered in isolation or as a substitute for operating income, net income, cash flows from operating, investing and financing activities, or other income

or cash flow statement data prepared in accordance with GAAP. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA provide no information regarding a Company's capital structure, borrowings, interest costs, capital expenditures and working capital movement or tax position.

The following table sets forth the reconciliation of our net income to EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA:

| | Year ended March 31, | | | | |
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| | | | (in thousands) | | |
|---|---|---|---|---|---|
| (Loss)/Profit for the year | $ (9,745) | $ 11,455 | $ 13,288 | $ 49,330 | $ 37,144 |
| Income tax expense | 9,127 | 11,039 | 12,711 | 13,178 | 12,843 |
| Net finance costs | 17,813 | 17,156 | 8,010 | 5,861 | 7,517 |
| Depreciation | 1,265 | 1,082 | 1,154 | 1,089 | 789 |
| Amortization(a) | 1,726 | 1,816 | 1,131 | 608 | 578 |
| EBITDA (Non-GAAP) | 20,186 | 42,548 | 36,294 | 70,066 | 58,871 |
| (Gain)/Impairment of available-for-sale financial assets | 2,436 | (58) | — | 1,307 | — |
| Transaction costs relating to equity transactions | — | — | — | 61 | 8,169 |
| Net (gain)/loss on derivative financial instruments | 586 | (10,297) | 3,566 | 7,801 | (5,177) |
| Share based payments(b) | 17,918 | 23,471 | 30,992 | 21,915 | 18,421 |
| Loss/(Gain) on sale of property and equipment | (2) | — | — | — | — |
| Loss on de-recognition of financial assets measured at amortized cost, net | 3,562 | — | — | — | — |
| Credit impairment loss, net | 4,308 | — | — | — | — |
| Loss on financial liability (convertible notes) measured at fair value through profit and loss | 13,840 | — | — | — | — |
| Loss on deconsolidation of a subsidiary | 14,649 | — | — | — | — |
| Impairment of goodwill | 1,205 | — | — | — | — |
| Others | (113) | — | — | — | — |
| Adjusted EBITDA (Non-GAAP)(b) | $ 78,575 | $ 55,664 | $ 70,852 | 101,150 | $ 80,284 |
| Amortization of intangible films and content rights | 115,285 | 135,316 | 128,303 | 117,254 | 99,620 |
| Gross Adjusted EBITDA (Non-GAAP)(b) | $ 193,860 | $ 190,980 | $ 199,155 | 218,404 | $ 179,904 |

(a)  Includes only amortization of intangible assets other than capitalized film content.

(b)  Consists of compensation costs, recognized with respect to all outstanding share based compensation plans and all other equity settled instruments.

2

Our management team believes that EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA are useful to an investor in evaluating our results of operations because these measures:

· are widely used by investors to measure a company's operating performance without regard to items excluded from the calculation of such term, which can vary substantially from company to company depending upon accounting methods and book value of assets, capital structure and the method by which assets were acquired, among other factors;

· help investors to evaluate and compare the results of our operations from period to period by removing the effect of our capital structure from our operating structure; and

· are used by our management team for various other purposes in presentations to our Board of Directors as a basis for strategic planning and forecasting.

However, there are significant limitations to using EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as a measure of performance, including the inability to analyze the effect of certain recurring and non-recurring items that materially affect our net income or loss, the lack of comparability of results of operations of different companies and the different methods of calculating EBITDA. Adjusted EBITDA and Gross Adjusted EBITDA reported by different companies.

**Exchange Rate Information**

Our reporting currency is the U.S. dollar. Transactions in foreign currencies are translated at the exchange rate prevailing at the date of the transaction. Monetary assets and liabilities in foreign currencies are translated into U.S. dollars at the exchange rates at the date of the applicable statement of financial position. For the purposes of consolidation, all income and expenses are translated at the average rate of exchange during the period covered by the applicable statement of income and assets and liabilities are translated at the exchange rate prevailing on the date of the applicable statement of financial position. When the U.S. dollar strengthens against a foreign currency, the value of our sales and expenses in that currency converted to U.S. dollars decreases. When the U.S. dollar weakens, the value of our sales and expenses in that currency converted to U.S. dollars increases. Recently, there have been periods of higher volatility in the Indian Rupee and U.S. dollar exchange rate. This volatility is illustrated in the table below for the periods indicated:

| | Period End | Average(1) | High | Low |
|---|---|---|---|---|
| **Fiscal Year** | | | | |
| 2011 | 44.54 | 45.46 | 47.49 | 43.90 |
| 2012 | 50.89 | 48.01 | 53.71 | 44.00 |
| 2013 | 54.52 | 54.36 | 57.13 | 50.64 |
| 2014 | 60.35 | 60.35 | 68.80 | 53.65 |
| 2015 | 62.58 | 61.15 | 63.70 | 58.46 |
| 2016 | 66.25 | 65.39 | 68.84 | 61.99 |
| 2017 | 64.85 | 67.01 | 68.86 | 64.85 |
| 2018 | 65.11 | 64.46 | 65.71 | 63.38 |
| **Months** | | | | |
| April 2017 | 64.27 | 64.54 | 65.10 | 64.08 |
| May 2017 | 64.50 | 64.42 | 64.87 | 64.03 |
| June 2017 | 64.62 | 64.45 | 64.66 | 64.23 |
| July 2017 | 64.18 | 64.42 | 64.84 | 64.11 |
| August 2017 | 63.93 | 63.97 | 64.16 | 63.64 |
| September 2017 | 65.30 | 64.48 | 65.71 | 63.78 |
| October 2017 | 64.75 | 65.04 | 65.48 | 64.70 |
| November 2017 | 64.46 | 64.84 | 65.46 | 64.29 |
| December 2017 | 63.83 | 64.24 | 64.57 | 63.83 |
| January 2018 | 63.58 | 63.65 | 64.01 | 63.38 |
| February 2018 | 65.20 | 64.43 | 65.20 | 63.93 |

| | | | | |
|---|---|---|---|---|
| March 2018 | 65.11 | 65.05 | 65.24 | 64.83 |
| April 2018 | 66.50 | 65.67 | 66.92 | 64.92 |
| May 2018 | 67.40 | 67.51 | 68.38 | 66.52 |
| June 2018 | 68.46 | 67.79 | 68.81 | 66.87 |

(1)  Represents the average of the U.S. dollar to Indian Rupee exchange rates on the last day of each month during the period for all fiscal years presented, and the average of the noon buying rate for all days during the period for all months presented.

3

**B. Capitalization and Indebtedness**

Not Applicable.

**C. Reason for the Offer and the Use of Proceeds**

Not Applicable.

**D. Risk Factors**

*This annual report contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of a number of factors, including those described in the following risk factors and elsewhere in this annual report. If any of the following risks were to occur, our business affairs, prospects, assets, financial condition, results of operations and cashflows could be materially and adversely affected and the market price of our A ordinary shares could decline.*

**Risks Related to Our Business**

**Anonymous letters to regulators or business associates or anonymous allegations on social media regarding our business practices, accounting practices and/or officers and directors could have a resultant material adverse effect on our business, financial condition and results of operations and could negatively impact the market price for our A ordinary shares.**

We have been, and in the future may be, the target of anonymous letters sent to regulators or business associates or anonymous allegations posted on social media or circulated in short selling reports regarding our accounting practices, business practices and/or officers and directors. Every time we have received such a letter we have undertaken what we believe to be a reasonably prudent review, including extensive due diligence to investigate the allegations, and where necessary our board of directors has engaged third party professional firms to report directly to the Company's Audit Committee. Having conducted these investigations, in each instance we found the allegations were without merit. However, the public dissemination of these allegations has adversely affected our reputation, business and the market price of our securities and required us to spend significant management time and incur substantial costs to address them.

If anonymous allegations are made in the future, it could result in a diversion of management resources, time and energy, significant costs, a material decline in the market price for our A ordinary shares, increased share price volatility and increased directors and officers' liability insurance premiums and could have a material adverse effect upon our business, prospects, financial condition, results of operations and ability to access the capital markets.

**We are party to class action lawsuits in the U.S. and an adverse ruling could have a material adverse effect on our business, financial condition and results of operations and could negatively impact the market price of our A ordinary shares.**

Beginning on November 13, 2015, the Company was named a defendant in five substantially similar putative class action lawsuits filed in federal court in New Jersey and New York by purported shareholders of the Company. The actions have been consolidated and a single consolidated action is now pending in the United States District Court for the Southern District of New York.

On April 5, 2016, a lead plaintiff and lead counsel were appointed in the now consolidated New York action. A single consolidated complaint was filed on July 14, 2016 and amended on October 10, 2016. The plaintiffs have alleged that the Company and certain individual defendants — Kishore Lulla, Jyoti Deshpande, Andrew Heffernan, and Prem Parameswaran — have violated the federal securities laws, specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 or the Exchange Act. The amended consolidated complaint claims are primarily focused on whether the Company and individual defendants made material misrepresentations concerning the Company's film library and materially misstated the usage and functionality of Eros Now, our digital OTT entertainment service.

On September 25, 2017, the United States District Court for the Southern District of New York entered a Memorandum and Order dismissing a putative securities class action, with prejudice, against Eros and certain officers and directors. On October 23, 2017, lead plaintiffs filed a Notice of Appeal, individually and on behalf of the putative class, to the United States Court of Appeals for the Second Circuit. The appeal does not dispute the District Court's dismissal, with prejudice, of lead plaintiffs' allegations relating to the Company's film library. The only remaining claim pertains to alleged

misstatements concerning the usage and functionality of Eros Now. Although the Company remains confident that the Second Circuit will affirm dismissal, there can be no assurances that we will not become subject to unfavorable interim or preliminary rulings that prolong the litigation process or that a favorable outcome will be obtained.

We are unable to predict how long such proceedings will continue and anticipate that we will continue to incur significant costs in connection with these matters to the extent not covered by our insurance policy and that these proceedings, investigations and inquiries will result in a substantial distraction of management's time, regardless of the outcome. To the extent that this or any future litigation to which we are a party results in an unfavorable judgment or if we decide to settle this or other lawsuits, we may be required to pay substantial monetary damages or fines or make changes to our products or business practices.

If we become subject to class action lawsuits or any other related lawsuits or investigations or proceedings by regulators in the future, it could result in a diversion of management resources, time and energy, significant costs, a material decline in the market price for our A ordinary shares, increased share price volatility and increased directors and officers liability insurance premiums and could have a material adverse effect upon our business, prospects, financial condition, results of operations and ability to access the capital markets.

***We may fail to source adequate film content on favorable terms or at all through acquisitions or co-productions, which could have a material and adverse impact on our business.***

We generate revenues by monetizing Indian film content that we primarily co-produce or acquire from third parties, and then distribute through various channels. Our ability to successfully enter into co-productions and to acquire content depends on, among other things, our ability to maintain existing relationships, and form new ones, with talent and other industry participants.

The pool of quality talent in India is limited and, as a result, there is significant competition to secure the services of certain actors, directors, composers and producers, among others. Competition can increase the cost of such talent, and hence the cost of film content. These costs may continue to increase, making it more difficult for us to access content cost-effectively and reducing our ability to sustain our margins and maximize revenues from distribution and monetization. Further, we may be unable to successfully maintain our long-standing relationships with certain industry participants and continue to have access to content and/or creative talent and may be unable to establish similar relationships with new leading creative talent. This is also dependent on relationships with various writers and talent and has execution risks associated with it. If any such relationships are adversely affected, or we are unable to form new relationships, or if any party fails to perform under its agreements or arrangements with us, our business, prospects, financial condition, liquidity and results of operations could be materially adversely affected.

***Our business involves substantial capital requirements, and our inability to maintain or raise sufficient capital could materially adversely affect our business.***

Our business requires a substantial investment of capital for the production, acquisition and distribution of films and a significant amount of time may elapse between our expenditure of funds and the receipt of revenues from our films. This may require us to fund a significant portion of our capital requirements from our credit facilities or other financing sources. Any capital shortfall could have a material adverse effect on our business, prospects, financial condition, results of operations and liquidity.

***Delays, cost overruns, cancellation or abandonment of the completion or release of films may have a material adverse effect on our business.***

There are substantial financial risks relating to film production, completion and release. Actual film costs may exceed their budgets and factors such as labor disputes, unavailability of a star performer, equipment shortages, disputes with production teams or adverse weather conditions may cause cost overruns and delay or hamper film completion. When a film we have contracted to acquire from a third party experiences delays or fails to be completed, we may not recover advance monies paid for the proposed acquisition. When we enter into co-productions, we are typically responsible for paying all production costs in accordance with an agreed upon budget and while we typically cap budgets in our contracts with our co-producer, given the importance of ongoing relationships in our industry, longer-term commercial considerations may in certain circumstances override strict contractual rights and we may feel obliged to fund cost over-runs where there is no contractual obligation requiring us to do so.

Production delays, failure to complete projects or cost overruns could result in us not recovering our costs and could have

a material adverse effect on our business, prospects, financial condition and results of operations.

***The popularity and commercial success of our films are subject to numerous factors, over which we may have limited or no control.***

The popularity and commercial success of our films depends on many factors including, but not limited to, the key talent involved, the timing of release, the promotion and marketing of the film, the quality and acceptance of other competing programs released into the marketplace at or near the same time, the availability of alternative forms of entertainment, general economic conditions, the genre and specific subject matter of the film, its critical acclaim and the breadth, timing and format of its initial release. We cannot predict the impact of such factors on any film, and many are factors that are beyond our control. As a result of these factors and many others, our films may not be as successful as we anticipate, and as a result, our results of operations may suffer.

***The success of our business depends on our ability to consistently create and distribute filmed entertainment that meets the changing preferences of the broad consumer market both within India and internationally.***

Changing consumer tastes affect our ability to predict which films will be popular with audiences in India and internationally. As we invest in a portfolio of films across a wide variety of genres, stars and directors, it is highly likely that at least some of the films in which we invest will not appeal to Indian or international audiences. Further, where we sell rights prior to release of a film, any failure to accurately predict the likely commercial success of a film may cause us to underestimate the value of such rights. If we are unable to co-produce and acquire rights to films that appeal to Indian and international film audiences or to accurately judge audience acceptance of our film content, the costs of such films could exceed revenues generated and anticipated profits may not be realized. Our failure to realize anticipated profits could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our ability to monetize our content is limited to the rights that we acquire from third parties or otherwise own.***

We have acquired our film content through contracts with third parties, which are primarily fixed-term contracts that may be subject to expiration or early termination. Upon expiration or termination of these arrangements, content may be unavailable to us on acceptable terms or at all, including with respect to technical matters such as encryption, territorial limitation and copy protection. In addition, if any of our competitors offer better terms, we will be required to spend more money or grant better terms, or both, to acquire or extend the rights we previously held. If we are unable to renew the rights to our film library on commercially favorable terms and to continue monetizing the existing films in our library or other content, it could have a material adverse effect on our business, prospects, financial condition and results of operations.

In addition, we typically only own certain rights for the monetization of content, which limits our ability to monetize content in certain media formats. In particular, we do not own the audio music rights to the majority of the films in our library and to certain new releases. See "Business — Our Business Description — Our Film Library" for detail regarding our rights. To the extent we do not own the music or other media rights in respect of a particular film, we may only monetize content through those channels to which we do own rights, which could have an adverse effect on our ability to generate revenue from a film and recover our costs from acquiring or producing content.

Based on our agreements in effect as of March 31, 2018, if we do not otherwise extend or renew our existing rights, we anticipate the rights we currently license in Hindi and regional languages, will expire as summarized in the table below.

**Term Expiration Dates**

| | Hindi Film Rights | Regional Film Rights(1) |
|---|---|---|
| | (approximate percentage of films whose licensed rights expire in the period indicated) | |
| Prior to December 31, 2020 | 22% | 20% |
| 2021-2025 | 39% | 16% |
| 2026-2030 | 25% | 6% |
| 2031-2045 | 2% | 1% |
| Perpetual(2) | 12% | 57% |

(1) Excludes the Kannada digital rights library for which we have perpetual rights subject to applicable copyright law.

(2) Subject to limitations imposed by Indian copyright law, which restricts the term to 60 years from the beginning of the calendar year following the year in which the film is released.

***We may face claims from third parties that our films may be infringing on their intellectual property.***

Third parties may claim that certain of our films misappropriate or infringe such third parties' intellectual property rights with respect to previously developed films, stories, characters, other entertainment or intellectual property. Any such assertions or claims may impact our rights to monetize the related films. Irrespective of the validity or the successful assertion of such claims, we could incur significant costs and diversion of resources in defending against them. If any claims or actions are asserted against us, we may seek to settle such claim by obtaining a license from the plaintiff covering the disputed intellectual property rights. We cannot provide any assurances, however, that under such circumstances a license, or any other form of settlement, would be available on reasonable terms or at all. Any of these

occurrences could have a material adverse effect on our business, prospects, financial condition and results of operations.

6

***Our business involves risks of liability claims for media content.***

As a producer and distributor of media content, we may face potential liability for:

- defamation;
- invasion of privacy;
- negligence;
- copyright or trademark infringement; and
- other claims based on the nature and content of the materials distributed.

These types of claims have been brought, sometimes successfully, against producers and/or distributors of media content. Any imposition of liability that is not covered by insurance or is in excess of insurance coverage could have a material adverse effect on our business and financial condition.

***We depend on the Indian box office success of our Hindi and high budget Tamil and Telugu films from which we derive a significant portion of our revenues.***

In India, a relatively high percentage of a film's overall revenues are derived from theater box office sales and, in particular, from such sales in the first week of a film's release. Indian domestic box office receipts are also an indicator of a film's expected success in other Indian and international distribution channels. As such, poor box office receipts in India for our films, even for those films for which we obtain only international distribution rights, could have a significant adverse impact on our results of operations in both the year of release of the relevant films and in the future for revenues expected to be earned through other distribution channels. In particular, we depend on the Indian box office success of our Hindi films and high budget Tamil and Telugu films.

***We may not be paid the full amount of box office revenues to which we are entitled.***

We derive revenues from theatrical exhibition of our films by collecting a specified percentage of box office receipts from multiplex and single screen theater operators. The Indian film industry continues to lack full exhibitor transparency. There is limited independent monitoring of such data in India or the Middle East, unlike the monitoring services provided by comScore in the United Kingdom and the United States. We therefore rely on theater operators and our sub- distributors to report relevant information to us in an accurate and timely manner.

While multiplex and single-screen operators have now moved to a digital distribution model that provides greater clarity on the number of screenings given to our films, many still do not have computerized tracking systems for box office receipts which can be tracked independently by a third party and we are reliant on box office reports generated internally by these multiplex and single screen operators which may not be entirely accurate or transparent.

Because we do not have a reliable system to determine if our box office receipts are underreported, box office receipts and sub-distribution revenues may be inadvertently or purposefully misreported or delayed, which could prevent us from being compensated appropriately for exhibition of our films. If we are not properly compensated, our business, prospects, financial condition and results of operations could be negatively impacted.

***We depend on our relationships with theater operators and other industry participants to monetize our film content. Any disputes with multiplex operators in India could have a material adverse effect on our ability or willingness to release our films as scheduled.***

We generate revenues from the monetization of Indian film content in various distribution channels through agreements with commercial theater operators, in particular multiplex operators, and with retailers, television operators, telecommunications companies and others. Our failure to maintain these relationships, or to establish and capitalize on new relationships, could harm our business or prevent our business from growing, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

We have had disputes with multiplex operators in India that required us to delay our film releases and disrupted our marketing schedule for future films. These disputes were subsequently settled pursuant to settlement agreements that expired in June 2011. We now enter into agreements on a film-by-film and exhibitor-by-exhibitor basis instead of entering into long-term agreements. To date, our film-by-film agreements have been on commercial terms that are no less favorable than the terms of the prior settlement agreements; however, we cannot guarantee such terms can always be

obtained. Accordingly, without a long-term commitment from multiplex operators, we may be at risk of losing a substantial portion of our revenues derived from our theatrical business. We may also have similar future disruptions in our relationship with multiplex operators, the operators of single-screen theaters or other industry participants, which could have a material adverse effect on our business, prospects, financial condition and results of operations. Further, the theater industry in India is rapidly growing and evolving and we cannot assure you that we will be able to establish relationships with new commercial theater operators.

7

***Eros Now, our digital OTT entertainment service accessible via internet-enabled devices may not achieve the desired growth rate.***

Eros Now was soft launched in 2012 and as of March 31, 2018 we had over 100 million registered users. As of March 31, 2018, we had 7.9 million paying subscribers. We must continue to grow and retain subscribers in India (one of our key markets) where they are currently used to traditional channels for content consumption, as well as grow our subscriber base in markets outside of India. Our ability to attract and retain subscribers will depend in part on our ability to consistently provide our subscribers a high-quality experience with respect to content and features and on the quality of data connectivity (either Wi-Fi, broadband, 3G or 4G mobile data) in India.

To achieve and sustain the desired growth rate from Eros Now, we must accomplish numerous objectives, including substantially increasing the number of paid subscribers to our service and retaining them, without which our revenues from digital stream will be adversely affected. We cannot assure you that we will be able to achieve these objectives due to any of the factors listed below, among other factors:

- our ability to maintain an adequate content offering;
- our ability to maintain, upgrade and develop our service offering on an ongoing basis;
- our ability to successfully distribute our service across multiple mobile, internet and cable platform worldwide;
- our ability to secure and retain distribution across various platforms including telecom operators and original equipment manufacturers;
- our ability to convert free registered users into paid subscribers and retain them;
- our ability to compete effectively against other Indian and foreign OTT services;
- our ability to manage technical glitches or disruptions;
- our ability to attract and retain our employees;
- any changes in government regulations and policies; and
- any changes in the general economic conditions specific to the internet and the movie industry.

***Our subscriber metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review key metrics related to the operation of our business, including, but not limited to, our subscribers, KPIs and MAUs, to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data as well as other sources. At times data may not have been validated by an independent third party. While these numbers are based on what we believe to be reasonable estimates of our subscriber base for the applicable period of measurement, there are inherent challenges in measuring how our Service is used across large populations globally. For example, we believe that there are individuals who have multiple Eros Now accounts, which can result in an overstatement of KPIs. Errors or inaccuracies in our metrics or data could result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of MAUs were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of Users to satisfy our growth strategies.

In addition, advertisers generally rely on third-party measurement services to calculate our metrics, and these third-party measurement services may not reflect our true audience. Some of our demographic data also may be incomplete or inaccurate because subscribers self-report their names and dates of birth. Consequently, the personal data we have may differ from our subscribers' actual names and ages. If advertisers, partners, or investors do not perceive our subscriber, geographic, or other demographic metrics to be accurate representations of our subscribers base, or if we discover material inaccuracies in our subscriber, geographic, or other demographic metrics, our reputation may be seriously harmed.

***Privacy concerns could limit our ability to collect and leverage our subscriber data and disclosure of membership data could adversely impact our business and reputation.***

In the ordinary course of business and in particular in connection with content acquisition and delivering our service to our

members, we collect and utilize data supplied by our subscribers. Other businesses have been criticized by privacy groups and governmental bodies for attempts to link personal identities and other information to data collected on the internet regarding users' browsing and other habits. Increased regulation of data utilization practices, including self-regulation or findings under existing laws that limit our ability to collect, transfer and use data, could have an adverse effect on our business. In addition, if we were to disclose data about our subscribers in a manner that was objectionable to them, our business reputation could be adversely affected, and we could face potential legal claims that could impact our operating results. Outside of India, we may become subject to additional and/or more stringent legal obligations concerning our treatment of customer and other personal information, such as laws regarding data localization and/or restrictions on data export. Failure to comply with these obligations could subject us to liability, and to the extent that we need to alter our business model or practices to adapt to these obligations, we could incur additional expenses.

8

***Changes in how we market our service could adversely affect our marketing expenses and subscriber levels may be adversely affected.***

We utilize a broad mix of marketing and public relations programs, including social media sites, to promote our service to potential new subscribers. We may limit or discontinue use or support of certain marketing sources or activities if advertising rates increase or if we become concerned that subscribers or potential subscribers deem certain marketing practices intrusive or damaging to our brand. If the available marketing channels are curtailed, our ability to attract new subscribers may be adversely affected. Companies that promote our service may decide that we negatively impact their business or may make business decisions that in turn negatively impact us. For example, if they decide that they want to compete more directly with us, enter a similar business or exclusively support our competitors, we may no longer have access to their marketing channels. If we are unable to maintain or replace our sources of subscribers with similarly effective sources, or if the cost of our existing sources increases, our subscriber levels and marketing expenses may be adversely affected.

***We rely upon a number of partners to make our service available on their devices.***

We currently offer subscribers the ability to receive streaming content through a host of internet-connected screens, including TVs, digital video players, television set-top boxes and mobile devices. We have agreements with various cable, satellite and mobile telecommunications operators to make our service available to subscribers. In many instances, our agreements also include provisions by which the partner bills consumers directly or otherwise offers services or products in connection with offering our service. We intend to continue to broaden our relationships with existing partners and to increase our capability to stream content to other platforms and partners over time. If we are not successful in maintaining existing and creating new relationships, or if we encounter technological, content licensing, regulatory, business or other impediments to delivering our streaming content to our subscribers via these devices, our ability to retain subscribers and grow our business could be adversely impacted. Our agreements with our partners are typically multi-year in duration and our business could be adversely affected if, upon expiration, a number of our partners do not continue to provide access to our service or are unwilling to do so on terms acceptable to us, which terms may include the degree of accessibility and prominence of our service. Furthermore, devices are manufactured and sold by entities other than Eros Now and while these entities should be responsible for the devices' performance, the connection between these devices and Eros Now may nonetheless result in consumer dissatisfaction toward Eros Now and such dissatisfaction could result in claims against us or otherwise adversely impact our business. In addition, technology changes to our streaming functionality may require that partners update their devices. If partners do not update or otherwise modify their devices, our service and our members' use and enjoyment could be negatively impacted.

***Changes in how network operators handle and charge for access to data that travel across their networks could adversely impact our business.***

We rely upon the ability of subscribers to access our service through the internet. If network operators block, restrict or otherwise impair access to our service over their networks, our service and business could be negatively affected. To the extent that network operators implement usage-based pricing, including meaningful bandwidth caps, or otherwise try to monetize access to their networks by data providers, we could incur greater operating expenses and our membership acquisition and retention could be negatively impacted. Furthermore, to the extent network operators create tiers of internet access service and either charge us for or prohibit us from being available through these tiers, our business could be negatively impacted.

***We rely upon Amazon Web Services to operate certain aspects of our service and any disruption of or interference with our use of the Amazon Web Services operation would impact our operations and our business would be adversely impacted.***

Amazon Web Services ("AWS") provides a distributed computing infrastructure platform for business operations, or what is commonly referred to as a "cloud" computing service. We have architected our software and computer systems so as to utilize data processing, storage capabilities and other services provided by AWS. Currently, we run material amount of our computing on AWS. Given this, along with the fact that we cannot easily switch our AWS operations to another cloud

provider, any disruption of or interference with our use of AWS would impact our operations and our business would be adversely impacted.

9

***We incur significant costs to protect electronically stored data and if our data is compromised despite this protection, we may incur additional costs, business interruption, lost opportunities and damage to our reputation.***

We collect and maintain information and data necessary for conducting our business operations, which information includes proprietary and confidential data and personal information of our customers and employees. Such information is often maintained electronically, which includes risks of intrusion, tampering, manipulation and misappropriation. We implement and maintain systems to protect our digital data, and obtaining and maintaining these systems is costly and usually requires continuous monitoring and updating for technological advances and change. Additionally, we sometimes provide confidential, proprietary and personal information to third parties when required in connection with certain business and commercial transactions. For instance, we have entered into an agreement with a third party vendor to assist in processing employee payroll, and they receive and maintain confidential personal information regarding our employees. We take precautions to try to ensure that such third parties will protect this information, but there remains a risk that the confidentiality of any data held by third parties may be compromised. If our data systems, or those of our third party vendors and partners, are compromised, there may be negative effects on our business including a loss of business opportunities or disclosure of trade secrets. If the personal information we maintain is tampered with or misappropriated, our reputation and relationships with our partners and customers may be adversely affected, and we may incur significant costs to remediate the problem and prevent future occurrences.

***Any significant disruption in or unauthorized access to our computer systems or those of third parties that we utilize in our operations, including those relating to cybersecurity or arising from cyber-attacks, could result in a loss or degradation of service, unauthorized disclosure of data, including member and corporate information, or theft of intellectual property, including digital content assets, which could adversely impact our business.***

Our reputation and ability to attract, retain and serve our consumers is dependent upon the reliable performance and security of our computer systems and those of third parties that we utilize in our operations. These systems may be subject to damage or interruption from earthquakes, adverse weather conditions, other natural disasters, terrorist attacks, power loss, telecommunications failures, and cybersecurity risks. Interruptions or malfunctions (including those due to equipment damage, power outages, computer viruses and a range of other hardware, software and network problems) in these systems, or with the internet in general, could make our service unavailable or degraded or otherwise hinder our ability to deliver streaming content. Service interruptions, errors in our software or the unavailability of computer systems used in our operations could diminish the overall attractiveness of our service to existing and potential subscribers. Our computer systems and those of third parties we use in our operations are vulnerable to cybersecurity risks, including cyber-attacks, both from state-sponsored and individual activity, such as computer viruses, denial of service attacks, physical or electronic break-ins and similar disruptions. These systems periodically experience directed attacks intended to lead to interruptions and delays in our service and operations as well as loss, misuse or theft of data or intellectual property. Any attempt by hackers to obtain our data (including subscriber and corporate information) or intellectual property (including digital content assets), disrupt our service, or otherwise access our systems, or those of third parties we use, if successful, could harm our business, be expensive to remedy and damage our reputation.

We have devoted and will continue to devote significant resources to the security of our computer systems; but we cannot guarantee that we will not experience such malfunctions, attacks or interruptions in the future. A significant or large-scale malfunction, attack or interruption of one or more of our computer or database systems could adversely affect our ability to keep our operations running efficiently. Our insurance does not cover expenses related to such disruptions or unauthorized access. Efforts to prevent hackers from disrupting our service or otherwise accessing our systems are expensive to implement and may limit the functionality of or otherwise negatively impact our service offering and systems. Any significant disruption to our service or access to our systems could result in a loss of subscribers and adversely affect our business and results of operation. We utilize our own communications and computer hardware systems located either in our facilities or in that of a third-party Web hosting provider. In addition, we utilize third-party "cloud" computing services in connection with our business operations. We also utilize our own and third-party content delivery networks to help us

stream content in high volume to subscribers over the internet. Problems faced by us or our third-party Web hosting, "cloud" computing, or other network providers, including technological or business-related disruptions, as well as cybersecurity threats, could adversely impact the experience of our members.

10

***A downturn in the Indian and international economies or instability in financial markets, including a decreased growth rate and increased Indian price inflation, could materially and adversely affect our results of operations and financial condition.***

Global economic conditions may negatively impact consumer spending. Prolonged negative trends in the global or local economies can adversely affect consumer spending and demand for our films and may shift consumer demand away from the entertainment we offer. For example, the results of the United Kingdom's referendum on withdrawal from the European Union may have a negative effect on global economic conditions, financial markets and our business, financial condition and results of operations. In June 2016, a majority of voters in the United Kingdom elected to withdraw from the European Union in a national referendum. The referendum was advisory, and the terms of any withdrawal are subject to a negotiation period that could last two years after the government of the United Kingdom formally initiates a withdrawal process. However, the referendum has created uncertainty about the future relationship between the United Kingdom and the European Union. The referendum has also given rise to calls for the governments of other European Union member states to consider withdrawing as well. These developments have had and may continue to have an adverse effect on global economic conditions and the stability of global financial markets.

According to the International Monetary Fund's World Economic Outlook Database, published in April 2018, the GDP growth rate of India is projected to increase from 6.7% in 2017 to approximately 7.4% in 2018 and 7.8% in 2019. The Central Statistics Office has estimated that the growth rate in GDP for the year ended March 31, 2018 is 6.7%.

A decline in attendance at theaters may reduce the revenues we generate from this channel, from which a significant proportion of our revenues are derived. If the general economic downturn continues to affect the countries in which we distribute our films, discretionary consumer spending may be adversely affected, which would have an adverse impact on demand for our theater, television and digital distribution channels. Economic instability and the continuing weak economy in India may negatively impact the Indian box office success of our Hindi, Tamil and Telugu films, on which we depend for a significant portion of our revenues.

Further, a sustained decline in economic conditions could result in closure or downsizing by, or otherwise adversely impact, industry participants on whom we rely for content sourcing and distribution. Any decline in demand for our content could have a material adverse effect on our business, prospects, financial condition and results of operations. In addition, global financial uncertainty has negatively affected the Indian financial markets.

Continued financial disruptions may limit our ability to obtain financing for our films. For example, any adverse revisions to India's credit ratings for domestic and international debt by domestic or international rating agencies may adversely impact our ability to raise additional financing and the interest rates and other commercial terms at which such additional financing is available. Any such event could have a material adverse effect on our business, prospects, financial condition and results of operations. India has recently experienced fluctuating wholesale price inflation compared to historical levels. An increase in inflation in India could cause a rise in the price of wages, particularly for Indian film talent, or any other expenses that we incur. If this trend continues, we may be unable to accurately estimate or control our costs of production. Because it is unlikely we would be able to pass all of our increased costs on to our customers, this could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Fluctuation in the value of the Indian Rupee against foreign currencies could materially and adversely affect our results of operations, financial condition and ability to service our debt.***

While a significant portion of our revenues are denominated in Indian Rupees, certain contracts for our film content are or may be denominated in foreign currencies. Additionally, we report our financial results in U.S. dollars and most of our debt is denominated in U.S. dollars. We expect that the continued volatility in the value of the Indian Rupee against foreign currency will continue to have an impact on our business. The Indian Rupee experienced an approximately 0.4% decrease in value as compared to the U.S. dollar in fiscal year 2018. In the fiscal year 2017 it increased by 2.2%. Changes in the growth of the Indian economy and the continued volatility of the Indian Rupee, may adversely affect our business. As of March 31, 2018, Eros International Plc had debt of $70.05 million in relation to a £50.00 million retail bond offering in October 2014. There can be no assurance, however, that currency fluctuations will not lead to an increase in

the amount of this debt.

Further, at the end of fiscal year 2018, $107.2 million, or 38.6% of our debt, was denominated in U.S. dollars, and we may not generate sufficient revenue in U.S. dollars to service all of our U.S. dollar-denominated debt or the Notes. Consequently, we may be required to use revenues generated in Indian Rupees to service our U.S. dollar-denominated debt or the Notes. Any devaluation or depreciation in the value of the Indian Rupee, compared to the U.S. dollar, could adversely affect our ability to service our debt. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Exchange Rate" for further information.

Although we have not historically done so, we may, from time to time, seek to reduce the effect of exchange rate fluctuations on our operating results by purchasing derivative instruments such as foreign exchange forward contracts to cover our intercompany indebtedness or outstanding receivables. However, we may not be able to purchase contracts to insulate ourselves adequately from foreign currency exchange risks. In addition, any such contracts may not perform effectively as a hedging mechanism. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Exchange Rate" for further information.

11

***We face increasing competition with other films for movie screens, and our inability to obtain sufficient distribution of our films could have a material adverse effect on our business.***

A substantial majority of the theater screens in India are typically committed at any one time to a limited number of films, and we compete directly against other producers and distributors of Indian films in each of our distribution channels. If the number of films released in the market as a whole increases it could create excess supply in the market, in particular at peak theater release times such as school and national holidays and during festivals, which would make it more difficult for our films to succeed.

Where we are unable to ensure a wide release for our films to maximize screenings in the first week of a film's release, it may have an adverse impact on our revenues. Further, failure to release during peak periods, or the inability to book sufficient screens, could cause us to miss potentially higher gross box-office receipts and/or affect subsequent revenue streams, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***We face increasing competition from other forms of entertainment, which could have a material adverse effect on our business.***

We also compete with all other sources of entertainment and information delivery, including television, the internet and sporting events such as the Indian Premier League for cricket. Technological advancements such as Video on Demand (VOD), mobile and internet streaming and downloading have increased the number of entertainment and information delivery choices available to consumers and have intensified the challenges posed by audience fragmentation. The increasing number of choices available to audiences including crossover from our Eros Now online entertainment service could negatively impact consumer demand for our films, and there can be no assurance that occupancy rates at theaters or demand for our other distribution channels will not fall.

***Competition within the Indian film industry is growing rapidly, and certain of our competitors are larger, have greater financial resources and are more diversified.***

The Indian film industry's rapid growth is changing the competitive landscape, increasing competition for content, talent and release dates. Growth in the Indian film industry has attracted foreign industry participants and competitors, such as Viacom, The Walt Disney Company, 21st Century Fox, Sony Pictures, Amazon, and Netflix, many of which are substantially larger and have greater financial resources, including competitors that own theaters and/or television networks and/or OTT platforms. These larger competitors may have the ability to spend additional funds on production of new films, which may require us to increase our production budgets beyond what we originally anticipated in order to compete effectively. In addition, these competitors may use their financial resources to gain increased access to movie screens and enter into exclusive content arrangements with key talent in the Indian film industry. Unlike some of these major competitors that are part of larger diversified corporate groups, we derive substantially all of our revenue from our film entertainment business. If our films fail to perform to our expectations, we are likely to face a greater adverse impact than would a more diversified competitor. In addition, other larger entertainment distribution companies may have larger budgets to monetize growing technological trends. If we are unable to compete with these companies effectively, our business prospects, results of operations and financial condition could suffer. With generally increasing budgets of Hindi, Tamil and Telugu films, we may not have the resources to distribute the same level of films as competitors with greater financial strength.

***We face and will continue to face competition for subscriber time.***

We compete for the time and attention of our Eros Now subscribers with other content providers on the basis of a number of factors, including quality of experience, relevance, diversity of content, ease of use, price, accessibility, perception of advertising load, brand awareness, and reputation.

We compete with providers of on-demand Indian entertainment, which is purchased or available for free and playable on mobile devices and in the home. We face increasing competition for subscribers from a growing variety of businesses, including other subscription services around the world, many of which offer services that deliver Indian entertainment content over the internet, through mobile phones, and through other wireless devices. Many of our current or future

competitors are already entrenched or may have significant brand recognition in a particular region or market in which we seek to penetrate.

We believe that companies with a combination of technical expertise, brand recognition, financial resources, and digital media experience also pose a significant threat of developing competing on-demand distribution technologies. In particular, if known incumbents in the digital media space such as Facebook choose to offer competing services, they may devote greater resources than we have available, have a more accelerated time frame for deployment, and leverage their existing user base and proprietary technologies to provide services that our subscribers and advertisers may view as superior. Furthermore, Amazon Prime, Netflix, Hotstar and others have competing services, which may negatively impact our business, operating results, and financial condition. Our current and future competitors may have higher brand recognition, more established relationships with talent and other content licensors and mobile device manufacturers, greater financial, technical, and other resources, more sophisticated technologies, and/or more experience in the markets in which we compete. In addition, Apple and Google also own application store platforms and are charging in-application purchase fees, which are not being levied on their own applications, thus creating a competitive advantage for themselves against us. As the market for on-demand music on the internet and mobile and connected devices increases, new competitors, business models, and solutions are likely to emerge.

We also compete for subscribers based on our presence and visibility as compared with other businesses and platforms that deliver entertainment content through the internet and mobile devices. We face significant competition for subscribers from companies promoting their own digital content online or through application stores, including several large, well-funded, and seasoned participants in the digital media market. Mobile device application stores often offer users the ability to browse applications by various criteria, such as the number of downloads in a given time period, the length of time since a mobile application was released or updated, or the category in which the application is placed. The websites and mobile applications of our competitors may rank higher than our website and our Eros Now mobile application, and our application may be difficult to locate in mobile device application stores, which could draw potential subscribers away from our platform and toward those of our competitors. If we are unable to compete successfully for subscribers against other digital media providers by maintaining and increasing our presence and visibility online, on mobile devices, and in application stores, our number of subscribers and content streamed on our platform may fail to increase or may decline and our subscription fees and advertising sales may suffer.

***Piracy of our content, including digital and internet piracy, may adversely impact our revenues and business.***

Our business depends in part on the adequacy, enforceability and maintenance of intellectual property rights in the entertainment products and services we create. Motion picture piracy is extensive in many parts of the world and is made easier by technological advances and the conversion of motion pictures into digital formats. This trend facilitates the creation, transmission and sharing of high quality unauthorized copies of motion pictures in theatrical release on DVDs, CDs and Blu-ray discs, from pay-per-view through set top boxes and other devices and through unlicensed broadcasts on free television and the internet.

Although DVD and CD sales represent a relatively small portion of Indian film and music industry revenues, the proliferation of unauthorized copies of these products results in lost revenue and significantly reduced pricing power, which could have a material adverse effect on our business, prospects, financial condition and results of operations. In particular, unauthorized copying and piracy are prevalent in countries outside of the United States, Canada and Western Europe, including India, whose legal systems may make it difficult for us to enforce our intellectual property rights and in which consumer awareness of the individual and industry consequences of piracy is lower. With broadband connectivity improving, 3G internet penetration increasing and with the advent of 4G in India, digital piracy of our content is an increasing risk.

In addition, the prevalence of third party hosting sites and a large number of links to potentially pirated content make it difficult to effectively monitor and prevent digital piracy of our content. Existing copyright and trademark laws in India afford only limited practical protection and the lack of internet-specific legislation relating to trademark and copyright protection creates a further challenge for us to protect our content delivered through such media. Additionally, we may seek to implement elaborate and costly security and anti-piracy measures, which could result in significant expenses and revenue losses. Even the highest levels of security and anti-piracy measures may fail to prevent piracy.

Litigation may also be necessary in the future to enforce our intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Regardless of the legitimacy or the success of these claims, we could incur costs and diversion of resources in enforcing our intellectual property rights or in defending against such claims, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***We may be unable to adequately protect or continue to use our intellectual property. Failure to protect such intellectual property may negatively impact our business.***

We rely on a combination of copyrights, trademarks, service marks and similar intellectual property rights to protect our name and branded products and to protect the entertainment products and services we create. The success of our business, in part, depends on our continued ability to use this intellectual property in order to increase awareness of the Eros name. We attempt to protect these intellectual property rights through available copyright and trademark laws and through a combination of employee, third-party assignments and nondisclosure agreements, other contractual restrictions, technological measures, and other methods. Despite these precautions, existing copyright and trademark laws afford only limited practical protection in certain countries, and the actions taken by us may be inadequate to prevent imitation by others of the Eros name and other Eros intellectual property. Despite our efforts to protect our intellectual property rights and trade secrets, unauthorized parties may attempt to copy aspects of our song recommendation technology or other technology, or obtain and use our trade secrets and other confidential information. Moreover, policing our intellectual property rights is difficult and time consuming. We cannot assure you that we would have adequate resources to protect and police our intellectual property rights, and we cannot assure you that the steps we take to do so will always be effective. In addition, if the applicable laws in these countries are drafted or interpreted in ways that limit the extent or duration of our rights, or if existing laws are changed, our ability to generate revenue from our intellectual property may decrease, or the cost of obtaining and maintaining rights may increase. We could lose both the ability to assert our intellectual property rights against, or to license our technology to, others and the ability to collect royalties or other payments.

Litigation or proceedings before governmental authorities and administrative bodies may be necessary in the future to

enforce our intellectual property rights, to protect our patent rights, trademarks, trade secrets, and domain names and to determine the validity and scope of the proprietary rights of others. Our efforts to enforce or protect our proprietary rights may be ineffective and could result in substantial costs and diversion of resources and management time, each of which could substantially harm our operating results.

Further, many existing laws governing property ownership, copyright and other intellectual property issues were adopted before the advent of the internet and do not address the unique issues associated with the internet, personal entertainment devices and related technologies, and new interpretations of these laws in response to emerging digital platforms may increase our digital distribution costs, require us to change business practices relating to digital distribution or otherwise harm our business. We also distribute our branded products in some countries in which there is no copyright or trademark protection. As a result, it may be possible for unauthorized third parties to copy and distribute our branded products or certain portions or applications of our branded products, which could have a material adverse effect on our business, prospects, results of operations and financial condition. If we fail to register the appropriate copyrights, patents, trademarks or our other efforts to protect relevant intellectual property prove to be inadequate, the value of the Eros name could be harmed, which could adversely affect our business and results of operations.

***We may be unable to continue to use the domain names that we use in our business, or prevent third parties from acquiring and using domain names that infringe on, are similar to or otherwise decrease the value of our brand or our trademarks or service marks.***

We have registered several domain names for websites that we use in our business, such as *erosplc.com, erosentertainment.com*, *erosnow.com* and although our Indian subsidiaries currently own over 120 registered trademarks, we have not obtained a registered trademark for any of our domain names. If we lose the ability to use a domain name, whether due to trademark claims, failure to renew the applicable registration or any other cause, we may be forced to market our products under a new domain name, which could cause us to lose users of our websites, or to incur significant expense in order to purchase rights to such a domain name. In addition, our competitors and others could attempt to capitalize on our brand recognition by using domain names similar to ours. Domain names similar to ours have been registered in the United States of America, India and elsewhere.

We may be unable to prevent third parties from acquiring and using domain names that infringe on, are similar to or otherwise decrease the value of our brand, trademarks or service marks. Protecting and enforcing our rights in our domain names may require litigation, which could result in substantial costs and diversion of management's attention.

13

***Litigation may be necessary to enforce our intellectual property rights or to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Regardless of the validity or the success of the assertion of any claims, we could incur significant costs and diversion of resources in enforcing our intellectual property rights or in defending against such claims, which could have a material adverse effect on our business and results of operations. Our services and products could infringe upon the intellectual property rights of third parties.***

Other parties, including our competitors, may hold or obtain patents, trademarks, copyright protection or other proprietary rights with respect to their previously developed films, characters, stories, themes and concepts or other entertainment, technology and software or other intellectual property of which we are unaware. In addition, the creative talent that we hire or use in our productions may not own all or any of the intellectual property that they represent they do, which may instead be held by third parties. Consequently, the film content that we produce and distribute or the software and technology we use may infringe the intellectual property rights of third parties, and we frequently have infringement claims asserted against us. Any claims or litigation, justified or not, could be time-consuming and costly, harm our reputation, require us to enter into royalty or licensing arrangements that may not be available on acceptable terms or at all or require us to undertake creative changes to our film content or source alternative content, software or technology. Where it is not possible to do so, claims may prevent us from producing and/or distributing certain film content and/or using certain technology or software in our operations. Any of the foregoing could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our ability to remain competitive may be adversely affected by rapid technological changes and by an inability to access such technology.***

The Indian film entertainment industry continues to undergo significant technological developments, including the ongoing transition from film to digital media. We may be unsuccessful in adopting new digital distribution methods or may lose market share to our competitors if the methods that we adopt are not as technologically sound, user-friendly, widely accessible or appealing to consumers as those adopted by our competitors. For example, our on-demand entertainment portal accessible via internet-enabled devices, Eros Now, may not achieve the desired growth rate.

Further, advances in technologies or alternative methods of product delivery or storage, or changes in consumer behavior driven by these or other technologies, could have a negative effect on our home entertainment market in India. If we fail to successfully monetize digital and other emerging technologies, it could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Our financial condition and results of operations fluctuate from period to period due to film release schedules and other factors and may not be indicative of results for future periods.***

Our financial condition and results of operations for any period fluctuate due to film release schedules in that period, none of which we can predict with reasonable certainty. Theater attendance in India has traditionally been highest during school holidays, national holidays and during festivals, and we typically aim to release big-budget films at these times. This timing of releases also takes account of competitor film releases, Indian Premier League cricket matches and the timing dictated by the film production process. As a result, our quarterly results can vary from one year to the next, and the results of one quarter are not necessarily indicative of results for the next or any future quarter. Additionally, the distribution window for the theatrical release of films, and the window between the theatrical release and distribution in other channels, have each been compressing in recent years and may continue to change. Further shortening of these periods could adversely impact our revenues if consumers opt to view a film on one distribution platform over another, resulting in the cannibalizing of revenues across distribution platforms. Additionally, because our revenue and operating results are seasonal in nature due to the impact of the timing of new releases, our revenue and operating results may fluctuate from period to period, and which could have a material adverse effect on our business, prospects, results of operations, financial condition and cash flows.

***Our accounting practices and management judgments may accentuate fluctuations in our annual and quarterly operating results and may not be comparable to other film entertainment companies.***

For first release film content, we use a stepped method of amortization and a first 12 months amortization rate based on management's judgment taking into account historic and expected performance, typically amortizing 50% of the capitalized cost for high budget films released during or after the fiscal year 2014, and 40% of the capitalized cost for all other films, in the first 12 months of their initial commercial monetization, and then the balance evenly over the lesser of the term of the rights held by us and nine years. Our management has determined to adjust the first-year amortization rate for high budget films because of the high contribution of theatrical revenue. Similar management judgment taking into account historic and expected performance is used to apply a stepped method of amortization on a quarterly basis within the first 12 months, within the overall parameters of the annual amortization.

14

Typically 25% of capitalized cost for high budget films released during or after the fiscal year 2014, and 20% of capitalized cost for all other films, is amortized in the initial quarter of their commercial monetization. In the fiscal year 2009 and the fiscal years prior to 2009, the balance of capitalized film content costs were amortized evenly over a maximum of four years rather than nine. Because management judgment is involved regarding amortization amounts, our amortization practices may not be comparable to other film entertainment companies. In the case of film content that we acquire after its initial monetization, commonly referred to as library, amortization is spread evenly over the lesser of ten years after our acquisition or our license period. At least annually, we review film and content rights for indications of impairment in accordance with International Accounting Standard (IAS) 36: Impairment of Assets issued by IASB.

***The amount of revenue which we report may be impacted by a new accounting standard dealing with revenue from customers.***

In May 2014, the IASB issued IFRS 15, Revenue from Contracts with Customers, ("IFRS 15"). This standard provides a single, principle-based five-step model to be applied to all contracts with customers. Guidance is provided on topics such as the point at which revenue is recognized, accounting for variable consideration, costs of fulfilling and obtaining a contract and various other related matters. IFRS 15 also introduced new disclosure requirements with respect to revenue. IFRS 15 is effective for fiscal years beginning on or after January 1, 2018 wherein earlier adoption is permitted. Because the amendment to IFRS 15 has not yet been implemented widely, we cannot yet predict how it will impact our current and new stream of revenues under the new standard. The amendment to IFRS 15 affects all IFRS reporting companies. When the amendment becomes effective, it may have an impact on our consolidated financial statements and results of operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" for further information.

***If we fail to achieve or maintain an effective system of internal control over financial reporting, our ability to accurately and timely report our financial results or prevent fraud may be adversely affected.***

When we cease to qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012, or the JOBS Act, at the end of fiscal 2019, we will become subject to additional requirements under the Sarbanes-Oxley Act or the SOx Act, including Section 404(b) of the SOx Act which will require our independent registered public accounting firm to attest to and report on management's assessment of the effectiveness of our internal control over financial reporting. However, because we qualify as an "emerging growth company" under the JOBS Act, these attestation requirements do not apply to us until we lose this status, i.e, at the end of fiscal 2019 on onwards. Our management may conclude in future years, that our internal controls are not effective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may disagree and may decline to attest to our management's assessment or may issue an adverse opinion. If we identify control deficiencies as a result of the assessment process in the future, we may be unable to conclude that we have effective internal controls over financial reporting, which are necessary for us to produce reliable financial reports and are important to help prevent fraud. As a result, our failure to achieve and maintain effective internal controls over financial reporting and certify the same in a timely manner, could result in the loss of investor confidence in the reliability of our financial statements, which in turn could harm our business and negatively impact the market price of our A ordinary shares.

***Our revenue is subject to significant variation based on the timing of certain licenses and contracts we enter into that may account for a large portion of our revenue in the period in which it is completed, which could adversely affect our operating results.***

From time to time, we license film content rights to a group of films pursuant to a single license that constitutes a large portion of our revenue for the fiscal year in which the revenue from the license is recognized. The timing and size of such licenses subjects our revenue to uncertainties and variability from period to period, which could adversely affect our operating results. We expect that we will continue to enter into licenses with customers that may represent a significant concentration of our revenues for the applicable period and we cannot guarantee that these revenues will recur.

***We have entered into certain related party transactions and may continue to rely on our founders for certain key development and support activities.***

We have entered, and may continue to enter, into transactions with related parties. We also rely on the Founders Group, which consists of Beech Investments Limited, Kishore Lulla and Vijay Ahuja and associates and enterprises controlled by certain of our directors and key management personnel for certain key development and support activities. While we believe that the Founders Group's interests are aligned with our own, such transactions may not have been entered into on an arm's-length basis, and we may have achieved more favorable terms had such transactions been entered into with unrelated parties. If future transactions with related parties are not entered into on an arm's-length basis, our business may be materially harmed.

Further, because certain members of the Founders Group are controlling shareholders of, or have significant influence on, both us and our related parties, conflicts of interest may arise in relation to dealings between us and our related parties and may not be resolved in our favor. For further information, see "Certain Relationships and Related Party Transactions."

***We may encounter operational and other problems relating to the operations of our subsidiaries, including as a result of restrictions in our current shareholder agreements.***

We operate several of our businesses through subsidiaries. Our financial condition and results of operations significantly depend on the performance of our subsidiaries and the income we receive from them. Our business may be adversely affected if our ability to exercise effective control over our non-wholly owned subsidiaries is diminished in any way. Although we control these subsidiaries through direct or indirect ownership of a majority equity interest or the ability to appoint the majority of the directors on the boards of such companies, unanimous board approval is required for major decisions relating to certain of these subsidiaries. To the extent there are disagreements between us and our various minority shareholders regarding the business and operations of our non-wholly owned subsidiaries, we may be unable to resolve them in a manner that will be satisfactory to us. Our minority shareholders may:

- be unable or unwilling to fulfill their obligations, whether of a financial nature or otherwise;
- have economic or business interests or goals that are inconsistent with ours;
- take actions contrary to our instructions, policies or objectives;
- take actions that are not acceptable to regulatory authorities;
- have financial difficulties; or
- have disputes with us.

Any of these actions could have a material adverse effect on our business, prospects, financial condition and results of operations.

Eros India has entered into shareholder agreements with third party shareholders of its non-wholly-owned subsidiaries, Big Screen Entertainment Private Limited and have signed a term sheet with Colour Yellow Productions Private Limited. See "Business" for further information. These agreements contain various restrictions on our rights in relation to these entities, including restrictions in relation to the transfer of shares, rights of first refusal, reserved board matters and non-solicitation of employees by us. We may also face operational limitations due to restrictive covenants in such shareholder agreements. In addition, under the terms of our shareholder agreement in relation to Big Screen Entertainment Private Limited, disputes between partners are required to be submitted to arbitration in Mumbai, India. These restrictions in our current shareholder agreements, and any restrictions of a similar or more onerous nature in any new or amended agreements into which we may enter, may limit our control of the relevant subsidiary or our ability to achieve our business objectives, as well as limiting our ability to realize value from our equity interests, any of which could have a material adverse effect on our business, prospects, financial condition and results of operations.

The interests of the other shareholders with respect to the operation of Big Screen Entertainment Private Limited, Colour Yellow Productions Private Limited and from fiscal 2019 Reliance Industries Ltd and Mr. V. Vijayendra Prasad may not be aligned with our interests. As a result, although we own a majority of the ownership interest in each of Big Screen Entertainment Private Limited, and 50% of the shareholding of Colour Yellow Productions Private Limited, taking actions that require approval of the minority shareholders (or their representative directors), such as entering into related party transactions, selling material assets and entering into material contracts, may be more difficult to accomplish.

***We depend on the services of senior management.***

We have, over time, built a strong team of experienced professionals on whom we depend to oversee the operations and growth of our businesses. We believe that our success substantially depends on the experience and expertise of, and the longstanding relationships with key talent and other industry participants built by, our senior management. Any loss of our senior management, any conflict of interest that may arise for such management or the inability to recruit further senior managers could impede our growth by impairing our day-to-day operations and hindering development of our business and our ability to develop, maintain and expand relationships, which would have a material adverse effect on our business, prospects, financial condition and results of operations.

In recent years, we have experienced additions to our senior management team, and our success depends in part on our ability to successfully integrate these new employees into our organization. We anticipate the need to hire additional members in senior management in connection with the expansion of our digital business. While some members of our senior management have entered into employment agreements that contain non-competition and non- solicitation provisions, these agreements may not be enforceable in the Isle of Man, India or the United Kingdom, whose laws govern these agreements or where our members of senior management reside. Even if enforceable, these non-competition and non-solicitation provisions are for limited time periods.

16

***To be successful, we need to attract and retain qualified personnel.***

Our success continues to depend to a significant extent on our ability to identify, attract, hire, train and retain qualified professional, creative, technical and managerial personnel. Competition for the caliber of talent required to produce and distribute our films continues to increase. We cannot assure you that we will be successful in identifying, attracting, hiring, training and retaining such personnel in the future. If we were unable to hire, assimilate and retain qualified personnel in the future, such inability would have a material adverse effect on our business and financial condition.

***We are currently migrating to an SAP ERP system, which could substantially disrupt our business, and our failure to successfully integrate our IT systems across our international operations could result in additional costs and diversion of resources and management attention.***

We are currently in the process of migrating to an SAP ERP system to replace several of our existing IT systems. We have completed this accounting migration in India, but the process is ongoing in the rest of the world and the implementation has been delayed.

Also we have not yet integrated supporting modules into the SAP ERP system, such as a module to manage our film library. This integration and migration may lead to unforeseen complications and expenses, and our failure to efficiently integrate and migrate our IT systems could substantially disrupt our business. We will implement further modules within SAP ERP once the initial worldwide integration has been completed. The SAP ERP system will be implemented globally in our different office locations and will need to accommodate our multilingual operations, resulting in further difficulties in such implementation. Our failure to successfully integrate our IT systems across our international operations could result in substantial costs and diversion of resources and management attention, which could harm our business and competitive position.

***Negative media coverage could adversely affect our business.***

We receive a high degree of media coverage around the world. Unfavorable publicity regarding, for example, payments to talent, third party content providers, publishers, artists, and other copyright owners, our privacy practices, terms of service, service changes, service quality, litigation or regulatory activity, government surveillance, the actions of our advertisers, the actions of our developers, the use of our OTT platform for illicit, objectionable, or illegal ends, the actions of our subscribers, the quality and integrity of content shared on our OTT platform, or the actions of other companies that provide similar services to us, could materially adversely affect our reputation. Such negative publicity also could have an adverse effect on the size, engagement, and loyalty of our subscriber base and result in decreased revenue, which could materially adversely affect our business, operating results, and financial condition.

***Some viewers or civil society organizations may find our film content objectionable.***

Some viewers or civil society organizations in India or other countries may object to film content produced or distributed by us based on religious, political, ideological or any other positions held by such viewers. This applies in particular, to content that is graphic in nature, including violent or romantic scenes and films that are politically oriented or targeted at a segment of the film audience. Viewers or civil society organizations, including interest groups, political parties, religious or other organizations may assert legal claims, seek to ban the exhibition of our films, protest against us or our films or object in a variety of other ways. Any of the foregoing could harm our reputation and could have a material adverse effect on our business, prospects, financial condition and results of operations. The film content that we produce and distribute could result in claims being asserted, prosecuted or threatened against us based on a variety of grounds, including defamation, offending religious sentiments, invasion of privacy, negligence, obscenity or facilitating illegal activities, any of which could have a material adverse effect on our business, prospects, financial condition or results of operations.

***Our films are required to be certified in India by the Central Board of Film Certification.***

Pursuant to the Indian Cinematograph Act, 1952, or the Cinematograph Act, films must be certified for adult viewing or general viewing in India by the Central Board of Film Certification, or CBFC, which looks at factors such as the interest of sovereignty, integrity and security of the relevant country, friendly relations with foreign states, public order and morality. There may be similar requirements in the United Kingdom, Canada and Australia, among other jurisdictions. We may be unable to obtain the desired certification for each of our films and we may have to modify the title, content, characters,

storylines, themes or concepts of a given film in order to obtain any certification or a desired certification for broadcast release that will facilitate distribution and monetization of the film. Any modification could result in substantial costs and or receipt of an undesirable certification could reduce the appeal of any affected film to our target audience and reduce our revenues from that film, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Litigation and negative claims about us or the Indian film entertainment industry generally could have a material adverse impact on our reputation, our relationship with distributors and co-producers and our business operations.***

We and certain of our directors and officers are subject to various legal civil and criminal proceedings in India. We are also subject to certain tax proceedings in India, including service tax claims aggregating to approximately $61 million, value added tax and sales tax claims aggregating to approximately $3 million, as of March 31, 2018 for the period between fiscal year 2010 to fiscal year 2017. In addition, there have been certain public allegations made against the Indian film entertainment industry generally, as well as against certain of the entities and individuals currently active in the industry about purported links to organized crime and other negative associations. As our success in the Indian film industry partially depends on our ability to maintain our brand image and corporate reputation, in particular in relation to our dealings with creative talent, co-producers, distributors and exhibitors, any such proceedings or allegations, public or private, whether or not routine or justified, could tarnish our reputation and cause creative talent, co-producers, distributors and exhibitors not to work with us. See "Business Overview— Litigation" for further details.

In addition, the nature of our business and our reliance on intellectual property and other proprietary rights subjects us to the risk of significant litigation. Litigation, or even the threat of litigation, can be expensive, lengthy and disruptive to normal business operations, and the results of litigation are inherently uncertain and may result in adverse rulings or decisions. We may enter into settlements or be subject to judgments that may, individually or in the aggregate, have a material adverse effect on our business, prospects, financial condition or results of operations.

***Our performance in India is linked to the stability of its policies, including taxation policy, and the political situation.***

The role of Indian central and state governments in the Indian economy has been and remains significant. Since 1991, India's government has pursued policies of economic liberalization, including significantly relaxing restrictions on the private sector. The rate of economic liberalization could change, and specific laws and policies affecting companies in the media and entertainment sector, foreign investment, currency exchange rates and other matters affecting investment in our securities could change as well. A significant change in India's economic liberalization and deregulation policies, and in particular, policies in relation to the film industry, could disrupt business and economic conditions in India and thereby affect our business.

Taxes generally are levied on a state-by-state basis for the Indian film industry. Recently, there has been interest in rationalizing the industry's taxes by instituting a uniform set of entertainment taxes administered by the Indian government. Such changes may increase our tax rate, which could adversely affect our financial condition and results of operations. Furthermore, in certain states, theater multiplexes have enjoyed entertainment tax benefits that may be disrupted or discontinued if India moves to a uniform entertainment tax system. This could slow the construction of new multiplexes, and may impact single screen theaters in tier 2 and tier 3 cities converting their 1,000 seater theaters into multiplexes with 2 or 3 screens with seating capacity of 300 seats or less, which we believe is a key driver for domestic theatrical revenue growth. Separately, there are certain deductions available to film producers for expenditures on production of feature films released during a given year. These tax benefits may be discontinued and impact current and deferred tax liabilities. In addition, the government of India has issued and may continue to issue tariff orders setting ceiling prices for distribution of content on cable television service charges in India.

Other proposed changes in the Indian law and policy environment which may have an impact on our business, results of operations and prospects, to the extent that we are unable to suitably respond to and comply with any such changes in applicable law and policy include the following:

- The General Anti Avoidance Rules ("GAAR") have come into effect for fiscal year 2018. The tax consequences of the GAAR provisions being applied to an arrangement could result in denial of tax benefit under the domestic tax laws as well as under a tax treaty, amongst other consequences. In the absence of any precedents on the subject, the application of these provisions is uncertain.

- The Government of India, effective July 1, 2017 implemented comprehensive national Goods and Services Tax (" **GST**") that subsumes all existing indirect taxes (such as Excise Duty, Service Tax, Countervailing Duty (CVD), Value Added Tax (VAT), Entertainment Tax at State level, Entry Tax ), and levies only one tax (GST) on value additions at national level. GST was introduced by an amendment to the Constitution of India, the Constitution (One Hundred and First Amendment) Act 2016, which grants enabling powers to central and state government to make laws relating to GST. While the Government of India and certain state governments have announced that all committed incentives will be protected following the implementation of the GST, given the limited availability of information in the public domain concerning the GST, we cannot provide any assurance as to this or any other aspect of the tax regime following implementation of the GST. Any future increases or amendments may affect the overall tax efficiency of companies operating in India and may result in significant additional taxes becoming payable. If, as a result of a particular tax risk materializing, the tax costs associated with certain transactions are greater than anticipated, it could affect the profitability of such transactions.

- GST is also expected to provide overall tax efficiencies for our business due to factors such as reduction in effective tax rate, seamless flow of credit, simplified tax structure, abolishment of inter-state barriers, and

reduction in cascading effect of taxes. Further, it is anticipated that, zero rated exports will enhance international competitiveness and that uniform tax rates will make GST neutral to geographical locations within India. However, we cannot provide any assurance as to benefits that GST may provide or any other aspect of the tax regime.

• The Organization of Economic Co-operation and Development (OECD) released the final package of all Action Plans of the Base Erosion and Profit Shifting (BEPS) project in October 2015. India is a member of G20 and active participant in the BEPS project. The BEPS project lead to a series of measures being developed across several actions such as the digital economy, treaty abuse, design of Controlled Foreign Company Rules, intangibles, country-by-country reporting, preventing artificial avoidance of PE status, improving dispute resolution etc. Several of these measures required implementation through changes in domestic law. As regards those measures which required implementation through changes to bilateral treaties, it was felt that a Multilateral Convention (MLI) that modified the existing bilateral treaty network would be preferable as it would ensure speed and consistency in implementation. Accordingly, MLI was introduced to incorporate treaty related measures identified as part of the final BEPS measures in relation to:

18

- Neutralising the effects of hybrid mismatch arrangements;
- Preventing the granting of treaty benefits in inappropriate circumstances;
- Preventing the artificial avoidance of Permanent Establishment status;
- Making dispute resolution mechanisms more effective.

India signed the MLI to implement tax treaty related measures to prevent BEPS on June 7, 2017. The MLI will operate to modify the existing tax treaties entered into between various countries.

- An equalization levy, or EL, in respect of e-commerce transactions has been introduced in India with effect from June 1, 2016. EL is to be deducted in respect of payments towards "specified services" (in excess of Indian Rupees 100,000). A "specified service" means online advertisement, any provision for digital advertising space or any other facility or service for the purpose of online advertisement and includes any other service as may be notified. Deduction of EL at the rate of six percent (on a gross basis) is the responsibility of Indian residents or non-residents having a permanent establishment, or PE, in India on payments to non-residents (not having a PE in India). Consequently, if a non-resident (not having a PE in India) earns income towards a "specified service" which is chargeable to EL, then the same would be exempt in the hands of non-resident company.

- The concept of Place of Effective Management (POEM) was introduced for the purpose of determining tax residence of foreign companies in India, effective April 1, 2016. The POEM is defined as the place where key management and commercial decisions that are necessary for the conduct of the business of an entity as a whole are in substance made. This could have significant impact on the foreign companies holding board meeting(s) in India, having key managerial personnel located in India, having regional headquarters located in India, etc. One of the key consequence if in case the POEM of a foreign company is considered to be situated in India and consequently, such company becomes tax resident in India, is that the company's global income would be taxable in India (even if it is not earned in India).

Our business and financial performance could be adversely affected by unfavorable changes in or applications or interpretations of existing, or the promulgation of new, laws, rules and regulations applicable to us and our business. Such unfavorable changes could decrease demand for our products, increase costs and/or subject us to additional liabilities.

Tax increases could place pricing pressures on cable television service providers and broadcasters, which may, among other things, restrict the ability and willingness of cable television broadcasters in India to pay for content acquisition, including for our films. Any of the foregoing could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Natural disasters, epidemics, terrorist attacks and other acts of violence or war could adversely affect the financial markets, result in a loss of business confidence and adversely affect our business, prospects, financial condition and results of operations.***

Numerous countries, including India, have experienced community disturbances, strikes, terrorist attacks, riots, epidemics and natural disasters. These acts and occurrences may result in a loss of business confidence and could cause a temporary suspension of our operations, for example, local authorities close theaters and could have an adverse effect on the financial markets and economies of India and other countries. Such closures have previously, and could in the future, impact our ability to exhibit our films and have a material adverse effect on our business, prospects, financial condition and results of operations. In addition, travel restrictions as a result of such events may interrupt our marketing and distribution efforts and have an adverse impact on our ability to operate effectively.

***Our insurance coverage may be inadequate to satisfy future claims against us.***

While we believe that we have adequately insured our operations and property in a way that we believe is customary in the Indian film entertainment industry and in amounts that we believe to be commercially appropriate, we may become subject to liabilities against which we are not adequately insured or against which we cannot be insured, including losses suffered that are not easily quantifiable and cause severe damage to our reputation. Film bonding, which is a customary practice for U.S. film companies, is rarely used in India. Even if a claim is made under an existing insurance policy, due to exclusions and limitations on coverage, we may not be able to successfully assert our claim for any liability or loss under

such insurance policy. In addition, in the future, we may not be able to maintain insurance of the types or in the amounts that we deem necessary or adequate or at premiums that we consider appropriate. The occurrence of an event for which we are not adequately or sufficiently insured including any class action litigation, the successful assertion of one or more large claims against us that exceed available insurance coverage, the successful assertion of claims against our co-producers, or changes in our insurance policies could have a material adverse effect on our business, prospects, financial condition and results of operations.

19

***Our Indian subsidiary, Eros India, from which we derive a substantial portion of our revenues, is publicly listed and we may lose our ability to control its activities.***

Our Indian subsidiary, Eros India, from which we derive a substantial portion of our revenues, is publicly listed on the Indian stock exchanges. As such, under Indian law, minority stockholders have certain rights and protections against oppression and mismanagement. Further, as of July 30, 2018 we owned approximately 60.06% of Eros India. Over time, we may lose control over its activities and, consequently, lose our ability to consolidate its revenues.

***Dividend distributions by our subsidiaries are subject to certain limitations under local laws, including Indian and Dubai law and other contractual restrictions.***

As a holding company, we rely on funds from our subsidiaries to satisfy our obligations. Dividend payments by our subsidiaries, including Eros India, are subject to certain limitations under local laws. For example, under Indian law, dividends other than in cash are not permitted and cash dividends are only permitted to be paid out of distributable profits. Dubai law imposes similar limitations on dividend payments. An Indian company paying dividends is also liable to pay dividend distribution tax at an effective rate of 20.56% including cess and surcharge.

***The Relationship Agreement with our subsidiaries may not reflect market standard terms that would have resulted from arm's length negotiations among unaffiliated third parties and may include terms that may not be obtained from future negotiations with unaffiliated third parties.***

The 2009 Relationship Agreement was renewed with the execution of the 2016 Relationship Agreement between Eros India, Eros Worldwide and us ("Relationship Agreement"). The Relationship Agreement, exclusively assigns to Eros Worldwide, certain intellectual property rights and all distribution rights (including global digital distribution rights) for films (other than Tamil films), held by Eros India or any of its subsidiary (the "Eros India Group"), in all territories other than India, Nepal, and Bhutan. In return, Eros Worldwide provides a lump sum minimum guaranteed fee to the Eros India Group in a fixed payment equal to 40% of the production cost of such film (including all costs incurred in connection with the acquisition, pre-production, production or post-production of such film), plus an amount equal to 20% thereon as markup. We refer to these payments collectively as the Minimum Guaranteed Fee. Eros Worldwide is also required to reimburse the Eros India Group pre-approved distribution expenses in connection with such film, plus an amount equal to 20% thereon as markup ("distribution expenses"). In addition, 15% of the gross proceeds received by the Eros International Group from monetization of such films, after certain amounts are retained by the Eros International Group, are payable over to the Eros India Group.

The Relationship Agreement may not reflect terms that would have resulted from arm's length negotiations among unaffiliated third parties, and the Eros's future operating results may be negatively affected if it does not receive terms as favorable in future negotiations with unaffiliated third parties. Further, as Eros does not have complete control of Eros India, it may lose control over its activities and, consequently, its ability to ensure its continued performance under the Relationship Agreement.

The transfer pricing arrangements in the Relationship Agreement are not binding on the applicable taxing authorities, and may be subject to scrutiny by such taxing authorities. Accordingly, there may be material and adverse tax consequences if the applicable taxing authorities challenge these arrangements, and they may adjust our income and expenses for tax purposes for both present and prior tax years, and assess interest on the adjusted but unpaid taxes.

***Our indebtedness could adversely affect our operations, including our ability to perform our obligations, fund working capital and pay dividends.***

As of March 31, 2018, we had $278.2 million of borrowings outstanding of which $152.3 million is repayable within one year. We may also incur substantial additional indebtedness. Our indebtedness could have important consequences, including the following:

- we could have difficulty satisfying our debt obligations, and if we fail to comply with these requirements, an event of default could result;
- we may be required to dedicate a substantial portion of our cash flow from operations to required payments on indebtedness, thereby reducing the cash flow available to fund working capital, capital expenditures and other

general corporate activities or to pay dividends;

- in order to manage our debt and cash flows, we may increase our short-term indebtedness and decrease our long-term indebtedness which may not achieve the desired results;
- covenants relating to our indebtedness may restrict our ability to make distributions to our shareholders;
- covenants relating to our indebtedness may limit our ability to obtain additional financing for working capital, capital expenditures and other general corporate activities, which may limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

20

- lenders are able to require us to repay their secured loans to each of Eros India and Eros International Limited prior to their maturity, which as of March 31, 2018, represented $105.5 million of the outstanding indebtedness of Eros India and $16.6 million of the outstanding indebtedness of Eros International Limited. Further in the event we decide to repay certain lenders of Eros India, we will be required to obtain their prior approval and/or prior notice of up to 30 days and this may also involve levy of prepayment charges of up to 2%;
- certain Eros India loan agreements are subject to annual renewal, and until these renewals are obtained, the lenders under these loan agreements may at any time require repayment of amounts outstanding. As at March 31, 2018, loan agreements amounting to $64.2 million were pending annual renewal;
- we may be more vulnerable to general adverse economic and industry conditions;
- we may be placed at a competitive disadvantage compared to our competitors with less debt; and
- we may have difficulty repaying or refinancing our obligations under our senior credit facilities on their respective maturity dates.

If any of these consequences occur, our financial condition, results of operations and ability to pay dividends could be adversely affected. This, in turn, could negatively affect the market price of our A ordinary shares, and we may need to undertake alternative financing plans, such as refinancing or restructuring our debt, selling assets, reducing or delaying capital investments or seeking to raise additional capital.

We cannot assure that any refinancing would be possible, that any assets could be sold, or, if sold, of the timing of the sales and the amount of proceeds that may be realized from those sales, or that additional financing could be obtained on acceptable terms, if at all.

***Our ability to incur debt and the use of our funds could be limited by the restrictive covenants in existing credit facilities as well as the Notes and our GBP denominated London Stock Exchange listed bond ("UK Retail Bond").***

Our existing credit facilities, the Notes and the UK Retail Bond contain restrictive covenants, as well as requirements to comply with certain leverage and other financial maintenance tests. These covenants and requirements could limit our ability to take various actions, including incurring additional debt, guaranteeing indebtedness and engaging in various types of transactions, including mergers, acquisitions and sales of assets. These covenants could place us at a disadvantage compared to some of our competitors, who may have fewer restrictive covenants and may not be required to operate under these restrictions. Further, these covenants could have an adverse effect on our business by limiting our ability to take advantage of financing, mergers and acquisitions or other opportunities.

***We may not be able to generate sufficient cash to service all of our Indebtedness, and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful.***

Based on interest rates as of March 31, 2018, and assuming no additional borrowings or principal payments on our credit facilities, Notes and the UK Retail Bond until their maturities, we would need approximately $152.3 million over the next year, and $125.8 million over the next five years, to meet our principal under our debt agreements. Our ability to satisfy our debt obligations will depend upon, among other things:

- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control;
- our ability to refinance our debt as it becomes due, which will be affected by the cost and availability of credit; and
- our future ability to borrow under our revolving credit facilities, the availability of which depends on, among other things, our compliance with the covenants in our revolving credit facilities.

There can be no assurance that our business will generate sufficient cash flow from operations, or that we will be able to refinance debt as it comes due or draw under our revolving credit facilities in an amount sufficient to fund our liquidity needs. If our cash flows and capital resources are insufficient to service our indebtedness, we may be forced to reduce or delay capital expenditures, sell assets, or seek additional capital. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. In addition, the terms of existing or future debt agreements may restrict us from adopting some of these alternatives. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our debt could

be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. If we are unable to generate sufficient cash flow, refinance our debt on favorable terms or sell additional debt or equity securities or our assets, it could have a material adverse effect on our financial condition and on our ability to make payments on our indebtedness.

21

Our trade accounts receivables were $225.0 million as at March 31, 2018, $226.8 million as of March 31, 2017 and $169.3 million as at March 31, 2016. If the cash flow, working capital, financial condition or results of operations of our customers deteriorate, they may be unable, or they may otherwise be unwilling, to pay trade account receivables owed to us promptly or at all. In addition, from time to time, we have significant concentrations of credit risk in relation to our trade account receivables as a result of individual theatrical releases, television syndication deals or music licenses. Although we use contractual terms to stagger receipts, de-recognition of financial assets and/or the release or airing of content, as of March 31, 2018, 20.5% of our trade account receivables were represented by our top five debtors, compared to 25.1% as of March 31, 2017. Any substantial defaults or delays by our customers could materially and adversely affect our cash flows, and we could be required to terminate our relationships with customers, which could adversely affect our business, prospects, financial condition, results of operations.

***We face risks relating to the international distribution of our films and related products.***

We derive a significant percentage of our net revenues from customers located outside of India. We derived 57.9% of our fiscal year 2018 net revenue from the monetization of our films in territories outside of India. We do not track revenues by geographical region other than based on our Company or customer domicile and not necessarily the country where the rights have been monetized or licensed. As a result, revenue by customer location may not be reflective of the potential of any given market. As a result of changes in the location of our customers, our revenues by customer location may vary year to year. Further, we may enter into a number of our contracts for international markets that have longer payment cycles that may extend up to 18-24 months from the date of the contract creating a mismatch in revenue and cash received.

We are currently in the process of entering the China market. If we are unsuccessful in the production, distribution and monetization of films not only in India but also in the international markets including China, we may suffer losses and it may materially affect our growth prospects.

Our business is subject to risks inherent in international trade, many of which are beyond our control. These risks includes:

- fluctuating foreign exchange rates;
- laws and policies affecting trade, investment and taxes, including laws and policies relating to the repatriation of funds and withholding taxes and changes in these laws;
- differing cultural tastes and attitudes, including varied censorship laws;
- differing degrees of protection for intellectual property;
- financial instability and increased market concentration of buyers in other markets;
- higher past due debtor days and difficulty of collecting trade receivables across multiple jurisdictions;
- the instability of other economies and governments; and
- war and acts of terrorism.

Events or developments related to these and other risks associated with international trade could adversely affect our revenues from non-Indian sources, which could have a material adverse effect on our business, prospects, financial condition and results of operations.

***We may pursue acquisition opportunities, which could subject us to considerable business and financial risk, divert management's attention and otherwise disrupt our operations and harm our operating results. We may fail to acquire companies whose market power or technology could be important to the future success of our business.***

We evaluate potential acquisitions of complementary businesses on an ongoing basis and may from time to time pursue acquisition opportunities. We may in the future seek to acquire or invest in other companies or technologies that we believe could complement or expand our services, enhance our technical capabilities, or otherwise offer growth opportunities. Pursuit of future potential acquisitions may divert the attention of management and cause us to incur various expenses in identifying, investigating, and pursuing suitable acquisitions, whether or not they are consummated. We may not be successful in identifying acquisition opportunities, assessing the value, strengths and weaknesses of

these opportunities or consummating acquisitions on acceptable terms. In addition, we have limited experience acquiring and integrating other businesses. We may be unsuccessful in integrating our recently acquired businesses or any additional business we may acquire in the future, and we may fail to acquire companies whose market power or technology could be important to the future success of our business. Future acquisitions may result in near term dilution to earnings, including potentially dilutive issuances of equity securities or issuances of debt. For instance, in fiscal year 2016, our subsidiary, Eros India acquired 100% of the shares and voting interest in Techzone, to utilize Techzone's billing integration and distribution across major telecom operations in India, in order to complement our Eros Now services. Acquisitions may expose us to particular business and financial risks that include, but are not limited to:

- diverting of financial and management resources from existing operations;
- incurring indebtedness and assuming additional liabilities, known and unknown, including liabilities relating to the use of intellectual property we acquire, including costs or liabilities arising from the acquired companies' failure to comply with intellectual property laws and licensing obligations they are subject to;
- incurring significant additional capital expenditures, transaction and operating expenses and non-recurring acquisition-related charges;
- experiencing an adverse impact on our earnings from the amortization or impairment of acquired goodwill and other intangible assets;
- failing to successfully integrate the operations and personnel of the acquired businesses;
- entering new markets or marketing new products with which we are not entirely familiar;
- failing to retain key personnel of, vendors to and clients of the acquired businesses;
- harm to our existing business relationships with business partners and advertisers as a result of the acquisition;
- harm to our brand and reputation; and
- use of resources that are needed in other parts of our business.

In addition, a significant portion of the purchase price of companies we acquire may be allocated to acquired goodwill, which must be assessed for impairment at least annually. In the future, if our acquisitions do not yield expected returns, we may be required to take charges to our operating results based on this impairment assessment process. Acquisitions also could result in dilutive issuances of equity securities or the incurrence of debt, which could adversely affect our operating results. In addition, if an acquired business fails to meet our expectations, our operating results, business, and financial condition may suffer.

If we are unable to address the risks associated with acquisitions, or if we encounter expenses, difficulties, complications or delays frequently encountered in connection with the integration of acquired entities and the expansion of operations, we may fail to achieve acquisition synergies and may be required to focus resources on integration of operations rather than on our primary business activities. In addition, future acquisitions could result in potentially dilutive issuances of our A ordinary shares, the incurrence of debt, contingent liabilities or amortization expenses, or write-offs of goodwill, any of which could harm our financial condition.

***We may require additional capital to support business growth and objectives, and this capital might not be available on acceptable terms, if at all.***

We intend to continue to make investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new features or enhance our existing services, expand into additional markets around the world, improve our infrastructure, or acquire complementary businesses and technologies. Accordingly, we may need to engage, and have engaged, in equity and debt financings to secure additional funds. If we raise additional funds through future issuances of equity or convertible debt securities, our existing shareholders could suffer additional significant dilution, and any new equity securities we issue could have rights, preferences, and privileges superior to those of holders of our ordinary shares. Any debt financing we secure in the future, including pursuant to the unwind described above, also could contain restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and pursue business opportunities, including potential acquisitions. We may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth, acquire or retain consumers and subscribers, and to respond to business challenges could be significantly impaired, and our business may be harmed.

### Risks Related to our A Ordinary Shares

***Our A ordinary share price may be highly volatile and, as a result, shareholders could lose a significant portion or all of their investment or we could become subject to securities class action litigation.***

Prior to November 12, 2013, our ordinary shares had been admitted on the Alternative Investment Market of the London Stock Exchange ("AIM") since 2006 and our 'A' ordinary shares have been traded on the New York Stock Exchange ("NYSE") since our initial public offering. The trading price of our ordinary shares on AIM and the NYSE has been highly volatile. For example, the highest price that our ordinary shares traded in the period beginning November 12, 2012 and ending November 12, 2013 was $4.48 per share and the lowest price was $2.96 per share, prior to giving effect to the one-for-three reverse stock split effectuated on November 12, 2013. Since the listing of our A ordinary shares on the NYSE, the highest closing price of the A ordinary shares, in the period beginning November 12, 2013 and ended May 31, 2018, was $39.01 per share and the lowest price was $5.59 per share. The market price of the A ordinary shares on the NYSE may fluctuate as a result of several factors, including the following:

- attacks from short sellers;
- variations in our quarterly operating results;
- adverse media report about us or our directors and officers;
- changes in financial estimates or publication of research reports by analysts regarding our A ordinary shares, other comparable companies or our industry generally;
- volatility in our industry, the industries of our customers and the global securities markets;
- risks relating to our business and industry, including those discussed above;
- strategic actions by us or our competitors;
- adverse judgments or settlements obligating us to pay damages;
- actual or expected changes in our growth rates or our competitors' growth rates;
- investor perception of us, the industry in which we operate, the investment opportunity associated with the A ordinary shares and our future performance;
- additions or departures of our executive officers;

- · trading volume of our A ordinary shares;
- · sales of our ordinary shares by us or our shareholders;
- · domestic and international economic, legal and regulatory factors unrelated to our performance; or
- · the release or expiration of lock-up or other transfer restrictions on our outstanding A ordinary shares.

These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions or interest rate changes may cause the market price of ordinary shares to decline.

In addition, some companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. A putative securities class action has been pending against Eros and certain of its officers since November 2015. Although the United States District Court for the Southern District of New York dismissed this putative class action with prejudice on September 25, 2017, the class action plaintiffs are pursuing an appeal before the United States Court of Appeals for the Second Circuit. Securities litigation against us could result in substantial costs and divert our management's attention from other business concerns, which could adversely impact our business and affect the market price of our A ordinary shares.

***Additional equity issuances will dilute your holdings, and sales by the Founders Group could adversely affect the market price of our A ordinary shares.***

Sales of a large number of our ordinary shares by the Founders Group, as defined in "Part I — Item 4. Information on the Company — C. Organizational Structure" could adversely affect the market price of our A ordinary shares. Similarly, the perception that any such primary or secondary sale may occur; could adversely affect the market price of our A ordinary shares. Any future issuance of our A ordinary shares by us may dilute the holdings of our existing shareholders, causing the market price of our A ordinary shares to decline. In addition, any perception by potential investors that such issuances or sales might occur could also affect the trading price of our A ordinary shares.

***The Founders Group, which includes our Chairman, Kishore Lulla, holds a substantial interest in and, through the voting rights afforded to our B ordinary shares and held by the Founders Group, will continue to have the ability to exercise a controlling influence over our business, which will limit your ability to influence corporate matters.***

Our B ordinary shares have ten votes per share and our A ordinary shares, which are trading on the NYSE, have one vote per share. As of July 30, 2018, the Founders Group collectively owns 38.6% of our issued share capital in the form of 16,834,066 A ordinary shares, representing 10.8% of the voting power of our outstanding ordinary shares, and 9,712,715 B ordinary shares, representing all of our B ordinary shares and 62.2% of the voting power of our outstanding ordinary shares.

Due to the disparate voting powers attached to our two classes of ordinary shares, the Founders Group continues to have significant influence over management and affairs and over all matters requiring shareholder approval, including our management and policies and the election of our directors and senior management, the approval of lending and investment policies, revenue budgets, capital expenditure, dividend policy, significant corporate transactions, such as a merger or other sale of our company or its assets and strategic acquisitions, for the foreseeable future. In addition, because of this dual class structure, the Founders Group will continue to be able to control all matters submitted to our shareholders for approval unless and until they come to own less than 10% of the outstanding ordinary shares, when all B ordinary shares held by the Founders Group will automatically convert into A ordinary shares on a one-for-one basis.

This concentrated control could delay, defer or prevent a change in control of our Company, impede a merger, consolidation, takeover or other business combination involving our Company, or discourage a potential acquirer from making a tender offer, initiating a potential merger or takeover or otherwise attempting to obtain control of the Company even though other holders of A ordinary shares may view a change in control as beneficial. Many of our directors and senior management also serve as directors of, or are employed by, our affiliated companies, and we cannot guarantee that any conflicts of interest will be resolved in our favor. As a result of these factors, members of the Founders Group may influence our material policies in a manner that could conflict with the interests of our shareholders. As a result, the market price of our A ordinary shares could be adversely affected.

***We will continue to incur substantial costs as a result of being a U.S. public company.***

We became a U.S. public company in November 2013. As a U.S. public company, we incur significant legal, accounting and other expenses and these expenses will likely increase after we no longer qualify as an "emerging growth company." Being a U.S. public company increased our legal and financial compliance costs and make some activities more time-consuming and costly. In addition it has made it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage in the future. As a result, it may be more difficult for us to attract and retain qualified individuals to serve on our board of directors or as executive officers.

***As a foreign private issuer, we are subject to different U.S. securities laws and NYSE governance standards than domestic U.S. issuers. This may afford less protection to holders of our A ordinary shares, and you may not receive corporate and Company information and disclosure that you are accustomed to receiving or in a manner in which you are accustomed to receiving it.***

As a foreign private issuer, the rules governing the information that we disclose differ from those governing U.S. corporations pursuant to the Securities Exchange Act of 1934, as amended, or the Exchange Act. Although we intend to report quarterly financial results and report certain material events, we are not required to file quarterly reports on Form 10-Q or provide current reports on Form 8-K disclosing significant events within four days of their occurrence and our quarterly or current reports may contain less information than required under U.S. filings. In addition, we are exempt from the Section 14 proxy rules, and proxy statements that we distribute will not be subject to review by the SEC. Our exemption from Section 16 rules regarding sales of ordinary shares by insiders means that you will have less data in this regard than shareholders of U.S. companies that are subject to the Securities Exchange Act. As a result, you may not have all the data that you are accustomed to having when making investment decisions. For example, our officers,

directors and principal shareholders are exempt from the reporting and "short-swing" profit recovery provisions of Section 16 of the Exchange Act and the rules thereunder with respect to their purchases and sales of our A ordinary shares.

The periodic disclosure required of foreign private issuers is more limited than that required of domestic U.S. issuers and there may therefore be less publicly available information about us than is regularly published by or about U.S. public companies. See "Part I — Item 10. Additional Information — H. Documents on Display."

As a foreign private issuer, we are exempt from complying with certain corporate governance requirements of the NYSE applicable to a U.S. issuer, including the requirement that a majority of our board of directors consist of independent directors. Although we are in compliance with the current NYSE corporate governance requirements imposed on U.S. issuers, with the exception of our Audit Committee currently having two rather than three members, our charter does not require that we meet these requirements.

24

As the corporate governance standards applicable to us are different than those applicable to domestic U.S. issuers, you may not have the same protections afforded under U.S. law and the NYSE rules as shareholders of companies that do not have such exemptions. It is also possible that the significant ownership interest of the Founders Group could adversely affect investor perception of our corporate governance.

***We are currently an "emerging growth company" and if we decide to comply only with reduced disclosure requirements applicable to emerging growth companies, our A ordinary shares could be less attractive to investors and our share price may be more volatile.***

We are an "emerging growth company," as defined in the JOBS Act, and, for as long as we continue to be an "emerging growth company," we may choose to take advantage of exemptions from various reporting requirements applicable to other public companies but not to "emerging growth companies," including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the SOx Act. We will cease to be an "emerging growth company" upon the earliest of (1) the first fiscal year following the fifth anniversary of our initial public offering, November 12, 2013, (2) the first fiscal year after our annual gross revenue is $1 billion or more, (3) the date on which we have, during the previous three-year period, issued more than $1 billion in non-convertible debt securities or (4) the end of any fiscal year in which the market value of our common stock held by non-affiliates exceeds $700 million as of the end of the second quarter of that fiscal year. We currently anticipate that we will lose our "emerging growth company" status as of the end of fiscal 2019. We cannot predict if investors will find our A ordinary shares less attractive if we choose to rely on these exemptions. If someinvestors find our A ordinary shares less attractive as a result of any choices to reduce future disclosure, there may be a less active trading market for our A ordinary shares and our share price may be more volatile.

***You may be subject to Indian taxes on income arising through the sale of our A ordinary shares.***

The Indian Income Tax Act, 1961 has been amended to provide that income arising directly or indirectly through the sale of a capital asset, including shares of a company incorporated outside of India, will be subject to tax in India, if such shares derive, directly or indirectly, their value substantially from assets located in India, whether or not the seller of such shares has a residence, place of business, business connection, or any other presence in India, if, on the specified date, the value of such assets (i) represents 50% of the value of all assets owned by the company or entity, or and (ii) exceeds the amount of 100 million rupees.

If the Indian tax authorities determine that our A ordinary shares derive their value substantially from assets located in India you may be subject to Indian income taxes on the income arising, directly or indirectly, through the sale of our A ordinary shares. However, the impact of the above indirect transfer provisions would need to be separately evaluated under the tax treaty scenario of the country of which the shareholder is a tax resident. For additional information, see "Part I—Item 10. Additional Information—E. Taxation."

***We are an Isle of Man company and, because judicial precedent regarding the rights of shareholders is more limited under Isle of Man law than under U.S. law, you may have less protection of your shareholder rights than you would under U.S. law.***

Our constitution is set out in our memorandum and articles of association, and we are subject to the Isle of Man Companies Act 2006, as amended, — see "Part II — Item 4. Information on the Company — Government Regulations" and Isle of Man common law. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Isle of Man law are to an extent governed by the common law of the Isle of Man. The common law of the Isle of Man is derived in part from comparatively limited judicial precedent in the Isle of Man as well as from English common law, which has persuasive, but not binding, authority on a court in the Isle of Man. The rights of our shareholders and the fiduciary responsibilities of our directors under Isle of Man law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Isle of Man has a less developed body of securities laws than the United States. In addition, some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Isle of Man. Furthermore, shareholders of Isle of Man companies may not have standing to initiate a shareholder derivative action in a federal court of the United States. As a result, shareholders may have more difficulties

in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as shareholders of a U.S. company.

***Our board of directors may determine that a shareholder meets the criteria of a "prohibited person" and subject such shareholder's shares to forced divestiture.***

Our articles of association permit our board of directors to determine that any person owning shares (directly or beneficially) constitutes a "prohibited person" and is not qualified to own shares if such person is in breach of any law or requirement of any country and, as determined solely by our board of directors, such ownership would cause a pecuniary or tax disadvantage to us, another shareholder or holders of our other securities. If our board of directors determines that a shareholder meets the above criteria of a "prohibited person," they may direct such shareholder to transfer all A ordinary shares such shareholder owns to another person. Under the provisions of our articles of association, such a determination by our board of directors would be conclusive and binding on such shareholder.

If our board of directors directs such shareholder to transfer all A ordinary shares such shareholder owns, such shareholder may recognize taxable gain or loss on the transfer. See "Part I — Item 10. Additional Information — E. Taxation" for a more detailed description of the tax consequences of a sale or exchange or other taxable disposition of such shareholders A ordinary shares.

***Judgements obtained against us by our shareholders may not be enforceable.***

We are an Isle of Man company and substantially all of our assets are located outside of the United States. A substantial part of our current operations are conducted in India. In addition, substantially all of our directors and executive officers are nationals and residents of countries other than the United States and we believe that a substantial portion of the assets of these persons may be located outside the United States. As a result, it may be difficult for you to effect service of process within the United States upon these persons. It may also be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors. Moreover, the courts of India would not automatically enforce judgments of U.S. courts obtained in such actions against us or our directors and officers, or entertain actions brought in India against us or such persons predicated solely upon United States federal securities laws. Further, the U.S. has not been declared by the Government of India to be a reciprocating territory for the purposes of enforcement of foreign judgments, and there are grounds upon which Indian courts may decline to enforce the judgments of United States courts. Some remedies available under the laws of United States jurisdictions, including remedies available under the United States federal securities laws, may not be allowed in Indian courts if contrary to public policy in India. Since judgments of United States courts are not automatically enforceable in India, it may be difficult for you to recover against us or our directors and officers based upon such judgments. There is uncertainty as to whether the courts of the Isle of Man would recognize or enforce judgments of United States courts against us or such persons predicated upon the civil liability provisions of the securities laws of the United States or any state. In addition, there is uncertainty as to whether such Isle of Man courts would be competent to hear original actions brought in the Isle of Man against us or such persons predicated upon the securities laws of the United States or any state.

***If securities or industry analysts do not publish research or publish unfavorable or inaccurate research about our business, our share price and trading volume could decline.***

The trading market for our A ordinary shares depends, in part, on the research and reports that securities or industry analysts publish about us or our business. We may be unable to sustain coverage by well-regarded securities and industry analysts. If either none or only a limited number of securities or industry analysts maintain coverage of our company, or if these securities or industry analysts are not widely respected within the general investment community, the trading price for our A ordinary shares would be negatively impacted. In the event we obtain securities or industry analyst coverage, if one or more of the analysts who cover us downgrade our A ordinary shares or publish inaccurate or unfavorable research about our business, our share price would likely decline. We have experienced such downgrade from two of our analysts in fiscal year 2016 during the period of anonymous short seller attacks on our stock. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, or fail to maintain a favourable outlook on the company, it may cause investor sentiment to be weak, demand for our A ordinary shares could decrease, which might cause our share price and trading volume to decline.

***We do not currently intend to pay dividends on our ordinary shares. Our ability to pay dividends in the future will depend upon satisfaction of the Isle of Man 2006 Companies Act solvency test, future earnings, financial condition, cash flows, working capital requirements and capital expenditures.***

We currently intend to retain any future earnings and do not expect to pay dividends on our ordinary shares. The amount of our future dividend payments, if any, will depend upon our satisfaction of the solvency test contained in the 2006 Companies Act, our future earnings, financial condition, cash flows, working capital requirements and capital expenditures. The 2006 Companies Act provides that a company satisfies the solvency test if: (i) it is able to pay its debts as they become due in the normal course of the company's business: and (ii) the value of the company's assets exceeds the value of its liabilities. There can be no assurance that we will be able to pay dividends. Additionally, we are restricted

by the terms of certain of our current debt financing facilities and may be restricted by the terms of any future debt financings in relation to the payment of dividends.

26

***We may be classified as a passive foreign investment company, or PFIC, under United States tax law, which could result in adverse United States federal income tax consequences to U.S. investors.***

Based upon the past and projected composition of our income and valuation of our assets, we do not believe we will be a PFIC for our taxable year ending December 31, 2018, and we do not expect to become one in the future, although there can be no assurance in this regard. The determination of whether or not we are a PFIC for any taxable year is made on an annual basis and will depend on the composition of our income and assets from time to time. Specifically, we will be classified as a PFIC for United States federal income tax purposes if either:

·   75% or more of our gross income in a taxable year is passive income, or

·   50% or more of the average quarterly value of our gross assets in a taxable year is attributable to assets that produce passive income or are held for the production of passive income.

The calculation of the value of our assets will be based, in part, on the then market value of our A ordinary shares, which is subject to change. We cannot assure you that we were not a PFIC for the previous taxable years or that we will not be a PFIC for this or any future taxable year. Moreover, the determination of our PFIC status is based on an annual determination that cannot be made until the close of a taxable year and involves extensive factual investigation. This investigation includes ascertaining the fair market value of all of our assets on a quarterly basis and the character of each item of income we earn, which cannot be completed until the close of a taxable year, and, therefore, our U.S. counsel expresses no opinion with respect to our PFIC status.

If we were to be or become classified as a PFIC, a U.S. Holder (as defined in "Part I — Item 10. Additional Information — E. Taxation") may be subject to burdensome reporting requirements and may incur significantly increased United States income tax on gain recognized on the sale or other disposition of the shares and on the receipt of distributions on the shares to the extent such gain or distribution is treated as an "excess distribution" under the United States federal income tax rules. Further, if we were a PFIC for any year during which a U.S. Holder held our shares, we would continue to be treated as a PFIC for all succeeding years during which such U.S. Holder held our shares. Each U.S. Holder is urged to consult its tax advisors concerning the United States federal income tax consequences of acquiring, holding and disposing of shares if we are or become classified as a PFIC. See "Part I — Item 10. Additional Information — E. Taxation" for a more detailed description of the PFIC rules.

***If the fair market value of our ordinary shares fluctuates unpredictably and significantly on a quarterly basis, the social costs we accrue for share-based compensation may fluctuate unpredictably and significantly, which could result in our failing to meet our expectations or investor expectations for quarterly financial performance. This could negatively impact investor sentiment for the Company, and as a result, adversely impact the price of our ordinary shares.***

Social costs are payroll taxes associated with employee salaries and benefits, including share-based compensation that we are subject to in various countries in which we operate.

When the fair market value of our ordinary shares increases on a quarter to quarter basis, the accrued expense for social costs will increase, and when the fair market value of ordinary shares falls, the accrued expense will become a reduction in social costs expense, all other things being equal, including the number of vested stock options and exercise price remains constant. The trading price of our A ordinary share price can be highly volatile. See "—Risks Related to our A Ordinary Shares—Our A ordinary share price may be highly volatile and, as a result, shareholders could lose a significant portion or all of their investment or we could become subject to securities class action litigation." As a result, the accrued expense for social costs may fluctuate unpredictably and significantly, from quarter to quarter, which could result in our failing to meet our expectations or investor expectations for quarterly financial performance. This could negatively impact investor sentiment for the company, and as a result, the price for our ordinary shares**.**

27

**ITEM 4. INFORMATION ON THE COMPANY**

**A. History and Development of our Company**

Eros International Plc was incorporated in the Isle of Man as of March 31, 2006 under the Companies Act 1931 commonly known as the 1931 Act — see "Part II — Item 4. Information on the Company — Government Regulations," as a public company limited by shares. Effective as of September 29, 2011, the Company was de-registered under the 1931 Act and re-registered as a company limited by shares under the Isle of Man, Companies Act 2006 (as amended) commonly referred to as the 2006 Act. We maintain our registered office at First Names House, Victoria Road, Douglas, Isle of Man IM2 4DF, British Isles, our principal executive office in the U.S.A is at 550 County Avenue, Secaucus, New Jersey 07094; and our telephone number is +1(201) 558-9001. We maintain a website at *www.erosplc.com.* Information contained in our website is not a part of, and is not incorporated by reference into, this annual report.

Our capital expenditures in fiscal 2018, 2017, and 2016 were $186.8 million, $173.5 million, and $211.3 million respectively. Our principal capital expenditures were incurred for the purposes of purchasing intangible film rights and related content. We expect our capital expenditure needs in fiscal 2019 to be approximately $200-$250 million, a significant amount of which we expect to be used for the acquisition of further intangible film rights and related content.

**B. Business Overview**

Eros International Plc is a leading global company in the Indian film entertainment industry, which co-produces, acquires and distributes Indian language films in multiple formats worldwide. The Company was founded in 1977 and is one of the oldest companies in the Indian film industry to focus on international market. We believe we are pioneers in our business. Our success is built on the relationships we have cultivated over the past 40 years with leading talent, production companies, exhibitors and other key participants in our industry. By leveraging these relationships, we have aggregated rights to over 3,000 films in our library, including recent and classic titles that span different genres, budgets and languages. Eros Now, our digital OTT entertainment service, has rights to over 11,000 films, out of which approximately 5, 000 films are owned in perpetuity, across Hindi and regional languages from Eros's internal library as well as third party aggregated content, which we believe makes it one of the largest Indian movie offering platforms around the world.

We have a multi-platform business model and derive revenues from the following three distribution channels:

- **Theatrical:** The theatrical channel largely includes revenues from multiplex chains, single screen theaters, distributors and content aggregators in case of dubbed and/or subtitled versions. We are a leading player in a growing and under-penetrated cinema market with two and seven out of top 15 box office hits in calendar year 2016 and 2015 respectively. We released a total of 24 films in fiscal year 2018, including 1 high budget film and 4 medium budget films. Based on gross collections reported by comScore, our market share (as an average over the preceding seven calendar years to 2017) is 27% of all theatrically released Indian language films in the United Kingdom and the U.S.

- **Television Syndication:** We de-risk our theatrical revenues while enhancing revenue predictability through pre-sales and television syndication which includes satellite television broadcasting, cable television and terrestrial television which are facilitated by our long-standing Eros brand, reputation and industry relationships. We license Indian film content (usually a combination of new releases and existing films in our library) over a stated period of time in exchange for a license fee, where payments terms may extend up to 18-24 months in some cases.

- **Digital and ancillary:** In addition to our theatrical and television distribution networks, we have a global network for the digital distribution of our content, which consists of full length films, music, music videos, clips and other video content. Through our digital distribution channel, we mainly monetize music assets and distribute movies and other content primarily in Internet Protocol television (IPTV), Video on Demand (VOD) (including Subscription Video on Demand (SVOD) and Direct-to-Home (DTH)) and online internet channels. This enables us to prolong the lifecycle of our films and film library. To date Eros Now has successfully premiered over 180 films and over 280 episodes of original short form programming. We are present in a high-growth digital market with India projected to have over 829 million internet users by 2021, according to the FICCI Report 2018.

28

**Content development and acquisition**

The success of our film distribution business lies in our ability to acquire and develop content. We have been building and adding to our film library for the past 40 years and each year, through acquisition and co-production arrangements, we seek to acquire rights to 40 to 50 additional films. We currently own or have license rights over approximately 3,000 films, including recent and classic titles that span different genres, budgets and languages. Each year, we focus on co-production, acquisition and distribution of a diverse portfolio of Indian language and themed films that we believe will have a wide audience appeal. For fiscal 2018, we released a total of 24 films in India and overseas. These comprised 14 Hindi films, 1 Tamil language film and 9 regional films. The Company's strong portfolio of films drove theatrical, television and digital/ancillary revenues worldwide with key titles such as *Munna Michael (Hindi), Shubh Mangal Saavdhan (Hindi), Sarkar 3 (Hindi), Oru Kidayin Karunai Manu (Tamil), Newton (Hindi), Sniff (Hindi), Posto (Bengali)* contributing a significant share to our revenue for fiscal 2018.

For fiscal year 2018, our aggregate revenues were $261.3 million which were derived from theatrical, television syndication and digital and ancillary distribution channels. Our typical annual slate of new releases consists of both Hindi language films and regional language films, primarily Tamil, Telugu and other regional Indian languages. Our most expensive films are generally the high and medium budget films (mainly Hindi and a few Tamil and Telugu films) which we release globally. Of the total 24 movies released in the fiscal 2018, one was a high budget film. We released 4 medium budget films in fiscal 2018 which mainly comprise Hindi and Tamil language films. This annual release slate is built around the high and medium budget films to create a slate that will attract varying segments of the audience. The low budget film slate consists of Hindi, Tamil, Telugu and other regional language films.

We are focusing on content driven films with appropriate budgets in order to generate attractive rate of return. We seek to mitigate the risks associated with high budget films through the use of our extensive pre-sale strategies. We have increased our focus on Tamil and Telugu films for similar reasons. In addition, we can release a Tamil and Hindi film on the same date as they cater to different audiences, which allow us to effectively schedule releases for our film portfolio and to take a greater combined share of the box office on those release dates.

With a focus on creating intellectual property in-house along with delivering wholesome entertainment to audiences, we have entered into key co-production partnerships with producers and directors. Colour Yellow Production, a subsidiary of Eros India with Aanand L Rai has announced film releases across budgets, genres and languages. This co-production model gives us better visibility on actual cost of production ensuring capped budgets and exclusive distribution rights, typically for at least 20 years.

In February 2018, Reliance Industries Ltd ("Reliance") agreed, subject to customary regulatory and other approvals, to purchase 5% of our A Ordinary shares at a price of $15 per share, which represents a premium of 18% over the last closing price before the date of announcement. At the same time, Eros India and Reliance announced an agreement to partner in India and formed Reliance Eros Productions LLP to jointly produce and consolidate content from across India. The new partnership will equally invest up to $150 million to produce and acquire Indian films and digital originals across all languages. This investment will dramatically scale Eros' capabilities in content production, marketing, and distribution, and make new strides on the digital and content forefronts, benefitting from the platform synergies across technology, content and digital platforms.

**Award winning content / franchise**

We are strategically positioned as a leader in our industry and are able to monetize our films through multiple channels globally. Our Hindi release "*Newton*" was selected as India's official entry for the Best Foreign Film language category at the 2018 Academy Awards. It also received accolades at the Berlin Film Festival. We have won over 207 awards in the last four Fiscal Years including Best Studio of the Year and Excellence in International Distribution. Some of our films from fiscal year 2018 that won awards include – *Newton, Shubh Mangal Savdhaan* and *Munna Michael*. *Newton* won 11 awards including Best International Film. *Shubh Mangal Savdhaan* won 3 awards including Marketing Campaign of the Year. *Munna Michael* won 2 awards including Best Social Media Marketing Campaign. Our films over the years have won various awards in multiple categories such as Best Film, Best Director, Best Story, Best Actor, Best Music, Best Special

Effects awards, and Innovative Marketing Campaign and Best Child Actor awards, to name a few . *Bajrangi Bhaijaan* won 37 awards including National Award for Popular Film. *Bajirao Mastani* won over 79 award titles including National Award for Best Director. *Tanu Weds Manu Returns* won 18 awards including National Award for Best Female Actor in a leading role, *Hero* won 7 awards and *Badlapur* won 7 awards. Our Malayalam film *Pathemari* had also won a national award for Best Malayalam Film. Eros India has featured as 'India's Top 500 Companies' as per Dun & Bradstreet Report 2018.

29

**Market opportunity**

***Domestic***: Our distribution capabilities enable us to target a majority of the 1.3 billion people in India. Recently, as demand for regional films and other media has increased in India, our brand recognition in Hindi films has helped us to grow our non-Hindi film business by targeting regional audiences in India and overseas. With our distribution network for Hindi and Tamil films, we believe we are well positioned to expand our offering of non-Hindi content.

***Overseas:*** Depending on the film, the distribution rights we acquire may be global, international or India only. Indian films have a global appeal and their popularity has been increasing in many countries that consume dubbed and subtitled foreign content in local languages. These markets include Germany, Poland, Russia, France, Italy, Spain, Indonesia, Malaysia, Japan, South Korea, China, the Middle East and Latin America among others. In all these markets it is the locals who are neither English nor Hindi speaking who view the content of the Indian film in a dubbed or subtitled version in their language, similar to the manner in which they view Hollywood content. Additionally, there is a large established Indian diaspora in North America which has a strong interest in the content of the Indian film industry. Based on gross collections reported by comScore, our market share (as an average over the preceding seven calendar years to 2017) is 27% of all theatrically released Indian language films in the United Kingdom and the U.S. Other international markets that exhibit significant demand for subtitled or dubbed Indian-themed entertainment include Europe and Southeast Asia. China is increasingly becoming an important market and we expect to release select films from our slate for wider release into China. In fiscal year 2018, Eros released *Bajarangi Bhaijan* across more than 8,000 screens in March 2018 and has since collected over $45 million at the box office in China. Based on information published by PricewaterhouseCoopers on PwC Global Entertainment and Media Outlook 2017 — 2021, China was the world's second largest box-office market with revenue of $6.2bn in 2016. It is a lucrative market for cinema with revenue expected to grow at a 11.6% CAGR from US$6.2bn in 2016 to US$10.7bn by 2021. China had 41,056 cinema screens compared to 40,928 in the US in 2016 and by 2021, China will have more than 80,000 screens, nearly twice as many as the US.

**Eros Now**

With falling smartphone prices, reduced data costs, increasing mobile data speed and the flexibility of viewing content at any hour of the day, OTT platforms are fast becoming favoured entertainment destination for youth. In fact, currently, 80% of the OTT content consumers are under 30 years of age and are starting to pay a premium for their choice of content according to the FICCI Report 2017. As of March 31, 2018, Eros Now has exceeded 100 million registered users and 7.9 million paying users worldwide across APP, WAP and Web. This growth represents a 58% increase over the last reported quarter and a 276% increase from 2.1 million paying subscribers in fiscal year 2017. We define paying subscribers to mean any subscriber who has made a valid payment to subscribe to a service that includes Eros Now services as part of a bundle or on a standalone basis, either directly or indirectly through an Original Equipment Manufacturer ("OEM") or mobile telecom provider in any given month, be it through a daily, weekly or monthly billing pack, as long as the validity of the pack is for at least one month. Eros Now users have demonstrated some of the highest levels of engagement in the India OTT space. Average session time for an engaged Eros Now user is over 40 minutes which is an industry high.

We believe Eros Now has the largest Indian language movie content library worldwide with over 11,000 digital titles, out of which approximately 5,000 films are owned in perpetuity. Eros Now also has a deep library of short-form content, totalling over 4,400 short-form videos including music videos, trailers, original short exclusive interviews and marketing shorts. To date Eros Now has successfully premiered over 180 films in nine different languages including Hindi, English, Tamil (Mo), Bengali (Monchora), Marathi (Guru), Gujarati, Malayalam (White), Telugu and Punjabi. The digital premieres span a wide range of genres, several high profile digitally-premiered films include: *Bajrangi Bhaijaan, Bajirao Mastani, The Lunchbox, PK, Tanu Weds Manu Returns and Aligarh.*

Eros Now made its IPL debut in Season 11 as the title sponsor of Virat Kohli captained team, Royal Challengers Bangalore (RCB). The collaboration was a part of the Company's endeavour to build a truly digital video brand with Indian users and provide the best of entertainment the country has to offer. Keeping up with the FIFA World Cup fever, Eros Now launched Eros Now Betz, a unique app created for millions of football lovers globally. With Eros Now Betz, users were able to earn points for every correct prediction that they make while the matches are being played in real-time. The

platform has also tied-up with brands across verticals like banking, lifestyle and food with State Bank of India (SBI), Gold's Gym, Paytm, Nature's Basket and Voonik.

Eros Now and Reliance Jio renewed their platform integration deal. Under the deal, Jio subscribers gained access to Eros Now's high-quality content including full-length movies and thematically curated playlists along with functions such as multi-language subtitles for movies, music video playlists, regional language filters, video progression and a watch list of titles. Currently live on Samsung TV, Eros Now also entered into a strategic distribution partnership with Xiaomi, India's leading smartphone brand for its smart Mi LED TVs. This distribution deal between Eros Now and Xiaomi is an extension of the immersive content experience that both partners offer. In addition to that, Eros Now has entered the Sri Lankan market through a partnership with Dialog Axiata, Sri Lanka's premier connectivity provider, and will be available on the Dialog ViU app.

Eros is extending its technological expertise in content curation by using world-class technology for its Original Content. Each original is/will be given the treatment of a film in terms of technology used and the detailing it requires from cinematography to production at which it is created. The technology on the platform gives consumers the ease of maneuverability, including categorization, search-ability and stacking of content under different domains for easy consumer access. Eros Now is available on App Store, Play Store for download and can be streamed on any device including Android, Amazon Fire TV stick, Android TV, Apple TV, Opera TV, making the entertainment experience platform agnostic. Having tie-ups across payment gateways and financial systems worldwide it provides a seamless experience to the consumers for payments and downloads.

**Eros Now Originals**

In April 2018, Eros Now successfully premiered its first worldwide direct-to-digital original film '*Meri Nimmo*', in association with acclaimed director Aanand L Rai, to positive critical reception. The platform is excited for its slate of originals with global concepts that will entertain audiences are being produced internally in partnership with the best talent. Over the next year, Eros Now is planning to launch an exclusive stable of feature films, made-for-digital originals films and over 20 original episodic programs, out of which three original series - *Flip, Smoke* and *Side Hero* will be launched at the beginning of September. While films like Meri Nimmo and Toffee are live on the platform, upcoming titles like *Blue Oak Academy, August 25th, Bhumi, Dashavatar, Minerva Mills Malady* and *Kurukshetra* will range across genres of drama, comedy, thriller, crime, horror and mythology. These originals will have popular names like Rohan Sippy, Kunal Roy Kapoor, Rajat Kapoor, Siddharth Anand and Pavan Kriplani associated with them in various capacities.

**Eros Now — Market Opportunity**

Eros Now is uniquely positioned to benefit from the fast-growing internet and mobile penetration in India. As per Telecom Regulatory Authority of India (TRAI) there were over 1.2 billion wireless subscribers in India at the end of February 2018. The number of wireless internet users in India is likely to reach 829 million by 2021. The adoption of 4G is gradually increasing and now 3G and 4G constitute over 75% of the overall wireless internet user base. Initiatives such as broadband rollout and public Wi-Fi as part of the government's Digital India campaign and the promotion of 4G data packs by leading telecoms will only help boost the quality of digital infrastructure in India.

Our portfolio of films over the last three completed fiscal years comprised 132 films. In fiscal 2018 our aggregate revenues were $261.3 million and we released 24 films in total either in India, overseas or both. These comprised 14 Hindi films, 1 Tamil film and 9 regional language films. The Company's strong portfolio of films like *Munna Michael (Hindi), Shubh Mangal Savdhaan (Hindi), Sarkar 3 (Hindi), Oru Kidayin Karunai Manu (Tamil), Newton (Hindi), Sniff (Hindi), Posto (Bengali), Raid (Overseas)* drove theatrical, television and digital/ancillary revenues worldwide.

Our total revenues for fiscal 2018 increased to $261.3 million from $253.0 million in fiscal 2017, our net income decreased to $(9.7) million for fiscal 2018 from $11.5 million in fiscal 2017 which was mainly on account of non-cash expenses of $51.1 million in fiscal 2018 against non-cash (income) of $10.6 million in fiscal 2017. The resultant EBITDA (Non-GAAP) also decreased to $20.2 million in fiscal 2018 from $42.5 million in fiscal 2017. The Adjusted EBITDA (Non-GAAP) increased to $78.6 million from $55.7 million in fiscal 2017 on account of lower amortization charge associated to lower cost of comparable film mix. The Gross Adjusted EBITDA (Non-GAAP) increased to $193.9 million from $191.0 million.

The tables below set forth, for the periods indicated, revenue by primary geographic area based on customer location, and the percentage share of total revenue.

| | Year ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| | (in thousands) | | | | | |
| India | $ | 109,986 | $ | 129,251 | $ | 158,843 |
| Europe | | 7,739 | | 7,695 | | 24,367 |
| North America | | 5,147 | | 10,132 | | 19,865 |
| Rest of the world | | 138,381 | | 105,916 | | 71,353 |
| Total revenues | $ | 261,253 | $ | 252,994 | $ | 274,428 |

| | Year ended March 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | (%) | | |
| India | 42.1 | 51.1 | 57.9 |
| Europe | 3.0 | 3.0 | 8.9 |
| North America | 2.0 | 4.0 | 7.2 |
| Rest of the world | 52.9 | 41.9 | 26.0 |
| Total revenues | 100.0% | 100.0% | 100.0% |

We believe the following competitive strengths position us as a leading global company in the Indian film entertainment industry.

***Leading co-producer and acquirer of new Indian film content, with an extensive film library.***

As one of the leading participants in the Indian film entertainment industry we believe our size, scale and market position will continue contributing to our growth in India and internationally. We have established our size and scale by aggregating a film library of over 3,000 films. We have demonstrated our leading market position by releasing, internationally or globally, Hindi language films which were among the top grossing films in India in calendar years 2016, 2015 and 2014. We believe that we have strong relationships with the Indian creative community and a reputation for quality productions. We have also announced partnership with Reliance to equally invest up to $150 million to produce and acquire Indian films and digital originals across all languages. This investment will dramatically scale Eros' capabilities in content production, marketing, and distribution.

We believe that these factors, along with our worldwide distribution platform, will enable us to continue to attract talent and film projects of a quality that we believe is one of the best in our industry, and build what we believe will continue to be a strong film slate in the coming years with some of the leading actors and production houses with whom we have previously delivered our biggest hits. We believe that the combined strength of our new releases and our extensive film library positions us well to build new strategic relationships.

***Established, worldwide, multi-channel distribution network with entry proposed into China.***

We distribute our films to the Indian population in India, the South Asian diaspora worldwide and to non-Indian consumers who view Indian films that are subtitled or dubbed in local languages. Internationally, our distribution network extends to over 50 countries, such as the United States, the United Kingdom and throughout the Middle East, where we distribute films to Indian expatriate populations, and to Germany, Poland, Russia, Romania, Indonesia, Malaysia, Taiwan, Japan, South Korea, China and Arabic and Spanish speaking countries, where we release Indian films that are subtitled or dubbed in local languages. China is increasingly becoming an important market and we expect to release selected successful films from our slate for wider release into China. We entered the China market in fiscal year 2018 by releasing Bajarangi Bhaijaan across more than 8,000 screens in March 2018 and has grossed approximately $45 million at the box office since release. We are also planning the release of our Indo-Chinese co-productions in fiscal 2020 in India, China and the rest of the world. Through this global distribution network, we distribute Indian entertainment content over three primary distribution channels — theatrical, television syndication and digital and ancillary platforms. Our primarily internal distribution network allows us greater control, transparency and flexibility over the regions in which we distribute our films,

which we believe results in the direct exploitation of our films without the payment of significant commissions to sub-distributors.

32

***Diversified revenue streams and pre-sale strategies mitigate risk and promote stable cash flow generation.***

Our revenue model is diversified by three major distribution channels:

- · theatrical distribution;
- · television syndication; and
- · digital distribution and ancillary products and services, including Eros Now.

In fiscal 2018, our revenues from theatrical distribution accounted for nearly 30.3% of our aggregate revenues, revenues from television syndication accounted for 37.2% and digital distribution and ancillary revenues accounted for 32.5%, reflecting our diversified revenue base that reduces our dependence on any single distribution channel.

We bundle library titles with new releases to maximize cash flows and we also utilize a pre-sale strategy to mitigate new production project risks by obtaining contractual commitments to recover a portion of our capitalized film costs through the licensing of television, music and other distribution rights prior to a film's completion.

Television pre-sales in India are an important factor in enhancing revenue predictability for our business and are part of our diversification strategy to mitigate risks of cash flow generation. For fiscal 2018, we had pre-sales visibility for some of our films such as *Munna Michael*, *Sarkar 3, Shubh Mangal Saavdhan*. For fiscal 2017, pre-sales from sale of satellite television rights was achieved for our films such as *Housefull 3, Dishoom, Baar Baar Dekho, Rock On 2, Banjo, Ki & Ka* along with some regional films. In fiscal 2017, for our two high budget Hindi films we had recouped 31% to 57% of the direct production cost through television and other pre-sales and had recouped 108% and 93% of our direct production cost of the two Telugu films released through contractual commitments prior to the films releases, and 96% of our direct production cost of one Tamil film released through contractual commitments prior to the film's release.

In addition, we further seek to reduce risk to our business by building a diverse film slate, with a mix of films by budget, region and genre that reduces our reliance on "hit films." This broad-based approach also enables us to bundle old and new titles for our television and digital distribution channels to generate additional revenues long after a film's theatrical release period is completed. We believe our multi-pronged approach to exploiting content through theatrical, television syndication and digital distribution channels, our pre-sale strategies and our portfolio approach to content sourcing and exploitation mitigates our dependence on any one revenue stream and promotes cash flow generation.

**Strong brand with fast growing international reach**

Theatrical Distribution Outside India: Outside India, we distribute our films theatrically through our offices in Dubai, Singapore, the United States, the United Kingdom, Australia and Fiji and through sub-distributors in other markets. In our international markets, instead of focusing on wide releases, we select a smaller number of theaters that play films targeted at the expatriate South Asian population or the growing international audiences for Indian films. We generally theatrically release subtitled versions of our films internationally on the release date in India, and dubbed versions of films in countries outside India 12-24 weeks after their initial theatrical release in India sometimes after a long gap. In Russia, we recently partnered with Central Partnership, an affiliate of Gazprom Media, to promote and distribute Indian and Russian content across multiple platforms in both countries.

International Broadcasting Distribution: Outside of India, we license Indian film content to content aggregator to reach cable and pay TV subscriber and for broadcasting on major channels and platforms around the world, such as Channel 4 (U.K.), CCTV (China), MBC (Middle East), TV3 (Malaysia), Bollywood Channel (Israel), RTL2 (Germany), M Channel (Thailand) and National TV (Romania) amongst others. We also license dubbed content to Europe, Arabic and Spanish speaking countries and in Southeast Asia and other parts of the world. Often such licenses include not just new releases, but films grouped around the same star, director or genre. International pre-sales of television, music and other distribution rights are an important component of our overall pre-sale strategy. We believe that our international distribution capabilities and large library of content enable us to generate a larger portion of our revenue through international distribution.

**Dynamic management of our film library**

We have the ability to combine our new release strategy with our library monetization efforts to maximize our revenues. We believe our extensive film library provides us with unique opportunities for content monetization, such as our dedicated Eros content channel carried by various cable companies outside India. Our extensive film library provides us with a reliable source of recurring cash flow after the theatrical release period for a film has ended. In addition, because our film library is large and diversified, we believe that we can more effectively leverage our library in many circumstances by licensing not just single films but multiple films. The existence of high margin library monetization avenues especially in television and digital platforms reduce reliance on theatrical revenues.

***Strong and experienced management team with established relationships with key industry participants.***

Our management team has substantial industry knowledge and expertise, with a majority of our executive officers and executive directors having been involved in the film, media and entertainment industries for 20 or more years, and has served as a key driver of our strength in content sourcing. In particular, several members of our management team have established personal relationships with leading talent, production companies, exhibitors and other key participants in the Indian film industry, which have been critical to our success. Through their relationships and expertise, our management team has also built our global distribution network, which has allowed us to effectively exploit our content globally.

**Our Strategy**

Our strategy is driven by the scale and variety of our content and the global exploitation of that content through diversified channels. Specifically, we intend to pursue the following strategies:

***Scaling up productions and co-productions including recently announced partnership with Reliance, to augment our film library and focus on creating never before seen Digital content.***

We will continue to leverage the longstanding relationships with creative talent, production houses and other key industry participants that we have built since our founding to source a wide variety of content. Our focus will be on investing in future slates comprised of a diverse portfolio mix ranging from high budget global theatrical releases to lower budget movies with targeted audiences. We intend to maintain our focus on high and medium budget films and augment our library with quality content for exploitation through our distribution channels and explore new bundling strategies to monetize existing content.

We continue to be focused on ramping up our own productions and co-productions through key partnerships. These partnerships include our partnership with talented producer-director, Aanand L Rai (Colour Yellow Production) and our partnership with Reliance to equally invest up to $150 million to produce and acquire Indian films and digital originals across all languages. This investment will dramatically scale Eros' capabilities in content production, marketing, and distribution. Eros and Reliance formed Reliance Eros Productions LLP which will make new strides on the digital and content forefronts, benefitting from the platform synergies across technology, content and digital platforms. We have also partnered with Phars Film, one of the UAE's largest film distribution and exhibition network. We intend to partner with Pana Film, one of the largest Turkish film studios for Indo-Turkish co-productions. We also have a distribution partnership with Central Partnership in Russia, that we believe will open new markets for Eros releases. These strategic partnerships not only help us augment our in-house content production model but also expand our geographical canvas for content monetization.

Our focus is to become a global digital content company. Eros Now launched an original short film, '*Toffee*' by Tahira Kashyap. *Toffee* has already garnered critical appreciation at various festivals including the 30th Cinekid International Film Festival, Amsterdam, the 14th Bahamas International Film Festival and MAMI. We also recently launched our first worldwide direct-to-digital original film, *Meri Nimmo*, in association with acclaimed director Aanand L Rai. In addition, over the next year Eros Now is planning to launch approximately 20 original episodic programs. Eros Now enhances its consumer appeal through exploring dynamic genres to create unseen, relatable and contemporary "Originals" that target the youth of India and are an important part of the Eros Now content strategy. Eros Now's original content offering began with the release of Salute Siachen, India's first ever celebrity high endurance expedition to the Siachen Glacier which was shot on a mobile phone. Eros Now has also added a series of short originals titled *Black and White* which range from

interviews to tête-à-tê with leading talent from the Indian film industry and are shot exclusively for Eros Now. Another short form of original content available on Eros Now is "E-Buzz", this offers exclusive behind the scene to all social celebrity events on the calendar.

34

***To promote Eros Now, our OTT digital entertainment service platform, as the preferred choice for online entertainment by consumers across digital platforms.***

As per Telecom Regulatory Authority of India (TRAI) there were over 1.2 billion wireless subscribers in India at the end of February 2018. The number of wireless internet users in India are likely to cross 829 million by 2021. The adoption of 4G is gradually increasing and now 3G and 4G constitute over 75% of the overall wireless internet user base. Initiatives such as broadband rollout and public Wi-Fi as part of the government's Digital India campaign and the promotion of 4G data packs by leading telecoms will only help boost the quality of digital infrastructure in India.

Eros Now is increasingly focused on offering quality content including Indian films, music and original shows, opening new markets, delivering consumer friendly product features such as offline viewing and subtitles and adopting a platform agnostic distribution strategy across all operating systems and platforms across mobile, tablets, cable or internet, including through deals with OEMs. Eros Now had over 100 million registered users and over 7.9 million paying users in March 2018. While a majority of users are from India, Eros Now has registered users in 135 different countries. Eros Now has rights to over 11,000 films, out of which around 5,000 films are owned in perpetuity, across Hindi and regional languages. Eros Now service is integrated with some of India's leading telecom operators, Jio, Bharti Airtel, Idea Cellular, and Vodafone and has partnered with Micromax, Samsung and Smartron to pre-bundle Eros Now in smart phones to be sold in India. Eros Now also entered into a strategic distribution partnership with Xiaomi, India's leading smartphone brand for its smart Mi LED TVs. With these platforms offering Eros Now integrated as part of their video services, it has increased Eros Now's potential of reaching a significant number of India's total mobile subscribers. We continue to believe that Eros Now will be a significant player within the OTT online Indian entertainment industry, especially given the rapidly growing internet and mobile penetration within India.

***Capitalize on positive industry trends driven by roll-out of high speed 4G services in the Indian market.***

Propelled by the economic expansion within India and the corresponding increase in consumer discretionary spending, the FICCI Indian Media and Entertainment Industry Report 2018 (FICCI Report 2018) projects that the dynamic Indian media and entertainment industry will grow at a 11.3% compound annual growth rate, or CAGR, from $22.7 billion in 2017 to $31.3 billion by 2020, and that the Indian film industry will grow from $2.4 billion in 2017 to $3.0 billion in 2020. India is one of the largest film markets in the world. In fiscal 2018 the average ticket price amongst the two leading multiplex cinema chains in India was $3.11 compared to $2.88 in fiscal 2017, a 7.8% increase year-on-year.

The Indian television market is the second largest in the world after China, reaching an estimated 183 million television, or TV households in 2017. FICCI Report 2018 projects that the Indian television industry will grow from $10.2 billion in 2017 to $13.3 billion in 2020. The growing size of the television industry has led television satellite networks to provide an increasing number of channels, resulting in competition for quality feature films for home viewing in order to attract increased advertising and subscription revenues.

Broadband and mobile platforms present growing digital avenues to exploit content. As per the latest Telecom Regulatory Authority of India report, there were over 1.2 billion wireless subscribers in India at the end of February 2018. The number of wireless internet users in India is likely to exceed 829 million by 2021. The adoption of 4G is gradually increasing and now 3G and 4G constitute over 75 % of the overall wireless internet user base. Online video audience in the country is expected to reach 500 million by 2020 from 250 million in 2017, a 2x growth driven by rapidly increasing mobile penetration, increasing Internet speeds, advent of 4G and falling data charges. By 2020, India is expected to become the second largest video-viewing audience globally.

We will take advantage of the opportunities presented by these trends within India to monetize our library and distribute new films through existing and emerging platforms, including by exploring new content options for expanding our digital strategy such as filming exclusive short form content for consumption through emerging channels such as mobile and internet streaming devices.

***Further extend the distribution of our content outside of India to new audiences.***

We currently distribute our content to consumers in more than 50 countries, including in markets where there is significant demand for subtitled and dubbed Indian themed entertainment, such as Europe and South East Asia, as well as to

markets where there is significant concentration of South Asian expatriates, such as the Middle East, the United States and the United Kingdom.

35

Our growth from non-diaspora international markets shows a growing appetite for the content of the Indian Film Industry in many new markets. One of our strongest potential markets, China, with a market size of $6.2 billion and almost 41,000 screens, is projected have more than 80,000 screens, nearly twice as many as the United States by FY2021. We believe our memorandum of understanding to collaborate with China Film Corp., Shanghai Film Group Co. Ltd. and Fudan University Press Co. Ltd. to co-produce and distribute Sino-Indian films will be an important step in maximizing our opportunity in China. The studio is also expanding into new film markets, which includes entry into China. We entered the China market in fiscal year 2018 by releasing *Bajarangi Bhaijaan* across more than 8,000 screens in March 2018 and has grossed approximately $45 million at the box office. Two projects will be co-produced with a leading Chinese studio, based on stories organically weaving the socio-cultural worlds of India and China. Additionally, the films will be shot in both Chinese and Hindi. We intend to promote and distribute our films in additional countries, and further expand in countries where we already distribute, when we believe that demand for Indian filmed entertainment exists or the potential for such demand exists. We have also entered into arrangements with local distributors in Taiwan, Japan, South Korea, and China to distribute dubbed or subtitled Eros films through theatrical release, television broadcast or DVD release. Additionally, we believe that the general population growth in India experienced over recent years may eventually lead to increasing migration of Indians to other regions, resulting in increased demand for our films internationally. In Russia, we recently partnered with Central Partnership, an affiliate of Gazprom Media, to promote and distribute Indian and Russian content across multiple platforms in both countries.

***Expand our regional Indian content offerings.***

We continue to be committed to promoting regional content films and growing the regional movie industry. We will utilize our resources, international reputation and distribution network to continue expanding our non-Hindi content offerings to reach the substantial Indian population whose main language is not Hindi. While Hindi films retain a broad appeal across India, the diversity of languages within India allows us to treat regional language markets as distinct markets where particular regional language films have a strong following.

Our regional language films include Marathi, Malayalam, Punjabi and Bengali films. Our Malayalam film *Pathemari* had won a national award for Best Malayalam Film. We intend to use our existing distribution network across India to distribute regional language films to specific territories. Where opportunities are available and where we have the rights, we also intend to exploit re-make rights to some of our popular Hindi films into non-Hindi language content targeted towards these regional audiences.

**Slate Profile**

The success of our film distribution business lies in our ability to acquire content. Each year, we focus on the acquisition and distribution of a diverse portfolio of Indian language and themed films that we believe will have a wide audience appeal. For fiscal 2018, our releases included 14 new Hindi films, of which one was high budget film, and one was Tamil language film. Our typical annual slate of new releases consists of both Hindi language films as well as films produced specifically for audiences whose main language is not Hindi, primarily Tamil, and to a lesser extent other regional Indian languages. Our most expensive films are generally the high and medium budget films (mainly Hindi and a few Tamil and Telugu films) that we release globally each year. The remainder of the films (mainly Hindi but also Tamil and/or Telugu) included in each annual release slate is built around these high budget films to create a slate that will attract varying segments of the audience. The remainder of the slate consists of Hindi, Tamil, Telugu and other language films of a lower budget.

We are focusing on content driven films with appropriate budgets in order to generate an attractive rate of return. We seek to mitigate the risks associated with high budget films through the use of our extensive pre-sale strategies. we have increased our focus on Tamil and Telugu films for similar reasons. In addition, we can release a Tamil and Hindi film on the same date as they cater to different audiences, which allow us to effectively schedule releases for our film portfolio and to take a greater combined share of the box office on those release dates. Our slate contained five high and medium budget films in fiscal 2018, of which four were Hindi and one was Tamil film and fifteen high budget and medium films in fiscal 2017, of which eight were Hindi, three Tamil two were Telugu and two were regional films.

36

*Hindi Film Content.* Our typical annual slate of films is comprised of high or medium budget films in the popular comedy and romance genres, supported by lower budget films.

**Selected Hindi Releases in fiscal 2018 (a)**

| Film | Cast/(Director) | Genre | Actual Month of Release |
|---|---|---|---|
| Sarkar 3 | Amitabh Bachchan, Amit Sadh, Ronit Roy, Yami, Jackie Shroff (Ram Gopal Verma) | Drama | May 2017 |
| Munna Michael | Tiger Shroff, Nidhhi Agerwal, Nawazuddin Siddiqui (Sabbir Khan) | Action | July 2017 |
| Sniff | Khushmeet Gill, Surekha Sikri, Manmeet Singh among others (Amole Gupte) | Kid's action | August 2017 |
| Shubh Mangal Savdhaan | Ayushman Khurana, Bhumi Pednekar (Prasanna / Colour Yellow Productions) | Romantic comedy | September 2017 |
| Newton | Rajkummar Rao, Pankaj Tripathi and Raghubir Yadav | Drama / Comedy | September 2017 |
| Mukkabaaz | Vineeth Kumar & Zoya (Anurag Kashyap / Colour Yellow Productions) | Sports drama | January 2018 |

(a) The list of films set forth in the table above is not a complete list of all the films released in the period by us and only covers selected Hindi film releases. We released a total of 24 films in fiscal 2018 of which 14 were Hindi films.

*Tamil, Telugu and Other Regional Film Content.* In order to respond to consumer demand for regional films, we have a slate of films produced in languages other than Hindi, such as Tamil, Telugu, Marathi, Malayalam, Bengali and Punjabi.

**Selected Tamil, Telugu and other regional language releases in fiscal 2018 (a)**

| Film | Cast/(Director) | Genre | Actual Month of Release |
|---|---|---|---|
| Oru Kidayin Karunai Manu (Tamil) | Vidharth, Raveena Ravi (Suresh Sangiah) | Drama | June 2017 |
| Tujha Tu Majha Mi (Marathi) | Lalit Prabhakar, Neha Mahajan (Kuldeep Jadhav) | Romance | June 2017 |
| Posto (Bengali) | Soumitra Chatterjee, Lily Chakraborty (Shibhoprasad Mukherjee & Nandita Roy) | Drama/Family | May 2017 |
| Rang Be Rang Er Kori (Bengali) | Rituparna Sengupta, Arunima Ghosh (Ranjan Ghosh) | Drama | March 2018 |
| Viswa Vikhyatharaya Payyanmar (Malayalam) | Deepak Parambol, Aju Varghese, Sudhi Koppa | Romance/ Comedy | October 2017 |

(a) The list of films set forth in the table above is not a complete list of all the films released in the period by us and only covers selected Tamil and Telugu film releases. We released a total of 24 films in fiscal 2018 of which 10 were regional films.

Tamil films are predominantly star-driven action or comedy films, which appeal to audiences distinct from audiences for more romance- focused Hindi films. We believe that a Tamil or Telugu film and a Hindi film can be released simultaneously on the same date without adversely affecting business for either film as each caters to a different audience.

37

We believe we can capitalize on the demand for regional films and replicate our success with Tamil and Telugu films for other distinct regional language films, including Marathi, Malayalam and Punjabi. In addition, the key Indian release dates for films, during school and other holidays, vary by region and therefore the ability to release films on different holidays in various regions, in addition to being able to release films in different regional languages simultaneously, expands the likely periods in which films can be successfully released. We intend to build up our portfolio of films targeting other regional language markets gradually.

**Selected Major Releases in fiscal 2019(a)**

| Film | Cast/(Director) |
|---|---|
| Meri Nimmo[b] | Anjali Patil, Karan Dave (Rahul Sanklya / Colour Yellow Productions) |
| Bhavesh Joshi | Harshvardhan Kapoor (Vikram Motwane / Phantom Films) |
| Manmarziyaan | Abhishek Bachchan, Vicky Kaushal, Tapsee Pannu (Anurag Kashyap / Colour Yellow Productions) |
| Happy Pill (Bengali) | Ritwick Chakraborty, Sohini Sarkar (Mainak Bhowmick) |
| Happy Phir Bhaag Jayegi | Sonakshi Sinha, Abhay Deol, Jimmy Shergill (Mudassar Aziz / Colour Yellow Productions) |
| Haathi Mere Saathi (Hindi / Tamil / Telugu) | Rana Dugabatti, Pulkit Samrat, Zoya Hussain, Kalki Koechlin (Prabhu Soloman) |
| Kaptan | Saif Ali Khan, R Madhavan, Sonakshi Sinha (Navdeep Singh / Colour Yellow Productions) |
| Saakshyam (Telugu) | Bellamkonda Sreenivas and Pooja Hegde (Sriwass / Abhishek Pictures ) |
| Mumbai Pune Mumbai 3 (Marathi) | Swapnil Joshi, Mukta Barve |

_____

(a)  The list of films set forth in the table above is for illustrative purposes only, is not complete and only includes released and anticipated future releases. Due to the uncertainties involved in the development and production of films, the date of their completion can be significantly delayed, planned talent can change and, in certain circumstances, films can be cancelled or not approved by the Indian Central Board of Film Certification. See "Part I — Item 3. Key Information — D. Risk Factors — Risks Relating to Our Business — Our films are required to be certified in India by the Central Board of Film Certification."

(b)  Direct-to-Digital Release

**Seasonality**

Theater attendance in India has traditionally been highest during school holidays, national holidays and during festivals, and we typically aim to release high budget films at these times. This timing of releases also takes account of competitor film releases, Indian Premier League cricket matches and the timing dictated by the film production process and as a result, our quarterly results can vary from one year to the next.

***Content Development and Sourcing***

We currently acquire films using two principal methods — by acquiring rights for films produced by others, generally through a license agreement, and by co-producing films with a production house, typically referred to as a banner, that is usually owned by a top Indian actor, director or writer, on a project by project basis. We regularly co-produce and acquire film content from some of the leading banners in India. We continue to be focused on ramping up our own productions and co-productions through key partnerships. These partnerships include the ones we have with - talented producer-director, Aanand L Rai (Colour Yellow Production) and our recently announced partnership with Reliance Industries Ltd, India's largest private sector company, to jointly produce and consolidate content from across India. The new partnership will equally invest up to $150 million to produce and acquire Indian films and digital originals across all languages. We have also partnered with Phars Film, one of the UAE's largest film distribution and exhibition network. We also intend to also partner with Pana Film, one of the largest Turkish film studios for Indo-Turkish co-productions. These strategic partnerships not only help us augment our in-house content production model but also expands our geographical canvas for content monetization.

Regardless of the acquisition method, over the past five years, we have typically obtained exclusive global distribution rights in all media for a minimum period of ten to twenty years from the Indian initial theatrical release date, although the term can vary for certain films for which we may only obtain international or only Indian distribution rights, and occasionally soundtrack or other rights are excluded from the rights acquired. For co-produced films, we typically have exclusive distribution rights for at least twenty years, co-own the copyright in such film in perpetuity and, after the exclusive distribution right period, share control over the further exploitation of the film.

We believe producers bring proposed films to us not only because of established relationships, but also because they want to leverage our proven distribution and marketing capabilities. Our in-house creative team also directly develops film ideas and contracts with writers and directors for development purposes. When we originate a film concept internally, we then approach appropriate banners for co-production. Our in-house creative team also participates in the selection of our slate with other members of our management in our analysis focused on the likelihood of the financial success of each project. Our management is extensively involved in the selection of our high budget films in particular.

Regardless of whether a film will be acquired or co-produced, we determine the likely value to us of the rights to be acquired for each film based on a variety of factors, including the stars cast, director, composer, script, estimated budget, genre, track record of the production house, our relationship with the talent and historical results from comparable films. Our primary focus is on sourcing a diversified portfolio of films expected to generate commercial success. We generally co-produce our high budget films and acquire rights to more medium and low budget films. Our model of primarily acquiring or co-producing films rather than investing in significant in-house production capability allows us to work on more than one production with key talent simultaneously, since the producer or co-producer takes the lead on the time intensive process of production, allowing us to scale our film slate more effectively. The following table summarizes typical terms included in our acquisition and co-production contracts.

| | Acquisition | Co-production |
|---|---|---|
| Film Cost | Negotiated "market value" | Actual cost of production or capped budget and 10-15% production fee |
| Rights | 10 years-20 years | Exclusive distribution rights for at least 20 years after which Eros shares control over the further exploitation of the film, and co-owned copyright in perpetuity, subject to applicable copyright laws |
| Payment Terms | 10-30% upon signature. Balance upon delivery or in installments between signing and delivery | In accordance with film budget and production schedule |
| Recoupment Waterfall | "Gross" revenues. Less 10-20% Eros distribution fee (% of | Generally same as Acquisition except sometimes Eros also charges interest and/or a production or |

cost or gross revenues)

Less print, advertising costs (actuals)

Less cost of the film

Net revenues generally shared equally

financing fee for the cost of capital and overhead recharges

39

Where we acquire film rights, we pay a negotiated fee based on our assessment of the expected value to us of the completed film. Although the timing of our payment of the negotiated fee for an acquired film to its producer varies, typically we pay the producer between 10% and 30% of a film's negotiated acquisition cost upon signing the acquisition agreement, and the remainder upon delivery of the completed film or in installments paid between signing and delivery. In addition to the negotiated fee, the producer usually receives a share of the film's revenue stream after we recoup a distribution fee on all revenues, the entire negotiated fee and distribution costs, including prints and ads. After we sign an acquisition agreement, we do not exercise any control over the production process, although we do retain complete control over the distribution rights we acquire.

For films that we co-produce, in exchange for our commitment to finance typically 100% of the agreed-upon production budget for the film and agreed budget adjustments, we typically share ownership of the intellectual property rights in perpetuity and secure exclusive global distribution rights for all media for at least twenty years. After we recoup our expenses, we and the co-producers share in the proceeds of the exploitation of the intellectual property rights. Pending determination of the actual production cost of the film, we also agree to a pre-determined production fee to compensate the co-producer for his services, which typically ranges from 10%-15% of the total budget. We typically also provide a share of net revenues to our co-producers. Net revenues generally means gross revenues less our distribution fee, distribution cost and the entire amount we have paid as committed financing for production of the film. Our distribution fee varies for each of the co-produced films, but is generally either a continuing 10% to 20% fee on all revenues, or a capped amount that is calculated as a percentage of the committed financing amount for production of the film. In some cases, net revenues also deduct an overhead charge and an amount representing an interest charge on some or all of the committed financing amount. Typically, once we agree with the co-producer on the script, cast and main crew including the director, the budget and expected cash flow through a detailed shooting schedule, the co-producer takes the lead in production and execution. We normally have our executive producer on the film to oversee the project.

We reduce financing risk for both acquired and co-produced films by capping our obligation to pay or advance funds at an agreed-upon amount or budgeted amount. We also frequently reduce financial risk on a film to which we have committed funds by pre-selling rights in that film.

Pre-sales give us advance information about likely cash flows from that particular film product, and accelerate cash flow realizable from that product. Our most common pre-sale transactions are the following:

- pre-selling theatrical rights for certain geographic areas, such as theaters outside the main theater circuits in India or certain non-Indian territories, for which we generally get nonrefundable minimum guarantees plus a share of revenues above a specified threshold;
- pre-selling television rights in India, generally by bundling releases in a package that is licensed to satellite television operators for a specified run; and
- pre-selling certain music rights, including for movie soundtracks and ringtones.

From time to time we also acquire specific rights to films that have already been released theatrically. We typically do not acquire global all-media rights to such films, but instead license limited rights to distribution channels, like digital, television, audio and home entertainment only, or rights within a certain geographic area. As additional rights to these films become available, we frequently seek to license them as well, and our package of distribution rights in a particular film may therefore vary over time. We work with producers not only to acquire or co-produce new films, but also to license from them other rights they hold that would supplement rights we hold or have previously held related to older films in our library. In certain cases, we may not hold full sequel or re-make rights or may share these rights with our co-producers.

***Our Film Library***

We currently own or license rights to over 3,000 films, including recent and classic titles that span different genres, budgets and languages. Eros Now has rights to over 11,000 films, out of which around 5,000 films are owned in perpetuity, across Hindi and regional languages from Eros's internal library as well as third party aggregated content, which we believe makes it one of the largest Indian movie offering platforms around the world. Our film library has been built up over more than 40 years and includes hits from across that time period, including, among others, *Newton, Munna*

*Michael, Subh Mangal Saavadhan, Ki & Ka, Housefull 3, Dishoom, Baar Baar Dekho, Bajrangi Bhaijaan, Bajirao Mastani, Tanu Weds Manu Returns, NH10, Badlapur, Devdas* , *Hum Dil De Chuke Sanam*, *Lage Raho Munna Bhai*, *Vicky Donor, English Vinglish*, and *Goliyon Ki Raasleela: Ram-Leela*. We have acquired most of our film content through fixed term contracts with third parties, which may be subject to expiration or early termination. We own the rights to the rest of our film content as co-producers or sole producer of those films. Through such acquisition and co-production arrangements, we seek to acquire rights to 40 to 50 additional films each year. While we typically hold rights to exploit our content through various distribution channels, including theatrical, television and new media formats, we may not acquire rights to all distribution channels for our films. In particular, we do not own or license the music rights to a majority of the films in our library. We expect to maintain more than half of the rights we presently own through at least December 31, 2025.

40

In an effort to reach a wide range of audiences, we maintain rights to a diverse portfolio of films spanning various genres, generations and languages. More than 55% of the films in our Hindi library are films produced in the last 15 years. We own or license rights to films produced in several regional languages, including Tamil, Telugu, Kannada, Marathi, Bengali, Malayalam and Punjabi.

We treat our new releases as part of our film library one year from the date of their initial theatrical release. We believe our extensive film library provides us with unique opportunities for content exploitation, such as our dedicated Eros content channel carried by various cable companies outside India. Our extensive film library provides us with a reliable source of recurring cash flow after the theatrical release period for a film has ended. In addition, because our film library is large and diversified, we believe that we can more effectively leverage our library in many circumstances by licensing not just single films but multiple films.

A summary of certain key features of our film library rights as of March 31, 2018 follows below.

| | Hindi Films | Regional Language Films (excluding Kannada films) | Kannada Films |
|---|---|---|---|
| Approximate percentage of total library | 17% | 67% | 16% |
| Approximate percentage of co-production films | 1% | Less than 1% | Not applicable |
| Minimum remaining term of exclusive distribution rights for total films (approximate percentage of rights expiring at the earliest in the periods indicated) | 2020 or earlier:22% 2021-2025: 39% 2026-2030: 25% 2031-2045: 2% Perpetual rights, subject to applicable copyright law limitations: 12% | 2020 or earlier: 20% 2021-2025: 16% 2026-2030: 6% 2031-2045: 1% Perpetual rights, subject to applicable copyright law limitations: 57% | Perpetual rights, subject to applicable copyright law limitations: 100% |
| Remaining term of exclusive distribution rights for co-production (approximate percentage of rights expiring earliest in the periods indicated) | 2020 or earlier: 0% 2021-2025: 0% 2026-2030: 0% 2031-2045: 0% Perpetual rights, subject to applicable copyright law limitations: 100% | Perpetual rights, subject to applicable copyright law limitations: 100% | Not applicable |
| Date of first release (by Eros or prior rights owner) | 1933-2018 | 1935-2018 | * |
| Rights in major distribution channels | Theatrical: 21% Television syndication: 21% Digital: 92% | Theatrical: 10% Television syndication: 13% Digital: 94% | Digital: 100% |
| Music Rights (approximate percentage of films) | 10% | 13% | 0% |
| Production Years (approximate percentage of films produced in the periods indicated) | 1933-1965: 13% 1966-1990: 19% 1991-2000: 7% 2001-2018: 61% | 1933-1965: 3% 1966-1990: 26% 1991-2000: 22% 2001-2018: 49% | * |

* Our Kannada digital rights library was acquired in September 2010, subsequent to the production and date of first

release for these films, and consequently this information is not in our records.

41

*Distribution Network and Channels*

We distribute film content primarily through the following distribution channels:

- **theatrical**, which includes multiplex chains and stand-alone theaters;
- **television syndication**, which includes satellite television broadcasting, cable television and terrestrial television; and
- **digital and ancillary** which primarily includes IPTV, VOD, music, inflight entertainment, home video, internet channels and Eros Now.

We generally monetize each new film we release through an initial twelve month revenue cycle commencing after the film's theatrical release date. Thereafter, the film becomes part of our film library where we seek to continue to monetize the content through various platforms. The diagram below illustrates a typical distribution timeline through the first twelve months following theatrical release of one of our films.

**Film release first cycle timeline**



We currently acquire films both for global distribution, which includes the Indian domestic market as well as international markets and for international distribution only.

Certain information regarding our initial distribution rights to films initially released in the three fiscal years 2018, 2017 2016 is set forth below:

| | Year ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| **Global (India and International)** | | | |
| Hindi films | 10 | 8 | 27 |
| Regional films (excluding Tamil films) | 3 | 12 | 6 |
| Tamil films | 1 | 3 | 8 |
| **International Only** | | | |
| Hindi films | 1 | 3 | 5 |
| Regional films (excluding Tamil films) | — | — | - |
| Tamil films | — | 12 | 10 |
| **India Only** | | | |
| Hindi films | 3 | 1 | 1 |
| Regional films (excluding Tamil films) | 6 | 5 | 5 |
| Tamil films | 0 | 1 | 1 |
| **Total** | 24 | 45 | 63 |

"High budget" films refer to Hindi films with direct production costs in excess of $8.5 million and for Tamil and Telugu films with direct production costs in excess of $7.0 million, in each case translated at the historical average exchange rate for

the applicable fiscal year. "Low budget" films refer to Hindi, and regional films with less than $1.0 million in direct production costs, in each case translated at the historical average exchange rate for the applicable fiscal year. "Medium budget" films refer to Hindi, and regional films within the remaining range of direct production costs.

We distribute content in over 50 countries through our own offices located in key strategic locations across the globe. In response to Indian cinemas' continued growth in popularity across the world, especially in non-English speaking markets, including Germany, Poland, Russia, Southeast Asia and Arabic speaking countries, we offer dubbed and/or subtitled content in over 25 different languages. We have entered into co-production deals with Chinese film companies. In addition to our internal distribution resources, our global distribution network includes relationships with distribution partners, sub-distributors, producers, directors and prominent figures within the Indian film industry and distribution arena.

42

***Theatrical Distribution and Marketing***

*Indian Theatrical Distribution.* The Indian theatrical market is comprised of both multiplex and single screen theaters which are 100% digitally equipped. In India, the cost of distributing a digital film print is lower than the cost of distributing a digital film print in the United States. Utilization of digital film media also provides additional protection against unauthorized copying, which enables us to capture incremental revenue that we believe are at risk of loss through content piracy.

India is divided into 14 geographical regions known as "Film Circuits" or "Film Territories" in the Indian Film Trade. We distribute our content in all of the circuits either through our internal distribution offices (Mumbai, Delhi, East Punjab, Mysore, Kerala, West Bengal and Bihar) or through sub-distributors in remaining circuits. The Film Circuits where we have direct offices comprise of a market share of up to 75% of the India theatrical revenue. Our primarily internal distribution network allows us greater control, transparency and flexibility over the core regions in which we distribute our films, and allows us to retain a greater portion of revenues per picture as a result of direct exploitation instead of using sub-distributors, which requires the payment of additional fees, sub distributor margins or revenue shares.

We entered into agreements with certain key multiplex operators to share net box office collections for our theatrical releases with the exhibitor for a predetermined base fee of 50% of net box office collections for the first week, after which the split decreases over time.

We primarily enter into agreements on a film-by-film and exhibitor-by-exhibitor basis. To date, our agreements have been on terms that are no less favorable than the terms of the prior settlement agreements; however, we cannot guarantee such terms can always be obtained.

The largest number of screens in India that we book for a particular film are booked for the first week of theatrical release, because as a substantial portion of box office revenues are collected in the first week of a film's theatrical exhibition. Our agreements with pan India multiplex operators is such that 100% of the entire first week of Eros share of revenues from all our films from such multiplexes is paid to us within 10 days of the release.

In single screens we either obtain non-refundable minimum guarantees/refundable advances and a revenue sharing arrangement above the minimum guarantee and with certain smaller multiplex chains we obtain refundable advances and a revenue sharing arrangement.

Pursuant to the Cinematograph Act, Indian films must be certified for adult viewing or general viewing by the Central Board of Film Certification, or CBFC, which looks at factors such as the interest of sovereignty, integrity and security of India, friendly relations with foreign states, public order and morality. Obtaining a desired certification may require us to modify the title, content, characters, storylines, themes or concepts of a given film.

*International Distribution.* Outside of India, we license Indian film content to content aggregator to reach cable and pay TV subscriber and for broadcasting on major channels and platforms around the world, such as Channel 4 (U.K.), CCTV (China), MBC (Middle East), TV3 (Malaysia), Bollywood Channel (Israel), RTL2 (Germany), M Channel (Thailand) and National TV (Romania), amongst others. We also license dubbed content to Europe, Arabic-speaking countries and in Southeast Asia and other parts of the world. Often such licenses include not just new releases, but films grouped around the same star, director or genre. International pre-sales of television, music and other distribution rights are an important component of our overall pre-sale strategy. We believe that our international distribution capabilities and large library of content enable us to generate a larger portion of our revenue through international distribution.

*Marketing.* The marketing campaign of a film is an integral part of the overall theatrical distribution strategy. It typically starts before the film goes into production with maximum impetus closer to the release of the film. Our marketing team creates a 360 degree campaign with specific emphasis across various media platforms - PR, Music, Digital, On ground, Brand Partnerships, Tie Ups etc. Each film campaign is unique and has a strategic, targeted approach based on the genre, talent involved, positioning of the movie, target group and overall strategy. Each film asset – Poster, Teaser, Trailer, Song etc is launched and mounted in an innovative way to create specific buzz and traction around the asset and the film.

The campaign is driven through strategic partnerships across Digital, TV, Radio, Print, Theatre and Brands to maximize visibility of the movie and drive box office conversions. The endeavor is to market the movie with minimum costs getting maximum mileage through strategic associations across mediums

Our marketing efforts are primarily managed by employees located in offices across India or in one of our international offices in Dubai, Singapore, the United States, the United Kingdom, Australia and Fiji. Occasionally, sub-distributors manage marketing efforts in regions that do not have a dedicated Eros team, using the creative aspects developed by us for our marketing campaigns. Managing marketing locally permits us to more easily identify appropriate local advertising channels and results in more effective and efficient marketing.

***Television Distribution***

*India Distribution.* We believe that the increasing television audience in India creates new opportunities for us to license our film content, and expands audience recognition of the Eros name and film products. We license Indian film content (usually a combination of new releases and existing films in our library), to satellite television broadcasters operating in India under agreements that generally allow them to telecast a film over a stated period of time in exchange for a specified license fee. We have, directly or indirectly, licensed content for major Indian television channels such as Colors, Sony, the Star Network and Zee TV.

Television pre-sales in India are an important factor in enhancing revenue predictability for our business and are part of our diversification strategy to mitigate risks of cash flow generation. For fiscal 2018, we had pre-sales visibility for some of our films such as *Munna Michael*, *Sarkar 3, Shubh Mangal Saavdhan*. For fiscal 2017, pre-sales from sale of satellite television rights was achieved for our films such as *Housefull 3, Dishoom, Baar Baar Dekho, Rock On 2, Banjo, Ki & Ka* along with some regional films. In fiscal 2017, for our two high budget Hindi films we had recouped 31% to 57% of the direct production cost through television and other pre-sales and had recouped 108% and 93% of our direct production cost of the two Telugu films released through contractual commitments prior to the films releases, and 96% of our direct production cost of one Tamil film released through contractual commitments prior to the film's release.

Our content is typically released on satellite television three to six months after the initial theatrical release. In India there are currently six direct to home, or DTH, providers. We have offered some of our films through DTH service providers, but we have also licensed these rights with the satellite TV rights to satellite channel providers. As the number of DTH subscribers increase in India, we anticipate that we will have an opportunity to license directly for DTH exploitation. We have also provided content to regional cable operators. Although DTH distribution is still relatively small in India, with Indian telecom networks and DTH platforms expanding their services, we are beginning to see an increased interest for video on demand in India. We also sub-license some of our films for broadcast on Doordarshan, the sole terrestrial television broadcast network, which is government owned. We are seeing increasing growth from the Indian cable system which is predominantly digital. We believe that as the cable industry migrates towards digital technology and moves toward consolidation, cable television licensing will represent a more significant revenue stream for our business.

*International Distribution.* Outside of India, we license Indian film content to content aggregators to reach cable and pay subscribers and for broadcasting on major channels and platforms around the world, such as Channel 4 (U.K.), CCTV (China), MBC (Middle East), TV3 (Malaysia), Bollywood Channel (Israel), RTL2 (Germany) and National TV (Romania), amongst others. We also license dubbed content to Europe, Arabic-speaking countries and in Southeast Asia and other parts of the world. Often such licenses include not just new releases, but films grouped around the same star, director or genre. International pre-sales of television, music and other distribution rights are an important component of our overall pre-sale strategy. We believe that our international distribution capabilities and large library of content enable us to generate a larger portion of our revenue through international distribution.

***Digital Distribution***

In addition to our theatrical and television distribution networks, we have a global network for the digital distribution of our content, which consists of full length films, music, music videos, clips and other video content. Through our digital distribution channel, we mainly monetize music assets and distribute movies and other content primarily in IPTV, VOD (including SVOD and DTH) and online internet channels. Our film content is distributed in original language, subtitled into

local languages or dubbed, in each case as driven by consumer or regional market preferences. With our large library of content and slate of new releases, we have sought to capitalize on changes in consumer demand through early adoption of new formats and services, which we believe enables us to generate a larger portion of our revenue through digital distribution than the film entertainment industry average in India.

44

With a significant portion of the Indian and international population rapidly moving toward digital technology, we are increasing our focus on providing on demand services, although the platforms and strategies differ by region. Outside of India, there is a proliferation of cable, satellite and internet services that we supply. In addition, with the proliferation of internet users, we are increasing our online distribution presence as well. These platforms enable us to continue to monetize a film in our library long after its theatrical release period has ended. In addition, the speed, ease of availability and prices of digital film distribution diminish incentives for unauthorized copying and content piracy.

In North America, we have an agreement with International Networks, a subsidiary of Comcast, to provide a SVOD service fully branded as 'Eros Now'. The service is carried on most of the major cable network providers including Comcast, Cox Communications, Cablevision and Time Warner Cable. We provide all programming for this film and music channel and share revenues with the cable providers. We also provide content to Amazon Digital and participate in a revenue share deal. In Canada, Eros has signed a Program License Agreement for various movies with Rogers Broadcasting Limited. In Europe, we have recently partnered with My Digital Company (France), ESC Distribution (France) and MT Trading Ug (Germany).

**Eros Now**

As per the latest Telecom Regulatory Authority of India report, there were over 1.2 billion wireless subscribers in India at the end of February 2018. The number of wireless internet users in India is likely to exceed 829 million by 2021. The adoption of 4G is gradually increasing and now 3G and 4G constitute over 75 % of the overall wireless internet user base. Online video audience in the country is expected to reach 500 million by 2020 from 250 million in 2017, a 2x growth driven by rapidly increasing mobile penetration, increasing Internet speeds, advent of 4G and falling data charges. By 2020, India is expected to become the second largest video-viewing audience globally.

With falling smartphone prices, reduced data costs, increasing mobile data speed and the flexibility of viewing content at any hour of the day, OTT platforms are fast becoming favoured entertainment destination for youth. In fact, currently, 80% of the OTT content consumers are under 30 years of age and are starting to pay a premium for their choice of content according to the FICCI Report 2017. As of March 31, 2018, Eros Now has exceeded 100 million registered users and 7.9 million paying users worldwide across APP, WAP and Web. This growth represents a 58% increase over the last reported quarter and a 276% increase from 2.1 million paying subscribers in fiscal year 2017. We define paying subscribers to mean any subscriber who has made a valid payment to subscribe to a service that includes Eros Now services as part of a bundle or on a standalone basis, either directly or indirectly through an Original Equipment Manufacturer ("OEM") or mobile telecom provider in any given month, be it through a daily, weekly or monthly billing pack, as long as the validity of the pack is for at least one month. Eros Now users have demonstrated some of the highest levels of engagement in the India OTT space. Average session time for an engaged Eros Now user is over 40 minutes which is an industry high.

We believe Eros Now has the largest movie Indian language content library worldwide with over 11,000 digital, out of which approximately 5,000 films are owned in perpetuity. Eros Now also has a deep library of short-form content, totalling over 4,400 short-form videos including music videos, trailers, original short exclusive interviews and marketing shorts.

Eros Now made its IPL debut in Season 11 as the title sponsor of Virat Kohli captained team, Royal Challengers Bangalore (RCB). The collaboration was a part of the company's endeavour to build a truly digital video brand with Indian users and provide the best of entertainment the country has to offer. Keeping up with the FIFA World Cup fever, Eros Now launched Eros Now Betz, a unique app created for millions of football lovers globally. With Eros Now Betz, users were able to earn points for every correct prediction that they make while the matches are being played in real-time. The platform has also tied-up with brands across verticals like banking, lifestyle and food with State Bank of India (SBI), Gold's Gym, Paytm, Nature's Basket and Voonik.

Eros Now and Reliance Jio renewed their platform integration deal. Under the deal, Jio subscribers gained access to Eros Now's high-quality content including full-length movies and thematically curated playlists along with functions such as multi-language subtitles for movies, music video playlists, regional language filters, video progression and a watch list of titles. Currently live on Samsung TV, Eros Now also entered into a strategic distribution partnership with Xiaomi, India's leading smartphone brand for its smart Mi LED TVs. This distribution deal between Eros Now and Xiaomi is an extension of the immersive content experience that both partners offer. In addition to that, Eros Now has entered the Sri Lankan market through a partnership with Dialog Axiata, Sri Lanka's premier connectivity provider, and will be available on the Dialog ViU app. Eros Now is available on App Store, Play Store for download and can be streamed on any device including Android, Amazon Fire TV stick, Android TV, Apple TV, Opera TV, making the entertainment experience platform agnostic. Having tie-ups across payment gateways and financial systems worldwide it gives a seamless experience to the consumers for payments and downloads.

**Eros Now Originals**

In April 2018, Eros Now successfully premiered its first worldwide direct-to-digital original film 'Meri Nimmo', in association with acclaimed director Aanand L Rai, to positive critical reception. The platform is excited for its slate of originals, with global concepts that will entertain audiences, are being produced internally in partnership with the best talent. Over the next year, Eros Now is planning to launch an exclusive stable of feature films, made-for-digital originals films and over 20 original episodic programs, out of which three original series - Flip, Smoke and Side Hero will be launched at the beginning of September. While films like Meri Nimmo and Toffee are live on the platform, upcoming titles like Blue Oak Academy, August 25th, Bhumi, Dashavatar, Minerva Mills Malady and Kurukshetra will range across genres of drama, comedy, thriller, crime, horror and mythology. These originals will have popular names like Rohan Sippy, Kunal Roy Kapoor, Rajat Kapoor, Siddharth Anand and Pavan Kriplani associated with them in various capacities. A selection of upcoming titles includes:

- Smoke: An unflinching look at the politics within the drug mafia that resides in the intoxicant riddled underbelly of its tropical paradise, Goa. Smoke is lead by an all-star cast including Jim Sarbh, Gulshan Devaiah, Kalki Koechlin, Mandira Bedi, Tom Alter amongst others.
- Blue Oak Academy: A teen-drama thriller that follows one young boy's quest to exact revenge with the most prestigious academic institution of the nation.
- Side Hero with Rohan Sippy: Featuring Kunaal Roy Kapur as a fictionalised version of himself – the less successful younger brother of a hotshot Bollywood producer and star – this comedy drama follows Kunaal trying to land a leading role in a bid to prove that his profession of acting is not just a 'hobby.'
- August 25th starring Rajat Kapoor (Short Film): A sci-fi drama that considers the possibility of time travel and the doors that might open up for mankind.
- Flesh with Siddharth Anand: An eight-year-old girl goes missing and her NRI parents are forced to seek the help of a suspended female cop in their search for her. An ex-human trafficker is blackmailed to join the search or else risk his sinful past catching with him.
- Swarajya: On the eve of India's independence, two senior civil servants in Nehru's government find themselves in the center of the storm, having to deal with myriad issues relating to the transfer of power and birth of a new nation.
- Minerva Mills Malady: Following the Minerva Mills Case in the 1970s through the eyes of the petitioners.
- Kurukshetra with Prakash Kovalamadhi: The tribals thought they were Gods. The army thought they were militants. What they turn out to be, are five children with 'superpowers' emerging from a genetic mutation. And with destinies that, almost uncannily, resemble the trajectory of the Mahabharata.
- Hacked with Abbas Tyrewala: A young man must team up with the spirit of a dead hacker that haunts his new laptop to uncover the truth behind his killing, leading them to a bloody conspiracy of murdered nuclear scientists.

46

***Physical and Other Distribution***

We also distribute globally our film content through physical formats (DVDs and Video Compact Discs, or VCDs), in hotels and with airlines, and for use on mobile networks. We distribute and license content on physical media throughout the world, including on Blu-ray and DVDs, and in India on VCD and DVD. In India, and in servicing South Asian consumers internationally, we distribute to wholesalers & corner shop retailers and internet platforms such as Amazon, as well as supply local wholesalers and retailers. We also license content to third party distributors internationally to provide content dubbed in local languages for consumption by non-South Asian audiences.

***Music***

Music is integral to our films, and when we obtain global, all-media rights in our acquired or co-produced films, music rights typically are included. Film music rights are often marketed and monetized separate from the underlying film, both before and after the release of the related films. In addition, we act as a music publisher for third party owned music rights within India. Through our internal resources and network of licensees, we are able to provide our consumers with music content directly, through third party platforms or through licensing deals. The content is primarily taken from our film content and the revenues are derived from mobile rights, MP3 tracks, sold via third party platforms such as iTunes and mobile operator platforms as well as streaming services such as Spotify, Saavn and YouTube digital streaming, physical CDs and publishing/master rights licensing.

We also exploit the music publishing and master rights we own, which involves directly licensing songs to radio and television channels in India, synchronizing of music content to film, television and advertisers globally, as well as receiving royalties from public performance of these songs when they are played at public events. Ancillary revenues from public performances in India are collected and paid over to us through Novex, which monitors, collects and distributes royalties to its members.

***Intellectual Property***

As our revenues are primarily generated from commercial exploitation of our films and other audio and/or audio-visual content, our intellectual property rights are a critical component of our business. Unauthorized use/access of intellectual property, particularly piracy of DVDs and CDs, as well as on-line piracy through unauthorized streaming/downloads, is widespread in India and other countries, and the mechanisms for protecting intellectual property rights in India and such other countries are not as effective as those of the United States and certain other countries. In order to restrict piracy, we participate directly and through industry organizations by way of actions including legal claims against persons/entities who illegally pirate our content. Further we also deal with piracy by promoting and marketing our films to the highest standards in order to ensure maximum viewership and revenues early in its release and shortening the period between the theatrical release of a film and its legitimate availability on DVD and VCD in the market. This is supported by the trend in the Indian market for a significant percentage of a film's box office receipts to be generated in the first few weeks after release.

Recently, there has been a rapid transition of consumer preference from physical to digital modes of consumption of film and related content via on-line, mobile and digital platforms. This has enabled our OTT platform "Eros Now" to grow rapidly. However, this business faces competition from sites offering unauthorized pirated content. In order to tackle this issue of on-line piracy, we have adapted modernized Digital Right Management technology in order to ensure that our content is protected from unauthorized and illegal access and copying.

47

**Copyright protection in India**

The Indian Copyright Act, 1957 (as amended) ("Copyright Act"), has prescribed provisions relating to registration of copyrights, transfer of ownership and licensing of copyrights and infringement of copyrights and remedies available in that respect. The Copyright Act affords copyright protection to cinematographic films and sound recordings and all other audio-visual content. For cinematographic films, copyright is granted for a certain period of time, usually for a period of 60 years from the beginning of the calendar year following the year in which such film is published, subsequent to which the work falls in the public domain and any act of reproduction of such work by any person other than the author would not amount to infringement.

India is a signatory to number of international conventions and treaties that provides for universal provisions for protection and enforcement of Copyrights. In addition to above, following the issuance of the International Copyright Order, 1999, subject to certain conditions and exceptions, certain provisions of the Copyright Act apply to nationals of all member states of the World Trade Organization, the Berne Convention and the Universal Copyright Convention.

Recently, the Copyright Act was amended in 2012 to allow authors of literary and musical works (which may be included as part of a cinematograph film) to retain the right to receive royalty for the utilization of such work (other than exhibition as part of the cinematograph film in a cinema hall) as mandated by the law.

Although the state governments in India serve as the enforcing authorities of the Copyright Act, the Indian government serves an advisory role in assisting with enforcement of anti-piracy measures.

In December 2009, the Union Information & Broadcasting Ministry established a task force to recommend measures to combat film, video and cable piracy, which submitted recommendations in September 2010, including:

- *as a condition to licenses being granted to theaters and multiplexes by district authorities, theater and multiplex operators should be required to prohibit viewers from carrying a cam-cording device inside the theater;*
- *encouraging state governments to enact legislation providing for preventive detention of video and audio pirates and bring video pirates under the Goonda Act; and*
- *undertaking measures to ensure high fidelity in genuine DVDs to discourage the public from buying pirated versions.*

However, these are recommendations of the task force, and there can be no assurance that any of these recommendations will be accepted and become binding law or regulation in a timely manner, or at all.

It is pertinent to note that, piracy continues to be one of the major issues affecting the Indian Film Industry with an annual loss of substantial revenues, to the tune of around INR 180 Billion every year. In an effort to protect their IP, filmmakers in India have started getting 'John Doe' orders from court that put the onus of the ISP to block access to websites and URL's that facilitate pirated content. We obtain similar protective orders from court for our films and also engage the services of a specialized anti-piracy agency to vigilantly monitor and take down on-line pirated content from our cinematograph films.

Recently, the Department of Industrial Policy and Promotion, Ministry of Commerce and Industry, Government of India issued the National Intellectual Property Rights Policy which aims, among other things, to stimulate intellectual property creation and protection by Indian and foreign corporates, to commercialize intellectual property rights by exploring the feasibility of creation of an IPR exchange and to enable valuation of intellectual property rights as intangible assets. The policy contemplates the review of existing intellectual property related laws, wherever necessary, and states that the Indian Cinematography Act, 1952 should be suitably amended to provide for penal provisions for illegal duplication of films.

***Trademark protection in India:***

We use a number of trademarks in our business, all of which are owned by our subsidiaries. Our Indian subsidiaries currently own over 120 Indian registered trademarks and domain names, which are used in their business, including the registered trademark "Eros," "Eros International," "Eros Music," and "Eros Now". However, certain of our trademarks used in India are still under the process of registration. A majority of these registrations, and certain applications for registrations, are in the name of our subsidiaries Eros India, Eros Films or Eros Digital Private Limited, with whom we have an informal arrangement with respect to the use of such trademarks. The registration of any trademark in India is a

time- consuming process, and there can be no assurance as to when any such registration will be granted.

48

The Indian Trade Marks Act, 1999, or the Trademarks Act, governs the registration, acquisition, transfer and infringement of trademarks and remedies available to a registered proprietor or user of a trademark. The registration of a trademark is valid for a period of ten years but can be renewed in accordance with the specified procedure. The registration of certain types of trademark is prohibited, including where the mark sought to be registered is not distinctive.

Until recently, to obtain registration of a trademark in multiple countries, an applicant was required to make separate applications in different languages and countries and disburse different fees in the respective countries. However, the Madrid Protocol enables nationals of member countries, including India, to secure protection of trademarks by filing a single application with one fee and in one language in their country of origin.

In lieu of the above the Trademarks Act, 1999 of India was amended by the Trade Marks (Amendment) Act 2010, or the Trademarks Amendment Act. The Trademarks Amendment Act empowers the Registrar of Trade Marks to deal with international applications originating from India as well as those received from the International Bureau and to maintain a record of international registrations. This amendment also removes the discretion of the trademark registrar to extend the time for filing a notice of opposition of published applications and provides for a uniform time limit of four months in all cases. Further, it simplifies the law relating to transfer of ownership of trademarks by assignment or transmission and brings the law generally in line with international practice. Pursuant to the Madrid Protocol and the Trademarks Amendment Act, we have obtained trademarks in Egypt, the European Community, United Arab Emirates, Australia and the United States.

Recently, in order to match the international standards of trademark protection and enforcement, and to speed up the trademark registration process the Trademark Rules 2002 were amended by the Trademark Rules, 2017. Some notable amendments were; reduction in the number of Trademark procedural forms; specific concessions to Start Ups, Individuals and Small Enterprises and for e-filing; Expedited Processing of Trademark Application; registration of sound marks; etc.

***Remedies for Infringement in Copyright Act and Trademark Act:***

The remedies available in the event of infringement under the Copyright Act and the Trademarks Act include civil proceedings for damages, account of profits, injunction and the delivery of the infringing materials to the owner of the right, as well as criminal remedies including imprisonment of the accused and the imposition of fines and seizure of infringing materials.

***Competition***

The Indian film industry's has experienced robust growth over the last few years and the same is changing the competitive landscape. By opening up and relaxing the entry barriers for foreign investments in certain key areas of this industry, including the relaxation norms for the broadcasting sector (DTH, cable networks etc.), the Government of India has provided the sector much needed impetus for growth. Several segments of the industry (such as broadcasting, films, sports and gaming) have especially undergone unprecedented advancements on multiple dimensions. The use of the latest technology in all phases of production, digitization and globalization of content, the availability of multiple revenue streams, financial transparency and corporatization have contributed towards the paradigm shift that the Media & Entertainment industry in India has witnessed over the last decade or so.

We believe we were one of the first companies in India to create an integrated business of sourcing new Indian film content through co-productions and acquisitions while building a valuable library of rights in existing content and also distributing Indian film content globally across formats.

Some of our direct competitors, such as The Walt Disney Company ("Disney"), 20th Century Fox Pictures and Viacom Studio 18, have moved toward similar models in addition to their other business lines within the Indian entertainment industry. We also face competition from the direct or indirect presence in India of significant global media companies, including the major Hollywood studios. Disney has acquired 100% of UTV and Viacom has ownership interests in Viacom Studio 18, while other Hollywood studios, such as News Corporation and Sony, have established local operations in India for film distribution, and have released a limited number of Indian films. Our primary competitors for Indian film content in the markets outside of India are UTV, Fox, Viacom and Yash Raj Films. We believe our experience and understanding of the Indian film market positions us well to compete with new and existing entrants to the Indian media and entertainment

sector. Based on gross collections reported by comScore, our market share (as an average over the preceding seven calendar years to 2017) is 27% of all theatrically released Indian language films in the United Kingdom and the U.S.. Competition within the industry is based on relationships, distribution capabilities, reputation for quality and brand recognition.

49

***Our Film Library***

We currently own or license rights to films currently comprising over 3,000 films, including recent and classic titles that span different genres, budgets and languages. Eros Now has rights to over 11,000 films, out of which around 5,000 films are owned in perpetuity, across Hindi and regional languages from Eros's internal library as well as third party aggregated content which it believes makes it one of the largest Indian movie offering platforms around the world. Our film library has been built up over more than 40 years and includes hits from across that time period, including among others *Newton, Shubh Mangal Savdhan, Ki & Ka, Housefull 3, Sardaar Gabbar Singh, , Dishoom Bajrangi Bhaijaan, Bajirao Mastani, Tanu Weds Manu Returns, NH10, Badlapur, Devdas*, *Hum Dil De Chuke Sanam*, *Lage Raho Munna Bhai*, *Vicky Donor, English Vinglish*, and *Goliyon Ki Raasleela: Ram-Leela*. We have acquired most of our film content through fixed term contracts with third parties, which may be subject to expiration or early termination.

We own the rights to the rest of our film content as co-producers or sole producer of those films. Through such acquisition and co-production arrangements, we seek to acquire rights to at least 40-50 additional films each year. While we typically hold rights to exploit our content through various distribution channels, including theatrical, television and new media formats, we may not acquire rights to all distribution channels for our films. In particular, we do not own or license the music rights to a majority of the films in our library. We expect to maintain more than half of the rights we presently own through at least March 31, 2025.

In an effort to reach a wide range of audiences, we maintain rights to a diverse portfolio of films spanning various genres, generations and languages. More than half of our library is comprised of films first released ten or more years ago, including films released as early as the 1940s. We own or license rights to films produced in several regional languages, including Tamil, Kannada, Marathi, Telugu, Bengali Malayalam and Punjabi.

We treat our new releases as part of our film library one year from the date of their initial theatrical release. We believe our extensive film library provides us with unique opportunities for content exploitation, such as our dedicated Eros content channel carried by various cable companies outside India. Our extensive film library provides us with a reliable source of recurring cash flow after the theatrical release period for a film has ended. In addition, because our film library is large and diversified, we believe that we can more effectively leverage our library in many circumstances by licensing not just single films but multiple films.

***Litigation***

From time to time, we and our subsidiaries are involved in various lawsuits and legal proceedings that arise in the ordinary course of business. The following discussion summarizes examples of such matters. Although the results of litigation and claims cannot be predicted with certainty, we currently believe that the final outcome of these matters will not have a material adverse effect on our business. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

Beginning on November 13, 2015, the Company was named a defendant in five substantially similar putative class action lawsuits filed in federal court in New Jersey and New York by purported shareholders of the Company. The three actions in New Jersey were consolidated, and, on May 17, 2016, were transferred to the United States District Court for the Southern District of New York where they were then consolidated with the other two actions on May 27, 2016. In general, the plaintiffs alleged that the Company, and in some cases also the Company's management, violated the federal securities laws by overstating the Company's financial and business results, enriching the Company's controlling owners at the expense of other shareholders, and engaging in improper accounting practices.

On April 5, 2016, a lead plaintiff and lead counsel were appointed in the now consolidated New York action. A single consolidated complaint was filed on July 14, 2016 and amended on October 10, 2016. The amended consolidated complaint alleged that the Company and certain individual defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, but did not assert certain claims that had been asserted in prior complaints. The remaining claims were primarily focused on whether the Company and individual defendants made material misrepresentations concerning the Company's film library and materially misstated the usage and functionality of Eros Now, our digital OTT entertainment service. On September 25, 2017, the United States District Court for the Southern District of New York entered a

Memorandum & Order dismissing the putative class action with prejudice.

50

On October 23, 2017, lead plaintiffs filed a Notice of Appeal, individually and on behalf of the putative class, to the United States Court of Appeals for the Second Circuit. The appeal does not dispute the District Court's dismissal, with prejudice, of lead plaintiffs' allegations relating to the Company's film library. The only remaining claim pertains to alleged misstatements concerning the usage and functionality of Eros Now.

On September 29, 2017, the Company filed a lawsuit against Mangrove Partners, Manuel P. Asensio, GeoInvesting, LLC, and other individuals and entities alleging the defendants and other co-conspirators disseminated material false, misleading, and defamatory information about the Company and are engaging in other misconduct that has harmed the Company. On May 31, 2018, the Company filed an amended complaint that added two new defendants and expanded the scope of the Company's initial allegations. The amended complaint alleges that Mangrove Partners and many of its co-conspirators held substantial short positions in the Company's stock and profited when its share price declined in response to their multi-year disinformation campaign. The Company seeks damages and injunctive relief for defamation, trade libel, civil conspiracy, and tortious interference, including but not limited to interference with its customers, producers, distributors, investors, and lenders.

Eros India and its subsidiaries are involved in ordinary course government tax audits and assessments, which typically include assessment orders for previous tax years including on account of disallowance of certain claimed deductions.

In fiscal 2015, Eros received show causes assessment order from the Commissioner of Service Tax (India) levying an amount aggregating to $61 million (including interest and penalty of $30 million) for the period April 1, 2009 to March 31, 2015 on account of service tax arising on temporary transfer of copyright services and certain other related matters. The Company has filed an appeal against the said order before the authorities. Considering the facts and nature of levies and the ad-interim protection for service tax levy for a certain period granted by the Honourable High Court of Mumbai, the Group expects that the final outcome of this matter will be favorable. There is no further update on this matter as preliminary hearing is yet to begin. Accordingly, based on the assessment made after taking appropriate legal advice, no additional liability has been recorded in Group's consolidated financial statements.

In fiscal 2015, Eros received several assessment orders and demand notices from value added tax and sales tax authorities in India for the payment of amounts aggregating to $3 million (including interest and penalties) for certain fiscal years between April 1, 2005 and March 31, 2011. Eros has appealed against each of these orders, and such appeals are pending before relevant tax authorities. Though there uncertainties are inherent in the final outcome of these matters, the Company believes, based on assessment made after taking legal advice, that the final outcome of the matters will be favorable. Accordingly, no additional liability has been recorded in Group's consolidated financial statements.

Eros is also named in various lawsuits challenging its ownership of some of its intellectual property or its ability to distribute these films in India. A number of these lawsuits seek injunctive relief restraining Eros from releasing or otherwise exploiting various films, including Om Shanti Om, Kochadaiiyaan, Bhoot Returns and Goliyon Ki Rasleela-Ram-leela, Bajrangi Bhaijaan, Welcome Back, Sardar Gabbar Singh, Aligarh, Housefull 3.

In India, private citizens are permitted to initiate criminal complaints against companies and other individuals by filing complaints or initiating proceedings with the police. Eros and certain executives have been named in certain criminal complaints from time to time.

If, as a result of such complaints, criminal proceedings are initiated by the relevant authorities in India and the Company or any of its executives are found guilty in such criminal proceedings, our executives could be subject to imprisonment as well as monetary penalties. We believe the claims brought to date are without merit and we intend to defend them vigorously.

For instance, in relation to the film Goliyon Ki Rasleela-Ram-leela, certain civil and criminal proceedings had been initiated in various local courts in India in and around November 2013, including arrest warrants against Mr. Kishore Lulla and others involved in the making of this film, alleging that this film disrespected religious sensibilities and seeking to restrain its release or seeking directions for a review of its film certification. We have contested such claims in the local courts as well as by way of petitions filed by us before the Supreme Court of India. While hearings or investigations continue in some of these proceedings, we have obtained interim orders in our favor from the Supreme Court of India as well as

certain of the local courts where such proceedings are being heard, including stays on all criminal proceedings against Eros India, Mr. Kishore Lulla and other persons involved in the making of the film. This film was released in November 2013.

51

**Government Regulations**

The following description is a summary of various sector-specific laws and regulations applicable to Eros.

***Material Isle of Man Regulations***

***Companies Regime.*** The Isle of Man is an internally self-governing dependent territory of the British Crown. It is politically and constitutionally separate from the United Kingdom and has its own legal system and jurisprudence based on English common law principles.

Isle of Man company law is largely based on that of England and Wales. There are two separate codes of company law, embodied in the Companies Acts of 1931-2004 (commonly referred to as the 1931 Act as the principal Act is the Companies Act 1931) and the Companies Act 2006 (commonly referred to as the 2006 Act), respectively. Our Company was incorporated on March 31, 2006 under the 1931 Act. Effective September 29, 2011, it re-registered as a company incorporated under the 2006 Act.

The 2006 Act updates and modernizes Isle of Man company law by introducing a new simplified corporate vehicle into Isle of Man law. The new corporate vehicle follows the international business company model available in a number of other jurisdictions. Companies incorporated or re-registered under the 2006 Act are governed solely by its provisions and, except in relation to liquidation and receivership, are not subject to the provisions of the 1931 Act. The following are some of the key characteristics of companies incorporated under the 2006 Act:

***Share Capital.*** Under the 2006 Act, there is no longer the concept of authorized capital. Therefore, shares may be issued with or without par value.

***Dividends, Redemptions and Buy-Backs.*** Subject to compliance with the memorandum and articles of association, the 2006 Act allows a company to declare and pay dividends, and to purchase, redeem or otherwise acquire its own shares subject only to meeting a solvency test set out in the 2006 Act. A company satisfies the solvency test if: (i) it is able to pay its debts as they become due in the normal course of business: and (ii) the value of the company's assets exceeds the value of its liabilities.

***Capacity and Powers.*** Companies incorporated under the 2006 Act have separate legal personality and perpetual existence. In addition, such companies have unlimited capacity to carry on or undertake any business or activity; this is so regardless of corporate benefit and regardless of whether or not it is in the best interests of the company to do so.

The 2006 Act specifically states that no corporate act is beyond the capacity of a company incorporated under the 2006 Act by reason only of the fact that the relevant company has purported to restrict its capacity in any way in its memorandum or articles or otherwise. A person who deals in good faith with a company incorporated under the 2006 Act is entitled to assume that the directors of the company are acting without limitation.

***Miscellaneous.*** In addition to the foregoing, the following other points should be noted in relation to companies incorporated under the 2006 Act:

(a) there are no prohibitions in relation to the company providing financial assistance for the purchase of its own shares (save in relation to a public company);

(b) there is no differentiation between public and private companies, but a company may adopt a name ending in the words "Public Limited Company" or "public limited company" or the abbreviation "PLC" or "plc";

(c) there are simple share offering/ annual report requirements;

(d) there are reduced compulsory registry filings;

(e)   the statutory accounting requirements are simplified; and

(f)   the 2006 Act allows a company to indemnify and purchase indemnity insurance for its directors. Shareholders should note that the above list is not exhaustive.

### Exchange Controls

No foreign exchange control regulations are in existence in the Isle of Man in relation to the exchange or remittance of sterling or any other currency from the Isle of Man and no authorizations, approvals or consents will be required from any authority in the Isle of Man in relation to the exchange and remittance of sterling and any other currency whether awarded by reason of a judgment or otherwise falling due and having been paid in the Isle of Man.

*Material Indian Regulations*

We are subject to other Indian and International regulations which may impact our business. In particular, the following regulations have a significant impact on our business.

*Notification of Industry Status.*

Prior to 1998, the lack of industry status barred legitimate financial institutions and private investors from financing films. However, on May 10, 1998, the Indian film industry was conferred industry status by a press release issued by the Minister of Information and Broadcasting (MIB).

*Film Certification.* The Cinematograph Act authorizes the Central Board of Film Certification (CBFC), in accordance with the Cinematograph (Certification) Rules, 1983, or the Certification Rules, for sanctioning films for public exhibition in India. Under the Certification Rules, the producer of a film is required to apply in the specified format for certification of such film, with the prescribed fee. The film is examined by an examining committee, which determines whether the film:

- is suitable for unrestricted public exhibition;
- is suitable for unrestricted public exhibition, with a caution that the question as to whether any child below the age of 12 years may be allowed to see the film should be considered by the parents or guardian of such child;
- is suitable for public exhibition restricted to adults;
- is suitable for public exhibition restricted to members of any profession or any class of persons having regard to the nature, content and theme of the film;
- is suitable for certification in terms of the above if a specified portion or portions be excised or modified therefrom; or
- that the film is not suitable for unrestricted or restricted public exhibitions, or that the film be refused a certificate.

A film will not be certified for public exhibition if, in the opinion of the CBFC, the film or any part of it is against the interests of the sovereignty, integrity or security of India, friendly relations with foreign states, public order, decency or morality, or involves defamation or contempt of court or is likely to incite the commission of any offence. Any applicant, if aggrieved by any order of the CBFC either refusing to grant a certificate or granting a certificate that restricts exhibition to certain persons only, may appeal to the Film Certification Appellate Tribunal constituted by the Central Government in India under the Cinematograph Act.

A certificate granted or an order refusing to grant a certificate in respect of any film is published in the Official Gazette of India and is valid throughout India for ten years from the date of grant. Films certified for public exhibition may be re-examined by the CBFC if any complaint is received. Pursuant to grant of a certificate, film advertisements must indicate that the film has been certified for such public exhibition.

The Central Government in India may issue directions to licensees of cinemas generally or to any licensee in particular for the purpose of regulating the exhibition of films, so that scientific films, films intended for educational purposes, films dealing with news and current events, documentary films or indigenous films secure an adequate opportunity of being exhibited.

The Central Government in India, acting through local authorities, may order suspension of exhibition of a film, if it is of the opinion that any film being publicly exhibited is likely to cause a breach of peace. Failure to comply with the Cinematograph Act may attract imprisonment and/or monetary fines.

Separately, the Cable Television Networks Rules, 1994 require that no film or film song, promotional material, trailer or film music video, album or their promotional materials, whether produced in India or abroad, shall be carried through cable services unless it has been certified by the CBFC as suitable for unrestricted public exhibition in India.

A draft Cinematograph Bill, 2013 has been prepared by the Ministry of Information and Broadcasting and is awaiting approval.

*Insolvency and Bankruptcy Code, 2016.* An act to consolidate and amend the laws relating to reorganisation and insolvency resolution of corporate persons, partnership firms and individuals in a time bound manner for maximisation of value of assets of such persons, to promote entrepreneurship, availability of credit and balance the interests of all the stakeholders including alteration in the order of priority of payment of Government dues and to establish an Insolvency

and Bankruptcy Board of India.

53

*Financing.* In October 2000, the Ministry of Finance, GOI notified the film industry as an industrial concern in terms of the Industrial Development Bank of India Act, 1964, pursuant to which loans and advances to industrial concerns became available to the film industry. The Reserve Bank of India, or the RBI, by circular dated May 14, 2001, permitted commercial banks to finance up to 50.0% of total production cost of a film. Further, by an RBI circular dated June 8, 2002, bank financing is now available even where total film production cost exceeds approximately $1.6 million. Banks which finance film productions customarily require borrowers to assign the film's intellectual property or music audio/video/CDs/ DVDs/internet, satellite, channel, export/international rights as part of the security for the loan, such that the banks would have a right in negotiation of valuation of such intellectual property rights.

*Labour Laws.* Depending on the nature of work and number of workers employed at any workplace, various labour related legislations may apply. Certain significant provisions of such labour related laws are provided below. The Employees' Provident Fund and Miscellaneous Provisions Act, 1952, or the EPF Act, applies to factories employing 20 or more employees and such other establishments as notified by the Government from time to time. It requires all such establishments to be registered with the relevant Provident Fund Commissioner. Also, such employers are required to contribute to the employees' provident fund the prescribed percentage of the basic wages and certain cash benefits payable to employees. Employees are also required to make equal contributions to the fund. A monthly return is required to be submitted to the relevant Provident Fund Commissioner in addition to the maintenance of registers by employers.

*Competition Act.* The Competition Act, 2002, or the Competition Act, prohibits practices that could have an appreciable adverse effect on competition in India. Under the Competition Act, any arrangement, understanding or action, whether formal or informal, which causes or is likely to cause an appreciable adverse effect on competition in India is void. Any agreement among competitors which directly or indirectly determines purchase or sale prices, results in bid rigging or collusive bidding, limits or controls production, supply, markets, technical development, investment or the provision of services, or shares the market or source of production or provision of services in any manner, including by way of allocation of geographical area or types of goods or services or number of customers in the market, is presumed to have an appreciable adverse effect on competition. Further, the Competition Act prohibits the abuse of a dominant position by any enterprise either directly or indirectly, including by way of unfair or discriminatory pricing or conditions in the sale of goods or services, using a dominant position in one relevant market to enter into, or protect, another relevant market, and denial of market access. Further, acquisitions, mergers and amalgamations which exceed certain revenue and asset thresholds require prior approval by the Competition Commission of India.

Under the Competition Act, the Competition Commission has powers to pass directions/impose penalties in cases of anti-competitive agreements, abuse of dominant position and combinations which are not in compliance with the Competition Act. If there is a continuing non-compliance the person may be punishable with imprisonment for a term extending up to three years or with a fine or with both as the Chief Metropolitan Magistrate, Delhi may deem fit. In case of offences committed by companies, the persons responsible to the company for the conduct of the business of the company will be liable under the Competition Act, except when the offense was committed without their knowledge or when they had exercised due diligence to prevent it. Where the contravention committed by the company took place with the consent or connivance of, or is attributable to any neglect on the part of, any director, manager, secretary or other officer of the company, such person is liable to be punished.

The Competition Act also provides that the Competition Commission has the jurisdiction to inquire into and pass orders in relation to an anti-competitive agreement, abuse of dominant position or a combination, which even though entered into, arising or taking place outside India or signed between one or more non-Indian parties, but causes or is likely to cause an appreciable adverse effect in the relevant market in India. The Competition Act was amended in 2009, and cases which were pending before the Monopolies and Restrictive Trade Practice Commission were transferred to the Competition Commission of India.

*Indian Takeover Regulations.* The SEBI (Substantial Acquisition of Shares and Takeover) Regulations, 2011 came into effect on October 22, 2011, which was last amended on August 14, 2017, superseding the earlier takeover regulations. The Takeover Regulations provide the process, timing and disclosure requirements for a public announcement of an open

offer in India and the applicable pricing norms.

54

Pursuant to the Takeover Regulations, a requirement to make a mandatory open offer by an "acquirer" (together with persons acting in concert with it) for at least 26% of the total shares of the Indian listed company, to all shareholders of such company (excluding the acquirer, persons acting in concert with it and the parties to any underlying agreement including persons deemed to be acting in concert) is triggered, subject to certain exemptions including transfers between promoters, if an acquirer acquires shares or voting rights in the Indian listed company, which together with its existing holdings and those of any persons acting in concert with him entitle the acquirer and persons acting in concert to exercise 25% or more of the voting rights in the Indian listed company; or an acquirer that holds between 25% and the maximum permissible non-public shareholding of an Indian listed company, acquires additional voting rights of more than 5% during a financial year; or an acquirer acquires, directly or indirectly, control over an Indian listed company, irrespective of acquisition of shares or voting rights in the Indian listed company.

An acquisition of shares or voting rights in, or control over, any company that would enable a person to exercise or direct the exercise of such percentage of voting rights in, or control over, an Indian listed company, the acquisition of which would otherwise attract the obligation to make an open offer under the Takeover Regulations will also trigger a mandatory open offer under the Takeover Regulations. Where the primary target of the acquisition is an overseas parent of an Indian listed company and the Indian listed company represents over 80% of a specified materiality parameter (including asset value, revenue or market capitalization) of the overseas parent company, such acquisition would be treated as a "direct acquisition" of the Indian listed company.

*Indian Companies Act.* A majority of the provisions of the Companies Act, 2013 read with Companies (Amendment) Act 2017 are now in effect, bringing into effect significant changes to the Indian company law framework, such as in the provisions related to issue of capital, disclosures, corporate governance norms, audit matters, and related party transactions. The Companies Act, 2013 has also introduced additional requirements which do not have equivalents under the Companies Act, 1956, including the introduction of a provision allowing the initiation of class action suits in India against companies by shareholders or depositors, a restriction on investment by an Indian company through more than two layers of subsidiary investment companies (subject to certain permitted exceptions), and prohibitions on advances to directors. Indian companies with net worth, turnover or net profits of INR 5,000 million or higher during any financial year are also required to spend 2.0% of their average net profits during the three immediately preceding financial years on activities pertaining to corporate social responsibility. Further, the Companies Act, 2013 imposes greater monetary and other liability on Indian companies, their directors and officers in default, for any non-compliance.

55

**Differences in Corporate Law**

The following chart summarizes certain material differences between the rights of holders of our A ordinary shares and the rights of holders of the common stock of a typical corporation incorporated under the laws of the State of Delaware that result from differences in governing documents and the laws of Isle of Man and Delaware.

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **General Meetings** | The 2006 Act does not require a company to hold an annual general meeting of its shareholders. Subject to anything contrary in the company's memorandum and articles of association, a meeting of shareholders can be held at such time and in such place, within or outside the Isle of Man, as the convener of the meeting considers appropriate. Under the 2006 Act, the directors of a company (or any other person permitted by the company's memorandum and articles of association) may convene a meeting of the shareholders of a company. Further, the directors of a company must call a meeting to consider a resolution requested in writing by shareholders holding at least 10% of the company's voting rights. The Isle of Man Court may order a meeting of members to be held and to be conducted in such manner as the Court orders, among other things, if it is of the opinion that it is in the interests of the shareholders of the company that a meeting of shareholders is held. Our articles require our Board of Directors to convene annually a general meeting of the shareholders at such time and place, and to consider such business, as the Board of Directors may determine. | Shareholders of a Delaware corporation generally do not have the right to call meetings of shareholders unless that right is granted in the certificate of incorporation or bylaws. However, if a corporation fails to hold its annual meeting within a period of 30 days after the date designated for the annual meeting, or if no date has been designated for a period of 13 months after its last annual meeting, the Delaware Court of Chancery may order a meeting to be held upon the application of a shareholder. |
| **Quorum Requirements for General Meetings** | The 2006 Act provides that a quorum at a general meeting of shareholders may be fixed by the articles. Our articles provide a quorum required for any general meeting consists of shareholders holding at least 30% of the issued share capital of the Company. | A Delaware corporation's certificate of incorporation or bylaws can specify the number of shares that constitute the quorum required to conduct business at a meeting, provided that in no event will a quorum consist of less than one-third of the shares entitled to vote at a meeting. |
| **Board of Directors** | Our articles provide that unless and until otherwise determined by our Board of Directors, the number of directors will not be less than three or more than twelve, with the exact number to be set from time to time by the Board of Directors. While there is no concept of dividing a board of directors into classes under Isle of Man law, there is nothing to prohibit a company from doing so. Consequently, under our articles, our Board of Directors is divided into three classes, each as nearly equal in | A typical certificate of incorporation and bylaws would provide that the number of directors on the board of directors will be fixed from time to time by a vote of the majority of the authorized directors. Under Delaware law, a board of directors can be divided into up to three classes. |

number as possible and at each annual general meeting, each of the directors of the relevant class the term of which shall then expire shall be eligible for re-election to the Board of Directors for a period of three years.

56

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **Removal of Directors** | Under Isle of Man law, notwithstanding anything in the memorandum or articles or in any agreement between a company and its directors, a director may be removed from office by way of shareholder resolution. Such resolution may only be passed (a) at a meeting of the shareholders called for such purposes including the removal of the director or (b) by a written resolution consented to by a shareholder or shareholders holding at least 75% of the voting rights. The 2006 Act provides that a director may be removed from office by a resolution of the directors if the directors are expressly given such authority in the memorandum or articles, but our articles do not provide this authority. | A typical certificate of incorporation and bylaws provide that, subject to the rights of holders of any preferred stock, directors may be removed at any time by the affirmative vote of the holders of at least a majority, or in some instances a supermajority, of the voting power of all of the then outstanding shares entitled to vote generally in the election of directors, voting together as a single class. A certificate of incorporation could also provide that such a right is only exercisable when a director is being removed for cause (removal of a director only for cause is the default rule in the case of a classified board). |
| **Vacancy of Directors** | Subject to any contrary provisions in a company's memorandum or articles of association, a person may be appointed as a director (either to fill a vacancy or as an additional director) by a resolution of the directors or by a resolution of the shareholders. Our articles provide that any vacancy resulting from, among other things, removal, resignation, conviction and disqualification, may be filled by another person willing to act as a director by way of shareholder resolution or resolution of our Board of Directors. Any director appointed by the Board of Directors will hold office only until the next annual general meeting of the Company, when he will be subject to retirement or re-election. | A typical certificate of incorporation and bylaws provide that, subject to the rights of the holders of any preferred stock, any vacancy, whether arising through death, resignation, retirement, disqualification, removal, an increase in the number of directors or any other reason, may be filled by a majority vote of the remaining directors, even if such directors remaining in office constitute less than a quorum, or by the sole remaining director. Any newly elected director usually holds office for the remainder of the full term expiring at the annual meeting of shareholders at which the term of the class of directors to which the newly elected director has been elected expires. |
| **Interested Director Transactions** | Under Isle of Man law, as soon as a director becomes aware of the fact that he is interested in a transaction entered into or to be entered into by the company, he must disclose this interest to the board of directors. Our articles provide that no director may participate in approval of a transaction in which he or she is interested. | Under Delaware law, some contracts or transactions in which one or more of a Delaware corporation's directors has an interest are not void or voidable because of such interest provided that some conditions, such as obtaining the required approval and fulfilling the requirements of good faith and full disclosure, are met. For an interested director transaction not to be voided, either the shareholders or the board of directors must approve in good faith any such contract or transaction after full disclosure of the material facts or the contract or transaction must have been "fair" as to the corporation at |

the time it was approved. If board or committee approval is sought, the contract or transaction must be approved in good faith by a majority of disinterested directors after full disclosure of material facts, even though less than a majority of a quorum.

57

|  | Isle of Man Law | Delaware Law |
|---|---|---|
| **Cumulative Voting** | There is no concept of cumulative voting under Isle of Man law. | Delaware law does not require that a Delaware corporation provide for cumulative voting. However, the certificate of incorporation of a Delaware corporation may provide that shareholders of any class or classes or of any series may vote cumulatively either at all elections or at elections under specified circumstances. |
| **Shareholder Action Without a Meeting** | A written resolution will be passed if it is consented to in writing by shareholders holding in excess of 50% or 75% in the case of a special resolution of the rights to vote on such resolution. The consent may be in the form of counterparts, and our articles provide that, in such circumstances, the resolution takes effect on the earliest date upon which shareholders holding a sufficient number of votes to constitute a resolution of shareholders have consented to the resolution in writing. Any holder of B ordinary shares consenting to a resolution in writing is first required to certify that it is a permitted holder as defined in our articles. If any written resolution of the shareholders of the company is adopted otherwise than by unanimous written consent, a copy of such resolution must be sent to all shareholders not consenting to such resolution upon it taking effect. | Unless otherwise specified in a Delaware corporation's certificate of incorporation, any action required or permitted to be taken by shareholders at an annual or special meeting may be taken by shareholders without a meeting, without notice and without a vote, if consents, in writing, setting forth the action, are signed by shareholders with not less than the minimum number of votes that would be necessary to authorize the action at a meeting at which all shares entitled to vote were present and voted. All consents must be dated. No consent is effective unless, within 60 days of the earliest dated consent delivered to the corporation, written consents signed by a sufficient number of holders to take the action are delivered to the corporation. |
| **Business Combinations** | Under Isle of Man law, a merger or consolidation must be approved by, among other things, the directors of the company and by shareholders holding at least 75% of the voting rights. A scheme of arrangement (which includes, among other things, a sale or transfer of the assets of the company) must be approved by, among other things, the directors of the company, a 75% shareholder majority and also requires the sanction of the court. | With certain exceptions, a merger, consolidation or sale of all or substantially all the assets of a Delaware corporation must be approved by the board of directors and a majority (unless the certificate of incorporation requires a higher percentage) of the outstanding shares entitled to vote thereon. |
| **Interested Shareholders** | There are no equivalent provisions under Isle of Man law relating to interested shareholders. | Section 203 of the Delaware General Corporation Law generally prohibits a Delaware corporation from engaging in specified corporate transactions (such as mergers, stock and asset sales and loans) with an "interested shareholder" for three years following the |

time that the shareholder becomes an interested shareholder. Subject to specified exceptions, an "interested shareholder" is a person or group that owns 15% or more of the corporation's outstanding voting stock (including any rights to acquire stock pursuant to an option, warrant, agreement, arrangement or understanding, or upon the exercise of conversion or exchange rights, and stock with respect to which the person has voting rights only), or is an affiliate or associate of the corporation and was the owner of 15% or more of the voting stock at any time within the previous three years.

58

| | Isle of Man Law | Delaware Law |
|---|---|---|
| | | A Delaware corporation may elect to "opt out" of, and not be governed by, Section 203 through a provision in either its original certificate of incorporation or its bylaws, or an amendment to its original certificate or bylaws that was approved by majority shareholder vote. With a limited exception, this amendment would not become effective until 12 months following its adoption. |
| **Limitations on Personal Liability of Directors** | Under Isle of Man law, a director who vacates office remains liable under any provisions of the 2006 Act that impose liabilities on a director in respect of any acts or omissions or decisions made while that person was a director. | A Delaware corporation may include in its certificate of incorporation provisions limiting the personal liability of its directors to the corporation or its shareholders for monetary damages for many types of breach of fiduciary duty. However, these provisions may not limit liability for any breach of the duty of loyalty, acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, the authorization of unlawful dividends, shares repurchases or shares barring redemptions, or any transaction from which a director derived an improper personal benefit. A typical certificate of incorporation would also provide that if Delaware law is amended so as to allow further elimination of, or limitations on, director liability, then the liability of directors will be eliminated or limited to the fullest extent permitted by Delaware law as so amended. However, these provisions would not be likely to bar claims arising under U.S. federal securities laws. |
| **Indemnification of Directors and Officers** | A company may indemnify against all expenses, any person who is or was a party, or is threatened to be made a party to any civil, criminal, administrative or investigative proceedings (threatened, pending or completed), by reason of the fact that the person is or was a director of the company, or who is or was, at the request of the company, serving as a director or acting for another company. Any indemnity given will be void and of no effect unless such person acted honestly and in good faith and in what such person believed to be in | Under Delaware law, subject to specified limitations in the case of derivative suits brought by a corporation's shareholders in its name, a corporation may indemnify any person who is made a party to any third party action, suit or proceeding on account of being a director, officer, employee or agent of the corporation (or was serving at the request of the corporation in such capacity for another corporation, partnership, joint venture, trust or other enterprise) against expenses, including attorney's fees, |

the best interests of the company and, in the case of criminal proceedings, had no reasonable cause to believe that the conduct of such person was unlawful.

judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with the action, suit or proceeding through, among other things, a majority vote of directors who were not parties to the suit or proceeding (even though less than a quorum), if the person:

59

| Isle of Man Law | Delaware Law |
|---|---|
| | · acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation or, in some circumstances, at least not opposed to its best interests; and |
| | · in a criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful. |
| | Delaware law permits indemnification by a corporation under similar circumstances for expenses (including attorneys' fees) actually and reasonably incurred by such persons in connection with the defense or settlement of a derivative action or suit, except that no indemnification may be made in respect of any claim, issue or matter as to which the person is adjudged to be liable to the corporation unless the Delaware Court of Chancery or the court in which the action or suit was brought determines upon application that the person is fairly and reasonably entitled to indemnity for the expenses which the court deems to be proper. |
| | To the extent a director, officer, employee or agent is successful in the defense of such an action, suit or proceeding, the corporation is required by Delaware law to indemnify such person for reasonable expenses incurred thereby. Expenses (including attorneys' fees) incurred by such persons in defending any action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of that person to repay the amount if it is ultimately determined that that person is not entitled to be so indemnified. |
| **Appraisal Rights** | There is no concept of appraisal rights under Isle of Man law. | A shareholder of a Delaware corporation participating in certain major corporate transactions may, under certain circumstances, be entitled to appraisal rights pursuant to which the shareholder may receive cash in the amount of the fair value of the shares held by that shareholder (as |

determined by a court) in lieu of the consideration the shareholder would otherwise receive in the transaction.

60

|  | **Isle of Man Law** | **Delaware Law** |
|---|---|---|
| **Shareholder Suits** | The Isle of Man Court may, on application of a shareholder, permit that shareholder to bring proceedings in the name and on behalf of the company (including intervening in proceedings to which the company is a party). In determining whether or not leave is to be granted, the Isle of Man Court will take into account such things as whether the shareholder is acting in good faith and whether the Isle of Man Court itself is satisfied that it is in the interests of the company that the conduct of the proceedings should not be left to the directors or to the determination of the shareholders as a whole. Under Isle of Man law, a shareholder may bring an action against the company for a breach of a duty owed by the company to such shareholder in that capacity. | Under Delaware law, a shareholder may bring a derivative action on behalf of the corporation to enforce the rights of the corporation, including for, among other things, breach of fiduciary duty, corporate waste and actions not taken in accordance with applicable law. An individual also may commence a class action suit on behalf of himself or herself and other similarly situated shareholders where the requirements for maintaining a class action under Delaware law have been met. A person may institute and maintain such a suit only if such person was a shareholder at the time of the transaction which is the subject of the suit or his or her shares thereafter devolved upon him or her by operation of law. Additionally, under established Delaware case law, the plaintiff generally must be a shareholder not only at the time of the transaction which is the subject of the suit, but also through the duration of the derivative suit. Delaware law also requires that the derivative plaintiff make a demand on the directors of the corporation to assert the corporate claim before the suit may be prosecuted by the derivative plaintiff, unless such demand would be futile. In such derivative and class actions, the court has discretion to permit the winning party to recover attorneys' fees incurred in connection with such action. |
| **Inspection of Books and Records** | Upon giving written notice, a shareholder is entitled to inspect and to make copies of (or obtain extracts of) the memorandum and articles and any of the registers of shareholders, directors and charges. A shareholder may only inspect the accounting records (and make copies or take extracts thereof) in certain circumstances. | All shareholders of a Delaware corporation have the right, upon written demand, to inspect or obtain copies of the corporation's shares ledger and its other books and records for any purpose reasonably related to such person's interest as a |

Our articles provide that no shareholder has any shareholder. right to inspect any accounting record or other document of the company unless he is authorized to do so by statute, by order of the Isle of Man Court, by our Board of Directors or by shareholder resolution.

61

| | Isle of Man Law | Delaware Law |
|---|---|---|
| **Amendment of Governing Documents** | Under Isle of Man law, the shareholders of a company may, by resolution, amend the memorandum and articles of the company. The memorandum and articles of a company may authorize the directors to amend the memorandum and articles, but our memorandum and articles do not contain any such power. Our memorandum of association provides that our memorandum of association and articles of association may be amended by a special resolution of shareholders. | Under Delaware law, amendments to a corporation's certificate of incorporation require the approval of shareholders holding a majority of the outstanding shares entitled to vote on the amendment. If a class vote on the amendment is required by Delaware law, a majority of the outstanding stock of the class is required, unless a greater proportion is specified in the certificate of incorporation or by other provisions of Delaware law. Under Delaware law, the board of directors may amend bylaws if so authorized in the certificate of incorporation. The shareholders of a Delaware corporation also have the power to amend bylaws. |
| **Dividends and Repurchases** | The 2006 Act contains a statutory solvency test. A company satisfies the solvency test if it is able to pay its debts as they become due in the normal course of its business and where the value of the company's assets exceeds the value of its liabilities.<br>Subject to the satisfaction of the solvency test and any contrary provision contained in a company's articles, a company may, by a resolution of the directors, declare and pay dividends. Our articles provide that where the solvency test has been satisfied, our Board of Directors may declare and pay dividends (including interim dividends) out of our profits to shareholders according to their respective rights and interests in the profits of the company.<br>Under Isle of Man law, a company may purchase, redeem or otherwise acquire its own shares for any consideration, subject to, among other things, satisfaction of the solvency test. | Delaware law permits a corporation to declare and pay dividends out of statutory surplus or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and/or for the preceding fiscal year as long as the amount of capital of the corporation following the declaration and payment of the dividend is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets.<br>Under Delaware law, any corporation may purchase or redeem its own shares, except that generally it may not purchase or redeem those shares if the capital of the corporation is impaired at the time or would become impaired as a result of the redemption. A corporation may, however, purchase or redeem capital shares that are entitled upon any distribution of its assets to a preference over another class or series of its shares if the shares are |

to be retired and the capital reduced.

**Changes in Capital**

The conditions in our articles of association governing changes in capital are not more stringent than as required under the 2006 Act. Our articles of association provide that our directors may, by resolution, alter our share capital. The 2006 Act subjects any reduction of share capital to the statutory solvency test. The 2006 Act provides that a company satisfies the solvency test if it is able to pay its debts as they become due in the normal course of the company's business and where the value of the company's assets exceeds the value of its liabilities.

62

**C. Organizational Structure**

We conduct our global operations through our Indian and international subsidiaries, including our majority-owned subsidiary Eros International Media Limited, or Eros India, a public company incorporated in India and listed on the BSE Limited and National Stock Exchange of India Limited, or the Indian Stock Exchanges. Our agent for service of process in the United States is Prem Parameswaran, located at 550 County Avenue, Secaucus, New Jersey.

As of July 30, 2018, the Founders Group holds approximately 38.6% of our issued share capital, which comprise all of our B ordinary shares and certain A ordinary shares. Beech Investments Limited, a company incorporated in the Isle of Man, is owned by discretionary trusts that include Eros director Kishore Lulla as a potential beneficiary.

The following diagram summarizes the corporate structure of our consolidated group of companies as of July 30, 2018:

**Eros Organizational Chart (as of July 30, 2018)**



(a) Eros India holds 100% of each of its Indian subsidiaries other than Big Screen Entertainment Private Limited (India) and Colour Yellow Productions Private Limited (India), and Eros

International Distribution LLP.

(b) The group divested its entire 51% stake from Ayngaran group with effect from October 01, 2017.

63

**D. Property and Equipment**

Our properties consist primarily of studios, office facilities, warehouses and distribution offices, most of which are located in Mumbai, India. We own our corporate and registered offices in Mumbai and rent our remaining properties in India. Four of these leased properties are owned by members of the Lulla family. The leases with the Lulla family were entered into at what we believe were market rates. See "Part I. — Item 7. Major Shareholders and Related Party Transactions" and "Part I — Item 3. Key Information — D. Risk Factors. We have entered into certain related party transactions and may continue to rely on our founders for certain key development and support activities." We also own or lease five properties in the United Kingdom, the United States and Dubai in connection with our international operations outside of India. Property and equipment with a net carrying amount of approximately $7.5 million (2017: $7.8 million) have been pledged to secure borrowings, and we currently do not have any significant plans to construct new properties or expand or improve our existing properties.

The following table provides detail regarding our properties in India and globally.

| Location | Size | Primary Use | Leased / Owned |
|---|---|---|---|
| Mumbai, India | 13,992 sq. ft. | Corporate Office | Owned |
| Mumbai, India | 2,750 sq. ft. | Studio Premises | Leased(1) |
| Mumbai, India | 8,094 sq. ft. | Executive Accommodation | Leased(1) |
| Mumbai, India | 17,120 sq. ft. | Office | Leased(1) |
| Mumbai, India | 1,000 sq. ft. | Film Negatives Warehouse | Leased |
| Mumbai, India | 100 sq. ft. | Film Prints Warehouse | Leased |
| Mumbai, India | 2,750 sq. ft. | Corporate | Owned |
| Delhi, India | 600 sq. ft. | Film Distribution Office | Leased |
| Kolkata, India | 640 sq. ft. | Film Distribution Office | Leased |
| Punjab, India | 438 sq. ft. | Film Distribution Office | Leased |
| Bihar, India | 1,130 sq. ft | Film Distribution Office | Leased |
| Kerala, India | 1,800 sq. ft | Film Distribution Office | Leased |
| Kerala, India | 1,500 sq. ft | Film Distribution Office | Leased |
| Chennai, India | 8,942 sq. ft. | Corporate Office | Leased |
| Delhi, India | 3,915 sq. ft. | Branch Office | Leased |
| Bangalore, India | 1,500 sq. ft. | Branch Office | Leased |
| Bangalore, India | 5,100 sq. ft. | Digital team | Leased |
| Dubai, United Arab Emirates | 536 sq. ft. | Corporate Office | Leased |
| Dubai, United Arab Emirates | 747 sq. ft. | Corporate Office | Leased |
| Secaucus, New Jersey, U.S. | 10,000 sq. ft. | Corporate Office | Leased(1) |
| London, England | 7,549 sq. ft. | DVD Warehouse | Owned |
| San Francisco, California, U.S. | 2,315 sq. ft. | Digital team | Leased |

(1) Leased directly or indirectly from a member of the Lulla family.

**ITEM 4A. UNRESOLVED STAFF COMMENTS**

Not applicable.

**ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

**A. Operating Results**

You should read the information contained in the table below in conjunction with our audited consolidated financial statements and the related notes included elsewhere in this annual report. The tables set forth below with our results of operations and period over period comparisons are not adjusted for the fluctuations in exchange rates described in "Part I — Item 3. Key Information — A. Selected Financial Data."

**Outlook**

Our primary revenue streams are derived from three channels: theatrical, television syndication and digital and ancillary. For the fiscal year ended March 31, 2018, the aggregate revenues from theatrical, television syndication and digital and ancillary were $79.1 million, $97.2 million and $85.0 million respectively, compared to $101.0 million, $88.0 million and $64.0 million, respectively, for the fiscal year ended March 31, 2017.

The contribution from these three distribution channels can fluctuate year over year based on, among other things, our mix of films and budget levels, and the size of our television syndication deals.

The significant component of our revenue is attributable to the theatrical distribution of our films in India. We anticipate that as additional multiplex theaters are built in India, there will be increased opportunities to exploit our film content theatrically. We expect that this multiplex theater growth coupled with the rise in ticket prices and the anticipated increase in the number of high budget Hindi and Tamil films in our slate will result in increased revenue. In addition, in India, we cannot predict the share of theatrical revenue we will receive, as we currently negotiate film-by-film and exhibitor-by-exhibitor. With a focus on creating intellectual property in-house along with delivering wholesome entertainment to audiences, we have entered into key co-production partnerships with writers, producers and directors. Colour Yellow Production, a subsidiary of Eros India with Anand L Rai has announced film releases across budgets, genres and languages. These co-production model gives us better visibility on actual cost of production ensuring capped budgets and exclusive distribution rights, typically for at least 20 years. In February 2018, Reliance Industries Ltd ("Reliance") agreed, subject to customary regulatory and other approvals, to purchase 5% of our A Ordinary shares at a price of $15 per share, which represents a premium of 18% over the last closing price before the date of announcement. At the same time, Eros India and Reliance announced an agreement to partner in India and formed Reliance Eros Productions LLP to jointly produce and consolidate content from across India. The new partnership will equally invest up to $150 million to produce and acquire Indian films and digital originals across all languages. This investment will dramatically scale Eros' capabilities in content production, marketing, and distribution, and make new strides on the digital and content forefronts, benefitting from the platform synergies across technology, content and digital platforms. From fiscal 2019, the Group will also co-produce film releases with Mr. V. Vijayendra Prasad.

We believe China to be a significant market opportunity for Indian films. As per information published by PricewaterhouseCoopers based on data from PwC Global Entertainment & Media Outlook 2017, China was the world's second largest box-office market with revenue of USD 6.2bn in 2016. It is a lucrative market for cinema with revenue expected to grow at a staggering 11.6% CAGR from US$6.2bn in 2016 to US$10.7bn by 2021. China had 41,056 cinema screens compared to 40,928 in the US in 2016 and by 2021, China will have more than 80,000 screens, nearly twice as many as the US. In fiscal year 2017, a Hindi Film *Dangal* was released in China across 9,000 screens and grossed about $180 million at the box office. Similarly, *Seceret Superstar*, another bollywood film released in China in 2017, grossed about $65 million within only 10 days of release at the box office and went on to become 2017's second highest earner. Eros released *Bajarangi Bhaijan* across more than 8,000 screens in March 2018 and collected over $45 million at the box office since its release in China.

Increasing the number of Tamil and Telugu global releases in our film mix allows us to expand our audience within significant regional markets. As we expand into other regional languages such as Marathi, Bengali, Punjabi and Malayalam, we may see the composition of our film mix changing over time in order to allow us to successfully scale our business around Hindi as well as regional language content. At the same time, the distribution window for the theatrical release of films, and the window between the theatrical release and distribution in other channels, have each been compressing in recent years and may continue to change.

A substantial portion of our revenue is also derived from television syndication. Because of increased demand for Indian film content on television in India as the number of DTH subscribers increase and the cable industry migrates toward digital technology, we expect a significant increase in demand for premium content such as movies and sports and a resultant increase in licensing fees payable to us by satellite and cable television operators. However, as competitors with compelling products, including international content providers, expand their content offerings in India, we expect

competition for television syndication revenues to increase, and license fees for such content could decrease.

65

Currently, the remainder of our revenue is derived from digital distribution and ancillary products and services. With a significant portion of the Indian and international population moving toward adoption of digital technology, we are increasing our focus on providing on-demand services. We have expanded our digital presence with the launch of our on-demand entertainment portal Eros Now, which leverages our film and music libraries by providing ad- supported and subscription-based streaming of film and music content via internet-enabled devices. Eros Now has been increasingly focused on delivering product features, being truly platform agnostic and monetizing it's growing registered user base. We also have an ad-supported YouTube portal site on Google that hosts an extensive collection of clips of our content. Accordingly, we anticipate that our revenue and costs associated with digital distribution are likely to increase over time. Ancillary revenues also include all other revenues that are not theatrical or television, including licensing to airlines and cable operators.

We anticipate that our costs associated with the co-production and acquisition of film content are likely to increase over time as we continue to focus on content driven films with appropriate budgets in order to generate attractive rate of return. In addition, increased competition in the Indian film entertainment industry, including from international film entertainment providers such as Disney, Twentieth Century Fox and Viacom, is likely to cause the cost of film production and acquisition to increase. In fiscal year 2018, we invested $186.8 million in film content, and in fiscal year 2019, we expect to invest approximately $200 to $250 million in film content.

We anticipate our administrative costs will increase as we expand our management team, especially to support the expansion of our digital businesses. In addition, our administrative costs will increase due to the costs associated with being a U.S.-listed public company. Although aggregate spending will increase, we do not anticipate that this will result in a material change in aggregate administrative costs as a percentage of revenue.

**Critical accounting policies**

Our consolidated financial statements are prepared in accordance with IFRS as issued by the IASB, which requires management to make estimates, judgments and assumptions that affect the amounts reported in the Consolidated Financial Statements and accompanying notes. Management considers the following accounting policies to be critical because they are important to our financial condition and results of operations and require significant judgment and estimates on the part of management in their application. The development and selection of these critical accounting policies have been determined by our management and the related disclosures have been reviewed with the Audit Committee of our board of directors. For a summary of all our accounting policies, see Note 3 to our audited Consolidated Financial Statements appearing elsewhere in this annual report.

**Use of estimates**

Estimates and judgments are evaluated on a regular basis and are based on historical experience and other factors, such as expectations of future events that are believed to be reasonable under the present circumstances.

The Group makes estimates and assumptions concerning the future. These estimates, by definition, will rarely equal the related actual results. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the financial year are highlighted below:

**Revenue**

Revenue is recognized, net of sales related taxes, when persuasive evidence of an arrangement exists, the fees are fixed or determinable, the product is delivered or services have been rendered and collectability is reasonably assured. The Group considers the terms of each arrangement to determine the appropriate accounting treatment.

The following additional criteria apply in respect of various revenue streams within filmed entertainment:

- In arrangements for theatrical distribution, contracted minimum guarantees are recognized on the theatrical release date. The Group's share of box office receipts in excess of the minimum guarantee is recognized at the point they are notified to the Group.
- In arrangements for television syndication, license fees received in advance which do not meet all the above criteria, including commencement of the availability for broadcast under the terms of the related licensing agreement, are included in deferred income until the above criteria is met.

66

- In arrangements for catalogue sales, the Company recognizes revenue if revenue recognition criteria's such as a valid sales contract exists, all films are delivered, the Company is reasonably certain on collectability, and the Company's contractual obligations are complete, are met. Considering the arrangement with catalogue customers provide for a contractual deferred payment terms up to a year and in many cases the payments often fall behind contractual terms, revenues from catalogue sales are recognized net of credit impairment loss calculated at imputed market rate of interest on the gross receivables. The re-measurement of such credit impairment loss at each balance sheet date and related gains or losses is recognized within administrative costs in the Statement of Income. The unwinding of the credit impairment loss reserve is recognized using effective interest rate within net finance cost in the Statement of Income.
- Digital and ancillary media revenues are recognized at the earlier of when the content is accessed or declared. Fees received for access to the specified and unspecified future content through digital and ancillary media, including usage of over-the-top platform developed by the Group, is recognized on straight line basis over the period of the service contract. Billing in excess of the revenue recognized is shown as deferred revenue.
- DVD, CD and video distribution revenue is recognized on the date the product is delivered or if licensed in line with the above criteria. Visual effects, production and other fees for services rendered by the Group and overhead recharges are recognized in the period in which they are earned and in certain cases, the stage of production is used to determine the proportion recognized in the period.

**Goodwill and trade name**

The Group tests annually whether goodwill and trade name have suffered impairment, in accordance with its accounting policy. The recoverable amount of cash-generating unit has been determined based on value in use calculations. We use market related information and estimates (generally risk adjusted discounted cash flows) to determine value in use. Cash flow projections take into account past experience and represent management's best estimate about future developments. Key assumptions on which management has based its determination of fair value less costs to sell and value in use includes estimated growth rates, weighted average cost of capital and tax rates. As of March 31, 2018, for assessing impairment of goodwill, value in use is determined using discounted cash flow method. The estimated cash flows for a period of four years were developed using internal forecasts, extrapolated for the fifth year, and a pre-tax discount rate of 15% and terminal growth rate of 4%. As of March 31, 2018, for assessing the impairment of the trade name, value in use is determined using the relief from royalty method based on a Royalty rate of 4% on the estimated total revenue for a period of four years, extrapolated for the fifth year, and, a pre-tax discount rate of 20% and terminal growth rate of 4%. These estimates, includes the methodology used, can have a material impact on the respective values and ultimately the amount of any goodwill and tradename impairment.

**Basis of consolidation**

The Group evaluates arrangements with special purpose vehicles in accordance with of IFRS 10 – Consolidated Financial Statements to establish how transactions with such entities should be accounted for. This requires a judgment over control such that it is exposed, or has rights, to variable returns and can influence the returns attached to the arrangements.

**Intangible assets**

The Group is required to identify and assess the useful life of intangible assets and determine their income generating life. Judgment is required in determining this and then providing an amortization rate to match this life as well as considering the recoverability or conversion of advances made in respect of securing film content or the services of talent associated with film production.

Accounting for the film content requires Management's judgment as it relates to total revenues to be received and costs to be incurred throughout the life of each film or its license period, whichever is the shorter. These judgments are used to determine the amortization of capitalized film content costs. The Group uses a stepped method of amortization on first release film content writing off more in year one which recognizes initial income flows and then the balance over a period of up to nine years. In the case of film content that is acquired by the Group after its initial exploitation, commonly referred

to as Library, amortization is spread evenly over the lesser of 10 years or the license period. Management's policy is based upon factors such as historical performance of similar films, the star power of the lead actors and actresses and others. Management regularly reviews, and revises when necessary, its estimates, which may result in a change in the rate of amortization and/or a write down of the asset to the recoverable amount.

The Group tests annually whether intangible assets have suffered any impairment, in accordance with the accounting policy. These calculations require judgments and estimates to be made, and, as with Goodwill, in the event of an unforeseen event these judgments and assumptions would need to be revised and the value of the intangible assets could be affected. There may be instances where the useful life of an asset is shortened to reflect the uncertainty of its estimated income generating life. This is particularly the case when acquiring assets in markets that the Group has not previously exploited.

67

**Allowances for doubtful accounts**

The Group extends credit to customers and other parties in the normal course of business and maintains an allowance for doubtful accounts for estimated losses resulting from the inability or unwillingness of customers to make required payments. The Group bases such estimates on historical experience, existing economic conditions, and any specific customer collection issues the Group has identified. Uncollectible accounts receivables are written off when a settlement is reached for an amount less than the outstanding balance or when the Group determines that the balance will not be collected. The allowance for doubtful accounts/bad debt for the year ended March 31, 2018 and March 31, 2017, was $4,740 and $2,430 respectively.

**Credit impairment losses**

In case of catalogue sales, the Group provides contractual deferred payment terms up to a year to the trading partners. Further, in several instances the catalogue customers fall behind contractual payment terms. The Group estimates credit impairment losses based on historical experience of collection from catalogue customers multiplied by the incremental borrowing rate applicable to the group of similar class of customer. The credit impairment losses, net of unwinding thereof, recognized in the Statement of Income for the year ended March 31, 2018 and March 31, 2017 was $10,193 and Nil, respectively.

**Valuation of available-for-sale financial assets**

The Group follows the guidance of IAS 39 – Financial Instruments: Recognition and Measurement to determine, where possible, the fair value of its available-for-sale financial assets. This determination, including identification of objective evidence of impairment, requires significant judgment. In making this judgment, the Group evaluates, among other factors, the duration and extent to which the fair value of an investment is less or more than its cost; the financial health of and near-term business outlook for the investee, including factors such as industry and sector performance, changes in technology and operational and financing cash flow.

**Income taxes and deferred taxation**

The Group is subject to income taxes in various jurisdictions. Judgment is required in determining the worldwide provision for income taxes. We are subject to tax assessment in certain jurisdictions. Significant judgment is involved in determining the provision for income taxes including judgment on whether the tax positions are probable of being sustained in tax assessments.

Judgment is also required when determining whether the Group should recognize a deferred tax asset, based on whether Management considers there is sufficient certainty in future earnings to justify the carry forward of assets created by tax losses and tax credits. Judgment is also required when determining whether the Group should recognize a deferred tax liability on undistributed earnings of subsidiaries. Where the ultimate outcome is different than that which was initially recorded there will be an impact on the income tax and deferred tax provisions.

**Share-based payments**

The Group is required to evaluate the terms to determine whether share based payment is equity settled or cash settled. Judgment is required to do this evaluation. Further, the Group is required to measure the fair value of equity settled transactions with employees at the grant date of the equity instruments. The fair value is determined principally by using the Black Scholes model and/or Monte Carlo Simulation Models which require assumptions regarding risk free interest rates, share price volatility, the expected term and other variables. The basis and assumptions used in these calculations are disclosed within Note 28. The aforementioned inputs entered in to the option valuation model that we use to determine the fair value of our share awards are subjective estimates and changes to these estimates will cause the fair value of our share-based awards and related share- based compensations expense we record to vary.

**Business combinations and deconsolidation**

Business combinations are accounted for using the acquisition method under the provisions of IFRS 3 (Revised), "Business Combinations". The cost of an acquisition is measured at the fair value of the assets transferred, equity instruments issued and liabilities incurred at the date of acquisition. The cost of the acquisition also includes the fair value of any contingent consideration. Identifiable tangible and intangible assets acquired and liabilities and contingent liabilities

assumed in a business combination are measured initially at their fair value on the date of acquisition. Significant estimates are required to be made in determining the value of contingent consideration and intangible assets.

During fiscal 2018, the Group divested its 51 percent equity interest in Ayngaran Group to the non-controlling investee. The Group recorded the financial asset retained in the former subsidiary on deconsolidation at its fair value and recorded a loss of $0.5 million. The discounting of the financial asset was determined using associated credit risk for similar instrument.

**Financial liabilities at fair value through profit and loss**

The Group has classified the convertible note as a financial liability at fair value through profit or loss and used the valuation models i.e. Black and Scholes and Monte-Carlo simulations to obtain the fair value of share warrant and convertible notes. Key assumptions on which external valuation experts has based their determination of fair value includes risk free rate, weighted average cost of capital, future volatility, proportion of debt to be converted into equity shares. These estimates, includes the methodology used, can have a material impact on the respective values and ultimately the amount of financial liability.

68

*Year Ended March 31, 2018 Compared to Year Ended March 31, 2017*

| | Year ended March 31, | | | As a % of revenue | |
| --- | --- | --- | --- | --- | --- |
| | **2018** | **2017** | **Change %** | **2018** | **2017** |
| | (in thousands) | | | | |
| Revenue | $ 261,253 | $ 252,994 | 3.3% | 100.0 | 100.0 |
| Cost of sales | (134,708) | (164,240) | (18.0%) | 51.6 | 64.9 |
| Gross profit | **126,545** | **88,754** | 42.6% | 48.4 | 35.1 |
| Administrative costs | (68,029) | (63,309) | 7.5% | 26.0 | 25.0 |
| Operating profit | **58,516** | **25,445** | 130.0% | 22.4 | 10.1 |
| Net finance costs | (17,813) | (17,156) | 3.8% | 6.8 | 6.8 |
| Other gains/(losses), net | (41,321) | 14,205 | (390.9%) | 15.8 | 5.6 |
| (Loss)/Profit before tax | **(618)** | **22,494** | (102.7%) | (0.2) | 8.9 |
| Income tax expense | (9,127) | (11,039) | (17.3%) | (3.5) | 4.4 |
| (Loss)/Profit for the year | $ **(9,745)** | $ **11,455** | (185.1%) | (3.7) | 4.5 |

The following table sets forth, for the period indicated, the revenue by region of domicile of Group's operation.

| | Year ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **Change (%)** |
| | (in thousands) | | |
| India | $ 98,073 | $ 121,966 | (19.6%) |
| Europe | 27,028 | 25,686 | 5.2% |
| North America | 1,244 | 2,549 | (51.2%) |
| Rest of the world | 134,908 | 102,793 | 31.2% |
| **Total revenues** | $ **261,253** | $ **252,994** | 3.3% |

*Revenue*

In fiscal 2018, Eros film slate comprised twenty four films of which one was high budget, four were medium budget and nineteen were low budget as compared to forty five films of which five were high budget, ten were medium budget and thirty were low budget in fiscal 2017.

In fiscal 2018, the Company's slate of twenty four films comprised fourteen Hindi films, one Tamil/Telugu film and nine regional films as compared to the same period last year where its slate of forty five films comprised twelve Hindi films, eighteen Tamil/Telugu films and fifteen regional films.

For the twelve months ended March 31, 2018, revenue increased by 3.3% to $261.3 million, compared to $253.0 million for the twelve months ended March 31, 2017.

In the twelve months ended March 31, 2018, the aggregate theatrical revenues decreased by 21.7% to $79.1 million from $101.0 million for the twelve months ended March 31, 2017. The decrease in theatrical revenues reflects the mix of films released in each period.

In the twelve months ended March 31, 2018, the aggregate revenues from television syndication increased by 10.5% to $97.2 million from $88.0 million for the twelve months ended March 31, 2017. This was due to strong catalogue sales in fiscal 2018 which is partially offset on account of the weaker new release slate and impact of credit impairment losses amounting $6.8 million.

In the twelve months ended March 31, 2018, the aggregate revenues from digital and ancillary increased by 32.8% to $85.0 million from $64.0 million for the twelve months ended March 31, 2017 mainly driven by catalogue monetization strategy, revenues from Eros Now and contribution from other ancillary revenues streams.

In the twelve months ended March 31, 2018, revenue from India decreased by 19.6% to $98.1 million, compared to $122.0 million in the twelve months ended March 31, 2017. The decrease was mainly due to mix of films released in fiscal 2018 compared to fiscal 2017.

69

In the twelve months ended March 31, 2018, revenue from Europe increased by 5.2% to $27.0 million, compared to $25.7 million in the twelve months ended March 31, 2017. This was on account of increased catalogue sales and partially offset by decrease in theatrical revenues.

In the twelve months ended March 31, 2018, revenue from North America decreased by 51.2% to $1.2 million, compared to $2.5 million in the twelve months ended March 2017. This was on account of relatively lower theatrical revenues from the film slate and lower catalogue revenues.

In the twelve months ended March 31, 2018, revenue from the rest of the world increased by 31.2% to $134.9 million, compared to $102.8 million in the twelve months ended March 31, 2017, mainly due to increased catalogue revenues and theatrical release of film *Bajrangi Bhaijaan* in China partially offset by decrease in theatrical revenues

### Cost of sales

For the twelve months ended March 31, 2018, cost of sales decreased by 18% to $134.7 million compared to $164.2 million in twelve months period ended March 31, 2017, primarily due to decrease in cumulative amortization costs of $20 million associated to lower cost of comparable film mix in twelve months ended March 2017 associated with less comparable film mix.

### Gross profit

In fiscal 2018 gross profit increased by 42.6% to $126.5 million, compared to $88.8 million in fiscal 2017. As a percentage of revenues, our gross profit margin was 48.4% in the fiscal 2018, compared to 35.1% in fiscal 2017. This was mainly due to strong catalogue sales and lower amortization charge associated to lower cost of comparable film mix.

### Adjusted EBITDA (Non-GAAP)

In fiscal 2018, adjusted EBITDA increased by 41.1% to $78.6 million, compared to $55.7 million in fiscal 2017 primarily due to our improved margins reflecting the higher proportionate of catalogue revenues, relative to the lower cost of the mix of new film releases and the resulting lower amortization charge partially offset due to net foreign exchange losses incurred in fiscal 2018 when compared to net foreign exchange gains earned in fiscal 2017.

### Adjusted Gross EBITDA (Non-GAAP)

In fiscal 2018, adjusted Gross EBITDA increased by 1.5% to $193.9 million, compared to $191.0 million in fiscal 2017. As a percentage of revenues, our adjusted gross EBITDA was 74.2%, compared to 75.4% in fiscal 2017. This was mainly due to net foreign exchange losses incurred during the fiscal 2018 compared to net foreign exchange gains earned in fiscal 2017 partially offset due to our improved margins reflecting the higher proportionate of catalogue revenues.

### Administrative costs

In fiscal 2018, administrative costs increased by 7.5% to $68.0 million compared to $63.3 million for the fiscal, 2017, due to impairment charge on goodwill amounting to $1.2 million, credit impairment loss amounting to $4.3 million and allowance for doubtful debts/ bad debts amounting to $4.7 million in the current fiscal year partially offset on account of reduction on share based compensation by $5.5 million.

### Net finance costs

In fiscal 2018, net finance costs increased by 3.8% to $17.8 million, compared to $17.2 million in fiscal 2017, mainly due to lower income from financing activities and increased borrowing costs partially offset on account of unwinding of credit impairment loss reserve by $0.9 million.

### Other gains/(loss), net

In fiscal 2018, other losses were $41.3 million, compared to other gains of $14.2 million in fiscal 2017, mainly on account of loss on financial liabilities measured at fair value through profit and loss, including derivative financial instrument, and unrealized exchange losses recorded in fiscal 2018 compared to gains recorded in fiscal 2017. In addition, due to certain non-recurring items such as loss on deconsolidation of a subsidiary amounting $14.6 million, impairment on available-for-sale financial asset amounting to $2.4 million and net loss incurred on de-recognition of financial assets amounting to $3.6 million arising on assignment and novation of trade receivable and trade payables with no recourse.

### Income tax expense

In fiscal 2018, the provisions for income taxes were $9.1 million, compared to $11.0 million in fiscal 2017, respectively.

Effective income tax rates were 20% and 31% for fiscal 2018 and 2017, respectively excluding non-deductible share-based payment charges and other non -taxable expenses. The change in effective rate principally reflects a change in the pattern of the profits subject to income tax amongst our subsidiaries.

### Net (loss)/profit

In fiscal 2018, net income decreased by 185.1% to $(9.7) million compared to $11.5 million for the fiscal, 2017 which was mainly on account of non-cash expenses in fiscal 2018 amounting $51.0 million against non-cash (income) of $10.6 million in fiscal 2017 partially offset due to our improved margins reflecting the higher proportionate of catalogue revenues, relative to the lower cost of the mix of new film releases and the resulting lower amortization charge, reduction in share based compensation and lower effective income tax rates.

### Trade receivables

As of March 31, 2018, Trade receivables decreased to $225.0 million from $226.8 million as of March 31, 2017.

70

*Net debt*

As of March 31, 2018, net debt increased to $189.2 million from $157.6 million as of March 31, 2017, mainly due to decrease in cash and bank balance by $25 million due to additional investment in film and content rights and repayment of the revolving credit facility and other borrowings (including settlement of derivative financial instrument) amounting $102.8 million partially offset on account of issuance of convertible notes amounting $100.0 million during the fiscal 2018.

*Year Ended March 31, 2017 Compared to Year Ended March 31, 2016*

| | Year ended March 31, | | | As a % of revenue | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 | Change % | 2017 | 2016 |
| | (in thousands) | | | | |
| Revenue | $ 252,994 | $ 274,428 | (7.8%) | 100.0 | 100.0 |
| Cost of sales | (164,240) | (172,764) | (4.9%) | 64.9 | 63.0 |
| Gross profit | 88,754 | 101,664 | (12.7%) | 35.1 | 37.0 |
| Administrative costs | (63,309) | (64,019) | (1.1%) | 25.0 | 23.3 |
| Operating profit | 25,445 | 37,645 | (32.4%) | 10.1 | 13.7 |
| Net finance costs | (17,156) | (8,010) | 114.2% | 6.8 | 2.9 |
| Other gains/(losses), net | 14,205 | (3,636) | 490.7% | 5.6 | 1.3 |
| (Loss)/Profit before tax | 22,494 | 25,999 | (13.5%) | 8.9 | 9.5 |
| Income tax expense | (11,039) | (12,711) | (13.2%) | 4.4 | 4.6 |
| (Loss)/Profit for the year | $ 11,455 | $ 13,288 | (13.8%) | 4.5 | 4.8 |

The following table sets forth, for the period indicated, the revenue by region of domicile of Group's operation.

| | Year ended March 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | Change (%) |
| | (in thousands) | | |
| India | $ 121,966 | $ 159,855 | (23.7%) |
| Europe | 25,686 | 34,209 | (24.9%) |
| North America | 2,549 | 14,622 | (82.6%) |
| Rest of the world | 102,793 | 65,742 | 56.4% |
| Total revenue | $ 252,994 | $ 274,428 | (7.8%) |

*Revenue*

In fiscal year 2017, revenue decreased by 7.8% to $253.0 million, compared to $274.4 million in fiscal year 2016.

In fiscal year 2017, Eros film slate comprised forty five films of which five were high budget, ten were medium budget and thirty were low budget as compared to sixty three films in fiscal year 2016, of which six was high budget, sixteen were medium budget and forty one were low budget.

In fiscal year 2017, the Company's slate of forty five films comprised twelve Hindi films, sixteen Tamil, two Telugu films and fifteen other regional films as compared to the same period last year where it was slate of sixty three films comprised thirty three Hindi films, nineteen Tamil, two Telugu films and nine other regional films.

In fiscal year 2017, the aggregate theatrical revenue decreased by 27.0% to $101.0 million as compared to $138.4 million in fiscal year 2016. The decrease in theatrical revenue reflects the mix of films released in each period as mentioned above. Theatrical revenue in fiscal year 2016 comprised revenue from *Bajrangi Bhaijaan, Bajirao Mastani, Tanu Weds Manu Returns* which were three out of the top four highest grossing films of 2016 compared to 2017 where *Housefull 3* was the only top 10 film so far coupled with the negative impact of demonetisation on the Indian film industry since November 2016, which necessitated the Company to defer some of its Hindi and regional releases indefinitely. As a result, in fiscal year 2017, the Company released only forty five films of which only twelve were Hindi compare to thirty three Hindi films out of a total sixty three films in fiscal year 2016 which explains the decline in theatrical revenues.

In fiscal year 2017, the aggregate revenue from television syndication increased by 22.1% to $88.0 million from $72.1 million in fiscal year 2016. This was due to strong catalogue sales in fiscal year 2017 to offset the weaker new release

slate, while in fiscal year 2016, the Company had decided to hold back and sacrifice some catalogue sales which come with longer payment terms to bring about working capital efficiencies.

71

In fiscal year 2017, the aggregate revenues from digital and ancillary increased by 0.2% to $64.0 million from $63.9 million in fiscal year 2016 mainly driven by catalogue monetization strategy, revenues from Eros Now and contribution from other ancillary revenues streams.

In fiscal year 2017, revenue from India decreased by 23.7% to $122 million, compared to $159.9 million in fiscal 2016. The decrease was mainly due to lower theatrical revenue on the back of weaker slate mix coupled with rupee demonetisation impact whereas fiscal year 2016 slate comprised of highly acclaimed and commercial successful films such as *Bajrangi Bhaijaan, Bajirao Mastani* and *Tanu Weds Manu Returns*. The decrease in overall theatrical revenue was offset by a stronger catalogue revenue contribution.

In fiscal year 2017, revenue from Europe decreased by 24.9% to $25.7 million, compared to $34.2 million in fiscal year 2016. The decrease is on account of lower theatrical revenues due to weaker mix of films partially offset by catalogue sales.

In fiscal year 2017, revenue from North America decreased by 82.6% to $2.5 million, compared to $14.6 million, in fiscal year 2016. The decrease is on account of relatively weaker slate mix coupled with lower catalogue revenues.

In fiscal year 2017, revenue from the rest of the world increased by 56.4% to $102.8 million, compared to $65.7 million in fiscal year 2016, mainly due to increase in catalogue revenues which were muted in last two quarters of fiscal year 2016 to bring-in working capital efficiencies.

### Cost of sales

In fiscal year 2017, cost of sales decreased by 4.9% to $164.2 million compared to $172.8 million in fiscal year 2016, which is attributable to decrease in accrual of overages to $1.0 million in fiscal year 2017 compared to $10.1 million due to an overall weaker slate mix. Further, decrease in publicity and distribution cost by $5.2 million in fiscal year 2017 compared to fiscal year 2016 contributed to the overall decrease in cost of sales which was partially offset by increase in cumulative amortisation costs of film library by $7 million in fiscal year 2017 as compared to fiscal year 2016.

### Gross profit

In fiscal year 2017 gross profit decreased by 12.7% to $88.8 million, compared to $101.7 million, in fiscal year 2016. As a percentage of revenues, gross profit margin is 35.1% in the fiscal 2017, compared to 37.0% in fiscal year 2016. The decrease in margin is primarily due to an overall weaker slate mix resulting in overall decrease of theatrical revenue by $37.4 million or 27.0% in fiscal year 2017 as compared to fiscal year 2016, offset by increase in television syndication revenue by $15.9 million or 22.1% and increase in amortization charge by $7.0 million or 5.5% in fiscal 2017.

### Adjusted gross EBITDA (Non-GAAP)

In fiscal 2017, adjusted Gross EBITDA decreased by 4.1% to $191.0 million, compared to $199.2 million in fiscal 2016. As a percentage of revenues, our adjusted gross EBITDA was 75.4%, compared to 72.6% in fiscal 2016. This was mainly due to net foreign exchange gains earned during the fiscal 2017 compared to net foreign exchange loss incurred in fiscal 2016 and our improved margins reflecting the higher proportionate of catalogue revenues, partially offset due to increase in amortization charge.

### Adjusted EBITDA (Non-GAAP)

In fiscal year 2017, adjusted EBITDA decreased by 21.4% to $55.7 million, compared to $70.9 million in fiscal year 2016 due to an overall weaker slate mix, reduced theatrical revenues for the films released during the rupee demonetization in India which was partially offset by significant high margin catalogue revenues.

### Administrative costs

In fiscal year 2017, administrative costs decreased by 1.1% to $63.3 million compared to $64.0 million for the fiscal year 2016, primarily due to decrease in share based payments, of $23.5 million in fiscal year 2017 as compared to $31.0 million in fiscal year 2016 which was partially offset by increase in salaries by $4.0 million in fiscal year 2017 as compared to fiscal year 2016.

### Net finance costs

In fiscal year 2017, net finance costs increased by 114.2% to $17.2 million, compared to $8 million in fiscal year 2016, mainly due to decrease in finance income by $3.3 million in fiscal year 2017 as compared to fiscal year 2016. Further, the

finance cost has increased $5.8 million in fiscal year 2017 as compared to fiscal year 2016 primarily due to high cost of debt due to higher debt within India as well as increased interest for the Revolving Credit Facility and decrease in capitalisation of interest on content assets by $2 million in fiscal year 2017 as compared to fiscal year 2016.

### *Income tax expense*

In fiscal year 2017, the provisions for income taxes are $11.0 million, compared to $12.7 million in fiscal year 2016. Effective income tax rates were 31% and 21% for fiscal year 2017 and 2016, respectively excluding non-deductible share-based payment charges and gain / loss on fair valuation of derivative liabilities. The change in effective tax rate principally reflects a change in the mix of the profits earned from taxable and non-taxable jurisdictions.

72

*Net income*

In fiscal year 2017, net income decreased by 13.8% to $11.5 million compares to $13.3 million for the fiscal 2016 as cost of sales remained relatively consistent with fiscal 2016 whereas revenue decreased by 7.8% in fiscal year 2017 as compared to fiscal 2016, which was offset by fair value gain on held for trading derivative liabilities of $10.3 million as compared to loss of $3.6 million in fiscal year 2016.

*Trade receivables*

In fiscal year 2017, trade receivables increased to $226.8 million from $169.3 million as of March 31, 2016 mainly due to resumption of catalogue sales from April 2016 compared to muted catalogue sales in fiscal year 2016 primarily due to sales held back during last two quarters of fiscal 2016 to achieve working capital efficiencies. Catalogue sales have payment terms extended up to a year. We have collected approximately $35 million of fiscal year 2017 trade receivables subsequent to reporting date.

*Net debt*

In fiscal year 2017, net debt increased to $157.6 million compared to $120.4 million in fiscal year 2016 mainly due to decrease in cash and bank balances by $70.5 million and repayment of $33.4 million debt.

*Exchange rates*

Our reporting currency is the U.S. dollar. Transactions in foreign currencies are translated at the exchange rate prevailing at the date of the transaction. Monetary assets and liabilities in foreign currencies are translated into U.S. dollars at the exchange rates at the date of the applicable statement of financial position. For the purposes of consolidation, all income and expenses are translated at the average rate of exchange during the period covered by the applicable statement of income and assets and liabilities are translated at the exchange rate prevailing on the date of the applicable statement of financial position. When the U.S. dollar strengthens against a foreign currency, the value of our sales and expenses in that currency converted to U.S. dollars decreases. When the U.S. dollar weakens, the value of our sales and expenses in that currency converted to U.S. dollars increases.

Recently, there have been periods of higher volatility in the Indian Rupee and U.S. dollar exchange rate. This volatility is illustrated in the table below for the periods indicated:

| | Period End | Average(1) | High | Low |
|---|---|---|---|---|
| **Fiscal Year** | | | | |
| 2011 | 44.54 | 45.46 | 47.49 | 43.90 |
| 2012 | 50.89 | 48.01 | 53.71 | 44.00 |
| 2013 | 54.52 | 54.36 | 57.13 | 50.64 |
| 2014 | 60.35 | 60.35 | 68.80 | 53.65 |
| 2015 | 62.58 | 61.15 | 63.70 | 58.46 |
| 2016 | 66.25 | 65.39 | 68.84 | 61.99 |
| 2017 | 64.85 | 67.01 | 68.86 | 64.85 |
| 2018 | 65.11 | 64.46 | 65.71 | 63.38 |
| **Months** | | | | |
| April 2017 | 64.27 | 64.54 | 65.10 | 64.08 |
| May 2017 | 64.50 | 64.42 | 64.87 | 64.03 |
| June 2017 | 64.62 | 64.45 | 64.66 | 64.23 |
| July 2017 | 64.18 | 64.42 | 64.84 | 64.11 |
| August 2017 | 63.93 | 63.97 | 64.16 | 63.64 |
| September 2017 | 65.30 | 64.48 | 65.71 | 63.78 |
| October 2017 | 64.75 | 65.04 | 65.48 | 64.70 |
| November 2017 | 64.46 | 64.84 | 65.46 | 64.29 |
| December 2017 | 63.83 | 64.24 | 64.57 | 63.83 |
| January 2018 | 63.58 | 63.65 | 64.01 | 63.38 |

| | | | | |
|---|---|---|---|---|
| February 2018 | 65.20 | 64.43 | 65.20 | 63.93 |
| March 2018 | 65.11 | 65.05 | 65.24 | 64.83 |
| April 2018 | 66.50 | 65.67 | 66.92 | 64.92 |
| May 2018 | 67.40 | 67.51 | 68.38 | 66.52 |
| June 2018 | 68.46 | 67.79 | 68.81 | 66.87 |

73

(1)  Represents the average of the U.S. dollar to Indian Rupee exchange rates on the last day of each month during the period for all fiscal years presented, and the average of the noon buying rate for all days during the period for all months presented.

This volatility in the Indian Rupee as compared to the U.S. dollar and the increasing exchange rate has impacted our results of operations as shown in the table below comparing the reported results against constant currency comparable based upon the average rate of exchange for the year ended March 31, 2018, of INR 64.46 to $1.00. In addition to the impact on gross profit, the volatility during the year ended March 31, 2018 also led to a non-cash foreign exchange loss of 6.2 million principally on retail bond foreign currency in the year ended March 31, 2018 compared to gain of $3.9 million in the year ended March 31, 2017.

The following table sets forth our constant currency revenue (a non-GAAP financial measure) for the periods indicated. Constant currency revenue is a non- GAAP financial measure. We present constant currency revenue so that revenue may be viewed without the impact of foreign currency exchange rate fluctuations, thereby facilitating period-to-period comparisons of business performance. Constant currency revenue is presented by recalculating prior period's revenue denominated in currencies other than in US dollars using the foreign exchange rate used for the latest period. Our non-US dollar denominated revenue includes, but is not limited to, revenue denominated in Indian rupee, pound sterling and United Arab Emirates Dirham.

| | Year ended March 31, | | | | | | | |
| | 2018 | | 2017 | | 2016 | | | |
| | Reported | Constant Currency (Non-GAAP) | Reported | Constant Currency (Non-GAAP) | Reported | Constant Currency (Non-GAAP) | | |
| | | | (in thousands) | | | | | |
| Revenue | $ 261,253 | 261,253 | $ 252,994 | $ 255,644 | $ 274,428 | $ 274,071 | | |
| Cost of sales | (134,708) | (134,708) | (164,240) | (168,644) | (172,764) | (172,698) | | |
| Gross Profit | $ 126,545 | 126,545 | $ 88,754 | $ 87,000 | $ 101,664 | $ 101,373 | | |

The percentage change for the data comparing the constant currency amounts against the reported results referenced in the table above:

| | Year ended March 31, | | |
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Revenue | —% | (1.0)% | 0.1% |
| Cost of sales | —% | (2.7)% | (0.0) |
| Gross profit | —% | 2.0% | 0.3% |

The Indian Rupee experienced an approximately 0.4% decrease in value as compared to the U.S. dollar in the fiscal year 2018. In the fiscal year 2017, it increased by 2.2%.

**B. Liquidity and Capital Resources**

Our operations and strategic objectives require continuing capital investment, and our resources include cash on hand and cash provided by operations, as well as access to capital from bank borrowings and access to capital markets. Management believes that cash generated by or available to us should be sufficient to fund our capital and liquidity needs for at least the next 12 months.

Our future financial and operating performance, ability to service or refinance debt and ability to comply with covenants and restrictions contained in our debt agreements will be subject to future economic conditions, the financial health of our customers and suppliers and to financial, business and other factors, many of which are beyond our control. Furthermore, management believes that working capital is sufficient for our present requirements.

| | Year ended March 31, |

|  | 2018 | 2017 | 2016 |
|---|---|---|---|
|  | (in thousands) | | |
| Current assets[*] | $ 339,562 | $ 362,477 | $ 373,482 |
| Current liabilities | 239,327 | 316,101 | 290,687 |
| Working capital | $ 100,235 | $ 46,376 | $ 82,795 |

(*) including trade receivables classified as current asset based on operating cycle of two years.

The significant increase in working capital as at March 31, 2018 as compared to March 31, 2017, principally reflects repayment of payables, repayment of long-term and short-term borrowings and conversion of convertible notes in equity shares during fiscal 2018.

74

*Indebtedness*

As of March 31, 2018, we had aggregate outstanding indebtedness of $278.2 million, and cash and cash equivalents of $87.8 million. At March 31, 2018, the total available facilities were comprised of (i) secured credit, bill discounting and overdraft, secured term loans, and vehicle loans of $105.5 million at Eros India, (ii) secured overdraft amounting to $16.7 million at Eros International Limited. In addition, Eros International plc has debt of $70.0 million in relation to a retail bond offering for £50 million in October 2014 and Senior Convertible Notes amounting to $86.0 million issued in December 2017. As at March 31, 2018, there were undrawn amounts under our facilities of $0.6 million.

|  | | As of March 31, 2018 |
|---|---|---|
|  | | (in thousands) |
| **Eros India** | | |
| Secured credit, bill discounting and overdraft | $ | 59,588 |
| Secured term loans | $ | 45,313 |
| Vehicle loans | $ | 560 |
| **Total** | **$** | **105,461** |
| **Eros International plc** | | |
| Retail Bond | $ | 70,055 |
| Senior Convertible Notes | $ | 86,010 |
| **Total** | **$** | **156,065** |
| **Eros International Limited** | | |
| Secured overdraft | $ | 16,630 |
| **Total** | **$** | **16,630** |
| **Total** | **$** | 278,156 |

Certain of our borrowings and loan agreements, including our new credit facility, contain customary covenants, including covenants that restrict our ability to incur additional indebtedness, create or permit liens on our assets or engage in mergers and acquisitions. Such agreements also contain various customary events of default with respect to the borrowings, including the failure to pay interest or principal when due and cross default provisions, and, under certain circumstances, lenders may be able to require repayment of loans to Eros India prior to their maturity. If an event of default occurs and is continuing, the principal amounts outstanding, together with all accrued unpaid interest and other amounts owed may be declared immediately due and payable by the lenders. If such an event were to occur, we would need to pursue new financing that may not be on as favorable terms as our current borrowings. We are currently in full compliance with all of our agreements governing indebtedness.

Borrowings under our term loan facilities, overdraft facility and revolving credit facilities at Eros India matures between 2019 and 2023 and bear interest at fluctuating interest rates pursuant to the relevant sanction letter governing such loans. We expect to renew, replace or extend our borrowings as they reach maturity. As at March 31, 2018, we had net undrawn amounts of $0.6 million available.

On December 6, 2017, the Company closed a registered direct offering (the "Offering") of $122,500,000 aggregate principal amount of the Company's Senior Convertible Notes (collectively, the "Notes") and a Warrant (collectively, the "Warrants") to purchase up to 2,000,000 of the Company's A ordinary shares, for an aggregate purchase price of $100,000,000. The Notes and Warrants were issued and sold pursuant to a Securities Purchase Agreement, dated as of December 4, 2017, by and among the Company and the buyers party thereto (the "Purchase Agreement").The Offering was effected pursuant to a prospectus supplement dated December 1, 2017 under the Company's Registration Statement on Form F-3 (Registration No. 333-219708), as amended (the "Registration Statement"). The Registration Statement was declared effective on October 2, 2017.

*The Notes*

In connection with the issuance of the Notes, the Company entered into an indenture, dated as of December 6, 2017, between the Company and Wilmington Savings Fund Society, FSB, as trustee (the "Base Indenture"), as supplemented

by a first supplemental indenture thereto, dated as of December 6, 2017 (the "Supplemental Indenture" and, the Base Indenture as supplemented by the Supplemental Indenture, the "Indenture"). The terms of the Notes include those provided in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended.

75

The Notes will mature on December 6, 2020 unless earlier converted or redeemed, subject to the right of the holders to extend the date under certain circumstances. The Notes were issued with an original issue discount and will not bear interest except upon the occurrence of an event of default, in which case the Notes shall bear interest at a rate of 6.0% per annum. The Notes are senior obligations of the Company.

The Company will make monthly payments consisting of an amortizing portion of the principal of each Note equal to $3,500,000 and accrued and unpaid interest and late charges on the Note. Provided certain conditions have been satisfied, the Company may make a monthly payment by converting such payment amount into A ordinary shares. Alternatively the Company may, at its option, make monthly payments by redeeming such payment amount in cash, or by any combination of conversion and redemption.

All amounts due under the Notes are convertible at any time, in whole or in part, at the holder's option, into A ordinary shares at the initial conversion price of $14.6875. The conversion price is subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the conversion of a Note will also be adjusted so that the aggregate conversion price shall be the same immediately before and immediately after any such adjustment. In addition, the conversion price is also subject to an anti-dilution adjustment if the Company issues or is deemed to have issued securities at a price lower than the then applicable conversion price. Further, if the Company sells or issues any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a Note will have the right thereafter to substitute the "floating" conversion price for the conversion price upon conversion of all or part the Note.

The Notes require "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon conversion.

On or after December 6, 2019, and subject to certain conditions, the Company will have the right to redeem all, but not less than all, of the remaining principal amount of the Notes and all accrued and unpaid interest and late charges in cash at a price equal to 100% of the amount being redeemed, so long as the VWAP the A ordinary shares exceeds $18.3594 (as adjusted for stock splits, stock dividends, recapitalizations and similar events) for at least 10 consecutive trading days. At any time prior to the date of the redemption, a holder may convert its Note, in whole or in part, into A ordinary shares. The Company will have no right to effect an optional redemption if any event of default has occurred and is continuing.

***The Warrants***

The Warrants will entitle the holders thereof to purchase, in the aggregate, up to 2,000,000 A ordinary shares. The Warrants will be exercisable upon their issuance and will expire six months from the Closing Date. The Warrants will initially be exercisable at an exercise price equal to $14.375 per A ordinary shares, subject to certain adjustments. The Warrants may be exercised for cash, provided that, if there is no effective registration statement available registering the exercise of the Warrants, the Warrants may be exercised on a cashless basis.

The exercise price is subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the exercise of a Warrant will also be adjusted so that the aggregate exercise price shall be the same immediately before and immediately after any such adjustment. In addition, the exercise price is also subject to an anti-dilution adjustment if the Company issues or is deemed to have issued securities at a price lower than the then applicable exercise price. Further, if the Company sells or issues any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a Warrant will have the right thereafter to substitute the "floating" conversion price for the exercise price upon exercise of all or part the Warrant.

The Warrants require "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon exercise.

The option to purchase warrants has expired in June 2018.

***Sources and uses of cash***

| | Year Ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | (in thousands) | | |
| Net cash from operating activities | $    83,243 | $    98,993 | $    234,599 |

| | | | | | |
|---|---|---|---|---|---|
| Net cash used in investing activities | $ | (185,420) | $ | (175,191) | $ | (211,355) |
| Net cash from financing activities | $ | 77,415 | $ | 5,929 | $ | 7,597 |

*Year ended March 31, 2018 Compared to Year Ended March 31, 2017*

Net cash generated from operating activities in fiscal year 2018, was $83.2 million, compared to $99.0 million in fiscal year 2017, a decrease of $15.8 million, or 15.9%, primarily due to decrease in working capital movement of $24.3 million mainly attributable to increase in trade receivables to $19.1 million and decrease in trade payables by $5.4 million. The cash flow from operating activities has also decreased due to increase in interest and income tax paid in fiscal 2018 by 2.4 million and $2.9 million respectively. The aforesaid decrease is partially offset on account of deconsolidation of a subsidiary during the year.

Net cash used in investing activities in fiscal year 2018 was $185.4 million, compared to $175.2 million in fiscal year 2017, an increase of $10 million, or 5.8%, due to the change in mix of films released in fiscal year 2018. The purchase of intangible film rights and content rights in fiscal year 2018 was $186.8 million, compared to $173.5 million in fiscal year 2017, an increase of $13.3 million, or 7.7%.

Net cash generated from financing activities in fiscal year 2018 was $77.4 million, compared to $5.9 million in fiscal year 2017, an increase of $71.5 million, or 1,205.7%, primarily due proceeds from issue of share capital of $16.6 million, proceeds from sale of shares of a subsidiary of $40.2 million and share application money of 18.0 million.

*Year ended March 31, 2017 Compared to Year Ended March 31, 2016*

Net cash generated from operating activities in fiscal year 2017 was $99 million, compared to $235 million in fiscal year 2016, a decrease of $136 million, or 57.9%, primarily due to decrease in working capital movement of $119.8 million attributable to increase in trade receivables to $91.9 million and decrease in trade payables by $27.3 million. The cash flow from operating activities has also decreased due to increase in interest paid in fiscal 2017 to $18.4 million compared to $12.5 million.

Net cash used in investing activities in fiscal year 2017 was $175.2 million, compared to $211.4 million in fiscal year 2016, a decrease of $36.2 million, or 17.1%, reflecting the change in mix of films released in fiscal year 2017 and our investment in upcoming film slate. The purchase of intangible film rights and content rights in fiscal year 2017 was $173.5 million, compared to $211.3 million in fiscal year 2016, a decrease of $37.8 million, or 17.9%.

Net cash generated from financing activities in fiscal year 2017 was $5.9 million, compared to $7.6 million in fiscal year 2016, a decrease of $1.7 million, or 22.4%, primarily due to repayment of debt of $118.3 million compared to $99.7 million in fiscal 2016 which is offset by proceeds from debt and equity of $92.8 million and $31.4 million respectively and $95.5 million and $11.8 million respectively in fiscal 2017 and fiscal 2016.

**Capital expenditures**

In fiscal year 2018, we invested $186.8 million in film content, and in fiscal 2019 we expect to invest approximately $200 to $250 million in film content.

**C. Research and Development**

Not applicable

**D. Trend Information**

**New accounting pronouncements issued but not yet effective**

Certain new standards, interpretations and amendments to existing standards have been published that are mandatory for our accounting periods beginning on or after April 1, 2018 or later periods. Those which are considered to be relevant to Group's operations are set out below.

**IFRS 15 Revenue from Contracts with Customers**

i) In May 2014, the IASB issued IFRS 15 Revenue from Contracts with Customers ("IFRS 15"). This standard provides a single, principle-based five-step model to be applied to all contracts with customers. Guidance is provided on topics such as the point at which revenue is recognized, accounting for variable consideration, costs of fulfilling and obtaining a contract and various other related matters. IFRS 15 also introduced new disclosure requirements with respect to revenue.

The five steps in the model under IFRS 15 are : (i) identify the contract with the customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contracts; and (v) recognize revenue when (or as) the entity satisfies a performance obligation.

IFRS 15 replaces the following standards and interpretations:

·    IAS 11 Construction Contracts
·    IAS 18 Revenue
·    IFRIC 13 Customer Loyalty Programmes
·    IFRIC 15 Agreements for the Construction of Real Estate
·    IFRIC 18 Transfers of Assets from Customers
·    SIC-31 Revenue - Barter Transactions Involving Advertising Services

When first applying IFRS 15, it should be applied in full for the current period, including retrospective application to all contracts that were not yet complete at the beginning of that period. In respect of prior periods, the transition guidance allows an option to either:

·    apply IFRS 15 in full to prior periods (with certain limited practical expedients being available); or
·    retain prior period figures as reported under the previous standards, recognizing the cumulative effect of applying IFRS 15 as an adjustment to the opening balance of equity as at the date of initial application (beginning of current reporting period).

IFRS 15 is effective for fiscal years beginning on or after January 1, 2018. Earlier application is permitted. The Group expects to apply this standard retrospectively with the cumulative effect of initially applying this standard recognized at April 1, 2018 (i.e. the date of initial application in accordance with this standard). The Group does not expect the impact of adoption of the standard on opening reserve to be material.

**IFRS 9 Financial Instruments:** In July 2014, the IASB finalized and issued IFRS 9 – Financial Instruments. IFRS 9 replaces IAS 39 "Financial instruments: recognition and measurement, the previous Standard which dealt with the recognition and measurement of financial instruments in its entirety upon the former's effective date.

The Key requirements of IFRS 9:

Replaces IAS 39's measurement categories with the following three categories:

·    fair value through profit or loss
·    fair value through other comprehensive income
·    amortized cost

Eliminates the requirement for separation of embedded derivatives from hybrid financial assets, the classification requirements to be applied to the hybrid financial asset in its entirety.

Requires an entity to present the amount of change in fair value due to change in entity's own credit risk in other comprehensive income.

Introduces new impairment model, under which the "expected" credit loss are required to be recognized as compared to the existing "incurred" credit loss model of IAS 39.

Fundamental changes in hedge accounting by introduction of new general hedge accounting model which:

·    Increases the eligibility of hedged item and hedging instruments;
·    Introduces a more principles–based approach to assess hedge effectiveness.

IFRS 9 is effective for annual periods beginning on or after January 1, 2018.

Earlier application is permitted provided that all the requirements in the Standard are applied at the same time with two exceptions:

- · The requirement to present changes in the fair value of a liability due to changes in own credit risk may be applied early in isolation;
- · Entity may choose as its accounting policy choice to continue to apply hedge accounting requirements of IAS 39 instead of new general hedge accounting model as provided in IFRS 9.

The Group does not expect the impact of adoption of the standard to be material.

Further, in October 2017, the International Accounting Standards Board (IASB) issued an additional amendment to IFRS 9. Based on the amendment financial assets containing prepayment features with negative compensation can now be measured at amortised cost or at fair value through other comprehensive income if they meet the other relevant requirements under IFRS 9.

The effective date for adoption of the amendment is 1 January 2019. Further, the amendment must be applied retrospectively and earlier application is permitted. The amendment provides specific transition provision if it is only applied in 2019 rather than in 2018 with the rest of IFRS 9. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

**IFRS 16 Leases:** On January 13, 2016, the International Accounting Standards Board issued the final version of IFRS 16, Leases. IFRS 16 will replace the existing leases Standard, IAS 17 Leases, and related Interpretations. The Standard sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract i.e., the lessee and the lessor. IFRS 16 introduces a single lessee accounting model and requires a lessee to recognize assets and liabilities for all leases with a term of more than 12 months, unless the underlying asset is of low value. Currently, operating lease expenses are charged to the statement of comprehensive income. The Standard also contains enhanced disclosure requirements for lessees. IFRS 16 substantially carries forward the lessor accounting requirements in IAS 17.

The effective date for adoption of IFRS 16 is annual periods beginning on or after January 1, 2019, though early adoption is permitted for companies applying IFRS 15 Revenue from Contracts with Customers. The Group is yet to evaluate the requirements of IFRS 16 and the impact on the consolidated financial statements.

**IFRIC 22, Foreign currency transactions and Advance consideration:** On December 8, 2016, the International Accounting Standards Board (IASB) issued IFRS interpretation IFRIC 22, Foreign currency transactions and Advance consideration which clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. The effective date for adoption of IFRIC 22 is annual reporting periods beginning on or after January 1, 2018, though early adoption is permitted. The Group is currently evaluating the effect of IFRIC 22 on the consolidated financial statements.

**IFRIC 23, Uncertainty over Income Tax Treatments:** In June 2017, the International Accounting Standards Board (IASB) issued IFRS interpretation IFRIC 23 — Uncertainty over Income Tax Treatments which is to be applied while performing the determination of taxable profit (or loss), tax bases, unused tax losses, unused tax credits and tax rates, when there is uncertainty over income tax treatments under IAS 12.

According to IFRIC 23, companies need to determine the probability of the relevant tax authority accepting each tax treatment, or group of tax treatments, that the companies have used or plan to use in their income tax filing which has to be considered to compute the most likely amount or the expected value of the tax treatment when determining taxable profit (tax loss), tax bases, unused tax losses, unused tax credits and tax rates.

The standard permits two possible methods of transition:

- · Full retrospective approach – Under this approach, IFRIC 23 will be applied retrospectively to each prior reporting period presented in accordance with IAS 8 – Accounting Policies, Changes in Accounting Estimates and Errors
- · Retrospectively with cumulative effect of initially applying IFRIC 23 recognized by adjusting equity on initial

application, without adjusting comparatives

79

The effective date for adoption of IFRIC 23 is annual periods beginning on or after January 1, 2019, though early adoption is permitted. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

**Amendment to IAS 28:** In October 2017, the International Accounting Standards Board (IASB) issued an amendment to IAS 28, to address the issue on accounting of long term interests in Associates and Joint ventures. The amendments clarify that an entity applies IFRS 9 Financial Instruments to long-term interests in an associate or joint venture to which the equity method is not applied but that, in substance, form part of the net investment in the associate or joint venture (long-term interests). This clarification is relevant because it implies that the expected credit loss model in IFRS 9 applies to such long-term interests.

The effective date for adoption of the amendment is 1 January 2019, however early adoption is permitted with disclosures. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

**Amendment to IAS 19:** In February, 2018, the International Accounting standards issued an amendment to IAS 19 to address the accounting when a plan amendment, curtailment or settlement occurs during a reporting period. The amendments specify that when a plan amendment, curtailment or settlement occurs during the annual reporting period, an entity is required to:

Determine current service cost for the remainder of the period after the plan amendment, curtailment or settlement, using the actuarial assumptions used to remeasure the net defined benefit liability (asset) reflecting the benefits offered under the plan and the plan assets after that event determine net interest for the remainder of the period after the plan amendment, curtailment or settlement using: the net defined benefit liability (asset) reflecting the benefits offered under the plan and the plan assets after that event; and the discount rate used to remeasure that net defined benefit liability (asset).

The effective date for adoption of the amendment is 1 January 2019, however early adoption is permitted. Given that the Group does not have any amendments to its defined benefit plan, the amendment does not have any impact on the Group.

**Amendments to IFRS 2, Share-based payment:** In June 2016, the International Accounting Standards Board issued the amendments to IFRS 2, providing specific guidance for measurement of cash-settled awards, modification of cash-settled awards and awards that include a net settlement feature in respect of withholding taxes. It clarifies that the fair value of cash-settled awards is determined on a basis consistent with that used for equity-settled awards. Market-based performance conditions and non-vesting conditions are reflected in the 'fair values', but non-market performance conditions and service vesting conditions are reflected in the estimate of the number of awards expected to vest. Also, the amendment clarifies that if the terms and conditions of a cash-settled share-based payment transaction are modified with the result that it becomes an equity-settled share-based payment transaction, the transaction is accounted for as such from the date of the modification. Further, the amendment requires the award that includes a net settlement feature in respect of withholding taxes to be treated as equity-settled in its entirety. The cash payment to the tax authority is treated as if it was part of an equity settlement. The effective date for adoption of the amendments to IFRS 2 is annual reporting periods beginning on or after January 1, 2018, though early adoption is permitted. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

80

**Quarterly Financial Information**

The table below presents our selected unaudited quarterly results of operations for the four quarters in the fiscal year ended March 31, 2018. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. We have prepared the unaudited financial data for the quarters presented on the same basis as our audited consolidated financial statements. The historical quarterly results presented below are not necessarily indicative of the results that may be expected for any future quarters or periods.

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2017 | September 30, 2017 | December 31, 2017 | March 31, 2018 |
| | (dollars in thousands) | | | |
| **Selected Quarterly Results of Operations** | | | | |
| Revenue | $    60,832 | $    63,308 | $    65,187 | $    71,926 |
| Cost of sales | (34,955) | (35,155) | (30,528) | (34,070) |
| Gross profit | 25,877 | 28,153 | 34,659 | 37,856 |
| Administrative costs | (14,186) | (16,715) | (19,567) | (17,561) |
| Operating profit | 11,691 | 11,438 | 15,092 | 20,295 |
| Net finance costs | (5,384) | (5,169) | (2,243) | (5,017) |
| Other losses | (1,523) | (3,222) | (8,505) | (28,071) |
| (Loss)/profit before tax | 4,784 | 3,047 | 4,344 | (12,793) |
| Income tax expense | (2,986) | (831) | (1,143) | (4,167) |
| (Loss)/Profit for the year | $    1,798 | $    2,216 | $    3,201 | $    (16,960) |
| **OTHER NON-GAAP MEASURES** | | | | |
| EBITDA[1] | $    10,800 | $    8,842 | $    7,279 | $    (6,735) |
| Adjusted EBITDA [1] | $    15,810 | $    15,123 | $    23,567 | $    24,075 |
| Gross Adjusted EBITDA [1] | $    47,822 | $    43,827 | $    50,173 | $    52,038 |
| **OPERATING DATA** | | | | |
| High budget film releases[2] | 1 | — | — | — |
| Medium budget film releases[2] | 1 | 2 | — | 1 |
| Low budget film releases[2] | 3 | 5 | 4 | 7 |
| Total new film releases[2] | 5 | 7 | 4 | 8 |

(1) We use EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as supplemental financial measures. EBITDA is defined by us as net income before interest expense, income tax expense and depreciation and amortization (excluding amortization of capitalized film content and debt issuance costs). Adjusted EBITDA is defined as EBITDA adjusted for (gain)/impairment of available-for-sale financial assets, profit/ loss on held for trading liabilities (including profit/loss on derivative financial instruments), transactions costs relating to equity transactions, share based payments, Loss / (Gain) on sale of property and equipment, Loss on de-recognition of financial assets measured at amortized cost, net, Credit impairment loss, net, Loss on financial liability (convertible notes) measured at fair value through profit and loss, Loss on deconsolidation of a subsidiary and Impairment of goodwill. Gross Adjusted EBITDA is defined as Adjusted EBITDA

adjusted for amortization of intangible film and content rights. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as used and defined by us, may not be comparable to similarly-titled measures employed by other companies and is not a measure of performance calculated in accordance with GAAP. EBITDA Adjusted EBITDA and Gross Adjusted EBITDA should not be considered in isolation or as a substitute for operating income, net income, cash flows from operating, investing and financing activities, or other income or cash flow statement data prepared in accordance with GAAP. EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA provide no information regarding a Company's capital structure, borrowings, interest costs, capital expenditures and working capital movement or tax position. However, our management team believes that EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA are useful to an investor in evaluating our results of operations because these measures:

· are widely used by investors to measure a company's operating performance without regard to items excluded from the calculation of such term, which can vary substantially from company to company depending upon accounting methods and book value of assets, capital structure and the method by which assets were acquired, among other factors;

· help investors to evaluate and compare the results of our operations from period to period by removing the effect of our capital structure from our operating structure; and

· are used by our management team for various other purposes in presentations to our board of directors as a basis for strategic planning and forecasting.

81

there are significant limitations to using EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA as a measure of performance, including the inability to analyze the effect of certain recurring and non-recurring items that materially affect our net income or loss, the lack of comparability of results of operations of different companies and the different methods of calculating EBITDA. Adjusted EBITDA and Gross Adjusted EBITDA reported by different companies.

The following table sets forth the reconciliation of our net income to EBITDA, Adjusted EBITDA and Gross Adjusted EBITDA:

| | Three Months Ended | | | |
| | June 30, 2017 | September 30, 2017 | December 31, 2017 | March 31, 2018 |
| | (in thousands) | | | |
|---|---|---|---|---|
| **(Loss)/Profit for the year** | $ 1,798 | 2,216 | 3,201 | $ (16,960) |
| Income tax expense | 2,986 | 831 | 1,143 | 4,167 |
| Net finance costs | 5,384 | 5,169 | 2,243 | 5,017 |
| Depreciation | 263 | 270 | 305 | 427 |
| Amortization[a] | 369 | 356 | 387 | 614 |
| **EBITDA (Non-GAAP)** | 10,800 | 8,842 | 7,279 | (6,735) |
| Impairment charge on available -for- sale financial assets | — | — | — | 2,436 |
| Share based payments[b] | 5,189 | 2,282 | 6,031 | 4,416 |
| Net (gain)/loss on derivative financial instruments | (183) | (786) | 1,555 | — |
| Loss on de-recognition of financial assets measured at amortized cost, net | — | 1,778 | 930 | 854 |
| Credit impairment losses, net | — | 3,007 | 1,439 | (138) |
| Loss /(Gain) on sale of property and equipment | 4 | | 14 | (20) |
| Loss on financial liability (convertible notes) measured at fair value through profit and loss | — | — | (6,976) | 20,816 |
| Loss on deconsolidation of a subsidiary | — | — | 13,294 | 1,355 |
| Impairment of goodwill | — | — | — | 1,205 |
| Others | — | — | 1 | (114) |
| **Adjusted EBITDA (Non-GAAP)** | $ 15,810 | 15,123 | 23,567 | $ 24,075 |
| Amortization of intangible film and content rights | 32,012 | 28,704 | 26,606 | 27,963 |
| **Gross Adjusted EBITDA (Non-GAAP)** | $ 47,822 | 43,827 | 50,173 | $ 52,038 |

a) Includes only amortization of intangible assets other than intangible content assets.

b) Consists of compensation costs recognized with respect to all outstanding plans and all other equity settled instruments.

2) Includes films that were released by us directly and licensed by us for

release.

Our revenues and operating results are significantly affected by the timing, number and breadth of our theatrical releases and their budgets, the timing of television syndication agreements, and our amortization policy for the first 12 months of commercial exploitation for a film. The timing of releases is determined based on several factors. A significant portion of the films we distribute are delivered to Indian theaters at times when theater attendance has traditionally been highest, including school holidays, national holidays and the festivals. This timing of releases also takes into account competitor film release dates, major cricket events in India and film production schedules. Significant holidays and festivals, such as Diwali, Eid and Christmas, occur during July to December each year, and the Indian Premier League cricket season generally occurs during April and May of each year. The Tamil New Year, called Pongal, falls in January each year making the quarter ending March an important one for Tamil releases.

In the fiscal year 2018, revenue fluctuations primarily reflected the timing of major theatrical releases, with our highest quarterly revenues of $71.9 million in the three months ended March 31, 2018 mainly due revenues from theatrical release of Bajrangi Bhaijaan in China as well as revenue contribution from Eros Now. The lowest quarterly revenues was of $60.8 million in the three months ended June 30, 2017. The fluctuations in other gains/ losses, net primarily reflect loss from deconsolidation of a subsidiary, loss on financial liability (convertible notes) measured accounted at Fair Value Through Profit and Loss, Impairment of available-for-sale financial assets and goodwill.

Our quarterly results can vary from one period to the next, and the results of one quarter are not necessarily indicative of results for the next or any future quarter. Our revenue and operating results are therefore seasonal in nature due to the impact on income of the timing of new releases as well as timing and quantum of catalogue revenues.

82

**E. Off-Balance Sheet Arrangements**

From time to time, to satisfy our filmed content purchase contracts, we obtain guarantees or other contractual arrangements, such as letters of credit, as support for our payment obligations.

As of March 31, 2018, the Group has provided certain stand-by letters of credit amounting to $53.9 million (2017: $80.6 million) which are in the nature of performance guarantees issued while entering into film co-production contracts and are valid until funding obligations under these contracts are met. These guarantees, issued in connection with outstanding content commitments, have varying maturity dates.

In addition, the Group issued financial guarantees amounting to $1.2 million (2017: $2.2 million) in the ordinary course of business, having varying maturity dates up to the next 12 months. The Group is only called upon to satisfy a guarantee when the guaranteed party fails to meet its obligations.

The Group did not earn any fee to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

**F. Contractual Obligations**

We have commitments under certain firm contractual arrangements, or firm commitments, to make future payments. These firm commitments secure future rights to various assets and services to be used in the normal course of our operations. The following table summarizes our firm commitments as of March 31, 2018.

|  | As of March 31, 2018 | | | | |
|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| --- | --- | --- | --- | --- | --- |
|  | | | (in thousands) | | |
| *Recorded Contractual Obligations* | | | | | |
| Debt | $ 278,156 | $ 152,330 | $ 50,650 | $ 75,176 | $ — |
| *Unrecorded Contractual Obligations* | | | | | |
| Operating leases | 416 | 149 | 267 | — | — |
| Film entertainment rights purchase obligations[1] | 336,144 | 119,718 | 135,869 | 79,444 | 1,113 |
| Interest payments on debt [2] | 48,750 | 26,024 | 15,319 | 7,407 | — |
| **Total** | **385,310** | **145,891** | **151,455** | **86,851** | **1,113** |

(1) The amounts disclosed as Film entertainment rights purchase obligations are mutually agreed terms and are presently disclosed on best estimate basis.

(2) The amounts shown in the table include future interest payments on variable and fixed rate debt at current interest rates ranging from 1.8% to 14.5%.

**G. Safe Harbor**

See "Special Note Regarding Forward-Looking Statements" at the beginning of this annual report.

**ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES**

**A. Directors and Executive Officers**

Our Board of Directors consists of eight directors.

The following table sets forth the name, age (as at July 30, 2018) and position of each of our directors and executive officers as at the date hereof.

| Name | Age | Position/s |
|---|---|---|
| **Directors** | | |
| Kishore Lulla | 56 | Executive Chairman and Group Chief Executive Officer and Managing Director |
| Jyoti Deshpande | 47 | Director |
| Vijay Ahuja | 61 | Director, Vice Chairman |
| Sunil Lulla | 54 | Director, Executive Vice Chairman |
| Dilip Thakkar(1)(2)(3)(4) | 81 | Director, Chairman of Audit Committee |
| David Maisel(1) | 56 | Director |
| Rishika Lulla Singh | 31 | Director |
| Shailendra Swarup(1)(2)(3)(4) | 73 | Director, Chairman of Remuneration Committee and Nomination Committee |
| **Senior Management** | | |
| Prem Parameswaran | 49 | President of North America & Group Chief Financial Officer |
| Mark Carbeck | 46 | Chief Corporate & Strategy Officer |
| Pranab Kapadia | 46 | President of Europe and Africa Operations |
| Surender Sadhwani | 62 | President of Middle East Operations |

(1) Independent Director

(2) Member of the Audit Committee

(3) Member of the Remuneration Committee

(4) Member of the Nomination Committee

Summarized below is relevant biographical information covering at least the past five years for each of our directors and executive officers.

**Directors**

*Mr. Kishore Lulla* is a Group Chief Executive Officer, Managing director and our Chairman. Mr. Lulla received a bachelor's degree in Arts from Mumbai University. He has over 35 years of experience in the media and film industry. He has served as a director since April 2006. He is a member of the British Academy of Film and Television Arts and Young Presidents' Organization and also a board member for the School of Film at the University of California, Los Angeles. He has been honored at the Asian Business Awards 2007 and the Indian Film Academy Awards 2007 for his contribution in taking Indian cinema global. In 2010, Mr. Lulla was awarded the Entrepreneur of the Year at the GG2 Leadership and Diversity Awards and In 2014, Forbes Asia featured Mr. Kishore Lulla on the list of Best under a Billion. He was also honored with the 2014 Global Citizenship Award by the American Jewish Committee, a leading global Jewish advocacy organization. Mr. Lulla also received the Entertainment Visionary award at the 2015 Annual Gala Dinner from the Asia Society Southern California. In 2015, he was further invited to attend the "billionaires' summer camp" in Sun Valley, an annual gathering of the world's most powerful entrepreneurs and business executives. As our Chairman, he has been instrumental in expanding our presence in the United Kingdom, the U.S., Dubai, Australia, Fiji and other international markets. Recently, he was featured in the Variety 500 List 'influential business leaders shaping the global $2 trillion entertainment industry'. Mr. Kishore Lulla is the father of Mrs. Rishika Lulla Singh, the brother of Mr. Sunil Lulla and a cousin of Mr. Vijay Ahuja and Mr. Sadhwani.

*Ms. Jyoti Deshpande* is a director and has over 25 years of experience in media and entertainment across advertising, media consulting, television and films. She has been part of the leadership team of Eros since 2001 and most recently served as Group CEO of Eros International PLC. In her role she helped spearhead Eros's growth as a global leader in

Indian filmed entertainment. Ms. Deshpande has served as a director since June 2012. From April 2018, Ms. Deshpande has joined Reliance Industries to head the Media and Entertainment business as President of the Chairman's Office. Ms. Deshpande was featured in the prestigious Fortune India magazine's 50 Most Powerful Women in Business (2017/2015) which celebrates the journeys and triumphs of women who not only impact their organizations but are also thought leaders in their industry. Ms. Deshpande's continues to serve on the Boards of Eros International Media Limited and Eros International PLC.

84

*Mr. Vijay Ahuja* is a director and our Vice Chairman. Mr. Ahuja received a bachelor's degree in commerce from Mumbai University. Mr. Ahuja co-founded our United Kingdom business in 1988 and has since played an important role in implementing our key international strategies, helping expand our business to its present scale by making a significant contribution to our development in the South East Asian markets, such as Singapore, Malaysia, Indonesia and Hong Kong. Mr. Ahuja has served as a director since April 2006. Mr. Ahuja is a cousin of Mr. Kishore Lulla and Mr. Sunil Lulla.

*Mr. Sunil Lulla* is a director and is Executive Vice Chairman and Managing Director of Eros India. He received a bachelor's degree in commerce from Mumbai University. Mr. Lulla has over 25 years of experience in the media and entertainment industry. Mr. Lulla has valuable relationships with talent in the Indian film industry and has been instrumental in our expansion into distribution in India as well as home entertainment and music. He has served as a director since April 2006 and led our growth within India for many years before being appointed Executive Vice Chairman and Managing Director of Eros India on September 28, 2009. Mr. Sunil Lulla is the brother of Mr. Kishore Lulla, uncle of Mrs. Rishika Lulla Singh and the cousin of Mr. Ahuja and Mr. Sadhwani.

*Mrs. Rishika Lulla Singh* is a director and the CEO of Eros Digital, which covers all of the digital initiatives for Eros including Eros Now. Mrs. Lulla Singh has been instrumental in spearheading the creation, and development distribution of Eros Now within India and internationally. She graduated from the School Of Oriental and African Studies with a BA in South Asian Studies and Management and completed a postgraduate study at the UCLA School of Theatre, Film and Television. With over five years of experience in over-the-top platforms and content, Mrs. Lulla Singh has been a key contributor in driving the growth and penetration of Eros Now, both with technological developments and relationship management to stimulate platform penetration. She was named Young Entrepreneur of the Year by the 2016 Asian Business Awards. Recently she won the award for 'Women Leadership in Industry' at the 'Times National Awards for Marketing Excellence' and featured in Top Women CEOs by India Today. Mrs. Lulla Singh is the daughter of Mr. Kishore Lulla and the niece of Mr. Sunil Lulla. She has served as director since November 2014.

*Mr. Shailendra Swarup* is a Director. Mr. Swarup is a practicing lawyer in India since 1965 and has over 50 years experience as corporate attorney in India. He is senior partner of the law firm Swarup & Company, New Delhi, India. He has served as a director since July 2017. His vast experience includes advising Indian and foreign with respect to transborder transactions, acquisitions, joint ventures, technology transfers in diverse sectors and industry. He presently serves as an independent Director on the Board of 6 public companies and 4 private companies. He was one of the members of Confederation of Indian Industry ("CII") Task Force which formulated for the first time in India the Code for corporate governance. He was member of the Committee constituted by the Reserve Bank of India for governance of public sector banks and financial institutions in India. He advised National Council for Applied Economic Research on and reviewed the draft Bill of the New Electricity Act. He advised National Highways Authority of India and the Planning Commission of India on development of documentation for infrastructure Projects through build operate transfer model and public private partnership.

*Mr. Dilip Thakkar* is a director. Mr. Thakkar received a degree in Commerce and Law from Mumbai University. A practicing chartered accountant since 1961, Mr. Thakkar has significant financial experience. He is a senior partner of Jayantilal Thakkar & Co. Chartered Accountants and a member of the Institute of Chartered Accountants in India. In 1986 he was appointed by the Reserve Bank of India as a member of the Indian Advisory Board for HSBC Bank and the British Bank of the Middle East for a period of eight years. He is the former President of the Bombay Chartered Accountants' Society and was then Chairman of its International Taxation Committee. Mr Thakkar serves as an Independent Director of seven public limited companies and seven private limited companies in India and twelve foreign companies. He has served as a director since April 2006.

*Mr. David Maisel* is a director. Mr. Maisel is Chairman of Mythos Studios which he and Scooter Braun launched in early 2018. Mr. Maisel was an Advisor to Rovio, the owners of Angry Birds, from 2011 - 2017 and is the Executive Producer of the Angry Birds feature film which was released in May 2016. Mr. Maisel is also a Director at Gaia, a NASDAQ listed company. Prior to this he served in senior executive positions with Marvel Entertainment from 2003 until 2010, where he conceived and spearheaded the creation of Marvel Studios, the launch of the "Iron Man" franchise, and Marvel's 2010

sale to The Walt Disney Company. At Marvel, he was Chairman of Marvel Studios and also in the Office of the Chief Executive for its parent company, Marvel Entertainment. He was also the Executive Producer of "Iron Man," "The Incredible Hulk," "Iron Man 2," "Thor," and "Captain America: The First Avenger." Prior to Marvel, Mr. Maisel served in senior executive positions at Endeavor Talent Agency, The Walt Disney Company, Creative Artists Agency, Chello Broadband, and The Boston Consulting Group. He is a graduate of Harvard Business School and Duke University. He has served as a director since November 2014.

**Senior Management**

Mr. Prem Parameswaran is our Group Chief Financial Officer and President of Eros International's North America operations. Mr. Parameswaran joined Eros with over 23 years of experience in investment banking, advising clients in the global telecommunications, media and technology sector, including on mergers and acquisitions and public, private equity and debt financings. Mr. Parameswaran most recently served as the Global Head of Media and Telecommunications Investment Banking at Jefferies LLC. Prior to Jefferies, he was the Americas Head of Media & Telecom at Deutsche Bank and also previously worked at both Goldman Sachs and Salomon Brothers. Throughout his career, he has executed over 300 transactions. Mr. Parameswaran graduated from Columbia University with a BA and received an MBA from Columbia Business School. Mr. Parameswaran joined us in June 2015. Mr. Parameswaran also serves on the Boards of the Columbia University Alumni Trustee Nominating Committee and the Program for Financial Studies at Columbia Business School. Mr. Parameswaran was invited to the White House Oval Office Reception for Diwali in 2017 with President Trump.

*Mr. Mark Carbeck is* our Chief Corporate & Strategy Officer, with management responsibility for Investor Relations, Group M&A, and Corporate Finance. Mr. Carbeck was formerly a Director in Citigroup's Investment Banking Division in London, having joined the firm in New York in 1997. He has over 18 years of experience. Most recently Mr. Carbeck led the European Media investment banking coverage efforts at Citigroup and has deep media industry knowledge and strong relationships with major United Kingdom and international media companies. Mr. Carbeck graduated from the University of Chicago in 1994 with a Bachelor's degree in History. Mr. Carbeck joined us in April 2014.

*Mr. Pranab Kapadia is* President Marketing & Distribution of our UK, Europe and Africa Operations. Mr. Kapadia received a Master's degree in Management Studies (MMS) from Bombay University, majoring in Finance. He has over 23 years of experience in the Indian TV & Film Industry, previously having served with Zee Network for 10 years as Head of Operations & Programming (Europe) and later as Business Head of Adlabs Films (U.K.) Limited for one year. Mr. Kapadia brings with him significant insight and a strong understanding of the entertainment needs of South Asians internationally. He joined us in 2007.

*Mr. Surender Sadhwani* is our President of Middle East Operations. Mr. Sadhwani received a post graduate degree in commerce from University of Madras in 1980. He has 22 years of experience in the banking industry through his work with Andhra Bank in Chennai. In addition, Mr. Sadhwani spent several years in finance and account management for Hartmann Electronics in their Dubai office. He joined our Middle East operations in April 2004 and was promoted to President of Middle East Operations in April 2006. Mr. Sadhwani is a cousin of Mr. Kishore Lulla and Mr. Sunil Lulla.

**B. Compensation**

Compensation of senior executive officers and directors is determined by the Remuneration Committee of our Board of Directors. The Remuneration Committee reviews the performance of our directors and each of our executive officers and sets the scale and structure of their compensation. Where required, the Remuneration Committee engages the services of external companies for the purposes of benchmarking of executive remuneration or such other remuneration related matter. As part of its role of overseeing the scale and structure of the compensation paid to our executive officers, the Remuneration Committee approves their service agreements with our subsidiaries and any bonus paid by our subsidiaries to such officers. The current members of the Remuneration Committee are two of our non-executive directors, Shailendra Swarup and Dilip Thakkar.

In determining the scale and structure of the compensation for executive directors and senior executives, the Remuneration Committee takes into account the need to offer a competitive compensation structure to attract and maintain a skilled and experienced management team. The Remuneration Committee creates competitive compensation programs by reviewing market data and setting compensation at levels comparable to those at our competitors. We believe that a compensation program with a strong performance based element is a prerequisite to obtaining our performance and growth objectives.

The main components of the compensation for our executive officers are a base salary, share awards, annual bonus and stock options.

The Remuneration Committee reviews these three compensation components in light of individual performance of the executive officers, external market data and reports provided by outside experts or advisors. For information about service contracts entered into by us, or our subsidiaries, and certain of our executives, see "Part I — Item 6. Directors, Senior Management and Employees — C. Board Practices."

The compensation of our non-executive directors is set by our board of directors as a whole, after consulting with outside experts or advisors.

86

The following tables and footnotes show the remuneration of each of our directors for fiscal 2018:

| | 2018 Salary | 2018 Director Fees | 2018 Benefits(1) | 2018 Total | 2017 Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Kishore Lulla | $ 1,331 | $ — | $ — | $ 1,331 | $ 1,306 |
| Jyoti Deshpande | 1,060 | — | — | 1,060 | 958 |
| Vijay Ahuja | 286 | — | 32 | 318 | 378 |
| Sunil Lulla(2) | 659 | — | 19 | 678 | 693 |
| Naresh Chandra | — | 103 | — | 103 | 180 |
| Dilip Thakkar | — | 81 | — | 81 | 77 |
| David Maisel | — | 95 | — | 95 | 91 |
| Rishika Lulla Singh | 345 | — | — | 345 | 320 |
| Shailendra Swarup | — | 37 | — | 37 | — |
| **Total** | **$ 3,681** | **$ 316** | **$ 51** | **$ 4,048** | **$ 4,003** |

(1) Health insurance, except for Sunil Lulla (see Note (2) below).

(2)(1) Sunil Lulla's fiscal 2018 compensation consisted of the following (Indian Rupees translated to U.S. dollars at a rate of INR 64.5 per $1.00)

| Particulars for Mr Sunil Lulla | INR | USD |
|---|---|---|
| Basic salary | 15,972,000 | $ 247,710 |
| Reimbursements car/entertainment etc. | 2,439,600 | 37,836 |
| Medical reimbursement | 15,000 | 233 |
| Special pay | 21,730,464 | 337,018 |
| Company rent accommodation | 3,600,000 | 55,832 |
| **Total India** | **43,757,064** | **$ 678,629** |

The total compensation paid to our executive officers in fiscal 2018 was $12 million (2017: $16.5 million).

The following table and footnotes show the cost recognized in fiscal 2018 in respect to all outstanding plans and by grant of shares, which are all equity settled instruments, to our directors is as follows:

| | Option 2014 | JSOP | June 09, 2015 | June 09, 2016 | November 22, 2017 | Total |
|---|---|---|---|---|---|---|
| Kishore Lulla | — | $ — | $ 458 | $ 961 | $ 573 | $ 1,992 |
| Jyoti Deshpande | — | — | $ 366 | 769 | 458 | $ 1,593 |
| Sunil Lulla | — | — | $ 366 | 769 | 458 | $ 1,593 |
| Dilip Thakkar | — | — | — | — | 47 | $ 47 |
| Naresh Chandra | — | — | — | — | — | — |
| David Maisel | $ 418 | — | — | — | — | $ 418 |
| Rishika Lulla Singh | — | 61 | — | 769 | 458 | $ 1,288 |
| Shailendra Swarup | — | — | — | — | 47 | $ 47 |
| Total | $ 418 | $ 61 | $ 1,190 | $ 3,268 | $ 2,041 | $ 6,978 |

**Eros India Incentive Compensation**

Pursuant to the Board Resolution dated May 29, 2015 and May 26, 2017 passed by the Board of Directors of Eros India and Shareholders Resolution dated September 3, 2015 and September 28, 2017 passed by the Shareholders of Eros India, the incentive bonus upto 1% of the net profits payable to Mr. Sunil Lulla and Mr. Kishore Lulla has been approved for the services rendered by Mr. Sunil Lulla and Mr. Kishore Lulla to Eros India, in accordance to the applicable laws. Mr. Sunil Lulla is eligible for incentive bonus for the term of 5 (Five) years, until September 27, 2020 and Mr. Kishore Lulla is eligible for incentive bonus for the term of 5 (Five) years, until October 31, 2022 respectively. The Nomination and Remuneration Committee of Eros India will take into account the incentive bonus paid to both Mr. Sunil Lulla and Mr.

Kishore Lulla, at the time of determination of compensation payable to each of them.

87

**Share-Based Compensation Plans**

The compensation cost recognized with respect to all outstanding plans and by grant of shares, which are all equity settled instruments, is as follows:

|  | Year ended March 31 | | |
|  | 2018 | 2017 | 2016 |
|  | (in thousands) | | |
|---|---|---|---|
| IPO India Plan | $      1,572 | $      2,140 | $      1,736 |
| JSOP Plan | 615 | 3,622 | 2,696 |
| Option award scheme 2012 | 197 | 699 | 1,610 |
| 2014 Share Plan | (22) | 1,427 | 2,361 |
| 2015 Share Plan | 100 | 328 | 932 |
| Other share option awards(*) | 7,283 | 4,405 | 894 |
| Management scheme (staff share grant) | 8,173 | 10,850 | 20,763 |
|  | $      17,918 | $      23,471 | $      30,992 |

(*) includes Restricted Share Unit (RSU) and Other share option plans.

**Joint Stock Ownership Plan (JSOP)**

In April 2012, the Company established a controlled trust called the Eros International Plc Employee Benefit Trust ("JSOP Trust"). The JSOP Trust purchased 2,000,164 shares of the Company out of funds borrowed from the Company and repayable on demand. The Company's Board, Nomination and Remuneration Committee recommends to the JSOP Trust certain employees, officers and key management personnel, to whom the JSOP Trust will be required to grant shares from its holdings at nominal price. Such shares are then held by the JSOP Trust and the scheme is referred to as the "JSOP Plan." The shares held by the JSOP Trust are reported as a reduction in stockholders' equity and termed as 'JSOP reserves'.

The movement in the shares held by the JSOP Trust is given below:

|  | Year ended March 31 | | |
|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| Shares held at the beginning of the year | 1,146,967 | 1,239,497 | 1,723,657 |
| Shares granted | — | — | 380,000 |
| Shares exercised | — | (92,530) | (573,260) |
| Shares forfeiture/lapsed | — | — | (290,900) |
| Shares held at the end of the year | 1,146,967 | 1,146,967 | 1,239,497 |
| Unallocated shares held by trust | 106,701 | 106,701 | 92,530 |
|  | 1,253,668 | 1,253,668 | 1,332,027 |

**Employee Stock Option Plans**

A summary of the general terms of the grants under stock option plans and stock awards are as follows:

|  | Range of exercise prices |
|---|---|
| IPO India Plan | INR10 – 175 |
| IPO Plan – June 2006 | GBP 5.28 |
| JSOP Plan | $11.00 – 24.00 |
| Option award scheme 2012 | $11.00 |
| 2014 Share Plan | $14.97– 18.50 |
| 2015 Share Plan | $7.40 – 33.12 |
| Other share option plans | $18– $18.88 |
| Restricted Share Unit (RSU) | — |
| Management Share Award | — |

Employees covered under the stock option plans are granted an option to purchase shares of the Company at the

respective exercise prices, subject to fulfilment of vesting conditions (generally service conditions). These options generally vest in tranches over a period of one to five years from the date of grant. Upon vesting, the employees can acquire one share for every option. The maximum contractual term for these stock option plans ranges between two to ten years.

88

The activity in these stock option plans is summarized below:

| | | Year ended March 31 | | | | | |
| | | 2018 | | 2017 | | 2016 | |
| | Name of Plan | Number of shares | Weighted average exercise price | Number of shares | Weighted average exercise price | Number of shares | Weighted average exercise price |
|---|---|---|---|---|---|---|---|
| Outstanding at the beginning of the year | IPO India Plan | 2,108,063 INR | 34.96 | 2,196,215 INR | 35.17 | 1,437,400 INR | 52 |
| Granted | | 863,320 | 10 | 269,381 | 10 | 966,009 | 10 |
| Exercised | | (1,113,160) | 32.19 | (269,553) | 10 | (180,920) | 39 |
| Forfeited and lapsed | | (234,188) | 10 | (87,980) | 10 | (26,274) | 10 |
| Outstanding at the end of the year | | 1,624,035 | 28.85 | 2,108,063 | 34.96 | 2,196,215 | 35.17 |
| Exercisable at the end of the year | | 501,122 INR | 65.14 | 911,854 INR | 63.75 | 632,566 INR | 78.00 |
| Outstanding at the beginning of the year | IPO Plan June 2006 | — | — | 62,438 GBP | 5.28 | 62,438 GBP | 5.28 |
| Granted | | — | — | — | — | — | — |
| Exercised | | — | — | (62,438) | 5.28 | — | — |
| Forfeited and lapsed | | — | — | — | — | — | — |
| Outstanding at the end of the year | | — | — | — | — | 62,438 | 5.28 |
| Exercisable at the end of the year | | — | — | — GBP | — | 62,438 GBP | 5.28 |
| Outstanding at the beginning of the year | JSOP Plan | 1,146,965 $ | 14.98 | 1,239,495 $ | 14.98 | 1,723,657 $ | 11.60 |
| Granted | | — | — | — | — | 380,000 | 24.00 |
| Exercised | | — | 11 | (92,530) | 11 | (573,262) | 11.00 |
| Forfeited and lapsed | | — | — | — | — | (290,900) | 11.00 |
| Outstanding at the end of the year | | 1,146,965 $ | 14.98 | 1,146,965 $ | 14.98 | 1,239,495 $ | 14.98 |
| Exercisable at the end of the year | | 728,736 $ | 11 | 728,736 $ | 11 | 617,450 $ | 11.00 |
| Outstanding at the beginning of the year | Option award scheme 2012 | 674,045 $ | 11 | 674,045 $ | 11 | 674,045 $ | 11.00 |
| Granted | | — | — | — | — | — | — |
| Exercised | | — | — | — | — | — | — |
| Forfeited and lapsed | | — | — | — | — | — | — |
| Outstanding at the end of the year | | 674,045 | 11 | 674,045 | 11 | 674,045 | 11.00 |
| Exercisable at the end of the year | | 674,045 $ | 11 | 449,363 $ | 11 | 224,682 $ | 11.00 |
| Outstanding at the beginning of the year | 2014 Share Plan | 723,749 $ | 18.06 | 773,749 $ | 17.86 | 230,000 $ | 16.27 |
| Granted | | — | — | — | — | 600,000 | 18.40 |
| Exercised | | — | — | — | — | — | — |
| Forfeited and lapsed | | (323,750) | 18.39 | (50,000) | 14.97 | (56,251) | 17.13 |
| Outstanding at the end of the year | | 399,999 | 17.79 | 723,749 | 18.06 | 773,749 | 17.86 |
| Exercisable at the end of the year | | 289,583 $ | 17.67 | 288,333 $ | 17.80 | 96,664 $ | 15.99 |
| Outstanding at the beginning of the year | 2015 Share Plan | 233,750 $ | 16.23 | 282,500 $ | 16.68 | 200,000 | 17.46 |
| Granted | | — | — | — | — | 105,000 $ | 15.35 |
| Exercised | | (10,208) | 8.71 | (8,750) | 8.84 | — | — |
| Forfeited and lapsed | | (12,292) | 14.64 | (40,000) | 18.68 | (22,500) | 19.17 |
| Outstanding at the end of the year | | 211,250 | 16.21 | 233,750 | 16.23 | 282,500 | 16.68 |
| Exercisable at the end of the year | | 181,354 $ | 17.36 | 127,604 $ | 17.46 | 72,708 $ | 16.90 |
| Outstanding at the beginning of the year | Other share option plans | 500,000 $ | 18.88 | 1,000,000 | 18.44 | 500,000 | 18.88 |
| Granted | | — | — | — | — | 500,000 | 18.00 |
| Exercised | | — | — | — | — | — | — |
| Forfeited and lapsed | | — | — | (500,000) | 18 | — | — |
| Outstanding at the end of the year | | 500,000 | 18.88 | 500,000 | 18.88 | 1,000,000 | 18.44 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Exercisable at the end of the year | | 300,000 | $ 18.88 | 200,000 | $ 18.88 | 100,000 | $ 18.88 |
| Outstanding at the beginning of the year | RSU | 182,725 | — | 72,480 | — | 116,730 | — |
| Granted | | 1,044,290 | — | 216,735 | — | — | — |
| Exercised | | (366,491) | — | (95,990) | — | (36,950) | — |
| Forfeited and lapsed | | (22,934) | — | (10,500) | — | (7,300) | — |
| Outstanding at the end of the year | | 837,590 | — | 182,725 | — | 72,480 | — |
| Exercisable at the end of the year | | 119,150 | — | 12,445 | — | 1,960 | — |
| Outstanding at the beginning of the year | Management Scheme | 1,130,000 | — | 910,000 | — | 525,000 | — |
| Granted | | 700,000 | — | 670,000 | — | 910,000 | — |
| Exercised | | (316,667) | — | (450,000) | — | (525,000) | — |
| Forfeited and lapsed | | — | — | — | — | — | — |
| Outstanding at the end of the year | | 1,513,333 | — | 1,130,000 | — | 910,000 | — |
| Exercisable at the end of the year | | 173,333 | — | 180,000 | — | 175,000 | — |

89

The following table summarizes information about outstanding stock options:

| | Year ended March 31 | | | | | |
| | 2018 | | 2017 | | 2016 | |
| Name of Plan | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price |
|---|---|---|---|---|---|---|
| IPO India Plan | 3.08 | INR* 35.0 | 4.10 | INR* 35.0 | 4.10 | INR* 35.0 |
| IPO Plan June 2006 | — | GBP** — | — | GBP** — | 0.25 | GBP** 5.28 |
| JSOP Plan | 3.93 | $ 16.19 | 4.93 | $ 16.19 | 5.93 | $ 14.98 |
| Option award scheme 2012 | 3.75 | $ 11.00 | 4.83 | $ 11.00 | 5.83 | $ 11.00 |
| 2014 Share Plan | 5.96 | $ 17.79 | 7.11 | $ 18.06 | 6.88 | $ 17.86 |
| 2015 Share Plan | 6.06 | $ 16.21 | 6.08 | $ 16.23 | 5.91 | $ 16.68 |
| Other share option plans | 3.75 | $ 18.88 | 4.75 | $ 18.88 | 5.75 | $ 18.44 |
| Management Scheme | 5.56 | $ — | 5.59 | $ — | 6.00 | $ — |
| Restricted Stock Unit | 5.60 | $ — | 5.63 | $ — | 6.00 | $ — |

(*) INR – Indian Rupees
(**) GBP – Great Britain Pound

The following table summarizes information about inputs to the fair valuation model for options granted during the year:

| | IPO India Plan |
|---|---|
| Expected volatility[1][2] | 35% - 75% |
| Option life (Years) | 1.91 - 7.00 |
| Dividend yield | 0% |
| Risk free rate | 6.51% - 8.50% |
| Range of fair value of the granted options at the grant date[3] | INR 179 – 380 |

(1)    The expected volatility in respect of the IPO India Plan is based on Eros International Media Limited's historic volatility.

(2)    The expected volatility of all other options is based on the historic share price volatility of the Company over time periods comparable to the time from the grant date to the maturity dates of the options.

(3)    Fair value of options granted under all other schemes is measured using a Black Scholes model.

**Restricted Stock Unit (RSU) and Management Scheme plan**

In respect of units/options granted towards RSU and Management Scheme, grant date fair value approximates intrinsic value.

**JOINT STOCK OWNERSHIP PLAN RESERVE (JSOP Reserve)**

| | (in thousands) |
|---|---|
| **Balance at April 1, 2016** | $ (17,167) |
| Issue out of treasury shares | 1,182 |
| **Balance at April 1, 2017** | $ (15,985) |
| Issue out of treasury shares | — |
| **Balance at March 31, 2018** | $ (15,985) |

The JSOP Reserve represents the cost of shares issued by Eros International Plc and held by the JSOP Trust to satisfy the requirements of the JSOP Plan (Refer Note 28). On June 5, 2014, the Board approved discretionary vesting of 20% of the applicable JSOP shares. In the current year 106,701 (2017: 106,701) 'A' ordinary shares held by the JSOP Trust were eligible to be issued to employees.

The number of shares held by the JSOP Trust at March 31, 2018 was 1,253,668 'A' Ordinary shares (2017: 1,253,668 'A' Ordinary shares).

**C. Board Practices**

All directors hold office until the expiration of their term of office, their resignation or removal from office for gross negligence or criminal conduct by a resolution of our shareholders or until they cease to be directors by virtue of any provision of law or they are disqualified by law from being directors or they become bankrupt or make any arrangement or composition with their creditors generally or they become of unsound mind. The term of office of the directors is divided into three classes:

·    Class A, whose term will expire at the annual general meeting to be held in fiscal year 2019;
·    Class B, whose term will expire at the annual general meeting to be held in fiscal year 2020; and
·    Class C, whose term will expire at the annual general meeting to be held in fiscal year 2021.

Our directors for fiscal year 2019 are classified as follows:

·    Class I: Jyoti Deshpande and Vijay Ahuja;
·    Class II: Sunil Lulla, Dilip Thakkar and Rishika Lulla Singh; and
·    Class III: Kishore Lulla, Shailendra Swarup and David Maisel.

**Indemnification Agreements**

We have entered into indemnification agreements with our directors and our officers that require us to indemnify, to the extent permitted by law, our officers and directors against liabilities that may arise by reason of their status or service as officers and directors and to pay expenses incurred by them as a result of any proceeding against them as to which they could be indemnified. We believe that these provisions are necessary to attract and retain qualified persons as directors and executive officers.

**Service Contracts and Letters of Appointment**

Kishore Lulla has entered into a service agreement with Eros Network Limited to provide services to us and our subsidiaries. The service agreements is terminable by either party with 12 months' written notice. Eros Network Limited may terminate the agreement immediately in certain circumstances, including upon certain types of misconduct or upon paying the executive an amount equivalent to his basic salary (inclusive of any bonus and benefits) for a twelve month period. The service agreements expire automatically upon the executive's 65th birthday. The service agreements provide for private medical insurance and 25 paid vacation days per year. Upon termination, compensation will be paid for any accrued but untaken holiday. The executive receive a basic gross annual salary, reviewed annually, and is entitled to participate in any current share option schemes and bonus schemes applicable to their positions maintained by the employing company. The agreement contains a confidentiality provision and non-competition and non-solicitation provisions that restrict the executive for a period of six to twelve months after termination.

Kishore Lulla also executed a letter of appointment for service as one of our directors. Under the terms of the letter of appointment, Mr. Lulla received an annual fee of $93,750. In connection with our initial public offering, this letter of appointment was terminated, and for so long as Mr. Lulla is our executive officer, he will not receive compensation as a director.

On February 17, 2016, with effect from April 1, 2016, Kishore Lulla's employment contract was transferred to Eros Digital FZ LLC at a gross annual salary of $1,133,000, which is recharged to group company and/or holding company, Eros and all other employments contracts were terminated. All other conditions of the employment contracts remain the same. Kishore Lulla is also director on the board of Eros India and is entitled to a gross salary $197,821.

Sunil Lulla, our director, has entered into an employment agreement with Eros India pursuant to which he serves as Executive Vice Chairman and Managing Director of Eros India. Sunil Lulla is entitled to receive a basic gross annual salary, as well as medical insurance and certain other benefits and perquisites. Eros India may terminate the agreement upon thirty days' notice if certain events occur, including a material breach of the agreement by Sunil Lulla. The agreement contains a confidentiality provision that restricts Sunil Lulla during the term of his employment and for a period of two years following termination and a non- competition provision that restricts him during the term of his employment.

91

Jyoti Deshpande, our director, has entered into an employment contract with us pursuant to which she serves as Chief Executive Officer and Managing Director and is entitled to receive a gross base annual salary, private medical insurance and other standard benefits and is eligible to participate in any share option scheme and/or bonus scheme maintained from time to time and applicable to her position. In addition, Ms. Deshpande was issued 1,676,645 "A" ordinary shares on September 18, 2013, of which an equal percentage of shares are restricted for one, two and three years from the date of issuance. In addition, on November 18, 2013, Ms. Deshpande received 181,818 A ordinary shares as part of a contractual arrangement valued at $2.0 million based on the $11.00 initial public offering. The employment agreement is for an initial period of three years commencing September 1, 2013 and will continue thereafter until terminated by either party upon not less than 12 months' prior written notice. We may, however, terminate the agreement immediately in certain circumstances, including upon certain types of misconduct or upon paying Ms. Deshpande an amount equal to her base salary for a 12 month period or remaining term of her employment, whichever is greater.

There are certain conditions under which if the agreement is terminated before September 1, 2016, Ms. Deshpande may be required to surrender all or part of the shares issued to her under this agreement. The agreement expires automatically upon Ms. Deshpande's 65th birthday. The agreement contains a confidentiality provision and non-competition and non-solicitation provisions that restrict Ms. Deshpande for a period of six to twelve months following termination. Ms. Deshpande, who is also a director on the board of Eros India, has a contract with Eros India that entitles her to a gross basic salary and Ms. Deshpande as on June 30, 2018 has options to purchase up to 211,160 shares of Eros India at $1.14 per share with a 3-year vesting period commencing from July 16, 2013.

Ms. Deshpande also owns 360,000 shares of Eros India that came from previously vested options that she exercised.

On February 17, 2016, with effect from April 1, 2016, it was agreed in a letter agreement between Eros International Plc, Eros Digital FZ LLC and Ms. Deshpande that she would receive a gross annual salary of $700,000 from Eros International Plc and $100,000 from Eros Digital FZ LLC. Ms. Deshpande's service agreement with Eros International Limited would stand terminated as of April 1, 2016 and her ongoing agreement with Eros International Media Limited remained unchanged.

From April 1, 2018, Jyoti Deshpande has stepped down from the post of Group Chief Executive Officer and Managing Director and has been re-designated as Non-Executive Non-Independent Director on the Board of Eros International Plc and Eros India and all emoluments payable to her by Eros International Plc, Eros Digital FZ LLC and Eros India has been discontinued effective April 1, 2018 and all the service agreements have been discontinued except for shares award entitlement granted to her which shall vest according to the terms of the grant/options.

Vijay Ahuja, our director and Vice Chairman, entered into a service agreement with Eros International Pte Ltd to provide services to us and our subsidiaries. The service agreement is terminable by either party with twelve months' written notice. Eros International Pte Ltd may terminate the agreement immediately in certain circumstances, including upon certain types of misconduct or upon paying the executive an amount equivalent to his basic salary for a twelve month period. The agreement shall automatically terminate on his 65th birthday. Mr. Ahuja receives a basic gross annual salary and is entitled to participate in any bonus scheme and/or option scheme applicable to his position. The agreement contains a confidentiality provision and non-competition and non- solicitation provisions that restrict Mr. Ahuja for a period of six months following termination.

Mrs. Rishika Lulla Singh, our director, has entered into a service agreement on July 3, 2015 with Eros Digital FZ LLC, pursuant to which she serves as the Chief Executive Officer and an executive director of Eros Digital FZ LLC. The employment agreement is for a term of three years and is terminable by either party by giving 12 months written notice. On February 17, 2016 with effect from April 1, 2016, an amended and restated service agreement was executed with Mrs. Rishika Lulla Singh by Eros Digital FZ LLC. Mrs. Rishika Lulla Singh is entitled to annual salary of $420,000 effective January 1, 2018.

Our non-executive Director, Mr. Dilip Thakkar, has entered into letter of appointment with us that provide him with annual fees of $95,000 per annum (as per Board Meeting dated June 28, 2016). Mr. Shailendra Swarup has been appointed as non-executive Director with effect from July 25, 2017 and annual fees for his service has director for Eros International Plc

is $53,000 (equivalent to GBP 40,000). The appointments are for an initial period of one year, and there after terminable by either the non- executive director or by us with three months' written notice, or by us immediately in the case of fraud.

92

Mr. David Maisel, our director, has entered into a service agreement with us, pursuant to which he serves as a non-executive director, which provides him with an annual fee of $89,075. The service agreement is terminable by either party with 30 days written notice. The service agreement is for a term of five years and three months from November 2014. Mr. Maisel was granted options to purchase up to 500,000 A ordinary shares at $18.88 as part of his service agreement, such options vest in five equal tranches commencing in November 2015. There are certain conditions under which, if the agreement is terminated before the relevant vesting date, the unvested options lapse.

Mr. Prem Parameswaran, our Group Chief Financial Officer and President North America, has entered into an employment agreement with us on May 26, 2015 which provides him with an annual salary of $450,000. The employment agreement is for a term of three years and is terminable by either party by giving 12 months written notice. Mr. Parameswaran is also entitled to 300,000 A ordinary shares at $0.45 per share as part of his employment agreement, these shares are restricted, but will cease to be so in three equal tranches from May 2016. Mr Parameswaran was also granted options to purchase up to 300,000 A ordinary shares at $18.30 as part of his employment agreement, such options vest in three equal annual tranches commencing in June 2016.

Mr. Mark Carbeck, our Chief Corporate and Strategy Officer and Mr. Pranab Kapadia, our President of Europe and Africa Operations, have both entered into service agreements with Eros International Limited to provide services to us and certain of our subsidiaries. The service agreements are terminable by either party with three months' written notice. Eros International Ltd may terminate the agreement immediately in certain circumstances, including upon certain types of misconduct or upon paying the executive an amount equivalent to his basic salary for a three month period. Mr. Carbeck and Mr Kapadia receive a basic gross annual salary and are entitled to participate in any current bonus scheme applicable to their positions. The agreement contains a confidentiality provision non-competition and non-solicitation provisions that restrict the executive for a period of twelve months following termination.

## Board Committees

We currently have an Audit Committee, Remuneration Committee and Nomination Committee, whose responsibilities are summarized below. We believe that the composition of these committees meet the criteria for independence under, and the functioning of these committees comply with the requirements of, the SOX Act, the rules of the NYSE and the SEC rules and regulations applicable to us.

## Audit Committee

Our board of directors has adopted a written charter under which our Audit Committee operates. This charter sets forth the duties and responsibilities of our Audit Committee, which, among other things, include: (i) monitoring our and our subsidiaries' accounting and financial reporting processes, including the audits of our financial statements and the integrity of the financial statements; (ii) monitoring our compliance with legal and regulatory requirements; (iii) assessing our external auditor's qualifications and independence; and (iv) monitoring the performance of our internal audit function and our external auditor. A copy of our Audit Committee charter is available on our website at www.erosplc.com. Information contained on our website is not a part of, and is not incorporated by reference into, this annual report.

The current members of our Audit Committee are Mr. Thakkar (Chair) and Mr. Swarup. The Audit Committee met six times during fiscal year 2018. Our board of directors has determined that each of the members of our Audit Committee are independent.

## Remuneration Committee

Our board of directors has adopted a written charter under which our Remuneration Committee operates. This charter sets forth the duties and responsibilities of our Remuneration Committee, which, among other things, include assisting our Board of Directors in establishing remuneration policies and practices. A copy of our Remuneration Committee charter is available on our website at www.erosplc.com. Information contained in our website is not a part of, and is not incorporated by reference into, this annual report.

The current members of our Remuneration Committee are Mr. Shailendra Swarup (Chair) and Mr. Dilip Thakkar. The Remuneration Committee met four times during fiscal year 2018. Our board of directors has determined that each of the members of our Remuneration Committee is independent.

93

*Nomination Committee*

Our board of directors has adopted a written charter under which our Nomination Committee operates. This charter sets forth the duties and responsibilities of our Nomination Committee, which, among other things, include recommending to our Board of Directors candidates for election at the annual meeting of shareholders and performing a leadership role in shaping the Company's corporate governance policies. A copy of our Nomination Committee charter is available on our website at www.erosplc.com . Information contained in our website is not a part of, and is not incorporated by reference into, this annual report.

The current members of our Nomination Committee are Mr. Shailendra Swarup (Chair) and Mr. Thakkar. The Nomination Committee is an ad hoc committee and met four times during fiscal year 2018. Our board of directors has determined that each of the members of our Nomination Committee is independent.

The table below summarizes the composition of our committees during the year.

| | Audit Committee | Remuneration Committee | Nomination Committee |
|---|---|---|---|
| Shailendra Swarup | Member | Chairman | Chairman |
| Dilip Thakkar | Chairman | Member | Member |

**D. Employees**

As of March 31, 2018, we had 423 employees, with 386 employees based in India, and the remainder employed by our international subsidiaries. All are full time employees or contractors. Our employees are not unionized. We believe that our employee relations are good.

**E. Share Ownership**

The following table sets forth information with respect to the beneficial ownership of our ordinary shares as at July 30, 2018 by each of our directors and all our directors and executive officers as a group. As used in this table, beneficial ownership means the sole or shared power to vote or direct the voting or to dispose of or direct the sale of any security. A person is deemed to be the beneficial owner of securities that can be acquired within 60 days upon the exercise of any option, warrant or right. Ordinary shares subject to options, warrants or rights that are currently exercisable or exercisable within 60 days are deemed outstanding for computing the ownership percentage of the person holding the options, warrants or rights, but are not deemed outstanding for computing the ownership percentage of any other person. The amounts and percentages as at July 30, 2018 are based on an aggregate of 68,824,171 ordinary shares outstanding as at that date.

94

| | Number of A Ordinary Shares Beneficially Owned | | Number of B Ordinary Shares Beneficially Owned | |
|---|---|---|---|---|
| | Number of Shares of A | Percent of Class | Number of Shares of B | Percent of Class |
| **Directors** | | | | |
| Kishore Lulla(1) | 11,567,399 | 19.6% | 9,712,715 | 100.0% |
| Jyoti Deshpande(2) | 2,112,333 | 3.6% | — | — |
| Vijay Ahuja | 5,266,667 | 8.9% | — | — |
| Sunil Lulla | * | * | — | — |
| Dilip Thakkar | * | * | — | — |
| David Maisel | * | * | — | — |
| Rishika Lulla Singh | * | * | — | — |
| **Senior Management** | | | | |
| Prem Paramsewaran | * | * | — | — |
| Mark Carbeck | — | — | — | — |
| Pranab Kapadia | — | — | — | — |
| Surender Sadhwani | * | * | — | — |
| **All directors and senior management as a group** | **20,279,706** | **34.3%** | **9,712,715** | **100.0%** |

\*    Represents less than 1%.

(1)  Kishore Lulla's interest in certain of his shares is by virtue of his holding ownership interest in and being a potential beneficiary of discretionary trusts that hold our shares and serving as trustee of the Lulla Foundation, a U.K. registered charity that holds our shares.

(2)  Jyoti Deshpande's interest in certain of her shares is by virtue of her prior existing shareholding vested options received as compensation and the 1,676,645 of our shares which she was issued on September 18, 2013 under her employment agreement. Ms Deshpande received A ordinary shares totalling to 90,000 in 2014 and 160,000 annually in 2015, 2016, and 2017 as part of executive director share awards.

Kishore Lulla, by virtue of their holdings of B ordinary shares have different voting rights to the other Directors. Each A ordinary share is entitled to one vote on all matters upon which the ordinary shares are entitled to vote, and each B ordinary share is entitled to ten votes. In order to vote at any meeting of shareholders, a holder of B ordinary shares will first be required to certify that it is a permitted holder as defined in our articles.

Options to purchase A ordinary from the Company are granted from time to time to directors, officers and employees of the Company on terms and conditions acceptable to the Board of Directors.

The following table provides the JSOP Plan details with respect to the directors and officers:

| Name | Number of 'A' ordinary Shares Options | Date of Grant | Exercise Price ($USD) | Expiration Date |
|---|---|---|---|---|
| Rishika Lulla Singh | 242,034 | August 2014 | $ 15.34 | August 2024 |
| Pranab Kapadia | 132,013 | April 2012 | $ 11.00 | April 2018 |
| Surender Sadhwani | 130,000 | August 2015 | $ 24.00 | May 2017 |

The following table provides option details with respect to the directors and officers.

| Name | Number of 'A' ordinary Shares Options | Date of Grant | Exercise Price ($USD) | Expiration Date |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Prem Parameswaran | 300,000 | June 2015 | $ | 18.3 | June 2018 |
| Surender Sadhwani | 674,045 | September 2014 | $ | 11.00 | June 2017 |
| David Maisel | 500,000 | February 2015 | $ | 18.88 | February 2020 |
| Mark Carbeck | 70,000 | February 2015 | $ | 14.97 | March 2025 |

(1) In addition Jyoti Deshpande also has 211,160 share options in Eros International Media Limited by virtue of the IPO India Plan. The options had a three year vesting period commencing July 16, 2013, with an exercise price of $1.14.

95

**ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS**

**A. Major Shareholders**

The following table and accompanying footnotes provide information regarding the beneficial ownership of our ordinary shares as of July 30, 2018 with respect to each person or group who beneficially owned 5% or more of our issued ordinary shares.

Beneficial ownership, which is determined in accordance with the rules and regulations of the SEC, means the sole or shared power to vote or direct the voting or dispose or direct the disposition of our ordinary shares. The number of our ordinary shares beneficially owned by a person includes ordinary shares issuable with respect to options or similar convertible securities held by that person that are exercisable or convertible within 60 days of July 30, 2018.

The number of shares and percentage beneficial ownership of ordinary shares below is based on 59,111,456 issued A ordinary shares and 9,712,715 issued B ordinary shares as of July 30, 2018.

Except as otherwise indicated in the footnotes to the table, shares are owned directly or indirectly with sole voting and investment power, subject to applicable marital property laws.

| | Number of A Ordinary Shares Beneficially Owned | | Number of B Ordinary Shares Beneficially Owned | |
|---|---|---|---|---|
| | Number of Shares of A | Percent of Class | Number of Shares of B | Percent of Class |
| Kishore Lulla(1) | 11,567,399 | 19.6% | 9,712,715 | 100.0% |
| Beech Investments(2) | 1,756,660 | 3.0% | 9,546,048 | 98.3% |
| Eros Ventures Limited(3) | 8,625,323 | 14.6% | — | — |
| Capital Research Global Investors | 6,846,094 | 11.6% | — | — |
| Vijay Ahuja | 5,266,667 | 8.9% | — | — |
| Paradice Investment Management LLC | 5,130,552 | 8.7% | — | — |
| Gilder Gagnon Howe & Co LLC | 3,615,139 | 6.1% | — | — |

(1) Kishore Lulla's interest in certain of his shares is by virtue of his holding ownership interest in and being a potential beneficiary of discretionary trusts that hold our shares and serving as trustee of the Lulla Foundation, a U.K. registered charity that holds our shares.

(2) Beech Investments Limited, c/o SG Hambros Trust Company (Channel Islands) Limited, 18 Esplanade, St Helier, Jersey, JE4 8RT. Beech Investments, a company incorporated in the Isle of Man, is owned by discretionary trusts that include Eros director Kishore Lulla as a beneficiary. The shares currently held by Beech Investments Limited are being held as B ordinary shares, but will convert into A ordinary shares (pursuant to Section 22.1 of the Articles of Association) upon being transferred to a person who is not a Permitted Holder (as defined in Section 22.1 of the Articles of Association).

(3) Eros Ventures Limited, c/o SG Kleinwort Hambros Trust Company Limited, Hambro House, St. Julians Avenue, St. Peter Port, Guernsey, GY1 3ED. Eros Ventures Limited, a company incorporated in the British Virgin Islands, is owned by discretionary trusts that include Mr. Kishore Lulla as beneficiary.

The following summarizes the significant changes in the percentage ownership held by our major shareholders during the past three years:

· Prior to our listing on the NYSE on November 18, 2013 the interests of all our major shareholders were in ordinary GBP 0.10 shares.

· Kishore Lulla's interest in certain of his shares is by virtue of his holding ownership interest in and being a potential beneficiary of discretionary trusts that hold our shares and serving as trustee of the Lulla Foundation, a U.K. registered charity that holds our shares. Since June 30, 2017, Mr. Lulla's aggregate ownership of our A ordinary shares, through both direct and indirect ownership, has increased by 1,883,945 shares. The increase in Mr. Lulla's ownership was driven by a combination of shares received through executive compensation schemes, increase in holdings of Beech Investments and Eros Ventures limited, and conversion of certain amounts of B ordinary shares into A ordinary shares.

96

- Capital Research Global Investors reported its percentage ownership of our ordinary shares to be 11.6% (based on the current number of our ordinary shares reported as of this filing) in a Schedule 13F filed with the Commission as of March 31, 2018.
- Paradice Investment Management LLC reported its percentage ownership of our ordinary shares to be 8.7% (based on the current number of our ordinary shares reported as of this filing) in a Schedule 13F filed with the Commission as of March 31, 2018.
- Gilder Gagnon Howe & Co LLC reported its percentage ownership of our ordinary shares to be 6.1% (based on the current number of our ordinary shares reported as outstanding as of this filing) in a Schedule 13F filed with the Commission as of March 31, 2018.

Kishore Lulla and Beech Investments Limited, by virtue of their holdings of B class shares have different voting rights to the other major shareholders. Each A ordinary share is entitled to one vote on all matters upon which the ordinary shares are entitled to vote, and each B ordinary share is entitled to ten votes. In order to vote at any meeting of shareholders, a holder of B ordinary shares will first be required to certify that it is a permitted holder as defined in our articles.

As of March 31, 2018, approximately 52,887,388 of our A ordinary shares, representing 94.9% of our outstanding A ordinary shares as of March 31, 2018, were held by a total of 3 record holders with addresses in the United States. Computershare, N.A., the depositary, has advised us that, as of March 31, 2018, approximately 94.2% of our total outstanding ordinary shares in the form of 52,482,888 A ordinary shares, were held of record by DTC, the Depository Trust Company, under the nominee name of Cede & Co., on behalf of DTC participants. The number of beneficial owners of our A ordinary shares in the United States is likely to be much larger than the number of record holders of our A ordinary shares in the United States.

## B. Related Party Transactions

The following is a description of transactions since April 1, 2014 to which we have been a party, in which the amount involved in the transaction exceeded or will exceed $120,000, and in which any of our directors, executive officers or beneficial holders of more than 5% of our issued share capital had or will have a direct or indirect material interest.

## Family Relationships

Mr. Kishore Lulla, our director and Chairman, is the brother of Mr. Sunil Lulla, and father of Mrs. Rishika Lulla Singh, each of whom are directors, and a cousin of Mr. Vijay Ahuja, our director and Vice Chairman, and of Mr. Surender Sadhwani, our President of Middle East Operations. Mr. Sunil Lulla is the brother of Mr. Kishore Lulla, uncle to Mrs. Lulla Singh, and a cousin of Mr. Ahuja and Mr. Sadhwani. Mr. Ahuja is a cousin of Mr. Kishore Lulla and Mr. Sunil Lulla. Mrs. Lulla Singh is the daughter of Mr. Kishore Lulla and niece of Mr. Sunil Lulla. Mr. Sadhwani is a cousin of Mr. Kishore Lulla and Mr. Sunil Lulla. Mr. Arjan Lulla, our founder, is the father of Mr. Kishore Lulla and Mr. Sunil Lulla, grandfather of Mrs. Lulla Singh, uncle of Mr. Ahuja and Mr. Sadhwani and an employee of Redbridge Group Ltd., is the Honorary President of Eros and a director of our subsidiary Eros Worldwide. Mrs. Manjula Lulla, the wife of Mr. Kishore Lulla, is an employee of our subsidiary. Ms Ridhima Lulla, is the daughter of Mr. Kishore Lulla and an employee of our subsidiary. Mrs. Krishika Lulla is the wife of Mr Sunil Lulla and an employee of Eros India.

97

**Leases**

Pursuant to a lease agreement that expired on March 31, 2018, the lease requires Eros International Media Limited to pay $5,000 each month under this lease. Eros International Media Limited leases apartments for studio use at Kailash Plaza, 3rd Floor, Opp. Laxmi Industrial Estate, Andheri (W), Mumbai, from Manjula K. Lulla, the wife of Kishore Lulla. The lease was renewed on April 1, 2018 for a further period of one year on the same terms.

Pursuant to a lease agreement that expired on September 30, 2015, the lease requires Eros International Media Limited to pay $5,000 each month under this lease. Eros International Media Limited leases for use as executive accommodations the property Aumkar Bungalow, Gandhi Gram Road, Juhu, Mumbai, from Sunil Lulla. The lease was renewed on October 1, 2015 for a further period of three years on the same terms.

Pursuant to a lease agreement that expires on January 4, 2020, Eros International Media Limited leases office premise for studio use at Supreme Chambers, 5th Floor, Andheri (W), Mumbai from Kishore and Sunil Lulla. Beginning January 2015, the lease requires Eros International Media Limited to pay $61,000 each month under this lease.

Pursuant to a lease agreement that expires on April 1, 2020, the real estate property at 550 County Avenue, Secaucus, New Jersey, from 550 County Avenue Property Corp, a Delaware corporation owned by Beech Investments. The lease commenced on April 1,2015, and required the Group to pay $11,000 each month. The lease was renewed on April 1, 2015 for a further period of five years on the same terms. This is a non-cancellable lease

Pursuant to a lease agreement that expired in March 2018, including renewal periods, the Group leases for U.K. corporate offices, the real property at 13 Manchester Square, London from Linecross Limited, a U.K. company owned indirectly by a discretionary trust of which Kishore Lulla is a potential beneficiary. The lease commenced on November 19, 2009 and requires the Group to pay $109,000 each quarter. The lease was not renewed after it expired in March 2018.

**Honorary Appointment of Mr. Arjan Lulla**

Pursuant to an agreement the Group entered into with Red Bridge Group Limited on June 27, 2006, the Group agreed to pay an annual fee set each year of $270,000, $260,000 and $300,000 in the respective years ended March 31, 2018, 2017 and 2016, for the services of Arjan Lulla, the father of Kishore Lulla and Sunil Lulla, grandfather of Mrs. Rishika Lulla Singh, uncle of Vijay Ahuja and Surender Sadhwani and an employee of Redbridge Group Limited. The agreement makes Arjan Lulla honorary life president and provides for services including attendance at Board meetings, entrepreneurial leadership and assistance in setting the Group's strategy. Red Bridge Group Limited. is an entity owned indirectly by a discretionary trust of which Kishore Lulla is a potential beneficiary.

**Lulla Family Transactions**

The Lulla family refers to Mr. Arjan Lulla, Mr. Kishore Lulla, Mr. Sunil Lulla, Mrs. Manjula Lulla, Mrs. Krishika Lulla, Mrs. Rishika Lulla Singh, and Ms. Riddhima Lulla.

The Group has engaged in transactions with NextGen Films Private Limited, an entity owned by the husband of Puja Rajani, sister of Kishore Lulla and Sunil Lulla, each of which involved the purchase and sale of film rights. In the year ended March 31, 2018, NextGen Films Private Limited sold film rights $7,760,000 (2017: $616,000, 2016: $2,728,000) to the Group, and purchased film rights, including production services, of Nil (2017: Nil and 2016: $Nil).The Group advanced $19,025,000 (2017: $22,881,000, 2016: $5,400,000) to NextGen Films Private Limited for film co-production and received refund of $6,114,000 (2017: $5,075,000, 2016: $6,945,000) on abandonment of certain film projects.

The Group also engaged in transactions with Everest Entertainment LLP entity owned by the brother of Manjula K. Lulla, wife of Kishore Lulla, which is involved in the purchase and sale of film rights. In the year ended March 31, 2018, Everest Entertainment LLP sold film rights of 166,000 (2017: Nil, 2016: Nil) to the Group.

Mrs. Manjula Lulla, the wife of Kishore Lulla, is an employee of Eros International Plc. and is entitled to a salary of $139, 000 per annum (2017: $130,000 and 2016: $154,000). Mrs. Krishika Lulla, the wife of Sunil Lulla, is an employee of Eros International Media Limited (EIML) and is entitled to a salary of $133,000 per annum (2017: $133,000, 2016: $138,000). Ms. Riddhima Lulla, the daughter of Kishore Lulla, was an employee of Eros Digital FZ LLC and is entitled to a salary of Nil per annum (2017: $51,000, 2016: $38,000 and is an employee of Eros World Wide FZ LLC is entitled to a salary of $90,000 per annum.

98

All of the amounts outstanding are unsecured and will be settled in cash.

As at March 31, 2018, the Group has provided performance guarantee to a bank amounting to $8,000,000 (2017: $19,500,000) in connection with funding commitments. under film co-production agreements with NextGen Films Private Limited and having varying maturity dates up to the next 12 months. The Group did not earn any fee to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

In fiscal year 2017, the Group obtained unsecured short-term borrowings of $6,417,000 from Eros Television India Private Limited at 12% per anum.

**Relationship Agreement**

Both we and our subsidiaries, including Eros India, acquire rights in movies. The 2009 Relationship Agreement was renewed with the execution of the 2016 Relationship Agreement between Eros India, Eros Worldwide and us ("Relationship Agreement"). The Relationship Agreement, exclusively assigns to Eros Worldwide, certain intellectual property rights and all distribution rights (including global digital distribution rights) for films (other than Tamil films), held by Eros India or any of its subsidiary or the "Eros India" group, in all territories other than India, Nepal, and Bhutan. In return, Eros Worldwide provides a lump sum minimum guaranteed fee to the Eros India Group in a fixed payment equal to 40% of the production cost of such film (including all costs incurred in connection with the acquisition, pre-production, production or post-production of such film), plus an amount equal to 20% thereon as markup. We refer to these payments collectively as the Minimum Guaranteed Fee. Eros Worldwide is also required to reimburse the Eros India Group pre-approved distribution expenses in connection with such film, plus an amount equal to 20% thereon as markup ("distribution expenses"). In addition, 15% of the gross proceeds received by the Eros International Group from monetization of such films, after certain amounts are retained by the Eros International Group, are payable over to the Eros India Group.

No share of gross proceeds from a film is payable by the Eros International Group to the Eros India Group until the Eros International Group has received and retained an amount equal to the Minimum Guaranteed Fee, a 20% fee on all gross proceeds and 100% of the distribution expenses incurred by the Eros International Group and the distribution expenses for which Eros Worldwide has provided reimbursement to the Eros India Group.

The initial term of the 2016 Relationship Agreement expires in April 2021. Upon expiration, the agreement provides that it will be automatically renewed for successive two year terms unless terminated by any party by 180 days written notice on or before commencement of any renewal term.

**Lulla Foundation**

Prior to our listing on the NYSE in November 2013, we issued the equivalent of 282,949 A ordinary shares to the Lulla Foundation (formerly the Eros Foundation), a U.K. registered charity, for no consideration. Such shares were granted by our Remuneration Committee to Mr. Kishore Lulla as compensation, each of whom directed the issuance of such shares to the Lulla Foundation. Mr. Kishore Lulla and his wife, Mrs. Manjula K. Lulla, are trustees, but not beneficiaries, of the foundation. The Lulla Foundation sold 76,000 A ordinary shares between May 20, 2014 and June 8, 2018 and now currently has 221,949 A ordinary shares as of June 30, 2018.

**C. Interests of Experts and Counsel**

Not applicable.

**ITEM 8. FINANCIAL INFORMATION**

**A. Consolidated Statements and Other Financial Information**

Please see "Part III — Item 18. Financial Statements" for a list of the financial statements filed as part of this Annual Report on Form 20-F.

**ITEM 9. THE OFFER AND LISTING**

**A. Offer and Listing Details**

The high and low last reported sale prices for our shares for the periods indicated are as shown below. We note that the periods are split between when Eros International was listed on the Alternative Investment Market ("AIM") and when it was listed on the New York Stock Exchange ("NYSE") on November 13, 2013. With respect to the trading prices on AIM, the prices are adjusted to reflect the one-for-three reverse stock split, which occurred on November 18, 2013, and a translation from British Pound Sterling to U.S. dollars based on the prevailing exchange rate between the British Pound Sterling and the U.S. dollar at the time of the applicable trade. Amounts on the NYSE share price table below are for the period November 18, 2013 to May 31, 2018; and on the AIM share price table, for the period 1 April 2010 to November 18, 2013, only.

|  | Price per share on NYSE | |
|  | High | Low |
|---|---|---|
| **Fiscal year:** | | |
| 2014 | $ 16.07 | $ 8.94 |
| 2015 | $ 22.44 | $ 13.65 |
| 2016 | $ 37.60 | $ 6.81 |
| 2017 | $ 19.23 | $ 9.65 |
| 2018 | $ 16.10 | $ 6.85 |
| **Fiscal Quarter:** | | |
| First quarter 2018 | $ 11.85 | $ 8.80 |
| Second quarter 2018 | $ 16.10 | $ 6.85 |
| Third quarter 2018 | $ 15.25 | $ 9.20 |
| Fourth quarter 2018 | $ 13.45 | $ 9.60 |
| **Month:** | | |
| April 2017 | $ 10.15 | $ 8.90 |
| May 2017 | $ 11.85 | $ 9.55 |
| June 2017 | $ 11.70 | $ 8.80 |
| July 2017 | $ 13.90 | $ 10.00 |
| August 2017 | $ 10.10 | $ 6.85 |
| September 2017 | $ 16.10 | $ 11.45 |
| October 2017 | $ 15.25 | $ 11.55 |
| November 2017 | $ 13.45 | $ 12.25 |
| December 2017 | $ 12.75 | $ 9.20 |
| January 2018 | $ 11.40 | $ 9.60 |
| February 2018 | $ 13.45 | $ 11.15 |
| March 2018 | $ 13.40 | $ 10.90 |
| April 2018 | $ 11.95 | $ 10.00 |
| May 2018 | $ 13.50 | $ 10.95 |

|  | Price per share on AIM | |
|  | High | Low |
|---|---|---|
| **Fiscal year:** | | |
| 2011 | $ 13.37 | $ 7.51 |
| 2012 | $ 13.11 | $ 9.54 |
| 2013 | $ 15.02 | $ 8.05 |
| **Fiscal Quarter:** | | |
| First quarter 2013 | $ 15.02 | $ 8.50 |
| Second quarter 2013 | $ 11.53 | $ 8.05 |

| | | | | |
|---|---|---|---|---|
| Third quarter 2013 | $ | 11.81 | $ | 8.90 |
| Fourth quarter 2013 | $ | 12.16 | $ | 10.44 |
| First quarter 2014 | $ | 11.36 | $ | 8.79 |
| Second quarter 2014 | $ | 13.45 | $ | 9.06 |
| **Month:** | | | | |
| October 2013 | $ | 11.05 | $ | 10.27 |
| November 2013 | $ | 11.05 | $ | 10.27 |

Our closing price on AIM on November 13, 2013 was $11.18.

100

**B. Plan of Distribution**

Not applicable.

**C. Markets**

Our shares are listed on the NYSE under the symbol "EROS."

**D. Selling Shareholders**

Not applicable.

**E. Dilution**

Not applicable.

**F. Expenses of the Issue**

Not applicable.

**ITEM 10. ADDITIONAL INFORMATION**

**A. Share Capital**

Not applicable.

**B. Memorandum and Articles of Association**

Eros International Plc was incorporated in the Isle of Man on March 31, 2006 under the 1931 Act, as a public company limited by shares and effective as of September 29, 2011, was de-registered under the 1931 Act and re-registered as a company limited by shares under the 2006 Act. We maintain our registered office at First Names House, Victoria Road Douglas, Isle of Man IM2 4DF, British Isles; our principal executive office in the U.S. is at 550 County Avenue, Secaucus, New Jersey 07094.

At March 31, 2018, Eros International plc has authorized share capital of 90,287,285 A ordinary shares at a par value of GBP 0.30 per share, of which 55,718,423 is issued share capital, and authorized share capital of 9,712,715 B ordinary shares at a par value of GBP 0.30 per share, of which 9,712,715 is entirely issued and outstanding.

Our activities are regulated by our Memorandum and Articles of Association. We adopted revised Articles of Association by special resolution of our shareholders passed on April 24, 2012. The material provisions of our revised Articles of Association are described below. In addition to our Memorandum and Articles of Association, our activities are regulated by (among other relevant legislation) the 2006 Act. Our Memorandum of Association states our company name, that we are a company limited by shares, that our registered office is at First Names House, Victoria Road Douglas, Isle of Man IM2 4DF, British Isles , that our registered agent is Cains Fiduciaries Limited and that neither the memorandum of association nor the articles of association may be amended except pursuant to a resolution approved by a majority of not less than three-fourths of such members as, being entitled so to do, vote in person or by proxy at the general meeting at which such resolution is proposed. Below is a summary of some of the provisions of our Articles of Association. It is not, nor does it purport to be, complete or to identify all of the rights and obligations of our shareholders.

The summary is qualified in its entirety by reference to our Articles of Association. See "Part III — Item 19. Exhibits — Exhibit 1.1" and "Part III — Item 19. Exhibits — Exhibit 1.2."

The following is a description of the material provisions of our articles of association, ordinary shares and certain provisions of Isle of Man law. This summary does not purport to be complete and is qualified in its entirety by reference to our Articles of Association, See "Part III - Item 19.

101

**Board of Directors**

Under our Articles of Association, the 2006 Act and the committee charters and governance policies adopted by our board of directors, our board of directors controls our business and actions. Our board of directors consists of between three and twelve directors and is divided into three staggered classes of directors of the same or nearly the same number. At each annual general meeting, a class of directors is elected for a three-year term to succeed the directors of the same class whose terms are then expiring. No director may participate in any approval of a transaction in which he or she is interested. The directors receive a fee determined by our board of directors for their services as directors and such fees are distinct from any salary, remuneration or other amounts that may be payable to the directors under our articles.

However, any director who is also one of our subsidiaries' officers is not entitled to any such director fees but may be paid a salary and/or remuneration for holding any employment or executive office, in accordance with the articles. Our directors are entitled to be repaid all reasonable expenses incurred in the performance of their duties as directors. There is no mandatory retirement age for our directors.

Our articles provide that the quorum necessary for the transaction of business may be determined by our board of directors and, in the absence of such determination, is the majority of the members of our board of directors. Subject to the provisions of the 2006 Act, the directors may exercise all the powers of the Company to borrow money, guarantee, indemnify and to mortgage or charge our assets.

**Ordinary Shares**

*Dividends*

Holders of our A ordinary shares and B ordinary shares whose names appear on the register on the date on which a dividend is declared by our board of directors are entitled to such dividends according to the shareholders' respective rights and interests in our profits and subject to the satisfaction of the solvency test contained in the 2006 Act. Any such dividend is payable on the date declared by our board of directors, or on any other date specified by our board of directors. Under the 2006 Act, a company satisfies the solvency test if (a) it is able to pay its debts as they become due in the normal course of its business and (b) the value of its assets exceeds the value of its liabilities. Under certain circumstances, if dividend payments are returned to us undelivered or left uncashed, we will not be obligated to send further dividends or other payments with respect to such ordinary shares until that shareholder notifies us of an address to be used for the purpose. In the discretion of our board of directors, all dividends unclaimed for a period of twelve months may be invested or otherwise used by our board of directors for our benefit until claimed (and we are not a trustee of such unclaimed funds) and all dividends unclaimed for a period of twelve years after having become due for payment may be forfeited and revert to us.

*Voting Rights*

Each A ordinary share is entitled to one vote on all matters upon which the ordinary shares are entitled to vote, and each B ordinary share is entitled to ten votes. In order to vote at any meeting of shareholders, a holder of B ordinary shares will first be required to certify that it is a permitted holder as defined in our articles.

*General Meetings*

Unless unanimously approved by all shareholders entitled to attend and vote at the meeting, all general meetings for the approval of a resolution appointing a director may be convened by our board of directors with at least 21 days' notice (excluding the date of notice and the date of the general meeting), and any other general meeting may be convened by our Board of Directors with at least 14 days' notice (excluding the date of notice and the date of the general meeting). A quorum required for any general meeting consists of shareholders holding at least 30% of our issued share capital. The concept of "ordinary," "special" and "extraordinary" resolutions is not recognized under the 2006 Act, and resolutions passed at a meeting of shareholders only require the approval of shareholders present in person or by proxy, holding in excess of 50% of the voting rights exercised in relation thereto. However, as permitted under the 2006 Act, our articles of association incorporate the concept of a "special resolution" (requiring the approval of shareholders holding 75% or more of the voting rights exercised in relation thereto) in relation to certain matters, such as directing the management of our business (subject to the provisions of the 2006 Act and our articles), sanctioning a transfer or sale of the whole or part of

our business or property to another company (pursuant to the relevant section of the 1931 Act) and allocating any shares or other consideration among the shareholders in the event of a winding up.

### Rights to Share in Dividends

Our shareholders have the right to a proportionate share of any dividends we declare.

102

*Limitations on Right to Hold Shares*

Our board of directors may determine that any person owning shares (directly or beneficially) constitutes a "prohibited person" and is not qualified to own shares if such person is in breach of any law or requirement of any country and, as determined solely by our board of directors, such ownership would cause a pecuniary or tax disadvantage to us, another shareholder or any of our other securities. Our board of directors may direct the prohibited person to transfer the shares to another person who is not a prohibited person. Any such determination made or action taken by our board of directors is conclusive and binding on all persons concerned, although in the event of such a transfer, the net proceeds of the sale of the relevant shares, after payment of our costs of the sale, shall be paid by us to the previous registered holders of such shares or, if reasonable inquiries failed to disclose the location of such registered holders, into a trust account at a bank designated by us, the associated costs of which shall be borne by such trust account. A prohibited person would have the right to apply to the Isle of Man court if he or she felt that our board of directors had not complied with the relevant provisions of our articles of association.

Our articles also identify certain "permitted holders" of B ordinary shares. Any B ordinary shares transferred to a person other than a permitted holder will, immediately upon registration of such transfer, convert automatically into A ordinary shares. In addition, if, at any time, the aggregate number of B ordinary shares in issue constitutes less than 10% of the aggregate number of A ordinary shares and B ordinary shares in issue, all B ordinary shares in issue will convert automatically into A ordinary shares on a one-for-one basis.

*Untraceable Shareholders*

Under certain circumstances, if any payment with respect to any ordinary shares has not been cashed and we have not received any communications from the holder of such ordinary shares, we may sell such ordinary shares after giving notice in accordance with procedures set out by our articles to the holder of the ordinary shares and any relevant regulatory authority.

*Action Required to Change Shareholder Rights or Amend Our Memorandum or Articles of Association*

All or any of the rights attached to any class of our ordinary shares may, subject to the provisions of the 2006 Act, be amended either with the written consent of the holders of 75% of the issued shares of that class or by a special resolution passed at a general meeting of the holders of shares of that class. Furthermore, our memorandum and articles of association may be amended by a special resolution of the holders of 75% of the issued shares.

*Liquidation Rights*

On a return of capital on winding up, assets available for distribution among the holders of ordinary shares will be distributed among holders of our ordinary shares on a pro rata basis. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately.

*Minority Shareholder Protections*

Under the 2006 Act, if a shareholder believes that the affairs of the company have been or are being conducted in a manner that is unfair to such shareholder or unfairly prejudicial or oppressive, the shareholder can seek a range of court remedies including winding up the company or setting aside decisions in breach of the 2006 Act or the company's memorandum and articles of association. Further, if a company or a director of a company breaches or proposes to breach the 2006 Act or its memorandum or articles of association, then, in response to a shareholder's application, the Isle of Man Court may issue an order requiring compliance with the 2006 Act or the memorandum or articles of association; alternatively, the Isle of Man Court may issue an order restraining certain action to prevent such a breach from occurring.

The 2006 Act also contains provisions that enable a shareholder to apply to the Isle of Man court for an order directing that an investigation be made of a company and any of its associated companies.

**Anti-takeover Effects of Our Dual Class Structure**

As a result of our dual class structure, the Founders Group and our executives and employees will have significant influence over all matters requiring shareholder approval, including the election of directors and significant corporate

transactions, such as a merger or other sale of our company or its assets. This concentrated control could discourage others from initiating any potential merger, takeover or other change of control transaction that other shareholders may view as beneficial.

103

**C. Material Contracts**

On December 6, 2017, the Company closed a registered direct offering (the "Offering") of $122,500,000 aggregate principal amount of the Company's Senior Convertible Notes (collectively, the "Notes") and a Warrant (collectively, the "Warrants") to purchase up to 2,000,000 of the Company's A ordinary shares, for an aggregate purchase price of $100,000,000. The Notes and Warrants were issued and sold pursuant to a Securities Purchase Agreement, dated as of December 4, 2017, by and among the Company and the buyers party thereto (the "Purchase Agreement").The Offering was effected pursuant to a prospectus supplement dated December 1, 2017 under the Company's Registration Statement on Form F-3 (Registration No. 333-219708), as amended (the "Registration Statement"). The Registration Statement was declared effective on October 2, 2017.

*The Notes*

In connection with the issuance of the Notes, the Company entered into an indenture, dated as of December 6, 2017, between the Company and Wilmington Savings Fund Society, FSB, as trustee (the "Base Indenture"), as supplemented by a first supplemental indenture thereto, dated as of December 6, 2017 (the "Supplemental Indenture" and, the Base Indenture as supplemented by the Supplemental Indenture, the "Indenture"). The terms of the Notes include those provided in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended.

The Notes will mature on December 6, 2020 unless earlier converted or redeemed, subject to the right of the holders to extend the date under certain circumstances. The Notes were issued with an original issue discount and will not bear interest except upon the occurrence of an event of default, in which case the Notes shall bear interest at a rate of 6.0% per annum. The Notes are senior obligations of the Company.

The Company will make monthly payments consisting of an amortizing portion of the principal of each Note equal to $3,500,000 and accrued and unpaid interest and late charges on the Note. Provided certain conditions have been satisfied, the Company may make a monthly payment by converting such payment amount into A ordinary shares. Alternatively the Company may, at its option, make monthly payments by redeeming such payment amount in cash, or by any combination of conversion and redemption.

All amounts due under the Notes are convertible at any time, in whole or in part, at the holder's option, into A ordinary shares at the initial conversion price of $14.6875. The conversion price is subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the conversion of a Note will also be adjusted so that the aggregate conversion price shall be the same immediately before and immediately after any such adjustment. In addition, the conversion price is also subject to an anti-dilution adjustment if the Company issues or is deemed to have issued securities at a price lower than the then applicable conversion price. Further, if the Company sells or issues any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a Note will have the right thereafter to substitute the "floating" conversion price for the conversion price upon conversion of all or part the Note.

The Notes require "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon conversion.

On or after December 6, 2019, and subject to certain conditions, the Company will have the right to redeem all, but not less than all, of the remaining principal amount of the Notes and all accrued and unpaid interest and late charges in cash at a price equal to 100% of the amount being redeemed, so long as the VWAP the A ordinary shares exceeds $18.3594 (as adjusted for stock splits, stock dividends, recapitalizations and similar events) for at least 10 consecutive trading days. At any time prior to the date of the redemption, a holder may convert its Note, in whole or in part, into A ordinary shares. The Company will have no right to effect an optional redemption if any event of default has occurred and is continuing.

*The Warrants*

The Warrants will entitle the holders thereof to purchase, in the aggregate, up to 2,000,000 A ordinary shares. The Warrants will be exercisable upon their issuance and will expire six months from the Closing Date. The Warrants will initially be exercisable at an exercise price equal to $14.375 per A ordinary shares, subject to certain adjustments. The

Warrants may be exercised for cash, provided that, if there is no effective registration statement available registering the exercise of the Warrants, the Warrants may be exercised on a cashless basis.

The exercise price is subject to adjustment for stock splits, combinations and similar events, and, in any such event, the number of A ordinary shares issuable upon the exercise of a Warrant will also be adjusted so that the aggregate exercise price shall be the same immediately before and immediately after any such adjustment. In addition, the exercise price is also subject to an anti-dilution adjustment if the Company issues or is deemed to have issued securities at a price lower than the then applicable exercise price. Further, if the Company sells or issues any securities with "floating" conversion prices based on the market price of the A ordinary shares, a holder of a Warrant will have the right thereafter to substitute the "floating" conversion price for the exercise price upon exercise of all or part the Warrant.

The Warrants require "buy-in" payments to be made by the Company for failure to deliver any A ordinary shares issuable upon exercise.

The option to purchase warrants has expired in June 2018.

104

We have not entered into any other material contracts other than in the ordinary course of business and other than those described in "Part I —Item 4.—Information on the Company" or elsewhere in this Annual Report on Form 20-F.

## D. Exchange Controls

No foreign exchange control regulations are in existence in the Isle of Man in relation to the exchange or remittance of sterling or any other currency from the Isle of Man and no authorizations, approvals or consents will be required from any authority in the Isle of Man in relation to the exchange and remittance of sterling and any other currency whether awarded by reason of a judgment or otherwise falling due and having been paid in the Isle of Man.

## E. Taxation

### Summary of Material Indian Tax Considerations

The discussion contained herein is based on the applicable tax laws of India as in effect on the date hereof and is subject to possible changes that may come into effect after such date. The information set forth below is intended to be a general discussion only. Prospective investors should consult their own tax advisers as to the consequences of purchasing the A ordinary shares, including, without limitation, the consequences of the receipt of dividend and the sale, transfer or disposition of the ordinary shares.

### i) Direct Tax:

**Indirect Transfer:**

Based on the fact that we are considered for tax purposes as a company domiciled abroad, any dividend income in respect of ordinary shares will not be subject to any withholding or deduction under the Indian income tax laws. As per the provisions of the Indian Income Tax Act, 1961, income arising directly or indirectly through the sale of a capital asset, including any share or interest in a company or entity registered or incorporated outside India, will be liable to tax in India, if such share or interest derives, directly or indirectly, its value substantially from assets located in India, whether or not the seller of such share or interest has a residence, place of business, business connection, or any other presence in India, if, on the specified date, the value of such assets (i) represents at least 50% of the value of all assets owned by the company or entity, and (ii) exceeds the amount of 100 million rupees. However, the impact of the above indirect transfer provisions would need to be separately evaluated under the tax treaty scenario.

**Dividend Distribution Tax:**

Further, dividend payments to us by our Indian subsidiaries are made after subjecting such payments to dividend distribution tax in India, at an effective rate of 20.56%, including applicable cess and surcharge.

**Equalization Levy:**

An equalization levy or EL in respect of e-commerce transactions has been introduced in India with effect from June 1, 2016. EL is to be deducted in respect of payments towards "specified services" (in excess of Indian Rupees 100,000). A "Specified service" means online advertisement, any provision for digital advertising space or any other facility or service for the purpose of online advertisement and includes any other service as may be notified. Deduction of EL at the rate of six per cent (on a gross basis) is the responsibility of Indian residents / non-residents having a permanent establishment or PE in India on payments to non-residents (not having a PE in India). Consequently, if a non-resident (not having a PE in India) earns income towards a "specified service" which is chargeable to EL, then the same would be exempt in the hands of non-resident company.

**Place of Effective Management:**

The concept of Place of Effective Management or POEM is introduced for the purpose of determining the tax residence of overseas companies in India. The POEM is defined to mean a place where key management and commercial decisions that are necessary for the conduct of the business of an entity as a whole are in substance made. This could have significant impact on the foreign companies holding board meeting(s) in India, having key managerial personnel located in India, having regional headquarters located in India, etc. In the event the POEM of a foreign company is considered to be situated in India and consequently, it becomes tax resident in India, its global income would be taxable in India (even if it is not earned in India).

105

**Income Computation and Disclosure Standards:**

With the adoption of Indian Accounting Standards (Ind AS), India now has two financial reporting frameworks (i.e. Ind AS and Indian GAAP) that will co-exist and be applicable to mutually exclusive set of companies. The existence of two financial reporting frameworks has also necessitated a response from the tax authorities to ensure that there is horizontal equity from a taxation point of view, for companies, irrespective of the financial reporting framework they follow. To meet this objective, the Government of India has issued revised Income Computation and Disclosure Standards ("ICDS") that are applicable in computing taxable income and payment of income taxes thereon with effect from the assessment period for the fiscal year 2017. ICDS are applicable to all taxpayers following an accrual system of accounting for the purpose of computation of income under the heads of "profits and gains of business or profession" and "income from other sources". The provisions of ICDS are to be considered while computing the tax liability of the Company.

ICDS do not cover the issue relating to computation of Minimum Alternate Tax (MAT), which is based on book profits, for companies transitioning to Ind AS. In response to this need, the Finance Act, 2017 amended the provisions of the Income Tax Act, 1961, in order to provide a mechanism for computation of book profits for Ind AS compliant companies for the purpose of levy of MAT.

**General Anti Avoidance Rules:**

The General Anti Avoidance Rules ("GAAR") have come into effect from financial year 2017-18. The tax consequences of the GAAR provisions being applied to an arrangement could result in denial of tax benefit under the domestic tax laws and under a tax treaty, amongst other consequences. In the absence of any precedents on the subject, the application of these provisions is uncertain.

**Multilateral Instrument:**

The Organization of Economic Co-operation and Development (OECD) released the final package of all Action Plans of the Base Erosion and Profit Shifting (BEPS) project in October 2015. India is a member of G20 and active participant in the BEPS project. The BEPS project lead to a series of measures being developed across several actions such as the digital economy, treaty abuse, design of Controlled Foreign Company Rules, intangibles, country-by-country reporting, preventing artificial avoidance of PE status, improving dispute resolution etc. Several of these measures required implementation through changes in domestic law. As regards those measures which required implementation through changes to bilateral treaties, it was felt that a Multilateral Convention (MLI) that modified the existing bilateral treaty network would be preferable as it would ensure speed and consistency in implementation. Accordingly, MLI was introduced to incorporate treaty related measures identified as part of the final BEPS measures in relation to:

– Neutralising the effects of hybrid mismatch arrangements;
– Preventing the granting of treaty benefits in inappropriate circumstances;
– Preventing the artificial avoidance of Permanent Establishment status;
– Making dispute resolution mechanisms more effective.

India has signed the MLI to implement tax treaty related measures to prevent BEPS, on 7 June 2017. The MLI will operate to modify the existing tax treaties entered into between various countries.

**Significant Economic Presence:**

Given the digital age, the need for physical presence in decision making is steeply reducing giving way to interaction by way of technology. Having regard to the report of OECD on BEPS Action Plan 1, an amendment has been made vide Finance Act 2018 whereby 'significant economic presence' shall also constitute 'business connection' in India. Significant economic presence shall mean to include:

• Transactions of goods, services or property (including downloading of data or software) by a nonresident in India;
• Non-residents involved in systematic and continuous soliciting of business activities or engaging with users in India;
• Attribution shall be restricted to such aforesaid transactions and / or business activities / users in India

The threshold of payments received and number of users (mentioned in the aforesaid conditions) shall be prescribed by the Central Board of Direct Taxes (CBDT) in due course only after which one will be able to gauge the impact of this

expansion in the provision.

Further, unless corresponding modifications to PE rules are made in tax treaties, the existing treaty rules will apply. Accordingly, the above provisions would need to be separately evaluated under the tax treaty scenario.

**Transfer Pricing – Country-by-Country reporting:**

Additionally, in relation to transfer pricing, pursuant to the Finance Act, 2016, a three tiered transfer pricing documentation structure was introduced in India, consisting of a master file, a local file and a country-by-country report. Such a structure is in line with the recommendations contained in the action plan on the Base Erosion and Profit Shifting or BEPS project issued by the Organization of Economic Cooperation and Development or OECD in October 2015.

106

### ii) Indirect Tax

**Goods and Services Tax**

The historic launch of Goods and Services Tax ('GST') in India has finally seen light of the day on 1 July 2017. GST has subsumed all existing indirect taxes such as Excise Duty, Service Tax, Countervailing Duty (CVD), Value Added Tax (VAT), Entertainment Tax at State level, Entry Tax etc. into one tax i.e. GST. GST which is generally described as 'one tax for one nation' has in true sense unified India as one market. The implementation and roll-out of GST has brought about elimination of multiple taxes, simplified tax structure, fungibility of credits between goods and services and reduction of cascading effect thereby reducing overall incidence of tax. While the GST implementation is expected to bring in tax efficiencies in to the economy, the journey so far into the GST regime has had its share of challenges. Some of the major challenges were the initial glitches in the technology and GST network, issues faced by exporters for export without payment of taxes, claiming of credits, coping up with the multiple compliance requirements, etc.

Under GST regime, though the entertainment tax which under earlier regime was levied by state governments in most of the states has been subsumed under GST, in certain states the local authorities have been given powers to levy and collect taxes on entertainment. This may be said to be a back door entry by state governments to levy taxes on entertainment. However, to what extent such local authorities will levy entertainment taxes will have to be awaited.

GST council, which has been the backbone of successful GST implementation, has been undertaking number of steps and initiatives to streamline transition into GST regime. Such initiatives majorly include simplifying GST return filing process, proposed to introduce concession in GST rates to incentivize promotion of digital payment, issuing various clarifications on law, etc.

Therefore, with the aforementioned developments under GST regime, the introduction of this biggest tax reform in India is expected to be worthwhile for the industry.

**Summary of Material Isle of Man Tax Considerations**

*Tax residence in the Isle of Man*

We are resident for taxation purposes in the Isle of Man by virtue of being incorporated in the Isle of Man.

*Capital taxes in the Isle of Man*

The Isle of Man has a regime for the taxation of income, but there are no taxes on capital gains, stamp taxes or inheritance taxes in the Isle of Man. No Isle of Man stamp duty or stamp duty reserve tax will be payable on the issue or transfer of, or any other dealing in, the A ordinary shares.

*Zero rate of corporate income tax in the Isle of Man*

The Isle of Man operates a zero rate of tax for most corporate taxpayers, including the Company. Under the regime, the Company will technically be subject to Isle of Man taxation on its income, but the rate of tax will be zero; there will be no required withholding by the Company on account of Isle of Man tax in respect of dividends paid by the Company.

The Company will be required to pay an annual return fee of £380 (US $495) per year.

*Isle of Man probate*

In the event of death of a sole, individual holder of the A ordinary shares, an Isle of Man probate fee or administration may be required, in respect of which certain fees will be payable to the Isle of Man government, subject to the fee. Currently the maximum fee, where the value of an estate exceeds £1,000,000 (US $1,300,000) is approximately £8,000 (US $10,400).

**Summary of Material United States Federal Income Tax Considerations**

The following summary describes the material United States federal income tax consequences associated with the acquisition, ownership and disposition of our A ordinary shares as of the date hereof. The discussion set forth below is applicable only to U.S. Holders (as defined below) and does not purport to be a comprehensive description of all tax considerations that may be relevant to a particular person's decision to acquire the A ordinary shares.

Except where noted, this summary applies only to a U.S. Holder that holds A ordinary shares as capital assets for United States federal income tax purposes. As used herein, the term "U.S. Holder" means a beneficial owner of a share that is for United States federal income tax purposes:

- an individual citizen or resident of the United States;
- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

107

- an estate the income of which is subject to United States federal income taxation regardless of its source; or
- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This summary does not describe all of the United States federal income tax consequences applicable to you if you are subject to special treatment under the United States federal income tax laws, including if you are a broker, a dealer or trader in securities or currencies, a financial institution, a regulated investment company, a real estate investment trust, a cooperative, an insurance company, a pension plan, a tax-exempt entity, a person holding our A ordinary shares as part of a hedging, integrated or conversion transaction, a constructive sale, a wash sale or a straddle, a person liable for alternative minimum tax, a person who owns or is deemed to own 10% or more of our voting stock, a person holding our A ordinary shares in connection with a trade or business conducted outside of the United States, a partnership or other pass-through entity for United States federal income tax purposes, a U.S. expatriate or a person whose "functional currency" for United States federal income tax purposes is not the United States dollar. The discussion below is based upon the provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), and regulations (including proposed regulations), rulings and judicial decisions thereunder as of the date hereof, and such authorities may be replaced, revoked or modified, possibly with retroactive effect, so as to result in United States federal income tax consequences different from those discussed below.

If a partnership (or other entity treated as a partnership for United States federal income tax purposes) holds our A ordinary shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership holding our A ordinary shares or a partner of a partnership holding our A ordinary shares, you should consult your tax advisors as to the particular United States federal income tax consequences of acquiring, holding and disposing of the A ordinary shares.

This discussion does not contain a detailed description of all the United States federal income tax consequences to you in light of your particular circumstances and does not address estate and gift taxes or the effects of any state, local or non-United States tax laws. If you are considering the purchase, ownership or disposition of our A ordinary shares, you should consult your own tax advisors concerning the United States federal income tax consequences to you in light of your particular situation as well as any other consequences to you arising under U.S. federal, state and local laws and the laws of any other applicable taxing jurisdiction in light of your particular circumstances.

*Taxation of Distributions*

Subject to the discussion under "—Passive Foreign Investment Company" below, the gross amount of distributions on the A ordinary shares will be taxable as dividends to the extent paid out of our current or accumulated earnings and profits, as determined under United States federal income tax principles. Because we do not expect to keep track of earnings and profits in accordance with United States federal income tax principles, you should expect that a distribution in respect of the A ordinary shares will generally be treated and reported as a dividend to you. Such dividend income will be includable in your gross income as ordinary income on the day actually received by you or on the day received by your nominee or agent that holds the A ordinary shares on your behalf. Such dividends will not be eligible for the dividends received deduction allowed to corporations in respect of dividends received from other U.S. corporations under the Code.

With respect to non-corporate U.S. Holders, certain dividends received from a qualified foreign corporation may be subject to reduced rates of taxation. A foreign corporation is treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares that are readily tradable on an established securities market in the United States. Our A ordinary shares are listed on the NYSE and we expect such shares to be considered readily tradable on an established securities market, although there can be no assurance that our A ordinary shares will continue to be readily tradable on an established securities market in later years. However, even if the A ordinary shares are readily tradable on an established securities market in the United States, we will not be treated as a qualified foreign corporation if we are a passive foreign investment company, or PFIC, for the taxable year in which we pay a dividend or were a passive foreign investment company, or PFIC, for the preceding taxable year. Non-corporate holders that do not meet a minimum holding period

requirement during which they are not protected from a risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) (B) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. For this purpose, the minimum holding period requirement will not be met if a share has been held by a holder for 60 days or less during the 121-day period beginning on the date which is 60 days before the date on which such share becomes ex-dividend with respect to such dividend, appropriately reduced by any period in which such holder is protected from risk of loss. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. You should consult your own tax advisors regarding the availability of the reduced tax rate on dividends in light of your particular circumstances.

108

Subject to certain conditions and limitations imposed by United States federal income tax rules relating to the availability of the foreign tax credit, some of which vary depending upon the U.S. Holder's circumstances, any foreign withholding taxes on dividends will be treated as foreign taxes eligible for credit against your United States federal income tax liability. The application of the rules governing foreign tax credits depends on the particular circumstances of each U.S. Holder. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For purposes of calculating the foreign tax credit, dividends paid on the A ordinary shares will be treated as income from sources outside the United States and will generally constitute "passive category income." Further, in certain circumstances, you will not be allowed a foreign tax credit for foreign taxes imposed on certain dividends paid on the A ordinary shares if you:

·    have held A ordinary shares for less than a specified minimum period during which you are not protected from risk of loss, or

·    are obligated to make certain payments related to the dividends.

The rules governing the foreign tax credit are complex and involve the application of rules that depend on your particular circumstances. You are urged to consult your tax advisors regarding the availability of the foreign tax credit under your particular circumstances.

***Passive Foreign Investment Company***

Based on the composition of our income and valuation of our assets, we do not believe we will be a PFIC for United States federal income tax purposes for the 2018 taxable year, and we do not expect to become one in the future. However, because PFIC status is an annual factual determination that cannot be made until after the close of each taxable year and depends on the composition of a company's income and assets and the market value of its assets from time to time, there can be no assurance that we will not be a PFIC for any taxable year.

In general, a non-United States corporation will be treated as a PFIC for U.S. federal income tax purposes for any taxable year in which:

·    at least 75% of its gross income is passive income, or

·    at least 50% of the value (determined based on a quarterly average) of its gross assets is attributable to assets that produce, or are held for the production of, passive income.

For this purpose, passive income generally includes dividends, interest, royalties and rents (except for certain royalties and rents derived from the active conduct of a trade or business), certain gains from commodities and securities transactions and the excess of gains over losses from the disposition of assets which produce passive income.

If we own, directly or indirectly, at least 25% (by value) of the stock of another corporation, we will be treated, for purposes of the PFIC tests described above, as directly owning our proportionate share of the other corporation's assets and receiving our proportionate share of the other corporation's income.

If we are a PFIC for any taxable year during which you hold our A ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" received and any gain realized from a sale or other disposition, including a pledge, of A ordinary shares, unless you make a "mark-to-market" election as discussed below.

Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the A ordinary shares (before the current taxable year) and gain realized on disposition of the A ordinary shares will be treated as excess distributions. Under these special tax rules:

·    the excess distribution or gain will be allocated ratably over your holding period for your A ordinary shares,

·    the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and

·    the amount allocated to each other year will be subject to tax at the highest applicable tax rate in effect for corporations or individuals, as appropriate, for that taxable year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

The tax liability for amounts allocated to years prior to the year of an "excess distribution," (including a disposition) cannot

be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the A ordinary shares cannot be treated as capital and will be subject to the "excess distribution" regime described above, even if you hold the A ordinary shares as capital assets.

In addition, as explained above under "—Taxation of Distributions," non-corporate U.S. Holders will not be eligible for reduced rates of taxation on any dividends received from us if we are a PFIC in our taxable year in which such dividends are paid or in the preceding taxable year.

109

If we are a PFIC for any taxable year during which you own our A ordinary shares, we will generally continue to be treated as a PFIC with respect to you for all succeeding years during which you own our A ordinary shares, even if we cease to meet the threshold requirements for PFIC status.

You will be required to file Internal Revenue Service Form 8621(a) annually if the aggregate value of all your directly owned PFIC shares on the last day of the taxable year is more than $25,000 ($50,000 on a joint return) or if you are deemed to own indirectly more than $5,000 in value of any PFIC shares owned by us; (b) you receive distributions on the A ordinary shares or realize any gain on the disposition of the A ordinary shares or (c) if you have made a mark-to market election (as described below). Other reporting requirements may apply. You are urged to consult your tax advisors regarding Form 8621 and other information reporting requirements if we are considered a PFIC in any taxable year.

If we are a PFIC for any taxable year during which a U.S. Holder holds our A ordinary shares and any of our non-United States subsidiaries is also a PFIC, a U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules.

Under these circumstances, a U.S. Holder would be subject to United States federal income tax on (i) a distribution on the shares of a lower-tier PFIC and (ii) a disposition of shares of a lower-tier PFIC, both as if such U.S. Holder directly held the shares of such lower-tier PFIC. You are urged to consult your tax advisors about the application of the PFIC rules to any of our subsidiaries.

In certain circumstances, in lieu of being subject to the excess distribution rules discussed above, you may make an election to include gain on the stock of a PFIC as ordinary income under a mark-to-market method, provided that such stock is regularly traded in other than de minimis quantities for at least 15 days during each calendar quarter on a qualified exchange, as defined in applicable U.S. Treasury Regulations. Our A ordinary shares are listed on the NYSE and we expect such shares to be "regularly traded" for purposes of the mark-to-market election.

If you make an effective mark-to-market election, you will include in each year that we are a PFIC, as ordinary income the excess of the fair market value of your A ordinary shares at the end of the year over your adjusted tax basis in the A ordinary shares. You will be entitled to deduct as an ordinary loss in each such year the excess of your adjusted tax basis in the A ordinary shares over their fair market value at the end of the year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election, although no assurance can be given that a mark-to-market election will be available to U.S. Holders.

If you make an effective mark-to-market election, any gain you recognize upon the sale or other disposition of your A ordinary shares in a year in which we are a PFIC will be treated as ordinary income. Any loss will be treated as ordinary loss, but only to the extent of the net amount of previously included income as a result of the mark-to-market election.

Your adjusted tax basis in the A ordinary shares will be increased by the amount of any income inclusion and decreased by the amount of any deductions under the mark-to-market rules. If you make a mark-to-market election, it will be effective for the taxable year for which the election is made and all subsequent taxable years unless the A ordinary shares are no longer regularly traded on a qualified exchange or the Internal Revenue Service consents to the revocation of the election. A mark-to-market election should be made by filing IRS Form 8621 in the first taxable year during which the U.S. Holder held the A ordinary shares and in which we are a PFIC. A mark-to-market election would not be available with respect to a subsidiary PFIC of ours that a U.S. Holder is deemed to own for the purposes of the PFIC rules; accordingly, a U.S. Holder would not be able to mitigate certain of the adverse U.S. "excess distribution" federal income tax consequences of its deemed ownership of stock in our subsidiary PFICs by making a mark-to-market election. You are urged to consult your tax advisor about the availability of the mark-to-market election and whether making the election would be advisable in your particular circumstances.

Alternatively, holders of PFIC shares can sometimes avoid the rules described above by electing to treat such PFIC as a "qualified electing fund" under Section 1295 of the Code. However, this option is not available to you because we do not intend to comply with the requirements, or furnish you with the information, necessary to permit you to make this election.

You are urged to consult your tax advisors concerning the United States federal income tax consequences of holding A ordinary shares if we are considered a PFIC in any taxable year.

110

***Sale or Other Disposition of A Ordinary Shares***

For United States federal income tax purposes, you will recognize taxable gain or loss on any sale or exchange or other taxable disposition of a A ordinary share in an amount equal to the difference between the amount realized for the share and your tax basis in the A ordinary share, in each case as determined in United States dollars. Subject to the discussion above under "Passive Foreign Investment Company," such gain or loss will be capital gain or loss. Capital gains of non-corporate U.S. Holders derived with respect to capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

Any gain or loss recognized by you will generally be treated as United States source gain or loss for U.S. foreign tax credit purposes. You are encouraged to consult your tax advisor regarding the availability of the U.S. foreign tax credit in your particular circumstances.

***Information Reporting and Backup Withholding***

In general, information reporting will apply to distributions in respect of our A ordinary shares and the proceeds from the sale, exchange or redemption of our A ordinary shares that are paid to you within the United States or through certain U.S.-related financial intermediaries, unless you are an exempt recipient. Backup withholding may apply to such payments if you fail to (i) provide a correct taxpayer identification number or (ii) certify that you are not subject to backup withholding. U.S. Holders who are required to establish their exemption from backup withholding must provide us or our withholding agent such certification on a properly completed Internal Revenue Service Form W-9. U.S. Holders should consult their tax advisors regarding the application of the United States information reporting and backup withholding rules.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the Internal Revenue Service.

Certain U.S. Holders who hold "specified foreign financial assets," including shares of a non-U.S. corporation that are not held in an account maintained by a U.S. "financial institution," the aggregate value of which exceeds $50,000 (or other applicable amount) during the tax year, may be required to attach to their tax returns for the year IRS Form 8938 containing certain specified information. Significant penalties can apply if you are required to file this form and you fail to do so. You are urged to consult your tax advisors regarding this and other information reporting requirements relating to your ownership of the A ordinary shares.

***Medicare Tax***

Certain U.S. Holders that are individuals, estates or trusts will be subject to an additional 3.8% tax on all or a portion of their "net investment income," which may include all or a portion of their dividends and net gains from the disposition of A ordinary shares. Special rules apply to stock in a PFIC. If you are a U.S. Holder that is an individual, estate or trust, you should consult your tax advisors regarding the applicability of this tax to your income and gains in respect of your investment in the A ordinary shares.

**F. Dividends and Paying Agents**

Not applicable.

**G. Statement by Experts**

Not applicable.

**H. Documents on Display**

Publicly filed documents concerning our company which are referred to in this annual report may be inspected and copied at the public reference facilities maintained by the Commission at 100 F Street, N.E., Washington, D.C. 20549. Copies of these materials can also be obtained from the Public Reference Room at the Commission's principal office, 100 F Street, N.E., Washington D.C. 20549, after payment of fees at prescribed rates.

The Commission maintains a website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that make electronic filings through its Electronic Data Gathering, Analysis, and Retrieval, or EDGAR, system. We have made all our filings with the Commission using the EDGAR system.

**I. Subsidiary Information**

For more information on our subsidiaries, please see "Part I — Item 4. Information on the Company — C. Organizational Structure."

111

**ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to financial risks, including credit risk, interest rate risk, foreign currency risk and equity risk:

***Credit Risk***

Trading credit risk is managed on a country by country basis by the use of credit checks on new clients and individual credit limits, where appropriate, together with regular updates on any changes in the trading partner's situation. In a number of cases trading partners will be required to make advance payments or minimum guarantee payments before delivery of any goods. The Group reviews reports received from third parties and in certain cases as a matter of course reserve the right within the contracts it enters into to request an independent third – party audit of the revenue reporting. Further, in many of the catalogue sales, the trading partners have extended payment terms of up to a year and often fall behind contractual payment terms, thus payment cycle extends to 18 to 24 months. With respect to catalogue customers with a long trading history with the Group and who have contracted and paid significant amounts in the past without any prior history of bad debt, the Group closely monitors the same revised payment plans to assure collections. In case of new customer onboarding, the Group follows certain standard Know Your Client (KYC) procedures to ascertain financial stability of the counterparty and follows internal policies to not make ongoing sales to such new customers who are not reasonably current with their payments.

The credit risk on cash balances and derivative financial instruments is limited because the counterparties are banks with high credit ratings assigned by international credit rating agencies.

The Group from time to time will have significant concentration of credit risk in relation to individual theatrical releases, television syndication deals or music licenses. This risk is mitigated by contractual terms which seek to stagger receipts, de-recognition of financial assets and/or the release or airing of content. As at March 31, 2018, 20.5% (2017: 25.1%) of trade account receivables were represented by the top five debtors and for the year ended March 31, 2018, a loss on de-recognition of financial assets amounting to $3,562 (2017: Nil and 2016: Nil) arising on assignment and novation of trade receivable and trade payables with no recourse have been recognized in the statement of Income within other gains/ (losses), net. The maximum exposure to credit risk is that shown within the statements of financial position, net of credit impairment loss $10,193 (2017: $ Nil). The maximum credit exposure on financial guarantees given by the Group for various financial facilities is described in Note 33.

As at March 31, 2018, the Group did not hold any material collateral or other credit enhancements to cover its credit risks associated with its financial assets.

***Interest Rate Risk***

The Group is exposed to interest rate risk because entities in the Group borrow funds at both fixed and floating interest rates. The risk is managed by maintaining an appropriate mix between fixed, capped and floating rate borrowings, and by the use of interest rate swap contracts and forward interest rate contracts. Hedging activities are evaluated to align with interest rate views to ensure the most cost effective hedging strategies are applied.

***Foreign Currency Risk***

We operate throughout the world with significant operations in India, the British Isles, the United States and the United Arab Emirates. As a result, we face both translation and transaction currency risks which are principally mitigated by matching foreign currency revenues and costs wherever possible.

A majority of our revenues are denominated in U.S. dollars, Indian Rupees and British Pounds Sterling, which are matched where possible to our costs so that these act as an automatic hedge against foreign currency exchange movements.

We have to date not entered into any currency hedging transactions, and we have managed foreign currency exposure to date by seeking to match foreign currency inflows and outflows to the extent possible.

A uniform decrease of 10% in exchange rates against all foreign currencies in position as of March 31, 2018 would have decreased our net income by approximately $5.9 million. An equal and opposite impact would be experienced in the event of an increase by a similar percentage. Our sensitivity to foreign currency has increased during the year ended March 31, 2018 as a result of an increase in the percentage of liabilities denominated in foreign currency over the comparative

period. As of March 31, 2018, 61.4% of our borrowings are denominated in foreign currency.

In management's opinion, the sensitivity analysis is not representative of the inherent foreign exchange risk because the exposure at the end of the reporting period does not reflect the exposure during the year.

112

*Equity Risk*

We are exposed to market risk relating to changes in the market value of our investments, which we hold for purposes other than trading. We invest in equity instruments of private companies for operational and strategic business reasons. These securities may be subject to significant fluctuations in fair market value due to volatility in the industries in which they operate. As at March 31, 2018, the aggregate value of all such equity investments was $27.3 million. For further discussion of our investments see Note 17 to our audited Consolidated Financial Statements appearing elsewhere in this Annual Report.

**ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES**

**A. Debt Securities**

Not applicable.

**B. Warrants and Rights**

Not applicable.

**C. Other Securities**

Not applicable.

**D. American Depository Shares**

Not applicable.

113

**PART II**

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES**

None.

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS**

Not applicable.

**ITEM 15. CONTROLS AND PROCEDURES**

As required by Rules 13a-15(e) and 15d-15(e) under the Exchange Act, management has evaluated, with the participation of our Group Chief Executive Officer and Group Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this annual report. Disclosure controls and procedures refer to controls and other procedures designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Commission. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding our required disclosure.

Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that, as at March 31, 2018, our disclosure controls and procedures were effective and provide a reasonable level of assurance.

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act.

Internal control over financial reporting refers to a process designed by, or under the supervision of, our Group Chief Executive Officer and Group Chief Financial Officer and effected by our Board of Directors, management and other personnel, to provide reasonable assurance to our management and Board of Directors regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

·    pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

·    provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and members of our Board of Directors; and

·    provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate due to changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of internal control over financial reporting as at March 31, 2018, based on the criteria established in 2013 *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the above criteria, and as a result of this assessment, management concluded that, as at March 31, 2018, our internal control over financial reporting was effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

This annual report does not include an attestation report of our independent registered public accounting firm regarding internal controls over financial reporting because the Jumpstart Our Business Startups Act provides an exemption from such requirement as we qualify as an emerging growth company.

**Changes in Internal Control over Financial Reporting**

During the period covered by this report, no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act), have occurred that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

114

**ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT**

Our Audit Committee members are Mr. Dilip Thakkar (Chairman) and Mr. Shailendra Swarup. Both Mr. Thakkar and Swarup are an independent director pursuant to the applicable rules of the Commission and the NYSE. See "Part I — Item 6. Directors, Senior Management and Employees — A. Directors and Executive Officers" for the experience and qualifications of the members of the Audit Committee. Our Board of Directors has determined that Mr. Thakkar qualifies as an "audit committee financial expert" as defined in Item 16A of Form 20-F.

**ITEM 16B. CODE OF ETHICS**

We have adopted a written Code of Business Ethics and Conduct that is applicable to all of our directors, senior management and employees. We have posted the code on our website at *www.erosplc.com*. Information contained on our website does not constitute a part of this annual report. We will also make available a copy of the Code of Business Ethics and Conduct to any person, without charge, if a written request is made to Investor Relations at our offices at Unit 23, Sovereign Park, Coronation Road, Park Royal, London, NW10 7QP.

**ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

**Principal Accountant Fees and Services**

Grant Thornton India LLP has served as our independent public accountant for the fiscal years ended March 31, 2018, 2017, and 2016. The following table shows the fees we paid or accrued for the audit and other services provided by Grant Thornton India LLP and associated entities for the years ended March 31, 2018, 2017, and 2016.

|  | Fiscal | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Audit fees | $   816,000 | $   933,000 | $   1,203,000 |
| Tax fees | 27,000 | 45,000 | 45,000 |

**Notes:**

*Audit fees.* This category consists of fees billed for the audit of financial statements, quarterly review of financial statements and other audit services, which are normally provided by the independent auditors in connection with statutory and accounting matters that arose during, or as a result of, the audit or the review of interim financial statements and include the group audit; comfort letters and consents; attest services; and assistance with and review of documents filed with the Commission.

*Tax fees.* This category includes fees billed for tax audits.

**Audit Committee Pre-approval Process**

Our Audit Committee reviews and pre-approves the scope and the cost of all audit and permissible non-audit services performed by our independent auditor. All of the services provided by Grant Thornton India LLP and associated entities during the last fiscal year have been pre-approved by our Audit Committee.

**ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

As permitted by the rules of the U.S. Securities and Exchange Commission, our audit committee is currently comprised of two non-executives. We believe that our reliance on this exemption from the listing standards for audit committees does not materially adversely affect the ability of our audit committee to act independently.

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Neither we, nor any affiliated purchaser, made any purchase of our equity securities in fiscal year 2018.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

Not applicable.

**ITEM 16G. CORPORATE GOVERNANCE**

We have posted our Corporate Governance Guidelines on our website at *www.erosplc.com*. Information contained on our website does not constitute a part of this annual report.

As our shares are listed on the NYSE, we are subject to the NYSE listing standards. However, as a foreign private issuer, we will be exempt from complying with certain corporate governance requirements of the NYSE applicable to a U.S. issuer. Under NYSE rules applicable to us, we only need to:

- establish an independent audit committee that has responsibilities set out in the NYSE rules;
- provide prompt certification by our chief executive officer of any material non-compliance with any corporate governance rules of the NYSE;
- provide periodic (annual and interim) written affirmations to the NYSE with respect to our corporate governance practices; and
- include in our annual reports a brief description of significant differences between our corporate governance practices and those followed by U.S. companies.

We are currently in compliance with the current applicable NYSE corporate governance requirements for foreign private issuers.

We believe that our corporate governance practices do not differ in any significant way from those required to be followed by issuers incorporated in the United States under the NYSE listing standards, except that the Dodd-Frank Wall Street Reform and Consumer Protection Act generally provides shareholders of United States public companies with the right to cast three types of votes: (i) an advisory vote to approve the compensation of the named executive officers, (ii) an advisory vote on the frequency with which shareholders should be entitled to cast votes on the company's executive compensation, and (iii) an advisory vote to approve certain payments made in connection with an acquisition, merger or other specified corporate transaction. We, as a foreign private issuer, are not subject to these requirements and we do not adopt any such voting practices.

As a foreign private issuer, we are exempt from the rules under the Exchange Act governing the furnishing and content of proxy statements, and our directors, senior management and principal shareholders are exempt from the reporting and "short-swing profit" recovery provisions contained in Section 16 of the Exchange Act.

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

116

**PART III**

**ITEM 17. FINANCIAL STATEMENTS**

See "Part III — Item 18. Financial Statements" for a list of our consolidated financial statements included elsewhere in this annual report.

**ITEM 18. FINANCIAL STATEMENTS**

The following statements are filed as part of this annual report, together with the report of the independent registered public accounting firm:

·    Report of Independent Registered Public Accounting Firm Grant Thornton India LLP
·    Consolidated Statements of Financial Position as at March 31, 2018 and 2017
·    Consolidated Statements of Income for the years ended March 31, 2018, 2017, and 2016
·    Consolidated Statements of Comprehensive Income for the years ended March 31, 2018, 2017, and 2016
·    Consolidated Statements of Changes in Equity for the years ended March 31, 2018, 2017, and 2016
·    Consolidated Statements of Cash Flows for the years ended March 31, 2018, 2017, and 2016
·    Notes to Consolidated Financial Statements

117

**ITEM 19. EXHIBITS**

The following exhibits are filed as part of this annual report:

| Exhibit Number | Title | |
|---|---|---|
| 1.1 | Memorandum of Association | (c) |
| 1.2 | Articles of Association | (c) |
| 2.1 | Form of A Share Certificate | (d) |
| 4.1 | Relationship Agreement, dated as of December 16, 2009, between Eros International Media Limited, the Company and Eros Worldwide FZ-LLC | (b) |
| 4.2 | Shareholders' Agreement, dated as of January 13,2007, between Eros Multimedia Private Limited and The Group and Big Screen Entertainment Private Limited | (b) |
| 4.3 | Shareholders' Agreement for Ayngaran International Limited, dated as of July 11,2007 | (b) |
| 4.4 | Employment Agreement of Sunil Lulla as Executive Vice Chairman of Eros International Medial Limited, dated September 29, 2009 | (b) |
| 4.5 | Service Agreement of Prem Parameswaran as Chief Financial Officer and President of North America and Group Chief Financial Officer, dated May 26, 2015 | (f) |
| 4.6 | Service Agreement of Kishore Lulla, dated February 17, 2016 | (g) |
| 4.7 | Service Agreement of Vijay Ahuja as Vice Chairman and President (International) dated June 27, 2006 | (b) |
| 4.8 | Rules of the Eros International Plc Bonus Share Plan Unapproved Option Scheme 2006, dated May 17, 2006 | (b) |
| 4.9 | Credit Facility, dated January 5, 2012, between Eros International Plc, Citibank, N.A., London Branch, Lloyds TSB Bank Plc and the Royal Bank of Scotland Plc, with Lloyds TSB Bank Plc as Facility Agent, in the original principal amount of $125 million | (b) |
| 4.10 | Increase Confirmation, dated January 12, 2012, from UBS AG, Singapore Branch, to Lloyds TSB Bank Plc as Facility Agent and Eros International Plc | (b) |
| 4.11 | IPO Plan Form of Option Agreement | (d) |
| 4.12 | Eros International Media Pvt. Ltd. ESOP 2009 | (c) |
| 4.13 | Form of Joint Share Ownership Deed Measured By Total Share Return | (c) |
| 4.14 | Form of Joint Share Ownership Deed Measured By Super Total Share Return | (c) |
| 4.15 | Form of Joint Share Ownership Deed Measured By Earnings Per Share | (c) |
| 4.16 | Employee Benefit Trust Deed | (c) |
| 4.17 | Form of Option Agreement for Option Awards Approved April 17, 2012 | (d) |
| 4.18 | Service Agreement of Jyoti Deshpande as Group Chief Executive Officer and Managing Director of Eros International Plc, date September 5, 2013 | (e) |
| 4.19 | Letter agreement for Employment between Eros International PLC, Eros Digital FZ LLC and Jyoti Deshpande dated February 17, 2016. | (g) |
| 4.20 | Employment Agreement of Jyoti Deshpande as Executive Director of Eros International Media Limited, dated August 29, 2013 | (d) |
| 4.21 | Service Agreement of Vijay Ahuja as Executive Director of Eros International Pte Ltd, dated April 1, 2013 | (d) |
| 4.22 | Service Agreement of Pranab Kapadia as President – Europe & Africa of Eros International Ltd., dated December 1, 2007 | (d) |

118

| Exhibit Number | Title | |
|---|---|---|
| 4.23 | Amended and Restated Service Agreement of Rishika Lulla Singh as Chief Executive Officer – Eros Digital FZ LLC, dated February 17, 2016 | (g) |
| 4.24 | Service Agreement of Mark Carbeck as Chief Corporate and Strategy Officer, dated April 3, 2014 | (g) |
| 4.25 | Service Agreement of David Maisel as Non-Executive Director, dated February 13, 2015 | (f) |
| 4.26 | Service Agreement of Rajeev Misra as Non-Executive Director, dated June 17, 2015 | (f) |
| 4.27 | Form of 2014 Option Agreement for Option Awards | (f) |
| 4.28 | Form of 2015 Option Agreement for Option Awards | (f) |
| 4.29 | Trust Deed constituting the £50 million 6.50% Bonds due 2021, dated October 15, 2014 | (f) |
| 4.30 | Amended Credit Agreement, between Eros International Plc, Citibank, N.A., London Branch, Lloyds TSB Bank Plc and the Royal Bank of Scotland Plc, dated February 12, 2015 | (f) |
| 4.31 | Form of Increase Confirmation, dated July 31, 2013, from HSBC Bank Plc to Lloyds TSB Bank Plc as Facility agent and Eros International Plc | (d) |
| 4.32 | Relationship Agreement dated as of September 20, 2016 between Eros International Media Limited and Eros Worldwide FZ LLC | (h) |
| 4.33 | Form of Indenture between the Company and Wilmington Savings Fund Society, FSB, as trustee | (i) |
| 4.34 | Form of Supplementary Indenture between the Company and Wilmington Savings Fund Society, FSB, as trustee | (i) |
| 4.35 | Form of Senior Convertible Note (included as Exhibit A to Exhibit 4.34 hereto) | (i) |
| 4.36 | Form of Warrant | (i) |
| 8.1 | Subsidiaries of Eros International Plc | (a) |
| 10.1 | Form of Securities Purchase Agreement | (i) |
| 12.1 | Certification of Principal Executive Officer Pursuant to Rule 13a-14(a)/15d-14(a) | (a) |
| 12.2 | Certification of Principal Financial Officer Pursuant to Rule 13a-14(a)/15d-14(a) | (a) |
| 13.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350 | (a) |
| 13.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350 | (a) |
| 15.2 | Consent to Use of Federation of Indian Chambers of Commerce and Industry – Indian Media and Entertainment Industry Reports | (a) |
| 101.INS | XBRL Instance Document | (a) |
| 101.SCH | XBRL Taxonomy Extension Schema Document | (a) |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | (a) |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | (a) |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | (a) |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | (a) |

---

(a)    Filed herewith

(b)    Previously filed on March 30, 2012 as an exhibit to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(c)    Previously filed on April 24, 2012 as an exhibit to Amendment No. 1 to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(d)    Previously filed on October 29, 2013 as an exhibit to Amendment No. 5 to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(e)    Previously filed on November 5, 2013 as an exhibit to Amendment No. 6 to the Company's Registration Statement on Form F-1 (File No. 333-180469) and incorporated herein by reference.

(f)    Previously filed on July 8, 2015 as an exhibit to the Company's Annual Report on Form 20-F and incorporated herein by reference.

(g)    Previously filed on July 27, 2016 as an exhibit to the Company's Annual Report on Form 20-F and incorporated herein by reference.

(h)    Previously filed on July 31, 2017 as an exhibit to the Company's Annual Report on Form 20-F and incorporated herein by reference.

(i)    Previously filed on December 4, 2017 as an exhibit to the Company's Current report on Form 6-K and incorporated herein by reference.

119

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: July 31, 2018                                    EROS INTERNATIONAL PLC

By:        */s/ Prem Parameswaran*

Name:    Prem Parameswaran

Title:    President of North America & Group Chief Financial
            Officer

120

**EROS INTERNATIONAL PLC**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm Grant Thornton India LLP | F-2 |
| Consolidated Statements of Financial Position as of March 31, 2018 and 2017 | F-3 |
| Consolidated Statements of Income for the years ended March 31, 2018, 2017 and 2016 | F-4 |
| Consolidated Statements of Comprehensive Income for the years ended March 31, 2018, 2017 and 2016 | F-5 |
| Consolidated Statements of Cash Flows for the years ended March 31, 2018, 2017 and 2016 | F-6 |
| Consolidated Statements of Changes in Equity for the years ended March 31, 2018, 2017 and 2016 | F-8 |
| Notes to the Consolidated Financial Statements | F-11 |

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders

Eros International PLC

Opinion on Financial Statements

We have audited the accompanying consolidated statements of financial position of Eros International PLC and its subsidiaries (the "Company") as of March 31, 2018 and 2017, and the related consolidated statements of income, comprehensive income, changes in equity, and cash flows for each of the three years in the period ended March 31, 2018, and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2018 and 2017, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2018, in conformity with International Financial Reporting Standards, as issued by the International Accounting Standards Board.

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. As a part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ Grant Thornton India LLP

We have served as the Company's auditor since 2013.

Mumbai, India

July 31, 2018

F-2

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF FINANCIAL POSITION**
**AS AT MARCH 31, 2018 AND 2017**

| | Note | As at March 31 | |
| | | 2018 | 2017 |
|---|---|---|---|
| | | (in thousands) | |
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property and equipment | 13 | $ 10,013 | $ 10,354 |
| Goodwill | 14 | 3,800 | 4,992 |
| Intangible assets — trade name | 14 | 14,000 | 14,000 |
| Intangible assets — content | 15 | 998,543 | 904,628 |
| Intangible assets — others | 16 | 5,280 | 4,360 |
| Available-for-sale financial assets | 17 | 27,257 | 29,613 |
| Trade and other receivables | 19 | 9,144 | 11,443 |
| Income tax receivable | | 1,269 | 1,051 |
| Restricted deposits | | 1,100 | 335 |
| Deferred income tax assets | 11 | 351 | 112 |
| **Total non-current assets** | | $ 1,070,757 | $ 980,888 |
| **Current assets** | | | |
| Inventories | 18 | $ 353 | $ 214 |
| Trade and other receivables | 19 | 245,079 | 242,762 |
| Current income tax receivable | | — | 253 |
| Cash and cash equivalents | 21 | 87,762 | 112,267 |
| Restricted deposits | | 6,368 | 6,981 |
| **Total current assets** | | 339,562 | 362,477 |
| **Total assets** | | $ 1,410,319 | $ 1,343,365 |
| **LIABILITIES** | | | |
| **Current liabilities** | | | |
| Trade and other payables | 20 | $ 72,142 | $ 120,082 |
| Acceptances | 24 | 8,898 | 8,935 |
| Short-term borrowings | 23 | 151,963 | 180,029 |
| Current income tax payable | | 6,324 | 7,055 |
| **Total current liabilities** | | $ 239,327 | $ 316,101 |
| **Non-current liabilities** | | | |
| Long-term borrowings | 23 | $ 124,983 | $ 89,841 |
| Other long - term liabilities | 25 | 3,073 | 5,349 |
| Derivative financial instruments | 26 | — | 12,553 |
| Deferred income tax liabilities | 11 | 39,519 | 35,973 |
| **Total non-current liabilities** | | $ 167,575 | $ 143,716 |
| **Total liabilities** | | $ 406,902 | $ 459,817 |
| **EQUITY** | | | |
| Share capital | 27 | $ 35,334 | $ 31,877 |
| Share premium | | 453,997 | 399,686 |
| Reserves | | 422,992 | 436,997 |
| Other components of equity | 30 | (48,649) | (48,118) |

| | | | | | |
|---|---|---|---|---|---|
| JSOP reserve | 29 | | (15,985) | | (15,985) |
| Share application money pending allotment | | | 18,000 | | — |
| **Equity attributable to equity holders of Eros International Plc** | | $ | **865,689** | $ | **804,457** |
| Non-controlling interest | 37 | | 137,728 | | 79,091 |
| **Total equity** | | $ | **1,003,417** | $ | **883,548** |
| **Total liabilities and shareholder's equity** | | $ | **1,410,319** | $ | **1,343,365** |

The accompanying notes form an integral part of these consolidated financial statements.

F-3

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF INCOME**
**FOR THE YEARS ENDED MARCH 31, 2018, 2017 AND 2016**

| | Note | Year ended March 31 | | |
| --- | --- | --- | --- | --- |
| | | 2018 | 2017 | 2016 |
| | | (in thousands, except per share amounts) | | |
| **Revenue** | 5 | $ 261,253 | $ 252,994 | $ 274,428 |
| Cost of sales | 6 | (134,708) | (164,240) | (172,764) |
| **Gross profit** | | 126,545 | 88,754 | 101,664 |
| Administrative costs | 6 | (68,029) | (63,309) | (64,019) |
| **Operating profit** | | 58,516 | 25,445 | 37,645 |
| Finance costs | 8 | (19,668) | (19,521) | (13,719) |
| Finance income | 8 | 1,855 | 2,365 | 5,709 |
| Net finance costs | 8 | (17,813) | (17,156) | (8,010) |
| Other gains/(losses), net | 9 | (41,321) | 14,205 | (3,636) |
| **(Loss)/Profit before tax** | | (618) | 22,494 | 25,999 |
| Income tax expense | 10 | (9,127) | (11,039) | (12,711) |
| **(Loss)/Profit for the year** | | $ (9,745) | $ 11,455 | $ 13,288 |
| **Attributable to:** | | | | |
| Equity holders of Eros International Plc | | $ (22,575) | $ 3,805 | $ 3,797 |
| Non-controlling interest | | 12,830 | 7,650 | 9,491 |
| | | $ (9,745) | $ 11,455 | $ 13,288 |
| **(Loss)/Earnings per share (cents)** | | | | |
| Basic (loss)/earnings per share | 12 | (36.3) | 6.4 | 6.6 |
| Diluted (loss)/earnings per share | 12 | (36.3) | 5.1 | 5.2 |

The accompanying notes form an integral part of these consolidated financial statements.

F-4

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**FOR THE YEARS ENDED MARCH 31, 2018, 2017 AND 2016**

| | Year ended March 31 | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | (in thousands, except per share amounts) | | |
| **(Loss)/profit for the year** | $ (9,745) | $ 11,455 | $ 13,288 |
| **Other comprehensive income:** | | | |
| **Items that will not be subsequently reclassified to profit or loss** | | | |
| Revaluation of property and equipment (net of tax) | — | — | 328 |
| **Items that will be subsequently reclassified to profit or loss** | | | |
| Exchange differences on translating foreign operations | (1,153) | 6,618 | (12,922) |
| Exchange differences on revaluation of property and equipment | 6 | (27) | — |
| Reclassification of cash flow hedge to consolidated statements of income | 375 | 804 | 804 |
| Impairment loss on available-for-sale financial assets | — | (384) | — |
| **Total other comprehensive income/(loss) for the year** | $ (772) | $ 7,011 | $ (11,790) |
| **Total comprehensive income for the year, net of tax** | $ (10,517) | $ 18,466 | $ 1,498 |
| **Attributable to** | | | |
| Equity holders of Eros International Plc | (23,106) | 8,997 | (5,632) |
| Non-controlling interest | 12,589 | 9,469 | 7,130 |

The accompanying notes form an integral part of these consolidated financial statements.

F-5

**EROS INTERNATIONAL PLC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED MARCH 31, 2018, 2017 AND 2016**

| | Note | Year ended March 31 | | |
| --- | --- | --- | --- | --- |
| | | 2018 | 2017 | 2016 |
| | | (in thousands) | | |
| **Cash flow from operating activities** | | | | |
| (Loss)/profit before tax | | $ (618) | $ 22,494 | $ 25,999 |
| Adjustments for: | | | | |
| Depreciation | 13 | 1,265 | 1,082 | 1,154 |
| Share based payments | 28 | 17,918 | 23,471 | 30,992 |
| Amortization of intangible film and content rights | 15 | 115,285 | 135,316 | 128,303 |
| Amortization of other intangible assets | 16 | 1,726 | 1,816 | 1,131 |
| Other non-cash items | 31 | 51,051 | (10,616) | 4,562 |
| Net finance costs | 8 | 17,813 | 17,156 | 8,010 |
| Gain on sale of available-for-sale financial assets | | — | (58) | — |
| Movement in trade and other receivables | | (91,317) | (72,247) | 19,690 |
| Movement in inventories | | (219) | (412) | 189 |
| Movement in trade and other payables | | (1,215) | 4,172 | 31,433 |
| Loss/(gain) on sale of property and equipment | | (2) | 22 | 21 |
| Cash generated from operations | | 111,687 | 122,196 | 251,484 |
| Interest paid | | (20,761) | (18,390) | (12,536) |
| Income taxes paid | | (7,683) | (4,813) | (4,349) |
| **Net cash generated from operating activities** | | $ 83,243 | $ 98,993 | $ 234,599 |
| **Cash flows from investing activities** | | | | |
| Purchase of available-for-sale investment | | $ — | $ — | $ (230) |
| Proceeds from sale of available-for-sale investment | | — | 288 | — |
| Purchase of property and equipment | | (913) | (678) | (1,702) |
| Proceeds from disposal of property and equipment | | 70 | 2 | 56 |
| Proceeds from/(investment in) restricted deposits held with banks | | (27) | (4,018) | 76 |
| Deconsolidation/acquisition of cash and cash equivalent in subsidiary | | (9) | — | 263 |
| Purchase of intangible film rights and content rights | | (186,757) | (173,481) | (211,253) |
| Purchase of other intangible assets | | (321) | — | (1,500) |
| Interest received | | 2,537 | 2,696 | 2,935 |
| **Net cash (used in) investing activities** | | $ (185,420) | $ (175,191) | $ (211,355) |
| **Cash flows from financing activities** | | | | |
| Proceeds from issue of share capital, net of transaction costs | | $ 16,645 | $ 30,466 | $ 5,414 |
| Proceeds from sale of shares of a subsidiary | | 40,221 | — | — |
| Proceeds from issue of shares by subsidiary | | 556 | 40 | 137 |
| Share application money received pending allotment | | 18,000 | — | — |
| Proceeds from issue out of treasury shares | | — | 938 | 6,294 |
| (Repayment of)/ proceeds from/ short term debt with maturity less than three months (net) | | 211 | (39,493) | 1,918 |
| Proceeds from short term debt | | 48,249 | 76,310 | 79,695 |
| Repayment of short term debt | | (43,785) | (66,404) | (72,746) |

| | | | | |
|---|---|---|---|---|
| Proceeds from long term debt, net of transaction costs of Nil (2017: $384, 2016: $139) | | 111,278 | 16,522 | 13,847 |
| Repayment of long term debt | | (113,960) | (12,450) | (26,962) |
| **Net cash generated from financing activities** | $ | **77,415** | $ 5,929 | $ 7,597 |
| Net (decrease)/increase in cash and cash equivalents | | (24,762) | (70,269) | 30,841 |
| Effects of exchange rate changes on cash and cash equivalents | | 257 | (238) | (1,731) |
| Cash and cash equivalents at beginning of year | | 112,267 | 182,774 | 153,664 |
| **Cash and cash equivalents at the end of year** | $ | **87,762** | $ 112,267 | $ 182,774 |

The cash outflow towards intangible film rights and content right includes, interest paid and capitalized $11,722 (2017: $7,176 and 2016: $9,204).

The accompanying notes form an integral part of these consolidated financial statements.

F-6

**Reconciliation of Liabilities arising from Financing activities:**

| | Long term debt(*) | Short term debt | Total |
|---|---|---|---|
| As at March 31, 2017 | $ 198,792 | $ 83,631 | $ 282,423 |
| Considered in cash flow (net) | (2,682) | 4,675 | 1,993 |
| Net finance cost | 3,575 | — | 3,575 |
| Shares issued in lieu of convertible notes | (32,168) | — | (32,168) |
| Convertible notes measured at fair value through profit and loss | 13,840 | — | 13,840 |
| Amortization of debt issuance cost | 664 | (253) | 411 |
| Exchange adjustment | 6,888 | (298) | 6,590 |
| As at March 31, 2018 | $ 188,909 | $ 87,755 | $ 276,664 |

(*) including current portion and derivative financial instruments

The accompanying notes form an integral part of these consolidated financial statements.

F-7

**EROS INTERNATIONAL PLC**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEAR ENDED MARCH 31, 2018**

| | Share capital | Share premium account | Currency translation reserve | Available for sale fair value reserves | Revaluation reserve | Hedging reserve | Reverse acquisition reserve | Merger reserve | Retained earnings | JSOP reserve | Share Application Reserve | Equity Attributable to Shareholders of EROS International PLC | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in thousands) | | | | | | | |
| Balance as at April 1, 2017 | $ 31,877 | $ 399,686 | $ (55,810) | $ 6,238 | $ 1,829 | $ (375) | $ (22,752) | $ 70,275 | $ 389,474 | $ (15,985) | — $ | $ 804,457 | $ 79,091 | $ 883,548 |
| (Loss)/Profit for the year | — | — | — | — | — | — | — | — | (22,575) | — | — | (22,575) | 12,830 | (9,745) |
| Other comprehensive income/(loss) for the year | — | — | (912) | — | 6 | 375 | — | — | — | — | — | (531) | (241) | (772) |
| **Total comprehensive income/(loss) for the year** | — | — | (912) | — | 6 | 375 | — | — | (22,575) | — | — | (23,106) | 12,589 | (10,517) |
| Share based compensation (Refer Note 28) | — | — | — | — | — | — | — | — | 17,316 | — | — | 17,316 | 602 | 17,918 |
| Shares issued on exercise of employee stock options and awards (Refer Note 27) | 277 | 8,894 | — | — | — | — | — | — | (8,955) | — | — | 216 | — | 216 |
| Changes in ownership interests in subsidiaries that do not result in a loss of control (Refer Note 4) | — | — | — | — | — | — | — | 209 | — | — | — | 209 | 40,568 | 40,777 |
| Issue of shares, net of transaction costs of Nil (Refer Note 27) | 555 | 15,874 | — | — | — | — | — | — | — | — | — | 16,429 | — | 16,429 |
| Loss of control in a subsidiary (Refer Note 4) | — | — | — | — | — | — | — | — | — | — | — | — | 4,878 | 4,878 |
| Shares pending for allotment (Refer Note 27) | — | — | — | — | — | — | — | — | — | — | 18,000 | 18,000 | — | 18,000 |
| Shares issued in lieu of convertible notes (Refer Note 27) | 2,625 | 29,543 | — | — | — | — | — | — | — | — | — | 32,168 | — | 32,168 |
| **Balance as at March 31, 2018** | $ 35,334 | $ 453,997 | $ (56,722) | $ 6,238 | $ 1,835 | — $ | $ (22,752) | $ 70,484 | $ 375,260 | $ (15,985) | $ 18,000 | $ 865,689 | $ 137,728 | $ 1,003,417 |

The accompanying notes form an integral part of these consolidated financial statements.

F-8

**EROS INTERNATIONAL PLC**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEAR ENDED MARCH 31, 2017**

| | Share capital | Share premium account | Currency translation reserve | Available for sale fair value reserves | Revaluation reserve | Hedging reserve | Reverse acquisition reserve | Merger reserve | Retained earnings | JSOP reserve | Equity Attributable to Shareholders of EROS International PLC | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in thousands) | | | | | | |
| **Balance as at April 1, 2016** | $ 30,793 | $ 356,865 | $ (60,609) | $ 6,622 | $ 1,856 | $ (1,179) | $ (22,752) | $ 69,586 | $ 376,317 | $ (17,167) | $ 740,332 | $ 68,762 | $ 809,094 |
| Profit for the year | — | — | — | — | — | — | — | — | 3,805 | — | 3,805 | 7.650 | 11,455 |
| Other comprehensive income/(loss) for the year | — | — | 4,799 | (384) | (27) | 804 | — | — | — | — | 5,192 | 1,819 | 7011 |
| **Total comprehensive income/(loss) for the year** | — | — | **4,799** | **(384)** | **(27)** | **804** | — | — | **3,805** | — | **8,997** | **9,469** | **18,466** |
| Issue of shares, net of transaction costs of Nil (Refer Note 27) | 808 | 29,712 | — | — | — | — | — | — | — | — | 30,520 | — | 30,520 |
| Share based compensation (Refer Note 28) | — | — | — | — | — | — | — | — | 22,901 | — | 22,901 | 570 | 23,471 |
| Shares issued on exercise of employee stock options and awards (Refer Note 27) | 276 | 13,273 | — | — | — | — | — | — | (13,549) | — | — | — | — |
| Issue out of treasury shares (Refer Note 29) | — | (164) | — | — | — | — | — | — | — | 1,182 | 1,018 | — | 1,018 |
| Changes in ownership interests in subsidiaries that do not result in a loss of control | — | — | — | — | — | — | — | 689 | — | — | 689 | 290 | 979 |
| **Balance as at March 31, 2017** | $ 31,877 | $ 399,686 | $ (55,810) | $ 6,238 | $ 1,829 | $ (375) | $ (22,752) | $ 70,275 | $ 389,474 | $ (15,985) | $ 804,457 | $ 79,091 | $ 883,548 |

The accompanying notes form an integral part of these consolidated financial statements.

F-9

**EROS INTERNATIONAL PLC**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEAR ENDED MARCH 31, 2016**

| | Share capital | Share premium account | Currency translation reserve | Available for sale fair value reserves | Revaluation reserve | Hedging reserve | Reverse acquisition reserve | Merger reserve | Retained earnings | JSOP reserve | Equity Attributable to Shareholders of EROS International PLC | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (in thousands) | | | | | |
| **Balance as at April 1, 2015** | $ 30,622 | $ 345,385 | $ (50,048) | $ 6,622 | $ 1,528 | $ (1,983) | $ (22,752) | $ 63,238 | $ 349,196 | $ (24,474) | $ 697,334 | $ 58,721 | $ 756,055 |
| Profit for the year | — | — | — | — | — | — | — | — | 3,797 | — | 3,797 | 9,491 | 13,288 |
| Other comprehensive income/(loss) for the year | — | — | (10,561) | — | 328 | 804 | — | — | — | — | (9,429) | (2,361) | (11,790) |
| **Total comprehensive income/(loss) for the year** | **—** | **—** | **(10,561)** | **—** | **328** | **804** | **—** | **—** | **3,797** | **—** | **(5,632)** | **7,130** | **1,498** |
| Issue of shares, net of transaction costs of Nil (Refer Note 27) | 153 | 5,302 | — | — | — | — | — | — | — | — | 5,455 | — | 5,455 |
| Share based compensation (Refer Note 28) | 18 | 7,191 | — | — | — | — | — | — | 23,324 | — | 30,533 | 459 | 30,992 |
| Issue out of treasury shares (Refer Note 29) | — | (1,013) | — | — | — | — | — | — | — | 7,307 | 6,294 | — | 6,294 |
| Changes in ownership interests in subsidiaries that do not result in a loss of control | — | — | — | — | — | — | — | 6,348 | — | — | 6,348 | 2,452 | 8,800 |
| **Balance as at March 31, 2016** | $ 30,793 | $ 356,865 | $ (60,609) | $ 6,622 | $ 1,856 | $ (1,179) | $ (22,752) | $ 69,586 | $ 376,317 | $ (17,167) | $ 740,332 | $ 68,762 | $ 809,094 |

The accompanying notes form an integral part of these consolidated financial statements.

F-10

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**1      NATURE OF OPERATIONS, GENERAL INFORMATION AND BASIS OF PREPARATION**

Eros International Plc ("Eros" or the "Company") and its subsidiaries' (together with Eros, the "Group") principal activities include the acquisition, co-production and distribution of Indian films and related content. Eros International Plc is the Group's ultimate parent company. It is incorporated and domiciled in the Isle of Man. The address of Eros International Plc's registered office is Victoria Road, Douglas, Isle of Man IM2 4DF.

The consolidated financial statements of the Group have been prepared in accordance with International Financial Reporting Standards ("IFRSs"), as issued by the International Accounting Standards Board (IASB). The financial statements have been prepared on accrual basis and under the historical cost convention on a going concern basis, with the exception of revaluation of certain properties and equipments certain financial instruments and assets acquired and liabilities assumed in a business combination that have been measured at fair value as required by relevant IFRSs.

The Group's accounting policies as set out below have been applied consistently throughout the Group to all the periods presented, unless otherwise stated. The financial statements of Eros and each of it's subsidiaries are measured using the currency of the primary economic environment in which these entities operate (i.e. the functional currency). The consolidated financial statements are presented in US Dollars (USD) which is the presentation currency of the Company and has been rounded off to the nearest thousands.

The consolidated financial statements for the year ended March 31, 2018 were approved by the Eros Board of Directors and authorized for issue on July 28, 2018.

**2      GOING CONCERN**

The Group meets its day to day working capital requirements and funds its investment in content primarily through a variety of banking arrangements and cash generated from operations. Under the terms of such banking arrangements the Group is able to draw down in the local currencies of its operating businesses. The net foreign currency monetary assets and liabilities position at March 31, 2018 and 2017 are shown in Note 32.

The borrowings (as set out in Note 23) are subject to individual covenants which vary but include provisions such as a fixed charge over certain assets, total available facilities against statement of financial position value, net debt against earnings before interest, income, tax expense, depreciation, certain impairments and amortization ("EBITDA"), certain financial ratios (such as a leverage ratio and fixed cover ratio), and a negative pledge that restricts the Group's ability to incur liens, security interests or similar encumbrances or arrangements on its assets. The Group is cash generating before capital expenditures and is in full compliance with the covenants contained in its existing debt facilities.

The Group is exposed to uncertainties arising from the global economic climate and also in the markets in which it operates. Market conditions could lead to lower than anticipated demand for the Group's products and services and exchange rate volatility could also impact reported performance. Management has considered the impact of these and other uncertainties and factored them into their financial forecasts and assessment of covenant headroom. The Group's forecasts and projections, taking account of reasonably possible changes in trading performance (and available mitigating actions), show that the Group will be able to operate within the expected limits of the facilities and provide headroom against the covenants for the foreseeable future. For this reason, Management continues to adopt the going concern basis in preparing the consolidated financial statements.

**3      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**3.1.    *Overall considerations***

The significant accounting policies that have been used in the preparation of these consolidated financial statements are summarized below. Financial statements are subject to the application of significant accounting estimates and judgments. These are summarized in Note 38.

**3.2.    *Basis of consolidation***

The Group financial statements consolidate results of the Company and entities controlled by the Company and its subsidiary undertakings. Control exists when the Company has existing rights that give the Company the current ability to

direct the activities which affect the entity's returns; the Company is exposed to or has rights to a return which may vary depending on the entity's performance; and the Company has the ability to use its powers to affect its own returns from its involvement with the entity.

F-11

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Unrealized gains on transactions between the Group and its subsidiaries are eliminated. Unrealized losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Amounts reported in the financial statements of subsidiaries have been adjusted where necessary to ensure consistency with the accounting policies adopted by the Group.

Business combinations are accounted for under the purchase method. The purchase method involves the recognition at fair value of all identifiable assets and liabilities, including contingent liabilities of the subsidiary, at the acquisition date, regardless of whether or not they were recorded in the financial statements of the subsidiary prior to acquisition. On initial recognition, the assets and liabilities of the subsidiary are included in the consolidated statement of financial position at their fair values, which are also used as the bases for subsequent measurement in accordance with the Group accounting policies. Transaction costs that the company incurs in connection with a business combination such as finder's fees, legal fees, due diligence fees, and other professional and consulting fees are expensed as incurred. Goodwill is stated after separating out identifiable intangible assets. Goodwill represents the excess of acquisition cost over the fair value of the Group's share of the identifiable net assets of the acquired subsidiary at the date of acquisition.

Changes in controlling interest in a subsidiary that do not result in gaining or losing control are not business combinations as defined by IFRS 3. The Group adopts the "equity transaction method" which regards the transaction as a realignment of the interests of the different equity holders in the Group. Under the equity transaction method an increase or decrease in the Group's ownership interest is accounted for as follows:

- the non-controlling component of equity is adjusted to reflect the non-controlling interest revised share of the net carrying value of the subsidiaries net assets;

- the difference between the consideration received or paid and the adjustment to non-controlling interests is debited or credited to a different component of equity — merger reserves;

- no adjustment is made to the carrying amount of goodwill or the subsidiaries' net assets as reported in the consolidated financial statements; and

- no gain or loss is reported in the consolidated statements of income.

***Loss of control policy***

When a change in the Group's ownership interest in a subsidiary results in a loss of control over the subsidiary, the assets and liabilities of the subsidiary including any goodwill are derecognized and a gain or loss arising thereto is accounted within Gain/(losses), net with Statement of Income. Amounts previously recognised in other comprehensive income in respect of that entity are also reclassified to Statement of Income.

**3.3.    Segment reporting**

IFRS 8 Operating Segments ("IFRS 8") requires operating segments to be identified on the same basis as is used internally for the review of performance and allocation of resources by the Group chief executive officer. The revenues of films are earned over various formats; all such formats are functional activities of filmed entertainment and these activities take place on an integrated basis. The management team reviews the financial information on an integrated basis for the Group as a whole, with respective heads of business for each region and in accordance with IFRS 8, the Company provides a geographical split as it considers that all activities fall within one segment of business which is filmed entertainment. The management team also monitors performance separately for individual films for at least 12 months after the theatrical release. Certain resources such as publicity and advertising, and the cost of a film are also reviewed globally.

Eros has identified four geographic areas, consisting of its main geographic areas (India, North America and Europe), together with the rest of the world.

**3.4.    Revenue**

Revenue is recognized, net of sales related taxes, when persuasive evidence of an arrangement exists, the fees are fixed

or determinable, the product is delivered or services have been rendered and collectability is reasonably assured. The Group considers the terms of each arrangement to determine the appropriate accounting treatment.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The following additional criteria apply in respect of various revenue streams within filmed entertainment:

- In arrangements for theatrical distribution, contracted minimum guarantees are recognized on the theatrical release date. The Group's share of box office receipts in excess of the minimum guarantee is recognized at the point they are notified to the Group.

- In arrangements for television syndication, license fees received in advance which do not meet all the above criteria, including commencement of the availability for broadcast under the terms of the related licensing agreement, are included in deferred income until the above criteria is met.

- In arrangements for catalogue sales, the Company recognizes revenue if revenue recognition criteria's such as a valid sales contract exists, all films are delivered, the Company is reasonably certain on collectability, and the Company's contractual obligations are complete, are met. Considering the arrangement with catalogue customers provide for a contractual deferred payment terms up to a year and in many cases the payments often fall behind contractual terms, revenues from catalogue sales are recognized net of credit impairment loss calculated at imputed market rate of interest on the gross receivables. The re-measurement of such credit impairment loss at each balance sheet date and related gains or losses is recognized within administrative costs in the Statement of Income. The unwinding of the credit impairment loss reserve is recognized using effective interest rate within net finance cost in the Statement of Income.

- Digital and ancillary media revenues are recognized at the earlier of when the content is accessed or declared. Fees received for access to the specified and unspecified future content through digital and ancillary media, including usage of over-the-top platform developed by the Group, is recognized on straight line basis over the period of the service contract. Billing in excess of the revenue recognized is shown as deferred revenue.

- DVD, CD and video distribution revenue is recognized on the date the product is delivered or if licensed in line with the above criteria. Visual effects, production and other fees for services rendered by the Group and overhead recharges are recognized in the period in which they are earned and in certain cases, the stage of production is used to determine the proportion recognized in the period.

### 3.5. *Goodwill*

Goodwill represents the excess of the consideration transferred in a business combination over the fair value of the Group's share of the identifiable net assets acquired. Goodwill is carried at cost less accumulated impairment losses. Gain on bargain purchase is recognized immediately after acquisition in the consolidated statement of income.

### 3.6. *Intangible assets*

Intangible assets acquired by the Group are stated at cost less accumulated amortization less impairment loss, if any, except those acquired as part of a business combination, which are shown at fair value at the date of acquisition less accumulated amortization less impairment loss, if any (film production cost and content advances are transferred to film and content rights at the point at which content is first exploited). "Eros" (the "Trade name") is considered to have an indefinite life because of the institutional nature of the corporate brand name, its proven ability to maintain market leadership and the Group's commitment to develop, enhance and retain its value. The carrying value is reviewed at least annually for impairment and adjusted to recoverable amount if required.

**Content**

Investments in films and associated rights, including acquired rights and distribution advances in respect of completed films, are stated at cost less amortization less provision for impairment. Costs include production costs, overhead and capitalized interest costs net of any amounts received from third party investors. A charge is made to write down the cost of completed rights over the estimated useful lives, writing off more in year one which recognizes initial income flows and then the balance over a period of up to nine years, except where the asset is not yet available for exploitation. The average life of the assets is the lesser of 10 years or the remaining life of the content rights. The amortization charge is recognized in the consolidated statement of income within cost of sales. The determination of useful life is based upon

management's judgment and includes assumptions on the timing and future estimated revenues to be generated by these assets, which are summarized in Note 38.3.

**Others**

Other intangible assets, which comprise internally generated and acquired software used within the Group's digital, home entertainment and internal accounting activities, are stated at cost less amortization less provision for impairment. A charge is made to write down the cost of completed rights over the estimated useful lives except where the asset is not yet available for exploitation. The average life of below intangible assets ranges from 3-6 years. The amortization charge is recognized in the consolidated statements of income within administrative expenses as stated below:

|  | Life of asset | Rate of amortization % straight line per annum |
|---|---|---|
| Information technology assets | 3 years | 33 |
| Other intangibles | 3 - 6 years | 17 - 33 |

F-13

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Subsequent expenditure**

Expenditure on capitalized intangible assets subsequent to the original expenditure is included only when it increases the future economic benefits embodied in the specific asset to which it relates.

**Information technology assets**

An internally generated intangible asset arising from the Group's software development activities that is expected to be completed is recognized only if all the following criteria are met:

· an asset is created that can be identified (such as software and new processes);

· it is probable that the asset created will generate future economic benefits; and

· the development cost can be measured reliably.

When these criteria are met and there are appropriate resources to complete development, the expenditure is capitalized at cost. Where these criteria are not met development expenditure is recognized as an expense in the period in which it is incurred. Internally generated intangible assets are amortized over their useful economic life from the date that they start generating future economic benefits.

### 3.7.    Impairment testing of goodwill, other intangible assets and property and Equipment

For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash flows (cash-generating units). As a result, some assets are tested individually for impairment and some are tested at the cash-generating unit level. Goodwill is allocated to those cash-generating units that are expected to benefit from synergies of the related business combination and represent the lowest level within the Group at which Management monitors the related cash flows.

Goodwill and Trade names are tested for impairment at least annually. All other individual assets or cash-generating units are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.

An impairment loss is recognized for the amount by which the asset's or cash-generating unit's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of fair value, reflecting market conditions less costs to sell, and value in use based on an internal discounted cash flow evaluation. Impairment losses recognized for cash-generating units, to which goodwill has been allocated, are credited initially to the carrying amount of goodwill. Any remaining impairment loss is charged pro rata to the other assets in the cash generating unit.

Film and content rights are stated at the lower of unamortized cost and estimated recoverable amounts. In accordance with IAS 36 Impairment of Assets, film content costs are assessed for indication of impairment on a library basis as the nature of the Group's business, the contracts it has in place and the markets it operates in do not yet make an ongoing individual film evaluation feasible with reasonable certainty. Impairment losses on content advances are recognized when film production does not seem viable and refund of the advance is not probable.

With the exception of goodwill, all assets are subsequently reassessed for indications that an impairment loss previously recognized may no longer exist.

### 3.8.    Property and equipment

Property and equipment are stated at historical cost less accumulated depreciation and impairment. Land and freehold buildings are shown at what Management believes to be their fair value, based on, among other things, periodic but at least triennial valuations by an external independent valuer, less subsequent depreciation for freehold buildings. Any accumulated depreciation at the date of revaluation is eliminated against the gross carrying amount of the asset and the net amount is restated to the revalued amount. Increases in the carrying amount arising on revaluation of freehold land and buildings are credited to other reserves in shareholders' equity. Decreases that offset previous increases are charged against other reserves.

F-14

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Depreciation is provided to write - off the cost of all property and equipment to their residual value as stated below:

|  | Life of Asset | Rate of depreciation % straight line per annum |
| --- | --- | --- |
| Freehold building | 10 years | 2-10 |
| Furniture and fittings and equipment | 5 years | 15-20 |
| Vehicles and machinery | 3-5 years | 20-30 |

Material residual value estimates are updated as required, but at least annually, whether or not the asset is revalued.

Advance paid towards the acquisition or improvement of property and equipment not ready for use before the reporting date are disclosed as capital work-in-progress.

### 3.9. Inventories

Inventories primarily comprise of music CDs and DVDs, and are valued at the lower of cost and net realizable value. Cost in respect of goods for resale is defined as purchase price, including appropriate labor costs and other overhead costs. Costs in respect of raw materials is purchase price.

Purchase price is assigned using a weighted average basis. Net realizable value is defined as anticipated selling price or anticipated revenue less cost to completion.

### 3.10. Cash and cash equivalents

Cash and cash equivalents include cash in hand, deposits held at call with banks, other short-term highly liquid investments which are readily convertible into known amounts of cash and are subject to insignificant risk of changes in value. Bank overdrafts are shown within "Borrowings" in "Current liabilities" on the statement of financial position.

### 3.11. Restricted deposits held with banks

Deposits held with banks as security for overdraft facilities are included in restricted deposits held with bank.

### 3.12. Borrowings

Borrowings are recognized initially at fair value, net of transaction costs incurred. Borrowings are subsequently stated at amortized cost with any difference between the proceeds (net of transaction costs) and the redemption value recognized in the consolidated statement of income within finance costs over the period of the borrowings using the effective interest method. Finance costs in respect of film productions and other assets which take a substantial period of time to get ready for use or for exploitation are capitalized as part of the asset.

Borrowings are classified as current liabilities unless the Group has an unconditional right to defer settlement of the liability for at least 12 months after the reporting date.

### 3.13. Financial instruments

Financial assets and financial liabilities are recognized when a Group entity becomes party to the contractual provisions of the instrument.

Financial assets and liabilities are initially measured at fair value. Transaction costs that are directly attributable to the acquisition or issue of financial assets or liabilities (other than financial assets and liabilities at fair value through profit and loss) and business combination are added to or deducted from the fair value of the financial assets or financial liabilities, as appropriate, on initial recognition. Transaction costs directly attributable to the acquisition of financial assets or financial liabilities at fair value through profit and loss are recognized immediately in consolidated statements of income. Financial assets and financial liabilities are offset against each other and the net amount reported in the consolidated statement of financial position if, and only if, there is a currently enforceable legal right to offset the recognized amounts and there is an intention to settle on a net basis, or to realize the assets and settle the liabilities simultaneously.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

A financial instrument is held for trading if:

- it has been acquired principally for the purpose of selling/repurchasing it in the near term;

- on initial recognition it is part of a portfolio of identified financial instruments that the Group manages together and has a recent pattern of short-term profit taking; or

- it is a derivative that is not designated in a hedging relationship.

The fair value of financial instruments denominated in a foreign currency is determined in that foreign currency and translated at the spot rate at the end of the reporting period. The foreign exchange component forms part of its fair value gain or loss. Therefore for financial instruments that are classified as fair value through profit and loss, the exchange component is recognized in consolidated statements of income through "other (gains)/losses."

### 3.14.  *Financial assets*

Financial assets are divided into the following categories:

- financial assets at fair value through profit and loss;

- loans and receivables;

- held-to-maturity investments; and

- available-for-sale financial assets.

Financial assets are assigned to the different categories by management on initial recognition, depending on the nature and purpose of the financial assets. The designation of financial assets is re-evaluated at every reporting date at which a choice of classification or accounting treatment is available.

### Loans and receivables

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. Loans and receivables (including trade and other receivables, bank and cash balances) are measured subsequent to initial recognition at amortized cost using the effective interest method, less provision for impairment. Any change in their value through impairment or reversal of impairment is recognized in the consolidate statement of income.

Provision against trade receivables is made when there is objective evidence that the Group will not be able to collect all amounts due to it in accordance with the original terms of those receivables. The amount of the write-down is determined as the difference between the asset's carrying amount and the present value of estimated future cash flows.

### Held-to-maturity investments

Held-to-maturity investments are non-derivative financial assets with fixed or determinable payments and fixed maturities that the Group's management has the positive intention and ability to hold to maturity.

### Available-for-sale financial assets

Available-for-sale financial assets include non-derivative financial assets that are either designated as such or do not qualify for inclusion in any of the other categories of financial assets. All financial assets within this category are measured subsequently at fair value, with changes in fair value recognized in other comprehensive income. Gains and losses arising from investments classified as available-for-sale are recognized in the consolidated statements of income when they are sold or when the investment is impaired.

In the case of impairment of available-for-sale assets, any loss previously recognized in other comprehensive income is transferred to the consolidate statement of income. Impairment losses recognized in the consolidate statement of income on equity instruments are not reversed through the consolidated statements of income. Impairment losses recognized previously on debt securities are reversed through the consolidated statement of income when the increase can be related objectively to an event occurring after the impairment loss was recognized in the consolidate statement of income.

F-16

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Where the Group consider that fair value can be reliably measured the fair values of financial instruments that are not traded in an active market are determined by using valuation techniques. The Group applies its judgment to select a variety of methods and make assumptions that are mainly based on market conditions existing at each statement of financial position date. Available-for-sale equity instruments that do not have a quoted price in an active market and whose fair value cannot be reliably measured are measured at cost less impairment at the end of each reporting period. An assessment for impairment is undertaken at least at each reporting date.

A financial asset is de-recognized only where the contractual rights to the cash flows from the asset expire or the financial asset is transferred and that transfer qualifies for de-recognition. A financial asset is transferred if the contractual rights to receive the cash flows of the asset have been transferred or the Group retains the contractual rights to receive the cash flows of the asset but assumes a contractual obligation to pay the cash flows to one or more recipients. A financial asset that is transferred qualifies for de-recognition if the Group transfers substantially all the risks and rewards of ownership of the asset, or if the Group neither retains nor transfers substantially all the risks and rewards of ownership but does transfer control of that asset.

### 3.15. Financial liabilities

Financial liabilities are classified as either 'financial liabilities at fair value through profit or loss' or 'other financial liabilities'. Financial liabilities are subsequently measured at amortized cost using the effective interest method or at fair value through profit or loss.

Financial liabilities are classified as at fair value through profit or loss when the financial liability is held for trading such as a derivative, except for a designated and effective hedging instrument, or if upon initial recognition it is thus designated to eliminate or significantly reduce measurement or recognition inconsistency or it forms part of a contract containing one or more embedded derivatives and the contract is designated as fair value through profit or loss.

Financial liabilities at fair value through profit or loss are stated at fair value. Any gains or losses arising from held for trading financial liabilities are recognized in consolidated statements of income. Such gains or losses incorporate any interest paid and are included in the "other gains and losses" line item.

Other financial liabilities (including borrowing and trade and other payables) are subsequently measured at amortized cost using the effective interest method.

The effective interest method is a method of calculating the amortized cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments (including all fees and points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the financial liability, or (where appropriate) a shorter period, to the net carrying amount on initial recognition.

A financial liability is derecognized only when the obligation is extinguished, that is, when the obligation is discharged or cancelled or expires. Changes in liabilities' fair value that are reported in profit or loss are included in the consolidated statement of income within 'finance costs' or "finance income".

### 3.16. Derivative financial instruments

The Group uses derivative financial instruments ("derivatives") to reduce its exposure to interest rate movements.

Derivatives are initially recognized at fair value at the date the derivative contracts are entered into and are subsequently re-measured to their fair value at the end of each reporting period. The resulting gain or loss is recognized in consolidated statements of income immediately unless the derivative is designated and effective as a hedging instrument, in which event the timing of the recognition in the profit or loss depends on the nature of the hedge relationship.

At the inception of the hedge relationship, the Group documents the relationship between the hedging instrument and the hedged item, along with its risk management objectives and its strategy for undertaking various hedge transactions. Furthermore, at the inception of the hedge and on an ongoing basis, the Group documents whether the hedging instrument is highly effective in offsetting changes in fair values or cash flows of the hedged item attributable to the

hedged risk.

F-17

Case 2:19-cv-14125-ES-JSA     Document 66-5     Filed 03/04/22     Page 249 of 312
PageID: 2508

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Cash flow hedging**

The effective portion of changes in the fair value of derivatives that are designated and qualify as cash flow hedges is recognized in other comprehensive income and accumulated under the heading of other reserves. The gain or loss relating to the ineffective portion is recognized immediately in consolidated statements of income, and is included in the 'other gains and losses' line item.

Amounts previously recognized in other comprehensive income and accumulated in equity are reclassified to consolidated statements of income in the periods when the hedged item is recognized in consolidated statements of income, in the same line of the consolidated statement of income as the recognized hedged item. However, when the hedged forecast transaction results in the recognition of a non-financial asset or a non-financial liability, the gains and losses previously recognized in other comprehensive income and accumulated in equity are transferred from equity and included in the initial measurement of the cost of the non-financial asset or non-financial liability.

Cash flow hedge accounting is discontinued when the Group revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or when it no longer qualifies for hedge accounting. Any gain or loss recognized in other comprehensive income and accumulated in equity at that time remains in equity and is recognized when the forecast transaction is ultimately recognized in consolidated statements of income. When a forecast transaction is no longer expected to occur, the gain or loss accumulated in equity is recognized immediately in consolidated statements of income.

### 3.17.  Provisions

Provisions are recognized when the Group has a present legal or constructive obligation as a result of a past event, it is more likely than not that an outflow of resources will be required to settle the obligations and can be reliably measured. Provisions are measured at management's best estimate of the expenditure required to settle the obligations at the statement of financial position date and are discounted to present value where the effect is material.

### 3.18.  Leases

Leases in which significantly all the risks and rewards incidental to ownership are not transferred to the lessee are classified as operating leases. Payments under such leases are charged to the consolidated statements of income on a straight line basis over the period of the lease.

### 3.19.  Taxation

Taxation on profit and loss comprises current income tax and deferred income tax. Tax is recognized in the consolidated statement of income except to the extent that it relates to items recognized directly in equity or other comprehensive income in which case it is recognized in equity or other comprehensive income.

Current income tax is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted at the reporting date along with any adjustment relating to tax payable in previous years.

Deferred income tax is provided in full, using the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the consolidated financial statements. Deferred income tax is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted or substantively enacted at the statement of financial position date and are expected to apply when the related deferred income tax asset is realized or the deferred income tax liability is settled in the appropriate territory.

Deferred income tax in respect of undistributed earnings of subsidiaries is recognized except where the Group is able to control the timing of the reversal of the temporary difference and that the temporary difference will not reverse in the foreseeable future. Deferred income tax assets are recognized to the extent that it is probable that future taxable profit will be available against which temporary differences can be utilized.

Deferred income tax assets and deferred income tax liabilities are offset if, and only if the Group has a legally enforceable right to set off current tax assets against current tax liabilities and the deferred tax assets and the deferred tax liabilities relate to income taxes levied by the same taxation authority on either the same taxable entity or different taxable entities

which intend either to settle current tax liabilities and assets on a net basis, or to realize the assets and settle the liabilities simultaneously, in each future period in which significant amounts of deferred tax liabilities or assets are expected to be settled or recovered.

F-18

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### 3.20. Employee benefits

The Group operates defined contribution pension plans and healthcare and insurance plans on behalf of its employees. The amounts due are all expensed as they fall due.

In accordance with IFRS 2 "Share Based Payments", the fair value of shares or options granted is recognized as personnel costs with a corresponding increase in equity. The fair value is measured at the grant date and spread over the period during which the recipient becomes unconditionally entitled to payment unless forfeited or surrendered.

The fair value of share options granted is measured using the Black Scholes model or a Monte-Carlo simulation model, each taking into account the terms and conditions upon which the grants are made. At each statement of financial position date, the Group revises its estimate of the number of equity instruments expected to vest as a result of non-market-based vesting conditions. The amount recognized as an expense is adjusted to reflect the revised estimate of the number of equity instruments that are expected to become exercisable, with a corresponding adjustment to equity reserves. None of the Group plans feature any options for cash settlements.

Upon exercise of share options, the proceeds received net of any directly attributable transaction costs up to the nominal value of the shares are allocated to share capital with any excess being recorded as share premium.

### 3.21. Foreign currencies

Transactions in foreign currencies are translated at the rates of exchange prevailing on the dates of the transactions. Monetary assets and liabilities in foreign currencies are translated at the prevailing rates of exchange at the reporting date. Non-monetary items that are measured at historical cost in a foreign currency are translated at the exchange rate at the date of the transaction. Non-monetary items that are measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value was determined.

Any exchange differences arising on the settlement of monetary items or on translating monetary items at rates different from those at which they were initially recorded are recognized in the income statement in the period in which they arise. Non-monetary items carried at fair value that are denominated in foreign currencies are translated at rates prevailing at the date when the fair value was determined. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.

The assets and liabilities in the financial statements of foreign subsidiaries and related goodwill are translated at the prevailing rate of exchange at the statement of financial position date. Income and expenses are translated at the monthly average rate. The exchange differences arising from the retranslation of the foreign operations are recognized in other comprehensive income and taken in to the "currency translation reserve" in equity. On disposal of a foreign operation the cumulative translation differences (including, if applicable, gains and losses on related hedges) are transferred to the consolidated statement of income as part of the gain or loss on disposal.

### 3.22. Transactions costs relating to equity transactions

The Group defers costs in issuing or acquiring its own equity instruments to the extent they are incremental costs directly attributable to an equity transaction that otherwise would have been avoided. Such costs are accounted for as a deduction from equity (net of any related income tax benefit) upon completion of the equity transaction. The costs of an equity transaction which is abandoned is recognized as an expense.

### 3.23. Earnings per share

Basic earnings per share is computed using the weighted average number of ordinary shares outstanding during the period. Diluted earnings per share is computed by considering the impact of the potential issuance of ordinary shares, using the treasury stock method, on the weighted average number of shares outstanding during the period except where the results would be anti-dilutive.

F-19

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### 3.24.  *Current/Non-current classification*

The Group presents assets and liabilities in the statement of financial position based on current/non-current classification.
An asset is current when it is:

-   Expected to be realised or intended to sold or consumed in the normal operating cycle (*)
-   Held primarily for the purpose of trading
-   Expected to be realised within twelve months after the reporting period or
-   Cash or cash equivalent unless restricted from being exchanged or used to settle a liability for at least twelve months after the reporting period

All other assets are classified as non-current.

(*) The operating cycle for the business activities of the Company is considered to be twelve months except in case of catalogue sales, which have been ascertained as two years for the purpose of current / non-current classification of assets.

A liability is current when:

-   It is expected to be settled in the normal operating cycle
-   It is held primarily for the purpose of trading
-   It is due to be settled within twelve months after the reporting period or
-   There is no unconditional right to defer the settlement of the liability for at least twelve months after the reporting period

The Group classifies all other liabilities as non-current. Deferred tax assets and liabilities are classified as non-current assets and liabilities.

### 4.    ACQUISITION, CHANGES IN OWNERSHIP INTEREST IN SUBSIDIARY AND DECONSOLIDATION

**Acquisition**

On August 1, 2015, Eros' subsidiary Eros International Media Limited ("EIML") acquired 100% of the shares and voting interests in Universal Power Systems Private Limited ("Techzone"). In accordance with the terms of the agreement between the parties, EIML issued 900,970 equity shares to the shareholders of Techzone at an acquisition date fair value of INR 586 ($9.16) per share, calculated on the basis of traded share price of EIML on the date of acquisition.

Goodwill is attributable mainly to expected synergies and assembled work force arising from the acquisition.

The acquisition of Techzone contributed $3,200 (2017: $4,200) to the Company's consolidated revenue and a (loss)/profit of $(2,000) (2017: $0.300) to the Company's profit for the year ended March 31, 2018 and March 31, 2017.

**Changes in ownership interest in a subsidiary**

As of March 31, 2018, EIML has 1,624,035 (2017: 2,108,063), stock option outstanding under the India IPO Plan. In the year ended March 31, 2018, 1,113,160 (2017: 269,553) options were exercised at a weighted average exercise price of INR 32.19 (2017: INR 10.00) per share. Further, Eros Worldwide FZ LLC has sold 11,716,850 shares of Eros International Media Limited in fiscal 2018 for a total cash consideration of $40,221 to reduce its revolving credit facility, resulting in to decrease in its percentage holding by 12.03%.

## EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

**Deconsolidation**

During fiscal 2018, the Group divested its 51 percent equity interest in Ayngaran Group to the non-controlling investee. The sale of the 51 percent equity interest in the majority-owned subsidiary resulted in a loss of control of the subsidiary, and therefore it was deconsolidated from the Company's financial statements during fiscal 2018.

The Company recognized loss of $14,649 on the deconsolidation, measured as the fair value of the consideration received for the 51 percent equity interest in the former subsidiary and the fair value of the financial asset retained in the former subsidiary on deconsolidation. Of the above, loss of $457 resulted on account of recording the retained financial assets at fair value. The aforesaid loss has been recorded within other gains/(losses), net in Statement of Income.

## 5    BUSINESS SEGMENTAL DATA

The Group acquires, co-produces and distributes Indian films in multiple formats worldwide. Film content is monitored and strategic decisions around the business operations are made based on the film content, whether it is new release or library. Hence, Management identifies only one operating segment in the business, film content. We distribute our film content to the Indian population in India, the South Asian diaspora worldwide and to non-Indian consumers who view Indian films that are subtitled or dubbed in local languages. As a result of these distribution activities, Eros has identified four geographic markets: India, North America, Europe and the Rest of the world.

Revenues are presented based on the region of domicile and by customer location:

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| | | (in thousands) | | | | |
| **Revenue by region of domicile of Group's operation** | | | | | | |
| India | $ | 98,073 | $ | 121,966 | $ | 159,855 |
| Europe | | 27,028 | | 25,686 | | 34,209 |
| North America | | 1,244 | | 2,549 | | 14,622 |
| Rest of the world | | 134,908 | | 102,793 | | 65,742 |
| Total Revenue | $ | 261,253 | $ | 252,994 | $ | 274,428 |

Revenue of $103,263 (2017: $74,006 and 2016: $35,869) from the United Arab Emirates is included within Rest of the world and revenue of $27,028 (2017: $25,686 and 2016: $34,209) from the United Kingdom and Isle of Man are included under Europe in the above table.

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| | | (in thousands) | | | | |
| **Revenue by region of domicile of customer's location** | | | | | | |
| India | $ | 109,986 | $ | 129,251 | $ | 158,843 |
| Europe | | 7,739 | | 7,695 | | 24,367 |
| North America | | 5,147 | | 10,132 | | 19,865 |
| Rest of the world | | 138,381 | | 105,916 | | 71,353 |
| Total Revenue | $ | 261,253 | $ | 252,994 | $ | 274,428 |

Revenue of $67,993 (2017: $62,966 and 2016: $61,546) from the United Arab Emirates is included within Rest of the world and revenue of $5,200 (2017: $5,791 and 2016: $22,755) from United Kingdom is included under Europe in the above table. In each year no revenue arose in the Isle of Man.

For the year ended March 31, 2018, March 31, 2017 and March 31, 2016, no customers accounted for more than 10% of the Group's total revenues.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Segment assets by region of domicile of Group's operation:

| | Total | India | North America | Europe | Rest of the World |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Non-current assets(*)** | | | | | |
| As of March 31, 2018 | $ 1,032,736 | $ 354,843 | $ 7 | $ 18,678 | $ 659,208 |
| As of March 31, 2017 | $ 938,669 | $ 386,921 | $ 13 | $ 24,620 | $ 527,115 |

Segment assets of $570,016 (2017: $514,089) in the United Arab Emirates is included under Rest of the world and segment assets of $18,678 (2017: $24,620) in the United Kingdom is included under Europe in the above table. In each year, there were no segment assets in the Isle of Man.

(*) Non-current assets include property and equipment, intangibles assets (tradename, content and others) goodwill and restricted deposit by geographic area.

## 6  NATURE OF EXPENSES

(Loss)/Profit for the year is arrived at after the following are charged to the consolidate statements of income:

| | Year ended March 31 | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Publicity and advertisement costs | $ 12,684 | $ 17,152 | $ 22,333 |
| Film distribution costs | 6,739 | 11,772 | 22,128 |
| Amortisation expenses | 115,285 | 135,316 | 128,303 |
| Personnel costs | 35,661 | 42,902 | 46,414 |
| Rent expenses | 1,359 | 1,559 | 2,112 |
| Legal and professional expenses | 8,204 | 4,697 | 3,177 |
| Provision for trade and other receivables | 1,968 | 2,430 | 1,315 |
| Bad debt | 2,772 | — | — |
| Credit impairment loss, net | 4,308 | — | — |
| Depreciation and amortization of other intangibles | 2,991 | 2,898 | 2,285 |
| Impairment charge on goodwill (Refer note 14) | 1,205 | — | — |
| Impairment loss on content advances and loans and advances | 353 | 1,887 | 2,545 |
| Other – expenses | 9,208 | 6,936 | 6,171 |
| | $ 202,737 | $ 227,549 | $ 236,783 |

## 7  PERSONNEL COSTS

| | Year ended March 31 | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Salaries | $ 16,790 | $ 18,590 | $ 14,616 |
| Social security and other employment charges | 916 | 792 | 771 |
| **Salaries and other charges** | 17,706 | 19,382 | 15,387 |
| Share based compensation (Refer Note 28) | 17,918 | 23,471 | 30,992 |
| Pension charges | 37 | 49 | 35 |
| | $ 35,661 | $ 42,902 | $ 46,414 |

| | Year ended March 31 | | |
|---|---|---|---|
| **Key management compensation** | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Salaries | $ 4,919 | $ 5,062 | $ 5,250 |

| | | | |
|---|---:|---:|---:|
| Share based compensation | 11,519 | 15,946 | 20,916 |
| Pension charges | 16 | 38 | 35 |
| | $ 16,454 | $ 21,046 | $ 26,201 |

F-22

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 8    NET FINANCE COSTS

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| | | (in thousands) | | | | |
| Interest on borrowings | $ | 32,556 | $ | 25,828 | $ | 22,644 |
| Reclassification of cash flow hedge to consolidated statements of income | | 375 | | 804 | | 804 |
| Total interest expense(*) | | 32,931 | | 26,632 | | 23.448 |
| Capitalized interest on eligible film rights and content advances | | (13,263) | | (7,111) | | (9,729) |
| Total finance costs | | 19,668 | | 19,521 | | 13,719 |
| Less: Interest income | | | | | | |
| Unwinding of interest | | (932) | | | | |
| Bank deposits | | (923) | | (2,365) | | (5,709) |
| Total finance income | | (1,855) | | (2,365) | | (5,709) |
| | $ | 17,813 | $ | 17,156 | $ | 8,010 |

For the year ended March 31, 2018, the capitalization rate of interest was 11.5% (2017: 7.6% and 2016: 6.9%).
(*) Interest expense in respect of financial liabilities classified at fair value through profit or loss $4,338 (2017: Nil and 2016: Nil)

## 9    OTHER GAINS/(LOSSES)

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| | | (in thousands) | | | | |
| Foreign exchange (loss)/gain, net | $ | (6,250) | $ | 3,872 | $ | (49) |
| Gain/(loss) on sale of property and equipment | | 2 | | (22) | | (21) |
| Gain on available-for-sale financial assets | | — | | 58 | | — |
| Impairment charge on available -for- sale financial assets (Refer note 17) | | (2,436) | | — | | — |
| (Loss) on de-recognition of financial assets measured at amortized cost net (*) | | (3,562) | | — | | — |
| Mark to market gain on derivative financial instrument measured at fair value through profit and loss account (Refer note 26) | | — | | 10,297 | | (3,566) |
| (Loss) on settlement of derivative financial instruments | | (586) | | — | | — |
| (Loss) on financial liability (convertible notes) measured at fair value through profit and loss account (Refer note 23) | | (13,840) | | — | | — |
| (Loss) on deconsolidation of a subsidiary (Refer note 4) | | (14,649) | | — | | — |
| | $ | (41,321) | $ | 14,205 | $ | (3,636) |

(*) arising on assignment and novation of trade receivables and trade payables with no-recourse. Derecognition of aforesaid financial assets/liabilities measured at amortized cost is to mitigate both credit risk and liquidity risk (Refer Note 32).

## 10    INCOME TAX EXPENSE

| | | Year ended March 31 | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| | | (in thousands) | | | | |
| **Current income tax expense** | $ | 5,556 | $ | 7,822 | $ | 8,161 |
| Deferred income tax charge | | 3,571 | | 3,217 | | 4,550 |

| | | | | | |
|---|---|---|---|---|---|
| **Income tax expenses** | $ | 9,127 | $ | 11,039 | $ | 12,711 |

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Reconciliation of tax charge

| | Year ended March 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | (in thousands) | | | | | |
| (Loss)/profit before tax | $ | (618) | $ | 22,494 | $ | 25,999 |
| Income tax expense at tax rates applicable to individual entities | | 7,358 | | 10,003 | | 10,785 |
| Tax effect of: | | | | | | |
| Adjustments in respect of current income tax of previous years | | 657 | | 375 | | — |
| Changes in tax rates on temporary differences brought forward | | (168) | | — | | 718 |
| Items not deductible for income tax | | 486 | | 815 | | 1,131 |
| Utilisation of unrecognised tax losses | | 794 | | — | | — |
| Others | | — | | (154) | | 77 |
| **Income tax expense** | $ | 9,127 | $ | 11,039 | $ | 12,711 |

## 11     DEFERRED INCOME TAX ASSETS AND LIABILITIES

Changes in deferred income tax assets and liabilities

| | As At March 31, 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Opening Balance | | Recognized in consolidated statements of income | | Exchange Difference | | Closing Balance | |
| | (in thousands) | | | | | | | |
| **Deferred tax assets:** | | | | | | | | |
| Minimum alternate tax carry-forward | $ | 11,749 | $ | (10,882) | $ | 60 | $ | 927 |
| Property and equipment | | 155 | | (72) | | — | | 83 |
| Others | | 1,082 | | 1,440 | | (80) | | 2,442 |
| **Total income deferred tax asset** | $ | 12,986 | $ | (9,514) | $ | (20) | $ | 3,452 |
| **Deferred income tax liabilities** | | | | | | | | |
| Property and equipment | | (1,228) | | 452 | | — | | (776) |
| Intangible assets | | (47,590) | | 5,491 | | 284 | | (41,815) |
| Others | | (29) | | — | | — | | (29) |
| **Total deferred income tax liability** | $ | (48,847) | $ | 5,943 | $ | 284 | $ | (42,620) |
| **Net deferred tax (liability) / asset** | $ | (35,861) | $ | (3,571) | $ | 264 | $ | (39,168) |
| **As at March 31, 2018** | | | | | | | | |
| **Deferred income tax asset** | | | | | | | $ | 351 |
| **Deferred income tax liability** | | | | | | | $ | (39,519) |

F-24

## EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### As At March 31, 2017

| | Opening Balance | Recognized in consolidated statements of income | Exchange Difference | Closing Balance |
|---|---|---|---|---|
| | | (in thousands) | | |
| **Deferred tax assets:** | | | | |
| Minimum alternate tax carry-forward | $ 14,170 | $ (2,621) | $ 200 | $ 11,749 |
| Property and equipment | 57 | 95 | 3 | 155 |
| Others | 834 | 216 | 32 | 1,082 |
| **Total income deferred tax asset** | $ 15,061 | $ (2,310) | $ 235 | $ 12,986 |
| **Deferred income tax liabilities** | | | | |
| Property and equipment | (1,247) | 24 | (5) | (1,228) |
| Intangible assets | (45,714) | (917) | (959) | (47,590) |
| Others | (14) | (14) | (1) | (29) |
| **Total deferred income tax liability** | $ (46,975) | $ (907) | $ (965) | $ (48,847) |
| **Net deferred tax (liability) / asset** | $ (31,914) | $ (3,217) | $ (730) | $ (35,861) |
| **As at March 31, 2017** | | | | |
| Deferred income tax asset | | | | $ 112 |
| Deferred income tax liability | | | | $ (35,973) |

### As At March 31, 2016

| | Opening Balance | Additions due to acquisition during the year | Recognized in consolidated statements of income | Recognized in other comprehensive income | Exchange Difference | Closing Balance |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Deferred income tax assets:** | | | | | | |
| Minimum alternate tax carry-forward | $ 14,246 | $ — | $ 821 | $ — | $ (897) | $ 14,170 |
| Property and equipment | 151 | 86 | (177) | — | (3) | 57 |
| Others | 768 | 48 | 86 | — | (68) | 834 |
| **Total deferred income tax asset** | $ 15,165 | $ 134 | $ 730 | $ — | $ (968) | $ 15,061 |
| **Deferred income tax liabilities** | | | | | | |
| Property and equipment | (240) | — | (11) | (1,010) | 14 | (1,247) |
| Intangible assets | (41,753) | (1,280) | (5,363) | — | 2,682 | (45,714) |
| Others | (107) | — | 94 | — | (1) | (14) |
| **Total deferred income tax liabilities** | $ (42,100) | $ (1,280) | $ (5,280) | $ (1,010) | $ 2,695 | $ (46,975) |
| **Net deferred income tax (liability) / asset** | $ (26,935) | $ (1,146) | $ (4,550) | $ (1,010) | $ 1,727 | $ (31,914) |
| **As at March 31, 2016** | | | | | | |

| | |
|---|---|
| **Deferred income tax asset** | $    167 |
| **Deferred income tax liability** | $  (32,081) |

Deferred tax is calculated in full on all temporary differences under the liability method using the local tax rate of the country in which the timing difference occurs.

Deferred tax assets have been recognized on the basis that there is reasonable certainty of profitability to utilize the available losses and tax credits. Deferred tax liabilities to the extent of $43,962 (2017: $40,432) have not been provided on the undistributed earnings of subsidiaries as Eros is able to control the timing of the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The excess tax paid under MAT provisions over and above normal tax liability can be carried forward and setoff against future tax liabilities computed under normal tax provisions. The Company was required to pay MAT in the past years and accordingly, a deferred tax asset of $927 (2017: $11,749 and 2016: $14,170) has been recognised in the balance sheet, which can be carried forward for a period of fifteen assessment years immediately succeeding the assessment year in which it becomes allowable.

Except for Nil (2017: Nil, 2016: 1,010) relating to tax on revaluation of freehold building, no amount has been recognized in other comprehensive income. No amounts relating to tax have been recognized directly in equity.

Domestic tax is Nil as the Company is subject to Income tax in IOM at a rate of zero percent. Foreign taxes are based on applicable tax rates in each subsidiary jurisdiction.

## 12     EARNINGS PER SHARE (EPS)

| | 2018 | | 2017 | | 2016 | |
|---|---|---|---|---|---|---|
| | Basic | Diluted | Basic | Diluted | Basic | Diluted |
| | (in thousands, except number of shares and earnings per share) | | | | | |
| **(Loss)/earnings** | | | | | | |
| Earnings attributable to the equity holders of the parent | $ (22,575) | (22,575) | $   3,805 | $   3,805 | $   3,797 | $   3,797 |
| Potential dilutive effect related to share based compensation scheme in subsidiary undertaking | — | (475) | — | (673) | — | (732) |
| **Adjusted earnings attributable to equity holders of the parent** | $ (22,575) | (23,050) | $   3,805 | $   3,132 | $   3,797 | $   3,065 |
| Number of shares | | | | | | |
| Weighted average number of shares | 62,151,155 | 62,151,155 | 59,410,292 | 59,410,292 | 57,731,839 | 57,731,839 |
| Potential dilutive effect related to share based compensation scheme | — | 1,331,211 | — | 1,532,839 | — | 1,304,185 |
| Adjusted weighted average number of shares | 62,151,155 | 63,482,366 | 59,410,292 | 60,943,131 | 57,731,839 | 59,036,024 |
| **(Loss)/earnings per share** | | | | | | |
| **(Loss)/earnings attributable to the equity holders of the parent per share (cents)** | (36.3) | (36.3) | 6.4 | 5.1 | 6.6 | 5.2 |

The above table does not split the earnings per share separately for the 'A' ordinary 30p shares and the 'B' ordinary 30p shares as there is no variation in their entitlement to participate in undistributed earnings. All share and per share data provided herein gives effect to the three-for-one stock split conversion that occurred in November 2013, retrospectively.

The Company excludes options with exercise prices that are greater than the average market price from the calculation of diluted EPS because their effect would be anti-dilutive. In the year ended March 31, 2018, 1,025,000 shares were not included in diluted earnings per share (2017: 1,370,625, 2016: 602,500). Further, the Company have excluded convertible notes 12,399,780 shares because their effect was anti-dilutive.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**13    PROPERTY AND EQUIPMENT**

| | | As At March 31, 2018 | | | |
|---|---|---|---|---|---|
| | Land and Building | Furniture, fittings and equipment | Vehicles | Machinery | Total |
| | | | (in thousands) | | |
| Opening net carrying amount | $ 8,791 | $ 432 | $ 504 | $ 606 | $ 10,333 |
| Exchange difference | (20) | — | (4) | (2) | (26) |
| Additions | 393 | 31 | 422 | 181 | 1,027 |
| Disposals | — | (91) | (468) | (227) | (786) |
| Adjustment of depreciation on disposal | — | 79 | 420 | 221 | 720 |
| Depreciation charge | (683) | (103) | (176) | (303) | (1,265) |
| **Balance as at March 31, 2018** | $ 8,481 | $ 348 | $ 698 | $ 476 | $ 10,003 |
| Capital work-in-progress | | | | | $ 10 |
| **Net carrying value as at March 31, 2018** | | | | | $ 10,013 |

| | | As At March 31, 2018 | | | |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Cost or valuation | $ 12,647 | $ 1,872 | $ 1,314 | $ 4,001 | $ 19,834 |
| Accumulated depreciation | (4,166) | (1,524) | (616) | (3,525) | (9,831) |
| **Net carrying amount** | $ 8,481 | $ 348 | $ 698 | $ 476 | $ 10,003 |
| Capital work-in-progress | | | | | $ 10 |
| **Net carrying value as at March 31, 2018** | | | | | $ 10,013 |

| | | As At March 31, 2017 | | | |
|---|---|---|---|---|---|
| | Land and Building | Furniture, fittings and equipment | Vehicles | Machinery | Total |
| | | | (in thousands) | | |
| Opening net carrying amount | $ 8,768 | $ 407 | $ 399 | $ 492 | $ 10,066 |
| Exchange difference | 100 | 6 | 11 | 14 | 131 |
| Revaluation | — | — | — | — | — |
| Additions | 385 | 187 | 260 | 463 | 1,295 |
| Others | — | (27) | — | (26) | (53) |
| Disposals | — | (24) | (5) | (5) | (34) |
| Adjustment of depreciation on disposal | — | — | 5 | 5 | 10 |
| Depreciation charge | (462) | (117) | (166) | (337) | (1,082) |
| **Balance as at March 31, 2017** | $ 8,791 | $ 432 | $ 504 | $ 606 | $ 10,333 |
| Capital work-in-progress | | | | | $ 21 |
| **Net carrying value as at March 31, 2017** | | | | | $ 10,354 |

| | | As At March 31, 2017 | | | |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Cost or valuation | $ 12,274 | $ 1,932 | $ 1,364 | $ 4,049 | $ 19,619 |
| Accumulated depreciation | (3,483) | (1,500) | (860) | (3,443) | (9,286) |
| **Net carrying amount** | $ 8791 | $ 432 | $ 504 | $ 606 | $ 10,333 |

| | | |
|---|---|---|
| Capital work-in-progress | $ | 21 |
| **Net carrying value as at March 31, 2017** | $ | 10,354 |

Property and equipment with a net carrying amount of $7,452 (2017: $7,849) have been pledged to secure borrowings (Refer Note 23).

Land and buildings were revalued as at March 31, 2016 by independent valuers on the basis of market value. Fair values were estimated based on recent market transactions, which were then adjusted for specific conditions relating to the land and buildings. As at March 31, 2018, had land and buildings of the Group been carried at historical cost less accumulated depreciation, their carrying amount would have been $5,549 (2017: $5,909).

Capital work-in-progress of $10 (2017: $21) primarily related to leasehold improvement cost in Company's leased premises.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 14    GOODWILL AND TRADE NAME

| | Goodwill | Trade Name |
|---|---|---|
| | (in thousands) | |
| **Balance As At March 31, 2018** | $    3,800 | $    14,000 |
| **Balance As At March 31, 2017** | $    4,992 | $    14,000 |

| Goodwill | Amount in US$ |
|---|---|
| Balance as at March 31, 2016 | $    5,097 |
| Foreign currency translation | (105) |
| Balance as at March 31, 2017 | 4,992 |
| Foreign currency translation | 13 |
| Impairment (Refer note 6) | (1,205) |
| Balance as at March 31, 2018 | $    3,800 |

Goodwill has been assessed for impairment at the Group level as the Group is considered as one single cash generating unit and represents the lowest level at which the goodwill is monitored for internal management purposes.

The recoverable amount of the cash generating unit has been determined based on value in use. Value in use has been determined based on future cash flows after considering current economic conditions and trends, estimated future operating results, growth rates and anticipated future economic conditions.

As of March 31, 2018, for assessing impairment of goodwill, value in use is determined using discounted cash flow method. The estimated cash flows for a period of four years were developed using internal forecasts, extrapolated for the fifth year, and a pre-tax discount rate of 15% and terminal growth rate of 4%.

As of March 31, 2018, for assessing the impairment of the trade name, value in use is determined using the relief from royalty method based on a Royalty rate of 4% on the estimated total revenue for a period of four years, extrapolated for the fifth year, and, a pre-tax discount rate of 20% and terminal growth rate of 4%.

Management believes that any reasonably possible change in the key assumptions would not cause the carrying amount (net of an impairment loss of $1,205) to exceed the recoverable amount of the cash generating unit.

## 15    INTANGIBLE CONTENT ASSETS

| | Gross Content Assets | Accumulated Amortization | Content Assets |
|---|---|---|---|
| | (in thousands) | | |
| **As at March 31, 2018** | | | |
| Film and content rights | $    1,493,099 | $    (854,991) | $    638,108 |
| Content advances | 349,568 | — | 349,568 |
| Film productions | 10,867 | — | 10,867 |
| **Non-current content assets** | $    1,853,534 | $    (854,991) | $    998,543 |
| **As at March 31, 2017** | | | |
| Film and content rights | $    1,430,523 | $    (796,058) | $    634,465 |
| Content advances | 266,232 | — | 266,232 |
| Film productions | 3,931 | — | 3,931 |
| **Non-current content assets** | $    1,700,686 | $    (796,058) | $    904,628 |

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Changes in the intangible - content assets are as follows:

| | As At ended March 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (in thousands) | | | |
| **Film productions** | | | | |
| **Opening balance** | $ | 3,931 | $ | 4,236 |
| Additions | | 10,521 | | 5,498 |
| Exchange difference | | (17) | | 86 |
| Transfer to film and content rights | | (3,568) | | (5,889) |
| **Closing balance** | $ | 10,867 | $ | 3,931 |
| **Content advances** | | | | |
| **Opening balance** | $ | 266,232 | $ | 284,817 |
| Additions (*) | | 221,251 | | 236,536 |
| Exchange difference | | (1,100) | | 2,279 |
| Impairment (**) | | (353) | | (1,625) |
| Transfer to film and content rights | | (136,462) | | (255,775) |
| **Closing balance** | $ | 349,568 | $ | 266,232 |
| **Film and content rights** | | | | |
| **Opening balance** | $ | 634,465 | $ | 506,086 |
| Amortization | | (115,285) | | (135,316) |
| Exchange difference | | (414) | | 2,031 |
| Deconsolidation (Refer Note 4) | | (20,688) | | — |
| Transfer from film productions and content advances | | 140,030 | | 261,664 |
| **Closing balance** | $ | 638,108 | $ | 634,465 |

Film and content rights with a carrying amount of $321,474 (2017: $321,872) have been pledged against secured borrowings (Refer Note 23).

(*) represents exchange of film rights for non-cash consideration, i.e. de-recognition of financial asset amounting $14,795.

(**) impairment loss on content advances relate to amounts advanced, to the extent not considered recoverable, for prospective film productions that are not being developed further or not considered viable.

**16    INTANGIBLE ASSETS- OTHER**

Other intangibles comprise of software and other intangibles used within the Group's digital and home entertainment activities and internal accounting activities.

The changes in other intangible assets are as follows:

| | As At March 31, 2018 | | | | | |
|---|---|---|---|---|---|---|
| | (in thousands) | | | | | |
| | Information technology assets | | Other intangibles | | Total | |
| Opening net carrying amount as on March 31, 2017 | $ | 2,160 | $ | 2,200 | $ | 4,360 |
| Exchange difference | | — | | (7) | | (7) |
| Additions | | 205 | | 2,450 | | 2,655 |
| Disposals | | — | | (2) | | (2) |
| Amortization charge | | (916) | | (810) | | (1,726) |
| **Closing net carrying amount as on March 31, 2018** | $ | 1,449 | $ | 3,831 | $ | 5,280 |

F-29

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

| | As At March 31, 2018 | | |
|---|---|---|---|
| | (in thousands) | | |
| Cost or valuation as on March 31, 2018 | $ 5,055 | $ 6,938 | $ 11,993 |
| Accumulated amortization | (3,606) | (3,107) | (6,713) |
| **Net carrying amount as on March 31, 2018** | **$ 1,449** | **$ 3,831** | **$ 5,280** |

| | As At March 31, 2017 ( | | |
|---|---|---|---|
| | (in thousands) | | |
| | Information technology assets | Other intangibles | Total |
| Opening net carrying amount as on March 31, 2016 | $ 3,303 | $ 2,824 | $ 6,127 |
| Exchange difference | 15 | 36 | 51 |
| Disposals | — | (2) | (2) |
| Amortization charge | (1,158) | (658) | (1,816) |
| **Closing net carrying amount as on March 31, 2017** | **$ 2,160** | **$ 2,200** | **$ 4,360** |

| | As At March 31, 2017 | | |
|---|---|---|---|
| | (in thousands) | | |
| Cost or valuation as on March 31, 2017 | $ 4,850 | $ 4,497 | $ 9,347 |
| Accumulated amortization | (2,690) | (2,297) | (4,987) |
| **Net carrying amount as on March 31, 2017** | **$ 2,160** | **$ 2,200** | **$ 4,360** |

Other intangible assets with a carrying amount of $143 (2017: $239) have been pledged against secured borrowings (Refer Note 23).

## 17 AVAILABLE-FOR-SALE FINANCIAL ASSETS

| | As At March 31 | |
|---|---|---|
| | 2018 | 2017 |
| | (in thousands) | |
| Valuable Technologies Limited | $ 11,097 | $ 11,097 |
| LMB Holdings Limited | 16,000 | 16,800 |
| Valuable Innovations Private Limited | — | 1,636 |
| Cloudstream Media Inc | 160 | 80 |
| | $ 27,257 | $ 29,613 |

Eros acquired an interest in Valuable Technologies Limited ("Valuable") in the year ended March 31, 2009. Valuable manages and operates a number of companies within media and entertainment, technology and infrastructure. These companies include UFO Moviez, the leading provider of Digital projection solutions for cinemas in India, Boxtech which is involved with digital movie rentals, and Impact whose business is theatrical ticketing and sales data. As at March 31, 2018, Eros owns 7.21% of Valuable's equity. In the year ended March 31, 2018, due to the range of potential outcomes in valuing Valuable, the Board was unable to give, with reasonable certainty, a fair value in the absence of detailed financial and/or valuation related information. Management has therefore held it at cost which equates to the fair value recognized in the year ended March 31, 2012.

Acacia Investments Holdings Limited ("Acacia") is a dormant holding company and owns 24% of L.M.B Holdings Limited ("LMB") which through its subsidiaries operates satellite television channels, such as B4U Music, B4U Movies and the Movie House Channel. As of March 31, 2018, and prior, the Group had no Board representation, no involvement in policy decision making, did not provide input in respect of technical know-how and had no material contract with LMB or its subsidiaries nor did they have the power to exert significant influence. In the year ended March 31, 2018, due to the range of potential outcomes in valuing LMB, the Board was unable to give, with reasonable certainty, a fair value in the absence

of detailed financial and/or valuation related information. The range of potential outcomes for the investment was estimated using level 3 inputs, using guideline public companies method with revenue multiple. Considering recent losses incurred by LMB (based on available historical data), the management believes that an objective evidence of impairment exists as at reporting date. Accordingly, an impairment loss calculated using difference between maximum value in the range of potential outcomes and the carrying value of the investment amounting $800 have been recorded in the Statement of Income, within Other gains/ (losses), net.

F-30

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

In April 2010, Eros acquired a 1.27% interest in Valuable Innovations Private Limited ("Valuable Innovations") at a total cost of $2,020. An entity related to Valuable Technologies, Valuable Innovations houses new technology and patents of the Valuable group entities and develops related products. During ended March 31, 2018, the Company recorded an impairment loss of $1,636 within profit or loss basis change in fair value of such investment. The fair value of the investment was estimated using level 3 inputs, wherein net asset value method is used as against income approach, as there are no revenue generating activities in Valuable Innovations.

Investments in these unquoted equity instruments are not held for trading. Instead, they are held for medium or long-term strategic purpose.

**18    INVENTORIES**

| | As At March 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (in thousands) | | | |
| Goods for resale | $ | 353 | $ | 214 |
| | $ | 353 | $ | 214 |

During the year ended March 31, 2018, inventory of $290 (2017: $350 and 2016: $354) was recognized in the consolidated statements of income as an expense. In each year none of the expense was as a result of the write down of inventories. Inventories with a carrying amount of $340 (2017: $113) have been pledged as security for certain of the Group's borrowings (Refer note 23).

**19    TRADE AND OTHER RECEIVABLES**

| | As At March 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (in thousands) | | | |
| Trade accounts receivables | $ | 235,191 | $ | 226,985 |
| Trade accounts receivables reserve | | — | | (163) |
| Credit impairment (loss) | | (10,193) | | — |
| **Trade accounts receivables net** | $ | **224,998** | $ | **226,822** |
| Other receivables(*) | | 20,933 | | 25,683 |
| Prepaid charges | | 2,700 | | 277 |
| Unbilled revenue | | 5,592 | | 1,423 |
| **Trade and other receivables** | $ | **254,223** | $ | **254,205** |
| **Current trade and other receivables** | | 245,079 | | 242,762 |
| **Non-current trade and other receivables** | | 9,144 | | 11,443 |
| | $ | **254,223** | $ | **254,205** |

(*) Includes derivative asset of $282 (2017: Nil) and advance to content vendors $8,056 (2017: $10,201).

The age of financial assets that are past due but not impaired were as follows:

| | As At March 31 | |
|---|---|---|
| | 2018 | 2017 |
| | (in thousands) | |
| Not more than three months | 40,249 | 23,593 |
| More than three months but not more than six months | 21,102 | 16,729 |
| More than six months but not more than one year | 15,813 | 43,920 |
| More than one year | 37,752 | 58,516 |
| | $ 114,916 | $ 142,758 |

F-31

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The movements in the trade accounts receivables reserve are as follows:

| | As At March 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | (in thousands) | | | | | |
| As at April 1 | $ | 163 | $ | 130 | $ | 250 |
| Provisions | | 1,968 | | 2,430 | | 1,315 |
| Amounts written off | | (2,131) | | (2,397) | | (1,435) |
| As at March 31 | $ | — | $ | 163 | $ | 130 |

The carrying amount of trade accounts receivables and other receivables are considered a reasonable approximation of fair value. Trade and other accounts receivables with a net carrying amount of $92,728 (2017: $60,128) have been pledged against secured borrowings (Refer Note 23).

**20    TRADE AND OTHER PAYABLES**

| | As At March 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (in thousands) | | | |
| Trade accounts payable | $ | 16,886 | $ | 12,142 |
| Accruals and other payables (includes creditors for content assets of $19,809 (2017: $71,983) | | 31,955 | | 83,405 |
| Deferred revenue | | 10,642 | | 7,131 |
| Accrued interest | | 2,546 | | 2,862 |
| Value added taxes and other taxes payable | | 10,113 | | 14,542 |
| | $ | 72,142 | $ | 120,082 |

The carrying amount of trade and other payables are considered a reasonable approximation of fair value.

**21    CASH AND CASH EQUIVALENTS**

Cash and cash equivalents consist of cash on hand and balance with banks (including balances in current account and demand deposits). Cash and cash equivalents included in the statements of cash flows comprise the following amounts in the statement of financial position.

| | As At March 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (in thousands) | | | |
| Cash at bank and in hand | $ | 87,762 | $ | 112,267 |
| | $ | 87,762 | $ | 112,267 |

**22    OPERATING LEASES**

The Group has leased various offices under non-cancellable operating lease agreements. The minimum lease rentals to be paid under non-cancellable operating leases are as follows:

| | As At March 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (in thousands) | | | |
| Within one year | $ | 149 | $ | 645 |
| Within two to five years | | 267 | | 273 |
| | $ | 416 | $ | 918 |

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 23    BORROWINGS

An analysis of long-term borrowings is shown in the table below.

| | Nominal Interest Rate | Maturity | As At March 31 2018 | As At March 31 2017 |
|---|---|---|---|---|
| | | | (in thousands) | |
| **Asset backed borrowings** | | | | |
| Vehicle loan | 7.5 -10.25% | 2017-21 | $       560 | $       325 |
| Term loan | BPLR+1.8% - 2.75% | 2017-18 | — | 1,264 |
| Term loan | BPLR+2.75% | 2017-18 | — | 466 |
| Term loan | BPLR+2.85% | 2019-20 | 3,453 | 5,776 |
| Term loan | BPLR+2.55% – 3.4% | 2020-21 | 8,767 | 11,945 |
| Term Loan | 13.75% | 2022-23 | 9,580 | — |
| Term loan | MCLR+3.45% | 2021-22 | 11,976 | 14,603 |
| | | | $    34,336 | $    34,379 |
| **Unsecured borrowings** | | | | |
| Retail bond | 6.5% | 2021-22 | 70,055 | 62,672 |
| Revolving facility[1] | LIBOR +1.9%- 7.5% and Mandatory Cost | 2017-18 | — | 85,000 |
| Convertible Notes [4] | 14.2% | 2020-21 | 86,010 | |
| Other borrowings | 10.5% | 2021-22 | — | 5,853 |
| | | | $   156,065 | $   153,525 |
| Nominal value of borrowings | | | $   190,401 | $   187,904 |
| Cumulative effect of unamortized costs | | | (1,210) | (1,665) |
| Installments due within one year | | | (64,208) | (96,398) |
| **Long-term borrowings — at amortized cost** | | | $   124,983 | $    89,841 |

Bank prime lending rate and marginal cost lending rate ("BPLR" & "MCLR") is the Indian equivalent to LIBOR. Asset backed borrowings are secured by fixed and floating charges over certain Group assets.

**Analysis of short-term borrowings**

| | Nominal interest rate (%) | As at March 31 2018 | As at March 31 2017 |
|---|---|---|---|
| | | (in thousands) | |
| **Asset backed borrowings** | | | |
| Export credit, bill discounting and overdraft | BPLR+1-3.5% | $    43,518 | $    41,687 |
| Export credit and overdraft | LIBOR+4.5% | 21,226 | 24,572 |
| Short term loan[2] | 13% - 14.25% | 11,537 | 5,396 |
| Short term loan | 10.20% | 11,474 | — |
| Short term loan | MCLR+4.25% | — | 4,943 |
| | | $    87,755 | $    76,598 |
| **Unsecured borrowings** | | | |
| Other short term loan [3] | 12% - 14% | — | 7,033 |
| Installments due within one year on long-term borrowings | | 64,208 | 96,398 |

| | | | |
|---|---|---|---|
| Short-term borrowings - at amortized cost | $ | 151,963 | $ | 180,029 |

(1)   The Group re-paid revolving credit facility in December 2017.

(2)   Secured by pledge of shares held in the Group's majority owned subsidiary, Eros International Media Limited, India.

(3)   Includes loan of $6,417 as at March 31, 2017 from Eros Television Private Limited, a related party. (See Note 35).

F-33

## EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(4) Eros International Plc. ("issuer") issued Senior Convertible Notes (SCN or convertible notes) on 6 December 2017 amounting to US$122,500 principal amount and option to purchase warrants up to 2,000 of A ordinary share for a term of 6 months at an offer price of $100,000 by private placement. The notes are payable in equal installments of $3,500 per month for 35 months. The installments can be paid either in cash or can be converted into A ordinary equity shares of the issuer at the option of the issuer as per the terms of the arrangement.

The holder of the notes can defer the payment of the amount due on any installment dates to another installment date as well as has the right to accelerate the payment on the notes as per the terms of the agreement

The Company has classified the instrument as a financial liability at fair value through profit or loss. The Company has used the Black – Scholes option pricing model to value the share warrants exercisable within six months and the Monte-Carlo simulation model to obtain the fair value of the convertible notes. The initial fair value of the financial liability recognized on the date of issue was $100,055. Fair value of the financial liability outstanding as at the date of reporting is $86,010.

The mark-to-market loss and interest expenses for the year ended March 31, 2018 amounting $13,840 and $4,338 have been recognized within other gain/(losses) and net finance cost, respectively, net in the Statement of Income.

The option to purchase warrants has expired in June 2018.

Fair value of the long-term borrowings as at March 31, 2018 is $172,788 (2017: $155,923). Fair values of long-term financial liabilities except retail bonds and convertibles notes have been determined by calculating their present values at the reporting date, using fixed effective market interest rates available to the Companies within the Group. As at March 31, 2018, the fair value of retail bond amounting to $58,218 (2017: $43,416) has been determined using quoted prices from the London Stock Exchange and the fair value of senior convertible notes has been determined at $86,010 by an independent valuation expert using Monte-Carlo simulation model. Carrying amount of short-term borrowings are considered a reasonable approximation of fair value.

The Company has placed time deposits of $7,468 (2017: $7,316) which has been disclosed as restricted deposits.

## 24    ACCEPTANCES

|  | As At March 31 | | | |
|---|---|---|---|---|
|  | 2018 | | 2017 | |
|  | (in thousands) | | | |
| Payable under the film financing arrangements | $ | 8,898 | $ | 8,935 |
|  | $ | 8,898 | $ | 8,935 |

Acceptances comprise of short-term credit availed from financial institutions for payment to film producers for film co-production arrangement entered by the group. The carrying value of acceptances are considered a reasonable approximation of fair value.

## 25    OTHER LONG – TERM LIABILITIES

|  | As At March 31 | | | |
|---|---|---|---|---|
|  | 2018 | | 2017 | |
|  | (in thousands) | | | |
| Deferred revenue | $ | 2,326 | $ | 4,654 |
| Employee benefit obligation |  | 747 |  | 695 |
|  | $ | 3,073 | $ | 5,349 |

## 26    DERIVATIVE FINANCIAL INSTRUMENTS

|  | As At March 31 | |
|---|---|---|
|  | 2018 | 2017 |
|  | (in thousands) | |

**Non-Current**

Derivative liabilities – Held for trading

| | | | |
|---|---|---|---|
| Interest rate cap | $ — | $ | (12,553) |

The above interest rate derivative instruments are not designated in a hedging relationship. They are carried at fair value through profit or loss. (Refer Note 9). The Group re-paid derivative instruments in December 2017.

F-34

## EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

**27    ISSUED SHARE CAPITAL**

| | Number of Shares | GBP |
|---|---|---|
| **Authorized** | | **(in thousands)** |
| Ordinary shares of 30p each at March 31, 2017 | 83,333,333 | 25,000 |
| Ordinary shares of 30p each at March 31, 2018 | 100,000,000 | 30,000 |

| | Number of Shares | | USD |
|---|---|---|---|
| | A Ordinary 30p Shares[*] | B Ordinary 30p Shares[*] | (in thousands) |
| **Allotted, called up and fully paid** | | | |
| **As at March 31, 2016** | **32,949,314** | **24,960,654** | **$       30,793** |
| Issue of shares in the quarter ended June 30, 2016 | 1,750 | — | 1 |
| Issue of shares in the quarter ended September 30, 2016 | 2,515,436 | — | 986 |
| Issue of shares in the quarter ended December 31, 2016 | 231,043 | — | 87 |
| Issue of shares in the quarter ended March 31, 2017 | 33,387 | — | 10 |
| Transfer of B Ordinary to A Ordinary share | 5,581,272 | (5,581,272) | — |
| **As at March 31, 2017** | **41,312,202** | **19,379,382** | **$       31,877** |
| Issue of shares in the quarter ended June 30, 2017 | 12,000 | — | 5 |
| Issue of shares in the quarter ended September 30, 2017 | 288,291 | — | 114 |
| Issue of shares in the quarter ended December 31, 2017 | 1,681,520 | — | 657 |
| Transfer of B Ordinary to A Ordinary share | 9,666,667 | (9,666,667) | — |
| Issue of shares in the quarter ended Mar 31, 2018 | 2,757,743 | | 2,681 |
| **As at March 31, 2018** | **55,718,423** | **9,712,715** | **$       35,334** |

[*] Each A ordinary shares is entitled to one vote on all matters and each B shares shares is entitled to ten votes.

On May 11, 2017, the Company entered into an exit agreement with an employee pursuant to which the Board approved a grant of 12,000 'A' ordinary share awards with Nil exercise price and a fair market value of $10.8 per share. The Shares were issued in May 2017.

In May 2017, the Company entered into an exit agreement with an employee pursuant to which the Board approved a grant of 90,000 'A' ordinary share awards with Nil exercise price and a fair market value of $10 per share. These shares were issued in July and August 2017.

Between the months of May to December, permitted Class B shares aggregating to 9,666,667 were converted into Class A shares. This was effected through the cancellation of 9,666,667 Class B shares and subsequent issuance of the equivalent amount of Class A shares.

In June 2015, 300,000 'A' ordinary shares awards with a nominal price were granted to the Group CFO with a fair market value of $21.34 per share. Subject to continued employment, these awards with nominal value exercise price vest annually in three tranches beginning June 9, 2016. Out of which, 200,000 shares were issued in September 2017.

On September 24, 2014, the Board approved a grant of 116,730 'A' ordinary share awards to certain employees. These awards, granted to the employees on October 21, 2014 with Nil exercise price, subject to continued employment, vest annually in three equal tranches from the date of grant. Fair value of each award was $17.07. In October, November 2017 and January 2018, a total of 26,550 shares were issued by the Company.

On October 6, 2017, 25,000 'A' ordinary shares were issued to a consultant with nominal exercise price and a fair value of $14.3 per share.

On October 24, 2017, 148,895 'A' ordinary shares were issued to employee as a settlement compensation with Nil exercise price and a fair value of $12.2 per share.

In November 2017 and March 2018, a total of 10,208 'A' ordinary shares were exercised by an employee.

F-35

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

On June 28, 2016, the Board of Directors approved a grant of 197,820 share awards to certain employees with a fair value of $14.68 per share. Subject to continued employment, these awards with Nil exercise price vest over a period of two and half years with first tranche vesting on November 11, 2016. In November 2017, December 2017 and January 2018, 54,846 shares were issued by the Company.

On November 22, 2017, the Board of Directors approved to offset loan and advances of Founder Group to the Company by approving the issuance of 1,421,520 'A' ordinary shares with a fair value of $11.6 per share which were issued in November 2017 in accordance with the resolution.

On February 17, 2017, the Board of Directors approved, 50,000 'A' ordinary share awards to an employee with a fair market value of $12.5 per share. Subject to continued employment, these awards with Nil exercise price, vest over a period of three years. In February 2018, 16,667 shares were vested and issued.

On November 22, 2017, 243,300 'A' ordinary share awards to certain employees with Nil exercise price, subject to continued employment, first vest immediately and remaining two tranches vest annually from the date of grant. Fair value of each award was $13.25. In February 2018, 9,200 shares were vested and issued.

On June 28, 2016 620,000, 'A' ordinary share awards to certain executive directors with a fair value of $14.68 per share. Subject to continued employment these awards with Nil exercise price, vest over a period of three years. In March 2018, 100,000 shares were vested and issued to the executive directors.

Between January and March 2018, 2,624,668 'A' ordinary shares were issued against repayment towards monthly instalment of convertible notes.

Between January and March 2018, the Company received share application money $18,000 from the Founder Group for the shares to be issued. Subsequently, on April 13, 2018, 1,225,323 shares were issued.

**28    SHARE BASED COMPENSATION PLANS**

The compensation cost recognized with respect to all outstanding plans and by grant of shares, which are all equity settled instruments, is as follows:

| | Year ended March 31 | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| IPO India Plan | $        1,572 | $        2,140 | $        1,736 |
| JSOP Plan | 615 | 3,622 | 2,696 |
| Option award scheme 2012 | 197 | 699 | 1,610 |
| 2014 Share Plan | (22) | 1,427 | 2,361 |
| 2015 Share Plan | 100 | 328 | 932 |
| Other share option awards[*] | 7,283 | 4,405 | 894 |
| Management scheme (staff share grant) | 8,173 | 10,850 | 20,763 |
| | $      17,918 | $      23,471 | $      30,992 |

[*] includes Restricted Share Unit (RSU) and Other share option plans.

**Joint Stock Ownership Plan (JSOP)**

In April 2012, the Company established a controlled trust called the Eros International Plc Employee Benefit Trust ("JSOP Trust"). The JSOP Trust purchased 2,000,164 shares of the Company out of funds borrowed from the Company and repayable on demand. The Company's Board, Nomination and Remuneration Committee recommends to the JSOP Trust certain employees, officers and key management personnel, to whom the JSOP Trust will be required to grant shares from its holdings at nominal price. Such shares are then held by the JSOP Trust and the scheme is referred to as the "JSOP Plan." The shares held by the JSOP Trust are reported as a reduction in stockholders' equity and termed as 'JSOP reserves'.

F-36

The movement in the shares held by the JSOP Trust is given below:

| | Year ended March 31 | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Shares held at the beginning of the year | 1,146,967 | 1,239,497 | 1,723,657 |
| Shares granted | — | — | 380,000 |
| Shares exercised | — | (92,530) | (573,260) |
| Shares forfeiture/lapsed | — | — | (290,900) |
| Shares held at the end of the year | 1,146,967 | 1,146,967 | 1,239,497 |
| Unallocated shares held by trust | 106,701 | 106,701 | 92,530 |
| | 1,253,668 | 1,253,668 | 1,332,027 |

**Employee Stock Option Plans**

A summary of the general terms of the grants under stock option plans and stock awards are as follows:

| | **Range of exercise prices** |
|---|---|
| IPO India Plan | INR10 – 175 |
| IPO Plan – June 2006 | GBP 5.28 |
| JSOP Plan | $11.00 – 24.00 |
| Option award scheme 2012 | $11.00 |
| 2014 Share Plan | $14.97– 18.50 |
| 2015 Share Plan | $7.40 – 33.12 |
| Other share option plans | $18– $18.88 |
| Restricted Share Unit (RSU) | — |
| Management Share Award | — |

Employees covered under the stock option plans are granted an option to purchase shares of the Company at the respective exercise prices, subject to fulfilment of vesting conditions (generally service conditions). These options generally vest in tranches over a period of one to five years from the date of grant. Upon vesting, the employees can acquire one share for every option. The maximum contractual term for these stock option plans ranges between two to ten years.

F-37

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The activity in these employee stock option plans is summarized below:

| | | Year ended March 31 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | | | 2017 | | | 2016 | | |
| | Name of Plan | Number of shares | | Weighted average exercise price | Number of shares | | Weighted average exercise price | Number of shares | | Weighted average exercise price |
| Outstanding at the beginning of the year | IPO India Plan | 2,108,063 | INR | 34.96 | 2,196,215 | INR | 35.17 | 1,437,400 | INR | 52 |
| Granted | | 863,320 | | 10 | 269,381 | | 10 | 966,009 | | 10 |
| Exercised | | (1,113,160) | | 32.19 | (269,553) | | 10 | (180,920) | | 39 |
| Forfeited and lapsed | | (234,188) | | 10 | (87,980) | | 10 | (26,274) | | 10 |
| Outstanding at the end of the year | | 1,624,035 | | 28.85 | 2,108,063 | | 34.96 | 2,196,215 | | 35.17 |
| Exercisable at the end of the year | | 501,122 | INR | 65.14 | 911,854 | INR | 63.75 | 632,566 | INR | 78.00 |
| Outstanding at the beginning of the year | IPO Plan June 2006 | — | | — | 62,438 | GBP | 5.28 | 62,438 | GBP | 5.28 |
| Granted | | — | | — | — | | — | — | | — |
| Exercised | | — | | — | (62,438) | | 5.28 | —- | | — |
| Forfeited and lapsed | | — | | — | —- | | | —- | | — |
| Outstanding at the end of the year | | — | | — | — | | — | 62,438 | | 5.28 |
| Exercisable at the end of the year | | — | | — | — | GBP | — | 62,438 | GBP | 5.28 |
| Outstanding at the beginning of the year | JSOP Plan | 1,146,965 | $ | 14.98 | 1,239,495 | $ | 14.98 | 1,723,657 | $ | 11.60 |
| Granted | | — | | — | — | | — | 380,000 | | 24.00 |
| Exercised | | — | | 11 | (92,530) | | 11 | (573,262) | | 11.00 |
| Forfeited and lapsed | | — | | — | — | | — | (290,900) | | 11.00 |
| Outstanding at the end of the year | | 1,146,965 | $ | 14.98 | 1,146,965 | $ | 14.98 | 1,239,495 | $ | 14.98 |
| Exercisable at the end of the year | | 728,736 | $ | 11 | 728,736 | $ | 11 | 617,450 | $ | 11.00 |
| Outstanding at the beginning of the year | Option award scheme 2012 | 674,045 | $ | 11 | 674,045 | $ | 11 | 674,045 | $ | 11.00 |
| Granted | | — | | — | — | | — | — | | — |
| Exercised | | — | | — | — | | — | — | | — |
| Forfeited and lapsed | | — | | — | — | | — | — | | — |
| Outstanding at the end of the year | | 674,045 | | 11 | 674,045 | | 11 | 674,045 | | 11.00 |
| Exercisable at the end of the year | | 674,045 | $ | 11 | 449,363 | $ | 11 | 224,682 | $ | 11.00 |
| Outstanding at the beginning of the year | 2014 Share Plan | 723,749 | $ | 18.06 | 773,749 | $ | 17.86 | 230,000 | $ | 16.27 |
| Granted | | — | | — | — | | — | 600,000 | | 18.40 |
| Exercised | | — | | — | — | | — | — | | — |
| Forfeited and lapsed | | (323,750) | | 18.39 | (50,000) | | 14.97 | (56,251) | | 17.13 |
| Outstanding at the end of the year | | 399,999 | | 17.79 | 723,749 | | 18.06 | 773,749 | | 17.86 |
| Exercisable at the end of the year | | 289,583 | $ | 17.67 | 288,333 | $ | 17.80 | 96,664 | $ | 15.99 |
| Outstanding at the beginning of the year | 2015 Share Plan | 233,750 | $ | 16.23 | 282,500 | $ | 16.68 | 200,000 | | 17.46 |
| Granted | | — | | — | — | | — | 105,000 | $ | 15.35 |
| Exercised | | (10,208) | | 8.71 | (8,750) | | 8.84 | — | | — |
| Forfeited and lapsed | | (12,292) | | 14.64 | (40,000) | | 18.68 | (22,500) | | 19.17 |
| Outstanding at the end of the year | | 211,250 | | 16.21 | 233,750 | | 16.23 | 282,500 | | 16.68 |
| Exercisable at the end of the year | | 181,354 | $ | 17.36 | 127,604 | $ | 17.46 | 72,708 | $ | 16.90 |
| Outstanding at the beginning of the year | Other share option plans | 500,000 | $ | 18.88 | 1,000,000 | | 18.44 | 500,000 | | 18.88 |
| Granted | | — | | | — | | | 500,000 | | 18.00 |
| Exercised | | — | | | — | | — | — | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forfeited and lapsed | | — | | (500,000) | 18 | — | — |
| Outstanding at the end of the year | | 500,000 | 18.88 | 500,000 | 18.88 | 1,000,000 | 18.44 |
| Exercisable at the end of the year | | 300,000 $ | 18.88 | 200,000 $ | 18.88 | 100,000 $ | 18.88 |
| Outstanding at the beginning of the year | RSU | 182,725 | — | 72,480 | — | 116,730 | — |
| Granted | | 1,044,290 | — | 216,735 | — | — | — |
| Exercised | | (366,491) | — | (95,990) | — | (36,950) | — |
| Forfeited and lapsed | | (22,934) | — | (10,500) | — | (7,300) | — |
| Outstanding at the end of the year | | 837,590 | — | 182,725 | — | 72,480 | — |
| Exercisable at the end of the year | | 119,150 | — | 12,445 | — | 1,960 | — |
| Outstanding at the beginning of the year | Management Scheme | 1,130,000 | — | 910,000 | — | 525,000 | — |
| Granted | | 700,000 | — | 670,000 | — | 910,000 | — |
| Exercised | | (316,667) | — | (450,000) | — | (525,000) | — |
| Forfeited and lapsed | | — | — | — | — | — | — |
| Outstanding at the end of the year | | 1,513,333 | — | 1,130,000 | — | 910,000 | — |
| Exercisable at the end of the year | | 173,333 | — | 180,000 | — | 175,000 | — |

F-38

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes information about outstanding stock options:

| | Year ended March 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Name of Plan | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price | Weighted average remaining life (Years) | Weighted average exercise price |
| IPO India Plan | 3.08 | INR* 35.0 | 4.10 | INR* 35.0 | 4.10 | INR* 35.0 |
| IPO Plan June 2006 | — | GBP** — | — | GBP** — | 0.25 | GBP** 5.28 |
| JSOP Plan | 3.93 | $ 16.19 | 4.93 | $ 16.19 | 5.93 | $ 14.98 |
| Option award scheme 2012 | 3.75 | $ 11.00 | 4.83 | $ 11.00 | 5.83 | $ 11.00 |
| 2014 Share Plan | 5.96 | $ 17.79 | 7.11 | $ 18.06 | 6.88 | $ 17.86 |
| 2015 Share Plan | 6.06 | $ 16.21 | 6.08 | $ 16.23 | 5.91 | $ 16.68 |
| Other share option plans | 3.75 | $ 18.88 | 4.75 | $ 18.88 | 5.75 | $ 18.44 |
| Management Scheme | 5.56 | $ — | 5.59 | $ — | 6.00 | $ — |
| Restricted Stock Unit | 5.60 | $ — | 5.63 | $ — | 6.00 | $ — |

*INR – Indian Rupees
**GBP – Great Britain Pound
IPO India Plan
The following table summarizes information about inputs to the fair valuation model for options granted during the year:

| | Inputs |
|---|---|
| Expected volatility[1][2] | 35% - 75% |
| Option life (Years) | 1.91 - 7.00 |
| Dividend yield | 0% |
| Risk free rate | 6.51% - 8.50% |
| Range of fair value of the granted options at the grant date[3] | INR 179 – 380 |

(1)    The expected volatility in respect of the IPO India Plan is based on Eros International Media Limited's historic volatility.

(2)    The expected volatility of all other options is based on the historic share price volatility of the Company over time periods comparable to the time from the grant date to the maturity dates of the options.

(3)    Fair value of options granted under all other schemes is measured using a Black Scholes model.

**Restricted Stock Unit (RSU) and Management Scheme plan**

In respect of units/options granted towards RSU and Management Scheme, grant date fair value approximates intrinsic value.

**29    JOINT STOCK OWNERSHIP PLAN RESERVE (JSOP Reserve)**

| | (in thousands) |
|---|---|
| **Balance at April 1, 2016** | $    (17,167) |
| Issue out of treasury shares | 1,182 |
| **Balance at April 1, 2017** | $    (15,985) |
| Issue out of treasury shares | — |
| **Balance at March 31, 2018** | $    (15,985) |

The JSOP Reserve represents the cost of shares issued by Eros International Plc and held by the JSOP Trust to satisfy the requirements of the JSOP Plan (Refer Note 28). On June 5, 2014, the Board approved discretionary vesting of 20% of the applicable JSOP shares. In the current year 106,701 (2017: 106,701) 'A' ordinary shares held by the JSOP Trust

were eligible to be issued to employees.

The number of shares held by the JSOP Trust at March 31, 2018 was 1,253,668 'A' Ordinary shares (2017: 1,253,668 'A' Ordinary shares).

F-39

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 30    OTHER COMPONENTS OF EQUITY

| | As at March 31 (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| **Movement in Hedging reserve:** | | | | | | |
| Opening balance | $ | (375) | $ | (1,179) | $ | (1,983) |
| Reclassified to consolidated statements of income | | 375 | | 804 | | 804 |
| Closing balance | $ | — | $ | (375) | $ | (1,179) |
| **Movement in revaluation reserve:** | | | | | | |
| Opening balance | $ | 1,829 | $ | 1,856 | $ | 1,528 |
| Gain recognized on revaluation of property and equipment | | — | | — | | 328 |
| Impact of translation difference | | 6 | | (27) | | — |
| Closing balance | $ | 1,835 | $ | 1,829 | $ | 1,856 |
| **Movement in available for sale fair value reserve:** | | | | | | |
| Opening balance | $ | 6,238 | $ | 6,622 | $ | 6,622 |
| Impairment loss on available-for-sale financial assets | | — | | (384) | | — |
| Closing balance | $ | 6,238 | $ | 6,238 | $ | 6,622 |
| **Movement in Foreign currency translation reserves** | | | | | | |
| Opening balance | $ | (55,810) | $ | (60,609) | $ | (50,048) |
| Other comprehensive loss due to translation of foreign operations (*) | | (912) | | 4,799 | | (10,561) |
| Closing balance | $ | (56,722) | $ | (55,810) | $ | (60,609) |
| Total other components of equity | $ | (48,649) | $ | (48,118) | $ | (53,310) |

(*) includes movement in foreign currency translation reserves arising on account of deconsolidation $502 (2017: Nil, 2016: Nil) of financial asset.

## 31    SIGNIFICANT NON-CASH EXPENSES

Significant non-cash expenses, except loss on sale of assets, share based compensation, depreciation and amortization were as follows:

| | As at March 31 | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| | (in thousands) | | | | | |
| Unrealized foreign exchange loss / (gain) | $ | 5,466 | $ | (3,838) | $ | (2,864) |
| Credit impairment Loss, net | | 4,308 | | — | | — |
| Impairment charge on available-for-sale financial assets | | 2,436 | | — | | — |
| Net losses on de-recognition of financial assets measured at amortized cost, net | | 3,562 | | — | | — |
| Mark to market gain on derivative financial instrument measured at fair value through profit and loss | | — | | (10,297) | | 3,566 |
| Loss on settlement of derivative financial instruments | | 586 | | — | | — |
| Loss on financial liability (convertible notes) measures at fair value through profit and loss | | 13,840 | | — | | — |
| Loss on deconsolidation of a subsidiary | | 14,649 | | — | | — |
| Provisions for trade and other receivables | | 4,740 | | 2,430 | | 1,315 |
| Provision no longer required, written-back | | (124) | | (798) | | — |
| Impairment loss on content advances and loans and advances | | 353 | | 1,887 | | 2,545 |

| | | | | | |
|---|---|---|---|---|---|
| Impairment charge on goodwill | 1,205 | | — | | — |
| Others | 30 | | — | | — |
| | $ | 51,051 | $ | (10,616) | $ | 4,562 |

F-40

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**32    FINANCIAL INSTRUMENTS AND RISK MANAGEMENT**

The Group has established objectives concerning the holding and use of financial instruments. The underlying basis of these objectives is to manage the financial risks faced by the Group.

Formal policies and guidelines have been set to achieve these objectives. The Group does not enter into speculative arrangements or trade in financial instruments and it is the Group's policy not to enter into complex financial instruments unless there are specific identified risks for which such instruments help mitigate uncertainties.

**Management of Capital Risk and Financial Risk**

The Group manages its capital to ensure that entities in the Group will be able to continue as a going concern while maximizing the return to shareholders through the optimization of the debt and equity balance. The capital structure of the Group consists of debt, which includes the cash and cash equivalents, borrowings and equity attributable to equity holders of Eros, comprising issued capital, reserves and retained earnings as disclosed in Notes 21, 23 and 27 and the consolidated statement of changes in equity.

The gearing ratio at the end of the reporting period was as follows:

| | As at March 31 | |
| --- | --- | --- |
| | 2018 | 2017 |
| | (in thousands) | |
| Debt (net of debt issuance cost of $1,210 (2017: $1,665)) | $ 276,946 | $ 269,870 |
| Cash and cash equivalents | 87,762 | 112,267 |
| Net debt | 189,184 | 157,603 |
| Equity | 1,003,417 | 883,548 |
| Net debt to equity ratio | 18.9% | 17.8% |

Debt is defined as long and short-term borrowings (excluding derivatives). Equity includes all capital and reserves of the Group that are managed as capital.

**Categories of financial instruments**

| | 2018 | 2017 |
| --- | --- | --- |
| | (in thousands) | |
| **Financial assets** | | |
| Available-for-sale investments | $ 27,257 | $ 29,613 |
| Other financial assets [1] | 340,994 | 362,286 |
| | $ 368,251 | $ 391,899 |
| **Financial liabilities at amortized cost** | | |
| Trade payables and acceptances excluding value added tax and other tax payables | $ 70,927 | $ 114,475 |
| Borrowings | 190,936 | 269,870 |
| **Financial Liabilities at fair value through profit or loss** | | |
| Derivatives at fair value through profit or loss - held for trading | — | 12,553 |
| Senior convertible Notes at fair value through profit or loss | 86,010 | — |
| | $ 347,873 | $ 396,898 |

(1) Other financial assets include loans and receivables, excluding prepaid charges and statutory receivables, and includes cash and cash equivalents and restricted deposits held with banks.

F-41

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Financial risk management objectives**

Based on the operations of the Group throughout the world, Management considers that the key financial risks that it faces are credit risk, currency risk, liquidity risk and interest rate risk. The objectives under each of these risks are as follows:

· credit risk: minimize the risk of default and concentration.

· currency risk: reduce exposure to foreign exchange movements principally between U.S. dollar, Indian Rupee and GBP.

· liquidity risk: ensure adequate funding to support working capital and future capital expenditure requirements.

· interest rate risk: mitigate risk of significant change in market rates on the cash flow of issued variable rate debt.

**Credit risk**

Trading credit risk is managed on a country by country basis by the use of credit checks on new clients and individual credit limits, where appropriate, together with regular updates on any changes in the trading partner's situation. In a number of cases trading partners will be required to make advance payments or minimum guarantee payments before delivery of any goods. The Group reviews reports received from third parties and in certain cases as a matter of course reserve the right within the contracts it enters into to request an independent third - party audit of the revenue reporting. Further, in many of the catalogue sales, the trading partners have extended payment terms of up to a year and often fall behind contractual payment terms, thus payment cycle extends to 18 to 24 months. With respect to catalogue customers with a long trading history with the Group and who have contracted and paid significant amounts in the past without any prior history of bad debt, the Group closely monitors the same revised payment plans to assure collections. In case of new customer onboarding, the Group follows certain standard Know Your Client (KYC) procedures to ascertain financial stability of the counterparty and follows internal policies to not make ongoing sales to such new customers who are not reasonably current with their payments.

The Group from time to time will have significant concentration of credit risk in relation to individual theatrical releases, television syndication deals or music licenses. This risk is mitigated by contractual terms which seek to stagger receipts, de-recognition of financial assets and/or the release or airing of content. As at March 31, 2018, 20.5% (2017: 25.1%) of trade account receivables were represented by the top five debtors and for the year ended March 31, 2018, a loss on de-recognition of financial assets amounting to $3,562 (2017: Nil and 2016: Nil) arising on assignment and novation of trade receivable and trade payables with no recourse have been recognized in the statement of Income within other gains/ (losses), net. The maximum exposure to credit risk is that shown within the statements of financial position, net of credit impairment loss $10,193 (2017: $ Nil). The maximum credit exposure on financial guarantees given by the Group for various financial facilities is described in Note 33.

As at March 31, 2018, the Group did not hold any material collateral or other credit enhancements to cover its credit risks associated with its financial assets.

**Currency risk**

The Group operates throughout the world with significant operations in India, the British Isles, the United States of America and the United Arab Emirates. As a result it faces both translation and transaction currency risks which are principally mitigated by matching foreign currency revenues and costs wherever possible.

The Group's major revenues are denominated in U.S. Dollars, Indian Rupees and British pounds sterling which are matched where possible to its costs so that these act as an automatic hedge against foreign currency exchange movements.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The Group has identified that it will need to utilize hedge transactions to mitigate any risks in movements between the U.S. Dollar and the Indian Rupee and has adopted an agreed set of principles that will be used when entering into any such transactions. No such transactions have been entered into to date and the Group has managed foreign currency exposure to date by seeking to match foreign currency inflows and outflows as much as possible. Details of the foreign currency borrowings that the Group uses to mitigate risk are shown within Interest Risk disclosures.

As at the reporting date there were no outstanding forward foreign exchange contracts. In fiscal 2018, foreign exchange exposure was managed through cross currency swap on $11,474 borrowings. The Group adopts a policy of borrowing where appropriate in the local currency as a hedge against translation risk. The table below shows the Group's net foreign currency monetary assets and liabilities position in the main foreign currencies, translated to USD equivalents, as at the year-end:

|  | | Net Balance | |
|---|---|---|---|
|  | USD | GBP | Other |
|  | | (in thousands) | |
| As at March 31, 2018 | (4,350) | (56,080) | 1,081 |
| As at March 31, 2017 | 4,025 | (39,460) | (2,320) |

The above exposure to foreign currency arises where a consolidated entity holds monetary assets and liabilities denominated in a currency different to the functional currency of that entity.

A uniform decrease of 10% in exchange rates against all foreign currencies in position as of March 31, 2018 would have decreased in the Company's net income before tax by approximately $5,935 (2017: loss of $3,775 and 2016: gain of $3,947). An equal and opposite impact would be experienced in the event of an increase by a similar percentage.

Our sensitivity to foreign currency has increased during the year ended March 31, 2018 as a result of an increase in liabilities compared to assets denominated in foreign currency over the comparative period. In Management's opinion, the sensitivity analysis is unrepresentative of the inherent foreign exchange risk because the exposure at the end of the reporting period does not reflect the exposure during the year.

**Liquidity risk**

The Group manages liquidity risk by maintaining adequate reserves and agreed committed banking facilities. Management of working capital takes account of film release dates and payment terms agreed with customers.

An analysis of short-term and long-term borrowings is set out in Note 23. Set out below is a maturity analysis for non-derivative and derivative financial liabilities. The amounts disclosed are based on contractual undiscounted cash flows. The table includes both interest and principal cash flows. To the extent that interest flows are floating rate, the undiscounted amount is derived from interest rates as at March 31, in each year.

|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
|  | | | (in thousands) | | |
| As at March 31, 2018 | | | | | |
| Borrowing principal payments[1] | $ 278,156 | $ 152,330 | $ 50,650 | $ 75,176 | $ — |
| Borrowing interest payments | 48,750 | 26,024 | 15,319 | 7,407 | — |
| Derivative financial instruments | — | — | — | — | — |
| Acceptances | 8,898 | 8,898 | — | — | — |
| Trade and other payables | 72,142 | 72,142 | — | — | — |

|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
|  | | | (in thousands) | | |
| As at March 31, 2017 | | | | | |
| Borrowing principal payments[1] | $ 271,535 | $ 180,722 | $ 18,079 | $ 71,881 | $ 853 |
| Borrowing interest payments | 40,987 | 22,019 | 12,046 | 6,922 | — |

| | | | | | |
|---|---|---|---|---|---|
| Derivative financial instruments | 12,553 | — | — | 12,533 | — |
| Acceptances | 8,935 | 8,935 | — | — | — |
| Trade and other payables | 120,082 | 120,082 | — | — | — |

(1) Excludes cumulative effect of unamortized costs.

F-43

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

At March 31, 2018, the Group had facilities available of $287,684 (2017: $282,685) and had net undrawn amounts of $630 (2017: $2,215) available.

In addition, the Group has issued financial guarantees amounting to $1,171 (2017: $2,192) in the ordinary course of business, having maturity dates up to the next 12 months. The Group did not earn any fees to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

**Interest rate risk**

The Group is exposed to interest rate risk because entities in the Group borrow funds at both fixed and floating interest rates. The risk is managed by maintaining an appropriate mix between fixed, capped and floating rate borrowings, and by the use of interest rate swap contracts and forward interest rate contracts. Hedging activities are evaluated to align with interest rate views to ensure the most cost effective hedging strategies are applied.

**Currency, Maturity and Nature of Interest Rate of the Nominal Value of Borrowings**

| | As at March 31 | | | |
|---|---|---|---|---|
| | 2018 | % | 2017 | % |
| | (in thousands, except percentages) | | | |
| **Currency** | | | | |
| U.S. Dollar | $ 107,236 | 38.6% | $ 115,424 | 42.5% |
| Great British Pounds Sterling | 70,055 | 25.2% | 62,672 | 23.1% |
| Indian Rupees | 100,865 | 36.2% | 93,439 | 34.4% |
| Total | $ 278,156 | 100.0% | $ 271,535 | 100.0% |
| **Maturity** | | | | |
| Due before one year | $ 152,330 | 54.8% | $ 180,722 | 66.6% |
| Due between one and three years | 50,650 | 18.2% | 18,079 | 6.7% |
| Due between four and five years | 75,176 | 27.0% | 71,881 | 26.5% |
| Due after five years | — | — | 853 | 0.2% |
| | $ 278,156 | 100.0% | $ 271,535 | 100.0% |
| **Nature of rates** | | | | |
| Fixed interest rate | $ 177,742 | 63.9% | $ 131,279 | 48.3% |
| Floating rate | 100,414 | 36.1% | 140,256 | 51.7% |
| Total | $ 278,156 | 100.0% | $ 271,535 | 100.0% |

In 2018 fiscal year, the interest exposure was managed through an interest cap on $100 million entered into in 2012. Two written floor contracts each with $100 million notional value were also entered into in 2012 were closed.

At 1% increase in underlying bank rates would lead to decrease in the Company's net income before tax by $851 for the year ended March 31, 2018 (2017: $2,461) on net income. An equal and opposite impact would be felt if rates fell by 1%. This analysis assumes that all other variables, in particular foreign currency rates, remain constant.

Under the interest swap contracts, we have agreed to exchange the difference between fixed and floating rate interest amounts calculated on an agreed notional principal amount. Such contracts enable us to mitigate the risk of changing interest rates on the cash flow of issued variable rate debt.

The fair value of interest rate derivatives which comprise derivatives at fair value through profit and loss is determined as the present value of future cash flows estimated and discounted based on the applicable yield curves derived from quoted interest rates.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Financial instruments — disclosure of fair value measurement level**

Disclosures of fair value measurements are grouped into the following levels:

- Level 1 fair value measurements derived from unadjusted quoted prices in active markets for identical assets or liabilities;

- Level 2 fair value measurements derived from inputs, other than quoted prices included within Level 1, that are observable for the asset or liability, either directly (as prices) or indirectly (derived from prices); and

- Level 3 fair value measurements derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data.

The table below presents assets and liabilities measured at fair value on a recurring basis, which are all category level 2:

**As at March 31, 2018**
**(in thousands)**

| Description of type of financial assets | Gross amount of recognized financial assets | Gross amount of recognized financial liabilities offset in the statement of financial position | Net amounts financial assets presented in the statement of financial position |
|---|---|---|---|
| Derivative assets | 282 | — | 282 |
| **Total** | 282 | — | 282 |

| Description of type of financial liabilities | Gross amount of recognized financial liabilities | Gross amount of recognized financial assets offset in the statement of financial position | Net amounts financial liabilities presented in the statement of financial position |
|---|---|---|---|
| Derivative liabilities | — | — | — |
| **Total** | — | — | — |

**As at March 31, 2017**
**(in thousands)**

| Description of type of financial assets | Gross amount of recognized financial assets | Gross amount of recognized financial liabilities offset in the statement of financial position | Net amounts financial assets presented in the statement of financial position |
|---|---|---|---|
| Derivative assets | 179 | (179) | — |
| **Total** | 179 | (179) | — |

| Description of type of financial liabilities | Gross amount of recognized financial liabilities | Gross amount of recognized financial assets offset in the statement of financial position | Net amounts financial liabilities presented in the statement of financial position |
|---|---|---|---|
| Derivative liabilities | (12,732) | 179 | (12,553) |
| **Total** | (12,732) | 179 | (12,553) |

Financial assets and liabilities subject to offsetting enforceable master netting arrangements or similar agreements as at

March 31, 2018 are as follows:

| | Average contract rate | Notional principal amount | Fair value of derivative instrument 2018 | Fair value of derivative instrument 2017 |
|---|---|---|---|---|
| | | **As at March 31,2018** **(in thousands)** | | |
| **Cross currency swap** | 4.8% | 11,474 | 282 | — |
| **2012 Interest Rate Cap** | 6% | 100,000 | — | (179) |
| **2012 Interest Rate Floor** | 0.5% - 3% | 100,000 | — | 6,366 |
| **2012 Interest Rate Floor** | 0.5% - 3% | 100,000 | — | 6,366 |
| **Total** | | | $          282 | $          12,553 |

None of the above derivative instruments is designated in a hedging relationship. A net loss of $304 (gain in 2017: Nil) in respect of the above derivative instruments has been recognized in the consolidated statements of income within other gain/(loss), net. Fair value of interest rate derivative involving interest rate options and cross currency swap is estimated as the present value of the estimated future cash flows based on observable yield curves using an option pricing model.

F-45

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Reconciliation of Level 3 fair value measurements of financial assets

|  | Available for sale of financial assets |
|---|---:|
|  | (in thousands) |
| **As at March 31, 2016** | $        30,147 |
| Total gain or (losses): |  |
|   -other comprehensive income | (384) |
|   Additions | 80 |
|   Disposals(*) | (230) |
| **As at March 31, 2017** | $        29,613 |
| Additions | 80 |
| **Total gain or (losses):** |  |
|   -profit and loss: | (2,436) |
| **As at March 31, 2018** | $        27,257 |

(*)On June 3, 2016, the Company sold its investment in The Cultural Trip ("TCT") for $288 recording a gain of $58. The Company had made investment in TCT in July 2015 at transaction price of $230.

Management uses valuation techniques in measuring the fair value of financial instruments, where active market quotes are not available. In applying the valuation techniques, management makes maximum use of market inputs, and uses estimates and assumptions that are, as far as possible, consistent with observable data that market participants would use in pricing the instrument. Where applicable data is not observable, management uses its best estimate about the assumptions that market participants would make. These estimates may vary from the actual prices that would be achieved in an arm's length transaction at the reporting date.

There were no transfers between any Levels in any of the years.

**33    CONTRACTUAL OBLIGATIONS AND COMMITMENTS**

Eros' material contractual obligations are comprised of contracts related to content commitments.

|  | Total |
|---|---:|
|  | (in thousands) |
| **As at March 31, 2018** | $        336,144 |
| **As at March 31, 2017** | $        250,997 |

The Group has provided certain stand-by letters of credit amounting to $53,904 (2017: $80,570) which are in the nature of performance guarantees issued while entering into film co-production contracts and are valid until funding obligations under these contracts are met. These guarantees, issued in connection with the aforementioned content commitments, and included in the table above have varying maturity dates and are expected to fall due within a period of one to three years.

In addition, the Group has issued financial guarantees amounting to $1,171 (2017: $2,192) in the ordinary course of business, and included in the table above, having varying maturity dates up to the next 12 months. The Group is only called upon to satisfy a guarantee when the guaranteed party fails to meet its obligations. The Group did not earn any fee to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

Operating lease commitments are disclosed in Note 22.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**34    CONTINGENT LIABILITIES**

1.  In Fiscal 2015 and Fiscal 2016 Eros received show causes assessment order from the Commissioner of Service Tax (India) levying an amount aggregating to $61,000 (including interest and penalty of $30,000) for the period April 1, 2009 to March 31, 2015 on account of service tax arising on temporary transfer of copyright services and certain other related matters. The Company has filed an appeal against the said order before the authorities. Considering the facts and nature of levies and the ad-interim protection for service tax levy for a certain period granted by the Honourable High Court of Mumbai, the Group expects that the final outcome of this matter will be favorable. There is no further update on this matter as preliminary hearing is yet to begin. Accordingly, based on the assessment made after taking appropriate legal advice, no additional liability has been recorded in Group's consolidated financial statements.

2.  In Fiscal 2015, Eros received several assessment orders and demand notices from value added tax and sales tax authorities in India for the payment of amounts aggregating to $3,000 (including interest and penalties) for certain fiscal years between April 1, 2005 and March 31, 2011. Eros has appealed against each of these orders, and such appeals are pending before relevant tax authorities. Though there uncertainties are inherent in the final outcome of these matters, the Company believes, based on assessment made after taking legal advice, that the final outcome of the matters will be favourable. Accordingly, no additional liability has been recorded in Group's consolidated financial statements.

3.  Beginning on November 13, 2015, Eros International Plc was named a defendant in five substantially similar putative class action lawsuits filed in federal court in New Jersey and New York by purported shareholders of the Company. The three actions in New Jersey were consolidated, and, on May 17, 2016, were transferred to the United States District Court for the Southern District of New York where they were then consolidated with the other two actions on May 27, 2016. In general, the plaintiffs allege that the Company, and in some cases also Company's management, violated federal securities laws by overstating Company's financial and business results, enriching the Company's controlling owners at the expense of other stockholders, and engaging in improper accounting practices. On April 5, 2016, a lead plaintiff and lead counsel were appointed in the now consolidated New York action. A single consolidated complaint was filed on July 14, 2016 and amended on October 10, 2016. The Plaintiffs have alleged that the Company and certain individual defendants — Kishore Lulla, Jyoti Deshpande, Andrew Heffernan, and Prem Parameswaran — have violated the federal securities laws, specifically Sections 10(b) and 20(a) of the Exchange Act. The amended consolidated complaint has narrowed in scope significantly and does not assert certain claims that had been asserted in prior complaints, including (i) claims arising under Sections 11 and 15 of the Securities Act, (ii) accounting and GAAP allegations, and (iii) claims against certain individual defendants, who are not now named defendants. The remaining claims are primarily focused on whether the Company and individual defendants made material misrepresentations concerning the Company's film library and materially misstated the usage and functionality of Eros Now. The Company's most recent motion to dismiss the amended consolidated complaint was filed on November 11, 2016 and its reply brief was filed on January 6, 2017. The Court has not scheduled oral argument or indicated when it will rule on this motion. Given the uncertainty inherent in these matters, based on assessment made after taking appropriate legal advice, the Company does not believe that the ultimate outcome of this matter will be unfavourable. Accordingly, no liability has been recorded in Group's consolidated financial statements.

4.  From time to time, Eros is involved in legal proceedings arising in the ordinary course of its business, typically intellectual property litigation and infringement claims related to the Group's feature films and other commercial activities, which could cause it to incur expenses or prevent it from releasing a film. While the resolution of these matters cannot be predicted with certainty, the Group does not believe, based on current knowledge or information available, that any existing legal proceedings or claims are likely to have a material and adverse

effect on its financial position, results of operations or cash flows.

There were no other material ongoing litigations at March 31, 2018 and March 31, 2017.

F-47

# EROS INTERNATIONAL PLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

**35    RELATED PARTY TRANSACTIONS**

| | Details of Transaction | As at March 31,2018 | | As at March 31,2017 | |
|---|---|---|---|---|---|
| | | (in thousands) | | | |
| | | Liability | Asset | Liability | Asset |
| Red Bridge Group Limited | President fees | $     464 | $     — | $     210 | $     0 |
| 550 County Avenue | Rent/Deposit | 482 | 135 | 420 | 135 |
| Line Cross Limited | Rent/Deposit | 876 | 258 | 356 | 258 |
| NextGen Films Private Limited | Purchase/ Sale | — | 38,862 | — | 34,843 |
| Everest Entertainment LLP | Purchase/ Sale | 65 | — | 17 | 115 |
| Lulla Family | Rent/Deposit | 244 | 947 | 123 | 1,003 |
| Lulla Family | Salary | 2,468 | — | 1,210 | — |
| Eros Television India Private Limited | Borrowing | — | — | 6,417 | — |

The Lulla family refers to Mr. Arjan Lulla, Mr. Kishore Lulla, Mr. Sunil Lulla, Mrs. Manjula Lulla, Mrs. Krishika Lulla, Mrs. Rishika Lulla Singh, and Ms. Riddhima Lulla.

Pursuant to a lease agreement that expired on March 31, 2018, the lease requires Eros International Media Limited to pay $5 each month under this lease. Eros International Media Limited leases apartments for studio use at Kailash Plaza, 3rd Floor, Opp. Laxmi Industrial Estate, Andheri (W), Mumbai, from Manjula K. Lulla, the wife of Kishore Lulla. The lease was renewed on April 1, 2018 for a further period of one year on the same terms.

Pursuant to a lease agreement that expired on September 30, 2015, the lease requires Eros International Media Limited to pay $5 each month under this lease. Eros International Media Limited leases for use as executive accommodations the property Aumkar Bungalow, Gandhi Gram Road, Juhu, Mumbai, from Sunil Lulla. The lease was renewed on October 1, 2015 for a further period of three years on the same terms.

Pursuant to a lease agreement that expires on January 4, 2020, Eros International Media Limited leases office premise for studio use at Supreme Chambers, 5th Floor, Andheri (W), Mumbai from Kishore and Sunil Lulla. Beginning January 2015, the lease requires Eros International Media Limited to pay $61 each month under this lease.

Pursuant to a lease agreement that expires on April 1, 2020, the real estate property at 550 County Avenue, Secaucus, New Jersey, from 550 County Avenue Property Corp, a Delaware corporation owned by Beech Investments. The lease commenced on April 1,2015, and required the Group to pay $11 each month. The lease was renewed on April 1, 2015 for a further period of five years on the same terms. This is a non-cancellable lease.

Pursuant to a lease agreement that expired in March 2018, including renewal periods, the Group leases for U.K. corporate offices, the real property at 13 Manchester Square, London from Linecross Limited, a U.K. company owned indirectly by a discretionary trust of which Kishore Lulla is a potential beneficiary. The lease commenced on November 19, 2009 and requires the Group to pay $109 each quarter. The lease was not renewed after it expired in March 2018.

Pursuant to an agreement the Group entered into with Redbridge Group Limited on June 27, 2006, the Group agreed to pay an annual fee set each year of $270, $260 and $300 in the respective years ended March 31, 2018, 2017 and 2016, for the services of Arjan Lulla, the father of Kishore Lulla and Sunil Lulla, grandfather of Mrs. Rishika Lulla Singh, uncle of Vijay Ahuja and Surender Sadhwani and an employee of Redbridge Group Limited. The agreement makes Arjan Lulla honorary life president and provides for services including attendance at Board meetings, entrepreneurial leadership and assistance in setting the Group's strategy. Redbridge Group Limited is an entity owned indirectly by a discretionary trust of which Kishore Lulla is a potential beneficiary.

The Group has engaged in transactions with NextGen Films Private Limited, an entity owned by the husband of Puja Rajani, sister of Kishore Lulla and Sunil Lulla, each of which involved the purchase and sale of film rights. In the year ended March 31, 2018, NextGen Films Private Limited sold film rights $7,760 (2017: $616, 2016: $2,728) to the Group, and purchased film rights, including production services, of Nil (2017: Nil and 2016: $Nil). The Group advanced $19,025 (2017: $22,881, 2016: $5,400) to NextGen Films Private Limited for film co-production and received refund of $6,114 (2017: $5,075, 2016: $6,945) on abandonment of certain film projects.

The Group also engaged in transactions with Everest Entertainment LLP entity owned by the brother of Manjula K. Lulla, wife of Kishore Lulla, which is involved in the purchase and sale of film rights. In March 31, 2018, Everest Entertainment LLP sold film rights of 166 (2017: Nil, 2016: Nil) to the Group.

F-48

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

In fiscal 2017, the Group obtained unsecured short-term borrowings of $6,417 from Eros Television India Private Limited at 12% per annum.

Mrs. Manjula Lulla, the wife of Kishore Lulla, is an employee of Eros International Plc. and is entitled to a salary of $139 per annum (2017: $130 and 2016: $154). Mrs. Krishika Lulla, the wife of Sunil Lulla, is an employee of EIML and is entitled to a salary of $133 per annum (2017: $133, 2016: $138). Ms. Riddhima Lulla, the daughter of Kishore Lulla, was an employee of Eros Digital FZ LLC and is entitled to a salary of Nil per annum (2017: $51, 2016: $38 and is an employee of Eros World Wide FZ LLC is entitled to a salary of $90 per annum.

All of the amounts outstanding are unsecured and will be settled in cash.

As at March 31, 2018, the Group has provided performance guarantee to a bank amounting to $8,000 (2017: $19,500) in connection with funding commitments. under film co-production agreements with NextGen Films Private Limited and having varying maturity dates up to the next 12 months. The Group did not earn any fee to provide such guarantees. It does not anticipate any liability on these guarantees as it expects that most of these will expire unused.

**36    MAJOR CONSOLIDATED ENTITIES**

| | Date | Country of Incorporation | % of voting rights held |
|---|---|---|---|
| Copsale Limited | June 2006 | BVI | 100.00 |
| Eros Australia Pty Limited | June 2006 | Australia | 100.00 |
| Eros International Films Private Limited | June 2006 | India | 100.00 |
| Eros International Limited | June 2006 | U.K. | 100.00 |
| Eros International Media Limited | June 2006 | India | 60.13 |
| Eros International USA Inc | June 2006 | U.S. | 100.00 |
| Eros Music Publishing Limited | June 2006 | U.K. | 100.00 |
| Eros Network Limited | June 2006 | U.K. | 100.00 |
| Eros Pacific Limited | June 2006 | Fiji | 100.00 |
| Eros Worldwide FZ-LLC | June 2006 | UAE | 100.00 |
| Big Screen Entertainment Private Limited | January 2007 | India | 64.00 |
| EyeQube Studios Private Limited | January 2008 | India | 99.99 |
| Acacia Investments Holdings Limited | April 2008 | IOM | 100.00 |
| Belvedere Holdings Pte Limited | March 2010 | Singapore | 100.00 |
| Eros International Pte Limited | August 2010 | Singapore | 100.00 |
| Digicine Pte. Limited | March 2012 | Singapore | 100.00 |
| Colour Yellow Productions Private Limited | May 2014 | India | 50.00 |
| Eros Digital FZ LLC | September 2015 | UAE | 100.00 |
| Eros Digital Limited | July 2016 | IOM | 100.00 |
| Eros Films Limited | November 2016 | IOM | 100.00 |
| Universal Power Systems Private Limited | August 2015 | India | 100.00 |

All of the companies were involved with the distribution of film content and associated media. All the companies are indirectly owned with the exception of Eros Network Limited, Eros Worldwide FZ-LLC and Eros International Pte Ltd.

In fiscal year 2018, Group shareholding of Eros International Media Ltd reduced to 60.13% (2017: 73.33%) The change is shareholding was due to exercise of 1.17% ESOP by the employees and sale of 12.03% shares in open market.

In fiscal year 2018, the Group has pledged 21.26% of its holding in Eros International Media Limited as security for certain of the Group's borrowings (See Note 23).

In addition to the above the Eros International Plc Employee Benefit Trust, a Jersey based Trust has been consolidated

as it is a fully controlled Trust.

F-49

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 37    NON-CONTROLLING INTERESTS

*Details of subsidiary that have material non-controlling interests*

The Group has a number of subsidiaries held directly and indirectly which operate and are incorporated around the world. Note 36 to the financial statements lists details of the major consolidated entities and the interests in these subsidiaries. The non-controlling interests that are material to the Group relate to Eros International Media Limited and its subsidiaries whose principal place of business is in India.

The table below shows the summarized financial information of Eros International Media Limited and its subsidiaries (EIML) whereas at March 31, 2018, non-controlling interests held an economic interest by virtue of shareholding of 39.87% (March 2017: 26.67%). The change in shareholding was due to exercise of 1.17% ESOP by the employees and sale of 12.03% shares in open market (Refer Note 4). The summarized financial information represents amounts before inter-company eliminations.

| | Year ended March 31 | |
|---|---|---|
| | (in thousands) | |
| **EIML** | 2018 | 2017 |
| Current assets | $ 152,997 | $ 143,037 |
| Non-current assets | 418,118 | 428,429 |
| Current liabilities | (162,898) | (192,807) |
| Non-current liabilities | (65,582) | (75,010) |
| **Total net assets attributable** | $ 342,635 | $ 303,649 |
| Equity attributable to owners of the Group | $ 204,907 | $ 224,558 |
| **Equity attributable to non-controlling interests** | **$ 137,728** | **$ 79,091** |
| Revenue | $ 151,887 | $ 210,776 |
| Expenses | (118,858) | (176,373) |
| **Profit for the year** | **$ 33,029** | **$ 34,403** |
| Profit attributable to the owners of the Group | $ 20,199 | $ 26,753 |
| Profit attributable to non-controlling interests | $ 12,830 | $ 7,650 |
| **Other comprehensive (loss)/income during the year** | **$ (612)** | **$ 5,277** |
| **Total comprehensive income during the year** | **$ 32,417** | **$ 39,680** |
| Total comprehensive income attributable to the owners of the Group | 19,828 | 30,211 |
| Total comprehensive income attributable to non-controlling interests | 12,589 | 9,469 |
| Net cash inflow from operating activities | $ 49,096 | $ 10,686 |
| Net cash outflow from investing activities | (55,755) | (78,121) |
| Net cash inflow from financing activities | 6,707 | 42,409 |
| **Net cash (outflow)/inflow** | **$ 48** | **$ (25,026)** |

No dividends were paid to non-controlling interests during the year ended March 31, 2018. (2017: Nil).

F-50

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## 38      SIGNIFICANT ACCOUNTING ESTIMATES AND JUDGMENTS

Estimates and judgments are evaluated on a regular basis and are based on historical experience and other factors, such as expectations of future events that are believed to be reasonable under the present circumstances.

The Group makes estimates and assumptions concerning the future. These estimates, by definition, will rarely equal the related actual results. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the financial year are highlighted below:

### 38.1.   Goodwill and trade name

The Group tests annually whether goodwill and trade name have suffered impairment, in accordance with its accounting policy. The recoverable amount of cash-generating units has been determined based on value in use calculations. We use market related information and estimates (generally risk adjusted discounted cash flows) to determine value in use. Cash flow projections take into account past experience and represent management's best estimate about future developments. Key assumptions on which management has based its determination of fair value less costs to sell and value in use includes estimated growth rates, weighted average cost of capital and tax rates. These estimates, includes the methodology used, can have a material impact on the respective values and ultimately the amount of any goodwill and tradename impairment.

### 38.2.   Basis of consolidation

The Group evaluates arrangements with special purpose vehicles in accordance with of IFRS 10 – Consolidated Financial Statements to establish how transactions with such entities should be accounted for. This requires a judgment over control such that it is exposed, or has rights, to variable returns and can influence the returns attached to the arrangements.

### 38.3.   Intangible assets

The Group is required to identify and assess the useful life of intangible assets and determine their income generating life. Judgment is required in determining this and then providing an amortization rate to match this life as well as considering the recoverability or conversion of advances made in respect of securing film content or the services of talent associated with film production.

Accounting for the film content requires Management's judgment as it relates to total revenues to be received and costs to be incurred throughout the life of each film or its license period, whichever is the shorter. These judgments are used to determine the amortization of capitalized film content costs. The Group uses a stepped method of amortization on first release film content writing off more in year one which recognizes initial income flows and then the balance over a period of up to nine years. In the case of film content that is acquired by the Group after its initial exploitation, commonly referred to as Library, amortization is spread evenly over the lesser of 10 years or the license period. Management's policy is based upon factors such as historical performance of similar films, the star power of the lead actors and actresses and others. Management regularly reviews, and revises when necessary, its estimates, which may result in a change in the rate of amortization and/or a write down of the asset to the recoverable amount.

The Group tests annually whether intangible assets have suffered any impairment, in accordance with the accounting policy. These calculations require judgments and estimates to be made, and, as with Goodwill, in the event of an unforeseen event these judgments and assumptions would need to be revised and the value of the intangible assets could be affected. There may be instances where the useful life of an asset is shortened to reflect the uncertainty of its estimated income generating life. This is particularly the case when acquiring assets in markets that the Group has not previously exploited.

### 38.4.   Allowances for doubtful accounts

The Group extends credit to customers and other parties in the normal course of business and maintains an allowance for doubtful accounts for estimated losses resulting from the inability or unwillingness of customers to make required payments. The Group bases such estimates on historical experience, existing economic conditions, and any specific

customer collection issues the Group has identified. Uncollectible accounts receivables are written off when a settlement is reached for an amount less than the outstanding balance or when the Group determines that the balance will not be collected. The allowance for doubtful accounts/bad debt for the year ended March 31, 2018 and March 31, 2017, was $4,740 and $2,430 respectively.

F-51

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**38.5.  Credit impairment losses**

In case of catalogue sales, the Group provides contractual deferred payment terms up to a year to the trading partners. Further, in several instances the catalogue customers fall behind contractual payment terms. The Group estimates credit impairment losses based on historical experience of collection from catalogue customers multiplied by the incremental borrowing rate applicable to the group of similar class of customer. The credit impairment losses, net of unwinding thereof, recognized in the Statement of Income for the year ended March 31, 2018 and March 31, 2017 was $10,193 and Nil, respectively.

**38.6.  Valuation of available-for-sale financial assets**

The Group follows the guidance of IAS 39 – Financial Instruments: Recognition and Measurement to determine, where possible, the fair value of its available-for-sale financial assets. This determination, including identification of objective evidence of impairment, requires significant judgment. In making this judgment, the Group evaluates, among other factors, the duration and extent to which the fair value of an investment is less or more than its cost; the financial health of and near-term business outlook for the investee, including factors such as industry and sector performance, changes in technology and operational and financing cash flow.

**38.7.  Income taxes and deferred taxation**

The Group is subject to income taxes in various jurisdictions. Judgment is required in determining the worldwide provision for income taxes. We are subject to tax assessment in certain jurisdictions. Significant judgment is involved in determining the provision for income taxes including judgment on whether the tax positions are probable of being sustained in tax assessments.

Judgment is also required when determining whether the Group should recognize a deferred tax asset, based on whether Management considers there is sufficient certainty in future earnings to justify the carry forward of assets created by tax losses and tax credits. Judgment is also required when determining whether the Group should recognize a deferred tax liability on undistributed earnings of subsidiaries. Where the ultimate outcome is different than that which was initially recorded there will be an impact on the income tax and deferred tax provisions.

**38.8.  Share-based payments**

The Group is required to evaluate the terms to determine whether share based payment is equity settled or cash settled. Judgment is required to do this evaluation. Further, the Group is required to measure the fair value of equity settled transactions with employees at the grant date of the equity instruments. The fair value is determined principally by using the Black Scholes model and/or Monte Carlo Simulation Models which require assumptions regarding risk free interest rates, share price volatility, the expected term and other variables. The basis and assumptions used in these calculations are disclosed within Note 28. The aforementioned inputs entered in to the option valuation model that we use to determine the fair value of our share awards are subjective estimates and changes to these estimates will cause the fair value of our share-based awards and related share- based compensations expense we record to vary.

**38.9.  Business combinations and deconsolidation**

Business combinations are accounted for using the acquisition method under the provisions of IFRS 3 (Revised), *"Business Combinations".*

The cost of an acquisition is measured at the fair value of the assets transferred, equity instruments issued and liabilities incurred at the date of acquisition. The cost of the acquisition also includes the fair value of any contingent consideration. Identifiable tangible and intangible assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair value on the date of acquisition. Significant estimates are required to be made in determining the value of contingent consideration and intangible assets.

During fiscal 2018, the Group divested its 51 percent equity interest in Ayngaran Group to the non-controlling investee. The Group recorded the financial asset retained in the former subsidiary on deconsolidation at its fair value and recorded a loss of $0.5 million. The discounting of the financial asset was determined using associated credit risk for similar

instrument.

**38.10. Financial liabilities at fair value through profit and loss**

The Group has classified the convertible note as a financial liability at fair value through profit or loss and used the valuation models i.e. Black and Scholes and Monte-Carlo simulations to obtain the fair value of share warrant and convertible notes. Key assumptions on which external valuation experts has based their determination of fair value includes risk free rate, weighted average cost of capital, future volatility, proportion of debt to be converted into equity shares. These estimates, includes the methodology used, can have a material impact on the respective values and ultimately the amount of financial liability.

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**39    ADOPTION OF NEW AND REVISED STANDARDS**

**Standards, Interpretations and Amendments to Published Standards that are not yet effective**

IFRS 15 Revenue from Contracts with Customers

i) In May 2014, the IASB issued IFRS 15 Revenue from Contracts with Customers ("IFRS 15"). This standard provides a single, principle-based five-step model to be applied to all contracts with customers. Guidance is provided on topics such as the point at which revenue is recognized, accounting for variable consideration, costs of fulfilling and obtaining a contract and various other related matters. IFRS 15 also introduced new disclosure requirements with respect to revenue.

The five steps in the model under IFRS 15 are : (i) identify the contract with the customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contracts; and (v) recognize revenue when (or as) the entity satisfies a performance obligation.

IFRS 15 replaces the following standards and interpretations:

- IAS 11 Construction Contracts
- IAS 18 Revenue
- IFRIC 13 Customer Loyalty Programmes
- IFRIC 15 Agreements for the Construction of Real Estate
- IFRIC 18 Transfers of Assets from Customers
- SIC-31 Revenue - Barter Transactions Involving Advertising Services

When first applying IFRS 15, it should be applied in full for the current period, including retrospective application to all contracts that were not yet complete at the beginning of that period. In respect of prior periods, the transition guidance allows an option to either:

- apply IFRS 15 in full to prior periods (with certain limited practical expedients being available); or
- retain prior period figures as reported under the previous standards, recognizing the cumulative effect of applying IFRS 15 as an adjustment to the opening balance of equity as at the date of initial application (beginning of current reporting period).

IFRS 15 is effective for fiscal years beginning on or after January 1, 2018. Earlier application is permitted. The Group expects to apply this standard retrospectively with the cumulative effect of initially applying this standard recognized at April 1, 2018 (i.e. the date of initial application in accordance with this standard). The Group does not expect the impact of adoption of the standard on opening reserve to be material.

IFRS 9 Financial Instruments: In July 2014, the IASB finalized and issued IFRS 9 – Financial Instruments. IFRS 9 replaces IAS 39 "Financial instruments: recognition and measurement, the previous Standard which dealt with the recognition and measurement of financial instruments in its entirety upon the former's effective date.

The Key requirements of IFRS 9:

Replaces IAS 39's measurement categories with the following three categories:

- fair value through profit or loss
- fair value through other comprehensive income
- amortized cost

Eliminates the requirement for separation of embedded derivatives from hybrid financial assets, the classification requirements to be applied to the hybrid financial asset in its entirety.

Requires an entity to present the amount of change in fair value due to change in entity's own credit risk in other comprehensive income.

Introduces new impairment model, under which the "expected" credit loss are required to be recognized as compared to the existing "incurred" credit loss model of IAS 39.

F-53

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Fundamental changes in hedge accounting by introduction of new general hedge accounting model which:

·       Increases the eligibility of hedged item and hedging instruments;

·       Introduces a more principles–based approach to assess hedge effectiveness.

IFRS 9 is effective for annual periods beginning on or after January 1, 2018.

Earlier application is permitted provided that all the requirements in the Standard are applied at the same time with two exceptions:

·       The requirement to present changes in the fair value of a liability due to changes in own credit risk may be applied early in isolation;

·       Entity may choose as its accounting policy choice to continue to apply hedge accounting requirements of IAS 39 instead of new general hedge accounting model as provided in IFRS 9.

The Group does not expect the impact of adoption of the standard to be material.

Further, in October 2017, the International Accounting Standards Board (IASB) issued an additional amendment to IFRS 9. Based on the amendment financial assets containing prepayment features with negative compensation can now be measured at amortised cost or at fair value through other comprehensive income if they meet the other relevant requirements under IFRS 9.

The effective date for adoption of the amendment is 1 January 2019. Further, the amendment must be applied retrospectively and earlier application is permitted. The amendment provides specific transition provision if it is only applied in 2019 rather than in 2018 with the rest of IFRS 9. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

IFRS 16 Leases: On January 13, 2016, the International Accounting Standards Board issued the final version of IFRS 16, Leases. IFRS 16 will replace the existing leases Standard, IAS 17 Leases, and related Interpretations. The Standard sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract i.e., the lessee and the lessor. IFRS 16 introduces a single lessee accounting model and requires a lessee to recognize assets and liabilities for all leases with a term of more than 12 months, unless the underlying asset is of low value. Currently, operating lease expenses are charged to the statement of comprehensive income. The Standard also contains enhanced disclosure requirements for lessees. IFRS 16 substantially carries forward the lessor accounting requirements in IAS 17.

The effective date for adoption of IFRS 16 is annual periods beginning on or after January 1, 2019, though early adoption is permitted for companies applying IFRS 15 Revenue from Contracts with Customers. The Group is yet to evaluate the requirements of IFRS 16 and the impact on the consolidated financial statements.

IFRIC 22, Foreign currency transactions and Advance consideration: On December 8, 2016, the International Accounting Standards Board (IASB) issued IFRS interpretation IFRIC 22, Foreign currency transactions and Advance consideration which clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. The effective date for adoption of IFRIC 22 is annual reporting periods beginning on or after January 1, 2018, though early adoption is permitted. The Group is currently evaluating the effect of IFRIC 22 on the consolidated financial statements.

IFRIC 23, Uncertainty over Income Tax Treatments: In June 2017, the International Accounting Standards Board (IASB) issued IFRS interpretation IFRIC 23 — Uncertainty over Income Tax Treatments which is to be applied while performing the determination of taxable profit (or loss), tax bases, unused tax losses, unused tax credits and tax rates, when there is uncertainty over income tax treatments under IAS 12.

According to IFRIC 23, companies need to determine the probability of the relevant tax authority accepting each tax treatment, or group of tax treatments, that the companies have used or plan to use in their income tax filing which has to be considered to compute the most likely amount or the expected value of the tax treatment when determining taxable profit (tax loss), tax bases, unused tax losses, unused tax credits and tax rates.

F-54

**EROS INTERNATIONAL PLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The standard permits two possible methods of transition:

· Full retrospective approach – Under this approach, IFRIC 23 will be applied retrospectively to each prior reporting period presented in accordance with IAS 8 – Accounting Policies, Changes in Accounting Estimates and Errors

· Retrospectively with cumulative effect of initially applying IFRIC 23 recognized by adjusting equity on initial application, without adjusting comparatives

The effective date for adoption of IFRIC 23 is annual periods beginning on or after January 1, 2019, though early adoption is permitted. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

Amendment to IAS 28

In October 2017, the International Accounting Standards Board (IASB) issued an amendment to IAS 28, to address the issue on accounting of long term interests in Associates and Joint ventures. The amendments clarify that an entity applies IFRS 9 Financial Instruments to long-term interests in an associate or joint venture to which the equity method is not applied but that, in substance, form part of the net investment in the associate or joint venture (long-term interests). This clarification is relevant because it implies that the expected credit loss model in IFRS 9 applies to such long-term interests.

The effective date for adoption of the amendment is 1 January 2019, however early adoption is permitted with disclosures. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

Amendment to IAS 19

In February, 2018, the International Accounting standards issued an amendment to IAS 19 to address the accounting when a plan amendment, curtailment or settlement occurs during a reporting period. The amendments specify that when a plan amendment, curtailment or settlement occurs during the annual reporting period, an entity is required to:

Determine current service cost for the remainder of the period after the plan amendment, curtailment or settlement, using the actuarial assumptions used to remeasure the net defined benefit liability (asset) reflecting the benefits offered under the plan and the plan assets after that event.

Determine net interest for the remainder of the period after the plan amendment, curtailment or settlement using: the net defined benefit liability (asset) reflecting the benefits offered under the plan and the plan assets after that event; and the discount rate used to remeasure that net defined benefit liability (asset)

The effective date for adoption of the amendment is 1 January 2019, however early adoption is permitted. Given that the Group does not have any amendments to its defined benefit plan, the amendment does not have any impact on the Group.

Amendments to IFRS 2, Share-based payment: In June 2016, the International Accounting Standards Board issued the amendments to IFRS 2, providing specific guidance for measurement of cash-settled awards, modification of cash-settled awards and awards that include a net settlement feature in respect of withholding taxes. It clarifies that the fair value of cash-settled awards is determined on a basis consistent with that used for equity-settled awards. Market-based performance conditions and non-vesting conditions are reflected in the 'fair values', but non-market performance conditions and service vesting conditions are reflected in the estimate of the number of awards expected to vest. Also, the amendment clarifies that if the terms and conditions of a cash-settled share-based payment transaction are modified with the result that it becomes an equity-settled share-based payment transaction, the transaction is accounted for as such from the date of the modification. Further, the amendment requires the award that includes a net settlement feature in respect of withholding taxes to be treated as equity-settled in its entirety. The cash payment to the tax authority is treated as if it was part of an equity settlement. The effective date for adoption of the amendments to IFRS 2 is annual reporting periods beginning on or after January 1, 2018, though early adoption is permitted. The Group does not believe that this amendment will have a material impact on its consolidated financial statements.

F-55