James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
Kevin G. Cooper
**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: jcecchi@carellabyrne.com

Kara M. Wolke
Leanne H. Solish
Raymond D. Sulentic
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs*

*Liaison Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EROS INTERNATIONAL PLC SECURITIES LITIGATION | C. A. No. 19-cv-14125 (JMV)(JAD)<br><br>**PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

791129.1

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   PROCEDURAL STATUS .................................................................................. 6

    A.    The Order Denying, In Part, Defendants' Motion To Dismiss .............................. 6

    B.    The Second And Third Amended Complaints ........................................................ 7

III.  RELEVANT BACKGROUND FACTS AND NEW ALLEGATIONS IN THE TAC ..... 7

    A.    Background On Eros And The Individual Defendants ........................................... 7

    B.    EIML Is Eros's Core Operation And Largest Subsidiary .................................... 10

    C.    Eros's $1 Billion Content And The Exceedingly Short Timeline Of Its Massive Class Period Impairments ....................................................... 10

    D.    The TAC Details The Accounting Rules And Eros's Internal Policy On Impairment, Including IAS 36, Demonstrating Defendants' Knowledge Or Reckless Disregard That The Intangible Content Was Impaired Earlier .............. 11

    E.    The TAC Alleges That After The Merger, Defendants Continued To Misrepresent Eros's Financial Condition ................................................. 13

    F.    As STX Delves Into Eros's Accounting, The Combined Company Faces A Swift Demise ................................................................. 14

IV.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ......... 15

V.    THE TAC ALLEGES ACTIONABLE, FALSE OR MISLEADING STATEMENTS MADE WITH SCIENTER .................................................. 16

    A.    Defendants' Misleading Statements And Omissions Regarding Eros's Intangible Content Asset Balances Are Actionable ............................................. 16

        1.    The Court Has Already Held Falsity Was Alleged With Respect To Eros's Intangible Content ....................................................... 16

            (a)    The Intangible Content Asset Balances Were Materially Inflated ... 16

            (b)    Even After Eros Started To Impair The Content, Defendants Gave Materially False And Misleading Explanations To Conceal The Content's True Value ................................................ 19

            (c)    As CFO Of The Combined Company, Warren Made Additional Misleading Claims About The Value Of The Content ................ 21

i

2.    The TAC Alleges That Defendants Knew Or Recklessly Disregarded That Eros's Intangible Content Assets Were Misleadingly Inflated................. 22

(a)    The Very Facts *Defendants* Claim Caused The 2019 And 2020 Impairments Existed Since The Beginning Of The Class Period, Thus Establishing That They Should Have Been Taken Earlier .. 22

(b)    The Need For Eros's Impairment Was Obvious.......................... 25

(c)    Eros Only Began To Record The Impairments After Being Exposed By A Third Party........................................................... 28

(d)    The Misleading And Contradictory Reasons Defendants Cited For The Content Impairments Further Support Scienter..................... 29

(e)    The Magnitude And Timing Of The Impairments Further Support Scienter ....................................................... 31

(f)    The Timing Of Eros's Second And Third Impairments In Relation To Warren's False Statements About Eros's Content Alleges A Strong Inference Of Scienter ....................................... 33

B.    Defendants' Misrepresentations Of Eros's Financial Condition Are Actionable ... 34

1.    The Court Previously Held Falsity Was Alleged...................................... 34

(a)    Defendants' Misrepresentations About Eros's Financial Health And Balance Sheet............................................................ 34

(b)    Defendants' Misleading Statements About The Ratings Agencies .. 36

2.    The TAC Alleges Defendants Knew Or Recklessly Disregarded Material Facts That Undercut Their Assurances About Eros's Financial Condition *Throughout* The Class Period ................................................... 38

(a)    Defendants Ignored Consistent And Obvious Signs Of Impairment 39

(b)    The TAC Bolsters CW Reports Of Eros Failing To Pay Salaries, Vendors, And Loans ....................................... 39

(c)    The Court Should Not Reconsider Its Prior Finding Of Scienter With Respect To Defendants' Misleading Assurances Following The CARE Downgrade ....................................... 42

C.    The TAC Alleges Actionable Statements Regarding Eros's FY 2020 Revenue And Receivables And ErosSTX's Intangible Assets And Goodwill Balances ............ 45

1.    Defendants Have Admitted The Challenged Statements Were False....... 45

ii

791129.1

2.      The Circumstances Surrounding Defendants' Statements Strongly Support Scienter ........................................................ 48

D.      Other Factors Further Support A Strong Inference Of Scienter ........................... 50

1.      The Individual Defendants' SOX Certifications Support Scienter ........... 50

2.      Lulla's Stock Sales And The Lulla Family's Lavish Compensation Structure Further Supports An Inference Of Scienter .............................. 52

E.      Eros's Corporate Scienter Is Alleged .................................................................. 53

VI.     THE TAC ALLEGES LOSS CAUSATION .................................................................... 53

VII.    THE TAC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY .................. 56

VIII.   CONCLUSION ................................................................................................................ 58

iii

791129.1

# TABLE OF AUTHORITIES

<u>CASES</u>

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................... 27

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ................................................................ 19, 30

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013) ............................................................................ 57, 58

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 ..................................................................................................... 18, 44

*City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009) ..................................................................... 50

*Columbus Life Ins. Co. v. Wilmington Tr., N.A.*,
2021 WL 3012864 (D.N.J. July 16, 2021) ........................................................... 42

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018) ........................................................... 54

*Derensis v. Coopers & Lybrand Chartered Accountants*,
930 F. Supp. 1003 (D.N.J. 1996) .......................................................................... 57

*Dudley v. Haub*,
2013 WL 1845519 (D.N.J. Apr. 30, 2013) ........................................................... 32

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................... 53

*Ezra Charitable Tr. v. Tyco Int'l, Ltd.*,
466 F.3d 1 (1st Cir. 2006) ..................................................................................... 51

*Finger v. Pearson PLC*,
2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019) .................................................... 28

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...................................... 17, 18, 19, 32

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .............................................................................. 27

iv

*Hull v. Glob. Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017)........................................................................ 49, 56

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008)............................................................................ 57

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020) ............................................................................... 58

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D.Pa.1999) ........................................................................................ 34

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005).................................................................................... 26

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004).................................................................................... 49

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................................ 33

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................... 27, 34, 47

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002).................................................................................................... 50

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) .................................................................................. 15, 44

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ................................................................. 36, 57, 58

*In re CommVault Sys., Inc. Sec. Litig.*,
   2016 WL 5745100 (D.N.J. Sept. 30, 2016) ..................................................................... 37, 43

*In re DVI, Inc. Sec. Litig.*,
   2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) .......................................................................... 55

*In re EQT Corp. Sec. Litig.*,
   504 F. Supp. 3d 474 (W.D. Pa. 2020)..................................................................................... 22

*In re Exxon Mobil Corp. Sec. Litig.*,
   387 F. Supp. 2d 407 (D.N.J. 2005) ........................................................................................ 25

v

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
 2004 WL 5278716 (E.D. Tex. June 16, 2004) ........................................................ 47

*In re Hertz Glob. Holdings Inc.*,
 905 F.3d 106 (3d Cir. 2018) ................................................................................... 53

*In re ICN Pharmaceuticals, Inc. Sec. Litig.*,
 299 F. Supp. 2d 1055 (C.D. Cal. 2004) ................................................................. 25

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ......................................................... 27

*In re Leapfrog Enter., Inc. Sec. Litig.*,
 237 F. Supp. 3d 943 (N.D. Cal. 2017) .............................................. 19, 23, 28, 31

*In re Omega Healthcare Invs., Inc. Sec. Litig.*
 2021 WL 4443562 (S.D.N.Y. Sept. 28, 2021) ....................................................... 36

*In re Rent-Way Sec. Litig.*,
 209 F. Supp. 2d 493 (W.D. Pa. 2002) .................................................................... 55

*In re SLM Corp. Sec. Litig.*,
 740 F. Supp. 2d 542 (S.D.N.Y. 2010) .................................................................... 50

*In re Suprema Specialties, Inc. Sec. Litig.*,
 438 F.3d 256 (3d Cir. 2006) ................................................................................... 52

*In re Toronto-Dominion Bank Sec. Litig.*,
 2018 WL 6381882 (D.N.J. Dec. 6, 2018) .......................................................... 42, 57

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
 535 F. Supp. 2d 249 (D.N.H. 2007) ....................................................................... 51

*In re Urban Outfitters, Inc. Sec. Litig.*,
 103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................. *passim*

*In re Veeco Instruments, Inc. Sec. Litig.*,
 235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................................ 49

*In re Wilmington Tr. Sec. Litig.*,
 29 F. Supp. 3d 432 (D. Del. 2014) ..................................................................... 53, 55

*Institutional Invs. Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009) ........................................................................ 15, 43, 53

vi

*Kaltman v. Key Energy Servs., Inc.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006) ................................................................. 47

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .............................................................................. 56

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) .......................................................... 41

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ................................................................................ 56

*Macovski v. Groupon, Inc.*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021) .................................................................... 22

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................................ 49

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ................................................................................ 51

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................... 15, 16, 43

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ....................................................................... 28

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................. 26

*Oregon Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*,
  2020 WL 5500458 (D. Colo. Sept. 11, 2020) ............................................. 23, 28, 32

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001) ....................................................................... 57

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) .................................................................................. 40

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) .................................................................................... 32

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ................................................................... 24

791129.1

*Steamfitters Local 499 Pension Fund v. Alter*,
2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ............................................................ 57

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005).............................................................. 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................................. 16

*Tracinda Corp. v. DaimlerChrysler AG*,
197 F. Supp. 2d 42 (D. Del. 2002)............................................................................ 40

*Utesch v. Lannett Co., Inc.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019) ........................................................................ 43

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
2020 WL 3169506 (D.N.J. June 12, 2020) .......................................................... 27, 56

*Zwick Partners, LP v. Quorum Health Corp.*,
2018 WL 2933406 (M.D. Tenn. Apr. 19, 2019)................................................. 22, 23, 28, 32

791129.1

Lead Plaintiffs Opus Chartered Issuances S.A., Compartment 127 and AI Undertaking IV ("Plaintiffs") respectfully submit this omnibus opposition to Defendants' motions to dismiss (ECF 66-67) the Third Amended Class Action Complaint (ECF 34, the "TAC").[1]

## I.       **<u>INTRODUCTION</u>**

Ignoring that securities fraud claims have already been sustained against them, Defendants incredibly accuse Eros's *investors* of "capitalizing on Eros's business challenges." Eros Br. 1. But those "challenges" are of Defendants' own making, and the direct result of the fraudulent conduct detailed in the TAC. During the Class Period, Defendants grossly inflated values of Eros's core asset—Bollywood film and television content, valued at nearly $1 billion by FY 2018 (¶74)—which artificially inflated Eros's stock price to its Class Period high of $16.10 per share on September 19, 2017 (¶425). But shareholders' equity was obliterated as the truth about the financial condition of Eros and its core assets was revealed through a series of corrective disclosures, including massive consecutive write-downs: the $1 billion valuation of Eros's "crown jewel" asset all but disappeared in a matter of just 15 months. By the end of the Class Period, Eros's stock traded at just $0.70 per share (¶36), it received a delisting notification from the NYSE (¶¶36-38), and was left teetering on the edge of bankruptcy (¶¶37, 145).

Since the order partially denying Defendants' first motion to dismiss (ECF 43, the "Order"), Eros's financial condition has continued to decline dramatically while Plaintiffs' claims about the Company's grossly inflated intangible content assets have been further vindicated. As detailed in the TAC, the Company: further reduced its intangible content asset balance by $333.824

---

[1] Defendants are ErosSTX Global Corporation, f/k/a Eros International Plc ("Eros" or the "Company"); Kishore Lulla; Prem Parameswaran; and Andrew Warren. The brief filed by Eros, Lulla, and Warren (ECF 67-1) is cited as "Eros Br." and the brief filed by Parameswaran (ECF 66-1) is cited as "PP Br." Exhibits filed by Defendants are "Eros Ex." and "PP Ex." All "¶__" citations are to the TAC. The Class Period is July 28, 2017 through August 3, 2021. ¶1.

million (framed as a post-merger accounting adjustment to reflect the "fair value" of Eros's content as of June 30, 2020) (¶137); launched a formal internal audit investigation of Eros's accounting and internal controls (¶¶34, 140); admitted that $85 million, or 55%, of Eros's revenue appears to have been inappropriately recognized in fiscal year 2020 and that "a significant portion of the receivables associated with such revenue was valued at zero for the six months ended September 30, 2020" (¶34); suggested that there will likely be a restatement of Eros's financials (¶¶34, 39); and, finally, admitted that "**substantially all of the intangible assets** and goodwill reflected in the Form 6-K [filed on March 31, 2021[2]] **are likely to be impaired**" (¶34).[3] In the midst of this corporate chaos, news reports circulated that "Eros has even destroyed its mail servers and laptops of employees have been seized to delete mails." ¶398.

Plaintiffs have adequately alleged securities law violations and this case is clearly ripe to move into discovery. Significantly, the Court already held that Plaintiffs sufficiently alleged falsity with respect to Defendants' misleading Class Period statements about the strength of Eros's financial profile and balance sheet (Order at 11-15), and that scienter also existed on these claims following the June 5, 2020 CARE credit downgrade (*id.* at 25-27). The Court also found falsity alleged with respect to Defendants' misleading statements about the value of Eros's intangible assets (*id.* at 15-19), but found scienter lacking because Plaintiffs previously failed to "adequately allege that the Eros' impairment should have been taken earlier, that the need for the impairment was obvious, or that Eros only took the impairment due to outside pressure." *Id.* at 29. The TAC squarely remedies that deficiency to allege a strong inference of scienter as to Defendants' statements about Eros's intangible assets and financial condition during the *entire* Class Period.

---

[2] The March 31, 2021 Form 6-K (¶138) was the last set of financials Eros filed. Since the end of the Class Period, Eros *still* has not filed its FY 2021 annual report for the year ending March 31, 2021.

[3] Unless otherwise noted, emphasis is added throughout.

2

791129.1

**First**, the TAC adds significant detail to allege that the impairments should have been taken earlier. Parameswaran cited two impairment indicators as the reason Eros first tested for impairment in FY 2019—that the carrying value of Eros's net assets exceeded its market cap ("Indicator 1"), and that Eros's content expenditures exceeded its cash from operations ("Indicator 2"). ¶¶21, 117. And Defendants told investors that Eros's market cap (*i.e.*, Indicator 1) was the "main driver" of both the 2019 and 2020 actual impairment charges. ¶203. But Eros's market cap *always* indicated impairment during the Class Period. In fact, the only time during the Class Period that the carrying value of Eros's net assets did *not* exceed its market cap was *after* the first $405.5 million write-down. ¶189. And save for one quarter where Indicator 2 was not present because Eros curtailed its expenditures (1Q19), Eros's content expenditures exceeded its cash generated from operations in *all* quarters during the Class Period where that data was reported. ¶189. That Eros consistently spent significantly more cash on its intangible content than those assets could generate is a clear sign that the underlying assets were impaired *before* the end of FY 2019.

**Second**, the TAC alleges that the need for the impairments was obvious from the beginning of the Class Period because the data showing the presence of the impairment indicators were readily available to Defendants and reflected a strong negative trend that indicated impairment *long* before the end of FY 2019. ¶¶189-92. Eros's market cap was below the carrying value of its net assets for *nine* consecutive quarters preceding the FY 2019 impairment. ¶189. And Eros's expenditures towards content and film rights exceeded its cash generated from operations by *41.9%* and *67.2%* for FY 2017 and FY 2018, respectively. ¶190. The impairment indicators were *consistently present for two years* and they were not subtle. They were obvious to Defendants.

**Third**, the TAC alleges that Eros was forced to record the first impairment due to outside pressure caused by the Hindenburg Report, the CARE downgrade, and the Moody's downgrade,

3

all of which sounded alarms on Eros's financial condition, thus calling attention to its core asset, the content. ¶205. Unable to continue concealing the overstatement of its core asset in the wake of those events, Eros purged a material portion of it from its balance sheet in FY 2019. *Id.* While Eros delayed impairment as long as it could, the cat was out of the bag: Defendants were forced to reveal the true value of Eros's intangible content in short order. ¶126 (announcing a $431.2 million impairment for FY 2020, ending March 31, 2020); ¶137 (announcing a further reduction of the asset value by $333.8 million "as of June 30, 2020," just three months later).

*Eros wrote-down its core asset in excess of $1.1 billion in just 15 months* (¶¶114, 126, 137) before finally admitting that Eros, as a company, was largely worthless (¶¶140, 142, 145). This level of impairment did not arise unexpectedly or virtually over-night, as Defendants would have the Court believe. To the contrary, Plaintiffs allege sufficient facts to infer that the impairment was obvious to Defendants *throughout* the Class Period but they concealed and delayed recording the losses. At bottom, the inference of scienter is *at least* as compelling as Defendants' counter-narrative, requiring Defendants' motions to be denied.

Defendants' motions to dismiss also should be expeditiously denied because, if nothing else, they highlight the need for this case to immediately proceed to discovery. Both motions are littered with inconsistencies and inaccuracies. For example, Parameswaran tries to distance himself from the alleged wrongdoing by arguing that the intangible content assets that Eros impaired "originated" at Eros's majority-owned subsidiary, Eros International Media Limited ("EIML"), and were "largely acquired and held by EIML." PP Br. 4. But EIML's FY 2019 annual report shows *no impairment whatsoever to EIML's intangible content* at the time that Eros made its first massive impairment. PP Ex. 4 at 79 (EIML Annual Report 2019-2020, Note 39 Exceptional Items) (showing no 2019 impairment of EIML's content). Parameswaran's attempt to place blame

4

791129.1

on EIML also conflicts with what he told investors when the impairments were announced. He didn't tell investors that the impairments originated from problems with EIML content. To the contrary, he misleadingly assured investors in 2019 that there was no change in the "actual real value of the film content." ¶296.

Parameswaran, Eros's Class Period CFO, further attempts to distance himself by misleadingly suggesting that the formal audit investigation announced by ErosSTX on August 3, 2021 pertained only to EIML, rather than to Eros. *See* PP Br. 4-5. What ErosSTX actually said is that it was reviewing accounting practices and internal controls at "*its* Eros subsidiaries", not just at *Eros's* subsidiaries. ¶¶367-68. The proper reading of that admission is that STX (as the acquirer) was investigating Eros itself, not just EIML. ¶135. That the investigation applied to Eros itself is supported by the Company's August 25, 2021 admission that, even though the review was not yet complete, the Audit Committee had already determined that $85.5 million of *Eros's* pre-merger revenue was improperly recognized. ¶147. EIML is mentioned nowhere in any of the post-merger disclosures related to the improperly recognized revenue, worthless receivables, or the additional post-merger impairments, including the Company's final admission that "substantially all" of the intangible assets reported in the March 31, 2021 Form 6-K were "likely to be impaired." ¶¶134-47. But even if the audit investigation *did* relate solely to EIML—again, there is *no* indication that the review is so limited—that would not support dismissal where the TAC alleges Parameswaran's (and Lulla's) knowledge of obvious impairment indicators were present *at Eros* since the beginning of the Class Period.

The Eros Defendants fare no better. For example, in arguing that scienter is lacking, the Eros Defendants insist that the "main driver" of the 2019 impairment charge was a "precipitous" drop in Eros's market cap following the June 5, 2019 CARE downgrade. Eros Br. 5, 13. But this

5

argument has a major timeline problem: Eros recorded the 2019 impairment effective as of March 31, 2019—meaning Defendants themselves conceded that the content was impaired months *before* the June 5, 2019 CARE downgrade. Eros Defendants' "pandemic excuse" for the 2020 impairment also fails (Eros Br. 5, 13) where the TAC clearly shows that Eros's market cap was *consistently* less than the carrying value of its net assets during the Class Period (save for in the immediate wake of the 2019 impairment) and was *always* less than the carrying value of Eros's intangible asset content balance. ¶189. And at the time, Eros conflictingly told investors that the pandemic, with the corresponding move to digital media, would be a boon to Eros's "ability to monetize [its content] through multiple channels around the world…." ¶211.

The record simply does not support Defendants' arguments that precipitous and unforeseen events caused the underlying value of its content to decrease and that the impairments were thus timely recorded, which is their main proffered inference against scienter. Their counter-narrative certainly does not raise a more compelling inference than that alleged by Plaintiffs, to wit, that Eros's content was grossly inflated from the beginning of the Class Period and Defendants delayed impairing it. At bottom, Defendants' arguments are all based on factual disputes that are not properly resolved in their favor on this motion. Because the Court has already held that Plaintiffs sufficiently alleged falsity, and because the TAC cures the previously identified pleading defects and more than sufficiently alleges facts to support a strong inference of scienter, the motions to dismiss should be denied in their entirety and this case should proceed to discovery.

## II.    PROCEDURAL STATUS

### A.    The Order Denying, In Part, Defendants' Motion To Dismiss

This action was initiated on June 21, 2019. Plaintiffs filed their consolidated complaint on July 1, 2020, and Defendants moved to dismiss. In the Order denying, in part, Defendants' motion

6

791129.1

to dismiss, the Court held that Plaintiffs needed to add particularity to their scienter allegations during the pre-June 5, 2019 time period, but sustained Plaintiffs' claims that Defendants misrepresented Eros's balance sheet and financial condition during the period following the CARE downgrade on June 5, 2019 through the then-end of the Class Period on September 26, 2019.

### B.    The Second And Third Amended Complaints

Plaintiffs filed their Second Amended Complaint on June 4, 2021. Defendants were supposed to move to dismiss on August 9, 2021. However, the parties agreed to a temporary stay of that deadline given the Company's intervening admissions on August 3, 2021 that: (i) "[s]ignificant revenue from Eros subsidiaries may not have been appropriately recognized during the fiscal year ended March 31, 2020[;]" (ii) "a significant portion of the receivables associated with such revenue was valued at zero for the six months ended September 30, 2020[;]" and (iii) "the Company currently expects that substantially all of the intangible assets and goodwill reflected in the [March 31, 2021] Form 6-K are likely to be impaired." ¶34; ECF 53-54. Plaintiffs filed their TAC on November 5, 2021, expanding the Class Period to end on August 3, 2021.[4]

### III.    RELEVANT BACKGROUND FACTS AND NEW ALLEGATIONS IN THE TAC

### A.    Background On Eros And The Individual Defendants

**Defendant Eros.** Eros is an entertainment holding company that co-produces, acquires, and distributes Indian language films worldwide. ¶60; PP Ex. 3 at 22. From FY 2017 through FY 2020, Eros spent over $600.2 million cash on its Bollywood content, and claimed to have "invested" another $289.7 million on content in 2019 and 2020. ¶¶6, n.4, 73. Eros recorded its content expenditures and investments as "Intangible Assets" on its balance sheet. ¶74, n.17. From

---

[4] Parameswaran repeatedly bemoans that Plaintiffs have made three "attempts" to state a case, ignoring that claims have already been sustained against him. Plaintiffs filed the TAC only after Defendants made an additional corrective disclosure of their fraud, causing more investor losses.

791129.1

FY 2017 through FY 2020, Eros's intangible assets constituted the vast majority, between 67.3% and 76%, of its total assets. ¶74. As of FY 2018 and the first three quarters of 2019, Eros's intangible content asset balance reached $1 billion. ¶6. As Defendant Parameswaran proclaimed, Eros's content was its "crown jewel." ¶73. In April 2020, Eros announced that it would merge with California-based STX Entertainment ("STX"), a producer of film, television, and digital media projects. The merger was effective July 30, 2020, and Eros was renamed ErosSTX.

**Lulla.** Defendant Lulla served as Eros's Chairman of the Board prior to and during the Class Period, and as its CEO from April 1, 2018 until the July 30, 2020 merger, at which point he became Executive Co-Chairman of the Board of the combined Company. ¶¶52, 67.

Lulla is the son of Eros's founder, Arjan Lulla, and he has worked at Eros since age 16. The Lulla family controlled many senior posts at both Eros and EIML during the Class Period. ¶¶2-3. Lulla served as Executive Director of EIML from 2009 through the end of the Class Period (¶4), while Lulla's brother, Sunil Lulla, was Executive Vice Chair and Managing Director of EIML during the Class Period (¶68). Lulla's daughter, Rishika Lulla Singh, served as an executive director of Eros from November 2014 until Eros merged with STX, when she became a board member of ErosSTX, and also served as CEO and Chair of Eros Digital. *Id.* Lulla's younger daughter, Ridhima Lulla, has worked at Eros since 2015, and Lulla's wife, cousins, son-in-law, and sister-in-law were (or still are) employees of Eros or its subsidiaries. *Id.*; ¶¶69, 379-81.

**Parameswaran.** Defendant Parameswaran served as Eros's CFO and as a Director from May 2015 until the merger, at which point he became the combined Company's Head of Corporate Strategy. ¶53.[5] Among other things, as Eros's CFO during the Class Period, Parameswaran

---

[5] While Parameswaran was removed from Eros's website in or around April 2021 (¶53), he claims to remain employed in the same capacity in his motion. PP Br. 18.

791129.1

*repeatedly* assured investors of Eros's "strong" and "very conservative" balance sheet.[6]

During the Class Period, unlike today, Parameswaran took responsibility for his statements. He signed and/or certified Eros's pre-merger financial results, including, of course, Eros's reported intangible content asset balances.[7] In each Class Period Form 20-F, Parameswaran specifically attested that he was "responsible for establishing and maintaining disclosure controls and procedures…and internal control over financial reporting…for the Company" and that in that capacity he "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared." ¶¶226, 256, 302, 337.[8] In short, Parameswaran told investors and the SEC that he took responsibility for ensuring the accuracy of Eros's financial reporting, including EIML's financial information that was consolidated into Eros's results—the very responsibility he denounces entirely in his motion.

**Warren.** Defendant Warren has served as the combined Company's CFO since the July 30, 2020, merger. ¶57. Prior to the merger, he was CFO of STX. Among other things, Warren signed Eros's post-merger accounting dated December 16, 2020. ¶58. Warren also signed the March 31, 2021 Form 6-K (reporting results for the post-merger period from July 30, 2020 and interim results for the six months ended September 30, 2020) (¶¶138, 345), which Eros and Warren soon after admitted had reported intangible asset and goodwill values "substantially all" of which was "likely to be impaired[.]" ¶34.

---

[6] ¶¶229, 232, 235, 237, 240, 243, 245, 251, 259, 264, 270, 274, 277, 285, 324.

[7] ¶¶226, 227, 233, 238, 246, 253, 255-57, 261, 268, 275, 297, 302-304, 316, 330, 337-38.

[8] ¶337 erroneously refers to 2019; the 2020 certification is filed herewith as Plffs' Ex. A.

791129.1

**B.    EIML Is Eros's Core Operation And Largest Subsidiary**

By far the largest and most important of Eros's operations during the Class Period was its majority-owned subsidiary, EIML, which houses Eros's core Bollywood film production and distribution business. ¶¶2-3, 63. In fact, Eros was formed by the Lulla family *as* EIML in 1977, and the Lulla family has tightly controlled its operations ever since. ¶¶4, 61, 66-70.

The operations and financial interests of Eros and EIML were closely intertwined as Eros incorporated EIML's results into its consolidated financial statements. Eros owned or controlled more than 60% of EIML during the Class Period (PP Ex. 2 at F-54 (pdf p. 317)), and Defendants also closely monitored and directed EIML (*e.g.*, ¶51 (Lulla was the Executive Director and served on EIML's Board of Directors)). According to CW2, Lulla was the key decision maker at EIML. ¶149. CW5 similarly observed that EIML executives followed directions from the Lulla family. ¶162. CW6 stated that Lulla and Sunil Lulla were present during EIML's 2017-2018 statutory audit and both Lullas closely monitored the balance sheet of EIML's subsidiaries. ¶166. CW7 recalled that after EIML began incurring penalties in 2017 for inconsistent loan payments, both Parameswaran and the Lullas were notified. ¶¶170-71. And Defendant Deshpande (Eros's CEO until April 2018) was on EIML's Board of Directors from 2012 through June 28, 2019. ¶55.

**C.    Eros's $1 Billion Content And The Exceedingly Short Timeline Of Its Massive Class Period Impairments**

At its peak in 3Q19—the quarter immediately preceding Eros's first massive impairment—Eros reported its intangible content assets at $1,072,686,000. ¶273; *see also* ¶189 (Table 1, Column C). Soon after, Eros would impair the vast majority of its intangible content assets, before ultimately admitting the Company is largely worthless on August 3, 2021. ¶34. The below table reflects the relevant write-downs:

10

791129.1

| Period | Impairment amount | Announced on | TAC |
|---|---|---|---|
| FY 2019 (as of 3/31/2019) | $405.5 million | July 15, 2019 | ¶114 |
| FY 2020 (as of 3/31/2020) | $431.2 million | July 30, 2020 | ¶126 |
| Post-Merger Accounting (as of 6/30/2020) | $333.8 million | December 16, 2020 | ¶137 |
| TOTAL REDUCTION | $1,170.5 million | | |

In short, Eros wrote off over $1.17 billion worth of its intangible content between March 31, 2019 and June 30, 2020—just 15 months.

**D.     The TAC Details The Accounting Rules And Eros's Internal Policy On Impairment, Including IAS 36, Demonstrating Defendants' Knowledge Or Reckless Disregard That The Intangible Content Was Impaired Earlier**

International Accounting Standards ("IAS") Rule 36 governs impairment and "prescribe[s] the procedures that an entity applies to ensure that its assets are carried at no more than their recoverable amount." ¶178; *see generally* ¶¶177-88. During the Class Period, Eros stated that "at least annually, we review film and content rights for indications of impairment in accordance with IAS 36." ¶192.[9] Under IAS 36, "[a]n entity shall assess at the end of each reporting period whether there is any indication that an asset may be impaired" (IAS 36.9), and if so, the entity must estimate the recoverable value of such an asset, and based on that estimate, impair the asset if necessary.[10] ¶¶179-85. IAS 36 further sets forth a non-exhaustive list of sources of information that an entity is supposed to consider to determine whether an asset is impaired, including if "the carrying amount

---

[9] Eros explained that the FY 2020 impairment charge "was taken as per IAS 36 under IFRS accounting rules which require companies to re-assess the carrying book value of assets both on a regular annual basis and also in the case of irregular events." ¶128. Defendants suggested at the time (and they continue to argue now) that the decision to both test and impair the assets in 2019 and 2020 were driven by irregular events (¶¶117, 203), but they made no mention of whether and when Eros had actually conducted regular impairment tests prior to June 2019, or what the outcome of any such previously-conducted tests (had they been conducted) were.

[10] The TAC details the mechanics of impairment under IAS 36. ¶¶181-186. Generally, once certain indicators suggest impairment, a company has to test for impairment by estimating what it thinks it could get for the asset if it were to sell it (¶182) and forecast the present value of the future cash flows from the asset (¶183). If the value of the asset on the balance sheet exceeds those estimates, per IAS 36, the company must "immediately" write down (impair) the value of the asset. ¶184.

11

of the net assets of the entity is more than its market capitalisation" (IAS 36.12(d)) and if there is evidence from internal reporting (such as cash flows) indicating "that the economic performance of an asset is, or will be, worse than expected" (IAS 36.12(g); IAS 36.14). ¶179.

Indeed, these are the two impairment factors cited by Parameswaran when explaining Eros's decision to test and record the FY 2019 impairment:

> During fiscal year-end 2019, *due to the significant decline in the market value [of Eros's market cap]*, *we tested impairment for carrying the value of net assets of the group exceeding our market capitalization and expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations*. Accordingly, we recorded a noncash impairment loss of $423 million net of taxes as an exceptional item within the P&L. ¶117.[11]

And when Eros reported its second consecutive massive impairment charge of $431.2 million for FY 2020, Defendants explained: "[a]s in our prior fiscal year, the significant reduction in the stock price and corresponding decline in market capitalisation was the main driver for the impairment charge." ¶203. Significantly, Defendants claimed—as they maintain now—that Eros's market cap falling below the carrying value of its net assets was the "main driver" of the actual impairment charges recorded in FY 2019 and 2020, not just the decision to test for impairment. ¶¶203, 207; Eros Br. 5, 13

But, as the TAC makes clear, Eros's market cap was *well below* the carrying value of its net assets in both FY 2017 and FY 2018. ¶189, Table Indicator 1. And Defendants knew that when they reported FY 2017 and FY 2018 results because under IAS 36 and Eros's own accounting policy, they were required to "assess at the end of each reporting period whether there is *any indication* that an asset may be impaired." IAS 36.9; ¶¶179, 192. Thus, Defendants also knew that Indicator 2 (content expenditures exceeding cash generated from operations) was *also present* in

---

[11] Of the total $423 million FY 2019 impairment, $405.5 million was allocated to Eros's intangible content asset balances. ¶360.

12

both FY 2017 and FY 2018—and solidly so, with content expenditures exceeding cash generated from operations by 42% and 67%, in 2017 and 2018, respectively. ¶189. Because these impairment indicators existed at the Eros parent level, Parameswaran cannot disclaim knowledge of them.

> **E.     The TAC Alleges That After The Merger, Defendants Continued To Misrepresent Eros's Financial Condition**

On July 30, 2020—the same day that Eros announced the second massive impairment of $431.2 million, revealing that the Company had cumulatively wiped out over 84% of its $1 billion core asset in just 12 months (¶126)—its merger with STX was finalized.

Despite the massive write-downs, Defendants continued to misrepresent Eros's financial health, including the value of Eros's content, following the merger. On August 4, 2020, the Company issued a press release and Form 6-K signed by Warren claiming that "Eros and STX will continue to have … one of the largest and most valuable libraries of Indian language films" and that the Company's balance sheet was "[w]ell capitalized." ¶340.

On November 4, 2020, the Company hosted a call to discuss its strategic priorities. ¶342. During that call, Warren projected FY 2022 revenue of *$800 million* (¶342), reflecting massive revenue growth, [12] which in turn implied that the Company's *content* could generate such revenue. Indeed, Warren spotlighted Eros's content as purportedly justifying such a surge in revenue: "we now have, as many of you know, developed a true library, with true library characteristics *of high cash flow, high-margin flow-through*, all of that as more and more benefiting our outer periods. That's part of why our 2022 growth rate looks as strong as it is." ¶342.

---

[12] By comparison, on a standalone basis, Eros reported just $155.5 million in annual revenue for the year ended March 31, 2020—approximately $85.5 million (55%) of which "was not properly recognized" according to Defendants' subsequent admission. ¶147. STX reported $434.2 million of standalone annual revenue for the year ending September 30, 2019. ¶26; Plffs' Ex. B at 61 (Form 20-F for the transition period from September 30, 2019 through March 31, 2020).

13

**F.    As STX Delves Into Eros's Accounting, The Combined Company Faces A Swift Demise**

The post-merger bliss quickly disappeared. The first crack in the ErosSTX façade appeared on December 16, 2020, when the Company reported its first post-merger accounting, revealing a reduction of Eros's content value (effectively a third impairment) by another $333.8 million, effective as of June 30, 2020—just three months after the $431.2 million write-down as of March 31, 2020 and, significantly, revealing the content was in fact materially impaired *beyond* the FY 2020 impairment charge of $432.2 million announced on July 30, 2020. ¶¶137, 215.

Thereafter, Defendants struggled to report financial results for the Company. ¶¶138-45. On March 31, 2021, Eros filed a Form 6-K attaching an incomplete set of financial statements[13] consisting of an unaudited income statement and balance sheet for the six months ended September 30, 2020. ¶138. Defendants told investors to expect complete financials by April 30, 2021, but on April 30, they revealed that Eros would not make any additional interim filings. ¶¶138-39.

Then, on August 3, 2021, the Company announced that it could not timely file its 2021 Form 20-F because it was "conducting a formal internal review of certain accounting practices and internal controls related to its Eros subsidiaries." ¶367. The Company admitted that "[s]ignificant revenue from [its Eros] subsidiaries may not have been appropriately recognized during the fiscal year ended March 31, 2020," that "a significant portion of the receivables associated with such revenue was valued at zero for the six months ended September 30, 2020," and that it "***expects that <u>substantially all of the intangible assets and goodwill … are likely to be impaired</u>*** and that one or more material weaknesses in internal controls over financial reporting are likely to be reported." ¶367. In other words, Eros admitted it was largely a worthless company. ¶¶142, 145.

---

[13] A complete set of financials requires three components: (1) an income statement; (2) a balance sheet; and (3) a statement of cash flows.

14

Finally, on August 25, 2021, the Company disclosed that it faced delisting from the NYSE and admitted that "it has determined that approximately $85.5 million of Eros pre-merger revenue was not properly recognized in the fiscal year ended March 31, 2020." ¶147. In other words, even on a preliminary review, the Audit Committee already concluded that at least 55% of Eros's $155.45 million revenue for FY 2020 was improperly recognized. ¶¶38-39, 147.

## IV.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

The TAC states §10(b) claims: (1) Defendants made material misrepresentations or omitted material information regarding Eros's financial condition and assets; (2) they knew or recklessly disregarded that the misrepresented or omitted information risked misleading investors; and (3) Eros's share price declined when corrective information was revealed. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[14] Because the Court has already held that Plaintiffs sufficiently alleged falsity with respect to Eros's intangible asset content balances (Order at 15-19) and its financial profile (Order at 11-15), the main issue on Defendants' motions is scienter.

Scienter is sufficiently alleged when the allegations give rise to a strong inference of "either reckless or conscious behavior." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276, 280 (3d Cir. 2009). Recklessness encompasses "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267, n.42. Conscious behavior exists when a plaintiff "allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

---

[14] Defendants challenge only falsity, scienter, and some alleged loss causation dates, thereby waiving the right to challenge all other §10(b) elements. Unless otherwise noted, all alterations, citations, and quotations are omitted dond emphasis is added throughout.

15

791129.1

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing [non-culpable] inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 328 (2007) (emphasis in original); *Matrixx*, 563 U.S. at 48-49. The inference of scienter need not be *more* likely than any non-culpable inference; in the face of equally compelling inferences, a tie goes to the plaintiff. *Tellabs*, 551 U.S. at 324 ("[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"). On Defendants' motions, the key inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310.

Because Plaintiffs allege facts that give rise to a strong inference of scienter as to the entire Class Period, Defendants' motions to dismiss should be denied.

## V.   THE TAC ALLEGES ACTIONABLE, FALSE OR MISLEADING STATEMENTS MADE WITH SCIENTER

Defendants' actionable false and misleading statements fall into three main categories concerning: (1) Eros's reported intangible content assets and related statements about the supposed value of the content; (2) Eros's financial state; and (3) Eros's revenues and receivables for FY 2020, and its intangible asset and goodwill balances reported in the March 31, 2021 Form 6-K.

### A.   Defendants' Misleading Statements And Omissions Regarding Eros's Intangible Content Asset Balances Are Actionable

#### 1.   The Court Has Already Held Falsity Was Alleged With Respect To Eros's Intangible Content

##### (a)   The Intangible Content Asset Balances Were Materially Inflated

This Court has already held that Plaintiffs sufficiently alleged that Eros's reported intangible content balances were misleadingly inflated in Eros's periodic financial results reported from FY 2017 through 3Q 2019:

16

In light of Plaintiffs' allegations that Eros' advances to NextGen were almost double the reported budget, Compl. ¶¶ 56-57, and that Defendants engaged in self-dealing to funnel money to family members, *id*. ¶ 54-55, the Court concludes that Plaintiffs sufficiently allege that Eros' intangible asset valuation lacked a reasonable basis and it is reasonable to infer that it was not honestly believed. Therefore, Plaintiffs plead actionable opinions under *Pfizer*. Turning to the Omnicare standard, the omitted information conflicts with what a reasonable investor would understand the opinions to mean. Accordingly, the alleged misrepresentations can also be considered opinions under *Omnicare*.

Order at 17-18.

Nothing has changed since the Order to upset that result, and the Court should reject Defendants' attempt to re-hash arguments they already lost. Indeed, Defendants' "disclosures of the value of some of [Eros's] business were misleading given existing risk of impairment to its intangibles." *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, *20 (N.D. Ill. Aug. 11, 2021). If anything, Plaintiffs' claims that Defendants misled investors by reporting inflated content values have only gotten *stronger* since the last round of briefing. Regardless, Plaintiffs again allege that Eros's FY 2017-3Q 2019 content balances were inflated for the same reasons the Court previously found misleading.[15] The TAC also alleges that the reported balances remained materially inflated in Eros's FY 2019 and 2020 financial results (¶¶295, 297-98, 330, 333), and until the end of the Class Period.[16]

Parameswaran asks the Court to revisit its prior decision that it was "reasonable to infer that [Eros's intangible asset valuation] was not honestly believed," Order at 17, arguing that Plaintiffs cannot plead that Parameswaran harbored any doubts about the related-party

---

[15] ¶¶5, 73-81, 98, 219, 223-24, 252-54, 295, 297-98.

[16] The complaint filed July 1, 2020 covered the Class Period July 28, 2017 through September 25, 2019. ECF 34 at ¶1. The TAC alleges that the intangible content asset balances reported in Eros's periodic filings thereafter were misleading for the same reasons and continued to be inflated even after Eros's consecutive impairments until the truth was finally fully revealed on August 3, 2021. ¶¶297-98, 305, 309, 312, 316-17, 318, 321, 325, 330, 333, 367.

17

transactions. PP Br. 21-22. But Eros's related party transactions had been the subject of much scrutiny during the Class Period (¶77) and Eros capitalized its content at cost, *i.e.*, what Eros paid (¶75). Eros over-paying for content necessarily means inflated assets appeared on its balance sheet. And overpay is what Eros did. As the TAC explains, for example, film budgets are often themselves inflated figures, including self-charged producer-fees and extra contingencies, and Eros's Class Period advances paid to NextGen were double the entire (already bloated) reported budget of NextGen's films since Eros's IPO. ¶¶79, 80 & nn. 16, 17. These facts are sufficient to infer that Eros's CFO, a former Goldman Sachs investment banker, did not honestly believe the reported balances reflected the true actual value of Eros's content.[17]

Moreover, neither Parameswaran nor the Eros Defendants challenge Plaintiffs' allegations that the intangible content balances were also inflated vis-à-vis the failure to impair the content earlier, despite the impairment indicators being consistently present *and obvious to Defendants* as of the start of the Class Period. These newly added allegations—particularly when Defendants claimed they annually reviewed Eros's content for indications of impairment (¶192)—further support the Court's proper conclusion that "Plaintiffs sufficiently allege that Eros' intangible asset valuation lacked a reasonable basis and it is reasonable to infer that it was not honestly believed." Order at 17 (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 3d Cir. 2014). As the court in *Kraft Heinz* recently held, allegations that a "triggering event occurred that should have alerted Defendants to the likelihood of impairment" were sufficient to allege the falsity of the

---

[17] Parameswaran also rehashes the argument that the related-party transactions were disclosed (PP Br. 22), but again ignores the fact that Eros materially over-paying related parties for content was not. Indeed, this Court already held that Eros's "Form 20-F disclosures do not insulate" Eros's intangible asset balances from liability, because the Form 20-Fs do not "warn[] investors that Defendants intentionally inflated the value of the Eros film rights, as alleged, to funnel money between family members." Order at 17. Parameswaran provides no reason to change that holding.

reported figures on a motion to dismiss. 2021 WL 3566602, at *9; *see also In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 955 (N.D. Cal. 2017) (falsity adequately alleged when defendants justified the asset impairment determination based on a significant stock decline, but that stock decline had primarily taken place in the prior quarterly financial period).

> **(b)    Even After Eros Started To Impair The Content, Defendants Gave Materially False And Misleading Explanations To Conceal The Content's True Value**

**FY 2019.** Even as Defendants were forced to record the first massive $405.5 million impairment to Eros's content, they lied about the nature of the charge and what it meant for Eros's content. ¶¶118, 296. During Eros's July 15, 2019 earnings call, Lulla volunteered: "And also this is reversible. As soon as the market capitalization of the company goes up, this could be reversed back to the same value also." ¶296. Parameswaran affirmed Lulla, commenting "That's right." *Id.* Those assurances were false and highly misleading.

IAS 36 clearly states that an impairment loss "shall be reversed, *if and only if*, there has been a change in estimates used to determine *the asset's recoverable amount*." ¶188 (quoting IAS 36.114). Of course, Eros's market cap does not determine the recoverable amount of the content, and an increase in market cap would not mean the asset was no longer impaired. The Eros Defendants' own authority explains that "[n]otably, *once a company recognizes an impairment based on negative market conditions, it is not allowed to go back and 'restore' the asset if favorable market conditions cause value to increase*." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 510 (D. Del. 2013) (cited in Eros Br. 13).

The Eros Defendants argue that the false assurance about the impairment being "reversible" is not actionable because impairment analyses involve business judgment, and thus the statement was an inactionable opinion. Eros Br. 13-14. But there was no *business judgment* involved in Lulla and Parameswaran's statement, and it certainly was not couched as an opinion—

19

it was a false recitation of accounting standards made for the purpose of assuaging investor concerns about the impairment.

Equally false and egregious, when questioned by an analyst, "[s]o there's no change in your assessment of the actual real value of the film content … the value is still there[?]" Parameswaran replied "That's right." ¶¶118, 296. Eros, and in particular, Parameswaran, conveniently pointed to Eros's steep stock price drop following the CARE downgrade as the cause of the massive impairment charge (¶¶116-17), rather than the ***truth***: that the recoverable amount of Eros's content was *far* below what Eros had been reporting in its financial results. The former was the misleading scapegoat, the latter was the reality.

Neither Parameswaran nor the Eros Defendants can dispute the patent falsity of Parameswaran's representation that the "actual real value of the content…is still there." The actual value of the content was not "still there" because an impairment charge is an admission that the "real value" is *actually less* than what a company had been reporting on its books. ¶¶116, 178-84, 300. Further, his false assurance that the value of the content was "still there" was made for the specific purpose of misleading investors as to the meaning and impact of the impairment charge.

**FY 2020.** Eros reported a second impairment charge of $431.2 million on July 30, 2020. In discussing this impairment, Eros's 2020 20-F, signed by Lulla and Parameswaran, stated that "[a]s in our prior fiscal year, the significant reduction in stock price and corresponding ***decline in market capitalisation was the main driver for the impairment charge***." ¶331. The Eros Defendants argue that there is nothing false and misleading about this statement, and that Eros was wise to conduct the impairment tests. Eros Br. 13. In making this argument, Defendants conflate the impairment *indicator*—lower market capitalization—and the impairment *charge*, which reflected that the estimated recoverable amount of Eros's content was actually less than its

20

791129.1

recorded book value. ¶¶128, 129. Again, there is no exercise of business judgment or opinion in misleading the market as to what actually caused the impairment charge.

(c)    **As CFO Of The Combined Company, Warren Made Additional Misleading Claims About The Value Of The Content**

In the combined Company's August 4, 2020 Form 6-K signed by Warren, its first Form 6-K following the merger, the Company immediately touted its Indian film and content library—*i.e.*, legacy Eros's content—stating that it was one of the "most valuable libraries of Indian language films" and proclaiming that "ErosSTX's balance sheet was "[w]ell capitalized" despite the $431.2 million impairment charge announced just days earlier. ¶340. During a November 4, 2020, special earnings call to discuss Eros's strategic priorities, Warren announced revenue guidance for FY 2022 of $800 million, largely based on the Company having "developed a true library, with true library characteristics of high cash flow, high-margin flow-through." ¶342. Just six weeks later, ErosSTX further wrote-down Eros's content by another $333.824 million to reflect what the Company claimed was the assets' "fair value" as of June 30, 2020. ¶¶136-37.

The Eros Defendants argue these statements are opinions and that Plaintiffs have not alleged that Defendants did not have a reasonable basis for making them. Eros. Br. 15. But the Eros Defendants do not explain why these statements should be analyzed as opinions, when this Court has previously analyzed similar statements as fact. *See* Order at 11-15 (analyzing similar financial profile statements as actionable statements). Even so, it was certainly not reasonable for Warren to tout the "valuable" library just days after Eros announced a $431.2 million impairment of that library and at a time when, by Eros's own subsequent admissions, the content was further impaired. Indeed, that the Company wrote off another almost $334 million of Eros's library to reflect its fair value "as of" June 30, 2020 (over a month before Warren touted the valuable library) is sufficient to allege that (i) Warren's statement conflicted with information available to him about

21

the content's actual value at the time; and (ii) Warren lacked a reasonable basis for the claim when he made it, and it is reasonable to infer that it was not honestly believed. Order at 17-18 (analyzing opinions under both *Pfizer* and *Omnicare* standards); *see also Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *6 (M.D. Tenn. Apr. 19, 2019) (opinions actionable if they do not "fairly align with the information in the company's possession at the time").

Finally, it was not reasonable for Warren to represent on November 4, 2020, that ErosSTX's library was "high cash flow, high-margin flow-through" and that this library supported $800 million in revenue guidance for FY 2022, when less than six weeks later, on December 16, 2020, Eros's library was massively written down to reflect its "fair value" "as of" June 30, 2020. Given that an impairment charge is only required where future expected cash flows are less than the recorded book value, these facts are sufficient to allege that Eros's library of content was *not* reasonably characterized as high cash flow, high-margin flow-through and thus, that the revenue guidance was unreasonable. *E.g.*, *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 496, 501 (W.D. Pa. 2020) (guidance made with knowing disregard for the risk of its falsity sufficiently alleged); *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 483-84 (N.D. Ill. 2021) (knowledge of severity of trouble in one of company's business lines rendered guidance reaffirmation misleading).

### 2. The TAC Alleges That Defendants Knew Or Recklessly Disregarded That Eros's Intangible Content Assets Were Misleadingly Inflated

#### (a) The Very Facts *Defendants* Claim Caused The 2019 And 2020 Impairments Existed Since The Beginning Of The Class Period, Thus Establishing That They Should Have Been Taken Earlier

The TAC alleges that Defendants knew or recklessly disregarded that Eros should have impaired its intangible assets earlier because the very impairment indicators that Defendants cited as having prompted Eros's impairment review and causing the impairment charge in FY 2019— "[1] carrying the value of net assets of the group exceeding our market capitalization and [2]

22

expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations" existed since before beginning of the Class Period. *See* ¶¶117, 189.

The first indicator tests whether Eros's stock price is such that its market cap is lower than the carrying value of its net assets. This signals likely impairment because it shows that the perceived actual value of the company is less than the recorded value of its assets. Eros's market cap was below the carrying value of its net assets in FY 2017 and FY 2018. ¶189. The second indicator essentially asks whether Eros spends more on content than it generates in cash from such content purchases; if so, this is another sign that the assets are likely overvalued and should be impaired. ¶¶189-90. Eros spent hundreds of millions on content (¶¶73-74) but consistently failed to generate more cash flow than it spent. ¶190. Significantly, Defendants cited these indicators as not only the reason to *test* for impairment, but for recording the impairment charges themselves. ¶¶117, 203 (calling market cap the "main driver" of both the 2019 and 2020 impairment charges).

The fact that both impairment indicators were present from the beginning of the Class Period and continued to be present consistently prior to Eros recording its first impairment in FY 2019 is sufficient to allege a strong inference that the impairment loss should have been recorded earlier. *Leapfrog*, 237 F. Supp. 3d at 953; *Oregon Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*, 2020 WL 5500458, at *13, *15 (D. Colo. Sept. 11, 2020); *Cf.* Order at n.6.[18]

Parameswaran tries to counter the inference of scienter by arguing that Plaintiffs fail to allege that "all of the relevant 'indicators' existed earlier." PP Br 17. This is a straw man argument with no basis in the law or the facts at the time. An asset must be tested for impairment if there is "any" indication it is impaired (¶¶179, 180), and a loss must be recorded immediately if the asset's

---

[18] *See also Zwick*, 2018 WL 2933406, at *6 ("For the purposes of these Motions to Dismiss, Plaintiffs have sufficiently alleged, given the underlying 'red flags,' that the decisions not to test for impairments and not to take those impairments in 1Q 2016 were fraudulent….").

23

value is recorded at higher than its recoverable amount (¶184). When discussing the decision to test and record the 2019 impairment, Parameswaran cited only two indicators as the factors Eros considered (¶117), and Defendants cited the market cap indicator as the "main driver" of *both* the 2019 and 2020 impairments (¶203). So Parameswaran's current misdirection—pointing to unidentified, hypothetical factors that may or may not have been considered by Defendants at the time, and that may or may not have *also* signaled impairment—fails to raise *any* opposing inference, let alone a more compelling one.

Finally, both Eros's stated policy and IAS 36 required Eros to test its intangible content assets for impairment annually, and immediately record any impairment loss. ¶¶179, 192. Where Defendants themselves claim the market cap indicator drove the actual impairment charges in 2019 and 2020, and where the market cap impairment indicator existed consistently during the Class Period from FY 2017 onwards, the TAC alleges a strong inference that Defendants intentionally or recklessly violated Eros's own stated policies by failing to detect and record the impairment sooner. *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007) ("violation of GAAP and/or a company's own accounting policies" supported a strong inference of scienter with respect to alleged inflated value of loan portfolio).[19]

---

[19] At the very least, the presence of the indicators in 2017 and 2018 required Defendants to do a deeper dive into the reported value of Eros's content, including EIML's content that was incorporated into Eros's financials, to *test* whether the assets were, in fact, impaired—something that by all accounts, including Parameswaran's own repeated argument disclaiming all knowledge of EIML's assets and accounting practices (*e.g.*, PP Br. 1-2, 4, 10, 11, 13-14), Defendants did not do. Indeed, there is **no** suggestion **anywhere** in the record that Defendants tested the content in FY 2017 and 2018 and determined it *not* to be impaired. But *even if* such tests *were* done, that would not support dismissal. At best, it would only raise questions for expert and fact discovery, including: what tests were conducted and by whom; whether they were appropriate measures of impairment; what the results were; and whether they supported a decision not to impair.

791129.1

### (b)     The Need For Eros's Impairment Was Obvious

The reported carrying value of Eros's net assets exceeded its market cap for **nine quarters** before Defendants belatedly recorded the 2019 impairment. The gap was not only long-running, it was substantial: Eros's net assets exceeded its market cap by 41.4% and 50.3% at fiscal year-end 2017 and 2018, respectively. ¶189.[20] Moreover, the cash Eros spent on content exceeded the cash generated from its operations by 41.9% and 67.2% for FY 2017 and FY 2018, respectively. ¶190. And during that timeframe, cash flow was a huge problem for the Company. *E.g.*, ¶¶148-55. These were **clear signs** to Defendants that Eros's assets were valued at more than they were worth.[21]

The Eros Defendants argue scienter is lacking because investors could have discerned the presence of the impairment factors prior to 2019. Eros Br. 14-15. But prior to Parameswaran's identification of the two impairment triggers in connection with the FY 2019 impairment (¶117), *investors* did not necessarily know that those were the indicators Eros used to assess impairment. More importantly, *investors* could not independently value Eros's content library—the only way to discern whether asset are actually impaired—only Defendants could.[22]

---

[20] Eros did not identify how it calculated the carrying value of its net assets. Most simply, net assets is total assets minus total liabilities (¶189, Indicator 1, Column A), and that is the amount analyzed above. *See* ¶189, n.37.

[21] The obvious nature of the indicators here distinguishes this case from *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 431 (D.N.J. 2005). Eros Br. 19. There, the alleged impairment indicators, which did not even exist within the company, were not alleged to be obvious. Rather, "Plaintiffs merely allege[d] that Defendants should have known to record the…impairments because of the prevailing **industry conditions**…and the actions of **Exxon's competitors** during this period." *Id.* at 427. Similarly, the plaintiffs in *In re ICN Pharmaceuticals, Inc. Sec. Litig.*, also relied on by Defendants, "fail[ed] to provide facts indicating why an analysis **by a competitor** and an offer of purchase translates to ICN or the other defendants having actual or constructive 'knowledge'" that the assets were impaired. 299 F. Supp. 2d 1055, 1064 (C.D. Cal. 2004).

[22] Further, whereas Parameswaran argues that he—Eros's CFO—failed to discern that the content was impaired (*e.g.*, PP Br. 4), and where Parameswaran *specifically* (and falsely) assured investors that the 2019 impairment did not reflect any actual diminution in the content's value (¶118), the Eros Defendants' attempts to evade liability by arguing *investors* must have known that the content

25

791129.1

Parameswaran argues the need to impair was not obvious to him because Eros's impaired assets "originated" at EIML and were "largely acquired and held by EIML," and that he knew nothing about EIML's content or accounting practices. PP Br. 4; *see also* PP Br. 16, n.13 (arguing that the impaired assets "were nearly entirely held by Eros subsidiaries"). Not only is Parameswaran's argument unsupported by the record,[23] it is a red herring: the obvious impairment indicators existed at the Eros parent level for years. Moreover, Parameswaran's argument that he knew nothing about EIML's assets or accounting practices conflicts with what he told investors at the time. Sec. III.A, *supra*; ¶¶226, 256, 302, 337 (attesting that he took steps to ensure the accuracy of Eros's and EIML's financial reporting). Thus, on a motion to dismiss, he is not entitled to the inference of ignorance. But *even if* it were true that (i) Eros's impairments were caused by EIML assets, and (ii) Parameswaran truly had no idea what was going on at EIML, that ignorance would itself establish recklessness. After the consistent presence of impairment indicators at Eros for two years, Parameswaran had an obvious duty to investigate the assets Eros was reporting on its balance sheet. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (scienter alleged where

---

was impaired fails. *See, e.g.*, *In re Alstom SA*, 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) ("'Defendants' cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that Alstom's CEO and CFO were unaware of those commitments.").

[23] Parameswaran's exhibits do not support his argument about EIML. *See* PP Ex. 4 at 79 (pdf page 83) (Note 39 Exceptional Items) (showing no 2019 impairment of content at EIML). Eros's own 2019 20-F also shows none of the impairment originating at EIML. *See* PP Ex. 2 at F-54 (pdf page 318). As for the 2020 impairment of $431.2 million, Eros reported that $208.9 million (or *less than half*) stemmed from EIML. *See* PP Ex. 1 at F-57 (pdf page 341) (showing Eros reporting EIML impairment of $208.9 million). Moreover, EIML itself reported a FY 2020 impairment of only $180.3 million. PP Ex. 4 (EIML's 2020 annual report) at 79 (pdf page 83) (showing 2020 impairment of 127,850 INR lakhs, or $180.3 million (based on the average FY 2020 USD/INR exchange rate of 70.90 reported in Eros's 2020 20-F)). And because Eros does not wholly own EIML, if anything, Eros should report an impairment from EIML that is proportionate to Eros's ownership in EIML, not an impairment from EIML that *exceeds* EIML's own reported impairment. Parameswaran implicates numerous factual issues that cannot be resolved on a motion to dismiss, and they certainly cannot be resolved in his favor.

26

"defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation...[or] failed to review or check information that they had a duty to monitor.").[24] Indeed, Lulla and Parameswaran signed and/or certified the financials that included these figures.[25] And both Lulla and Parameswaran repeatedly touted Eros's "strong" and "well-capitalized" balance sheet, ignoring the obvious signs that Eros's "crown jewel" assets were deeply impaired.[26] They "were not entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004).

Finally, the Eros Defendants protest that Plaintiffs fail to provide evidence of "internal reports" that proved impairment (Eros Br. 19), while Parameswaran argues that scienter cannot be shown "absent specific information" indicating impairment. PP Br. 16. "But a strong inference of scienter does not require a 'smoking gun.'" *Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 233 (E.D. Pa. 2021). "Defendants' arguments ignore the fact that recklessness can be alleged based on their mere '***access to information***' in contradiction to their public statements." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *12 (E.D. Pa. Mar. 25, 2020). To be sure, Parameswaran—a career investment banker who previously

---

[24] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *63 (S.D.N.Y. Sept. 6, 2005) (executives have a "duty to familiarize themselves with the facts" in SEC filings they sign); *Atlas Air*, 324 F. Supp. 2d at 491 (similar) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000) ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements.")).

[25] ¶¶226-27, 253, 256-57. *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *9 (D.N.J. June 12, 2020) ("It is a commonsense inference that the Company's CEO was familiar with the existence and contents of the press releases and annual reports.").

[26] *E.g.*, ¶¶220, 222, 229, 232, 235, 237.

791129.1

worked at Goldman Sachs (¶53)—understood the implications of Eros's asset value exceeding market value and Eros spending significantly more on content than the cash it generated from that content.[27] Eros's own independent public accountant before the merger with STX cautioned that "[w]hile an entity may not be able to pinpoint a specific event or moment when an adverse trend becomes an impairment indicator, adverse trends such as this clearly cannot be ignored." ¶191. The ongoing presence of the clear impairment triggers here screamed for an impairment, yet these obvious indicators were ignored. *Zwick*, 2018 WL 2933406, *5, *9 (failure to write-down goodwill earlier actionable where "there were 'triggering events'" defendants ignored).[28]

### (c)    Eros Only Began To Record The Impairments After Being Exposed By A Third Party

As in *Maxar*, Eros "did not decide to conduct an impairment analysis on its own accord. It only did so after its financial health and accounting practices were questioned by [third parties such as Hindenburg] in its [June 7, 2019] report", along with other third-parties CARE Ratings and Moody's (*e.g.*, ¶¶107-10). *Maxar*, 2020 WL 5500458, at *15. In *Maxar*, the defendant announced impairment was possible less than three weeks after a short seller report. *Id*. Here, about five weeks passed between the June 7, 2019 Hindenburg Report that first spotlighted the issues

---

[27] Parameswaran's argument largely relies on inapposite cases finding a lack of scienter with respect to *goodwill* impairments. PP Br. 16 (citing *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 547, 558 (D.N.J. 2010); *Finger v. Pearson PLC*, 2019 WL 10632904, at *13 (S.D.N.Y. Sept. 16, 2019)). Courts often analyze goodwill impairments differently than other asset impairments (like Eros's content) because goodwill is a mere accounting entry "generated by the acquisition of a business for a price greater than the value of the business's net identifiable assets.'" *Finger*, 2019 WL 10632904, at *2. Thus, the court in *Leapfrog* held that signs of impairment "have resonance in respect to long-lived asset impairment" but did not necessarily support scienter on a goodwill impairment. 237 F. Supp. 3d at 953.

[28] In *Leapfrog*, meanwhile, the presence of the impairment indicator that the defendants cited as the cause of the impairment—a stock price decline—for just a single quarter prior to the write-down was sufficient to allege scienter. 237 F. Supp. 3d at 953. Here, the indicators were consistently present for approximately *two years*.

28

with Eros's balance sheet, including content issues (¶205) and Eros announcing the impairment on July 15, 2019. Following the combination of the Hindenburg Report and the CARE and Moody's downgrades, public scrutiny on Eros reached a tipping point, and Defendants could no longer conceal the Company's intangible content problem: so they purged a material portion of it from Eros's balance sheet. ¶205. And rather than revealing the true cause of the impairment—the content was worth less than reflected on the balance sheet—Defendants blamed it on the stock drop following the CARE downgrade. ¶¶117,118, 203. But upon closer examination (*see* Sec. V.A.2.d, immediately below), Defendants' CARE excuse, while convenient, is unconvincing.

**(d)      The Misleading And Contradictory Reasons Defendants Cited For The Content Impairments Further Support Scienter**

Defendants offered misleading and at times irreconcilable reasons for what caused Eros's 2019 impairment. Eros's July 15, 2019 press release said it was "mainly ***due to high discount rate*** …and changes in the market conditions." ¶116. But on an earnings call the same day, Defendants never even mentioned the discount rate; instead, Parameswaran said, "***due to the significant decline in the market value*** [of Eros's stock], we tested impairment for carrying the value of net assets of the group exceeding our market capitalization and expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations. ***Accordingly***, we recorded a noncash impairment loss of $423 million…." ¶117. While those statements could theoretically be reconciled if Parameswaran was solely referring to what prompted Eros to *test* for impairment, rather than what *caused* the impairment, just over a year later, in its 2020 20-F, Eros reiterated that "[a]s in our prior fiscal year [2019], the significant reduction in the stock price and corresponding decline in market capitalisation was ***the main driver*** for [*i.e.*, caused] the impairment charge." ¶331. In other words, Defendants clearly tried to lay blame for both the 2019 and 2020 impairments on Eros's low stock price rather than admit trouble with the content.

29

Defendants argue that "[t]here is nothing false or misleading about the statement that the decline in market capitalization was the "main driver" for [*i.e.*, caused] Eros's impairment charges." Eros Br. 13 (also arguing that "the declines in Eros's market capitalization that occurred following the CARE downgrade in 2019, and again in 2020 during the height of the global pandemic, were precipitous"). But it *was* misleading; it is now abundantly clear that Eros's market cap drop did not "cause" the content assets to be impaired. The content was impaired because Eros had booked and carried the value of the content assets in gross excess of what they were worth.

Further, Defendants' claim that the drop in Eros's market cap following the June 5, 2019 CARE downgrade was the "main driver" of the 2019 impairment charge suffers a major timeline problem: Eros recorded the 2019 impairment effective as of March 31, 2019—meaning Defendants themselves must concede that they determined that the content assets were actually impaired months *before* the CARE downgrade. While the impairment may have been *announced* after the CARE downgrade, Eros's 2019 financial results reflect that the impairment itself *occurred* before the CARE downgrade.[29] Thus, when Lulla and Parameswaran assured the market on July 15, 2019 that the impairment charge was "reversible" if Eros's market cap went back up, and that there was no impact on "the actual real value of the film content" (¶118), those statements were *knowingly* false when made.[30] And they were made for the specific purpose of assuaging

---

[29] Defendants fail to explain how an event occurring more than two months after Eros's 2019 year-end impacted its 2019 financial results. If the CARE downgrade truly caused the assets to be impaired, the impairment would have been recorded when it happened in 1Q 2020, not 2019. Defendants' argument is further belied by the fact that Eros did not mark down the value of its bonds (*i.e.*, credit) in its 2019 20-F. *See* PP Ex. 2 at page F-37 (reporting "fair value" of its retail bonds at $59.3 million in 2019, and $58.2 million in 2018). Eros's argument about the CARE downgrade asks the Court to believe that somehow a credit downgrade had no impact on the Company's *credit*, but did wipe out 40% of its film content, which defies logic.

[30] Indeed, an impairment charge recorded only if asset value is actually estimated to be lower than booked (¶178), and asset impairments are not simply reversible if a company's stock price rises (¶188). *Bartesch*, 941 F. Supp. 2d at 510.

30

791129.1

investors' concerns about the cause and potential ongoing impact of the impairment. *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("the most powerful evidence of scienter is the content and context of the statements made by [Defendants], which were made in response to analysts questions.").

The second impairment, announced on July 30, 2020 similarly suffers from inconsistencies about the purported cause. As to the cause of the 2020 impairment, Defendants blamed "the height of the global pandemic." Eros Br. 5, 13; ¶129. While the pandemic may have presented a convenient excuse on the surface, Defendants simultaneously touted the pandemic as *a benefit* to Eros—and specifically a boon to Eros's content.[31] All Defendants wholly ignore the TAC's allegation that Eros claimed that the pandemic would benefit their business.

The cogent and compelling inference from Defendants' conflicting explanations for Eros's impairments is that they were, and are still, lying about the real cause: Eros's content was impaired all along—including from the beginning of the Class Period—but Defendants delayed recording the impairments and admitting the truth about Eros's content for as long as they could. ¶¶204-05, 214, 215. Defendants' mounting inconsistencies make one point strikingly clear: "At the end of the day, Plaintiffs' allegations regarding scienter are more than merely plausible; the inference of scienter is at least as compelling as any opposing inference." *Leapfrog*, 237 F. Supp. 3d at 955.

          **(e)**       **The Magnitude And Timing Of The Impairments Further Support Scienter**

Defendants' impairment of over $1.1 billion of Eros's core assets in just 15 months supports a strong inference "that the impairment was not a sudden, unexpected event, but rather the result of ongoing problems at the Company, about which it is unlikely that Defendants were

---

[31] ¶¶27, 211 (touting Eros's streaming service and claiming the pandemic "accelerat[ed]" Eros's "ability to monetize through multiple channels around the world" and that "watch-at-home consumption patterns underpin" the consumption of Eros's "deep and rich library").

absolutely ignorant." *Kraft Heinz*, 2021 WL 3566602, at *13 (gathering cases); *Maxar*, 2020 WL 5500458, at *16 (applying IAS 36 and noting that the size of the impairment, $383.6 million, supported an inference of scienter); *Dudley v. Haub*, 2013 WL 1845519 (D.N.J. Apr. 30, 2013) ("the magnitude of the impairment suggests that it should have been recorded earlier").[32]

Defendants' counter-argument—that the impairments were caused entirely by, and timely recorded after, extraneous and unpredictable market events—manages to write any consideration of the assets themselves almost entirely out of the equation. It ignores the law on impairment and the facts as alleged, and it certainly does not raise a *more* compelling inference than Plaintiffs' allegations that the content's value was inflated all along and the impairments should have been recorded earlier. To credit Defendants' inference over Plaintiffs', the Court would have to believe the implausible: that Eros's content value actually declined an additional $432.2 million in just twelve months following the $405.5 million FY 2019 impairment charge; and that it declined another $333.8 million *in just three months* after the $432.2 million FY 2020 impairment charge.[33]

In fact, Defendants' third write-down of $333.8 million "as of June 30, 2020" necessarily *admits* that the content was *in fact impaired* in a material amount *beyond* the $432.2 million FY 2020 impairment at the time that charge was announced on July 30, 2020. Either Defendants *knew* the content was impaired by a much higher amount than the loss recorded, or they were extremely reckless in failing to discern it. Either scenario strongly alleges scienter. Defendants' proffered inference of timely and orderly write-downs is not only *not* more compelling, it's nonsense.

---

[32] *See also Zwick*, 2018 WL 2933406, at *10 (noting "courts have noted that the sheer size of a write-down adds to the inference that the defendants must have been aware the problem was brewing" and holding $250.4 million impairment charge supported inference of scienter); *Rothman v. Gregor*, 220 F.3d 81, 90-92 (2d Cir. 2000) (large size of write-off "renders less credible the proposition that ... [defendant] believed it likely that it could recover those royalty advances").

[33] The FY 2020 impairment represented over 61% of the content balance left at the end of FY 2019, and the post-merger reduction represented over 72% of the remaining balance at the end of FY 2020.

791129.1

(f)    **The Timing Of Eros's Second And Third Impairments In Relation To Warren's False Statements About Eros's Content Alleges A Strong Inference Of Scienter**

On August 4, 2020, just days after Eros announced the $431.2 million 2020 impairment—for a cumulative impairment of $836.7 million (or 84%) of Eros's content from 2019-2020 (¶26)—Defendant Warren filed a Form 6-K announcing the completion of the merger and touting the Company's "[w]ell capitalized" balance sheet and stating that Eros "will continue to have…one of the largest and *most valuable libraries* of Indian language films." ¶340. On November 4, 2020, Warren claimed that ErosSTX had "developed a true library, with… characteristics of high cash flow, high-margin flow-through" that supported FY 2022 revenue guidance of $800 million. ¶342. Just six weeks later, Warren filed the post-merger accounting revealing the additional write-down of Eros's content by $333.824 million to reflect its "fair value" as of June 30, 2020. ¶¶134-37. That the write-down came so soon after Warren touted the content in support of the guidance supports scienter. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) (2 month gap between giving guidance and subsequently lowering it by 10% supported scienter "because temporal proximity makes more plausible that intervening events did not cause the inconsistent statements.") (collecting cases).

In addition, the timing of Warren's positive statements sandwiched in between the announcements of two massive write-downs alleges a strong inference that his statements were either knowingly misleading or *extremely reckless* when made. As the CFO of the newly-combined Company, Warren had a duty to ensure the accuracy of his statements about the content before speaking to its value—particularly when making such assurances on the heels of Eros's second massive write down and when trying to induce reliance on extremely aggressive FY 2022

33

791129.1

guidance.[34] Warren's subsequent admission that, in fact, the content was materially impaired *as of June 30, 2020* alleges a strong inference that Warren was, at least, extremely reckless when he touted the "well-capitalized" balance sheet and supposed value of Eros's content library on August 4, 2020 and when he cited it in support of the Company's revenue guidance on November 4, 2020.

### B. Defendants' Misrepresentations Of Eros's Financial Condition Are Actionable

#### 1. The Court Previously Held Falsity Was Alleged

##### (a) Defendants' Misrepresentations About Eros's Financial Health And Balance Sheet

During the Class Period, Defendants repeatedly touted Eros's supposed financial well-being, stating that it was "well-capitalized," that its liquidity, cash flows, and balance sheet were "strong" and "conservative," and that its capital structure was solid.[35] This Court already held that these statements are sufficiently alleged to be false as of the beginning of the Class Period, and specifically found that "Plaintiffs sufficiently plead that leading up to the [June 5, 2019 CARE downgrade], Eros' finances were not as strong as Defendants represented." Order at 11-15.

In the TAC, Plaintiffs continue to allege facts showing that Eros's finances remained profoundly weaker than Defendants portrayed throughout the extended Class Period.[36] These facts include that: (1) Eros was forced to resort to toxic fundraising in September 2019 to access much needed cash for "general corporate purposes" (¶¶123-25); (2) the salary delays continued as well

---

[34] *Atlas Air*, 324 F. Supp. 2d at 490 ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who ***should have known of facts relating to the core operations*** of their company that ***would have led them to the realization that the company's financial statements were false*** ...."); *cf. In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D.Pa.1999) (integration problems "should have alerted high-level officers within the company to the fact that the company's financial statements and optimistic comments were false or misleading.").

[35] ¶¶216, 217, 220, 221, 222, 229, 231, 232, 235, 237, 240, 241, 243, 245, 248, 250, 251, 259, 263, 264, 266, 267, 270, 272, 274, 277, 278, 279, 285, 294.

[36] *E.g.*, ¶¶306, 313, 322, 324, 329, 340 (between October 2019 to August 4, 2020, claiming Eros's balance sheet "remains conservative", or "very conservative", "healthy", and "well-capitalized").

34

as missed payments to Eros's vendors (¶¶152-61); (3) Eros continued to materially overstate its content balances (¶¶206-15); (4) by the Company's own admission, 55% of Eros's 2020 revenue was improperly recorded and the receivables associated with such revenue were valued at zero (¶¶140-47); and (5) the Company announced that it could not timely release its FY 2020 financial results for the year ending March 31, 2020 because its Audit Committee was reviewing Eros's accounting practices and that it expected all intangible assets and goodwill would be impaired (*id.*).

In response to the foregoing, the Eros Defendants again try to disclaim liability by generally making a truth on the market defense (Eros Br. 14-15)—despite the Court previously rejecting this argument. Order at 12-14.[37] Eros's argument again fails because its failure to consistently pay its salaries and other obligations obviously was *not* reflected in its financial statements. ¶¶148-76. Nor did Eros's financials reveal Defendants' inflation of Eros's content balances both through related party overpayments and their failure to timely impair—especially when Defendants claimed they reviewed the content annually for indications of impairment (¶192) and where Defendants specifically denied any problem with the actual content value when they announced the 2019 impairment (¶296). Finally, the reported financial information did not inform investors that Defendants overstated FY 2020 revenues by 55% based on inflated receivables (¶140-41, 147); particularly when in announcing FY 2020 revenues, Eros credited the "resilience of our business model and inherent demand for premium content." Eros Ex. 12 at 2.

For his part, Parameswaran asks this Court to "revisit" its prior decision finding his repeated assurances about Eros's financial condition to be false, explaining that such a decision in his favor would allow him to avoid discovery. PP. Br. 19-20. This is not a sufficient reason to

---

[37] Eros Defendants alternatively argue that Plaintiffs fail to plead facts to challenge the accuracy of their statements about Eros's financial condition at the time they were made (Eros Br. 14), entirely ignoring the allegations in Plaintiffs' TAC.

35

791129.1

"revisit" the Court's prior decision, particularly where Parameswaran largely cites the same authority as he did previously and otherwise offers no legal or factual argument that compels a different result. *Compare* PP. Br. 19-20 *with* ECF 37-1 at 24-26.[38] As the Court previously noted, there is precedent in support of both Parameswaran and Plaintiffs' arguments about the materiality of his statements. Order at 13-14. Moreover, the TAC alleges facts showing that Parameswaran specifically assured investors on June 9, 2019 that "Eros has a strong liquidity profile and healthy balance sheet" to assuage their concerns in the wake of the CARE downgrade (¶¶283-85), and such assurances simply cannot be dismissed as generic and immaterial.[39] The Court was right in holding that such "questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact" (Order at 14), and the Court should thus again decline to dismiss.

### (b)    Defendants' Misleading Statements About The Ratings Agencies

As for Defendants' statements about the June 2019 credit rating actions and their obfuscation of the reasons for the CARE downgrade and Moody's withdrawal (¶¶281, 287, 289, 290), and Eros's efforts to restore its CARE rating (¶¶283, 289, 308, 315), the TAC again alleges that not only were they false, but they gave the materially misleading impression that Eros's

---

[38] Moreover, Parameswaran's newly offered cases are all inapposite as none of the plaintiffs had—as Plaintiffs have here—sufficiently alleged any facts to show that the statements at issue were inaccurate or misleading. *See* PP Br. 20. In *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, the court explained that the statements about the company's "solid performance," "sustained strength," and "strong vertical presence" were not actually alleged to be inaccurate or sufficiently related to the bribery scheme at issue to be misleading. 2018 WL 3772675, at *22, *23 (D.N.J. Aug. 8, 2018). The court in *In re Omega Healthcare Invs., Inc. Sec. Litig.* found that "[i]n the absence of any factual attack on the accuracy of the statements about Omega's quarterly financial performance … plaintiffs cannot show anything but a tenuous connection between the affirmative statement and the specific information … that plaintiffs claim should have been disclosed." 2021 WL 4443562, at *9 (S.D.N.Y. Sept. 28, 2021). Here, by contrast, Plaintiffs *directly* attack the accuracy of Eros's financial statements, including its inflated content balances and false FY 2020 revenue.

[39] *See also* ¶283 (in the same June 9, 2019 press release, Lulla specifically claimed in response to the CARE downgrade that "I am pleased to inform shareholders that we now have a strong financial and operating position….").

36

financial position was better than it actually was and that the credit rating issues were simple clerical matters that would be quickly resolved. ¶¶293, 311, 319. Other than the statements about Eros's efforts to restore its CARE Ratings, these statements were previously held to be misleading. Order at 21-24.

Defendants only challenge the falsity of the statements made by Parameswaran (¶¶308, 315[40]), Lulla (¶283), and Eros (¶289) assuring that Eros was working with CARE, focusing on the sufficiency of the allegations from CW5. Eros Br. 9-10; PP Br. 23. The Court previously discounted CW5's allegations due to the failure to explain "how CW5 obtained the information which forms the basis of his statements." Order at 22. The TAC adds these details, explaining that although CW5 (a CARE analyst) did not work on the Eros account, CW5 was part of the same CARE analyst pool as CARE's Eros analyst, and that Eros was the topic of discussions between employees in which both CW5 and the Eros analyst were present. ¶162. CW5 need not be the actual CARE analyst covering Eros to be reliable; it is logical that colleagues would discuss significant work issues with each other. And, indeed, the 10-notch downgrade (to the lowest rating, Default) by India's largest credit ratings agency was highly significant. ¶8; *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *7 (D.N.J. Sept. 30, 2016) (finding defendants' arguments about lower level employee statements unpersuasive and noting that these employees would know the "pulse" of the company, and would communicate among themselves to learn about problems).

The TAC also bolsters CW5's allegations with CARE's own announcement on September 25, 2020 that "[t]he company has not provided the requisite information for monitoring the

---

[40] Neither Parameswaran nor the Eros Defendants challenge the falsity of the portion of Parameswaran's statement in ¶315 attesting that Eros was "in full compliance with all our debt commitments." Plaintiffs allege that at that time, Eros was routinely late in paying its obligations, including loan payments, payroll, and amounts due to vendors (¶¶148-76, 320), thus sufficiently alleging the falsity of Parameswaran's statement.

791129.1

ratings[,]" despite CARE requesting such information, categorizing EIML as "Not Cooperating." ¶¶131-32. Defendants' attempt to discredit CARE's announcement of non-cooperation by arguing that it was not contemporaneous with their statements fails. *See* Eros Br. 10, PP Br. 15, 23. It is far more plausible that CARE tried (unsuccessfully) to work with Eros and EIML in the year following the downgrade, giving them reasonable time to provide the information CARE requested before the agency finally got fed up and made the announcement. This inference is supported by CARE's own explanation that it made "adequate efforts" to get the requested information. ¶132.[41]

Finally, Eros's FY 2020 content impairment (¶26), its content write-down as of June 30, 2020 (¶215) and its subsequent admission of the unreliability of its reported FY 2020 revenue (¶140) *further* bolster CW5's account and CARE's announcement that Eros had failed to cooperate: if Defendants *had* provided the financial information CARE requested between June 2019 and September 2020, the picture would not have looked good and it is not likely that CARE would have restored Eros's rating. But the risk of cooperating with CARE was even greater than that—had Defendants provided CARE with financial information about its content and revenue, they risked CARE figuring out that both were grossly inflated.

### 2. The TAC Alleges Defendants Knew Or Recklessly Disregarded Material Facts That Undercut Their Assurances About Eros's Financial Condition *Throughout* The Class Period

The Court previously held that scienter was alleged as to Lulla's and Parameswaran's financial condition statements after the CARE downgrade (*see* Sec V.B.2(c), *infra*), but it found scienter insufficiently alleged prior to the downgrade, focusing on deficiencies in Plaintiffs'

---

[41] Defendants' improper attempt to introduce new facts, *i.e.*, that another credit ratings agency began to cover EIML and "EIML withdrew its mandate to CARE to provide ratings" (Eros Br. 10, n. 3; PP Br. 23, n. 20), should be rejected. But even so, it is entirely in step with the fraud extensively detailed in the TAC that EIML would turn to another ratings agency when CARE would not provide the desired restored rating.

confidential witness allegations. Order at 26-27. The TAC bolsters the CW facts, and also alleges a plethora of facts relating to Eros's content balances to allege a strong inference of scienter with respect to Defendants' statements about Eros's financial condition *throughout* the Class Period.

### (a)   Defendants Ignored Consistent And Obvious Signs Of Impairment

During the Class Period, Eros's content comprised between 67% and 76% of the assets on its balance sheet. ¶74. For all the same reasons that Defendants' statements about Eros's intangible content balances were made with scienter (*see* Secs. V.A.2.(a)-(f), *supra*), so too were Defendants' rosy statements about Eros's financial condition. Indeed, a company does not have a "strong" or "conservative" balance sheet when its largest and most important assets are materially over-stated.

### (b)   The TAC Bolsters CW Reports Of Eros Failing To Pay Salaries, Vendors, And Loans

**Salary delays.** In the Order, the Court explained that more details from the former employees about the alleged salary delays were needed to lend support to the inference of scienter. Order at 26. The TAC includes more of these details from CW3, for example, including CW3's recollection that mid-level management had to frequently wait for their salaries during the 2016-2018 timeframe. ¶150. CW3 recalled that salaries in 2017 were inconsistent, and that twice salaries were delayed by over half a month (*id.*), and through colleagues with whom CW3 remained in touch, CW3 learned that the inconsistent salary trend lasted after CW3 left EIML in 2017. *Id.*

The TAC also includes allegations from new former employees (CW9 and CW10), who provide specific details about their own salary delays, that these delays were frequent during a four-to-five month period in the first half of 2019 and were up to 24 days delayed. ¶¶152-55. Both CW9 and CW10 further recall that the salary delays began again in September or October 2019 and continued to be delayed on-and-off until CW10 left in 2020. *Id.* The witnesses explained that the salary delays caused talented colleagues to leave, and that Eros's payment issues extended

39

beyond its own employees to its vendors. *Id*.

Corroborating CW9 and CW10's accounts of frequent salary delays over the course of four-to-five months in early 2019, during the same timeframe, Lulla also apparently made three personal loans in quick succession to Eros: on February 16, 2019, four days later on February 20, 2019, and again on May 7, 2019—implying that the Company needed quick cash infusions. ¶373; Plffs' Ex. C at 6.[42] The TAC also alleges reports in news articles that bolster and confirm the former employee accounts,[43] reporting similar salary delays, failure to pay vendors, and that EIML executives were similarly not-being paid money owed. ¶¶105, 156-61 (describing the payment problems as a "common agony").

**Loan and credit problems.** The TAC also alleges more information from CW6 (an EIML auditor) regarding why a credit downgrade appeared inevitable by the time of EIML's 2017/18 financial audit, including that EIML was already facing issues in making payments due, resulting in late payment penalties, and increasing the company's liabilities. ¶167. CW6 further stated that he informed Mr. Koria, the senior audit manager, who was in direct contact with Lulla for all audit related issues, about his concerns that, based on this pattern of borrowing and lending, EIML would

---

[42] While Eros did not disclose the amount of the loans, Lulla was repaid in 7,044,210 shares of stock valued at the market price as of July 11, 2019 (the closing price was $1.64/share on July 11, 2019, amounting to approximately $11.55 million). ¶373; Plffs' Ex. C at 6.

[43] Defendants question some of the news articles that corroborate the CW accounts of salary delays and failure to pay vendors. Eros Br. 24-25; PP Br. 11-13. Eros criticizes the reliability of the Daily2Daily article—which includes serious allegations of evidence spoliation relevant here (¶¶398-400)—but cite a Third Circuit case that addressed the requirements to plead allegations from confidential witnesses interviewed by counsel, not allegations drawn from a news article. Eros Br. 25 (citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013)). Allegations based on news articles are sufficient so long as the allegations "clearly identify the media sources upon which they rely." *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 79 (D. Del. 2002); *see also* Order at 19 (crediting allegations from the Hindenburg article). And Daily2Daily has proven reliable with respect to other information it reported: while Eros initially denied the Daily2Daily report that STX had begun an investigation into Eros (¶161 & n. 33, ¶391), one week later, ErosSTX confirmed it had indeed launched an investigation into Eros's accounting. ¶140.

791129.1

soon face cash flow problems; that Lulla would have knowledge of the late, non-payment, and bank penalty notifications EIML was receiving; and that furthermore, EIML employees began discussing a downgrade in 2017 due to salary delays. ¶¶166-69.

The TAC also clarifies details from CW7 regarding obvious problems with the Bank of Baroda loan to EIML, including that: the loan originated in 2016; the "non-payment fiasco" started in 2017; Lulla and Parameswaran received quarterly statements and were notified of EIML's penalties for inconsistent payments of the loan installments;[44] the penalty was 2% of the total amount due for non-payment of installments; EIML was under scrutiny for inconsistent salary payments from 2017-2019; and salary delays happened at least four to five times a year from 2017-2019. ¶¶170-72. Finally, CW8—who reported that management and the core team at Eros knew the CARE and Moody's downgrades were coming—further explained that CW8 obtained the reported information from close friends and colleagues at EIML. ¶¶173-75. These added details are enough to, at a minimum, infer that Lulla[45] and Parameswaran had "access to information contradicting their public statements" (Order at 25, 27) about Eros's supposed financial health.

Ignoring these additions, the Eros Defendants argue that the CW allegations are "materially unchanged." Eros Br. 17-18. But the new details provide consistent and corroborative accounts that Eros and EIML faced serious financial problems throughout the Class Period. *See Local 731*

---

[44] Parameswaran takes specific issue with CW7 centered on his same faulty premise that, because he was the CFO of the holding group, and not EIML, he could not have possibly been notified of EIML's late payments. PP Br. 9-11. But Plaintiffs' allegations must be taken as true, and it is entirely plausible—indeed, likely—that Parameswaran, the CFO of the holding company, was informed about the debts of the largest company in the holding group. Parameswaran's further complaints about CW7 fail: CW7 was the credit manager for the bank (¶170), the information CW7 provided is all within the sphere of what a credit manager would know.

[45] Not only did many witnesses explain that Lulla was highly involved in the inner workings of EIML and was the key decision maker, but Lulla held himself out as intimately familiar with EIML's day-to-day operations in a series of Indian press outlet interviews responding to the CARE downgrade. ¶¶100-03.

41

*I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, 2011 WL 2444675, at \*12 (D. Del. June 14, 2011) (corroborative nature of confidential witnesses supported inference of scienter). Although not all of the insider accounts directly link Defendants' knowledge (Eros Br. 18; PP Br. 11-13), the fact that many employees and insiders knew about both the salary delays and problems in repaying money owed during the 2017 to 2019 timeframe supports the inference of Defendants' scienter in touting Eros's supposedly strong financial condition at that time. *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*13 (D.N.J. Dec. 6, 2018) (allegations that conduct was widely known supported scienter allegations as to individual defendants).

**(c)      The Court Should Not Reconsider Its Prior Finding Of Scienter With Respect To Defendants' Misleading Assurances Following The CARE Downgrade**

This Court has already found scienter for the assurances as to the credit rating actions and Eros's financial profile after the June 5, 2019 CARE downgrade. Order at 27, 30-31. Defendants seek to reopen this holding in their Motion, and the Court should reject these attempts at "a second bite of the apple." *Cf. Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 2021 WL 3012864, at \*1 (D.N.J. July 16, 2021) ("reconsideration is inappropriate when a party merely disagrees with a court's ruling or when a party simply wishes to re-argue or re-hash its original motion").

**June 6, 2019 CARE Statement.** The Eros Defendants' request to "revisit" the Court's finding of scienter should be denied. Order at 27; Eros Br. 26. Eros claimed that it issued the June 6, 2019 press release to "provide[] clarification regarding a credit rating downgrade at EIML." Eros Ex. 2; ¶281. This was no "innocent mistake" (Eros Br. 26)—Eros was trying to diffuse and lessen the impact of the dramatic CARE downgrade by falsely claiming that "Eros International PLC and all of its subsidiaries have met and continue to meet all debt service commitments. The Company retains the full faith and confidence of our lenders." ¶281. That statement was not even remotely true. Even giving Defendants the benefit of the doubt that the press release *was* a

791129.1

mistake—a benefit to which they are not even entitled on their motions—offering investors "clarification" of this nature without inquiring into the bases for their claim would *at least* allege deliberate ignorance, *i.e*, recklessness. *Avaya*, 564 F.3d at 270.

**Moody's Withdrawal.** The Court also already found scienter alleged as to Eros and Lulla's false statements about Moody's decision to withdraw its coverage of Eros. Order at 30-31; ¶¶289-91 (calling concern about Moody's withdrawal "fake news" and claiming that Moody's withdrew its credit rating at *Eros's* request). The Eros Defendants indirectly suggest the Court should change its holding, citing a single out-of-circuit case as support for their argument that reflexive denials do not support scienter. Eros Br. 25-26. This argument is contrary Third Circuit precedent, which clearly holds that the content and context of statements, including misleading or "unhedged denials", support a strong inference of scienter. *Avaya*, 564 F.3d at 270.[46]

Moreover, the TAC clearly alleges that *Moody's* stated it withdrew the Eros rating on its own accord. ¶292. On these facts, the TAC sufficiently alleges that Eros and Lulla knew their claims about Moody's were false when made. *Matrixx*, 563 U.S. at 49 & n.15 (misleading press release was the "[m]ost significant[ ]" fact in favor of a finding of scienter).

**Financial Condition Statements Post-CARE Downgrade.** This Court has also already found recklessness alleged with respect to Lulla and Parameswaran's statements about Eros's financial profile following the CARE credit downgrade due to defendants' positions and the public nature of the downgrade. Order at 27. All Defendants' attempts to revisit that holding fail.

---

[46] *See also CommVault Sys.*, 2016 WL 5745100, at *8 ("Defendants emphatic and repeated denial of the impact of the loss of Dell and the effect of deferred revenue on growth demonstrates that, at minimum, they were reckless in disregarding investor's concerns on these issues."); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (defendants denials "made with such 'certitude'— when viewed in the 'context' of such persistent and significant underlying questions, is suggestive that they were made with the requisite scienter.").

43

The Eros Defendants attempt to reopen that holding by citing to an analyst report by Macquarie Research that does not prove their point (Eros Br. 26-27). The June 6, 2019 Macquarie report does not prove the *truth* of Defendants' claims that the missed EIML payments were, in fact, due to clerical error. Macquarie Research was not an insider with any particular insight into Eros's true financial state; it was simply repeating what Defendants stated to the market. ¶¶96, 293 (Macquarie explaining that its "understanding"—*which it got from Defendants*—was that missed payments were due to clerical error). Macquarie's report merely shows that Defendants' false assurances had their intended effect—market participants repeated them. Moreover, in their brief, the Eros Defendants conveniently omit Macquarie's conclusion: "This is inexcusable if true[.]" ¶96.

Parameswaran tries to revisit this holding by arguing "that there is no suggestion that he subjectively disbelieved these statements," apparently suggesting that the Court should apply a standard for opinions to his statements of fact. PP Br. 12. But Parameswaran does not articulate *why* the Court should analyze these statements as opinions—the statements were not couched as opinions at the time—and he offers no explanation as to why knowledge, rather than recklessness, should be required. As the Court rightly held when it first considered scienter with respect these statements, "[r]ecklessness may be inferred at the motion to dismiss stage when plaintiffs 'specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." Order at 25 (citing *Campbell Soup*, 145 F. Supp. 2d at 599). Regardless, the TAC alleges both information contradicting his statements, and allegations sufficient to show that the statements were "not honestly believed and lack[ed] a reasonable basis." *Pfizer*, 754 F.3d at 170. When Parameswaran tried to assuage investor concerns in the wake of the CARE downgrade by claiming on June 9, 2019 that "Eros has a strong liquidity profile and healthy balance sheet,"

44

Hindenburg had just reported that a "liquidity event seemed to border on the inevitable." ¶98.[47]

Further, Eros was in the process of preparing its FY 2019 financials, during which impairment was tested (¶117) and a $405.5 million impairment to Eros's content was recorded as of March 31, 2019. Parameswaran's March 10, 2020 statement that Eros had a "very conservative balance sheet" (¶324) fares no better: following the FY 2019 impairment, its impairment indicators remained present during FY 2020, and Eros was on the verge of impairing its content by another $431.2 million as of March 31, 2020. These facts show that when the statements were made, Parameswaran did not believe Eros's balance sheet was "healthy" or "very conservative" and that the statement lacked a reasonable basis when made. ¶¶285, 325.

### C. The TAC Alleges Actionable Statements Regarding Eros's FY 2020 Revenue And Receivables And ErosSTX's Intangible Assets And Goodwill Balances

#### 1. Defendants Have Admitted The Challenged Statements Were False

Defendants' last set of false statements concerns Eros's reported revenue and trade receivables balances throughout FY 2020,[48] as well as the reported intangible asset balance of $147.367 million[49] and goodwill balance of $496.213 million in the Company's March 31, 2021 Form 6-K signed by Warren, all of which were materially overstated. ¶345.

As part of its August 3, 2021 and August 25, 2021 announcements, the Company admitted that these previously reported figures were false, and more specifically that: (1) "approximately

---

[47] Lulla had expressly responded to this conclusion in the press (¶100) and during an earnings call with analysts and Parameswaran (¶¶296, 406), supporting an inference of Parameswaran's knowledge of the Hindenburg Report and its conclusion.

[48] ¶305, 307, 312, 314, 316, 321, 323, 327, 328 (Eros press release 7/30/20, reporting revenue for the year and highlighting that Eros's "ability to generate a meaningful amount of revenue … highlights the resilience or our business model"), 330, 332.

[49] This balance did not include content, which was moved to a separate line item on the balance sheet called "film and television costs." ¶136 & n.28.

45

$85.5 million of Eros pre-merger revenue was not properly recognized in" FY 2020; (2) "a significant portion of the receivables associated with such revenue was valued at zero for the six months ended September 30, 2020;"[50] and (3) the Company "expects that substantially all of the intangible assets and goodwill reflected in the [March 31, 2021] Form 6-K are likely to be impaired." ¶¶140, 146-47. These facts alone suffice to plead falsity. Indeed, Defendants do not challenge the falsity of Eros's FY 2020 revenue, nor could they—ErosSTX has already admitted that Eros did not properly recognize at least $85.5 million, or 55%, of Eros's FY 2020 originally reported revenue.

Eros Defendants do argue that because the Audit Committee investigation announcement presented preliminary results from the investigation rather than the findings at the conclusion of the review, the trade receivables, intangible asset balance, and goodwill balance cannot be false as the findings may be revised. Eros Br. 11-12. This argument is factually wrong, illogical, and unsupported by case law. ErosSTX explained that it **had already** valued a significant portion of the trade receivables associated with the $85.5 million in improperly recognized revenue at zero as of September 30, 2020. ¶140. Moreover, if the Audit Committee was not reasonably sure that substantially all the intangible asset and goodwill balances would be impaired, it would not have included this conclusion in the announcement. While the exact amount of the write-down and impairments may only be disclosed at the end of the investigation, it is implausible that they will not be substantial or that the Audit Committee will change its mind.

Courts facing similar factual circumstances have easily found falsity alleged. *See, e.g.*,

---

[50] Although ErosSTX did not specify the total receivables written off in the March 31, 2021 Form 6-K (containing the balance sheet as of September 30, 2020), the total receivables balance reported was $90.9 million less than the $196.4 million receivables balance reported in ErosSTX's Post-Merger Accounting—which itself reflected a $30 million write-off to reflect the "fair value" of Eros's receivables. ¶141.

*Atlas Air*, 324 F. Supp. 2d at 487 ("Neither the PSLRA nor Rule 9(b) requires a plaintiff to reconstruct a company's financial affairs in greater detail than the corporation's own auditors were able to achieve. The fact that Atlas announced the need to significantly adjust its reported financials for 2000 is sufficient to indicate that the company's reported financials for the first and second quarter of that year were materially false."); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006) (company's announcement "of the need to restate its earnings constitutes an admission that its public filings are false" despite company not yet restating earnings or announcing the size of restatement as of the resolution of defendants' motions to dismiss); *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *25 (E.D. Tex. June 16, 2004) (similar).

Eros Defendants also claim that Plaintiffs impermissibly link the trade receivables to Eros's $85.5 million in pre-merger revenue that was admittedly not properly recognized. Eros Br. 12. But it was the Company that linked the two (not Plaintiffs) on August 3, 2021: "[f]urther, a significant portion of the receivables associated with such revenue was valued at zero." ¶140; Eros Ex. 7. And this makes sense: Eros's own accounting policies, in line with IFRS 15,[51] required that to recognize revenue, Eros had to ensure its collectability. PP. Ex 1 at 75-76 (pdf p. 146-47) ("Significant Accounting Policies") (noting in multiple places that Eros will recognize revenue if Eros is "reasonably certain on collectability").

The Eros Defendants similarly argue that ErosSTX's intangible asset and goodwill balances as of September 30, 2020 were not false or misleading when ErosSTX published those figures. Eros Br. 12, n. 6. The likely impairment of substantially all the intangibles and goodwill

---

[51] To recognize revenue pursuant to IFRS 15, an entity must, as part of the process, conclude that "it is probable that the entity will collect the consideration to which it will be entitled in exchange for the goods or services[.]" IFRS 15.9.

791129.1

is essentially an admission that Eros was largely worthless. ¶¶142, 145. When ErosSTX issued these financials on March 31, 2021, the Company had been struggling for eight months, and to this day continues to struggle, to issue a full set of financials, due largely to complications in understanding Eros and its accounting. ¶¶138-42. It was materially misleading to issue financial figures estimating Eros's value when, at the time, ErosSTX was struggling to understand Eros's financials—to the point that ErosSTX could not even put together a statement of cash flows of the company that it just acquired. ¶138. Afterall, projecting cash flows is a required element in assessing whether Eros's intangible assets should be impaired. *See* ¶183 (value in use represents "the present value of the future cash flows . ..") (quoting IAS 36.6).

### 2.   The Circumstances Surrounding Defendants' Statements Strongly Support Scienter

Eros's massive overstatement of its FY 2020 revenue and receivables strongly supports an inference of scienter. ErosSTX's admission that the receivables associated with the $85.5 million in improperly recognized revenue were valued at zero strongly infers that Eros was recognizing worthless revenue—*i.e.*, revenue that was not reasonably certain to be collectable.

At that time, Moody's had already called out Eros's challenges in recovering their receivables balance. ¶109. And Lulla and Parameswaran admitted as such in the 2019 and 2020 20-Fs, explaining that Eros's customer due diligence was not satisfactory, which could result in assigning inappropriate credit limits. ¶¶301, 336, 402, 407. Even so, despite admitting that more work needed to be done to ensure that credit assessments of its customers were appropriately performed, Lulla and Parameswaran assured investors that they concluded "that, the consolidated financial statements included in the [2020] annual report fairly present, in all material respects, the Group's financial position[ and] results of operations." ¶¶301, 336; PP Ex. 1 at 139 (pdf p. 248). Under these circumstances it was, at minimum, extremely reckless to recognize $85.5 million in

48

revenue substantially based on admittedly worthless receivables. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.").

Moreover, had Eros not "improperly recognized" as much as 55% of its 2020 revenue, it would have missed its revenue guidance forecast by miles right on the heels of the credit downgrades, the first massive impairment, and the toxic financing deal (¶¶382-86), which supports scienter. *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (holding that manipulated revenue used to meet quarterly revenue targets suggested scienter). "[A]ccounting manipulations involving premature revenue recognition ... are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

Defendants offer no plausible opposing inferences. Instead, Parameswaran relies on his tired defense that this all somehow took place at Eros's subsidiaries. PP Br. 13-14. Along with all the reasons above as to why this argument carries no weight, ErosSTX admitted that this was Eros's – and not any particular subsidiary's – revenue: "approximately $85.5 million of ***Eros*** pre-merger revenue was not properly recognized in the fiscal year ended March 31, 2020." ¶147; PP Ex. 14 at ex. 99.1, p. 2.

All Defendants likewise respond that the generic desire to meet financial targets cannot support an inference of scienter. PP Br. 8; Eros Br. 24. But the situation at Eros was far from a "generic business motive," Eros's life was on the line and Defendants were motivated to find a life-line (a decision STX surely regrets). In such circumstances, courts have found similar motive allegations supportive of scienter. *See, e.g.*, *Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148,

49

at *20 (D.N.J. Dec. 19, 2017) ("when corporate defendants materially misrepresent the financial status of a company to enable stock-based business acquisitions at the time of the alleged misrepresentations, that alleged motive can give rise to a strong inference of scienter.") (collecting cases); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010) (motive allegations concerning merger "transcend generic corporate desire to negotiate favorable terms"); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (motive to conceal the serious and worsening deterioration of company's financial health supports inference of scienter).

### D.    Other Factors Further Support A Strong Inference Of Scienter

#### 1.    The Individual Defendants' SOX Certifications Support Scienter

Sarbanes-Oxley ("SOX") certifications are meant to ensure corporate executives thoroughly review the information reported in SEC filings so as to present a fair picture of the company. *City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419-20 (D. Del. 2009) ("the SEC interprets 'fair presentation' of financials to include 'any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition.'"). Thus, SOX certifications of financial statements that contain false or misleading information are indicia of scienter. *Urban Outfitters*, 103 F. Supp. 3d at 653 (SOX certifications are "probative of scienter when in conjunction with other evidence of recklessness.").

In signing SOX certifications here,[52] Lulla and Parameswaran knew or recklessly disregarded that Eros's content was impaired and that Eros was overstating its revenues and receivables – areas that should have been disclosed in accordance with SOX requirements to present a fair picture of the Company. Defendants thus "did not fairly present a complete picture of [Eros's] financial condition." *Roseville*, 686 F. Supp. 2d at 419-20. Their failure to do so in

---

[52] ¶¶226-27, 256-57, 302-03, 337-38; Plffs' Ex. A.

contravention of their corporate duty supports scienter.

Defendants argue that the later disclosures of internal control weaknesses and the Audit Committee's investigation weigh against scienter, citing inapt authority. Eros Br. 20-21; PP Br. 15 (same). Unlike in *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, Eros's internal control deficiencies did not stem from unreliable and insufficient financial reporting software, 576 F.3d 172, 177-79, 184 (4th Cir. 2009), and unlike in *Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, Plaintiffs here are not seeking redress from ErosSTX's current management for further GAAP violations made in the midst of undertaking "a massive clean-up of fraud" and after "disclos[ing] the wrongdoing of prior management." 466 F.3d 1, 7 (1st Cir. 2006).[53]

The circumstances of the 2019 and 2020 disclosures of internal control weaknesses and the Audit Committee's investigation enhance the inference of scienter. These internal control weaknesses put Defendants on firm notice of problems with revenue collectability (¶¶301, 336, 402, 407), but even so, Eros overstated its FY 2020 revenue by 55%, and the receivables associated with that revenue were later valued at zero. ¶¶140, 147. Moreover, Eros's 2019 and 2020 disclosures of internal control weaknesses came only *after* the credit actions and Hindenburg Report spotlighted Eros's financial state and internal controls. And after Eros and STX merged, the newly combined company (under new management) struggled to issue a full set of financial statements in the year following the merger, prompting the announcement that more material weaknesses in internal controls were to come. ¶¶138-145. On top of all of that, serious allegations of evidence spoliation arose in response to the Audit Committee investigation. ¶¶391-392, 398-400. All this does not support an inference of good faith, but just the opposite.

---

[53] For this earlier fraud by prior management, Tyco and its auditor settled securities fraud claims for $3.2 billion. *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 256 (D.N.H. 2007).

51

## 2.    Lulla's Stock Sales And The Lulla Family's Lavish Compensation Structure Further Supports An Inference Of Scienter

While the TAC's motive allegations (¶¶372-81) are not one of its primary bases for pleading scienter, they do buttress the conclusion that Lulla acted with scienter under the holistic analysis required by *Tellabs*. Eros was the Lulla family business (¶¶61, 66-72), and Lulla, at the helm, made sure that he and his family were richly compensated – either through stock, jobs, the purchase of film rights, or through co-production deals. ¶¶78-81, 377-81 ($4.49 million cumulative cash compensation to Lulla and $45 million cash to members of the Lulla family during the Class Period). The Lulla family's success was inextricably intertwined with Eros's success.

In addition, from July30, 2018 - July 30, 2019, Lulla offloaded at least 10.7 million shares. ¶¶373-75. Eros Defendants argue that these sales are insufficient because Lulla "owned a significant number of Eros stock towards the end of the putative class period." Eros Br. 21. But even considering this "significant number of shares" held as of July 27, 2020 (over 18.76 million (Eros Br. 21, n. 8.)),[54] Lulla's disposition of 10.7 million shares between July 2018 and July 2019, amounted to a disposal of over 55% of his "significant" shares. The Third Circuit has held that even smaller percentages support scienter. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (31%); *Urban Outfitters*, 103 F. Supp. 3d at 654-55 (individual defendant that continued to hold substantial percentage of stock after sales supported scienter). The Eros Defendants also ignore important contextual factors: the sales took place during the year just before the June 2019 credit downgrades and Eros's first massive content impairment. ¶373.

---

[54] Because Eros did not file SEC Form 4s (which reports changes in beneficial ownership by a company insider), it is not clear when any specific transaction took place, and what percentage of beneficial ownership was sold at the time of the sale. ¶372.

791129.1

### E.    Eros's Corporate Scienter Is Alleged

Defendant Eros is also liable under the doctrine of corporate scienter. ¶¶416-18. While the Third Circuit itself has "neither accepted nor rejected th[e] doctrine [of corporate scienter]," *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018), this Court has applied it here, holding that the liability for statements made by the individual defendants is imputed to Eros. Order at 31, n.7. Defendants do not challenge Plaintiffs' corporate scienter allegations, and even if the Court were to conclude that the Individual Defendants were unaware of the facts that tended to undermine their false and misleading statements—which it should not—Eros itself can and should be held liable for misleading investors. Where false and misleading information regarding Eros's content balances, revenue, receivables, and financial performance was, at a minimum, recklessly disseminated to the market, Eros itself is responsible because "a corporation is liable for statements by employees who have apparent authority to make them." *Avaya*, 564 F.3d at 251-52.

## VI.    THE TAC ALLEGES LOSS CAUSATION

"Loss causation is a causal connection between the material misrepresentation or omission and the loss suffered." *Urban Outfitters*, 103 F. Supp. 3d at 655. Loss causation is not subject to any heightened pleading requirements. Instead, under Rule 8(a), all that is required is that a plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); Order at 32. "Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014). The requisite causal connection can be pled by alleging (i) a corrective disclosure or (ii) "the materialization of a concealed risk" that causes a stock price decline. *Id*. Under either approach, "the exposure of the

53

alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series of partial corrective disclosures." *Urban Outfitters*, 103 F. Supp. 3d at 655-56.[55]

Here, the TAC pleads a series of partial corrective disclosures and/or materializations of risk spanning from June 5, 2019 to August 3, 2021, through which truths about Eros's financial condition was revealed. Each of these partial disclosures/materializations of risk was accompanied by a precipitous fall in Eros's stock price. ¶¶348-369. In its prior decision, the Court found that each of Plaintiffs' previously pled loss causation dates (June 5, 2019, June 6, 2019, June 7, 2019, June 11, 2019, June 26, 2019, July 15, 2019, and September 26, 2019) was sufficiently alleged as to alleged misrepresentations concerning the CARE downgrade and the misrepresentations about Eros's financial profile. Order at 32-33.

However, the Court found that Plaintiffs failed to plead allegations demonstrating that there was any corrective statement on the market after the two statements obscuring the reasons for Moody's withdrawal. *Id.* at 33-34; *see also* Eros Br. 37, n. 11 (relying on the Order's reasoning). Plaintiffs make clear in their TAC that not only were these statements false, but that they also gave the materially misleading impression that Moody's withdrawal was clerical and thus that Eros's financial position and liquidity were better off than they were. ¶¶289, 290, 293. The later announcements, including the September 26, 2019 announcement of Eros's toxic financing to secure $25 million in needed funds (¶363), served as partial corrective disclosures and/or materializations of the previously concealed risks, each revealing a little more of the truth

---

[55] *See also De Vito v. Liquid Holdings Grp., Inc*., 2018 WL 6891832, at *39, n.37 (D.N.J. Dec. 31, 2018) ("The ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.").

791129.1

concerning the extent of Eros's liquidity problems and the precarious nature of Eros's finances.

In their Motions, Defendants do not challenge any of the loss causation dates previously alleged, and thus concede that Plaintiffs sufficiently alleged loss causation for these dates. Instead, the Eros Defendants challenge the sufficiency of the two new loss causation dates: July 30, 2020 and August 3, 2021. Eros Br. 27-28.

**July 30, 2020**: On July 30, 2020, Eros announced its financial results for FY 2020, and as part of these results, revealed that it had impaired its intangible content by another $431.2 million. ¶365. In response, Eros's shares fell $0.69 per share, or 18.16%, on unusually heavy volume.¶366. In challenging this loss causation event, Eros Defendants claim that "disclosure of disappointing earnings or other indications of the 'true financial condition' of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure." Eros Br. 27 (quoting *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *24 (E.D. Pa. Sept. 3, 2010)). Whereas in *DVI* the court found, ***at summary judgment***, that certain announcements stating that the company expected, and later reported, a loss for the financial period, standing alone, did not relate to the alleged misrepresentations, here Plaintiffs clearly allege that the July 30, 2020 drop was linked to the fraud—*i.e.*, that Defendants had grossly inflated the value of Eros's core asset. At the pleading stage, nothing more is required. *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 512–13 (W.D. Pa. 2002); *see also, e.g.*, *Wilmington*, 29 F. Supp. 3d at 450 (alleged corrective disclosures, including announcement of large quarterly loss, sufficient to allege loss causation).

**August 3, 2021**: On August 3, 2021, Eros announced that: (1) it would be unable to timely file its FY 2021 financial results; (2) the Audit Committee was conducting a formal internal review of Eros's accounting practices and internal controls; (3) ErosSTX violated certain debt covenants under various debt arrangements amounting to approximately $242 million in debt maturing within

55

one year; (4) significant revenue from Eros may not have been appropriately recognized in FY 2020 and a significant portion of the receivables associated with such revenue was valued at zero; and (5) substantially all of the intangible assets and goodwill reflected in the Company's March 31, 2021 Form 6-K were likely to be impaired. ¶¶367-68. In response to this news, Eros's shares fell $0.19, or almost 18% on August 4, 2021, and continued to fall another $0.17, almost 20%, on August 5, 2021, all on extremely heavy trading volume. ¶369.

Despite the multitude of clearly fraud-related news further revealing the depth of Eros's strained financials, the Eros Defendants hone in on the Audit Committee investigation, arguing that this is insufficient to plead loss causation. Eros Br. 27-28. But courts in this District have found the opposite. *See, e.g.*, *China Zenix Auto*, 2020 WL 3169506, at *12 ("disclosures of investigations of potential wrongdoing have been found sufficient for a showing of loss causation"); *Hull*, 2017 WL 6493148, at *15 (collecting cases and noting that various courts have held that the announcement of an SEC investigation was sufficient to meet the pleading requirement for loss causation, and further commenting that a corrective disclosure need not "take any particular format"). Defendants cannot defeat loss causation by ignoring the content of their own announcement.[56]

## VII.    THE TAC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

To state a claim under §20(a), a plaintiff must allege (1) an underlying violation of §10(b), and (2) that the defendants controlled the person or entity that committed the underlying violation.

---

[56] *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), cited at Eros Br. 28, is unavailing. Eros's post-Class Period disclosure on August 25, 2021 offered determinations from the Audit Committee's investigation. ¶147. This is sufficient to plead loss causation under the Ninth Circuit's limitation of *Loos* in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016) (although an "the announcement of an investigation...standing alone" does not qualify as a corrective disclosure, it "can form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant.").

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 623 (D.N.J. 2001). As the Eros Defendants acknowledge, the Third Circuit has declined to resolve the divide among district courts on whether there is also a requirement to plead "culpable participation." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 485 n.20 (3d Cir. 2013). "[C]ontrol person claims need not be pleaded with particularity so long as the underlying Section 10(b) violation is properly pled." *Toronto-Dominion Bank*, 2018 WL 6381882, at *20.

As discussed above, the TAC alleges a primary violation of §10(b). Parameswaran contends Plaintiffs do not adequately allege his control, based on his same faulty premise that the fraud took place only at EIML and that his executive status is not sufficient. PP Br. 24-25. But for pleading purposes, an individual defendant's position as a high ranking officer is enough to allege control. *See, e.g.*, *Cognizant*, 2018 WL 3772675, at *35 (cited at PP Br. 24); *Toronto-Dominion Bank*, 2018 WL 6381882, at *21. Each of the Individual Defendants signed one or more public filings during the Class Period, thereby "accepting responsibility for its contents." *Steamfitters Local 499 Pension Fund v. Alter*, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011). This places the Individual Defendants within the meaning of "controlling persons" under §20(a). *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *28 (D.N.J. Mar. 24, 2008).

The Individual Defendants also insist that the "culpable participation" allegations fall short. Eros. Br. 29-30; PP Br. 24-25. Assuming that culpable participation is required, the Individual Defendants demand too much. *See Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1013 (D.N.J. 1996) (plaintiff "need only plead circumstances establishing control because: (1) the facts establishing culpable participation can only be expected to emerge after discovery; and (2) virtually all of the remaining evidence, should it exist, is usually within the defendants' control"); *Toronto-Dominion Bank*, 2018 WL 6381882, at *21 (same). In fact, the case

57

791129.1

on which Warren and Lulla rely examines whether the district court appropriately granted *summary judgment* on the basis that there was no *evidence* of culpable participation. Eros Br. 29-30 (discussing *Belmont*, 708 F.3d at 484-85). District courts that have required "culpable participation" at the pleading stage have found that a finding of scienter also supports a finding of culpable participation. *Cognizant*, 2018 WL 3772675, at *35; *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *9 (D. Del. Feb. 7, 2020).

## VIII.  CONCLUSION

For all the reasons stated herein, Plaintiffs request that the Court deny Defendants' Motions in their entirety.

791129.1

DATED: April 15, 2022                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

By:  *s/ James E. Cecchi*
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: jcecchi@carellabyrne.com

*Liaison Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke
Leanne H. Solish
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs*

59

791129.1